**In The Matter Of:**

*EUREKA COLE v.*
*CARNIVAL CORPORATION*

*VIKRAM THAPA*
*November 3, 2023*
*ORIGINAL TRANSCRIPT*

*CourtScribes, Inc.*
*"Delivering More For Less"*
*(833) 727-4237*
*info@courtscribes.com*
*www.courtscribes.com*

**ORIGINAL TRANSCRIPT**

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.:  23-CV-60532-RAR

EUREKA COLE,

      PLAINTIFF,

  V.

CARNIVAL CORPORATION,

      DEFENDANT.

_____

     VIDEOTAPED DEPOSITION OF VIKRAM THAPA

DATE:          NOVEMBER 3, 2023

REPORTER:      PAMELA ABUCHAIBE

PLACE:         ZOOM VIDEOCONFERENCE

**ORIGINAL TRANSCRIPT**

2

APPEARANCES


ON BEHALF OF PLAINTIFF:

RAYMOND R. DIEPPA, ESQUIRE

FLORIDA LEGAL, LLC

150 SOUTHEAST 2ND AVENUE, SUITE 1001

MIAMI, FLORIDA 33131

TELEPHONE:  (305) 901-2209

EMAIL:  RAY.DIEPPA@FLORIDALEGAL.LAW


ON BEHALF OF DEFENDANT:

W. COOPER JARNAGIN, ESQUIRE

GRAYROBINSON, P.A.

515 NORTH FLAGLER DRIVE, SUITE 650

WEST PALM BEACH, FLORIDA 33401

TELEPHONE:  (561) 268-5727

EMAIL:  COOPER.JARNAGIN@GRAY-ROBINSON.COM

**ORIGINAL TRANSCRIPT**

INDEX

                                                        Page

     PROCEEDINGS                                          5

     DIRECT EXAMINATION BY MR. DIEPPA                     5

     CROSS EXAMINATION BY MR. JARNAGIN                   36


                         EXHIBITS

Exhibit                                                 Page

PLAINTIFF

1          DIAGRAM OF THE LIDO DECK                      12

2          PASSENGER INJURY STATEMENT                    19


DEFENSE

1          PHOTOGRAPH DEPICTING COVER ON SCALE           37

## ORIGINAL TRANSCRIPT

4

STIPULATION

THE VIDEOTAPED DEPOSITION OF VIKRAM THAPA TAKEN VIA REMOTE ZOOM CONFERENCE ON FRIDAY THE 3RD DAY OF NOVEMBER 2023 AT APPROXIMATELY 10:58 A.M.; SAID DEPOSITION WAS TAKEN PURSUANT TO THE FLORIDA RULES OF CIVIL PROCEDURE.

IT IS AGREED THAT PAMELA ABUCHAIBE, BEING A NOTARY PUBLIC AND COURT REPORTER FOR THE STATE OF FLORIDA, MAY SWEAR THE WITNESS AND THAT THE READING AND SIGNING OF THE COMPLETED TRANSCRIPT IS NOT WAIVED.

## ORIGINAL TRANSCRIPT

5

PROCEEDINGS

COURT REPORTER:  Good morning.  The time is 10:58 a.m., and we are on record.  We are here today, November 3, 2023, by remote appearance for the purpose of recording the video Zoom deposition of Vikram Thapa in the matter of Eureka Cole versus Carnival Corporation, Case Number 23-cv-60532-RAR in the United States District Court, Southern District of Florida, Miami Division.  Will counsel please state their appearance for the record?

MR. DIEPPA:  Raymond Dieppa, here for the plaintiff Eureka Cole.

MR. JARNAGIN:  And Cooper Jarnagin on behalf of defendant Carnival Corporation.

COURT REPORTER:  Thank you.  Mr. Thapa, please raise your right hand.

Do you, Vikram Thapa, swear or affirm to tell the truth, the whole truth and nothing but the truth, so help you God?

MR. THAPA:  I do.

COURT REPORTER:  Thank you.  Counsel, you may begin.

DIRECT EXAMINATION

BY MR. DIEPPA:

Q    Good morning, sir.  Could you please state

6

your full name?

A    So my name is Vikram Thapa.

Q    Okay.  And where are you currently located?

A    I'm working with Carnival.  I'm working with Carnival.  At present, I'm working in Carnival Magic, and we are at sea right now.  We are heading towards Miami.

Q    Okay.  And what's your current job title with Carnival?

A    So I'm working as assistant chief security officer.

Q    Okay.  And on the date of the incident we're here about today, July 24, 2022, what was your job title?

A    I was the same job title, sir, assistant chief security officer.

Q    Okay.  And do you recall the name of the ship you were assigned to on July 24, 2022?

A    Carnival Conquest.

Q    Okay.  And what were your job duties there?

A    Sir, I'm a supervisor.  Like, I report to chief security officer.  I handle a team of security officers onboard.  We make sure that all the guests and crew are safe, and I supervise my team.

Q    Do you have access -- okay.  Do you have

7

access to the security cameras onboard?

A    Yes, sir.

Q    Okay.  For the Carnival Conquest, do you recall how many security cameras were onboard the ship?

A    Carnival Conquest, I believe 79, if I remember, because it's been, like, long time I've been there.  So I don't necessarily recall.

Q    Okay.  And for the Lido deck of the ship, are there cameras that are located on the Lido deck?

A    At seven places, there are cameras.

Q    Do you recall what those places are?

A    I don't really recall.

Q    Okay.  But there are cameras on the Lido deck of the ship, correct?

A    Not everywhere.

Q    There are multiple cameras on the Lido deck of the ship, sir?

A    Sir, that's what I said.  Like, I don't really recall where exactly the location of the cameras are, but not everywhere the cameras are located.

Q    Sir, I'll repeat my question.  I didn't ask you if the cameras were everywhere.  I asked you if there are multiple cameras on the Lido deck of the

8

ship.

A    Yes, I think so.  There are multiple cameras.

Q    And you, as the security officer, have access to those cameras.  Can you explain to me how you would be able to access those cameras?

A    If -- like, we have the cameras, CCTV system in the office.  So if we have to review the camera, we can review.  We have access to that.

Q    Okay.  And where is that office located on the ship?

A    On Conquest, it is on deck three.

Q    Okay.  And in addition to accessing the cameras, do the cameras and the camera system have the ability to record video?

A    Yes, sir.

Q    Okay.  How is the video recorded?

A    It is recorded for 30 days.

Q    Okay.  And what happens after 30 days?

A    Actually, there is a hard drive, so it just gets stored.  And then after that, it gets deleted automatically.

Q    Okay.  So if it's not retrieved by an employee or a security personnel within 30 days, then it would be overwritten and erased?

9

A    So 30 days is the limited time.  I mean, for 30 days, the cameras are recording the videos.

Q    Yes.  What I'm saying is if -- do you have a procedure to download footage after an incident occurs so that it is not erased after 30 days?

A    Sir, if there's any incident occurs and it is covered by CCTV, we do save the videos.

Q    Okay.  So what procedure do you follow?  How do you do that?

A    We just -- like, we just download the video. I mean, there's no certain procedure.  I mean, if we have to download -- say, for example, there's an incident happened yesterday and we are investigating it, we just download it on the same day or the other day happen.

Q    Okay.  When you say, we download it, do you mean the security officers?

A    No, it's we, as in assistant chief security or chief security.

Q    That's what I'm trying to understand. Security personnel, those are the personnel who have the responsibility to download the video if the incident is picked up on video.

A    Sir, that is the assistant chief security or chief security who downloads the videos.

**ORIGINAL TRANSCRIPT**

10

Q    Okay.  So that would have been you on the date of this incident, right, on July 24, 2022?

A    If there would be a CCTV.

Q    Okay.  Would that have been you, in  this case, the person that would have been responsible for reviewing the CCTV cameras?

A    Yes, sir.  If I'm investigating an incident, then I would be the one who would be downloading the video.

Q    Okay.  This incident we're here about today involving the injury Ms. Eureka Cole reported on the Lido deck, you were informed of this incident on the date that it occurred?

A    Sir, yes, I believe.

Q    Okay.

A    I don't remember correct because it's been almost a year.

