**In The Matter Of:**

*EUREKA COLE v.*

*CARNIVAL CORPORATION*

*MONICA BORCEGUE*

*December 15, 2023*

*ORIGINAL TRANSCRIPT*

*CourtScribes, Inc.*

*"Delivering More For Less"*

*(833) 727-4237*

*info@courtscribes.com*

*www.courtscribes.com*

**ORIGINAL TRANSCRIPT**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.:  23-CV-60532-RAR


EUREKA COLE,

      PLAINTIFF,

  V.

CARNIVAL CORPORATION,

      DEFENDANT.

_____

     VIDEOTAPED DEPOSITION OF MONICA BORCEGUE

DATE:         DECEMBER 15, 2023

REPORTER:     FRANCISCO RAMOS

PLACE:        ZOOM VIDEOCONFERENCE

**ORIGINAL TRANSCRIPT**

APPEARANCES


ON BEHALF OF PLAINTIFF, EUREKA COLE:

RAYMOND R. DIEPPA, ESQUIRE

FLORIDA LEGAL, LLC

150 SOUTHEAST 2ND AVENUE, SUITE 1001

MIAMI, FLORIDA 33131-1577

TELEPHONE NO.:  (305) 901-2209

E-MAIL:  RAY.DIEPPA@FLORIDALEGAL.LAW



ON BEHALF OF DEFENDANT, CARNIVAL CORPORATION:

W. COOPER JARNAGIN, ESQUIRE

GRAY ROBINSON, P.A.

515 NORTH FLAGLER DRIVE, SUITE 650

WEST PALM BEACH, FLORIDA 33401-4339

TELEPHONE NO.:  (561) 268-5727

E-MAIL:  COOPER.JARNAGIN@GRAY-ROBINSON.COM

**ORIGINAL TRANSCRIPT**

3

INDEX

                                                          Page

PROCEEDINGS                                                 5

DIRECT EXAMINATION BY MR. DIEPPA                            6

EXHIBITS

Exhibit                                                    Page

1    NOTICE OF TAKING DEPOSITION                            6

2    AFFIRMATIVE DEFENSES                                  10

3    EXPERT REPORT                                         24

4    ANSWERS TO INTERROGATORIES                            49

5    E. COLE MEDICAL RECORDS FOR CARNIVAL                  84

**ORIGINAL TRANSCRIPT**

4

STIPULATION

THE VIDEOTAPED DEPOSITION OF MONICA BORCEGUE TAKEN VIA REMOTE ZOOM CONFERENCE ON FRIDAY, THE 15TH DAY OF DECEMBER, 2023, AT APPROXIMATELY 10:09 A.M.; SAID DEPOSITION WAS TAKEN PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE.

IT IS AGREED THAT FRANCISCO RAMOS, BEING A NOTARY PUBLIC AND COURT REPORTER FOR THE STATE OF FLORIDA, MAY SWEAR THE WITNESS AND THAT THE READING AND SIGNING OF THE COMPLETED TRANSCRIPT IS NOT WAIVED.

**ORIGINAL TRANSCRIPT**

5

PROCEEDINGS

COURT REPORTER:  The time is 10:09 a.m. and we are now on record.

Good morning.  My name is Francisco Ramos with CourtScribes.  I'm the digital court reporter. We are here today, December 15, 2023, by remote appearance for the purpose of digitally recording the video deposition of Monica Borcegue in the matter of Eureka Cole versus Carnival Corporation, case number 2023-CV-60532.

Will counsel please state your appearance for the record, beginning with noticing attorney?

MR. DIEPPA:  This is Raymond Dieppa on behalf of the plaintiff, Eureka Cole.

MR. JARNAGIN:  And Cooper Jarnagin on behalf of Defendant, Carnival Corporation.

COURT REPORTER:  Thank you.  I will now swear in the witness.

Ms. Borcegue, would you please raise right hand?

Do you, Monica Borcegue, swear or affirm to tell the truth, the whole truth and nothing but the truth?

MS. BORCEGUE:  Yes.

COURT REPORTER:  Thank you very much.  You

6

may put your hand down.

And, counsel, you may proceed.

DIRECT EXAMINATION

BY MR. DIEPPA:

Q   Good morning, ma'am.  Can you please state your full name?

A   Good morning.  Monica Borcegue.

Q   Okay.  And where are you currently giving this deposition from?  Where are you located?

A   I work from home.  I'm in Miami.

Q   Great.  Miami-Dade County?

A   Yes.

Q   All right.  What is your current place of employment?

A   Carnival Cruise Line.

Q   And what is your job title there?

A   Guest claims manager.

Q   Okay.

MR. DIEPPA:  I'm going to show you what we'll mark as Exhibit 1.  This is a copy of the Notice of Deposition that was sent to Carnival Cruise Lines initially on June 12th, 2023, and subsequently for the re-notice on November 14, 2023.  I'll put those on my screen.

(EXHIBIT 1 WAS MARKED FOR IDENTIFICATION.)

ORIGINAL TRANSCRIPT

7

BY MR. DIEPPA:

Q    All right.  Looking at the Schedule A, there are a list of topics.  Can you state for me if you have been designated by the defendant pursuant to Federal Rule of Civil Procedure 30 to testify as the corporate representative for the defendant, Carnival Cruise Lines in this case?

A    I have.  I have been.

Q    Okay.  Have you had an opportunity to review the notice before your deposition today in order to testify with knowledge regarding the topics listed in the Notice of Deposition?

A    I have.

Q    Okay.  Do you have any personal knowledge or involvement in the events relating to the subject lawsuit?

A    Personal, no.  And I'm here to testify on behalf of Carnival today, so you're asking me, just so I understand, me as Monica Borcegue, not as Carnival, correct?

Q    Yes.  Well, in terms of your being the representative, you, yourself individually, you were not personally involved with any of the events, did not witness any of the events.  So you were not there.  Am I correct?

**ORIGINAL TRANSCRIPT**

8

A    Correct.  Yeah.

Q    But nevertheless, my understanding is before today, you took on efforts to prepare to testify on behalf of Carnival Cruise Line; is that correct?

A    Correct.

Q    Okay.  Do you have any experience relating to maintaining the dining area of a cruise ship or securing objects in the -- in the dining area of any of Carnival's cruise ships?

A    As far as experience working onboard the vessels, or just knowledge of how workings onboard are carried out and things like that?  How do you mean?

Q    Yes, I mean, have you ever actually had any experience doing that or any training, you know, doing those things?

A    No, I've never worked onboard the vessels.

Q    Okay.  What is the nature of your work for Carnival?  What has it been since you've worked for Carnival?

A    So I've always worked shoreside at the Miami offices.  Most of my time here has been within the legal department.  At the current time, I assist both in-house and outside counsel with discovery.  That's mostly what I do, pulling documents, doing prior incident searches, anything needed for discovery.  And

**ORIGINAL TRANSCRIPT**

9

I also sit for corporate representative depositions such as this one.  I testify at trial whenever needed. That's basically what I do day in and day out.

Q    Okay.  So, your job at Carnival, from what you've told me, it sounds like you work as a paralegal, but you also serve as Carnival Cruise Line's designated corporate rep.  Is that the nature of your employment?

A    I would say so.  It is paralegal work.  I'm not -- I'm not a certified paralegal.

Q    Sure.

A    But it is -- yeah.

Q    Yeah, I'm just trying to understanding the, you know, the -- the work you do is -- you -- you assist in responding to the legal claims and -- and, if necessary, you can testify as the corporate representative?

A    Yeah, it's usually -- that's usually on me.

Q    Okay.  Do you recall how many times you've testified as Carnival Cruise Line's corporate representative?

A    I've lost count at this point, but over 250.

Q    Okay.  Over the past how long, if you know?

A    I would say since 2015.

Q    Okay.  Okay.  So, before we get into the

**ORIGINAL TRANSCRIPT**

10

facts of this case, because it's one of the items that you were asked to testify about today --

MR. DIEPPA:  And we'll mark this as Exhibit 2 to your deposition.  And this is Carnival Corporation's Answer and Affirmative Defenses to the Plaintiff's Amended Complaint.  I'll put that up on my screen here.

(EXHIBIT 2 WAS MARKED FOR IDENTIFICATION.)

BY MR. DIEPPA:

Q    So looking at Exhibit 2, and for the ease of reference, as we go forward, when I say "you", I'm going to reference Carnival Cruise Lines.  If I want to reference you individually, I'll reference you as you individually.  Is that all right?

A    That's fine.

Q    Okay.  So, you, Carnival Cruise Lines raised certain affirmative defenses.  And I just wanted to -- to ask you some questions about those starting with affirmative defense (c).  Do you see that one?

A    I do.

Q    Okay.  So, in that defense, you have alleged in this case affirmatively that the plaintiff's damages were the result of an act of God, and therefore defendant is not liable.  Can you tell me, please, what evidence you have to support that

**ORIGINAL TRANSCRIPT**

11

affirmative defense?

MR. JARNAGIN:  Yeah. And Raymond, I --I can go ahead and put on the record, we can withdraw that affirmative defense.

MR. DIEPPA:  Okay.  All right.  So based on your counsel's stipulation that that affirmative defense is being withdrawn, you will not have to answer that question.

THE WITNESS:  Perfect.  Let me just -- I'm going to interrupt you for one second.

MR. DIEPPA:  Uh-huh.

THE WITNESS:  If I'm looking on this side it's because I'm using two screens --

MR. DIEPPA:  Sure.

THE WITNESS: -- and this one's bigger.  So, I'm sorry if I'm not looking directly at the camera, but that's so you know what's going on.

MR. DIEPPA:  Do whatever you need to do to follow along is all right.

BY MR. DIEPPA:

Q    All right.  So the next affirmative defense here, Carnival Cruise Line alleges affirmatively that "the plaintiff did not exercise ordinary care, caution or prudence for her own welfare to avoid the happening of the alleged incident, injuries or damages, if any,

**ORIGINAL TRANSCRIPT**

12

the existence of with, Defendant expressly denies. And by this failure to do so, Plaintiff thereby directly and proximately contributed to the happening of said alleged injuries, losses and damages, if any, the existence of which the defendant expressly denies."

In terms of that affirmative defense, subsection (d), can you state for me the evidence that you have to support that defense?

A    Well, as I sit here today, to the extent that everything happened the way she claims it did, we don't believe that there's any negligence by -- by either side.  This, unfortunately, is an accident that occurred, but I don't think that either side would be negligent.

Q    Okay.  Well, you're alleging that Ms. Eureka Cole was negligent.  So, based on what you're alleging, I want to -- I want to know what, you know, piece of evidence or -- or testimony supports your claim that Ms. Eureka Cole was negligent in this case.

A    Right.  But like I stated, as I sit here today, I don't have any facts to support this, if -- to the extent that it -- that it did happen, the events happened the way that she is alleging.  Like I said, I -- I don't believe that there's any negligence

**ORIGINAL TRANSCRIPT**

13

by either side.  So, as you know, these are filed before discovery is -- is started and all of that.  So as I sit here today, that's my answer.

Q    Okay.  And -- and that's -- and that's why I asked because, you know, there's -- there's been significant discovery since you filed these and so I'm -- and if I'm correct in understanding your answer, Carnival's position is that you don't believe there was -- there's any evidence to support a claim of negligence as to the conduct of Ms. Eureka Cole, but you also deny that Carnival was negligent.  Do I have that correct?

A    That's correct.

Q    And would that also hold true for affirmative defense (h), where you allege that plaintiff herself was negligent and therefore plaintiff was barred for recovery, et cetera?

A    Yes, it would apply for (h) as well.

Q    Okay.  Now, (i), in that affirmative defense, Carnival alleges that "Plaintiff, Ms. Eureka Cole, failed to seek timely medical treatment for her condition, which caused and/or exacerbated her damages and/or failed to follow instructions, follow up, participate in or attend subsequent medical care and treatment, which has delayed or negatively affected

**ORIGINAL TRANSCRIPT**

14

her recovery."  In this case, do you know how long after the alleged incident Ms. Eureka Cole first received medical care?

A    Well, she did receive medical care onboard the vessel.  But as far as any medical treatment beyond that, I -- I would defer to our medical expert.  Any opinions on that would have to come from -- from an expert, not from myself.  I only have access to the -- the ship medical records, and that's the extent of the knowledge I have as far as medical treatment.

Q    Okay.  And I just mean factually, is it Carnival's position that Ms. Eureka Cole should have sought initial medical treatment faster than she did when, you know, she was injured, and she went to the ship's infirmary?

A    No, I don't believe that there was any delay in her visiting the Medical Center.  I believe she went, you know, immediately after, when -- when they called down to the Medical Center.  But anything beyond that would be for a medical expert to -- to opine on.

Q    Okay.  But you -- in this case, you've also examined Ms. Cole.  Dr. Chalal, your expert, has examined Ms. Cole.  He's issued a report which was disclosed in this case.  In that report, do you -- is

**ORIGINAL TRANSCRIPT**

15

there anything in Dr. Chalal's report that says that, you know, Ms. Cole should have received treatment sooner?

A     I've not seen the report.  So I, again, would defer to whatever the report states -- if any -- if anything.  Again, I -- anything medical would have to be -- I would defer to a medical expert for that. I am not here to --

Q     Okay.  Well, I just want to know, just as far as your knowledge as we sit here today in terms of the evidence and facts, my understanding of the evidence and facts in this case is Ms. Cole reported an injury.  She was treated by the ship's physician. Do you understand that?

A     Yes.

Q     Okay.  And then after she went off the ship, she was also treated at the hospital.  You understand that as well?

A     I believe that's what occurred.

Q     Okay.  Other than that treatment, and based on that treatment, is it still Carnival's position that Ms. Cole failed to seek timely medical treatment?

A     And again, my answer is the same.  I don't believe that there was any delay on board.  Whether there's any other time where she failed to do things

**ORIGINAL TRANSCRIPT**

16

timely within her treatment, I wouldn't be able to tell you.  I've -- I've only got access to the shipboard medical records.  So again, anything beyond that would be for a medical expert to -- to testify on.  I can only tell you that I don't believe there was any delay onboard the vessel, in -- in her going to the Medical Center.

Q    Okay.  And you -- you have not -- I mean, have you had the opportunity, for example, before -- in preparing for your deposition to review the -- the plaintiff's Rule 26 disclosures and the defendant's Rule 26 disclosures and the attachments to those pleadings?

A    I've seen them, yes.

Q    Okay.  And you're aware those disclosures also included Ms. Cole's medical records?

A    Yes.

Q    Okay.  And you don't recall in reviewing any of those medical records, any instance where Carnival would point out that Ms. Cole should have sought medical treatment, as it's alleged here, more timely than she did?

A    No.  And, again, my answer is the same.  As I sit here today, reviewing the shipboard medical records, I don't believe that there was any delay

**ORIGINAL TRANSCRIPT**

17

onboard the ship.  It's just anything outside of that that I wouldn't be able to testify on.  But again, on the ship, I don't believe that there was any delay.

Q    Okay.  How about after she got off the ship? Are you aware of any other delay that you allege was the fault of Ms. Cole in seeking medical treatment?

A    No, and that's -- that's where I've explained.  I don't have knowledge of her treatment beyond the ship.  That I would defer to a medical expert for their opinion.

Q    And as far as medical expert in this case, are you referring to the one that's been disclosed by Carnival, Dr. Chalal?

A    I believe that's the only one that's been disclosed at this time, yes.

Q    Okay.

MR. JARNAGIN:  And I just want to -- I just want to put on the record, Dr. Chalal's report was disclosed to Mr. Dieppa earlier than the expert disclosure deadline of December 29th in this case.  So Carnival maintains the right to timely disclose any experts and reports.

MR. DIEPPA:  Yeah, and I'm not – Dr. Chalal's is the only report that was provided to the plaintiff under Rule 35, not, you know, Rule 26 as me

**ORIGINAL TRANSCRIPT**

18

and Mr. Jarnagin discussed previously.  And, Cooper, I'm -- I'm not asking her to disclose any experts early.  I'm just asking her pertaining to the one physician that has been disclosed.

MR. JARNAGIN:  Okay.

BY MR. DIEPPA:

Q   All right.  So moving on to defense letter (l), Carnival alleges in defense -- affirmative defense (l), "plaintiff damages, if any, were solely and proximately caused by an intervening and/or superseding medical condition or event, which was not itself the result of any negligence on the part of this defendant.  And accordingly, recovery against this defendant must be denied."  The event that's described here -- or the event or medical condition that Carnival is describing here, can you tell me what that is?

A   So I'm aware that Carnival has records that she was in a car accident in 2019.  I believe it was a shoulder injury at that time.  But again, any -- anything beyond shipboard treatment, I would defer to our medical expert on.  I -- I have not reviewed those records and that's just my general understanding.

Q   Are you aware which shoulder Ms. Cole injured or alleges she injured in this incident?

**ORIGINAL TRANSCRIPT**

19

A    Honestly, off the top of my head, I can't recall.  I'd have to review records and --

Q    Okay.  And this 2019 record, does that indicate she had an injury to the same part of the shoulder or the same shoulder she claimed she injured in this case?

A    Like I said, I've not reviewed the medical records off -- you know, outside of the shipboard medical records.  That's -- again, I defer to our medical expert on that.

Q    Okay.  Well, you -- you referenced it, so I assumed that you were informed of it.

A    Yeah, I have general knowledge, but I can't recall --

Q    Okay.

A    -- specific details.

Q    Yeah.  Well, I mean -- and you understand, I'm sure, you know, under the Rules of Procedure, Carnival has the burden of showing factual support for these affirmative defenses.  So, as we sit here today and -- and you can say you don't know, but do you have or know of any evidence or testimony indicating that Ms. Eureka Cole, as you allege here, had an intervening and/or superseding medical condition?

A    Other than the information I've provided

20

you, I'm aware she had an accident in 2019 with a shoulder injury, but I don't have details.  Off the top of my head, I -- I can't recall and I'm not going misspeak on, you know, on -- on the facts that I have. I gave you the general information.  But again, any -- any medical treatment, I think, you know, that's for the medical expert to -- to testify on.  That's not -- that's not me.

Q   I -- I disagree.  But let's talk about what you do know.  So you're alleging in support of this defense that you have evidence of a record in 2019 where Ms. Cole had a previous shoulder injury, and the same shoulder she complained of in this case; is that your testimony?

MR. JARNAGIN:  Objection to form.

THE WITNESS:  I testified that I couldn't recall which shoulder it was.  I know it was a shoulder injury in 2019 due to a car accident.  But I can't – again, I've not reviewed the medical records outside of the ship.  So that's just information that I have, you know -- general information that I have. But I've -- I've told you everything I know as I sit here today.

BY MR. DIEPPA:

Q   Okay.  Meaning that you -- this prior

**ORIGINAL TRANSCRIPT**

21

record, you don't know if it's for one shoulder or the other, but that's what you're basing this affirmative defense -- affirmative defense (1) on?

A   Correct.  It would be based on the fact that she was in an accident in 2019.  But again, any -- any medical treatment would need to be testified about by a medical expert.  That's -- that's not -- that's not something I've reviewed and I've already testified to that.

Q   Are you aware whether or not this alleged 2019 record that you claim pertains to a shoulder was reviewed or shown to Dr. Chalal?

A   I'm not aware of what he reviewed.  I did not see the records that he reviewed.  I did not provide them to him.  I -- I have no involvement in that.

Q   So your -- your testimony is even though you were asked to come here to prepare for this deposition, you did not review the Rule 35 report of your expert physician?

A   I did not review the -- the report, no.  I don't know that I can get into what I spoke about with my attorney during -- during our preparation, but I am prepared to answer your questions.  I -- I am aware of the report.  I am aware of the medical records that

**ORIGINAL TRANSCRIPT**

22

exist.  It's just not something that I am here to testify on.  Medical treatment is not something that I'm here to -- to speak on.

Q   Are you under -- you're -- no.  You're here to speak on the topics in the notice --

A   Correct.

Q   -- as we confirmed before.  So, and obviously, your communications are confidential, of course, with your attorney.  But the facts that you're aware of, you must disclose those facts if they -- they pertain to this.  So, if factually -- factually, you're saying you just -- I mean, I'll ask it to you this way.  Were you shown a 2019 medical record showing that Ms. Cole had the same injury she's claiming in this case in 2019?

MR. JARNAGIN:  (Crosstalk.)

A   No, and that's not what I've testified to. Sorry, I interrupted, Cooper.

Q   No, it's all right.  Were you otherwise told that -- about the existence of this record?  That she had a -- a prior 2019 injury in her shoulder?

A   I'm not -- I mean, I don't know that I can answer that without getting into what we spoke about. Obviously, I was prepared.  I did speak to counsel on this, and I do have some information.  I have not

**ORIGINAL TRANSCRIPT**

23

reviewed the medical records.  I've already testified to that a number of times.

Q    Okay.

A    So I'm just – I -- again, I'm aware that this is something that happened in 2019, but I've not reviewed any medical records.

Q    Okay.  Ma'am, you're -- you're going to have to answer unless you're instructed to answer.  Once again, were you informed of the fact prior to this deposition that Ms. Cole had a prior 2019 shoulder injury?

A    Obviously, I was.  That's how I know about it.  I've already answered your question.  I just -- again --

Q    Can you please --

A    It's -- it's been part of my preparation and it's general knowledge, and I've already told you what I know.  I -- I don't know anything else other than the fact that there was a car accident in 2019, where she had a shoulder injury.  That's the general information that I know.  I have not reviewed any records.

Q    Are you aware of what specific diagnosis she received for that shoulder in that accident?

A    I am not.

**ORIGINAL TRANSCRIPT**

24

Q   Okay.  So you're not aware if it was -- you're not aware of which shoulder, and you're not aware what the injury actually was?

A   Correct, as I've already stated.

Q   Okay.  Are you aware of what treatment she received?

A   No, I've already told you what I know. Generally, the only information I have is what I've told you.  I don't know anything else about that 2019 incident.

Q   Do you recall when you were told about this 2019 alleged shoulder injury?

A   During my preparation for this deposition.

Q   Okay.

(EXHIBIT 3 WAS MARKED FOR IDENTIFICATION.)

By MR. DIEPPA:

Q   And looking at Exhibit 3, which is the report of Carnival's expert, Joseph Chalal, MD, you have not reviewed this report before today; is that correct?

A   That's correct.

Q   All right.  Do you know if in this report your expert, Dr. Chalal, even references a -- a 2019 shoulder injury?

A   I have not reviewed the record.  So I would

**ORIGINAL TRANSCRIPT**

25

not be aware.  I'd have to review it --

Q     Okay.

A     -- to give you that information.

Q     Going back to the affirmative defenses, given the facts that you -- and evidence that you have testified to in support of affirmative defense letter (l), is it Carnival's position to proceed with that defense?

MR. JARNAGIN:  Objection to form.  I just want to again put on the record that expert disclosures are due on December 29th.  So Carnival does preserve the right to amend and supplement --

MR. DIEPPA:  Okay.

MR. JARNAGIN:  -- the evidence that supports this affirmative defense based on expert disclosures.

MR. DIEPPA:  Okay.  Mr. Jarnagin, I -- I didn't object last time.  Rule 30 prohibits speaking objections.  So I'm going to ask you to just keep your objection to form.  If necessary, you need to instruct the witness not to answer, you can do that as well, and -- and we can take it up.  But I don't want any further speaking objections that may impact the witness's testimony.