Q    Your name was provided as the security officer that responded to this incident.  You don't disagree, right?

A    Yes, sir.

Q    Okay.

A    I don't disagree.

Q    Okay.  So tell me, at any point after being informed of this incident involving Ms. Eureka Cole,

11

did you go and review the available CCTV footage from the cameras that were present on the Lido deck?

A    Sir, the incident that happened, it happened on the Lido deck and there are no CCTV cameras in that location.

Q    That was not my question, sir.  My question was, at any point, did you go and review the available CCTV footage from the cameras on the Lido deck in regards to this incident?  Did you ever do that?

A    Sir, because there is no CCTV, so there's no point recording -- I mean, no point downloading the video.

Q    Okay.  You keep telling there's no CCTV cameras.  But you did say there's CCTV cameras on the Lido deck, correct?

A    Sir, Lido deck is quite big, right?  So there are different parts of Lido deck, forward, midship, aft, right.  So this incident happened in the aft.  So in the aft, there is no cameras, no CCTV cameras.

Q    Sir, you're not understanding my question.

A    Uh-huh.

Q    I'm not asking where you believe there's cameras.

A    Uh-huh.

**ORIGINAL TRANSCRIPT**

12

Q    I'm asking you very simply --

A    Uh-huh.

Q    -- in this case, when you were informed of Ms. Eureka Cole's incident on July 24, 2022, did you make any attempt at all to review the CCTV footage from any cameras on the Lido deck, yes or no?

A    Sir, I did not because there is no CCTV camera in there.

Q    Okay.

A    That's the reason because --

Q    Do you -- I mean -- and okay, I'll ask you that.  Can you tell me, looking at a diagram of the Lido deck, where the cameras are located?

A    I don't recall, sir, sorry.

Q    Okay.  So if you don't recall, then how is it that you would know for certain there were no cameras that picked up any portion of this incident?

A    Sir, because on there we used to review the cameras, like, every time.  Every day we would review the cameras, the cameras are working or not.  So we know that there is no cameras on Lido deck aft.

MR. DIEPPA:  Okay.  Well, I'm going to show you what we'll mark as Exhibit 1.

(PLAINTIFF EXHIBIT 1 WAS MARKED FOR IDENTIFICATION.)

13

BY MR. DIEPPA:

Q    It's a diagram of the Lido deck, and you can tell me where you believe the cameras on the Lido are located.  Can you please inform me where the cameras on the Lido deck are located and how that made you certain that no part of this incident was picked up on the camera?

A    Sir, I really don't remember what part of the -- exactly.  I don't want to give you wrong information, right?  So that's the reason.  Like, but I do remember that, at the back of the ship, there are no cameras.

I don't -- I really don't remember where exactly I can -- because I don't want -- that's why I said, like, I don't to give you wrong information and say that, okay.  At this point, there is -- there are cameras, right.  Because it's been almost a year I have working in that class of ship.

Q    There is a schematic which would show you where the cameras are located, isn't there?

A    Sir, nothing in here.  I mean, there's just a deck plan and --

Q    Oh, I understand.  I'm just saying that you're aware that Carnival does keep track of the location of the cameras on its ship.  Usually there's

**ORIGINAL TRANSCRIPT**

14

a diagram and, obviously, on the camera system itself, the cameras are labeled.  Correct?

A   Sir, I don't remember if Conquest has that. But we do have a list of the cameras, like, where all the cameras are.  Because all ships have those, you know, because we maintain a log of cameras.  I mean, yeah.

Q   Okay.  So you're aware, in this case, that the plaintiff, Ms. Eureka Cole, she walked to the Lido deck and then, after she was injured, she made her way down to the infirmary.  You're aware of that.

MR. JARNAGIN:  Objection, form.

THE WITNESS:  I think so.  I mean, I think, yeah, she might have gone to the medical center.

BY MR. DIEPPA:

Q   Okay.  Is it your testimony today that, from all the way entering and approaching the Lido deck, through the dining area and all the way down to the ship's infirmary, there are no cameras?

A   There are cameras, sir.  That's what I said.

Q   Okay.

A   But I am not really sure of where the cameras would be, sir.

Q   Well, you never checked to see if any part of this incident, from Ms. Cole's approach and

15

entrance onto the Lido deck all the way to her walking down to the ship's infirmary, were picked up on camera because you never reviewed or attempted to review any of the ship's cameras in relation to this incident. Correct?

A    Sir, let me just interrupt you.  This is how we deal with an incident.  Like, you know, if there is any kind of incident on certain location, right -- say, for example, if I take the example of this accident, if the accident happened at the aft of the ship, we would investigate only the location, right, because there is like -- there is no point reviewing the camera in between to say that the incident happened on the Lido deck aft.  If it would have happened in the restaurant area, then we -- if there is a camera, then we would have definitely reviewed the camera.

Q    Okay.

A    But if it happens in a specific location, we just investigate that area, not the whole ship.  So that's the reason I did not review the camera for other locations.

Q    Okay.  Sir, I -- today, I only want you tell me what's within your personal knowledge.

A    Yes, sir.

16

Q    I don't want you to speculate.

A    Uh-huh.

Q    So in this case, you did not review any footage.

A    I did not.

Q    Okay.  So you would not know what would have been picked up on a camera or not been picked up on a camera because, even though you could have gone and reviewed the camera footage, you did not.

MR. JARNAGIN:  Objection, form.

THE WITNESS:  Sir, the area that happened -- the accident happened, there is no camera that focuses on that particular location.

BY MR. DIEPPA:

Q    Where do the cameras focus then?

A    Sorry?  I don't remember.

Q    Okay.  So if you don't remember --

A    What I remember is, because --

Q    Sir, sir, one moment.  One moment, sir. Sir, this is a deposition, and you're under oath. It's got to be one or the other.

A    Uh-huh.

Q    So if you're telling me you don't remember where the cameras are, that's fine.  But if you don't remember where the cameras are, I have to assume that

17

you don't know for sure if a camera would have picked up this incident or not, because I have asked you repeatedly at this time where the cameras would have been located.  And you told me you don't know.  Do you understand?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  Sir, it's been almost a year I have worked in that ship, right?

MR. DIEPPA:  That's okay.

THE WITNESS:  And the incident happened, it's almost a year, more than a year, I would say.  So it is very difficult to remember what are the exact location of the camera and where they focus.  But I do remember, when I investigated this case, there was no camera that was focusing on the said location.

BY MR. DIEPPA:

Q    You don't know, you don't know, because you can't tell me where that camera was or wasn't.

A    Sorry?

Q    Once again, if you do know where the cameras are located, please tell me by referring to Exhibit 1, the diagram of the Lido deck.  If you don't know where the cameras are, please confirm that.

A    I don't recall, sir.

Q    Okay.  And we can also agree, because of the

18

way the security system works, that on that date, as far as you know, the security system in regards to the cameras, that surveillance system was working.  It wasn't malfunctioning that day, at least as far as you know, correct?

A    Yes, sir.

Q    Okay.  And if that system is working and functioning, any footage that would have been recorded on the date of this incident, on July 24, 2022, that footage has now been completely erased because it's been more than 30 days since July 24, 2022.

A    Yeah, it's been a year, almost a year.  More than a year, yeah.

Q    Okay.  All right.  Did you witness yourself any portion of this incident?

A    I did not.

Q    Okay.  How long --

A    I just investigated.

Q    Okay.  Who notified you as to this incident?

A    The nurse.

Q    Okay.  Do you recall her name?

A    The nurse -- yeah, the nurse called.  And then I went to the medical center, and I spoke to the guest.

Q    Did you ask the guest, Ms. Cole, to fill out

any paperwork or an incident report of any type?

A    She did fill up a passenger injury statement.

Q    Okay.  Did she do that in your presence?

A    Yes, sir.

Q    Okay.  So you were notified of this incident by one of the nurses, probably Nurse Ng (ph), in the ship's infirmary.  And then when you responded to the incident, you responded to the ship's infirmary.

A    Yes, sir.

MR. DIEPPA: Now, looking at Exhibit 2 here, is this the passenger injury statement that Ms. Cole completed in front of you?

THE WITNESS:  Yes, sir.