THE WITNESS:  Are you asking me about this --

26

MR. DIEPPA:  Yeah, I'll -- I'll just -- I'll re-ask the question for the record.

BY MR. DIEPPA:

Q    Based on what you've testified to today concerning affirmative defense (l), does Carnival intend to proceed with that affirmative defense?

A    We do.  I've given you the information.  (l) has been the one that we've been discussing this whole time, just to be clear, correct?

Q    Uh-huh, yes.

A    Yes.

Q    Okay.  As to (m) wherein Carnival alleges that "Plaintiff damages were the result of a pre-existing injury/condition, assuming arguendo that any pre-existing mental or physical injury or illness was aggravated by any alleged incident, herein for which defendant expressly denies any responsibility.  That plaintiff is only entitled to reimbursement for the degree of aggravation and all recovery obtained, herein must be reduced to the percentage of aggravation, which the plaintiff allegedly suffered, as a result of the subject incident."  As to that affirmative defense, can you identify for me the pre-existing mental or physical injury that's being referred to?

**ORIGINAL TRANSCRIPT**

27

A    Again, this would be medical treatment beyond the shipboard medical treatment.  That would be something for a medical expert to testify on.  As I sit here today, I don't have any information about medical treatment.

Q    Okay.  You don't have any -- you cannot testify (crosstalk) --

A    Sorry.  I said medical treatment.  It's I -- I would say preexisting for this one.  Like I said, I I don't have any knowledge outside of the shipboard medical records.  So that's, again, for a medical expert.

Q    Okay.  So, just to be clear, in terms of the preexisting injury or condition that Carnival has affirmatively alleged in its answer described in affirmative defense (m), you cannot, as we sit here today, specifically identify any evidence or testimony that would support that defense?

A    Correct.  As I sit here today, I don't have any information.  That would be -- I -- I defer to a medical expert's opinion.

Q    Okay.  You cannot identify that medical expert either, as we sit here today?

A    Well, we know that we have the doctor's report.  I'm not sure if there will be anybody else.

**ORIGINAL TRANSCRIPT**

28

At this time, I believe he is the only one that's been disclosed, and you have his report.

Q   Okay, but you have not seen his report?

A   Again, no, I have not reviewed that report.

Q   So you wouldn't know if that report actually referenced any injury pre-existing the date of this incident, July 24, 2022?

A   If I've not reviewed the record, I wouldn't know what's in it.

Q   Okay.  Moving on to affirmative defense (n), Carnival here alleges in their affirmative defense (n), "Plaintiff damages were caused in whole or in part by the action and the inaction of third parties, for whom this defendant is not responsible for, including but not limited to any and all healthcare providers who rendered treatment to plaintiff before the subject cruise, and thereafter the subject cruise."

Can you read that?

A   Yes.

Q   Okay.  So, in this case, Carnival is alleging that both the people, the medical providers that treated Ms. Cole prior to and subsequent to the incident, committed malpractice?  Is that what's being alleged?

29

A    I'm reading it again.  I apologize because I'm following you along, but I wasn't --

Q    Okay.

A    So again, this would be medical treatment. And again, I would defer to a medical expert.  I don't have any information as I sit here today.  I would defer to a medical expert on this one as well.

Q    Okay, but once again, I need to know this. Carnival intends to allege in this case that Ms. Cole's prior physicians committed medical malpractice? That's -- that's what you intend to allege going forward?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  At this time, that affirmative defense has not been withdrawn.  I don't know what will happen from here on out.  I'm not the lawyer on this case.  I don't know that I have any information as I sit here today about this specific affirmative defense.  It is related to medical treatment.  And again, that's something for a medical expert to testify on.  That would not be my area.  So --

Q    Okay.  Can you identify for me, as we sit here today, the name or identity of any medical provider that may have treated Ms. Cole at any time before or after her accident that Carnival alleges

30

provided negligent medical treatment?

A    And again, I've not reviewed any records before or after the shipboard medical records.  I don't have any previous information and I don't have any information beyond her medical treatment on board the ship.  I've already said that a number of times.  I've not reviewed anything, you know, related to any medical records.  That's for a medical expert to, again, opine on that.  That's not something I'm here to do.

Q    Okay.  You are here to do that because you've -- you were asked today -- and I'll go back to your notice -- and you confirmed that you were here to testify about all evidence supporting defendant's affirmative defenses.  That's in Schedule A, number 3.  So I -- I disagree with your characterization.  But once again, the question really wasn't what you reviewed, ma'am.  I'm just asking you to -- if you can, you can identify these medical providers that that Carnival is claiming provided negligent medical treatment, or if you -- if you don't know of any, you can just confirm that you don't know of any as you sit here today.  And that is what I'm trying to find out.  So once again, --

A    That is what I've answered.

**ORIGINAL TRANSCRIPT**

31

Q   -- I'll just -- I'm going to finish.  I have to re-ask my question once again.  I'll repeat.  If you could, please state whether you can identify by name any medical providers that administered treatment to the plaintiff, Ms. Eureka Cole, before or after her incident who Carnival alleges were negligent and/or provided negligent medical treatment.  Please provide the names.

MR. JARNAGIN:  Objection, form.

And I'll just state, Carnival is not alleging in this case that any medical provider or treater afforded -- performed negligent medical care with regards to Ms. Cole.

MR. DIEPPA:  So it sounds, based on what your attorney has said, that that's no longer being alleged.  So I will -- based on Mr. Jarnagin's representation, you will not have to answer my last question.

BY MR. DIEPPA:

Q   In terms of what's being alleged in as far as third parties is it Carnival's position in this case that any third parties, non-parties, were responsible for Ms. Cole's injuries?

A   As far as any healthcare providers, again, I don't know of any as I sit here today.  I defer to a

**ORIGINAL TRANSCRIPT**

32

medical expert.  My answers aren't going to change.  I have not reviewed any records, so I cannot give you any names of any healthcare providers at this time.  That's what the expert is -- is hired to do.  That -- that's not my area.  So I've (crosstalk) --

Q    I'll clarify.

A    -- a number of times, I've -- I've not reviewed any medical records, so it's not information that I have as I sit here today.

Q    Yeah, I'll clarify.  Before, we were discussing medical providers as third parties.  My question now as to third parties is limited to just third-party individuals or entities, not physicians, just third parties --

A    Right.

Q    -- that you allege were negligent or were a non-party that contributed or caused the plaintiff's injuries?

A    No, I'm not aware of any.

Q    Okay.  As to (o), "Carnival alleges that the injuries complained of by plaintiff in this action were caused or suffered during incidents other than the ones alleged to have occurred from the incident stated in the complaint, and therefore, non-compensable in this action and the defendant is not

**ORIGINAL TRANSCRIPT**

33

liable for those injuries."  As it relates to affirmative defense (o), could you please inform me as to what these incidents are that Carnival is alleging?

A    So again, this would be the accident -- the car accident from 2019, which I don't have other than just general knowledge of it occurring.  As I sit here today, that's -- that's the only potential information that I have.  Anything else, again, I would defer to a medical expert on.

Q    Okay.  So, nothing else other than this 2019 car accident?

A    Correct.  As I sit here today, that's -- that's my answer.

Q    As to (s), Carnival alleges in affirmative defense (s), "Any risk-creating condition was open and obvious, obviating a duty to warn by the defendant." First off, the risk-creating condition that you're referring to here, do you know what that is?

A    If there was any risk-creating condition, it -- it's my understanding that she's alleging it was wind that -- that caused this lid to -- to hit her. If it happened the way she says it happened, anybody sitting outside in an open space can expect on a -- on a cruise ship in an open space -- can expect that wind can pick up at any time, and items obviously can be

**ORIGINAL TRANSCRIPT**

34

picked up with wind.  So that's just an open and obvious condition that anybody on a cruise ship would -- would expect.

Q   Okay.  So according to Carnival, if a passenger goes out on the deck when it's windy and something hits them, that's just a risk that they assume?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  If you are -- sorry.  If you are going outside on an open deck on a cruise ship where there's weather, it's exposed to the elements, yes, that's something that can happen.  So that's, you know, if --

MR. DIEPPA:  That's a risk --

THE WITNESS:  -- you're aware of your surroundings that that is something that can -- can occur.

BY MR. DIEPPA:

Q   Okay.  So Carnival has no responsibility when conditions are poor, for example, when there -- there's high winds to do anything in terms of the safety of the passengers, or otherwise restrict access to that open deck?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  It depends on -- It depends on

**ORIGINAL TRANSCRIPT**

35

the condition.  If it's extreme weather, obviously, we can restrict access to the outer decks.  It just depends on the conditions on that day.  There's nothing that I have that indicates that the day of the incident was one of these extreme weather condition days.

BY MR. DIEPPA:

Q   You're aware of the testimony of the Carnival employee saying it was windy that day, correct?

A   I believe that's what the maître d' might have said.  I reviewed the testimony.  But again, just because it is windy, that doesn't mean that it's extreme weather that needs to be, you know -- that the that the Lido deck needs to be shut -- shut off from -- from operations.  Wind does happen on cruise ships. You are sailing in the middle of the ocean.  It's a possibility that wind can pick up.  But just because it's windy, that doesn't necessarily mean that we have to shut down operations on the outer decks.

Q   Okay.  You understand that it wasn't wind that struck Ms. Cole, correct?

A   I'm sorry?

Q   You understand that it wasn't wind that caused Ms. Cole's injury that struck her?  You

**ORIGINAL TRANSCRIPT**

36

understand that?

A    It -- my understanding is that the wind is what blew the lid of the Lexin, which is what she's alleging hit her.

Q    Okay.  Yeah, exactly.  It wasn't the wind that hit her.  It was the Lexin that hit her, the plastic container, whatever you want to call it.

A    As -- right as a result of wind, no?  That's my understanding.

Q    So you understand here that at the time this occurred, the dining area on the Lido deck was open?

A    You mean, open for guest use --

Q    Yeah.

A    -- or open as in open deck?

Q    Was open for guest use.

A    Yes.

Q    Okay.  You understand that as far as the evidence shows, there were no additional precautions taken in terms of securing any items on the Lido deck?  You're aware of that?

A    I am aware of that.  I don't believe that the conditions merited any -- any sort of securing anything in the area.  It's just normal weather on board a cruise ship.

Q    Have you ever worked on a cruise ship,

37

ma'am?

A    I've never worked on a cruise ship.  I've been on multiple cruise ships.

Q    Okay.  Yeah, and I mean in -- in terms of the professional obligations and the operations of a cruise ship, you, individually, you have no personal knowledge regarding those?

A    I've never worked onboard a ship.  I think I've already testified to that.

Q    Right.  And then you're aware that Ms. Cole sat down, and she was served her meal by the crew members and proceeded to, you know, try to have her meal on the Lido deck, which was open, correct?

A    I don't believe she was served by a crew member at the table.  I -- that is not table service in the back area where she was.  So she might have obtained food from one of the food lines and brought it back herself just to make that distinction.  She wasn't served by anyone.

Q    How would she get the food placed on her plate?

A    There is a buffet line where you can go and -- and get food.  I believe she testified it was chicken tenders and salad.  So that's something that you would have likely gotten from the inside buffet.

**ORIGINAL TRANSCRIPT**

38

Q    Uh-huh, and how does the buffet give the food to the passengers?

A    The buffet just has a display of food.  You grab your plate, and you serve your plate.  It's the standard buffet operation, just like anything on land or any other buffet.

Q    Okay.  So there's no one there that places the food on the plates of the passengers as far as you know?

A    Not for chicken tenders or salad.  That's something that you would do yourself.  There are some items, you know, off the top of my head and nothing to do with this case like prime rib, for example, that they will slice and place on your plate.  But chicken tenders and salad is something you grab on your own.

Q    All right.  But you wouldn't really know because you don't – you, individually, don't have personal knowledge regarding that and there's -- there's no video of -- of what -- of the incident or -- or what happened prior to the incident.  We can agree?

A    I have -- I have knowledge on how Carnival operates.  Again, I've been on the cruise ships many times.  I've worked for the company for 17 years and I've been sailing them for longer than that.  So I'm

**ORIGINAL TRANSCRIPT**

39

pretty familiar with how the buffets work.  On that specific day, obviously, I was not onboard.  But it's a general understanding of how our buffets work.  So not to say that she didn't get her food and sit down at the table, but it's the distinction of being served.  I don't believe that she was served her -- her meal at the table.  It was not a sit-down dining venue.

Q    What I'm asking is in terms of the events, how she got her food or how she didn't get her food, not based on your experience going on vacation on cruises, but just on -- in terms of what happened the actual day, you don't --

A    And just to interrupt you (crosstalk) --

Q    Ma'am, I just want to -- ma'am, you have to --

A    And I'm not.  I just want to make a distinction.  It's not just going on vacation.  Again, I worked for the company for 17 years and I've done ship inspections and I've been on for work, so it's not just vacations.  It's -- I work for the company, so I do have knowledge.  I just wanted to make that clear.

Q    Ma'am, I had asked if you had any professional experience on a cruise ship or operating

**ORIGINAL TRANSCRIPT**

40

a cruise ship earlier.  You -- you told me that you never worked on a cruise ship.

A    I don't work onboard.  I'm not a crew member.  However, I do go onboard for ship inspections, which is different.  That's not what you asked.

Q    Ship inspections in terms of litigation?

A    Correct.

Q    Okay.

A    For the most part, that's correct.

Q    Okay.  What I'm trying to confirm here is there's no video and there's no eyewitnesses as to what Ms. Cole was doing at the buffet or -- or how she got her food.  Is that your understanding?

A    There is no video whatsoever in this case.  No.

Q    There any eyewitnesses that you know of have testified as to observing Ms. Cole getting food at the buffet and how that food came to be on her plate?

A    No, and I don't believe that that's really an issue in this case.  So I don't think that that's something that we've really investigated, not that there would be any information about that.  We wouldn't keep a record of how she got the food on her plate.  It's just a simple distinction that, you know,

**ORIGINAL TRANSCRIPT**

41

I was correcting you on.  It's not table service.

Q   Okay.  I'm just asking you if you know in terms of the events of this specific day?

A   No, that would not have been recorded anywhere.  I don't think that has anything to do with the -- the case itself.

Q   Okay.  Now, going on to this claim that it was open and obvious.  Now, are -- do you know at the time of Ms. Cole's injury, which direction she was facing?

A   I believe she had her back turned to the -- the dining station.  I believe that's the testimony that it was behind her.

Q   Okay.  So can you describe for me if the dining station is behind her, how she would be able to visually observe the dining station if it was directly behind her?

A   At any point in time when she sat down at the table, you are aware of your surroundings, and you know what's -- what's around you.  I mean, it's a -- it's a dining station.  It's quite visible to anybody in the area.

Q   Okay.  So I mean -- no, I'm asking how is it that a person that's looking forward and sitting forward would be able to simultaneously observe what's

**ORIGINAL TRANSCRIPT**

42

going on behind them?  If you could, describe that for me.

A    That would obviously depend on the situation.  If something is noisy going on behind them, or if something is, you know it -- it would depend.  A wait station wouldn't really make any noise.  You're just really aware that it's there because it is a dining station.  You did walk over to the table, choose your seat, sit down.  So you are aware of its existence.  But anything behind you, I guess you wouldn't be able to see if it's behind you, right?  So the existence of the wait station is obviously open and obvious to anybody in the area. Anything that happens behind your back, obviously, that's -- that's not something you can see.  So I'm not sure I understand your question.

Q    Are wait stations, according to Carnival, inherently dangerous objects?

A    No, they're not.

Q    Okay.  Does Carnival place warnings on wait stations that they can spontaneously, openly, and obviously injure someone at any time?

A    No, not at all.  And they're a bolted-down wait station, so it's not like they can -- it's not like they can do anything other than just be a wait

**ORIGINAL TRANSCRIPT**

43

station.  So the wait station itself is a permanent fixture on the deck.  There's nothing dangerous about it.

Q    And on -- on this date, regardless of what the conditions were or how high the wind speeds were, do you know if Carnival either by a -- some written warning or verbal warning communicated to Ms. Cole at any time that she was taking a risk upon herself walking onto the Lido deck and dining in the open dining area?

A    No, there were no warnings at all concerning the open deck areas -- the dining areas, and the open deck.

Q    Okay.  So -- but you're saying that Ms. Cole, a passenger on a cruise ship, and without knowing if she'd ever been on a cruise ship before, she should have known that the winds were too high, and she could get hurt?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  Well, I believe her testimony is that she had been on cruises before, so I don't know that she's never been on a cruise ship.  I believe she testified she sailed twice before.  But neither here nor there, if you're in an open deck area, it's not -- it's not -- I mean, the wind and

**ORIGINAL TRANSCRIPT**

44

weather is not specific to only cruise ships.  It's anywhere.  If you're anywhere in a windy spot, you can, you know, definitely expect that the wind can pick up objects and something can -- can fly, you know, through the air.  That's -- that's just common sense.  But the cruise ship is exposed to weather. It's exposed to the elements and there is wind on the open decks.  And that's something that is open and obvious to anybody on any outside deck, you can feel the wind.  You can see the weather.  So it's just common sense.

Q   Okay.  I'm just trying to understand what Carnival's going to allege at trial in this case.  So, Ms. Cole, on the date in question, it was her responsibility solely to see that it was windy and know that if she went and got food and sat down in the Lido deck to eat, there was a chance she could be injured.  And that was completely on her.  Carnival had no further responsibility regarding the conditions on the ship and whether or not they may pose a risk of injury to Ms. Cole.  Is that your position in this case?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  I mean, I don't know about being injured.  That's not the only expectation.  My -

**ORIGINAL TRANSCRIPT**

45

- my -- my answer to you was a little more general. You -- it's no different than, for example, a menu hitting you.  A menu is made out of paper, but it can fly if -- if the wind picks up.  So it's not just an expectation of getting injured.  It's -- it's an expectation that if you are on an open deck, wind does and can occur.  And anything that can be picked up by the wind, that's a possibility for it to -- to be picked up and and fly, right?  So it's just common sense and that's something that -- that is open and obvious on an open deck with elements.

BY MR. DIEPPA:

Q    Okay.  So does that mean Carnival disavows responsibility for any object picked up by the wind on its ships that may strike a passenger?  That's never Carnival's responsibility?  Is that what you're saying?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  That's not exactly what I'm saying.  It depends on the object as well.  I mean, it's --

BY MR. DIEPPA:

Q    Explain.

A    So in in this case, it's a lid on a Lexin. It's a food operations item.  It's not really

**ORIGINAL TRANSCRIPT**

46

something that we have any record of ever happening before. It's not something that, you know, we've -- we've never had this issue before. So it's nothing that we would foresee would happen. It's different if we're talking about other items, you know, bulky items, things like that. But this is a lid on a container that weighs, you know, less than a pound. It's not something that -- that it's -- that that we've had issues within the past.

Q   Okay. You're saying that Carnival has never had a loose object strike a passenger?

MR. JARNAGIN: Objection, form.

THE WITNESS: I'm specifically referring to the lids on these containers, which is what's at issue in this case. I'm not saying anything else, any other objects. That wasn't really at issue here. What's at issue here is a lid from the containers in the wait station.

BY MR. DIEPPA:

Q   Ma'am, are you saying that Carnival has never had a loose object picked up and strike and injured a passenger before Ms. Cole's incident?

A   Again, that's not what I'm saying. I'm specifically talking about the lid on these Lexin containers. That's what's that issue in this case,

**ORIGINAL TRANSCRIPT**

47

and that's what I'm talking about specifically.

Q   Okay.  Have you ever had a similar incident where, maybe not a Lexin, but another object came loose on a ship and struck and injured a passenger?

A   I believe we did a prior incident search in this case, and there were other instances, none having to do with these containers themselves.  There were other objects.  But again, my answer is solely basing it on the containers and the lids at issue in this case.  That's what I am referring to.

Q   Okay.  So, unless it specifically involves a piece of plastic or plastic container, Carnival would have no way of anticipating or foreseeing that Ms. Cole's incident could have ever happened?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  I don't understand your question.  Unless it is a container, I'm not sure how you phrase it.  Can you rephrase that?

BY MR. DIEPPA:

Q   That's what you're telling me, ma'am. You're saying that nothing ever happened similar to this incident because nothing ever happened with a plastic container.  That's what you told me.

A   I'm saying we've never had this issue before of the lid on -- on these types of containers hitting

**ORIGINAL TRANSCRIPT**

48

anybody.  It's not something that we've had before.

Q    I understand.

A    I just did not understand your question. The way you phrased it, I didn't understand it, so I was asking you to rephrase it.

Q    Yes.  And the question is, is it Carnival's position that unless something happened previous to this, that specifically involved a plastic container being picked up by wind, Carnival is unable to safeguard or foresee or otherwise anticipate that an incident like this could have occurred?

MR. JARNAGIN:  Objection.

THE WITNESS:  And I apologize.  I don't understand what you're asking me.  It's confusing to me and I -- I can't answer your question.  I don't understand what you're trying to ask.

BY MR. DIEPPA:

Q    Well, you're saying in this case that Carnival had no way to anticipate what happened, correct?

A    As far as a lid from the wait station like this, right.

Q    Uh-huh.

A    We -- it's not something that we've had an issue with before.

**ORIGINAL TRANSCRIPT**

49

Q   Okay.  So that's -- that's what you're saying.  Unless this exact sequence of events happened, like you've described, that a wind picked up piece of plastic or plastic lid, Carnival, it would be impossible for them to anticipate or foresee this ever happening the way it did, correct?

A   I would say so.  We've -- we've never had any prior instances where this has occurred.  So, it's not something we were expecting to occur.

Q   Okay.  And that is the position of Carnival in this case?

A   As I sit here today, that is my position, yes.

Q   Okay.  All right.  So looking at --

MR. DIEPPA:  And we'll mark this as Exhibit 4.  And this is Carnival's Verified Answer to Plaintiff's Interrogatory Number 10.  Carnival provided a list of incidents and I'd like to go through those with you.

(EXHIBIT 4 WAS MARKED FOR IDENTIFICATION.)

BY MR. DIEPPA:

Q   All right.  Okay.  Can you see those, ma'am?

A   I can.

Q   Okay.  And you've identified here five incidents, and you would agree each of these incidents

**ORIGINAL TRANSCRIPT**

50

occurred on a Carnival cruise ship prior to the date of Ms. Cole's incident on July 24, 2022, correct?

A    I believe so.  That's correct.  We did three years back, I believe.

Q    Okay.  So, you would agree that on October 4, 2019, a guest was injured when she was eating on Deck 9 when a piece of metal frame fell on his head, causing laceration or injury, correct?

A    That's what it states.  That's correct.

Q    Okay.  And we can agree in this case, well, do you know which deck Ms. Cole was in this case?

A    I believe it is Deck 9.

Q    Okay.  And was she also eating?

A    She was eating.  It's at a different location.  The Rosie Restaurant is an indoor venue, but she was eating at the time.

Q    Okay.  Did something fall on her?

A    Something struck her.  I'm not sure that we can describe that as something falling.  It's a little different than a metal frame falling from above.

Q    Did something strike Ms. Cole while she was eating on Deck 9 of a Carnival Cruise Line ship?

A    That is what she's alleging.