(PLAINTIFF EXHIBIT 2 WAS MARKED FOR IDENTIFICATION.)

BY MR. DIEPPA:

Q    Okay.  And so at that time, you asked her to prepare the incident report.  She would have been required to fill this out in her own handwriting?

A    Yes, sir.

Q    Okay.  And she reported to you, when you spoke to her at the infirmary, that she had a hard pain in her left shoulder?

A    She said, yeah, she's got a pain, yeah.

20

Q    Okay.  And she explained to you what happened?

A    Yes, sir.

Q    In words her words, she stated to you and she wrote down in the report, "I was eating.  Some stack of containers hit me in the back of my left shoulder as the wind was blowing."  That's what she told you?

A    Yes, sir.

Q    Okay.  Subsequent to her filling out this report, did you have any further conversation with Ms. Cole?

A    Then after that, me and the guest, we went up to the Lido deck where she showed me the location, and she showed me the cover of the Lexan which hit her.

Q    Okay.  And was that a Lexan, those plastic containers, were those still present on the Lido deck?

A    Yeah, at that time, that was present, the Lexan with the cover.

Q    Okay.  And was the wind still blowing as she said?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  She said --

MR. DIEPPA:  Go ahead.

**ORIGINAL TRANSCRIPT**

21

THE WITNESS:  Yeah, she said that the wind was blowing.  But when we went, there wasn't no wind blowing.

BY MR. DIEPPA:

Q    Was -- there was no wind at all?

A    No wind.

Q    Okay.  Do you know what the wind was like when the incident happened?

A    Sir, we do have the ship position request, and it's mentioned in there.

Q    I'm sorry, could you repeat that?  You do have the what?

A    The position request for the ship, which gives all the details of the weather and how was the breeze.

Q    Did you have the opportunity to review that?

A    Yes, sir, I have attached with my report.

Q    Okay.  And what did it indicate to you was the wind?

A    Sir, I haven't seen it.  I mean, I don't remember because that's what I said.  I haven't seen this document long time it's been -- I have been dealing with a lot of incidents so, if you have it with you, I mean --

Q    Was this the first time that you were

22

required to respond to an incident where something had fallen and hit a passenger?

A Sir, this -- I -- to be honest, yes. This is the first time I dealt with this kind of situation.

Q Okay. So in your career before July 24, 2022, you have -- you had never responded to an incident where anything -- any object, fell and struck a passenger?

A No.

Q Okay. You have never responded to any incident where ship conditions caused something to fall over and injure a passenger. You have never done that?

A No, sir.

Q Okay. And we could your prior incident reports to verify that?

A Yes, sir, please.

Q Okay. Have you ever been on a ship where it's windy before?

A Yes, sir.

Q Okay. How often?

A Multiple times.

Q Okay. Do you -- does your ship, the Carnival Conquest, your ship at this time, did it have protocols in place for securing items when the ship

23

was experiencing high wind conditions?

A   Sir, all departments has their own responsibility to secure their items.  So that's how it works.  Like, if it is too windy, I mean, every department has their own responsibility to secure their own items, sir.

Q   Okay.  So I interpret as, yes, there are procedures for each respective department to secure items when winds are high or conditions are rough.

A   Yeah, if the ship is -- yeah, there are.

Q   Okay.  And would that include the -- I guess, the dining department or the restaurant department of the ship?  Do they also have those protocols and procedures in place that they need to secure items if the winds are high or the conditions are bad on the ship?

A   Sir, I am really sorry, but I don't know about the food ops because I take care of security. So they have their own procedures and what all they have to secure.

Q   Okay.  So tell me about the procedures that you're familiar with.

A   Sir, if there is high winds or the ship is rocking, then we secure our security equipment.  So this is what I know on (inaudible).

**ORIGINAL TRANSCRIPT**

24

Q    And how do you secure them?

A    We just tie it to a certain place, our walk-through metal detectors --

Q    Okay.  So you --

A    -- and x-ray machines.  So we just tie them.

Q    Did the Carnival Conquest have a cargo securing manual that you're aware of?

A    I'm sorry, I don't have that, sir.  I don't know.  I'm not aware of it.

Q    Okay.  But at least as far as your department was concerned, you did have procedures in place to secure items in the event of high winds.

A    Our department, yes.  I mean, if the ship is rocking, yeah, we do.  We do secure our walk-through metal detectors and the x-ray machines.

Q    Okay.  And has -- as far as you know, has that procedure been in place since you began working at the Carnival Conquest?

A    Yes, sir, we always secure our equipment.

Q    And on the date of this incident, July 24, 2022, how many years had you been working for Carnival Cruise Lines?

A    Sir, I started my career 2009, as security officer, and then I got promoted in 2017 so --

Q    Okay.  And as far as you know, that

25

procedure has been in place since you have been working at Carnival Cruise Line, that if winds are high, at least in your department, items need to be tied down to keep them from falling over or moving about the ship.

A    If the winds are high and if the bridge suggest us, then we do.

Q    Okay.  So the bridge -- when you mean the bridge, you mean the captain?

A    Captain, staff captain, the navigation bridge, yeah.  Because they are the one who monitor the winds and everything.  So they just let us know if there would be high winds, and the ship would be rocking, so for sure.

Q    Okay.  So when you went back up to the Lido deck with Ms. Cole, did she show you the containers which struck her?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  The cover.

MR. DIEPPA:  Say again.

THE WITNESS:  The cover, cover of the Lexan.

BY MR. DIEPPA:

Q    The cover of the Lexan is what she said?

A    Uh-huh.

Q    Did you -- when you got there, were any of

**ORIGINAL TRANSCRIPT**

26

the containers on the floor?

A    I'm sorry?

Q    When you got --

A    There was -- there was this cover, and the Lexan was there, and it was covered with the cover item.

Q    Sir, when you arrived at the scene, were any of the containers on the floor?

A    Floor -- no, the weren't -- they weren't in the floor.

Q    Had they been picked up already?

A    They were on the walls.  Sir, I have no idea whether (ph) --

Q    Okay.  Other than Ms. Cole, did you investigate the incident further?

A    So there was a witness.  What she said was guest, but she never mentioned who were the guest because they're almost 3,000 guests onboard.  So I did ask her who is the witness.  So she said some guest. She doesn't know.

Q    I mean she also identified her husband as well as a witness, didn't she?

A    Sir, she just said that the husband was sitting next to her.  Like, she -- he was nearby so --

Q    Did you speak to him?

**ORIGINAL TRANSCRIPT**

27

A    He was there.

Q    Okay.  Did he tell you the same thing?

A    Yeah, if I remember.

Q    Did you speak to any of the other employees that may have been involved in the incident?

A    Sir, if any incident happens in certain area, so we usually take the department representative, a supervisor, to check the area, how it is.  So this is what it is.  So it was food ops, so I just went with the food ops I remember, assistant food ops manager or something.  So we went and we checked the location, what was the condition.  This is what happened.

Q    Who was it that you spoke to?

A    Sorry?

Q    What was the name of the person you spoke to?

A    I am sorry, I don't recall the name, sir.

Q    All right.  Do you recall what that person told you?

A    Nothing, she just -- we just came.  She was a female, if I remember.  We just went.  We saw the area, and the Lexan and the cover were on, like, you know, on the -- on the workstation.  That is the way it is.

28

Q   So she didn't tell you anything, this person?

A   No, I don't remember.

Q   Did you conduct any further investigation to see whether or not any of the employees that were working in this area of the Lido deck had information about how this incident occurred?

A   Sir, I tried to find out, but there was no witness.  I mean, because there was no one working at that time at that location so there was no witness.

Q   There was no -- there was nobody serving food on the Lidoo deck at that time?

A   So Lido deck aft is -- usually, they serve food in the restaurant.  Even there is, like, buffet. The waiters are usually in the restaurant area.  This is the Lido deck aft.  So aft usually they don't have much waiters or team members working there.

Q   So you did not speak to any other individuals working for Carnival that may have been involved in this incident.

A   Nobody approached me, and nobody informed me that they witnessed or anything like that, so I did not.

Q   Did you take any photographs of the area?

A   I did, sir.

ORIGINAL TRANSCRIPT

29

Q    Okay.  How many photographs did you take?