Q    Okay.  And October 4, 2019, did you also have a report of a passenger eating on Deck 9 and

**ORIGINAL TRANSCRIPT**

51

being struck by an object?

A    A metal frame that fell on his head.  Yes, that's correct.

Q    And on November 10, 2019, you had another incident here where a guest was seated on the couch and a metal piece of a vacuum cleaner extension fell from above and hit his left leg.  Correct?

A    That is correct.

Q    Okay.  So as far as this incident, this involved another instance where something fell on a passenger or a passenger was struck by an object?

A    That's correct.

Q    Okay.  And on December 16, 2019, you reported an incident involving another guest and this guest, he was also in the dining room?

A    This would be one of the main dining rooms on Deck 3, correct.

Q    Okay.  And in this case, a waiter dropped a -- is that plastic covers?

A    It's a brown plastic cover to a dining plate.  So it's a round plastic cover that they put to keep the food warm.

Q    Okay.  And as far as you know, the object that struck Ms. Cole, was it also plastic?

A    It was plastic as well.  It's a little

**ORIGINAL TRANSCRIPT**

52

different.  It's --

Q    Ms. Cole was --

A    The brown plastic containers are -- they go up directly on the dining plates.  So it's not exactly like a lid.  It's -- it's a smaller container or lid or whatnot.

Q    Okay.  So here we have on September 16, 2019, we have a guest that's -- that's eating.  There's a waiter in the vicinity.  And as far as you know, in Ms. Cole's case, was there also a waiter in the vicinity at the time of her injury?

A    I'm not sure if there was a waiter or not --

Q    Right.

A    -- in the Lido deck area aft where the plaintiff was.

Q    Are you aware of the testimony in terms of the maître d' and what Ms. Cole said about who was in the vicinity?

A    I read the testimony.  I just can't recall if it was anybody, you know, not -- not like, for example, here where it was a server that's in the dining room serving people.  I believe it might have been a crew member in the area, but it -- it's not -- you know, they're not waiting on tables like they

**ORIGINAL TRANSCRIPT**

53

would have been in the dining room for the guests that we're referring to now.  It's a little different.

Q   Oh, okay.  And -- and -- but we can agree this guest was eating at the time a plastic cover struck him, specifically, his right ankle -- or struck her?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  The waiter did drop the plastic cover, which did strike the passenger.  That's correct.

BY MR. DIEPPA:

Q   And the passenger reported an injury due to that instance?

A   Correct.

Q   And then, specifically in terms of the third incident, on December 16, 2019, is it Carnival's position that there's absolutely no similarity between this incident and the incident that occurred involving Ms. Cole on July 24, 2022?

A   It's completely different being that they are completely different venues.  One is a sit-down, indoor restaurant where a waiter was actually serving the guest, and actually dropped one of the plate covers on the guest, or -- well, on the floor and it bounced back on the guest.  But it was human error

**ORIGINAL TRANSCRIPT**

54

where he dropped something.  And what happened in our case is different because it happened on an outer deck, exposed to the elements where the wind is what allegedly picked up this plastic piece and that's what struck the plaintiff.  So the mechanics and the setting and everything is -- is different.  I don't consider it similar at all.

Q   Other than reviewing the written incident reports corresponding to these prior incidents listed in your interrogatories, did you ever conduct any personal investigation of how the incidents occurred?

A   No.  I mean, other than the documentation that we have, I -- I wouldn't have done anything additional.

Q   Okay.  So you wouldn't be able to tell me about the specific facts of the incidents?  I mean, you never spoke to anyone who was involved in the incident?  You've never reviewed the records relating to the incident or a video relating to any of these incidents, correct?

A   No, these are privileged documents.  I did not review the full accident reports for -- for today's deposition.  We have passenger injury statements, but that's -- that would be the extent of it.

**ORIGINAL TRANSCRIPT**

55

Q   Okay.  So the -- the conduct of the waiter you're describing as human error would that just be something that you're getting from looking at the written incident report that was produced in this case?

A   That and the description that we have in front of us now that you're showing me.  It clearly states that a waiter dropped a plastic cover.  So that would be the waiter's action.  That's a little different than wind picking something up.

Q   You've never spoken to that waiter, correct?

A   No, I have not.

Q   There's nothing in the incident report stating why that waiter dropped that container, correct?

A   Well, I -- I don't know.  Again, I haven't reviewed the accident report.  But this is an indoor dining venue, so I don't believe that wind would have been a factor in -- in an indoor dining area.

Q   Okay, I'm not asking about wind.  I'm asking about what you're contending as human error.  And from what you've told me thus far, it sounds like you're just speculating that this waiter committed some human error.  Because I -- I don't see that it's in the incident report, and I don't see that it's in your

56

answers to interrogatories.

A    No, it's my interpretation of him dropping. It was his actions that caused him to drop the plastic cover.  So that's why I categorized it as human error. It's -- to me, it's common sense.  But you're right, I've not reviewed any records.

Q    And on November 12, 2021, you identify here a prior incident, Deck 10, aft, portside, Old Fashioned BBQ Restaurant.  Do you know if that's indoors or outdoors?

A    That would be indoors.

Q    Okay.  And this incident, a metal plate fell from the ceiling and hit this passenger on her right shoulder?

A    Correct.

Q    Okay.  Do you know if Ms. Cole complained of an injury to her shoulder while she was eating in this case?

A    It -- that's what she's alleging, correct. It's her shoulder that was injured.

Q    Okay.  And on November 12, 2021, you had another incident where a passenger was eating at one of the ship's restaurants.  Something fell on them, and they also injured their shoulder?

A    In an indoor venue, a ceiling panel seems to

57

have fallen from above and hit the person in the shoulder as reported.  So, it is a little different than what occurred in our case.  But you are correct.  You have the facts in front of you.

Q   Okay.  And July 15, 2022, which is approximately 10 days before Ms. Cole's incident, another guest was injured when a server carrying a tray of plates dropped a plate onto her head?

A   That is correct.

Q   Okay.  And this guest was also injured in a ship's dining area when something was dropped onto them?

A   This was in an indoor dining room when the server dropped the plate.  Yes, that's correct.

Q   Okay.  As far as the containers that struck Ms. Cole, do you know who placed them out on the Lido deck when it was windy that day?

A   Not specifically the crew member who placed them.  It would have been somebody in the Food Operations Department.  They're the ones with access to the wait stations and the -- and the equipment.  But we don't know who it was specifically.

Q   Okay.  In terms of those employees, whichever employee it was, we can agree that those containers, they're -- they're normally placed there

**ORIGINAL TRANSCRIPT**

58

by employees of Carnival?

A    They are.

Q    And are those employees instructed to monitor the conditions outside on the Lido deck before they place containers in the dining area and leave them unattended?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  Usually, I don't believe that there's any -- any notification or any instruction about that.  Unless there is extreme weather conditions that they would need to cease operations on the outer decks, I don't think that normally day-to-day there's any warnings or any information given to them about these containers.

Q    Okay.  In terms of the training received by the crew members that are responsible for the Lido deck dining area where Ms. Cole's incident occurred, are you aware of what their training consists of?

A    Generally, it would be on what their duties are, whether they are, you know, servers or restaurant or cooks or whatever it is in food operations.  I'm not really sure what specifically you're -- you're asking to know about.

Q    I'm just asking if you're aware of what their training consists of; the servers in the Lido

**ORIGINAL TRANSCRIPT**

59

deck area.

A    Generally, what -- what they're going to be doing.  It depends on the position, but it's generally, you know, how to do their jobs.  It's how the operations would run or how they would work or what they would be doing; their duties.  It would be just general food operations training.  I don't really have specific knowledge.  I -- generally, they are trained on their positions.  But again, I don't know if that's enough to answer your question, or I don't know exactly what you're looking for.

Q    Do you know if they're instructed that they should not leave objects or equipment in places where those objects or equipment can come loose or come unsecured and injure passengers?

A    No, I don't believe that there's anything that's specific as part of their training.

Q    Okay.  Do you believe, even if it's not part of their training, that's something they should do in -- in the ordinary course of their employment?  Make sure that the items they use to operate the dining area are secured in the manner that they're not going to pose a threat of injury to the ship's passengers?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  And again, it depends on what

**ORIGINAL TRANSCRIPT**

60

we're talking about.  If we're talking about these containers at issue, I -- I don't believe that there's anything that they need to do that, you know, extra or additional to.  These lids are plastic.  They weigh less than a pound.  It's not something that they would need to secure in any way.  The lids are part of a container, and it's -- it's really no different if, you know, a plastic cup falls from a table and picks up -- the wind picks it up and -- and, you know, it flies across the deck.  It can happen, but it's something that wouldn't be a danger or a risk to anybody.  There's really nothing that these containers need to be, you know, secured with or anything like that.  It -- it's just not something that they would do onboard.

Q    That wasn't part of my question.

MR. JARNAGIN:  I don't mean to interrupt your line of questioning, but when we have a moment, can we have a bathroom break for like five minutes?

MR. DIEPPA:  Yeah, yeah.  I'll just get --

BY MR. DIEPPA:

Q    Ma'am, that wasn't part of my question.  At no point in time did I reference containers in this case.  My question was simply, do the employees receive training or instruction, or does Carnival

**ORIGINAL TRANSCRIPT**

61

otherwise believe that in the normal course of their operating the dining area, they should take precautions to make sure that the equipment and objects they use to operate the dining area don't come loose or unsecured and injure passengers?

A    No.  And I've answered that.  There's really nothing that they would need to do that with.  It's not -- within the dining operations, there's really nothing that -- that poses a risk of harm or anything that they would need to secure.  It's just not what they work with.  It's not the objects that they work with, day in and day out.  So I don't believe that there's a need for that.

Q    Okay.  So if one of the restaurant workers, you know, wanted to leave a pot of boiling water on a on a shelf directly above a table where passengers are eating, according to Carnival, there would be no problem with that?

A    You're -- you're coming up with a hypothetical situation that would never happen.

Q    I am.  I am.  So I'm just --

A    There's -- there's no instance where a cook with a boiling pot would place it over a guest table. That's just something that is completely hypothetical and completely just ridiculous.  It wouldn't happen.

62

Q   Ma'am, I need to answer the question.  I need you to answer the question regarding --

A   I answered the question.  That's ridiculous and it would never happen.  I don't know how to answer your question.

Q   Ma'am, and I'll ask it again.  Once again, does Carnival believe that's an acceptable conduct by one of its maître d's to leave a pot of boiling water on a ledge directly above a table where its passengers are eating?  I would just like you to answer.

A   That's -- that would never occur.  That's my answer.  That would just never happen in the realm of of onboard duties or just ships themselves.  That's just not possible of ever happening.

Q   I'm just asking you to tell me whether Carnival believes that would be safe or acceptable conduct by its employees?

A   It would never happen.  That -- that would never be an instance that would occur on a cruise ship.  That's something that would just not happen.  It's something that a crew member would never do.  It's something that just wouldn't occur.  So how do you expect me to answer something that just would never happen?

Q   I'm not asking if it would ever happen.  I'm

**ORIGINAL TRANSCRIPT**

63

just asking if the conduct that I described, you know, leaving something obviously dangerous as scolding water directly above a passenger who's eating would be conduct that Carnival would believe is acceptable by its restaurant workers -- restaurant --

A    I don't believe anybody would believe that that's acceptable.  You're coming up with a ridiculous situation that just would never occur.  No, that would never be a normal situation anywhere.  Forget cruise ships.  That would not be something you do at home.  That's just completely ridiculous.  You're coming up with a hypothetical situation that just -- it's -- it's -- it would not happen.  That -- that action would not be safe for anybody to take anywhere in the world -- (inaudible) a cruise ship.

Q    So okay.  So is there anything -- you know, now that we kind of understand that, is there anything you know that you believe have no -- has no restriction?  That's absolutely safe that, you know, in terms of the equipment and the supplies that are being used to operate the restaurant that, you know, the -- the maître d's can leave anywhere without regard for the safety of the passengers?  Any other objects that you can --

A    Look, accidents can occur, but does that

**ORIGINAL TRANSCRIPT**

64

mean that we need to strap down every -- every knife and make sure that they're strapped down to a table? That's -- that's -- it wouldn't happen.  That's ridiculous.  A knife can fall and injure somebody, for example, sure.  If it falls a certain way off of a table, it can definitely injure somebody.  Sure.  Does that mean that we're going to not use knives onboard? No.  Does that mean that a maître d' is going to have to cut your food for you?  No, that's ridiculous. It's not expected.  Right?  So it's -- it's -- the dining area isn't really something where they are using equipment or items that are dangerous and that would pose a risk.

Of course, accidents happen.  Freak accidents can happen.  Things can occur, but the expectation is that the dining equipment is not something dangerous.  In this -- in this specific case, we're talking about a plastic lid that weighs less than a pound.  That in itself is never going to be expected to be a danger to a passenger, a crew member, or anybody else onboard.  So it's -- you have to kind of take it for what it is.  The dining room or just the dining operations, they don't really work with any equipment that is dangerous or harmful.  Can accidents occur?  Absolutely.  But do they have any

65

procedures to secure their equipment, there are no procedures for that.  It's a dining room.

Q   I'm just -- I'm trying to find out what is the level of acceptable risk of injury and/or death to Carnival's passengers that Carnival is willing to tolerate.  That's why I'm asking these questions.  So can you tell me, as far as you understand it, what level of risk of injury and/or death is Carnival comfortable with exposing its passenger to?

THE WITNESS:  We are talking about --

MR. JARNAGIN:  Object to form.

THE WITNESS:  -- sorry.  We are talking about specific operations within the Food Operations Department and dining rooms.  That's what's at issue in this case.

MR. DIEPPA:  That's not what I'm asking you.

THE WITNESS:  We're not talking about -- well, if you're asking me generally about any operation onboard the vessel, we obviously do have procedures and we obviously do have certain trainings and -- and, you know, regulations.  But we're talking about different areas of the ship.  I'm not here to testify about, you know, the engine department or the deck department or any other department.  We're here about a plastic lid that hit your client.

**ORIGINAL TRANSCRIPT**

66

BY MR. DIEPPA:

Q    Ma'am, you have to --

A    So a plastic lid that belongs to the Food Operations Department, I've already testified on.

Q    You have to -- you have to answer my questions, not the questions you -- you wish to answer.

A    No, no, I am answering your question, (crosstalk) --

Q    And specific to the topic, ma'am, so I'll -- I'll repeat my question.

A    (Crosstalk) -- I'm still speaking here.  I'm trying to answer your question.  You're not listening to me.  I am giving you the answers for what I'm here today.  You're asking extremely broad questions that just don't have anything to do with this case.

Q    Ma'am --

A    Because you don't like the answer I'm giving you.  But that's the answer I'm giving you.

Q    No.  No, ma'am.  I'm just -- your attorney is here to object to the questions, not yourself.

A    I don't believe I'm objecting to a question, sir.  I'm answering your questions.

Q    And that one --

A    But if -- if this is a good time for a

**ORIGINAL TRANSCRIPT**

67

break, I think it might be beneficial for all of us to take one.

Q   I just -- yeah, if you just answer.  I'll let you go as soon as you answer my last question if you can answer it.

A   Sure.

Q   Yeah.  Okay.  Your company, what is the level of acceptable risk of injury and/or death that your company is acceptable with exposing its passengers to?

A   That is a very broad question that is not on today's notice.  What department are we talking about?  What -- what -- you know, give me a -- you have to give me a little more.  That's a very, very broad question.  We operate an entire fleet of cruise ships.  What are you referring to?

Q   On the Lido deck.

A   On the Lido deck is still very broad.  I don't know what you're referring to.  You need to ask me a very specific question because we have different departments.  We have an engine department that deals with Lido.  We have a deck department that deals with the Lido deck.  We have a hotel department that, you know, deals with the Lido deck.  So what are we talking about in general?

**ORIGINAL TRANSCRIPT**

68

Q    The dining area.

A    In the dining room area, it would be food operations and I've already answered your question. There's nothing that food operations would deal with in the dining area for the guest side that would require them to have any sort of procedure or -- or training for securing objects.  They work with plates and silverware, plastic objects.  It's -- it's just not something that we do.  So your question is very different than what's at issue in this case. Generally, there are procedures and there are things for -- for different areas.  But specifically for dining on Lido, I've given you the answer.  There's just nothing.

MR. DIEPPA:  Thank you, ma'am.  We can take a break now.

THE WITNESS:  Thank you.

MR. DIEPPA:  How long do you need, Cooper?

MR. JARNAGIN:  Just five minutes is fine.

MR. DIEPPA:  Okay.  We'll -- we'll come back in five.

MR. JARNAGIN:  Thank you.

COURT REPORTER:  Time is 11:28 a.m.  We're off the record.

(OFF THE RECORD.)

**ORIGINAL TRANSCRIPT**

69

COURT REPORTER:  Time is 11:36 a.m.  We're back on the record.

BY MR. DIEPPA:

Q    Okay.  Ma'am, going back to Exhibit 2, Carnival's affirmative defenses in this case, there's affirmative defense letter (t) where Carnival alleges that plaintiff's claim is a fraud in whole or in part.  So in this case, Carnival is accusing Eureka Cole of fraud; is that correct?

MR. JARNAGIN:  I'll just step in and say Carnival's withdrawing that affirmative defense.

MR. DIEPPA:  Okay.  So based on the stipulation by Carnival's attorney, you will not have to answer the last question.

BY MR. DIEPPA:

Q    Ma'am, I know we touched on it earlier, but are you aware that in this case Carnival employees, Vikram Thapa (ph), Shruti Bhatia (ph), Alexandra Ong (ph), and Juan Esteban Venegas Gonzalez (ph), MD have testified at deposition?  Are you aware of that?

A    I am.

Q    Okay.  In terms of their testimony is there anything that you, as a corporate representative, dispute or disagree with?

A    No, I don't believe so.

**ORIGINAL TRANSCRIPT**

70

Q   Now, a number of other employees were listed in Carnival's interrogatories who were, I guess, in the -- in the vicinity of the dining area at the time the incident occurred.  You're aware of that?  I believe it's about 12 separate individuals.

A   That they would have been working the -- the dining shift that evening, yes.  I'm not sure that they would have been in the immediate area, but those were the people on the schedule for that day.

Q   Okay.  In terms of -- of those individuals have -- has Carnival since been able to identify any of those individuals as being individuals who were in the vicinity of the incident at the time the incident with Ms. Cole occurred?

A   No.  At this time, we do not have any information as to who was in the area.  We've reached out to a -- to a number of them on that list.  The ones that we have been able to reach have confirmed that they were not involved.  That they were not, you know, aware of this incident.  And then there are a few that we've not been able to -- to reach to contact.  So at this time, we do not have the identity of the person that would have been in the area immediately when it occurred.

Q   Do you know which ones you haven't been able

**ORIGINAL TRANSCRIPT**

71

to communicate with?

A    Not off the top of my head.  I can get the information.  I'm sure Mr. Jarnagin can provide you that information as well.  But I just don't have that right now.

Q    Okay.

A    If you need me to look into it, I can do that.

Q    Yeah, we can do it after the deposition.  I'm sure Mr. Jarnagin will get that information over to me.

But in terms -- at least in terms of that individual who would have been there, who, you know, is one of the 12 people most likely, that individual would have been an employee of Carnival Cruise Lines as far as you know?

A    Correct.

Q    In terms of the events leading up to this incident, the operation of the dining area and the placement of the plastic containers outside of the Lido deck are those all things that were done by Carnival Cruise Line's employees in the course and scope of their employment?

A    The placement, you said?

Q    Yeah.

72

A    Yeah.  It would have been.

Q    And to the extent any employee was in the area and -- and I know we don't know which employee -- you know, any -- any statements they would have made or any precautions they may have undertaken or not undertaken, that would have been by a Carnival employee in the course and scope of that employee's employment?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  You might need to repeat that or rephrase that because I kind of lost you.

MR. DIEPPA:  Yeah, I'll rephrase it.

BY MR. DIEPPA:

Q    I'll -- I'll put it this way.  In terms of whatever that unknown employee that was in the vicinity did, is it Carnival's position that he would have been acting in the course and scope of his employment?

A    Yes.  As far as assisting in contacting the maître-d', his boss at the time, to alert him that the passenger wanted to speak to him and all of that. That's what you're referring to?

Q    Yeah, yeah.

A    Yes.

Q    And as far as you know on -- on the date

**ORIGINAL TRANSCRIPT**

73

this incident occurred had any warnings been posted in the dining area of the Lido deck or announced pertaining to the dining area of the Lido deck by Carnival?

A   No.

Q   Is Carnival aware of the wind speeds on the date of the incident?

A   As I sit here, right now, I'm not aware of any information about weather.  They don't really keep weather reports.  I think they only keep the navigational deck logs, which would record certain weather conditions.  But they do that on an hourly basis, so I'm not sure if we have the information for the exact time of the incident.

Q   And at the time of this incident, do you know if the ship was moving?

A   I believe it was.  I believe they had left port, if I'm not mistaken.

Q   Okay.  Do you know -- do you know how fast?

A   No, I do not.

Q   Does Carnival know how long the -- the containers that struck Ms. Cole were left unattended on the Lido deck before the incident?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  No, I do not.  And I don't

**ORIGINAL TRANSCRIPT**

74

know about leaving them -- you describe it as "unattended".  That's just where they place the containers.  I don't think that there's ever anybody attending to the station permanently.  The station is there to facilitate the use of, you know, silverware and -- and where they place dirty plates and things like that.  I don't believe that there's anybody permanently attending the wait stuff.  It's just there to facilitate their -- their job duties.

BY MR. DIEPPA:

Q   Okay.  Are -- do you know if, prior to this incident, any specific employee of Carnival was attending to this particular dining station?

A   No, I'm not aware of anybody.

Q   Okay.  So to the extent that nobody was attending it and there was no Carnival employee in the area, do you know how long the dining station was in that condition prior to Ms. Cole's incident?

A   In that condition, meaning with the containers placed on the surface, correct?

Q   Yeah.

A   No.

Q   However it was left.

A   Yeah, no.  We -- we don't keep track of, you know, when the containers are placed or anything like

75

that.  Like I said, it's -- it's just a station to facilitate their -- their duties.  It's not something we record or keep track of.

Q    Yeah.  And what I mean is -- for example, do you know the time the Lido deck dining area would have opened on that day?

A    So the chairs where she was sitting, that area is open 24 hours a day.  Whether there's food available or not, that's a different story.  But the seating area doesn't really close.  It's -- it's open seating that's available for anybody to access whenever they'd like.

Q    Okay.  So Carnival doesn't know when the winds would have started picking up on the Lido deck, correct?

A    I -- like I said, we would only have a deck log that would show hourly updates on weather, very brief updates on weather, but that would be the only information that we have for the date of the incident.

Q    Okay.  So and -- and Carnival, likewise, does not know the total time period those containers that ultimately struck Ms. Cole would have been present outdoors on the Lido deck prior to her injury?

A    Right.  Like I said, we don't keep track of that.  We don't keep record of when they're placed.

**ORIGINAL TRANSCRIPT**

76

Q    And do you know from either personal experience or being informed prior to this deposition today how many cameras were in the vicinity where Ms. Cole's injury occurred?

A    I don't believe that there are any cameras in the area of the Lido deck aft where this occurred.