A    I don't remember, five or six, maybe.

Q    Okay.  And when did you take those photographs?

A    The other day.  No, on the same day, I think.  No, really, I'm sorry.  I don't remember.  I'm sorry about that, sir.  I really don't recall.

Q    Okay.  And when you took those photographs, was it in the presence of Ms. Cole?

A    No, we don't -- no, I don't think so, sir. I don't remember.  Sorry about that, sir.  I really don't remember if I took it front of her or on her absence.

Q    Did you do anything further to investigate this incident?

A    Yes, I did measure the weight of the Lexan cover, and I got its dimension, too.

Q    Okay.  And where did you weigh the Lexan cover?

A    Security office.

Q    Do you still have the Lexan cover with you?

A    I don't think so, sir.  I mean, I don't remember if they still have it because I'm not on that ship now.

Q    How much did it weigh?

ORIGINAL TRANSCRIPT

30

A    It weighed somewhere around 87 grams, approximately something or something.

Q    Did you weigh the entire container?

A    Not the entire container, sir, just the cover.

Q    You don't know how much -- okay.  You don't how much the entire container weighs?

A    No, sir, because she said that it was the cover that hit her.  So that's the reason I weighed just the cover.

Q    Okay.  Did you do any further investigation? I mean, as to how fast the cover was moving or anything like that?

A    No, sir.  I mean, what do you mean, like, how fast the cover was?  I didn't get your question, sir, sorry.  Can you repeat that?

Q    Yeah, I mean, other than placing the cover on a scale, did you do anything further to investigate the incident?

A    I measured the dimension of the cover.

Q    And what dimension was it?

A    I don't remember, sir.  No, I -- 18 inches, I don't remember exactly.

Q    And the cover that you weighed, was it the same cover that hit her, Ms. Cole?

**ORIGINAL TRANSCRIPT**

31

A    Yes, sir.  I mean, same cover -- I mean, it's the same kind of cover that we have onboard, so same kind of Lexan.

Q    Okay.  So it wasn't -- it wasn't the same one.  You're saying it was the same kind, you believe.

A    Same -- it's the same thing, same cover.

Q    All right.  My question is very specific.

A    Because -- because she was -- she was not sure which cover flew.

Q    Okay.

A    So she said one of the covers.  So how would I know?

Q    Sir, please answer my question.  I asked you if you weighed the same cover as the one that was involved in the incident.  Did you?

A    I don't -- I don't know.  I don't remember because she did not mention me which cover hit her because she, herself, didn't know which cover hit her. So -- but she said one of the cover, right, so I have to weigh it, and I have to take the dimension of that cover so --

Q    How long after the incident did you conduct this experiment where you weighed the cover?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  I don't remember.  Maybe the

**ORIGINAL TRANSCRIPT**

32

same time I might have taken the -- I don't recall.

BY MR. DIEPPA:

Q And what kind of scale did you use? I mean, where did you get the scale?

A We have a weighing scale in the office.

Q Okay. Is -- I mean, what's that scale usually used for?

A That scale? We use it to measure, like, anything if we have any kind of, you know, incident that happens where if it is a light object. So we weigh it or any other incident, like, security related incident.

Q Were you the one responsible for calibrating and maintaining that scale?

A Sir, we don't need to calibrate that, but we do maintain it. I mean, we make sure that the batteries are all intact.

Q I mean, is it a -- is, like, a digital scale?

A It is a digital scale, sir.

Q Okay. Do you have any qualifications in biomechanics or accident reconstruction of any type?

A Sir, like I said, I have been working with Carnival since 2009, and I am working as assistant chief security as -- since 2017. So we have been

**ORIGINAL TRANSCRIPT**

33

trained by our chief security police.  So during the on job training, so that is what it is.

Q    My question was, do you have any training in biomechanics or accident reconstruction, any formal training, sir?

A    No, sir.  No, I don't have.

Q    Okay.  What's your highest level of education, formal education?

A    I'm a graduate.

Q    Graduate of what?

A    Bidat (ph).

Q    Is that, like, a bachelor's degree?

A    Yes, sir.

Q    Okay.  In what field?

A    English history and sociology.

Q    After -- so just want to be clear.  Where abouts of the lid that you weighed, you're not sure of the whereabouts of that lid.

A    So because the guest doesn't know which lid was it.  So she just pointed out it was that lid.  So we just picked it up -- picked up, and we weighed it.

Q    Okay.

A    We did the investigation.

Q    As we sit here today, the lid that you weighed, that lid that you weighed and you took a

34

photo of --

A    The one that you pointed.

Q    Do you know where that is?

A    I have no idea, sir.

Q    Okay.  So we would not be able --

A    Because I don't, sorry.

Q    Excuse me.  So we would not be able to go and duplicate your experiment.  We would not be able to get the same lid that you weighed and weigh it ourselves because we're not sure where that lid is right now.

MR. JARNAGIN:  Objection, form.

THE WITNESS:  Sir, maybe if you go to the ship, you might get the -- if you see the Lexan there and you have the measurement, you can just see if the same lid is there.  I mean, you know, you can get the same measurement of the lid, and it would be the same one because there are -- around the ship, there are multiple Lexans and multiple lids.

BY MR. DIEPPA:

Q    So is it that --

A    So I'm not sure if that particular lid we still have it or not.  I mean --

Q    Uh-huh.  Sir, this is a very straightforward question.  You took -- you didn't weigh more than one

**ORIGINAL TRANSCRIPT**

35

lid.  You weighed one plastic lid, correct?

A     The one that the guest pointed towards me, sir.

Q     Okay.  And you physically took that lid, and you placed it on a scale in your office.  Correct?

A     Yes, sir.

Q     Okay.  That lid, you don't know where it is, as we sit here today?

A     No.

Q     After weighing the lid, did you do anything else to further investigate this incident?

A     No, sir.

Q     Did you ever speak to Ms. Cole after your initial conversation with her?

A     No, sir.

Q     Okay.  Did you ever view the ship physician's report regarding Ms. Cole's injury?

A     Sorry?

Q     I'm sorry, the -- yeah, did you ever review the ship's infirmary report regarding Ms. Cole's injury?

A     Sir, we don't review the ship physician because that is confidential so --

Q     Did you ever review any other records regarding Ms. Cole's injury on the date of this

36

accident, 7/24/2022?

A    No, sir.

Q    Okay.  Is there any other information in your possession that you recall regarding this incident?

A    No, sir, I don't.

MR. DIEPPA:  All right, Mr. Thapa, that's all the questions I have for you right now.

CROSS EXAMINATION

BY MR. JARNAGIN:

Q    And Mr. Thapa, I just have really brief follow-up.  Earlier you were discussing taking the lid container that Ms. Cole identified you -- strike that.

Earlier you were discussing the Lexan cover that Ms. Cole identified to you when you were investigating your incident.  Correct?

A    Yes, sir.

Q    Okay.  As part of your investigation into the incident, you weighed the Lexan cover?

A    Uh-huh.  Yes, sir.

Q    Did you take a photograph of the Lexan cover on the weigh station within the security office?

A    I did.

Q    Okay.

MR. JARNAGIN:  I'm just going to mark as

**ORIGINAL TRANSCRIPT**

37

defense Exhibit 1 this photograph Bates stamped GR35.

(DEFENSE EXHIBIT 1 WAS MARKED FOR IDENTIFICATION.)

BY MR. JARNAGIN:

Q    Is this the photograph depicting the Lexan cover on the scale within the security office?

A    Yes, sir.

MR. DIEPPA:  Yeah, just note my objection on the grounds of personal knowledge and authenticity.

MR. JARNAGIN:  That's all the questions I have for you, Mr. Thapa.  Thank you for your time today.

THE WITNESS:  Thank you, sir.

MR. DIEPPA:  All right, no further questions.  Does he read or waive?

MR. JARNAGIN:  He'll read.

MR. DIEPPA:  Okay.  All right.  We will order.

COURT REPORTER:  Regular delivery?

MR. DIEPPA:  Regular delivery.

COURT REPORTER:  (Technical difficulty)

MR. JARNAGIN:  We'll take a copy, please.

COURT REPORTER:  Okay.  Video or just the -- or just the transcript?