Q    Do you know if it is Carnival's procedure to retrieve or attempt to retrieve footage of an incident where a passenger claims they were injured?

A    Yes, as part of the accident investigation, security will always check to see if there are cameras that do capture the area of the incident, and, more importantly, whether or not the incident was captured on the -- on the on the footage.  In this case, I did reach out to the ship.  And I am confirming that now. I reached out to the ship security staff just to doublecheck, and they did confirm for me that there are no cameras on Deck 9 in the aft Lido location.  So in this case, they would have checked.  They would have seen that there were no cameras.  And, obviously, there would be no footage if there are no cameras in the area.

Q    Do you know if Mr. Thapa -- Vikram Thapa checked on the date of the incident for camera footage?

**ORIGINAL TRANSCRIPT**

77

A    I mean, that's standard procedure.  They would always, when doing the accident report investigation, they would always check for CCTV.  But like I said, there are no cameras there.  There's never been any cameras on the aft portion of the Lido deck on the ship.  So if there are no cameras, obviously, there is no video.

Q    Okay.  And we spoke to Mr. Thapa.  And during his deposition, he testified regarding a photograph where a container lid was being weighed.  I asked him about the whereabouts of that lid.  Can you confirm the whereabouts of that lid?

A    The exact lid?  I'm not sure if it was taken out of service or anything like that.  I believe he even testified he wasn't sure if it was the same one.  It was the one that the -- the plaintiff took him to the -- the area and pointed out the lid.  So that's the one that he, you know, took down and -- and weighed.  But after that was done, I don't believe that we've saved the exact lid.  I know we have a sample lid in our possession, but they're all pretty much the same.

Q    Okay, so your testimony about the weight of the lid, is it -- is it based on Mr. Thapa's experiment, you know, weighing the lid on the -- on

**ORIGINAL TRANSCRIPT**

78

the cruise ship --

A    It's --

Q    -- sometime after the incident occurred?

A    -- part of the accident report investigation.  That's correct.

Q    Okay.  I mean, do you know where the scale is that he used?

A    I believe he testified that it's a security department scale.  It would be in their office.

Q    Okay.  And then that that lid that he weighed on that date, Carnival's not sure about that object's whereabouts?

A    The exact lid, no.

Q    Does Carnival know how fast that lid was traveling at the time it struck Ms. Cole?

A    No.

Q    Is there any procedure in place as to the maintenance of the dining stations, like, you know, when they're supposed to be emptied out?  You know, when they're supposed to be, you know, replenished or, you know, what have you?

A    I'm not really sure if there are specific instructions on that.  I know that they -- they do their -- their job on board.  You know, a lot of stuff is on-the-job training and -- and just as per the

**ORIGINAL TRANSCRIPT**

79

needs of the vessel.  I don't believe that I've ever seen anything as specific as when they're supposed to replenish or put those containers out or anything like that.

Q   Okay.  Does Carnival have safety procedures in place for when the company believes the -- the winds are too high on the deck?  Do those procedures exist at all?

A   They wouldn't be food operations procedures. But generally, there would be procedures as to what to do in inclement weather conditions.  I'm not too familiar with them as I sit here today.  Obviously, they don't have anything to do with food operations. We're talking just about navigational operations and things like that.  That -- that does exist.  But I'm not really aware of any details as I sit here today.

Q   Okay.  And I'm just asking about, you know, not -- not dining, just, you know, weather conditions including wind.  So do you know any measures or steps that Carnival takes when it believes there is inclement conditions on the exterior of its ship, specifically relating to wind?

A   This would not be specific to this case. Again, it's not something that I prepared for to testify today.  It's just knowledge I have from other

**ORIGINAL TRANSCRIPT**

80

cases and from working with the company.  They do take certain steps when the winds reach certain speeds, then the navigational bridge will put out an advisory to all the departments, and the departments will shut down operations if they need to.  For example, the pools can be closed.  Water parks, water features can be closed.  Even doorways to the exterior might be closed.  Balcony doors, things like that.  It just -- it depends on the weather.  And it would also depend on the departments and what they need to do in order to secure their areas.

So again, that's just very generic information that I just know from other cases, but nothing really at issue here on the date of the incident.  It wasn't that type of weather condition.

Q    I mean, we can agree you're not completely sure of what the weather conditions were at all?

A    I've already testified we don't have specific weather reports for the time of the incident.  But I don't have any indication that there was any inclement weather or any need to shut down the -- the operations on the open decks on that day.

Q    In terms of what you described, shutting down the operations on the open deck, would that also include, if necessary, the Lido deck dining area?

**ORIGINAL TRANSCRIPT**

81

A    Outdoors, certainly.  I'm not sure that they would suspend dining altogether inside.  There are dining venues that are covered and indoors on the Lido deck.  But perhaps, you know, if the weather gets bad enough, they -- they can close the doorways leading to the open decks.  Not what happened in this case at all.  I'm just, again, generally -- that's my understanding that they can do that if it gets to that point with weather.

Q    Yeah, and I'm only asking if it's something that can be done, that it's feasible for Carnival to do.  So that -- that would be one of those things.

A    Sure, in extreme weather conditions, that's something that they can do.

Q    In those conditions, are there, like, further additional procedures for securing cargo?

A    That I'm not sure about.

Q    Okay.  Or as far as you're aware, does Carnival have any procedures for securing cargo on its ships?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  I believe there are certain procedures for certain items.  Again, nothing to do with food operation, so it's not something that I'm familiar with as I sit here today.  Generally, I do

**ORIGINAL TRANSCRIPT**

82

believe that there are certain procedures for other departments that deal with, you know, bigger items on board the ship, in other areas of operation.

BY MR. DIEPPA:

Q    Yeah, and what I'm saying is, as far as what's -- you know, the equipment present and, you know, the other objects present in the dining area of the ship, do you know if there's any, you know, policies or procedures as far as securing those items, whatever they may be?  You know, it maybe the -- you know, maybe the stoves or the kitchen equipment or, you know, any other supplies?

A    No, I mean -- no.  Because that would be -- that would be different.  That would be -- food operations is kind of broad, right?  That's dealing with chefs and the galley and the crew, and that's completely different than what's at issue here.  So I really don't have any details as far as what they would do inside a gallery or inside a crew area.  For the dining areas, there's really nothing.  I've already testified to that.  There are no procedures or, you know, policies or anything like that, that would apply.

Q    The dining station that was involved in Ms. Cole's incident, do you know if that was secured?

**ORIGINAL TRANSCRIPT**

83

A    The dining station itself is bolted down to the floor.  It's -- it's not -- it's a fixed object.

Q    Okay.  So it is secured to the deck?

A    Yeah, it's permanently affixed to the deck. It doesn't move.

Q    Okay.  Do you know why the dining station used in the Lido area is secured to the deck versus, you know, one that would be able to be moved about the deck?

A    I don't.  It's the way the ships are designed.  I believe that tables out on the open deck are also part of the -- the design.  They are also affixed to the -- to the floor, to the deck.  But that's just the way the ships are designed.  I don't have any further information on that.

Q    Okay.  Wouldn't that be to keep, you know, those objects that you described, the dining station and the tables, to keep them from -- from shifting in inclement conditions or -- or while the ship is underway?  Wouldn't it be for that reason?

A    I could speculate that that would be the reason.  I don't think that's what you want me to do. I would need to confirm that with, I guess, a design department or a new builds department.  I can assume that that's the reason.  Obviously, you're on a moving

**ORIGINAL TRANSCRIPT**

84

ship, so it's much easier to have the tables and the -- the bigger fixtures affixed to the -- to the deck but that would just be speculating on my part.

Q   Okay.  And in terms of the -- the medical records you did review, that would be the -- the medical records generated from the onboard physician?

A   Correct.

Q   And do you have any reason to dispute the accuracy of what's contained in those records?

A   I do not.

Q   So we can agree that at least as far as those records are concerned --

MR. DIEPPA:  -- and we can mark them as Exhibit 5.  I can show them to you if you don't have a copy, if you like.

THE WITNESS:  I have a copy I can pull up and follow along.

MR. DIEPPA:  Okay, that's fine.

THE WITNESS:  Sure.

(EXHIBIT 5 WAS MARKED FOR IDENTIFICATION.)

BY MR. DIEPPA:

Q   Okay.  So in terms of the ship's medical records and the information contained in those records, which we marked as Exhibit 5, we can agree that Ms. Cole presented to the ship's infirmary at

**ORIGINAL TRANSCRIPT**

85

7:06 p.m.?

A    That is the time on the top of the document, correct.

Q    Okay.  And then she -- also according to that record, she complained of left shoulder pain?

A    Yes.

Q    And ultimately the -- the ship's diagnosis was some form of shoulder injury?

A    (Technical difficulty) -- diagnosis was -- I see the final diagnosis listed as muscle strain.

Q    Yeah.

A    Yes.

Q    To the left shoulder?

A    I would assume so.  That's what the records are talking about, the left shoulder.  The diagnosis itself just has muscle strain, but I can see that only the left shoulder was treated.

Q    Okay.  And then there's a -- on the HPI, history of patient injury, shoulder injury.  There's the description of the incident.  You can see that?

A    Yes, it starts on page 2 and goes on the following page?

Q    Yes.

A    Okay.

Q    Okay.  And in terms of that description at

**ORIGINAL TRANSCRIPT**

86

least, that was taken down by Dr. Gonzalez.  You don't dispute that description as to how Ms. Cole described the incident and how Carnival understands the incident occurred?

A    No.  That would have been what she reported and that would have been what was taken down at the time by the doctor.

Q    Okay.  And you agree that Carnival ship's doctor also observed that Ms. Cole had pain on palpitation in the area of the site that she complained was injured?

A    You're reading from a specific portion of it or --

Q    Well, I can help you.  Yeah.  And it's immediately under the the physical examination there.

A    Okay.

Q    Under musculoskeletal, you see Dr. Gonzalez's note there?

A    Got it.  Yeah.

Q    Got it.  All right.  So we can agree that, you know, when she came into ship's infirmary, Ms. Cole, she had a physical examination by Dr. Gonzalez.  And he observed that she had pain on palpitation in her left shoulder.  You can agree on that?

A    On palpation, yes.

**ORIGINAL TRANSCRIPT**

87

Q    Palpation, correct.  Palpation.  Okay.

A    Other than that, yeah.  He didn't see any other signs of -- of anything.  Full range of motion. I mean, the document speaks for itself.

Q    He did recommend that she seek further treatment?

A    I believe he did.  If I can just scroll down, it does say, "follow up care, if required".

Q    Okay.  Also -- he also made a note that the injury was beyond first aid?

A    I believe so, because she did have X-rays taken, so that is considered beyond first aid treatment.

Q    Okay.  And he also confirmed that according to his observations, alcohol or drugs did not contribute to Ms. Cole's incident, correct?

A    I don't believe that they did.  I don't see it here, but I don't (crosstalk) --

Q    Okay.

A    -- believe that that's an issue.

Q    Yeah, I'm just looking at the bottom of page 5 just for your information.

A    Okay.  Got it.  I have it.  Yeah, you're correct.

Q    Okay.  And then on the injury severity,

88

we're on the same page, Dr. Gonzalez, he classified the injury type as bruise/contusion as far as his examination?

A    Yes, I can see that.

Q    Okay.  And then he also indicated the -- the cause of injury under "direct injury cause" and you would agree that he stated it was "struck by object" as far as the cause of the injury?

A    That's what it states, correct.

Q    Okay.  And you also agree that Dr. Gonzalez in his report while he was working for Carnival, he also made an indication as to whether or not a pre-existing medical condition could have contributed to the incident.  You see that as well?

A    Sorry, I'm not -- yeah, I see it.

Q    Still on page 5.

A    I see it.  Yes, I see it.

Q    Okay.  And -- and you would agree that Dr. Gonzalez, while he was working as Cardinal ship's doctor, his answer was "no", correct?

A    Yes, he did mark, "No".

Q    Okay.  So, as -- as far as the first doctor that saw Ms. Cole, we can agree it was Dr. Gonzalez, as far as you know, a doctor that was actually working for Carnival at the time?

89

A    The doctor -- he was working onboard of a Carnival ship.  The doctor is an independent contractor, but he was working onboard the ship.  You are correct.

Q    Yeah.  And I'll just say it this way.  I mean, regardless of the nature of his employment contract, he was assigned as the Chief -- the ship's chief medical officer?

A    Yes, the ship's physician.  I don't know if he was a senior physician or not, but yes, you are correct.

Q    And this report, I mean, he indicated -- I mean it's Ms. Cole's medical records, but it's also part of Carnival's official medical records that are generated whenever a patient is treated at the ship's infirmary, correct?

A    That's correct.

Q    Okay.  So in this document that was generated by Carnival, this indicates that Ms. Cole's injury, which she reported to Carnival on the -- on the date of this incident, that injury, any pre-existing medical condition did not contribute to it.  At least that's what's stated in Carnival's record?

A    That's what's stated in Carnival's record.  He would only have access to whatever it is that the

**ORIGINAL TRANSCRIPT**

90

plaintiff would have told him during her consultation. Obviously, he has no access to her previous records. He's not her treating physician.  So he was limited to, you know, whatever information the patient provided.  But that is what's marked on the --

Q    Okay.

A    -- on the document.

Q    Did you have an opportunity to review Dr. Gonzalez's testimony in this case?

A    I did review it.

Q    Okay.  Would you just basically defer to whatever he said in his deposition in terms of why he came up with the diagnosis?

A    Yes, I would.

Q    Other than the people that have been deposed in this case and the people that Carnival has disclosed in its interrogatory answers are you aware of any other individuals who may have any personal knowledge regarding this case?

A    No, not as I sit here today.

Q    Okay.  For the past three years prior to this incident, because we've agreed on that scope, are you aware of the total number of passengers who have been injured when an unsecured object has fallen or, you know, gone airborne and struck them?

**ORIGINAL TRANSCRIPT**

91

MR. JARNAGIN:  Objection, form.

THE WITNESS:  It would be whatever the resulting information was that we provided.  I didn't count them.  We can go back to the document you have for the three years for the class of ships that would have been the results.  I'm not sure if that's what you're asking specifically.

BY MR. DIEPPA:

Q    The manner in which you retrieve those incidents is that -- without going into anything that's -- that's privileged -- is that from a computer database that's maintained by Carnival?

A    From a number of them.  I use three different databases to do those searches.  But yes, they are databases that are maintained by Carnival.

Q    Okay.  In terms of the containers that struck Ms. Cole, are the Carnival employees the only individuals authorized to use and move those containers?

A    They're -- they would be the only ones on board to -- to handle them.  That's -- I would say that's correct.

Q    The containers that were involved in this incident, do you know if those containers were specifically preserved?

**ORIGINAL TRANSCRIPT**

92

MR. JARNAGIN:  Objection, form.

THE WITNESS:  Again, that -- I'm not sure that it was the same exact container from that day, but we -- we use the same type of container, so we do have access to a similar container.  I just can't tell you if it's the same exact one.

BY MR. DIEPPA:

Q    Yeah.  And I just -- you know, not in terms of category, but in terms of the actual objects that were involved, the actual containers that were involved in this incident, do you know if those were preserved?

A    No, I don't believe that they were.

Q    Okay.  Do you have any information as to how Ms. Cole's body moved or reacted at the time she was struck by any of the containers?

A    No, I do not.

MR. DIEPPA:  Let's take a five-minute break.  I'm just going to look over my notes.  I don't think I have much left for you, ma'am.

THE WITNESS:  Sure.

COURT REPORTER:  Time is 12:07 p.m.  We are off the record.

(OFF THE RECORD.)

COURT REPORTER:  Time is 12:11 p.m.  We're

**ORIGINAL TRANSCRIPT**

93

back on the record.

BY MR. DIEPPA:

Q    Ma'am, do you know if whether subsequent to the -- the prior incidents that were identified in the interrogatory answers and including Ms. Cole's incident on July 24, 2022, Carnival has undertaken any measures to prevent this sort of incident that happened to Ms. Cole from occurring again?

A    I do not believe that there's been any change in the way that they carry out operations on board.  Definitely nothing as a result of this.

Q    All right.  In terms of -- if Carnival instructed its employees to tie down the plastic containers and secure them to the fixed dining station in the dining area of the ship is that something that would be feasible for Carnival to do if it wished?

A    I'm not sure how that would work.  I'm not sure if that's something that could be done, and I don't know if that's something that they would do.

Q    Okay.

A    Or, you know, if it's needed to do.  So as I sit here today, I don't know.

Q    Okay, that's fine.  And that's all I'm trying to find out.  Like, you know, and I'll -- I'll be more specific.  For example, we know what these

94

containers looked like when they were placed on the dining station.  Do you know if it would be feasible for Carnival to, you know, take a Velcro strap and you know, strap those containers down on windy days?

A    I'm not sure if that's something that could be done or how easily that could be done.  I would only be speculating.  I'm sorry.

Q    That's okay.  But Carnival hasn't done that?

A    No.

Q    Okay.  I mean, do you disagree that if at the time this incident occurred the containers were -- were physically tied down, it's likely that this incident would not have occurred?

A    I mean, that's a possibility.  But again, it's -- it's not something that -- you know, it is a danger I don't think.  Like I've explained, accidents do happen and wind can pick up suddenly, but I don't think that that's something that would be feasible to do.  To have somebody, at any time that the wind picks up, to go and strap down the containers.  It's -- it's not really something that they would be doing.  There's really no need to do that.  Again, the lids don't really weigh anything.  It's -- it's just a standard container that's in use daily.  It's not something that they would need to strap down in any

**ORIGINAL TRANSCRIPT**

95

way.

Q    Okay.  So you don't think it'd be feasible to do?

A    I again don't know what that would entail, but I -- I don't think that that would be -- you know, the wind can pick up at any time.  So would that mean that anytime that there's a gust of wind, they would have to go and secure it?  And then unsecure it?  And, you know, I don't know.  I don't know how easy that would be on a day-to-day operation.  I'm not aware.

Q    There are some things that are tied down on the deck of the ship at some times, correct?

A    Depending on the department and the objects, yes.

Q    But just going back to, you know, if the -- if these objects had been tied down, I mean, wouldn't it be reasonable to assume if these -- these containers were tied down physically, it would be less likely that the wind would pick them up and they would hit somebody?

A    That would depend.  If they're -- it depends on the wind.  It depends on how they are strapped down.  What are you talking about?

Q    I'm asking if you agree that it would be

96

less likely that in an incident such as Ms. Cole's incident would happen if the containers were -- were physically, you know, tied down in the event of wind? Would the incident have been less likely?

A    For -- perhaps.  I mean, if the wind -- if all the conditions are exactly the same, and you're saying that the lid would have been secured on the wait station on that day, then perhaps it would not have happened.  But again I -- I couldn't tell you what the conditions of the wind were, how it happened or anything like that.  So it would just depend on the circumstance.

Q    Okay.  In terms of whether or not Carnival would have elected to tie down or provide the means for -- for tying down and securing objects like the container that struck Ms. Cole, the decision not to do that, would that have to do with the cost of that you know, measure or safety measure?

A    I don't believe so.

MR. DIEPPA:  All right, ma'am.  Those are all the questions I have for you at this time.  You know, barring any, you know, new disclosures or something like that, you know, of course, I reserve the right to come back.  But for today, that is all I have for you.

**ORIGINAL TRANSCRIPT**

97

THE WITNESS:  Sure.  Thank you.

MR. DIEPPA:  Thank you, ma'am.

MR. JARNAGIN:  Thank you.  And I don't have any questions for you, Ms. Borcegue.  If the transcript is ordered, Ms. Borcegue will read.

COURT REPORTER:  Read, all right.

And are there any orders for a transcript of or the video as of right now?

MR. DIEPPA:  Yeah, I'll order a copy.

COURT REPORTER:  Okay (crosstalk) --

MR. DIEPPA:  And yeah, and Cooper, I don't know if you made a note of the, you know, affirmative defenses that were withdrawn during the record, but if you could just, you know, file something or serve something so, you know, we have a written confirmation of what the defenses are going to be for trial?

MR. JARNAGIN:  Sure.  Yes, that's fine.  I can do that.

MR. DIEPPA:  Okay, great.  I appreciate it.  Enjoy your holiday.  Have a good weekend.

THE WITNESS:  Thank you, guys.  Have a good one.

COURT REPORTER:  I think you're going --

12:17.  Off the record.

(DEPOSITION CONCLUDED AT 12:17 P.M.)

**ORIGINAL TRANSCRIPT**

98

CERTIFICATE OF OATH


STATE OF FLORIDA

COUNTY OF MIAMI-DADE


     I, the undersigned, certify that the witness in the foregoing transcript personally appeared before me and was duly sworn.


Identification:  Produced Identification




_____

FRANCISCO RAMOS

Court Reporter, Notary Public

State of Florida

Commission Expires: 01/04/2025

Commission Number:  HH076991

**ORIGINAL TRANSCRIPT**

99

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF MIAMI-DADE

I, FRANCISCO RAMOS, Notary Public in and for the State of FLORIDA at Large, do hereby certify that I made an accurate and complete digital recording of the deposition in the above-styled case.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties, attorney or counsel connected with the action, nor financially interested in the action.

Dated this 21st day of December, 2023.

_____

FRANCISCO RAMOS

**ORIGINAL TRANSCRIPT**

100

CERTIFICATE OF TRANSCRIPTIONIST

I, LUANN H. PARKS, Legal Transcriptionist, do hereby certify:

That the foregoing is a complete and true transcription of the original digital audio recording of the testimony and proceedings captured in the above-entitled matter.  As the transcriptionist, I have reviewed and transcribed the entirety of the original digital audio recording of the proceeding to ensure a verbatim record to the best of my ability.

I further certify that I am neither attorney for nor a relative or employee of any of the parties to the action; further, that I am not a relative or employee of any attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this matter.

IN WITNESS THEREOF, I have hereunto set my hand this 21st day of December, 2023.


_____

LUANN H. PARKS

**Ex. 1**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**EUREKA COLE,**

        Plaintiff,

vs.

**CARNIVAL CORPORATION,**

        Defendant.

_____/

CASE NO.: 23-cv-60532-RAR

**PLAINTIFF'S RENOTICE OF TAKING ZOOM VIDEO DEPOSITION OF**
**CORPORATE REPRESENTATIVE AND REQUEST FOR PRODUCTION PURSUANT**
**TO FEDERAL RULE OF CIVIL PROCEDURE RULE 30(b)(5-6)**

      **PLEASE TAKE NOTICE** that the Plaintiff, will take the deposition of the below named person/entity on the date and at the hour indicated:

**NAME:**     **Corporate Representative of Carnival Corporation with the appropriate knowledge to testify on behalf of the corporation/entity regarding the matters set forth in Schedule A and B, attached to this Notice, pursuant to Federal Rule of Civil Procedure Rule 30(b)(5-6)**

**DATE:**     **Friday, December 15, 2023**

**TIME:**     **10:00 a.m.**

**PLACE:**     **CourtScribes via Zoom (Link to be Provided)**

The deposition is being taken for the purpose of discovery, for use at trial, or both of the foregoing, or for such other purposes as are permitted under the applicable and governing rules.