MR. DIEPPA:  Just the transcript right now.

**ORIGINAL TRANSCRIPT**

38

COURT REPORTER:  Okay.  We're off record at 11:39.

(DEPOSITION CONCLUDED AT 11:39 A.M.)

**ORIGINAL TRANSCRIPT**

39

CERTIFICATE OF OATH


STATE OF FLORIDA

COUNTY OF MIAMI-DADE


    I, the undersigned, certify that the witness in

the foregoing transcript personally appeared before me

and was duly sworn.


Identification:  Produced Identification




_____

PAMELA ABUCHAIBE

Court Reporter, Notary Public

State of Florida

Commission Expires: 12/12/2026

Commission Number:  HH340273

**ORIGINAL TRANSCRIPT**

40

CERTIFICATE OF REPORTER


STATE OF FLORIDA

COUNTY OF MIAMI-DADE


I, Pamela Abuchaibe, Notary Public in and for the State of Florida at Large, do hereby certify that I made an accurate and complete digital recording of the deposition in the above-styled case.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties, attorney or counsel connected with the action, nor financially interested in the action.


Dated this 3rd day of November, 2023.




_____

PAMELA ABUCHAIBE

**ORIGINAL TRANSCRIPT**

41

CERTIFICATE OF TRANSCRIPTIONIST

I, Carlotta Barr-Smith, Legal Transcriptionist, do hereby certify:

That the foregoing is a complete and true transcription of the original digital audio recording of the testimony and proceedings captured in the above-entitled matter.  As the transcriptionist, I have reviewed and transcribed the entirety of the original digital audio recording of the proceeding to ensure a verbatim record to the best of my ability.

I further certify that I am neither attorney for nor a relative or employee of any of the parties to the action; further, that I am not a relative or employee of any attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this matter.

IN WITNESS THEREOF, I have hereunto set my hand this 12th day of November, 2023.

_____

Carlotta Barr-Smith

## A

**ability (1)**
8:15
**able (4)**
8:6;34:5,7,8
**abouts (1)**
33:17
**absence (1)**
29:13
**access (5)**
6:25;7:1;8:5,6,9
**accessing (1)**
8:13
**accident (6)**
15:10,10;16:12;
32:22;33:4;36:1
**Actually (1)**
8:20
**addition (1)**
8:13
**affirm (1)**
5:17
**aft (9)**
11:18,19,19;12:21;
15:10,14;28:13,16,16
**again (2)**
17:20;25:20
**agree (1)**
17:25
**ahead (1)**
20:25
**almost (6)**
10:17;13:17;17:7,
11;18:12;26:18
**always (1)**
24:19
**appearance (2)**
5:4,10
**approach (1)**
14:25
**approached (1)**
28:21
**approaching (1)**
14:17
**approximately (1)**
30:2
**area (10)**
14:18;15:15,20;
16:11;27:7,8,23;28:6,
15,24
**around (2)**
30:1;34:18
**arrived (1)**
26:7
**assigned (1)**
6:18
**assistant (6)**
6:10,15;9:18,24;
27:10;32:24
**assume (1)**
16:25

**attached (1)**
21:17
**attempt (1)**
12:5
**attempted (1)**
15:3
**authenticity (1)**
37:9
**automatically (1)**
8:22
**available (2)**
11:1,7
**aware (5)**
13:24;14:8,11;24:7,
9

## B

**bachelor's (1)**
33:12
**back (3)**
13:11;20:6;25:15
**bad (1)**
23:16
**Bates (1)**
37:1
**batteries (1)**
32:17
**began (1)**
24:17
**begin (1)**
5:22
**behalf (1)**
5:13
**Bidat (1)**
33:11
**big (1)**
11:16
**biomechanics (2)**
32:22;33:4
**blowing (4)**
20:7,21;21:2,3
**breeze (1)**
21:15
**bridge (4)**
25:6,8,9,11
**brief (1)**
36:11
**buffet (1)**
28:14

## C

**calibrate (1)**
32:15
**calibrating (1)**
32:13
**called (1)**
18:22
**came (1)**
27:21
**camera (18)**
8:8,14;12:8;13:7;

14:1;15:2,13,16,17,
21;16:7,8,9,12;17:1,
13,15,18
**cameras (54)**
7:1,4,10,11,14,17,
21,21,24,25;8:3,5,6,7,
14,14;9:2;10:6;11:2,
4,8,14,14,19,20,24;
12:6,13,17,19,20,20,
21;13:3,4,12,17,20,
25;14:2,4,5,6,19,20,
23;15:4;16:15,24,25;
17:3,20,23;18:3
**Can (10)**
8:5,9;12:12;13:2,4,
14;17:25;30:16;
34:15,16
**captain (3)**
25:9,10,10
**care (1)**
23:18
**career (2)**
22:5;24:23
**cargo (1)**
24:6
**Carnival (17)**
5:6,14;6:4,5,5,9,19;
7:3,6;13:24;22:24;
24:6,18,21;25:2;
28:19;32:24
**Case (6)**
5:7;10:5;12:3;14:8;
16:3;17:14
**caused (1)**
22:11
**CCTV (13)**
8:7;9:7;10:3,6;11:1,
4,8,10,13,14,19;12:5,
7
**center (2)**
14:14;18:23
**certain (6)**
9:11;12:16;13:6;
15:8;24:2;27:6
**check (1)**
27:8
**checked (2)**
14:24;27:12
**chief (9)**
6:10,16,22;9:18,19,
24,25;32:25;33:1
**class (1)**
13:18
**clear (1)**
33:16
**Cole (15)**
5:6,12;10:11,25;
14:9;18:25;19:12;
20:12;25:16;26:14;
29:9;30:25;35:13;
36:13,15
**Cole's (5)**
12:4;14:25;35:17,

20,25
**completed (1)**
19:13
**completely (1)**
18:10
**concerned (1)**
24:11
**CONCLUDED (1)**
38:3
**condition (1)**
27:12
**conditions (4)**
22:11;23:1,9,15
**conduct (2)**
28:4;31:22
**confidential (1)**
35:23
**confirm (1)**
17:23
**Conquest (8)**
6:19;7:3,6;8:12;
14:3;22:24;24:6,18
**container (4)**
30:3,4,7;36:13
**containers (5)**
20:6,18;25:16;26:1,
8
**conversation (2)**
20:11;35:14
**Cooper (1)**
5:13
**copy (1)**
37:22
**Corporation (2)**
5:7,14
**counsel (2)**
5:9,21
**COURT (8)**
5:2,8,15,21;37:19,
21,23;38:1
**cover (35)**
20:15,20;25:19,21,
21,23;26:4,5;27:23;
29:17,19,21;30:5,9,
10,12,15,17,20,24,25;
31:1,2,6,9,14,17,18,
19,21,23;36:14,19,21;
37:6
**covered (2)**
9:7;26:5
**covers (1)**
31:11
**crew (1)**
6:24
**CROSS (1)**
36:9
**Cruise (2)**
24:22;25:2
**current (1)**
6:8
**currently (1)**
6:3

## D

**date (7)**
6:12;10:2,13;18:1,
9;24:20;35:25
**day (6)**
9:14,15;12:19;18:4;
29:5,5
**days (7)**
8:18,19,24;9:1,2,5;
18:11
**deal (1)**
15:7
**dealing (1)**
21:23
**dealt (1)**
22:4
**deck (31)**
7:9,10,15,17,25;
8:12;10:12;11:2,4,8,
15,16,17;12:6,13,21;
13:2,5,22;14:10,17;
15:1,14;17:22;20:14,
18;25:16;28:6,12,13,
16
**defendant (1)**
5:14
**defense (2)**
37:1,2
**definitely (1)**
15:16
**degree (1)**
33:12
**deleted (1)**
8:21
**delivery (2)**
37:19,20
**department (8)**
23:5,8,12,13;24:11,
13;25:3;27:7
**departments (1)**
23:2
**depicting (1)**
37:5
**deposition (3)**
5:5;16:20;38:3
**details (1)**
21:14
**detectors (2)**
24:3,15
**diagram (4)**
12:12;13:2;14:1;
17:22
**Dieppa (23)**
5:11,11,24;12:22;
13:1;14:15;16:14;
17:9,16;19:11,17;
20:25;21:4;25:20,22;
32:2;34:20;36:7;37:8,
14,17,20,25
**different (1)**
11:17

difficult (1)
17:12
difficulty (1)
37:21
digital (2)
32:18,20
dimension (4)
29:17;30:20,21;
31:20
dining (2)
14:18;23:12
DIRECT (1)
5:23
disagree (2)
10:20,23
discussing (2)
36:12,14
District (2)
5:8,8
Division (1)
5:9
document (1)
21:22
done (1)
22:12
down (5)
14:11,18;15:2;20:5;
25:4
download (6)
9:4,10,12,14,16,22
downloading (2)
10:8;11:11
downloads (1)
9:25
drive (1)
8:20
duplicate (1)
34:8
during (1)
33:1
duties (1)
6:20