**IF THE WITNESS IS APPEARING VIA VIDEO CONFERENCE, THEY ARE REQUIRED TO HAVE ACCESS TO A COMPUTER MONITOR IN ORDER TO PROPERLY VIEW ANY EXHIBITS WHICH MAY BE PRESENTED DURING THE DEPOSITION**

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 14, 2023, a true copy of the foregoing was sent via Electronic Mail to:

GrayRobinson, P.A.
Ashley Genoese
Michael J. Drahos
W. Cooper Jarnagin
515 North Flagler Drive, Ste. 650
West Palm Beach, Florida 33401
Tel: (561) 268-5727
Fax: (561) 268-5747
michael.drahos@gray-robinson.com
cooper.jarnagin@gray-robinson.com
ashley.genoese@gray-robinson.com


By:

*Counsel for Plaintiff*

FLORIDA LEGAL, LLC
Attorneys for Plaintiff
12550 Biscayne Boulevard
Suite 405
North Miami, Florida 33181
(t) (305) 901-2209
(f) (786) 870-4030


*/s/ Raymond R. Dieppa*
Raymond R. Dieppa, Esq.
Florida Bar No. 27690
E-Mail: ray.dieppa@floridalegal.law

## SCHEDULE A

1. The Affirmative Defenses and denials raised by the Defendant in its Answer.

2. The Allegations in Plaintiff's Complaint.

3. The evidence supporting the Defendant's Affirmative Defenses.

4. All evidence, facts, and witnesses supporting any claim, assertion or defense, that the Defendant did not have actual or constructive notice of the dangerous condition alleged in the Plaintiff's complaint.

5. All policies and procedure for securing cargo on the ship's vessel.

6. The facts and circumstances surrounding any prior incidents where any passengers on the Defendant's vessels have been injured by unsecured objects or cargo.

7. Any attempts by the Defendant or its employees to determine the origin and cause of the incident which resulted in Plaintiff's injury is the subject of this lawsuit.

8. All information and evidence in the Defendant's possession concerning how the cause of the subject incident and how it occurred.

9. All actions taken by the Defendant subsequent to the subject incident address or remedy the incident alleged in Plaintiff's Complaint.

10. Any and all evidence supporting any claim by the Defendant that the Plaintiff's own negligence caused her injury.

11. The legal name of any entity that employed any of the crew on the Defendant's ship.

12. Any communications or efforts by the Defendant to address, remedy, or repair the condition, malfunction, or other circumstance which caused the injury alleged in Plaintiff's Complaint. To include the names and entities of any third parties who may have been contacted.

13. All evidence, facts, and witnesses supporting any assertion by the Defendant that they did not have notice of the dangerous condition alleged in the Plaintiff's Complaint.

14. All evidence, facts, and witnesses supporting any assertion by the Defendant as to the duration of time the dangerous condition alleged in the Plaintiff's Complaint existed.

15. All communications between Plaintiff and the Defendant or its agents.

16. The identities of any of the Defendant's employees or other witnesses who were present during the subject incident and their last known contact information.

17. Defendant's Answers to Interrogatories.

18. The subject incident, and related events preceding and subsequent to same.

19. Defendant's policies and procedures relating to;

    a. maintenance of the subject vessel's common areas;

    b. conduct and training of employees;

    c. securing of cargo and other objects on the vessel;

    d. warning of dangerous conditions on the vessel;

    e. monitoring areas of the vessel for dangerous conditions;

    f. warning customers of spills and other dangerous conditions;

    g. responding to any incident where a patron is injured on the subject store's premises;

    h. preserving evidence when an incident involving an injury to a patron has occurred;

    i. Employee training and orientation;

20. The identities of the employees who were involved in or witnessed the subject incident on the date in question and their training and orientation.

21. The identities and contact information of any other witnesses to the subject incident.

22. The circumstances and/or reasons for the resignation, termination, or discontinuing of employment for the employees of Defendant which were present on the date of subject incident at the Defendant's store.

## SCHEDULE B

### REQUEST FOR PRODUCTION PURSUANT TO Fed. R. Civ. P. 30(b)(6)

1. All documents, video, photographs, or other items (*other than attorney-client or work product privilege materials*) which the witness will require to provide testimony on the above topics and comply with his/her obligations as a corporate representative witness.

2. Any policies and procedures the Defendant contends are applicable to the subject incident.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**EUREKA COLE,**

              CASE NO.: 23-cv-60532-RAR

      Plaintiff,

vs.

**CARNIVAL CORPORATION,**

      Defendant.

_____/

**PLAINTIFF'S NOTICE OF TAKING IN PERSON VIDEO DEPOSITION OF**
**CORPORATE REPRESENTATIVE AND REQUEST FOR PRODUCTION PURSUANT**
**TO FEDERAL RULE OF CIVIL PROCEDURE RULE 30(b)(5-6)**

      **PLEASE TAKE NOTICE** that the Plaintiff, will take the deposition of the below named person/entity on the date and at the hour indicated:

**NAME:**     **Corporate Representative of Carnival Corporation with the appropriate knowledge to testify on behalf of the corporation/entity regarding the matters set forth in Schedule A and B, attached to this Notice, pursuant to Federal Rule of Civil Procedure Rule 30(b)(5-6)**

**DATE:**     **Tuesday, September 12, 2023**

**TIME:**     **10:30 a.m.**

**PLACE:**     **CourtScribes**
              **Empire Executive Offices**
              **1021 Ives Dairy Road, Building 3, Suite 115**
              **Miami, Florida  33179**
              **(305) 400 - 1100**

      The deposition is being taken for the purpose of discovery, for use at trial, or both of the foregoing, or for such other purposes as are permitted under the applicable and governing Rules. Pursuant to Federal Rule of Civil Procedure Rule 30 the officer administering the oath will upon request  (i) identify the style of the action, (ii) state the date, and (iii) swear the witness. Unless otherwise stated, the officer/stenographer administering the oath shall operate the video.

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2023, a true copy of the foregoing was sent via Electronic Mail to:

GrayRobinson, P.A.
Ashley Genoese
Michael J. Drahos
W. Cooper Jarnagin
515 North Flagler Drive, Ste. 650
West Palm Beach, Florida 33401
Tel: (561) 268-5727
Fax: (561) 268-5747
michael.drahos@gray-robinson.com
cooper.jarnagin@gray-robinson.com
ashley.genoese@gray-robinson.com

By:

*Counsel for Plaintiff*

FLORIDA LEGAL, LLC
Attorneys for Plaintiff
12550 Biscayne Boulevard
Suite 405
North Miami, Florida 33181
(t) (305) 901-2209
(f) (786) 870-4030

*/s/ Raymond R. Dieppa*
Raymond R. Dieppa, Esq.
Florida Bar No. 27690
E-Mail: ray.dieppa@floridalegal.law

## SCHEDULE A

1. The Affirmative Defenses and denials raised by the Defendant in its Answer.

2. The Allegations in Plaintiff's Complaint.

3. The evidence supporting the Defendant's Affirmative Defenses.

4. All evidence, facts, and witnesses supporting any claim, assertion or defense, that the Defendant did not have actual or constructive notice of the dangerous condition alleged in the Plaintiff's complaint.

5. All policies and procedure for securing cargo on the ship's vessel.

6. The facts and circumstances surrounding any prior incidents where any passengers on the Defendant's vessels have been injured by unsecured objects or cargo.

7. Any attempts by the Defendant or its employees to determine the origin and cause of the incident which resulted in Plaintiff's injury is the subject of this lawsuit.

8. All information and evidence in the Defendant's possession concerning how the cause of the subject incident and how it occurred.

9. All actions taken by the Defendant subsequent to the subject incident address or remedy the incident alleged in Plaintiff's Complaint.

10. Any and all evidence supporting any claim by the Defendant that the Plaintiff's own negligence caused her injury.

11. The legal name of any entity that employed any of the crew on the Defendant's ship.

12. Any communications or efforts by the Defendant to address, remedy, or repair the condition, malfunction, or other circumstance which caused the injury alleged in Plaintiff's Complaint. To include the names and entities of any third parties who may have been contacted.

13. All evidence, facts, and witnesses supporting any assertion by the Defendant that they did not have notice of the dangerous condition alleged in the Plaintiff's Complaint.

14. All evidence, facts, and witnesses supporting any assertion by the Defendant as to the duration of time the dangerous condition alleged in the Plaintiff's Complaint existed.

15. All communications between Plaintiff and the Defendant or its agents.

16. The identities of any of the Defendant's employees or other witnesses who were present during the subject incident and their last known contact information.

17. Defendant's Answers to Interrogatories.

18. The subject incident, and related events preceding and subsequent to same.

19. Defendant's policies and procedures relating to;

   a. maintenance of the subject vessel's common areas;

   b. conduct and training of employees;

   c. securing of cargo and other objects on the vessel;

   d. warning of dangerous conditions on the vessel;

   e. monitoring areas of the vessel for dangerous conditions;

   f. warning customers of spills and other dangerous conditions;

   g. responding to any incident where a patron is injured on the subject store's premises;

   h. preserving evidence when an incident involving an injury to a patron has occurred;

   i. Employee training and orientation;

20. The identities of the employees who were involved in or witnessed the subject incident on the date in question and their training and orientation.

21. The identities and contact information of any other witnesses to the subject incident.

22. The circumstances and/or reasons for the resignation, termination, or discontinuing of employment for the employees of Defendant which were present on the date of subject incident at the Defendant's store.


**SCHEDULE B**

**REQUEST FOR PRODUCTION PURSUANT TO Fed. R. Civ. P. 30(b)(6)**

1. All documents, video, photographs, or other items (*other than attorney-client or work product privilege materials*) which the witness will require to provide testimony on the above topics and comply with his/her obligations as a corporate representative witness.

2. Any policies and procedures the Defendant contends are applicable to the subject incident.

Ex. 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-cv-60532-RAR

EUREKA COLE,

     Plaintiff,

v.

CARNIVAL CORPORATION,

     Defendant.

_____ /

**DEFENDANT, CARNIVAL CORPORATION'S ANSWER AND AFFIRMATIVE
DEFENSES TO PLAINTIFF'S SECOND AMENDED COMPLAINT**

Defendant, CARNIVAL CORPORATION ("Carnival" or "Defendant"), by and through

undersigned counsel, hereby files its Answer and Affirmative Defenses to Plaintiff's Second

Amended Complaint [ECF No. 15], and states as follows\*:

**ANSWER**

**PARTIES AND JURISDICTION**

1. Admitted Plaintiff is seeking damages in excess of $75,000, denied as to Plaintiff's

entitlement to same.

2. Admitted that subject matter jurisdiction exists pursuant to 28 U.S.C. §1333.

3. Admitted that venue is proper in the Southern District of Florida.

4. Defendant is without knowledge, therefore denied.

5. It is admitted that this Court maintains personal jurisdiction over this Defendant,

otherwise denied.

6. It is admitted that this Court maintains personal jurisdiction over this Defendant,

otherwise denied.

a. It is admitted that this Court maintains personal jurisdiction over this Defendant, otherwise denied.

b. It is admitted that this Court maintains personal jurisdiction over this Defendant, otherwise denied.

c. It is admitted that this Court maintains personal jurisdiction over this Defendant, otherwise denied.

d. It is admitted that this Court maintains personal jurisdiction over this Defendant, otherwise denied.

7. Defendant is without knowledge, therefore denied.

8. Admitted that Carnival operated the *Conquest* at all times relevant.

9. Denied.

10. Denied as phrased.

11. Denied as a legal conclusion.

## COUNT I - NEGLIGENCE

12. Defendant reincorporates each and every response in paragraphs 1 through 11, including subparts, as if fully set forth herein.

13. Admitted that Carnival owes its passengers a duty of reasonable care, otherwise denied.

14. Denied as an inaccurate and incomplete statement of law.

15. Admitted that Carnival owes its passengers a duty of reasonable care, otherwise denied.

a. Admitted that Carnival owes its passengers a duty of reasonable care, otherwise denied.

b.     Admitted that Carnival owes its passengers a duty of reasonable care, otherwise denied.

c.     Admitted that Carnival owes its passengers a duty of reasonable care, otherwise denied.

16.     Denied.

      a.     Denied.

      b.     Denied.

      c.     Denied.

17.     Denied.

      a.     Denied.

18.     Denied.

19.     Denied.

20.     Denied.

21.     Denied.

22.     Denied.

## COUNT II – VICARIOUS LIABILITY / RESPONDEAT SUPERIOR

23.     Defendant reincorporates each and every response in paragraphs 1 through 11, including subparts, as if fully set forth herein.

24.     Admitted that Carnival operated the *Conquest* at all times relevant.

25.     Defendant is without knowledge, therefore denied.

26.     Defendant is without knowledge, therefore denied.

27.     Denied as an incomplete and inaccurate statement of law.

28.     Denied.

a. Denied.

b. Denied.

c. Denied.

29. Denied.

30. Denied.

31. Denied.

32. Defendant is without knowledge, therefore denied.

*Defendant denies each and every allegation not heretofore responded to, including all claims for damages, and demands strict proof thereof.

## AFFIRMATIVE DEFENSES

In Answering further, Defendant would also affirmatively state as follows:

A. This action is governed by and subject to the terms, limitations and conditions contained within the Plaintiff's Passenger Ticket Contract.

B. Plaintiff's damages were caused or exacerbated as a result of intervening and superseding factors that are independent of any fault of Defendant and which were not reasonably foreseeable to it.

C. Plaintiff's damages were the result of an Act of God and therefore Defendant is not liable.

D. Plaintiff did not exercise ordinary care, caution, or prudence for her own welfare to avoid the happening of the alleged incident, injuries or damages, if any, the existence of which Defendant expressly denies, and by this failure to do so, the Plaintiff thereby directly and proximately contributed to the happening of said alleged injuries, losses and damages, if any, the existence of which the Defendant expressly denies.

E.  Plaintiff has a duty to mitigate the losses or damages claimed against Defendant by taking advantage of any reasonable opportunity that might exist under the circumstances to reduce or minimize the loss or damage, and failed to do so.

F.  Plaintiff's claims are governed by maritime law and any recovery is limited to same.

G.  Defendant is entitled to a set-off for all sums paid or payable by collateral sources.

H.  Plaintiff herself was negligent and therefore Plaintiff is either barred from recovery or the damages in this case must be apportioned and reduced in proportion to the share of negligence attributable to the Plaintiff.

I.  Plaintiff failed to seek timely medical treatment for her condition which caused and/or exacerbated her damages and/or failed to follow instructions, follow up, participate in, or attend subsequent medical care and treatment which has delayed/negatively affected her recovery.

J.  Plaintiff's claim(s) are barred in whole or in part by the applicable statute of limitations.

K.  As to any alleged medical expenses that were contractually reduced, Plaintiff should only be permitted to introduce evidence showing the actual costs of the medical bills and not the unreduced amount. Moreover, Plaintiff should only be permitted to introduce evidence of paid bills that are reasonable and customary.

L.  Plaintiff's damages, if any, were solely and proximately caused by an intervening and/or superseding medical condition or event, which was not itself the result of any negligence on the part of this Defendant and, accordingly, recovery against this Defendant must be denied.

M.  Plaintiff's damages were the result of a pre-existing injury/condition. Assuming, *arguendo*, that any pre-existing mental or physical injury or illness was aggravated by any alleged

incident herein, for which this Defendant expressly denies any responsibility, the Plaintiff is only entitled to reimbursement for the degree of aggravation and any and all recovery obtained herein must be reduced to the percentage of aggravation which the Plaintiff allegedly suffered as a result of the subject incident.

N. Plaintiff's damages were caused in whole or in part by the action and/or inaction of third parties for whom this Defendant is not responsible for, including but not limited to any and all healthcare providers who rendered treatment to Plaintiff before the subject cruise and/or after the subject cruise.

O. The injuries complained of by Plaintiff in this action were caused or suffered during incidents other than the ones alleged to have occurred from the incident stated in the Complaint, and therefore non-compensable in this action and the Defendant is not liable for those injuries.

P. Defendant is entitled to a setoff for any settlement or award obtained by the Plaintiff from any other person or entity for the injuries she claims of in this action, as provided by Florida law.

Q. Plaintiff has failed to state a claim for vicarious liability as a matter of law.

R. Defendant had no notice of any alleged risk-creating condition.

S. Any risk-creating condition was open and obvious, obviating any duty to warn by Defendant.

T. Plaintiff's claim is a fraud in whole or in part.

U. Defendant has not specifically or intentionally waived any affirmative defenses and specifically reserves the right to allege additional affirmative defenses as they may present themselves in response to information that becomes available through discovery in the future.

Respectfully submitted,

GrayRobinson, P.A.
515 North Flagler Drive, Ste. 650
West Palm Beach, Florida 33401
Tel: (561) 268-5727
Fax: (561) 268-5747

By: */s/  Ashley N. Genoese*
    Michael J. Drahos
    Florida Bar No. 0617059
    michael.drahos@gray-robinson.com
    W. Cooper Jarnagin
    Florida Bar No. 117767
    cooper.jarnagin@gray-robinson.com
    Ashley Genoese
    Florida Bar No. 1019357
    ashley.genoese@gray-robinson.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 24, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to received electronically Notices of Electronic Filing.

*/s/*      *Ashley N. Genoese*

## SERVICE LIST

Raymond Renato Dieppa
FLORIDA LEGAL
12550 Biscayne Blvd., Suite 209
North Miami, FL 33181
Telephone: (305) 901-2209
Facsimile: (786) 870-4030
*ray.dieppa@floridalegal.law*
*Attorney for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI CIVIL DIVISION

CASE NO. 23-cv-60532-RAR

EUREKA COLE,

        Plaintiff,

v.

CARNIVAL CORPORATION,

        Defendant.

_____/

**DEFENDANT'S NOTICE OF SERVICE OF MEDICAL EXAMINATION REPORT**

      Defendant, CARNIVAL CORPORATION, by and through undersigned counsel, hereby gives notice of serving Dr. Joseph Chalal's report of Plaintiff's medical examination completed on September 19, 2023, attached hereto as **Exhibit 1.** Defendant will serve a Rule 26 report and materials by this Court's deadline of December 29, 2023. *See* ECF No. 19.

**CERTIFICATE OF SERVICE**

      I hereby certify that on November 6, 2023, a copy of the foregoing was sent via e-mail to the recipients on the service list below.

GrayRobinson, P.A.
515 North Flagler Drive, Ste. 650
West Palm Beach, Florida 33401
Tel: (561) 268-5727
Fax: (561) 268-5747

By: */s/ Cooper Jarnagin*
   Michael J. Drahos
   Florida Bar No. 0617059
   michael.drahos@gray-robinson.com
   W. Cooper Jarnagin
   Florida Bar No. 117767
   cooper.jarnagin@gray-robinson.com
   Ashley Genoese
   Florida Bar No. 1019357
   ashley.genoese@gray-robinson.com

**SERVICE LIST**
**CASE NO. 23-cv-60532-RAR**

Raymond Renato Dieppa
FLORIDA LEGAL
12550 Biscayne Blvd., Suite 209
North Miami, FL 33181
Telephone: (305) 901-2209
Facsimile: (786) 870-4030
*ray.dieppa@floridalegal.law*

*Attorney for Plaintiff*

Exhibit 1

Ex. 3



## Personalized Orthopedics of the Palm Beaches

| *Gregory Martin, MD* | *Joseph Chalal, MD* | *Jeffrey Press, MD* | *Michael Baskin MD* | *Eric K. Lee, MD* |
|---|---|---|---|---|
| Hip & Knee Replacement Revision Surgery | Sports Medicine Shoulder & Knee Surgery | Sports Medicine Joint Replacement | Interventional Spine | Hip/Knee Replacement |

September 19, 2023

### REPORT OF EXAMINATION

**PATIENT NAME:**   Eureka Cole

**DATE OF BIRTH:**   02/08/1971

**DATE OF ONSET:**   07/22/2022

**HISTORY OF PRESENT ILLNESS:**   Eureka Cole is a 52-year-old female who is being evaluated today for ongoing left shoulder concerns which she relates to an accident on 07/22/2022.  The details of this report come from the patient as well as medical records provided.   Medical records reviewed included those from Carnival Conquest, Community Radiology Associates, Florida Westside Hospital, Dr. April Rolle, Carol Lieberman ARNP, CitiMed, Eliza Berdier DNP APRN FNP-BC, Dr. John Wilkerson, Carnival Conquest Medical Center, HCI Florida Westside Hospital, Dr. Nelson Colon, Liena Tamayo Flores APRN FNP-BC, Miami Surgical Center, colored left shoulder arthroscopic photos dated 09/15/2022, Robert Strubbe PA-C, Quest Diagnostics, Anesthesia Professional Services, Cardiovascular Medicine Associates, My Cardiologist, Julio Barcana, and CVS. I was also provided, for my review, a left shoulder MRI from CitiMed, dated 07/27/2022.

The patient was having lunch with her husband on a cruise ship when "ship containers" fell on her left shoulder on 07/22/2022.  "It was really windy", and the patient noted the immediate onset of left shoulder pain.

The patient was evaluated at Carnival Conquest Medical Center on 07/22/2022.

*TEL: 561.733.5888*          *FAX: 561.733.5851*          *http://www.popb.md*

Patient Name:      Eureka Cole
Date of Service:   September 19, 2023
Page **2** of **20**

"Patient walked into the medical center, conscious, coherent, and alert, GCS 15, with complaints of left shoulder pain.

Patient verbalized that she was sitting at the leader deck when a container hit her left shoulder onset 06:20pm.

With proper range of motion of both shoulders.

No redness, no swelling noted.

No wound and no abrasion".

"Pain on palpation over the left trapezius, full range of motion, no open wounds, no edema, no ecchymosis, no clinical signs of dislocation of the shoulder or clinical signs of rotator cuff impingement or tear."

X-rays of the left shoulder, dated 07/24/2022, were read as showing "no fracture or dislocation.   The joint spaces are normally maintained.   There is no bony erosion or periarticular calcification.   No bony tumors are visualized.   The visualized ribs are intact.   The visualized lung is clear.   There is no soft tissue abnormality."

After the patient departed the ship, she was evaluated at HCI Florida Westside Hospital Emergency Room on 07/25/2022.

"51 year old female pt states she was on a cruise ship and a plastic container fell and hit her left upper back.   She states she went to the infirmary and was given ibuprofen.   She states she feels pain in the area.   On exam noted a scratch.   No swelling, bruising, ecchymosis noted on exam.   The pt has a picture of the container.   It was a sml plastic container.   She states she was hit by a corner.   She states this happened on Saturday.   She also reports that on Saturday she slipped in water and fell but did not report the fall.   No c.o. numbness or weakness in the er, she has from on the left shoulder."

The patient was diagnosed by Dr. April Rolle as having a "contusion on the left upper back excluding scapular region".

The patient was evaluated at CitiMed Hollywood by Eliza Berdier, DNP, APRN, FNP-BC on 07/27/2022.

Patient Name:   Eureka Cole
Date of Service:  September 19, 2023
Page **3** of **20**

"Eureka Cole is a 51-year-old female patient involved in a traumatic event on 07/24/2022. Patient was at a Carnival Cruise Ship.  While she was having lunch a working station moved and hit her left shoulder.  She was evaluated at the clinic inside the cruise ship.  X-rays of the left shoulder were performed.   The patient was driven by someone to Plantation General Hospital 07/25/2022.  The patient was discharged with ibuprofen 600 mg."