**E**

Earlier (2)
36:12,14
eating (1)
20:5
education (2)
33:8,8
else (1)
35:11
employee (1)
8:24
employees (2)
27:4;28:5
English (1)
33:15
entering (1)
14:17
entire (3)
30:3,4,7

entrance (1)
15:1
equipment (2)
23:24;24:19
erased (3)
8:25;9:5;18:10
Eureka (6)
5:6,12;10:11,25;
12:4;14:9
even (2)
16:8;28:14
event (1)
24:12
everywhere (3)
7:16,21,24
exact (1)
17:12
exactly (4)
7:20;13:9,14;30:23
EXAMINATION (2)
5:23;36:9
example (3)
9:12;15:9,9
Excuse (1)
34:7
Exhibit (7)
12:23,24;17:21;
19:11,15;37:1,2
experiencing (1)
23:1
experiment (2)
31:23;34:8
explain (1)
8:5
explained (1)
20:1

**F**

fall (1)
22:12
fallen (1)
22:2
falling (1)
25:4
familiar (1)
23:22
far (5)
18:2,4;24:10,16,25
fast (2)
30:12,15
fell (1)
22:7
female (1)
27:22
field (1)
33:14
fill (3)
18:25;19:2,20
filling (1)
20:10
find (1)
28:8

fine (1)
16:24
first (2)
21:25;22:4
five (1)
29:2
flew (1)
31:9
floor (4)
26:1,8,9,10
Florida (1)
5:8
focus (2)
16:15;17:13
focuses (1)
16:12
focusing (1)
17:15
follow (1)
9:8
follow-up (1)
36:12
food (6)
23:18;27:9,10,11;
28:12,14
footage (8)
9:4;11:1,8;12:5;
16:4,9;18:8,10
form (7)
14:12;16:10;17:6;
20:23;25:18;31:24;
34:12
formal (2)
33:4,8
forward (1)
11:17
front (2)
19:13;29:12
full (1)
6:1
functioning (1)
18:8
further (8)
20:11;26:15;28:4;
29:14;30:11,18;
35:11;37:14

**G**

gets (2)
8:21,21
gives (1)
21:14
God (1)
5:19
Good (2)
5:2,25
GR35 (1)
37:1
graduate (2)
33:9,10
grams (1)
30:1

grounds (1)
37:9
guess (1)
23:12
guest (8)
18:24,25;20:13;
26:17,17,19;33:19;
35:2
guests (2)
6:23;26:18

**H**

hand (1)
5:16
handle (1)
6:22
handwriting (1)
19:20
happen (1)
9:15
happened (13)
9:13;11:3,3,18;
15:10,14,15;16:11,12;
17:10;20:2;21:8;
27:13
happens (4)
8:19;15:19;27:6;
32:10
hard (2)
8:20;19:23
heading (1)
6:6
help (1)
5:19
herself (1)
31:18
high (8)
23:1,9,15,23;24:12;
25:3,6,13
highest (1)
33:7
history (1)
33:15
hit (7)
20:6,15;22:2;30:9,
25;31:17,18
honest (1)
22:3
husband (2)
26:21,23

**I**

idea (2)
26:12;34:4
IDENTIFICATION (3)
12:25;19:16;37:3
identified (3)
26:21;36:13,15
inaudible (1)
23:25
inches (1)

30:22
incident (53)
6:12;9:4,6,13,23;
10:2,7,10,12,19,25;
11:3,9,18;12:4,17;
13:6;14:25;15:4,7,8,
13;17:2,10;18:9,15,
19;19:1,6,9,19;21:8;
22:1,7,11,15;24:20;
26:15;27:5,6;28:7,20;
29:15;30:19;31:15,
22;32:9,11,12;35:11;
36:5,16,19
incidents (1)
21:23
include (1)
23:11
indicate (1)
21:18
individuals (1)
28:19
infirmary (7)
14:11,19;15:2;19:8,
9,23;35:20
inform (1)
13:4
information (4)
13:10,15;28:6;36:3
informed (4)
10:12,25;12:3;
28:21
initial (1)
35:14
injure (1)
22:12
injured (1)
14:10
injury (6)
10:11;19:2,12;
35:17,21,25
intact (1)
32:17
interpret (1)
23:7
interrupt (1)
15:6
into (1)
36:18
investigate (6)
15:11,20;26:15;
29:14;30:18;35:11
investigated (2)
17:14;18:18
investigating (3)
9:13;10:7;36:16
investigation (4)
28:4;30:11;33:23;
36:18
involved (3)
27:5;28:20;31:15
involving (2)
10:11,25
item (1)

26:6
**items (7)**
22:25;23:3,6,9,15;
24:12;25:3

## J

**Jarnagin (15)**
5:13,13;14:12;
16:10;17:6;20:23;
25:18;31:24;34:12;
36:10,25;37:4,10,16,
22
**job (5)**
6:8,13,15,20;33:2
**July (8)**
6:13,18;10:2;12:4;
18:9,11;22:5;24:20

## K

**keep (3)**
11:13;13:24;25:4
**kind (7)**
15:8;22:4;31:2,3,5;
32:3,9
**knowledge (2)**
15:24;37:9

## L

**labeled (1)**
14:2
**least (3)**
18:4;24:10;25:3
**left (2)**
19:24;20:6
**level (1)**
33:7
**Lexan (16)**
20:15,17,20;25:21,
23;26:5;27:23;29:16,
18,21;31:3;34:14;
36:14,19,21;37:5
**Lexans (1)**
34:19
**lid (17)**
33:17,18,19,20,24,
25;34:9,10,16,17,22;
35:1,1,4,7,10;36:12
**Lido (29)**
7:9,10,14,17,25;
10:12;11:2,4,8,15,16,
17;12:6,13,21;13:2,3,
5;14:9,17;15:1,14;
17:22;20:14,18;
25:15;28:6,13,16
**Lidoo (1)**
28:12
**lids (1)**
34:19
**light (1)**
32:10

**limited (1)**
9:1
**Line (1)**
25:2
**Lines (1)**
24:22
**list (1)**
14:4
**located (10)**
6:3;7:10,22;8:10;
12:13;13:4,5,20;17:4,
21
**location (12)**
7:20;11:5;13:25;
15:8,11,19;16:13;
17:13,15;20:14;
27:12;28:10
**locations (1)**
15:22
**log (1)**
14:6
**long (4)**
7:7;18:17;21:22;
31:22
**looking (2)**
12:12;19:11
**lot (1)**
21:23

## M

**machines (2)**
24:5,15
**Magic (1)**
6:5
**maintain (2)**
14:6;32:16
**maintaining (1)**
32:14
**malfunctioning (1)**
18:4
**manager (1)**
27:11
**manual (1)**
24:7
**many (3)**
7:4;24:21;29:1
**mark (2)**
12:23;36:25
**MARKED (3)**
12:24;19:15;37:2
**matter (1)**
5:6
**may (3)**
5:22;27:5;28:19
**maybe (3)**
29:2;31:25;34:13
**mean (30)**
9:1,11,11,17;11:11;
12:11;13:21;14:6,13;
21:20,24;23:4;24:13;
25:8,9;26:21;28:9;
29:22;30:12,14,14,17;