"The patient presents to this office today for further assessment and recommendations regarding the injuries sustained in this accident described above.  The patient complains of immediate pain in her left shoulder, cervical and thoracic spine.  The bilateral cervical pain is intermittent and mild.  The left thoracic pain is intermittent and moderate to severe.  The left shoulder pain is intermittent and severe."

"The left shoulder has limited range of motion.  The left shoulder has increased pain with passive motion.  Positive Neer's…"

The patient was diagnosed as having:
1.      Sprain of ligaments of cervical spine…
2.      Sprain of ligaments of thoracic spine…
3.      Unspecified sprain of left shoulder joint…

An MRI of the left shoulder and physical therapy was recommended.

"Start home TENS unit topically prn to affected areas."

An MRI of the left shoulder from CitiMed, dated 07/27/2022, was read as showing "there is tendinosis and tendinitis of the supraspinatus tendon and infraspinatus tendon.  There is a small focus of mild undersurface partial tearing of the supraspinatus tendon measuring no greater than 3-4 mm in size.  The tear involves no greater than 10% of the tendon thickness. The infraspinatus tendon and teres minor are intact.  The subscapularis tendon is intact. There is no muscle atrophy or fatty replacement.  There is fluid within the subacromial and subdeltoid bursa consistent with bursitis.   The acromioclavicular joint has moderate hypertrophy and inflammation with an os acromiale present.  There are some cystic changes within the superolateral aspect of the humeral head, most likely reactive in nature.  There is no fracture evident.  There is subarticular edema within the glenoid anterior and inferiorly

Patient Name:    Eureka Cole
Date of Service:  September 19, 2023
Page **4** of **20**

with subjacent moderate-grade partial-thickness chondral loss.   There is no fracture identified.   Evaluation of the glenoid labrum demonstrates irregularity and tearing of the anterior labrum which extends from the 3 o'clock to 6 o'clock position.   The biceps tendon is intact.   There is no axillary mass present."

The patient began a course of physical therapy at CitiMed on 07/28/2022.

The patient underwent a Telemedicine Evaluation at CitiMed by a physiatrist, Dr. Nelson Colon, on 08/03/2022 with the chief complaints of "neck/mid back pain, left shoulder pain".

"On 08/03/2022 she referred residual moderate to severe left shoulder pain affecting her job (phlebotomist).   She is right-handed.   She also referred residual neck and midback non radiating pain."

The patient was diagnosed by Dr. Colon as having:
1.      Pain in left shoulder.
2.      Cervicalgia.
3.      Pain in thoracic spine.
4.      Bursitis of left shoulder.
5.      Sprain of ligaments of cervical spine…
6.      Sprain of ligaments of thoracic spine…
7.      Unspecified sprain of left shoulder joint…
8.      Superior glenoid labral lesion of left shoulder…

"The patient is to continue with the prescribed course of physical therapy as ordered for cervical/thoracic/left shoulder.
This may include manual therapy, mechanical traction, manual traction, neuromuscular re-education, ultrasound, and therapeutic exercises…"

The patient was evaluated at CitiMed by an orthopedic surgeon, Dr. John Wilkerson, on 08/12/2022.

"Eureka Cole is a 51-year-old female patient that presents today for evaluation of her left shoulder.  She reports that on July 24th, 2022. She was a passenger on a Carnival cruise ship

Patient Name:    Eureka Cole
Date of Service:  September 19, 2023
Page **5** of **20**

while she was having lunch and a large container struck her on her mid back.  The impact pushed her forward and she braced herself with her hand on the table.  She was evaluated at the cruise medical center.  She currently is complaining of left shoulder throbbing pain with activities."

"Examination of the left shoulder reveals active range of motion of 0-160 degrees of forward flexion.  0-160 abduction.  0-70 of internal rotation.  0-70 of external rotation.  Positive OBrien.  Positive apprehension test.  Positive impingement maneuver.  Neurovascular examination is intact."

The patient was diagnosed by Dr. Wilkerson as having:
1.      Bursitis of left shoulder.
2.      Superior glenoid labral lesion of left shoulder.
3.      Strain of musc/tend of rotator cuff of left shoulder…

"Reviewed the patient's MRI scan which reveals a glenoid labrum tear and rotator cuff tear.  The patient has failed conservative treatment with medication and physical therapy.  The patient elects to proceed with a right shoulder arthroscopy with rotator cuff and glenoid labrum repair and surgery as indicated…"

A chest x-ray from CitiMed, dated 09/01/2022, was read as showing "there is no acute disease in the chest."

On 09/15/2022, the patient underwent the following left shoulder procedures by Dr. Wilkerson with a surgical assistant, Robert Strubbe PA-C:
1.      Left shoulder arthroscopy with arthroscopic rotator cuff repair…
2.      Left shoulder arthroscopy with arthroscopic glenoid labral repair…
3.      Left shoulder arthroscopy with arthroscopic debridement of glenohumeral joint…
4.      Left shoulder arthroscopy with arthroscopic synovectomy…
5.      Left shoulder arthroscopy with arthroscopic subacromial decompression…

The patient's preoperative diagnoses were:
1.      Left shoulder partial-thickness rotator cuff tear.
2.      Left shoulder glenoid labral tear.

Patient Name:    Eureka Cole
Date of Service:  September 19, 2023
Page **6** of **20**

The patient's postoperative diagnoses were:

1.      Left shoulder partial-thickness articular surface supraspinatus tendon tear.

2.      Left shoulder anterior glenoid labral tear.

3.      Left shoulder internal derangement.

4.      Left shoulder synovitis.

5.      Left shoulder subacromial bursitis.

"Arthroscope was inserted into the shoulder joint and shoulder was inspected.  The patient was found to have tearing of the anterior glenoid labrum.  Glenoid chondromalacia was also present.  Synovitis within the shoulder joint was noted…Curved shaver was then introduced to begin debridement of the glenoid labrum and glenoid chondromalacia.  The labrum detachment was confirmed.  A rasp was then used to rasp the bony glenoid region to stimulate the bleeding from the bone to facilitate repair and get the labral tissue.  Once the bony tissue was rasped, a shaver was then used to remove the soft tissue and bony debris.  The labrum was then repaired to the glenoid surface…Labrum was repaired from inferior to superior, in the same fashion multiple suture anchor combinations were used for repair.  Three of them were placed anteriorly.  Upon completion of the repair, the labrum was noted to be well fixed to the glenoid.  Fluid pressure was decreased, there was good bleeding from the bone labral interface.  Next, attention was then drawn to the synovitis within the shoulder.  Synovitis posteriorly was identified and resected using the curved shaver.  Synovitis anteriorly was resected using the curved shaver.  Looking superiorly the undersurface tearing of the supraspinatus tendon was confirmed…Curved shaver was then used to debris the articular portion of the rotator cuff footprint where visible.  The shaver was then subsequently removed and the arthroscopic instruments were placed into the subacromial space.  Once in the subacromial space, a curved shaver was used to carefully resect the subacromial subdeltoid bursa.  After the bursectomy was completed, the FiberTape sutures were identified and brought out through the lateral portion.  The sutures were then reduced to the greater tuberosity.  The sutures were then brought out through the anterior portal after which arthroscopic burr was then re-introduced to debride the greater tuberosity and decorticate the bone to facilitate healing of the bone in this location.  Arthroscopic bur was also used to perform a subacromial decompression and acromioplasty was performed.  Electrothermal device was then used to release the coracoacromial ligament.  After this was completed, the AC joint was identified.  There was good mobilization of the AC joint and it

Patient Name:     Eureka Cole
Date of Service:  September 19, 2023
Page **7** of **20**

was left intact.  The rotator cuff sutures were then brought back from the anterior portal and then out the lateral portal and placed into a SwivelLock anchor…The rotator cuff was well fixed to the bone.  Rotator cuff tear was then re-visualized from beneath on the articular side and the cuff tear had been reduced…"

On 09/15/2022, CitiMed charged $9,919.00 for an arthroscopic labral repair (CPT 29807), $5,627.00 for an arthroscopic complete synovectomy (CPT 29821), $5,969.00 for an arthroscopic extensive debridement (CPT 29823), $5,808.00 for an arthroscopic subacromial decompression (CPT 29826), and $9,515.00 for an arthroscopic rotator cuff repair (CPT 29827).

On 09/15/2022, Miami Surgical Center charged $26,825.40 for an arthroscopic rotator cuff repair (CPT 29827), $26,825.40 for an arthroscopic labral repair (CPT 29807), $5,000.00 for an arthroscopic subacromial decompression (CPT 29826), and $6,837.48 for "supplies and materials…"

The total charges from Miami Surgical Center on 09/15/2022 were $65,488.28.

On 09/15/2022, Anesthesia Professional Services charged $3,750.00 for anesthesia for the shoulder surgery, $800.00 for a brachial plexus block, and $304.00 for ultrasound guidance.

The total charges from Anesthesia Professional Services on 09/15/2022 were $4,854.00.

Upon reevaluation on 09/16/2022, Dr. Wilkerson stated "she is status post left shoulder arthroscopy with rotator cuff and labrum repair performed on September 15, 2022.  Patient is doing well…"

The patient was evaluated at CitiMed Physical Therapy on 09/16/2022 for postoperative therapy.

Upon reevaluation on 10/21/2022, continued physical therapy was recommended by Dr. Wilkerson.

Patient Name:     Eureka Cole
Date of Service:  September 19, 2023
Page **8** of **20**

Upon reevaluation on 11/18/2022, Dr. Wilkerson recommended continued physical therapy "to improve range of motion and strength…"

Upon reevaluation on 01/06/2023, Dr. Wilkerson stated "she reports improvement of her pain and range of motion.  She is able to do most of her activities and perform her job, towards the end of the day her shoulder becomes weak and starts to ache."

"Examination of the left shoulder reveals active range of motion of 0-150 degrees of forward flexion.  0-130 degrees of abduction.  0-80 degrees of internal rotation.  0-70 degrees of external rotation.  Strength 4/5…"

"Recommend additional management with anti-inflammatory medication, home icing program, and rotator cuff strengthening exercises.  Patient to progress to a home exercise program.  Follow up as needed."

Thereafter, Dr. Wilkerson stated "the patient has reached maximum medical improvement.  Patient has an impairment rating of 8% for the left shoulder using the American Medical Association Guide to the Evaluation of Permanent Impairment, Sixth …

Work status: Regular duty…

Overall orthopedic prognosis was discussed.  Important symptoms and signs that should prompt immediate attention were emphasized.  The proper administration side effects and compliance with prescribed medications were reviewed with the patient.  Activity modification discussed."

The total charges from CitiMed from 07/27/2022 through 01/06/2023 were $69,313.00.

The patient comes in today with ongoing left shoulder concerns which she relates to the 07/22/2022 accident.  She has left shoulder pain "every day" and it is worse with "activity".  "I can't hold it up for any period of time" and "can't draw blood any longer".  The patient takes over-the-counter Motrin as needed and is on a home exercise program for her left shoulder "about three times per week."  She has not required any recent treatment, nor has any follow-up appointment scheduled with Dr. Wilkerson for her ongoing left shoulder

Patient Name:     Eureka Cole
Date of Service:  September 19, 2023
Page **9** of **20**

complaints which she relates to the 07/22/2022 accident.  The patient is right-hand dominant.
She denied any prior "significant" left shoulder concerns before the 07/27/2022 accident

The patient has no other ongoing complaints, other than her left shoulder, which she relates
to the 07/22/2022 accident.

**MEDICATIONS:**  The patient takes Motrin as needed, Metformin and Jardiance for diabetes,
and vitamins.

**ALLERGIES:**  She has no known allergies to medications, "just shellfish".

**PAST SURGICAL HISTORY:**
The patient underwent left shoulder surgery by Dr. Wilkerson on 09/15/2022.

**SOCIAL HISTORY:**  She does not smoke.  She drinks socially.  She was a phlebotomist at
Jackson Memorial Hospital at the time of the 07/22/2022 accident.  The patient is still working
at Jackson Memorial Hospital, "just not doing phlebotomy".

**PHYSICAL EXAMINATION:**
Physical examination was performed in the presence of Stephanie in the room.

The patient has **active** range of motion of her left shoulder 90/30/SI.  She has well-healed
portals.  She has pain with **active** forward elevation.  She has AC discomfort to **light**
palpation.  She has a negative push-off.  She has 5/5 external rotation and biceps strength.
She has no scapular winging.

The patient has range of motion of her right shoulder 145/60/T12.  She has no pain with
**active** forward elevation.  She has no AC discomfort.  She has a negative push-off.  She has
5/5 external rotation and biceps strength.  She has no scapular winging.

The patient has painless range of motion of her elbows and wrists.  She has palpable pulses
bilaterally.

Patient Name:     Eureka Cole
Date of Service:  September 19, 2023
Page **10** of **20**

### RADIOGRAPHS:

X-rays of the left shoulder, dated 07/24/2022, were read as showing "no fracture or dislocation.   The joint spaces are normally maintained.   There is no bony erosion or periarticular calcification.  No bony tumors are visualized.  The visualized ribs are intact.  The visualized lung is clear.  There is no soft tissue abnormality."

MRI of the left shoulder from CitiMed, dated 07/27/2022 and sent for my review, showed rotator cuff tendinosis, with a tiny articular-sided supraspinatus tendon tear distally measuring no more than 3-4 mm. There was reactive edema along the rotator cuff footprint, with subcortical cystic changes. There was a trace subdeltoid effusion.  The biceps tendon was intact, with surrounding fluid.   There was anteroinferior labral degeneration and a physiologic effusion.   There was subchondral edema along the glenoid anteriorly and inferiorly, with intermediate-grade partial-thickness chondral loss. There were moderate acromioclavicular hypertrophic changes, a small effusion, and an os acromiale.

Chest x-ray from CitiMed, dated 09/01/2022 and sent for my review, showed no acute cardiopulmonary process

### IMPRESSIONS:

1.      Apparent left shoulder contusion, 07/22/2022.
2.      Status post left shoulder surgery, 09/05/2022 by Dr. Wilkerson.
3.      Underlying left shoulder glenohumeral DJD.
4.      Diabetes.

### RECOMMENDATIONS:

The patient comes in today with ongoing, subjective left shoulder concerns which she relates to the 07/22/2022 accident.

The patient was evaluated at Carnival Conquest Medical Center on **07/22/2022**.

"Patient walked into the medical center, conscious, coherent, and alert, GCS 15, with complaints of left shoulder pain.
Patient verbalized that she was sitting at the leader deck when a container hit her left shoulder onset 06:20pm.

Patient Name:     Eureka Cole
Date of Service:  September 19, 2023
Page **11** of **20**

With proper range of motion of both shoulders.

No redness, no swelling noted.

No wound and no abrasion".

"**Pain on palpation over the left trapezius, <u>full range of motion</u>**, no open wounds, no edema, no ecchymosis, no clinical signs of dislocation of the shoulder or clinical signs of rotator cuff impingement or tear."

X-rays of the left shoulder, dated **07/24/2**022, were read as showing "no fracture or dislocation.    The joint spaces are normally maintained.    There is no bony erosion or periarticular calcification.  No bony tumors are visualized.  The visualized ribs are intact.  The visualized lung is clear.  There is no soft tissue abnormality."

After the patient departed the ship, she was evaluated at HCI Florida Westside Hospital Emergency Room on **07/25/2022**.

"51 year old female pt states she was on a cruise ship and a plastic container fell and hit her left upper back.  She states she went to the infirmary and was given ibuprofen.  She states she feels pain in the area.  On exam noted a scratch.  **No swelling, bruising, ecchymosis noted on exam.**  The pt has a picture of the container.  It was a sml plastic container.  She states she was hit by a corner.  She states this happened on Saturday.  She also reports that on Saturday she slipped in water and fell but did not report the fall.  No c.o. numbness or weakness in the er, she has from on the left shoulder."

The patient was diagnosed by Dr. April Rolle as having a "contusion on the left upper back excluding scapular region".
**There was no mention of any specific left shoulder diagnosis.**

The patient was evaluated at CitiMed Hollywood by Eliza Berdier, DNP, APRN, FNP-BC on **07/27/2022**.

"Eureka Cole is a 51-year-old female patient involved in a traumatic event on 07/24/2022. Patient was at a Carnival Cruise Ship.  While she was having lunch a working station moved and hit her left shoulder.  She was evaluated at the clinic inside the cruise ship.  X-rays of the

Patient Name:    Eureka Cole
Date of Service:  September 19, 2023
Page **12** of **20**

left shoulder were performed.  The patient was driven by someone to Plantation General Hospital 07/25/2022.  The patient was discharged with ibuprofen 600 mg."

"The patient presents to this office today for further assessment and recommendations regarding the injuries sustained in this accident described above.  The patient complains of immediate pain in her **left shoulder**, cervical and thoracic spine.  The bilateral cervical pain is intermittent and mild.  The left thoracic pain is intermittent and moderate to severe.  The left shoulder pain is intermittent and severe."

"**The left shoulder has limited range of motion.  The left shoulder has increased pain with passive motion.  Positive Neer's**…"

The patient was diagnosed as having:
1.    Sprain of ligaments of cervical spine…
2.    Sprain of ligaments of thoracic spine…
3.    **Unspecified sprain of left shoulder joint**…

An MRI of the left shoulder and physical therapy was recommended.

"Start home TENS unit topically prn to affected areas."

The patient's left shoulder MRI from CitiMed, dated **07/27/2022**, showed rotator cuff tendinosis, with a tiny articular-sided supraspinatus tendon tear distally measuring no more than 3-4 mm. There was reactive edema along the rotator cuff footprint, with subcortical cystic changes. There was a trace subdeltoid effusion.  The biceps tendon was intact, with surrounding fluid.  There was anteroinferior labral degeneration and a physiologic effusion. There was subchondral edema along the glenoid anteriorly and inferiorly, with intermediate-grade partial-thickness chondral loss. There were moderate acromioclavicular hypertrophic changes, a small effusion, and an os acromiale.
**It is <u>not</u> within medical probability that these MRI findings were causally related to the 07/25/2022 accident.  Rather, it is within medical probability that they were degenerative in nature, predated the 07/22/2022 accident, and unrelated to such.**

Patient Name:      Eureka Cole
Date of Service:   September 19, 2023
Page **13** of **20**

The patient began a course of physical therapy at CitiMed on **07/28/2022**.

The patient underwent a Telemedicine Evaluation at CitiMed by a physiatrist, Dr. Nelson Colon, on **08/03/2022** with the chief complaints of "neck/mid back pain, **left shoulder pain**".

"On 08/03/2022 she referred residual moderate to severe left shoulder pain affecting her job (phlebotomist).  She is right-handed.  She also referred residual neck and midback non radiating pain."

The patient was diagnosed by Dr. Colon as having:

1.      **Pain in left shoulder.**
2.      Cervicalgia.
3.      Pain in thoracic spine.
4.      Bursitis of left shoulder.
5.      Sprain of ligaments of cervical spine…
6.      Sprain of ligaments of thoracic spine…
7.      Unspecified sprain of left shoulder joint…
8.      **Superior glenoid labral lesion of left shoulder**…

"The patient is to continue with the prescribed course of physical therapy as ordered for cervical/thoracic/left shoulder.
This may include manual therapy, mechanical traction, manual traction, neuromuscular re-education, ultrasound, and therapeutic exercises…"

The patient was evaluated at CitiMed by an orthopedic surgeon, Dr. John Wilkerson, on **08/12/2022**.

"Eureka Cole is a 51-year-old female patient that presents today for evaluation of her left shoulder.  She reports that on July 24th, 2022. She was a passenger on a Carnival cruise ship while she was having lunch and a large container struck her on her mid back.  The impact pushed her forward and she braced herself with her hand on the table.  She was evaluated at

Patient Name:     Eureka Cole
Date of Service:  September 19, 2023
Page **14** of **20**

the cruise medical center.  She currently is complaining of left shoulder throbbing pain with activities."

"**Examination of the left shoulder reveals active range of motion of 0-160 degrees of forward flexion.  0-160 abduction.  0-70 of internal rotation.  0-70 of external rotation.**  Positive OBrien.  Positive apprehension test.  Positive impingement maneuver.  Neurovascular examination is intact."

The patient was diagnosed by Dr. Wilkerson as having:
1.     **Bursitis of left shoulder.**
2.     **Superior glenoid labral lesion of left shoulder.**
3.     **Strain of musc/tend of rotator cuff of left shoulder**…

"Reviewed the patient's MRI scan which reveals a glenoid labrum tear and rotator cuff tear.  The patient has failed conservative treatment with medication and physical therapy.  The patient elects to proceed with a right shoulder arthroscopy with rotator cuff and glenoid labrum repair and surgery as indicated…"

On **09/15/2022**, the patient underwent the following left shoulder procedures by Dr. Wilkerson with a surgical assistant, Robert Strubbe PA-C:
1.     Left shoulder arthroscopy with arthroscopic rotator cuff repair…
2.     Left shoulder arthroscopy with arthroscopic glenoid labral repair…
3.     Left shoulder arthroscopy with arthroscopic debridement of glenohumeral joint…
4.     Left shoulder arthroscopy with arthroscopic synovectomy…
5.     Left shoulder arthroscopy with arthroscopic subacromial decompression…

The patient's preoperative diagnoses were:
1.     Left shoulder partial-thickness rotator cuff tear.
2.     Left shoulder glenoid labral tear.

The patient's postoperative diagnoses were:
1.     Left shoulder partial-thickness articular surface supraspinatus tendon tear.
2.     Left shoulder anterior glenoid labral tear.

Patient Name:     Eureka Cole
Date of Service:  September 19, 2023
Page **15** of **20**

3.      Left shoulder internal derangement.

4.      Left shoulder synovitis.

5.      Left shoulder subacromial bursitis.

"Arthroscope was inserted into the shoulder joint and shoulder was inspected.  The patient was found to have tearing of the anterior glenoid labrum.  **Glenoid chondromalacia was also present.**  Synovitis within the shoulder joint was noted…Curved shaver was then introduced to begin debridement of the glenoid labrum and **glenoid chondromalacia**.  The labrum detachment was confirmed.  A rasp was then used to rasp the bony glenoid region to stimulate the bleeding from the bone to facilitate repair and get the labral tissue.  Once the bony tissue was rasped, a shaver was then used to remove the soft tissue and bony debris.  The labrum was then repaired to the glenoid surface…Labrum was repaired from inferior to superior, in the same fashion multiple suture anchor combinations were used for repair.  Three of them were placed anteriorly.  Upon completion of the repair, the labrum was noted to be well fixed to the glenoid.  Fluid pressure was decreased, there was good bleeding from the bone labral interface.  Next, attention was then drawn to the synovitis within the shoulder.  Synovitis posteriorly was identified and resected using the curved shaver.  Synovitis anteriorly was resected using the curved shaver.  Looking superiorly the undersurface tearing of the supraspinatus tendon was confirmed…Curved shaver was then used to debris the articular portion of the rotator cuff footprint where visible.  The shaver was then subsequently removed and the arthroscopic instruments were placed into the subacromial space.  Once in the subacromial space, a curved shaver was used to carefully resect the subacromial subdeltoid bursa.  After the bursectomy was completed, the FiberTape sutures were identified and brought out through the lateral portion.  The sutures were then reduced to the greater tuberosity.  The sutures were then brought out through the anterior portal after which arthroscopic burr was then re-introduced to debride the greater tuberosity and decorticate the bone to facilitate healing of the bone in this location.  Arthroscopic bur was also used to perform a subacromial decompression and acromioplasty was performed.  Electrothermal device was then used to release the coracoacromial ligament.  After this was completed, the AC joint was identified.  There was good mobilization of the AC joint and it was left intact.  The rotator cuff sutures were then brought back from the anterior portal and then out the lateral portal and placed into a SwivelLock anchor…The rotator cuff was well fixed to the bone.