31:1,1;32:3,6,16,18;
34:16,23
**measure (2)**
29:16;32:8
**measured (1)**
30:20
**measurement (2)**
34:15,17
**medical (2)**
14:14;18:23
**members (1)**
28:17
**mention (1)**
31:17
**mentioned (2)**
21:10;26:17
**metal (2)**
24:3,15
**Miami (2)**
5:9;6:7
**midship (1)**
11:18
**might (3)**
14:14;32:1;34:14
**moment (2)**
16:19,19
**monitor (1)**
25:11
**more (4)**
17:11;18:11,12;
34:25
**morning (2)**
5:2,25
**moving (2)**
25:4;30:12
**much (4)**
28:17;29:25;30:6,7
**multiple (6)**
7:17,25;8:2;22:22;
34:19,19

## N

**name (7)**
6:1,2,17;10:18;
18:21;27:16,18
**navigation (1)**
25:10
**nearby (1)**
26:24
**necessarily (1)**
7:8
**need (3)**
23:14;25:3;32:15
**next (1)**
26:24
**Ng (1)**
19:7
**nobody (3)**
28:11,21,21
**note (1)**
37:8
**notified (2)**

18:19;19:6
**November (1)**
5:4
**Number (1)**
5:7
**nurse (4)**
18:20,22,22;19:7
**nurses (1)**
19:7

## O

**oath (1)**
16:20
**object (2)**
22:7;32:10
**Objection (8)**
14:12;16:10;17:6;
20:23;25:18;31:24;
34:12;37:8
**obviously (1)**
14:1
**occurred (2)**
10:13;28:7
**occurs (2)**
9:4,6
**off (1)**
38:1
**office (7)**
8:8,10;29:20;32:5;
35:5;36:22;37:6
**officer (6)**
6:11,16,22;8:4;
10:19;24:24
**officers (2)**
6:23;9:17
**often (1)**
22:21
**onboard (5)**
6:23;7:1,4;26:18;
31:2
**Once (1)**
17:20
**one (17)**
10:8;16:19,19,21;
19:7;25:11;28:9;31:5,
11,14,19;32:13;34:2,
18,25;35:1,2
**only (2)**
15:11,23
**onto (1)**
15:1
**opportunity (1)**
21:16
**ops (4)**
23:18;27:9,10,11
**order (1)**
37:18
**ourselves (1)**
34:10
**out (5)**
18:25;19:20;20:10;
28:8;33:20

**over (2)**
22:12;25:4
**overwritten (1)**
8:25
**own (5)**
19:20;23:2,5,6,19

## P

**pain (2)**
19:24,25
**paperwork (1)**
19:1
**part (4)**
13:6,8;14:24;36:18
**particular (2)**
16:13;34:22
**parts (1)**
11:17
**passenger (5)**
19:2,12;22:2,8,12
**person (4)**
10:5;27:16,19;28:2
**personal (2)**
15:24;37:9
**personnel (3)**
8:24;9:21,21
**ph (3)**
19:7;26:13;33:11
**photo (1)**
34:1
**photograph (3)**
36:21;37:1,5
**photographs (4)**
28:24;29:1,4,8
**physically (1)**
35:4
**physician (1)**
35:22
**physician's (1)**
35:17
**picked (10)**
9:23;12:17;13:6;
15:2;16:7,7;17:1;
26:11;33:21,21
**place (6)**
22:25;23:14;24:2,
12,17;25:1
**placed (1)**
35:5
**places (2)**
7:11,12
**placing (1)**
30:17
**plaintiff (4)**
5:12;12:24;14:9;
19:15
**plan (1)**
13:22
**plastic (2)**
20:17;35:1
**please (9)**
5:9,16,25;13:4;

Case 0:23-cv-60532-MD Document 74-3 Entered on FLSD Docket 03/15/2024 Page 46 of 50
EUREKA COLE v.
CARNIVAL CORPORATION
ORIGINAL TRANSCRIPT
VIKRAM THAPA
November 3, 2023

17:21,23;22:17;
31:13;37:22
**point (6)**
10:24;11:7,11,11;
13:16;15:12
**pointed (3)**
33:20;34:2;35:2
**police (1)**
33:1
**portion (2)**
12:17;18:15
**position (2)**
21:9,13
**possession (1)**
36:4
**prepare (1)**
19:19
**presence (2)**
19:4;29:9
**present (4)**
6:5;11:2;20:18,19
**prior (1)**
22:15
**probably (1)**
19:7
**procedure (5)**
9:4,8,11;24:17;25:1
**procedures (5)**
23:8,14,19,21;
24:11
**PROCEEDINGS (1)**
5:1
**promoted (1)**
24:24
**protocols (2)**
22:25;23:14
**provided (1)**
10:18
**purpose (1)**
5:4

## Q

**qualifications (1)**
32:21
**quite (1)**
11:16

## R

**raise (1)**
5:16
**Raymond (1)**
5:11
**read (2)**
37:15,16
**really (10)**
7:13,20;13:8,13;
14:22;23:17;29:6,7,
11;36:11
**reason (4)**
12:10;13:10;15:21;
30:9

**recall (15)**
6:17;7:4,8,12,13,
20;12:14,15;17:24;
18:21;27:18,19;29:7;
32:1;36:4
**reconstruction (2)**
32:22;33:4
**record (4)**
5:3,10;8:15;38:1
**recorded (3)**
8:17,18;18:8
**recording (3)**
5:5;9:2;11:11
**records (1)**
35:24
**referring (1)**
17:21
**regarding (4)**
35:17,20,25;36:4
**regards (2)**
11:9;18:2
**Regular (2)**
37:19,20
**related (1)**
32:11
**relation (1)**
15:4
**remember (27)**
7:7;10:16;13:8,11,
13;14:3;16:16,17,18,
23,25;17:12,14;
21:21;27:3,10,22;
28:3;29:2,6,11,12,23;
30:22,23;31:16,25
**remote (1)**
5:4
**repeat (3)**
7:23;21:11;30:16
**repeatedly (1)**
17:3
**report (8)**
6:21;19:1,19;20:5,
11;21:17;35:17,20
**reported (2)**
10:11;19:22
**REPORTER (7)**
5:2,15,21;37:19,21,
23;38:1
**reports (1)**
22:16
**representative (1)**
27:8
**request (2)**
21:9,13
**required (2)**
19:20;22:1
**respective (1)**
23:8
**respond (1)**
22:1
**responded (5)**
10:19;19:8,9;22:6,
10

**responsibility (3)**
9:22;23:3,5
**responsible (2)**
10:5;32:13
**restaurant (4)**
15:15;23:12;28:14,
15
**retrieved (1)**
8:23
**review (14)**
8:8,9;11:1,7;12:5,
18,19;15:3,21;16:3;
21:16;35:19,22,24
**reviewed (3)**
15:3,16;16:9
**reviewing (2)**
10:6;15:12
**right (21)**
5:16;6:6;10:2,20;
11:16,18;13:10,17;
15:8,11;17:8;18:14;
27:19;31:7,19;34:11;
36:7,8;37:14,17,25
**rocking (3)**
23:24;24:14;25:14
**rough (1)**
23:9

## S

**safe (1)**
6:24
**same (19)**
6:15;9:14;27:2;
29:5;30:25;31:1,2,3,4,
5,6,6,6,14;32:1;34:9,
16,17,17
**save (1)**
9:7
**saw (1)**
27:22
**saying (3)**
9:3;13:23;31:5
**scale (11)**
30:18;32:3,4,5,6,8,
14,19,20;35:5;37:6
**scene (1)**
26:7
**schematic (1)**
13:19
**sea (1)**
6:6
**secure (10)**
23:3,5,8,15,20,24;
24:1,12,14,19
**securing (2)**
22:25;24:7
**security (26)**
6:10,16,22,22;7:1,
4;8:4,24;9:17,18,19,
21,24,25;10:18;18:1,
2;23:18,24;24:23;
29:20;32:11,25;33:1;