Patient Name:     Eureka Cole
Date of Service:  September 19, 2023
Page **16** of **20**

Rotator cuff tear was then re-visualized from beneath on the articular side and the cuff tear had been reduced…"

**It is <u>not</u> within medical probability that these intraoperative findings were causally related to the 07/22/2022 accident.  Rather, it is within medical probability that they were degenerative in nature, predated the 07/22/2022 accident, and unrelated to such.**

On 09/15/2022, CitiMed charged $9,919.00 for an arthroscopic labral repair (CPT 29807), $5,627.00 for an arthroscopic complete synovectomy (CPT 29821), $5,969.00 for an arthroscopic extensive debridement (CPT 29823), $5,808.00 for an arthroscopic subacromial decompression (CPT 29826), and $9,515.00 for an arthroscopic rotator cuff repair (CPT 29827).

According to the American Academy of Orthopaedic Surgeons, "*Code 29821 (synovectomy, complete) should only be used when the underlying diagnosis is pathologic synovium such as is found in rheumatoid arthritis or pigmented villonodular synovitis. Cleaning up the "whole" joint due to reactive synovitis is inclusive of the more extensive codes.*"
Therefore, charging $5,627.00 for an arthroscopic complete synovectomy (CPT 29821) would **not be warranted**.

On 09/15/2022, CitiMed's charge of $9,919.00 for an arthroscopic labral repair (CPT 29807) was **excessive in nature**.
**The reasonable and customary charge for CPT 29807 is approximately $3,500.00-$4,800.00.**

On 09/15/2022, CitiMed's charge of $5,969.00 for an arthroscopic extensive debridement (CPT 29823) was **excessive in nature**.
**The reasonable and customary charge for an arthroscopic extensive debridement (CPT 29823) is approximately $2,211.00-$2,900.00.**

On 09/15/2022, CitiMed's charge of $5,808.00 for an arthroscopic subacromial decompression (CPT 29826) was **excessive in nature**.
**The reasonable and customary charge for an arthroscopic subacromial decompression (CPT 29826) is approximately $600.00-$1,000.00.**

Patient Name:     Eureka Cole
Date of Service:  September 19, 2023
Page **17** of **20**

On 09/15/2022, CitiMed's charge of $9,515.00 for an arthroscopic rotator cuff repair (CPT 29827) was **excessive in nature**.

**The reasonable and customary charge for an arthroscopic rotator cuff repair (CPT 29827) is approximately $3,313.00-$5,855.00.**

On 09/15/2022, Miami Surgical Center's charges of $26,825.40 for an arthroscopic rotator cuff repair (CPT 29827), $26,825.40 for an arthroscopic labral repair (CPT 29807), $5,000.00 for an arthroscopic subacromial decompression (CPT 29826), and $6,837.48 for "supplies and materials…" were **excessive in nature**.

**As a basis of comparison, and per the FloridaHealthPriceFinder website, the Florida State Cost for an outpatient arthroscopic labral repair (CPT 29807) ranges from $13,891-$20,760.**

**Per the FloridaHealthPriceFinder website, the Florida State Average Cost for an outpatient arthroscopic rotator cuff repair (CPT 29827) ranges from $8,576-$19,021.**

The total charges from Miami Surgical Center on 09/15/2022 of $65,488.28 were **excessive in nature**.

On 09/15/2022, Anesthesia Professional Services' charges of $3,750.00 for anesthesia for the shoulder surgery, $800.00 for a brachial plexus block, and $304.00 for ultrasound guidance were **excessive in nature**.

The total charges from Anesthesia Professional Services on 09/15/2022 of $4,854.00 were **excessive in nature**.

Upon reevaluation on **09/16/2022**, Dr. Wilkerson stated "she is status post left shoulder arthroscopy with rotator cuff and labrum repair performed on September 15, 2022.  Patient is doing well…"

The patient was evaluated at CitiMed Physical Therapy on **09/16/2022** for postoperative therapy.

Patient Name:    Eureka Cole
Date of Service:  September 19, 2023
Page **18** of **20**

Upon reevaluation on **10/21/2022**, continued physical therapy was recommended by Dr. Wilkerson.

Upon reevaluation on **11/18/2022**, Dr. Wilkerson recommended continued physical therapy "to improve range of motion and strength…"

Upon reevaluation on **01/06/2023**, Dr. Wilkerson stated "she reports improvement of her pain and range of motion.  She is able to do most of her activities and perform her job, towards the end of the day her shoulder becomes weak and starts to ache."

"Examination of the left shoulder reveals active range of motion of 0-150 degrees of forward flexion.  0-130 degrees of abduction.  0-80 degrees of internal rotation.  0-70 degrees of external rotation.  Strength 4/5…"

"Recommend additional management with anti-inflammatory medication, home icing program, and rotator cuff strengthening exercises.  Patient to progress to a home exercise program.  Follow up as needed."

Thereafter, Dr. Wilkerson stated "the patient has reached maximum medical improvement. Patient has an impairment rating of 8% for the left shoulder using the American Medical Association Guide to the Evaluation of Permanent Impairment, Sixth …

Work status: Regular duty…

Overall orthopedic prognosis was discussed.  Important symptoms and signs that should prompt immediate attention were emphasized.  The proper administration side effects and compliance with prescribed medications were reviewed with the patient.  Activity modification discussed."

The total charges from CitiMed from 07/27/2022 through 01/06/2023 were $69,313.00.

Patient Name:      Eureka Cole
Date of Service:   September 19, 2023
Page **19** of **20**

The patient has not required any recent orthopedic care, nor has any follow-up appointment scheduled with Dr. Wilkerson for her ongoing, subjective left shoulder complaints which she relates to the 07/22/2022 accident.

The patient's left shoulder physical examination today was remarkable for her postoperative restricted **active** range of motion and her AC discomfort to **light** palpation.

Based upon the patient's history, physical examination, and medical records provided, the patient has **no** permanent impairment due to her apparent left shoulder contusion, as it relates to the 07/22/2022 accident.

The patient does **not** require any ongoing orthopedic, physiatric, or other medical care due to her apparent left shoulder contusion, as it relates to the 07/22/2022 accident.

**Other than <u>perhaps</u> the evaluation at the Carnival Conquest Medical Center on 07/22/2022, <u>perhaps</u> the Emergency Room evaluation at HCI Florida Westside Hospital on 07/25/2022, <u>perhaps</u> the evaluation at CitiMed Hollywood by Eliza Berdier, DMP, APRN, FNP-BC on 07/27/2022, <u>perhaps</u> the left shoulder MRI on 07/27/2022, <u>perhaps</u> the orthopedic evaluation by Dr. Wilkerson on 08/12/2022, and <u>perhaps</u> 6-8 weeks of physical therapy, any further workup or treatment thereafter to the patient's left shoulder would <u>not</u> be causally related to the 07/22/2022 accident.**

The patient will **not** require any future injections to her left shoulder, as it relates to the 07/22/2022 accident.

The patient will **not** require any future surgical intervention to her left shoulder, as it relates to the 07/22/2022 accident.

The patient's left shoulder surgery by Dr. Wilkerson on 09/15/2022 would **not** be causally related to the 07/22/2022 accident.

The patient would **not** have any work restrictions, or restrictions in her activities of daily living due to her apparent left shoulder contusion, as it relates to the 07/22/2022 accident.

Patient Name:      Eureka Cole
Date of Service:  September 19, 2023
Page **20** of **20**

I will be happy to review any additional medical records or radiographs provided and offer an addendum thereafter.

I declare that the information contained within this document was prepared and is the work product of the undersigned, and is true to the best of my knowledge and information.

I certify that I meet the requirements of section 627.736(7) of Florida Statute which states that the physician preparing the report must be in active practice unless the physician is physically disabled.  I understand that active practice, as defined by the statute, means that during the three years immediately preceding the date of the physical examination or review of the treatment records the physician must have devoted professional time to an active clinical practice of evaluation, diagnosis, or treatment of medical conditions or to the instruction of students in an accredited residency program or a clinical research program that is affiliated with an accredited health professional school or teaching hospital or accredited residency program.

_____

**Joseph B. Chalal, M.D.**

JBC/dl

Cc: Michael Drahos, Esq



**Personalized Orthopedics of the Palm Beaches**

| *Gregory Martin, MD* | *Joseph Chalal, MD* | *Jeffrey Press, MD* | *Michael Baskin MD* | *Eric K. Lee, MD* |
|---|---|---|---|---|
| Hip & Knee Replacement Revision Surgery | Sports Medicine Shoulder & Knee Surgery | Sports Medicine Joint Replacement | Interventional Spine | Hip/Knee Replacement |

---

October 27, 2023

## ADDENDUM

**PATIENT NAME:**   Eureka Cole
**DATE OF BIRTH:**   12/08/1971
**DATE OF ONSET:**   07/22/2022

I am in receipt of additional medical records, including those from Cardiovascular Medicine Associates, Dr. Julio Barcena, Quantum Health Diagnostics, Miami Surgical Center, Dr. John Wilkerson, Robert Strubbe PA-C, Miami Surgical Center, HCA FL Westside Hospital, Dr. April Rolle, and Carol Lieberman ARNP.

The patient's 09/15/2022 surgery began at 11:45 a.m., and ended at 1:10 p.m., for a total surgical time of one hour and 25 minutes.

My impressions and recommendations, dated 09/19/2023, remain unchanged.

Based upon the patient's history, physical examination, and medical records provided, the patient has **no** permanent impairment due to her apparent left shoulder contusion, as it relates to the 07/22/2022 accident.

The patient does **not** require any ongoing orthopedic, physiatric, or other medical care due to her apparent left shoulder contusion, as it relates to the 07/22/2022 accident.

---

*TEL: 561.733.5888*          *FAX: 561.733.5851*          *http://www.popb.md*

Patient Name:     Eureka Cole
Date of Service:  October 27, 2023
Page **2** of **2**

**Other than <u>perhaps</u> the evaluation at the Carnival Conquest Medical Center on 07/22/2022, <u>perhaps</u> the Emergency Room evaluation at HCI Florida Westside Hospital on 07/25/2022, <u>perhaps</u> the evaluation at CitiMed Hollywood by Eliza Berdier, DMP, APRN, FNP-BC on 07/27/2022, <u>perhaps</u> the left shoulder MRI on 07/27/2022, <u>perhaps</u> the orthopedic evaluation by Dr. Wilkerson on 08/12/2022, and <u>perhaps</u> 6-8 weeks of physical therapy, any further workup or treatment thereafter to the patient's left shoulder would <u>not</u> be causally related to the 07/22/2022 accident.**

The patient will **not** require any future injections to her left shoulder, as it relates to the 07/22/2022 accident.

The patient will **not** require any future surgical intervention to her left shoulder, as it relates to the 07/22/2022 accident.

The patient's left shoulder surgery by Dr. Wilkerson on 09/15/2022 would **not** be causally related to the 07/22/2022 accident.

The patient would **not** have any work restrictions, or restrictions in her activities of daily living due to her apparent left shoulder contusion, as it relates to the 07/22/2022 accident.

I will be happy to review any additional medical records or radiographs provided and offer an addendum thereafter.

_____

**Joseph B. Chalal, M.D.**

JBC/dl


Cc: Michael Drahos, Esq



Ex.4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-cv-60532-RAR

EUREKA COLE,

     Plaintiff,

v.

CARNIVAL CORPORATION,

     Defendant.

_____/

## DEFENDANT, CARNIVAL CORPORATION'S NOTICE OF SERVICE OF SUPPLEMENTAL ANSWERS TO PLAINTIFF'S INTERROGATORIES

Defendant, CARNIVAL CORPORATION, by and through undersigned counsel, hereby serves its Supplemental Answers to Plaintiff's Interrogatories.

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2023, a copy of the foregoing was served via e-mail to the recipients listed on the Service List below.

GrayRobinson, P.A.
515 North Flagler Drive, Suite 650
West Palm Beach, Florida 33401
Tel: (561) 268-5727
Fax: (561) 268-5747

By: __*Cooper Jarnagin*_____
Michael J. Drahos
Florida Bar No. 0617059
W. Cooper Jarnagin
Florida Bar No. 117767
Ashley N. Genoese
Florida Bar No. 1019357
*Michael.Drahos@Gray-Robinson.com*
*Cooper.Jarnagin@Gray-Robinson.com*
*Ashley.Genoese@Gray-Robinson.com*
*Lilia.Parker@Gray-Robinson.com*

**SERVICE LIST**
**CASE NO. 23-cv-60532-RAR**


Raymond Renato Dieppa
FLORIDA LEGAL
12550 Biscayne Blvd., Suite 209
North Miami, FL 33181
Telephone: (305) 901-2209
Facsimile: (786) 870-4030
*ray.dieppa@floridalegal.law*

*Attorney for Plaintiff*

I.        **<u>PRELIMINARY STATEMENT</u>**

The party on whose behalf these Responses are given has not yet completed its investigation of the facts relating to this incident, has not yet completed its discovery in this action, and has not yet completed its preparation for trial. Consequently, the following Responses are given without prejudice to the responding party's right to produce, at the time of trial, subsequently discovered evidence relating to the proof of facts subsequently discovered to be relevant.

Except for facts exclusively admitted herein, no admission of any nature whatsoever is to be implied or inferred. The fact that a request herein has been answered should not be taken as an admission or concession of the existence of any fact as set forth or assumed. All responses are given on the basis of present recollection.

### DEFENDANT'S SUPPLEMENTAL ANSWERS
### TO PLAINTIFF'S INTERROGATORIES

2.      Provide the legal name, address and phone number of the entity or person who you contend had possession and control over the premises that is the subject of Plaintiff's Complaint.

**RESPONSE: Objection. Defendant objects as there is no temporal limitation on this interrogatory, and is overly broad, unduly burdensome, and disproportionate to the need for discovery in this litigation. See Fed. R. Civ. 26(b)(1).** ***See Nat'l Staffing Sols., Inc. v. Sanchez*, No. 6:21-CV-1590-PGB-LHP, 2022 WL 19354640, at \*9 (M.D. Fla. Sept. 12, 2022) (finding discovery request with no temporal scope as overly broad, as it provides no time limit).**

**Without waiving the foregoing objections, at the time of the subject incident, the Defendant, Carnival Corporation, 3655 NW 87th Avenue, Miami, FL 33178, had possession and control over the subject vessel, Carnival *Conquest*, and the areas of the premises at the time of the subject incident.**

3.      Identify each witness or individual with any knowledge regarding this incident of which you are aware. For each person provide their name address, phone number, and email address, and indicate whether they currently work for your company, and your understanding of the subject matter of their anticipated knowledge or testimony.

**RESPONSE: Objection. Defendant objects to providing the personal home addresses, phone numbers, emails addresses, and employment status, of the Ship's Medical Staff and/or employees identified below as an unwarranted invasion of privacy. Without waiving the foregoing objections, to the best of Defendant's knowledge at this time, the following individuals may have knowledge with regard to Plaintiff's alleged accident and/or damages:**

**Eureka Cole, Plaintiff**

**Lucien Cole, Plaintiff's Travel Companion and husband**

**Juan Esteban Vanegas Gonzalez, Ship Physician**
**Currently not on board a Carnival vessel. Home country is Colombia.\***
**c/o GrayRobinson, P.A.**

**Dr. Gonzalez may have knowledge regarding the medical care to Plaintiff on board the subject cruise.**

**Fnu Sivabalan Navaratnam, Ship Physician**

Currently not on board a Carnival vessel. Home country is Malaysia.*
c/o GrayRobinson, P.A.

Dr. Navaratnam may have knowledge regarding the medical care to Plaintiff on board the subject cruise.

Alexandra Ong, Ship Nurse
Ms. Ong is currently scheduled for deposition on September 1, 2023.
c/o Carnival Corporation
3655 NW 87th Avenue
Miami, FL 33178

Nurse Ong may have knowledge regarding the medical care to Plaintiff on board the subject cruise.

Shruti Bhatia, Mgmt. Trainee D/R II
Currently not onboard a vessel. Ms. Bhatia is presently scheduled for deposition on August 29, 2023.
c/o Carnival Corporation
3655 NW 87th Avenue
Miami, FL 33178

Ms. Bhatia responded to the scene and assisted Plaintiff to the medical center.

Vikram Thapa, Assistant Chief Security Officer
Currently onboard the Carnival Luminosa, scheduled to sign off on August 31, 2023.
c/o Carnival Corporation
3655 NW 87th Avenue
Miami, FL 33178

Mr. Thapa investigated the scene after Plaintiff reported the alleged incident.

Plaintiff testified during her deposition that she interacted with a crewmember immediately following her alleged incident. Defendant is currently investigating to determine whether this crewmember can be identified. Defendant will supplement any further information learned.

* Crewmember locations and ship assignments are subject to change and will be updated through the course of discovery.

Defendant objects to providing personal contact information for its crewmembers. Their depositions may be scheduled at a mutually convenient date and time.

**Discovery is ongoing and Defendant preserves the right to amend and supplement its response.**

4.      Identify each witness or individual who was in the vicinity of the subject incident for the one hour prior to the subject incident. For each such individual provide their name address, phone number, and email address, and indicate whether they currently work for your company, and your understanding of the subject matter of their anticipated knowledge or testimony.

> **RESPONSE: Objection. Defendant objects to this request as to the names, addresses, telephone numbers, and email addresses of each individual who was in the vicinity of the incident for one hour prior to Plaintiff's alleged incident. Plaintiff's request is overly broad in time and scope, disproportional to the needs of the case, irrelevant, immaterial and not reasonably calculated to lead to the discovery of relevant or admissible evidence. See Fed. R. Civ. 26(b)(1).**
>
> **Without waiving the foregoing objections, upon information and belief, Plaintiff was dining with other traveling companions who were present and may have witnessed the incident. This includes Plaintiff's husband, Lucien Cole.**
>
> **Additionally, Mgmt. Trainee D/R II Shruti Bhatia was notified of the alleged incident and assisted Plaintiff to the medical center. Ms. Bhatia also assisted ACSO Vikram Thapa in investigating the scene of the incident with Plaintiff after she was treated in the medical center. *See* answer to interrogatory no. 3 for contact information.**
>
> **Moreover, the following Assistant Servers were scheduled to work on lido deck 9 at the time of the subject incident. Defendant is currently without knowledge as to whether any of these Assistant Servers were in the immediate area of lido deck 9 aft at the time of Plaintiff's alleged incident.**
>
> 1. **Morales Primo, Juan Jhonatan**
>
> 2. **Putra, I Putu Agus Kusuma**
>
> 3. **Lengkong, Bobby Christian**
>
> 4. **Putra, I Putu Kana**
>
> 5. **Teti, Lilis**
>
> 6. **Cumberbatch, Kareem Hesborne Odel**

7.  **Inpumet, Mayurin**

8.  **Wanmola, Pairin**

9.  **Prayudi, Ida Bagus Trisna**

10. **Sanjaya, Putu Hendra**

11. **Palamine, Bernice Bongales**

12. **Ardhiyanti, Zabrina Bunga**

**Discovery is ongoing and Defendant preserves the right to amend and supplement its response.**

5.      Identify each witness or individual who responded to the subject incident including any individual who may have spoken to the Plaintiff. For each such individual provide their name address, phone number, and email address, and indicate whether they currently work for your company, and your understanding of the subject matter of their anticipated knowledge or testimony.

**RESPONSE: Objection. Defendant objects to this request as to the names, addresses, telephone numbers, and email addresses of each individual who was in the vicinity of the incident for one hour prior to Plaintiff's alleged incident. Plaintiff's request is overly broad in time and scope, disproportional to the needs of the case, irrelevant, immaterial and not reasonably calculated to lead to the discovery of relevant or admissible evidence. See Fed. R. Civ. 26(b)(1).**

**Without waiving the foregoing objections, Shruti Bhatia, Mgmt. Trainee D/R II, was notified of the subject incident and reported to the scene after the incident occurred. Ms. Bhatia also investigated the alleged incident. Ms. Bhatia is currently scheduled for deposition in this matter on August 29, 2023.**

**Moreover, Assistant Chief Security Officer Vikram Thapa investigated the scene of the incident and spoke with Plaintiff after she was treated within the medical center. Mr. Thapa is currently onboard the Carnival *Luminosa*, scheduled to sign off on August 31, 2023.**

**Plaintiff testified during her deposition that she interacted with a crewmember immediately following her alleged incident. Defendant is currently investigating to**

**determine whether this crewmember can be identified. Defendant will supplement any further information learned.**

**\* Crewmember locations and ship assignments are subject to change and will be updated through the course of discovery. Defendant objects to providing personal contact information for its crewmembers.**

**Discovery is ongoing and Defendant preserves the right to amend and supplement its response.**

6. Identify each individual who was responsible for the work performed, safety, or maintenance of the area where the subject incident occurred. For each such individual provide their name address, phone number, and email address, and indicate whether they currently work for your company.

> **RESPONSE: Objection. Defendant objects to this request as Plaintiff's request is vague, ambiguous, overly broad in time and scope, disproportional to the needs of the case, irrelevant, immaterial and not reasonably calculated to lead to the discovery of relevant or admissible evidence. See Fed. R. Civ. 26(b)(1). Further, Defendant objects to providing the names, addresses, telephone numbers, and email addresses of each individual who was responsible for the work performed, safety, or maintenance of the area where the subject incident occurred. Plaintiff's interrogatory is vague, ambiguous, and confusing as to "who was responsible for the work performed," that Defendant cannot reasonably form a response to Plaintiff's request. Defendant further objects as there is no temporal limitation on this interrogatory, and is overly broad, unduly burdensome, and disproportionate to the need for discovery in this litigation. *See Nat'l Staffing Sols., Inc. v. Sanchez*, No. 6:21-CV-1590-PGB-LHP, 2022 WL 19354640, at \*9 (M.D. Fla. Sept. 12, 2022) (finding discovery request with no temporal scope as overly broad, as it provides no time limit).**
>
> **Defendant objects to providing the personal home addresses, phone numbers, emails addresses, and employment status, of the Ship's employees identified below as an unwarranted invasion of privacy. Without waiving the foregoing objections, Shruti Bhatia, Mgmt. Trainee D/R II, was notified of the subject incident and reported to the scene after the incident occurred. Ms. Bhatia also assisted in investigating the alleged incident. Ms. Bhatia is currently on board the Carnival *Dream*, and is presently scheduled for deposition on August 29, 2023.**
>
> **Additionally, Defendant has identified assistant servers scheduled to work on lido deck 9 in Defendant's answer to interrogatory no. 4. The assistant servers would be responsible for work performed, safety, and maintaining the service stations.**

**\* Crewmember locations and ship assignments are subject to change and will be updated through the course of discovery. Defendant objects to providing personal contact information for its crewmembers.**

**Discovery is ongoing and Defendant preserves the right to amend and supplement its response.**

7.      Describe in detail all documents, rules, and policies and procedures you were required to comply with on the date of the subject incident which pertain to or concern the securing of cargo, eating utensils, containers, or similar items while the subject vessel was underway at sea.