36:22;37:6
**serve (1)**
28:13
**serving (1)**
28:11
**seven (1)**
7:11
**ship (32)**
6:18;7:5,9,15,18;
8:1,11;13:11,18,25;
15:11,20;17:8;21:9,
13;22:11,18,23,24,25;
23:10,13,16,23;24:13;
25:5,13;29:24;34:14,
18;35:16,22
**ships (1)**
14:5
**ship's (6)**
14:19;15:2,4;19:8,
9;35:20
**shoulder (2)**
19:24;20:7
**show (3)**
12:22;13:19;25:16
**showed (2)**
20:14,15
**simply (1)**
12:1
**sit (2)**
33:24;35:8
**sitting (1)**
26:24
**situation (1)**
22:4
**six (1)**
29:2
**sociology (1)**
33:15
**somewhere (1)**
30:1
**sorry (16)**
12:14;16:16;17:19;
21:11;23:17;24:8;
26:2;27:15,18;29:6,7,
11;30:16;34:6;35:18,
19
**Southern (1)**
5:8
**speak (4)**
26:25;27:4;28:18;
35:13
**specific (2)**
15:19;31:7
**speculate (1)**
16:1
**spoke (4)**
18:23;19:23;27:14,
16
**stack (1)**
20:6
**staff (1)**
25:10
**stamped (1)**

37:1
**started (1)**
24:23
**state (2)**
5:9,25
**stated (1)**
20:4
**statement (2)**
19:3,12
**States (1)**
5:8
**station (1)**
36:22
**still (5)**
20:18,21;29:21,23;
34:23
**stored (1)**
8:21
**straightforward (1)**
34:24
**strike (1)**
36:13
**struck (2)**
22:7;25:17
**Subsequent (1)**
20:10
**suggest (1)**
25:7
**supervise (1)**
6:24
**supervisor (2)**
6:21;27:8
**sure (9)**
6:23;14:22;17:1;
25:14;31:9;32:16;
33:17;34:10,22
**surveillance (1)**
18:3
**swear (1)**
5:17
**system (7)**
8:7,14;14:1;18:1,2,
3,7

## T

**team (3)**
6:22,24;28:17
**Technical (1)**
37:21
**telling (2)**
11:13;16:23
**testimony (1)**
14:16
**Thapa (8)**
5:5,15,17,20;6:2;
36:7,11;37:11
**though (1)**
16:8
**three (1)**
8:12
**tie (2)**
24:2,5

**tied (1)**
25:4
**times (1)**
22:22
**title (3)**
6:8,14,15
**today (8)**
5:3;6:13;10:10;
14:16;15:23;33:24;
35:8;37:12
**told (3)**
17:4;20:8;27:20
**took (5)**
29:8,12;33:25;
34:25;35:4
**towards (2)**
6:6;35:2
**track (1)**
13:24
**trained (1)**
33:1
**training (3)**
33:2,3,5
**transcript (2)**
37:24,25
**tried (1)**
28:8
**truth (3)**
5:18,18,19
**trying (1)**
9:20
**type (2)**
19:1;32:22

## U

**under (1)**
16:20
**United (1)**
5:7
**up (13)**
9:23;12:17;13:6;
15:2;16:7,7;17:2;
19:2;20:14;25:15;
26:11;33:21,21
**use (2)**
32:3,8
**used (2)**
12:18;32:7
**Usually (6)**
13:25;27:7;28:13,
15,16;32:7

## V

**verify (1)**
22:16
**versus (1)**
5:6
**video (9)**
5:5;8:15,17;9:10,
22,23;10:9;11:12;
37:23

**videos (3)**
9:2,7,25
**view (1)**
35:16
**Vikram (3)**
5:5,17;6:2

## W

**waiters (2)**
28:15,17
**waive (1)**
37:15
**walk- (1)**
24:2
**walked (1)**
14:9
**walking (1)**
15:1
**walk-through (1)**
24:14
**walls (1)**
26:12
**way (6)**
14:10,17,18;15:1;
18:1;27:24
**weather (1)**
21:14
**weigh (8)**
29:18,25;30:3;
31:20;32:11;34:9,25;
36:22
**weighed (12)**
30:1,9,24;31:14,23;
33:17,21,25,25;34:9;
35:1;36:19
**weighing (2)**
32:5;35:10
**weighs (1)**
30:7
**weight (1)**
29:16
**weren't (2)**
26:9,9
**what's (4)**
6:8;15:24;32:6;
33:7
**whereabouts (1)**
33:18
**whole (2)**
5:18;15:20
**wind (9)**
20:7,21;21:1,2,5,6,
7,19;23:1
**winds (8)**
23:9,15,23;24:12;
25:2,6,12,13
**windy (2)**
22:19;23:4
**within (4)**
8:24;15:24;36:22;
37:6
**WITNESS (18)**

14:13;16:11;17:7,
10;18:14;19:14;
20:24;21:1;25:19,21;
26:16,19,22;28:9,10;
31:25;34:13;37:13
**witnessed (1)**
28:22
**words (2)**
20:4,4
**worked (1)**
17:8
**working (17)**
6:4,4,5,10;12:20;
13:18;18:3,7;24:17,
21;25:2;28:6,9,17,19;
32:23,24
**works (2)**
18:1;23:4
**workstation (1)**
27:24
**wrong (2)**
13:9,15
**wrote (1)**
20:5

## X

**x-ray (2)**
24:5,15

## Y

**year (8)**
10:17;13:17;17:7,
11,11;18:12,12,13
**years (1)**
24:21
**yesterday (1)**
9:13

## Z

**Zoom (1)**
5:5

## 1

**1 (5)**
12:23,24;17:21;
37:1,2
**10:58 (1)**
5:3
**11:39 (2)**
38:2,3
**18 (1)**
30:22

## 2

**2 (2)**
19:11,15
**2009 (2)**
24:23;32:24

**2017 (2)**
24:24;32:25
**2022 (8)**
6:13,18;10:2;12:4;
18:9,11;22:6;24:21
**2023 (1)**
5:4
**23-cv-60532-RAR (1)**
5:7
**24 (8)**
6:13,18;10:2;12:4;
18:9,11;22:5;24:20

## 3

**3 (1)**
5:4
**3,000 (1)**
26:18
**30 (7)**
8:18,19,24;9:1,2,5;
18:11

## 7

**7/24/2022 (1)**
36:1
**79 (1)**
7:6

## 8

**87 (1)**
30:1



GR000035

Ex. 1



Lido • Deck 9

Ex.2

CGO3072222



CCLCQHEA2022001Y24V

PASSENGER INJURY STATEMENT

Ship and Voyage No. _____

### THE FOLLOWING IS TO BE FILLED BY THE PASSENGER IN HIS OR HER HANDWRITING

Last Name __Cole__                                          First Name __EUREKA__

Cabin No. __1418__   Nationality __American__          Place of Birth _____   Occupation __Pathology Associate 2__

Age __51__   Height __5'4__   Weight __238__   Sex __F__   Marital Status: Divorced /(Married)/Single / Widower (Circle One)

Home Address __2670 SW 8th St #4__                City __Fort Lauderdale__        State __FL__

Zip/Postal Code __33312__   Country __U.S.A.__   Home Phone __786-216-2808__   Work Phone _____

E-mail __EUREKACOKR@YAHOO.com__                What kind of shoes were you wearing? __Slippers__

Do you wear glasses or contact lenses? __yes__          Did you have them on when the accident occurred? __NO__

Name of staff member accident reported to __Not sure of name__          Date of accident __7 /24/ 2022__

Time of accident __6:20pm__   AM/(PM)   Date reported __7 /24/2022__   Time reported __6:23__          AM/(PM)

If not reported immediately, please explain why? _____

Are you hurt? If so, please explain. __yes! HARD PAIN on my left Shoulder__

Who witnessed the accident? __Guest__

Who was with you, or nearby, at the time of the accident? __My Husband + Another guest__

Please state what you were doing at the time of the accident. __Eating At the table__

Please state in detail what happened at the time of the accident. __I WAS eating Some stacked up containers hit me in the back on my left Shoulder As the wind was blowing__

Please state in detail the location of the exact accident. __LIDO DECK Behind the Hot tub__

What do you believe caused this accident? __WIND__

What equipment, if any, was involved in the accident? __Plastic Container__

Please state what you could have done to avoid the accident. __Nothing really it came out of NO where__

__7/24/22__
DATE

__E. & Cole__
SIGNATURE

REVISION 8/24/2011

GR000026