**RESPONSE: Per the parties' 7.1 discovery conference, Defendant discloses it has no responsive written policies and procedures in effect on the date of the subject incident relating to the securing and storing of objects on the ship's outer deck from its Food Operations Department or Housekeeping Department, which would have control of the dining areas for set up, use, cleaning and maintenance.**

8.      State whether at any time since the date of the incident alleged in the Complaint you, your agents, attorneys, or insurance company contacted the Plaintiff or any other nonparty witnesses, If so provide

    a.   The date of each communication;

    b.   The manner of communication;

    c.   The phone number or email used;

    d.   The name, address, and phone number of the person contacted;

    e.   The reason for the communication;

**Ex.4**

**RESPONSE: Per the parties' 7.1 discovery conference, Defendant confirms it has had no communications with Plaintiff or any other nonparty witnesses, other than Plaintiff's and her husband's deposition. Defendant also provided notice of subpoenas served to Plaintiff's medical providers identified in her answers to interrogatories.**

10.      Identify each incident where a passenger has been injured by unsecured items or cargo on one of your vessels or ships; for all of your vessels and for the 5 years preceding the subject incident. For each incident include the name of the vessel, the date of the incident, a

description of the incident, and the name, addresses, and phone numbers of all employees, injured parties, and witnesses involved.

> **RESPONSE:** Defendant previously responded that there have been no prior incidents of items hitting guests in the Lido Deck area onboard the *Conquest*, in the five years prior to the subject incident.
>
> Per the parties' 7.1 discovery conference, the scope of priors incidents has been expanded to identification of prior incidents involving passengers who were injured by unsecured cargo items in the dining areas of its ships in the three (3) years prior to Plaintiff's alleged incident for *Conquest*-class vessels. Responsive prior incidents are below. Defendant makes no representation that any prior incidents are substantially similar to Plaintiff's alleged incident.

| # | Date/ Location | Name/Contact | Description of Incident |
|---|---|---|---|
| 1 | **October 4, 2019** *Valor* **Deck 9 Aft, Rosie Restaurant Portside** | Steve Young (*See passenger injury statement for contact info*) | Guest was eating on Deck 9 Aft Rosie Restaurant when a piece of metal frame fell on his head, causing laceration injury. |
| 2 | **November 10, 2019** *Valor* **Deck 3 Atrium Lobby** | Mark Rogers, Jr. (*See passenger injury statement for contact info*) | Guest claimed that while he was seated on the couch on deck 3 forward port side lobby, a metal piece of a vacuum cleaner extension fell from above and hit the shin of his left leg, causing injury to his shin. |
| 3 | **December 16, 2019** *Freedom* **Deck 3 Aft Posh Dining Room** | Joan Robinson-Gray (*See passenger injury statement for contact info*) | Guest claimed that while she was having dinner in Posh Dining Room, a waiter dropped one of the brown plastic covers on on the carpeted floor and it bounced back and hit her right ankle, causing her pain. |
| 4 | **November 12, 2021** *Freedom* **Deck 10, Aft portside Old Fashioned BBQ Restaurant** | Mary Rogers (*See passenger injury statement for contact info*) | Guest was seated at table for lunch at Old Fashioned BBQ, when a metal plate allegedly fell from the ceiling and hit her on the right side of her head and shoulder, resulting in contusion to her right shoulder. |
| 5 | **July 15, 2022** *Freedom* | Valerie Berry | Guest claims she was sitting at her table waiting for dinner when a server who was |

| | | |
|---|---|---|
| Deck 3 Forward, Chic Dining Room | (*See passenger injury statement for contact info*) | carrying a tray of plates accidentally dropped plate onto her head. Guest was treated for a superficial laceration on the scalp. |

14.     List the names and addresses of all persons who are believed or known by you, your agents, or your attorneys to have any knowledge concerning any of the issues in this lawsuit; and specify the subject matter about which the witness has knowledge. For each individual specify if they are still employed with your company.

**RESPONSE: Objection. Defendant objects to providing the personal home addresses, phone numbers, emails addresses, and employment status, of the Ship's Medical Staff and/or employees identified below as an unwarranted invasion of privacy. Without waiving the foregoing objections, upon information and belief,**

**Juan Esteban Vanegas Gonzalez, Ship Physician**
**Currently not on board a Carnival vessel. Home country is Colombia.\***
**c/o GrayRobinson, P.A.**

**Dr. Gonzalez may have knowledge regarding the medical care to Plaintiff on board the subject cruise.**

**Fnu Sivabalan Navaratnam, Ship Physician**
**Currently not on board a Carnival vessel. Home country is Malaysia.\***
**c/o GrayRobinson, P.A.**

**Dr. Navaratnam may have knowledge regarding the medical care to Plaintiff on board the subject cruise.**

**Alexandra Ong, Ship Nurse**
**Ms. Ong is currently scheduled for deposition on September 1, 2023.**
**c/o Carnival Corporation**
**3655 NW 87th Avenue**
**Miami, FL 33178**

**Nurse Ong may have knowledge regarding the medical care to Plaintiff on board the subject cruise.**

**Shruti Bhatia, Mgmt. Trainee D/R II**

**Ms. Bhatia is currently scheduled for deposition on August 29, 2023.**
**c/o Carnival Corporation**
**3655 NW 87th Avenue**
**Miami, FL 33178**

**Ms. Bhatia may have knowledge regarding the Plaintiff's alleged incident.**

**Plaintiff testified during her deposition that she interacted with a crewmember immediately following her alleged incident. Defendant is currently investigating to determine whether this crewmember can be identified. Defendant will supplement any further information learned.**

**\* Crewmember locations and ship assignments are subject to change and will be updated through the course of discovery.**

**Defendant objects to providing personal contact information and employment status for its crewmembers. Their depositions may be scheduled at a mutually convenient date and time.**

**Discovery is ongoing and Defendant preserves the right to amend and supplement its response.**

**ACKNOWLEDGEMENT AND VERIFICATION OF SUPPLEMENTAL ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Pursuant to 28 U.S.C. S 1746(2), I declare under penalty of perjury that while I do not have personal knowledge of all the facts recited in the foregoing Answers to Plaintiff's Initial Interrogatories, the information contained therein has been collected and made available to me by others, and said Answers are true and correct to the best of my information, knowledge and belief based upon the information made available to me and therefore the foregoing Answers are verified on behalf of Carnival Corporation.

**Dated:** _August 28_ _____, 2023

By:_____

**Monica Borcegue**
Guest Claims Manager
On Behalf of Carnival Corporation

## CASE SUMMARY

Ex. 5

CQ0724221646S - Carnival Conquest - CQ20220722003 (Jul 22, 2022 - Jul 25, 2022) - Jul 24, 2022 19:06 UTC-04:00

| PATIENT ID | NAME | DATE OF BIRTH | GENDER | CABIN |
|---|---|---|---|---|
| 75060 | COLE, EUREKA LATONYA | Feb 8, 1971 | F | 1418 |

## Triage

| DOCUMENTED DATE | DOCUMENTED USER | VISIT REASON |
|---|---|---|
| Jul 24, 2022 19:34 UTC-04:00 | Ong, Alexandra RN | Injury |

| LAST UPDATED DATE | LAST UPDATED USER |
|---|---|
| Jul 24, 2022 19:34 UTC-04:00 | Ong, Alexandra RN |

PRIORITY

NON-URGENT

CHIEF COMPLAINTS

**Patient attends clinic for left shoulder pain**

NOTES

patient walked into the medical center, conscious, coherent and alert, GCS 15

with complaints of left shoulder pain

patient verbalized that she was sitting at lido deck when container hit her left shoulder onset 06:20pm

With proper range of motion on her both shoulder

no redness nor swelling noted

no wound and no abrassion

## Vitals

| DATE | PERFORMED BY |
|---|---|
| Jul 24, 2022 19:40 UTC-04:00 | ONG, ALEXANDRA RN |

**VITAL SIGNS**

| TEMPERATURE | BLOOD PRESSURE | MAP |
|---|---|---|
| 97.9 F 36.6 C I | 130/80 RA sit | 96 |

| HEART RATE | SPO2 | RESPIRATORY RATE |
|---|---|---|
| 79 bpm | 100 SpO2 Finger Room air | 17 breaths/min |

A.V.P.U

A

INCLUDE IN VITAL SIGN CHECKS

Yes

COMMENTS

--

## Allergy

| IDENTIFIED WHEN | IDENTIFIED BY | LAST REACTION |
|---|---|---|
| -- | by the patient | -- |

| ALLERGY NAME | SEVERITY | REACTION |
|---|---|---|
| **seafood** | Minor | swelling |

| COMMENTS | TREATMENT |
|---|---|
| -- | **n/a** |

## Medical History

| DATE ONSET | DATE OF RESOLUTION | DOCUMENTED BY |
|---|---|---|
| -- | -- | Ong, Alexandra RN |

CONDITION
**J45.9 - Asthma, unspecified**

NOTES
--

| DATE ONSET | DATE OF RESOLUTION | DOCUMENTED BY |
|---|---|---|
| -- | -- | Ong, Alexandra RN |

CONDITION
**E11 - Type 2 diabetes mellitus**

NOTES
--

## Social History

| Marital Status: | Married |
|---|---|
| Number of children: | 3 |
| Smoking History: | No |
| Alcohol History: | No |
| Recreational Drugs Use: | No |
| Caffeine Use: | Yes |
| Type: | Tea |
| How many cups a day? | 1 |
| Exercise: | Yes |

## HPI

| DATE | PERFORMED BY |
|---|---|
| Jul 24, 2022 19:40 UTC-04:00 | Vanegas Gonzalez, Juan Esteban |

SHOULDER INJURY
Coming walking to the medical center stating that she was on the lido deck, and accidentally a plastic container fell on the left trapezius area, she says that it was windy, and the wind blew it, now is feeling localized pain, no head injury, no loss of consciousness, no numbness or tingling, no open wounds

## Physical Examination

DATE
Jul 24, 2022 19:37 UTC-04:00

PERFORMED BY
Vanegas Gonzalez, Juan Esteban

GENERAL
Well developed, well nourished, alert and cooperative, and appears to be in no acute distress.

MUSCULOSKELETAL
Additional Note: Pain on palpation over the left trapezius, full range of motion, no open wounds, no edema, no ecchymoses, no clinical signs of dislocationof the shoulder or clinical signs of rotator cuff inpingement or tear.

NEUROLOGICAL
Oriented to person, place, and date. CN II-XII intact. Strength and sensation symmetric and intact throughout. Patellar, Brachial, and brachioradialis reflexes 2+ bilaterally. Steady gait, negative Romberg test. Inspection: Normal. Higher cortical function: Normal. Mood and affect: Normal. Mental status: Alert, Oriented: Person, Oriented: Place and Oriented: Time. Memory: Normal. Speech and language: Normal. Upper limbs: Inspect: Normal symmetry, no deformities, no muscle wasting, no fasciculation's, no tremors and No Pronator drift. Tone: Normal tone. Power: Shoulder normal, Elbow normal, Wrist normal and Fingers normal.

PSYCHIATRIC
Demonstrates good judgment and reason, without abnormal affect or abnormal behaviors during the examination.

## Physician Orders

| STATUS | TASK | ORDERED | ORDER ID |
|---|---|---|---|
| **Completed** | SHOULDER X-RAY, DIGITAL SERIES & RADIOLOGIST'S REPORT | Jul 24, 2022 19:40 UTC-04:00 by Vanegas Gonzalez, Juan Esteban | 719527 |
| FREQUENCY/TIMES | LOCATION | PRIORITY | NOTES |
| once | -- | -- | -- |

| ACTION | USER | DATE |
|---|---|---|
| Completed | Vanegas Gonzalez, Juan Esteban | Jul 24, 2022 19:40 UTC-04:00 |

DOCUMENTS
 COLE, EUREKA LATONYA_XRAY REPORT_CQ 2022 07 25 004

| FINDINGS | COMMENTS |
|---|---|
| no signs of dislocation or fracture | -- |

## Current Medications

JARDIANCE
25 Milligram once daily

METFORMIN
500 Milligram twice daily

## New Medications

| IBUPROPHEN 200MG PO
200 Milligram four times daily starting Jul 24, 2022 19:41 UTC-04:00 for 3 day(s)

# Diagnosis

| DOCUMENTED DATE | DOCUMENTED USER |
| --- | --- |
| Jul 24, 2022 | Vanegas Gonzalez, Juan Esteban |
| LAST UPDATED DATE | LAST UPDATED USER |
| Jul 24, 2022 | Vanegas Gonzalez, Juan Esteban |
| TYPE | DIAGNOSIS |
| Final | **M62.6 - Muscle strain** |

NOTES
--

# Note

| DATE | PERFORMED BY |
| --- | --- |
| Jul 24, 2022 19:42 UTC-04:00 | Ong, Alexandra RN |

NOTES
patient was seen and examined by Dr. Vanegas
Xray left shoulder was done, image was seen by Dr.
Ibuprofen 200mg was given as per instruction of Dr. Vanegas
Injury report done with security officer
patient was discharged left medical center walking in good condition

# Disposition

| MEDICAL DEPARTMENT DECIDED TO | DOCUMENTED USER | DOCUMENTED DATE |
| --- | --- | --- |
| **Discharge from our care, follow up if required** | Vanegas Gonzalez, Juan Esteban | Jul 24, 2022 19:34 UTC-04:00 |
| LAST UPDATED USER | LAST UPDATED DATE | |
| Vanegas Gonzalez, Juan Esteban | Jul 24, 2022 19:34 UTC-04:00 | |

COMMENTS
--

| DETAILS | |
| --- | --- |
| Provider | -- |

DISCHARGE DOCUMENTS

Clinical Note

Instructions

Prescriptions

PATIENT SIGNATURE



COLE, EUREKA LATONYA
Jul 24, 2022 19:34 UTC-04:00

INSTRUCTIONS

Follow up with her Doctor back home

Ice 20 minutes 4 times a day

If there's any new symptoms call 911.

## Injury

| INJURY SEVERITY | INJURY DATE | TREATING DOCTOR ID NUMBER | SEAEVENT REPORT NUMBER |
|---|---|---|---|
| Beyond First Aid | Jul 24, 2022 18:20 UTC-04:00 | 448488 | CCLCQHEA2022 00124V |
| DATE REQUESTED MEDICAL ATTENTION Jul 24, 2022 18:40 UTC-04:00 | DATE FIRST SEEN BY MEDICAL STAFF Jul 24, 2022 19:06 UTC-04:00 | LOCATION WHERE FIRST SEEN BY MEDICAL STAFF Ship's Medical Center | |
| INJURY TYPE Bruise/Contusion | SEVERITY OF VISION IMPAIRMENT -- | DIRECT INJURY CAUSE Struck By Object | |
| GENERAL BODY REGION Trunk | SPECIFIC BODY PART Upper back | DISPOSITION Return to Normal Activity | |
| DURATION OF ADMISSION TO SHIP'S MEDICAL CENTER -- | DATE PRONOUNCED DEAD -- | | |
| DATE OF DISEMBARKATION -- | DISEMBARKATION METHOD -- | WAS THE PATIENT TAKEN TO A HEALTHCARE FACILITY? -- | |
| COULD PRE-EXISTING MEDICAL CONDITIONS(S) HAVE CONTRIBUTED TO THE INCIDENT? No | | | |
| COULD ALCOHOL/DRUGS HAVE CONTRIBUTED TO THE INCIDENT? No | | | |

## Case Diagnosis

M62.6 - Muscle strain

# CARNIVAL Conquest Medical Department

**Guest Consultation Form**

 **Carnival**

| Date | MM/DD/YYYY 07-24-2022 | Time | | A.M. P.M. | **PLEASE PRINT CLEARLY** | | | | |
|---|---|---|---|---|---|---|---|---|---|

| Full Name | Last Name *Cole* | | First Name *EUREKA* | | Cabin Number *1418* | | Folio Number *75060* | |
|---|---|---|---|---|---|---|---|---|

| Date of Birth | MM/DD/YYYY 02-08-1971 | Age 51 | Street Address | 2670 SW 8th St #4 | |
|---|---|---|---|---|---|

| City *Fort Lauderdale* | State FL / FL | Country *U.S.A.* | Zip or Postal Code *33312* |
|---|---|---|---|

| Phone Number 786-216-2808 | Emergency Contact Name and Phone Number | |
|---|---|---|

Do you have any medical problems? (YES)/ NO

If yes and any of these, **please encircle:**

Hypertension.
(Diabetes,)
(Asthma,)
COPD.
Arthritis.
Gout.

Depression.
Anxiety.
Heart Problems.
Alzheimer's.
Thyroid Problems.
Osteoporosis.

Cancer.
Kidney stones.
Bleeding Disorder.
Migraine.
Stroke.
Gastritis.

Pulmonary Embolism.
Deep Vein Thrombosis.
Back Problems.
Seizures.
Diverticulosis.
Previous surgery:

| Other, please list: | N/A |
|---|---|

Are you taking ANY medication presently (including birth control pills and over the counter)? (YES)/ NO

| If yes, please list: | metformine  Jardiance  Ozempic |
|---|---|

Any FAMILIAL MEDICAL history? Y E S (N O) If Yes, Please specify
Paternal: _____
Maternal: _____
Sibling: _____

Any ALLERGIES? Y E S /(N O)
If Yes, Please list: _____
_____

ALCOHOL: Beer ____/ Week  Wine____/Week  Liquor____/Week

Do you smoke? Y E S / N O
If yes, how many sticks per day? _____
Do you Exercise? Y E S / N O   How many times a week:____

| For Medical Staff Only. | BP | HR | RR | Temp | Spo2 | BS | WT: | HT: |
|---|---|---|---|---|---|---|---|---|

| Reason for Today's Visit: | Container blew off work station and hit me on my Shoulder (left Side) |
|---|---|

I am responsible for payment of all fees for physician and/or nurse consultations, medications, supplies provided onboard or shore side as well as any administrative fees and transportation costs related and incurred for the coordination of medical treatment for myself or my child. The fees will be applied to my Sail and Sign card. If my Sail and Sign account does not have sufficient funds to cover the cost of all medical services and supplies provided during the cruise, shipboard or shore side, I will be responsible for providing alternative form of payment, which may include signing a promissory note.

SIGNATURE: ✗ ....*G___k___Cole*....................

Rev.00 – 12/30/2016

**HEADER**

| QUESTIONNAIRE | DATE |
|---|---|
| HQ012 HQ012 / PHS / COVID-19 Pre-boarding Health Declaration / US Ships | Jul 22, 2022 15:08 UTC+00:00 |

| COMPLETED BY | COMPLETED ON |
|---|---|
| EUREKA COLE | POMMED23 |

| PHASE | PORT |
|---|---|
| Embarkation | DEFAULT |

**ANSWERS**

1A. IN THE 10 DAYS BEFORE BOARDING, HAVE YOU HAD ANY ONE OR MORE OF THE FOLLOWING SYMPTOMS: COUGH, SHORTNESS OF BREATH, DIFFICULTY BREATHING, FEVER OR CHILLS, NEW LOSS OF TASTE OR NEW LOSS OF SMELL?

No

1B. IN THE 10 DAYS BEFORE BOARDING, HAVE YOU HAD ANY TWO OR MORE OF THE FOLLOWING SYMPTOMS: CONGESTED OR RUNNING NOSE, SORE THROAT, MUSCLE OR BODY ACHES, EXTREME TIREDNESS, HEADACHE, VOMITING OR DIARRHEA?

No

2. IN THE 10 DAYS BEFORE BOARDING, HAVE YOU TESTED POSITIVE FOR COVID-19?

No

3. IN THE 10 DAYS BEFORE BOARDING, WERE YOU IN CONTACT WITH A PERSON WHO HAD CONFIRMED COVID-19 OR COVID-19 SYMPTOMS?

No

4. ARE YOU FULLY VACCINATED WITH AN AUTHORIZED COVID-19 VACCINE AT LEAST 14 DAYS BEFORE EMBARKATION? ( FULLY VACCINATED IS YOU RECEIVED THE LAST DOSE IN A PRIMARY VACCINATION SERIES AT LEAST 14 DAYS BEFORE EMBARKATION. )

Yes

5. PRE-TRAVEL COVID-19 TEST VALIDATED:

Negative

6. EMBARKATION DAY COVID-19 TEST VALIDATED (IF APPLICABLE):

N/A

7. COVID-19 VACCINATION STATUS VALIDATED:

Fully Vaccinated

8. FOR DESTINATIONS WHERE UP TO DATE VACCINES ARE REQUIRED:

Not applicable

10. OUTCOME OF HEALTH SCREENING

Permit boarding

**CUSTOM ATTRIBUTES**

CUSTOM1

--

CUSTOM2

--

CUSTOM3

--

**HEADER**

| | |
|---|---|
| QUESTIONNAIRE | DATE |
| HQ009 HQ009 / PHS / Pre-cruise Health Declaration | Jul 8, 2022 21:36 UTC+00:00 |

| | |
|---|---|
| COMPLETED BY | COMPLETED ON |
| EUREKA COLE | -- |

| | |
|---|---|
| PHASE | PORT |
| -- | -- |

**ANSWERS**

ARE YOU, OR WILL YOU BE FULLY VACCINATED WITH A WHO OR FDA AUTHORIZED COVID-19 VACCINE AT LEAST 14 DAYS BEFORE BOARDING? (FULLY VACCINATED IS YOU RECEIVED THE FINAL DOSE OF A VACCINE SERIES AT LEAST 14 DAYS BEFORE EMBARKATION.)

Yes

**CUSTOM ATTRIBUTES**

CUSTOM1

--

CUSTOM2

--

CUSTOM3

--

**HEADER**

DATE

Jul 24, 2022 19:40 UTC-04:00

TAKEN BY

Ong, Alexandra RN

TAKEN ON

--

PHASE

--

PORT

--

**VITALS**

TEMPERATURE

97.9 F, 36.6 C

TAKEN METHOD

Infrared/Thermal

SPO2

100 %

Finger Room air

RESPIRATORY RATE

17 breaths/min



COLE_EUREKA_LEFT SHOULDER-XRAY-2022-07-24.JPG

# X-Ray Report

**PATIENT:**      EUREKA COLE,                                    **DOB:** 2/8/1971 12:00:00 AM
**PATIENT ID:**   191145                                          **DOS:** 7/24/2022 2:18:00 PM
**REFERRING PHYSICIAN:**   NAVARATNAM, S DR.
**INSTITUTION:** Carnival Conquest

EXAMINATION: Left shoulder.

INDICATION: Pain following injury.

COMPARISON: None.

FINDINGS: AP views of the left shoulder with the humerus in internal and external rotation and a Y view show no fracture or dislocation. The joint spaces are normally maintained. There is no bony erosion or periarticular calcification. No bony tumors are visualized. The visualized ribs are intact. The visualized lung is clear. There is no soft tissue abnormality.

IMPRESSION: Negative left shoulder.

Electronically signed by: Gregory Downing MD 7/25/2022 8:21 AM CDT Workstation: 109-95134R0

M.D.
Community Radiology Associates, PA
7/25/2022 8:23:20 AM
Transcribed by: