**In The Matter Of:**

*EUREKA COLE v.*
*CARNIVAL CORPORATION*

*SHRUTI BHATIA*
*August 29, 2021*
*ORIGINAL TRANSCRIPT*

*CourtScribes, Inc.*
*"Delivering More For Less"*
*(833) 727-4237*
*info@courtscribes.com*
*www.courtscribes.com*

**ORIGINAL TRANSCRIPT**

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.:  23-CV-60532-RAR

EUREKA COLE,

      PLAINTIFF,

  V.

CARNIVAL CORPORATION,

      DEFENDANT.

_____

     VIDEOTAPED DEPOSITION OF SHRUTI BHATIA

DATE:        AUGUST 29, 2021

REPORTER:    KRISTEN WAY

PLACE:       VIA REMOTE ZOOM VIDEO CONFERENCE

**ORIGINAL TRANSCRIPT**

2

APPEARANCES

ON BEHALF OF PLAINTIFF:

RAYMOND DIEPPA, ESQUIRE

FLORIDA LEGAL, LLC

150 SOUTHEAST 2ND AVENUE, SUITE 1001

MIAMI, FLORIDA  33131-1577

TELEPHONE NO.:  (305) 901-2209

E-MAIL:  RAY.DIEPPA@FLORIDALEGAL.LAW


ON BEHALF OF DEFENDANT:

COOPER JARNIGAN, ESQUIRE

GRAY ROBINSON, P.A.

515 NORTH FLAGLER DRIVE, SUITE 650

WEST PALM BEACH, FLORIDA   33401

TELEPHONE NO.:  (561) 268-5727

E-MAIL:  COOPER.JARNAGIN@GRAY-ROBINSON.COM

**ORIGINAL TRANSCRIPT**

3

INDEX

|                                        | Page |
|----------------------------------------|------|
| PROCEEDINGS                            | 5    |
| DIRECT EXAMINATION BY MR. DIEPPA        | 6    |
| CROSS-EXAMINATION BY MR. JARNAGIN       | 68   |

EXHIBITS

| Exhibit |                                           | Page |
|---------|-------------------------------------------|------|
| 1       | PHOTOGRAPH OF ICE AND MEDICATION          | 23   |
| 2       | PHOTOGRAPH OF CONTAINERS                   | 29   |
| 3       | DIAGRAM OF DECK 9                          | 39   |
| 4       | MEDICAL REPORTS                           | 55   |
| 5       | CASE SUMMARY AND SHIP'S INFIRMARY REPORT   | 59   |

**ORIGINAL TRANSCRIPT**

4

STIPULATION

THE VIDEOTAPED DEPOSITION SHRUTI BHATIA TAKEN VIA REMOTE ZOOM CONFERENCE ON TUESDAY, THE 29TH DAY OF AUGUST 2023 AT APPROXIMATELY 11:05 A.M.; SAID DEPOSITION WAS TAKEN PURSUANT TO THE FLORIDA RULES OF CIVIL PROCEDURE.

IT IS AGREED THAT KRISTEN WAY, BEING A NOTARY PUBLIC AND COURT REPORTER FOR THE STATE OF FLORIDA, MAY SWEAR THE WITNESS AND THE READING AND SIGNING OF THE COMPLETED TRANSCRIPT BY THE WITNESS IS NOT WAIVED.

**ORIGINAL TRANSCRIPT**

5

PROCEEDINGS

COURT REPORTER:  The time is 11:05 a.m., and we are now on the record.

We are here today August 29, 2023, by remote appearance for the purpose of recording the deposition of Shruti Bhatia in the matter of Eureka Cole versus Carnival Corporation, Case Number 23-cv-60532-RAR, United States District Court, Southern District of Florida, Miami Division.

Will counsel please state their appearance for the record?

MR. DIEPPA:  Yes, Raymond Dieppa on behalf of the plaintiff, Eureka Cole.

MR. JARNAGIN:  And Cooper Jarnagin on behalf of the defendant, Carnival Corporation.

COURT REPORTER:  Thank you.

Ms. Bhatia, please raise your right hand.

Do you, Shruti Bhatia, swear or affirm to tell the truth, the whole truth, and nothing but the truth so help you God?

MS. BHATIA:  Yes, I swear to tell the truth, nothing but the truth.

COURT REPORTER:  Thank you.

Counsel, you may begin.

MR. DIEPPA:  Okay.

ORIGINAL TRANSCRIPT

6

DIRECT EXAMINATION

BY MR. DIEPPA:

Q    Ma'am, can you please state your full name?

A    My name is Shruti Bhatia.

Q    And what is your nationality?

A    I'm Indian.

Q    So what country are you a resident of or a citizen of?

A    India. I'm Indian.

Q    Oh, sorry.  I didn't catch that.

A    Yeah.

Q    Have you ever given a deposition before?

A    No, sir, I haven't.

Q    Where are you currently giving this deposition from?  Where are you located now?

A    It's my home in New Delhi.

Q    Okay, in India?

A    Yeah, India.

Q    All right.  Have you ever given a deposition before today?

A    I beg your pardon?

Q    Have you ever given a deposition before today?

A    No, sir.  I haven't.

Q    Okay.  Essentially, this is a way to get

## ORIGINAL TRANSCRIPT

7

your testimony.  There is a court reporter taking down what you say.  And your testimony is also being video recorded.

So all I would ask you is just to wait until I finish my question before you answer.  And likewise, I will wait for you to finish your answer before I ask my next question.  Is that all right?

A    That's perfectly fine.

Q    Okay.  Also, if you don't understand my question, please let me know and we will address that.  Otherwise, I will assume that you understood my question.  Is that all right?

A    Okay.  Understood.

Q    All right.  So where are you currently employed?

A    I'm employed with Carnival Corporation Lines.

Q    Okay.  How long have you been employed with them?

A    So, okay.  I joined the company in 2014.  Left in '18.  And then again joined in 2021.  So it's been six-and-a-half years.

Q    Okay.  When you first joined the company, what was your job title?

A    Room service operator.

**ORIGINAL TRANSCRIPT**

8

Q    And when you were first hired by Carnival to be a room service operator was that on one of their cruise ships?

A    Yes.

Q    Okay.  And did you undergo any training when you started that job to be able to work on a cruise ship?

A    No.

Q    Okay.  So did you have training regarding how to work on a cruise ship before you started working for Carnival?

A    No.

Q    Okay.  So then Carnival, they hired you to work as a housekeeper on the cruise ship.  They provided you with zero training?

A    Yes, as a room service operator.

Q    Yeah.  So what training did they provide you?

A    There wasn't any training.

Q    Okay.  So they didn't train you on how to use the life rafts if the ship is sinking or anything like that?

A    Well, that there was some -- okay.  So there was some programs going on for a month that were for new hires.  Yeah, that is like the crowd management

9

and all that.  Those courses included all of this, how many rafts we had, safety courses and on.  I thought you were asking pertaining to my job title.

Q   No, when I say "training", I mean any training.  Safety training --

A   Yes.

Q   -- any training that Carnival required you to undergo in order to work for them on a ship.

A   Absolutely, they did.

Q   Okay.  Can you tell me about that training? You said it was about a month long or something like that.  What did that entail, and what did they train you to do?  And, you know, what was that like?  Tell me.

A   Okay.  It was many years ago, so it's -- okay, it has crisis management, and crowd management, with, you know, safety measures, how many rafts you have, general understanding of the layout of the ship, cabin size, boat size, forward/aft, emergency numbers for the bridge, for, you know, for medical.  Simply, all that.

Q   Okay.  Were you also trained on how to operate the ship safely if there were -- if there was a storm or there were bad weather conditions?  Did that safety training also cover that?

ORIGINAL TRANSCRIPT

10

A    No.

Q    Okay.  So you were never taught what to do if there was bad weather on a ship or, you know, maybe the ship was moving in such a way that articles on the ship were becoming loose and presenting a risk of injury?  Carnival never elected to train you on any of those issues, correct?

MR. JARNAGIN:  Objection.

THE WITNESS:  Yes, correct.

BY MR. DIEPPA:

Q    Okay.  And so, did they ever train you later in your career with Carnival as to how to address issues with cargo or items on the ship that may become loose and injure people?  Were you trained on how to secure and handle those items, so they don't get loose and injure passengers?

A    No.

Q    Okay.  Now, the type of training that you did receive was that a written training?  Was that through an instructor?  Did you watch a video?

A    With an instructor and then we watching a video.

Q    Okay.  What were the names of all those videos that you watched?

A    I don't remember.

11

Q    How many videos did you watch?

A    Again, I don't remember.

Q    And your -- back on July 24, 2022, what was your job title?

A    I was the management trainee.

Q    To be a management trainee, did you receive any additional training or instructions from Carnival as to how to do that job?

A    I was on the training.  So back then, there wasn't any practical training program as such.

Q    Okay.  So nobody trained you to do that job? They just told you to do it?

A    Well, they had different sections.  My training included how to, you know, manage the room service, the back dining rooms, then came the dining room.  So it was going like that. And at that moment, I was taking care of -- in the evening, opening the bistro on the Lido deck.

Q    Okay.  So who teaches you, for example, the food trays, the cleaning equipment, the carts for serving the food?  Who teaches you how to take those out and then store them when they're not being used? How did you learn that?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  I had basically always

12

accompanied with my other managers when I took a position.  And I was like given like two to three hours with them, and then they just take me to the area, and you know, how the operations run.

BY MR. DIEPPA:

Q    Okay.  So, I mean, when you're managers are training you, do they teach you, for example, when the food containers are not being used, you should store them somewhere?

A    Food containers when they are not used, they are always stored in the galley.  Nobody taught me anything, but that is how I saw -- saw it.

Q    Okay.  The process of whenever you are given a new job title at Carnival are you required to undergo any training when you receive a new job title?

A    Yes, which is --

Q    Okay.

A    Yeah.

Q    Okay.  So what new training were you required to undergo that was provided to you by Carnival to be a management trainee?

A    Okay.  So I just said.  My training started for the (inaudible) areas.  So opening, I was up through mess and south mess, how to open the lines, you know, taking care of the operations, taking

13

(inaudible).  And the same training somehow went on for different segments.  If it's a function that I have to organize, it has to be explained.  Dining room was totally different.  It's just a basic operation, how it runs, how you need to take the reservations, and you know (inaudible), and has been in sitting. And then the bistro, opening the lines, you know, at 6:00 and closing the line at 9:15.  Generally, taking care of the operations, that the tables are clean.

Q   Okay.  And that training, was that on a video?  Was that written?

A   No, as I said, for this training, I had to be with the manager and walk with them for, you know, for one whole day probably to understand, or maybe several days if I am trying -- if they have put me in the back dining room, then I'll be there for a month to understand the operations, be with the manager, or putting me (inaudible) area.  And then just be with them and, you know, understand how we close.

Q   Okay.  So I mean, did he teach you how to, you know, serve the food and stow the equipment that's used to serve the food when it's not being used?

A   No.

Q   Okay.  So you had no idea how to serve the food or how to stow the equipment relating to this

**ORIGINAL TRANSCRIPT**

14

food service when it was not being used?

A   No.  Yeah, I have no idea about that.

Q   Okay.  So when this accident happened, and you were called to the scene, and there was some containers and there was a -- what looked like a food service cart on the Lido Deck, you had no idea how any of that worked, correct?

A   No.  I mean, those are -- as far as I remember, those were those empty Lexans.

Q   Yeah.

A   And it was a side stand.

Q   Uh-huh.  Yeah, did you ever receive any training on how to use those, how to store those?

A   No.

Q   Okay.  So what about the person -- so do you know why they were even out on the Lido deck at that time?

A   For what?  The Lexans?

Q   The plastic containers and the food cart that caused the injury in this case, do you have any idea why those were out on the Lido deck at the time of this incident?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  So it's just like a standard that we do.  That's how we know it.  It's not a food

15

cart.  And then these Lexans are used for, you know, storing cleaning equipment.

BY MR. DIEPPA:

Q    Uh-huh.  How do you know that if you were never trained on how to use them?

A    I tell you, because it's not a part of my training.  But as I said, when you go around in the restaurant, we have so many side stands.  And then usually, these Lexans used by them on the side stands or inside the galley.  I mean, you store your stuff there.  So it wasn't trained, train trained to me because I was always a part of -- you know, I was a room service operator.  We used to store things there.

Q    Do you have any idea of the proper and safe method to use those side stands on the Lido deck?  Do you have any idea regarding that?

A    These side stands are actually not mobile. I mean, they are safe.  So we don't have to secure the side stands.

Q    Who taught you that?

A    They are -- you know, they are like bolted to the floor.

Q    Who taught you and trained you on the use of the side stands?

A    Nobody taught me.  I mean, it's literally

ORIGINAL TRANSCRIPT

16

how they are, done by the people who designed the ship.

Q    Who taught you how to load and unload the side stands safely?

A    I didn't get your question.

Q    Yes, the side stands, they have containers that can be loaded in them, correct?

A    Uh-huh.

Q    You have to say, "Yes."

A    Yes.

Q    Okay.  So who taught you the proper and safe way how to load those side stands while you were working for Carnival Cruise Lines?

A    It's just that I observed.  Again, nobody taught us such.  When I am moving around with my manager, or sometimes we put the Lexans there, sometimes it's inside.  It totally depends how the situation is like.  It is for a purpose.

Q    What was the name of the manager that allegedly was teaching you how to do that?

A    On Conquest, I don't remember on Conquest. However, my basic training was basically done on Carnival Miracle.  Then it was put to me through a video, and then I was transferred to Carnival Conquest.  And I was actually -- I was filling in the

ORIGINAL TRANSCRIPT

17

position for a system Matre'd on Carnival Conquest because there was nobody there. So I was basically -- whatever training I got from Carnival Miracle, I was applying on that training on Conquest.

Q Okay. So what did that training consist of? The training you received on Carnival Miracle?

A I was -- it was a long training. Again, I mean, I'm just repeating myself. You know, it's just the same thing. How to take care of the operations you are overseeing, opening the lines. It was regarding all that.

Q Okay. So in any of that training is it your testimony that you were never taught how to secure items that may be on the ship's deck in any way?

A Sorry, I was receiving a call. I beg your pardon. Sorry.

What was the question again, please?

Q Yes. Is it your testimony that throughout any of that training at no point in time you were ever taught how to safely secure items on the ship -- on the deck of the cruise ship?

A I -- see, on the training, there isn't anything.

Q Okay.

A But --

**ORIGINAL TRANSCRIPT**

18

Q   Go ahead.  I'm sorry.  Go ahead.

Yeah, you were saying?

A   Yes, on the training, there isn't anything. It's just when, you know, sometimes the weather is bad and if the Captain sends an email to the bosses, then they tell us to secure the items.  But our items are usually inside the galley.  So we need to secure all items that we have inside the galley.

Q   Okay.  And when you get that email from the Captain, how did you learn how to secure the items?

A   That is, like, you know, through my manager, like, my seniors and my bosses.  So we usually have trollies inside the galley.  And the wheels have a stopper.  We put the stopper there, make sure if you are putting the plates on the line, we don't put it on too high.  We put minimum plates, minimum cups and glasses just in case that the ship goes -- if it's like a pitcher of tea, so they don't fall off.

Q   So okay --

A   That's (cross talk) --

Q   So your managers are the ones that teach you when you receive a notice from the ship how to secure items on the deck of the ship to keep them from falling over or maybe injuring somebody?

A   Yes, sir.

ORIGINAL TRANSCRIPT

19

Q    That's how you know that?

A    Yes, sir.  Yes.

Q    Okay.  And that's -- is that only verbal?
You're not given instructions or a written procedure
in any way?

A    It's totally verbal.

Q    Okay.

A    Or, they can, you know, accompany and show
it to you.

Q    Okay.  So you're manager, they would
accompany and show you how to properly secure items on
the deck if there were hazardous conditions outside,
or, you know, perhaps high winds or a storm; is that
correct?

A    Not always.  Only if I am not pretty much
sure.  But it's a very big process, as I said.
Usually our area is inside the galley.  And that way,
they need me to, you know, secure it because you have
waiters working there.  You have folks walking there.
That whole area.

Q    Okay.  Right.

A    (Cross talk.)

Q    And I just want to get your testimony clear
for the record before we proceed in this case.  Your
testimony today is that as far as you know at Carnival

ORIGINAL TRANSCRIPT

20

Cruise Line, there exists no written or procedure on video that relates to securing items on the deck of the ship that you are aware of?  And you have not seen any as you sit here today; is that correct?

A     That's correct.

Q     Okay.  But you were trained, at least before this incident, by your managers as to how to properly secure items on the deck of a ship if you needed to or if you were instructed to, correct?

A     True, yes.

Q     And during the time that you worked at Carnival from 2014 to 2022, were you ever working at a time where there was a storm or bad weather that required you to secure items on the deck of a ship?

A     No.

Q     Okay.  So you've -- during the time you've been on Carnival ships, you've never been on the ship when there was a storm or when there were hazardous high seas or anything like that?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  I was, but I wasn't asked to secure the items.  And specifically, I was a room service operator, so, you know, you're inside the ship.  I wasn't outside.  Even on this position, no.

BY MR. DIEPPA:

21

Q    Okay.  During the times you were on the ship during a storm or hazardous conditions were you aware of that procedure that certain employees had to secure items if there were hazardous conditions out on the deck?

A    We do it from our waiters and supervisors. But especially, if the weather is bad in the night, because during the day, we're on the floor, and, you know, you can sense it.  But when you're in the night, you lean from them.  You know, if it's the trollies, don't put many plates or the glass on the -- and the (inaudible) signs and all that --

Q    Okay, so --

A    -- at every station.

Q    Yeah.  So you are aware of the procedure that when there's hazardous conditions, the trollies or the dining equipment that need to be secured if those conditions exist, correct?

A    Correct.

Q    Okay.  Now the incident we're here about today involving Ms. Eureka Cole and her being struck by containers that were stored on the dining area is that an incident that you personally witnessed?

A    No.

Q    Okay.  Did you get to the scene after the

22

incident occurred?

A    Yes.

Q    Okay.  How long after the incident occurred did you arrive at the scene?

A    I'm not sure on that.

Q    Okay.  When you arrived at the scene was there a Carnival employee already there?

A    Could be.  It's an open deck, so we do have housekeeping and bar people on there.

Q    So you've been identified as one of the first people who arrived at the scene.  So do you remember who else that was working with you was at the scene when you arrived that day?

A    No, I don't remember.

Q    Okay.  Are you saying you don't remember if there was anyone there, or you don't remember the name of the person?

A    I don't remember the name of the person.  And if -- as I said.  So it's an open deck.  We have, you know, the food, the bar and everything.  So it could be other crew members.  But I don't remember who was there and my mind was -- you know, I didn't even look down in there for, you know, if I know people there, or if I know crew members there.

Q    Well, it looks like there was a passenger

23

that was injured, and someone had at that point brought the passenger some ice for her shoulder, correct?

A    I don't remember.

Q    Are you saying that -- are you denying that someone brought ice for the passenger after she was injured?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  I'm saying I don't remember.

BY MR. DIEPPA:

Q    Okay.  I know you don't remember.  But you're not disputing it, are you?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  I don't know what to say.  I sincerely don't remember.

BY MR. DIEPPA:

Q    Okay.  So you have no knowledge one way or the other that someone had brought ice for this passenger after she was injured, correct?

A    Correct.

MR. DIEPPA:  And I'll show you what we'll mark as Plaintiff's Exhibit 1 to your deposition.

(EXHIBIT 1 MARKED FOR IDENTIFICATION.)

BY MR. DIEPPA:

Q    This is a photograph.  Can you see that?

24

A    Yes.

Q    Okay.  Now, this is the photograph of the ice and the medication that was given to Ms. Eureka Cole in the dining area.  Does that look at all familiar to you, Ma'am?

A    Yes, it does.  But I'm just thinking -- yeah, it does.

Q    Okay.

A    It's a pack of ice and it's medicine, yes.

Q    All right.  Since there was an injury involving a passenger, and according to Carnival, as far as Carnival Cruise Line is aware, you're the first person they are aware of that arrived at the scene. Can you tell me or describe for me what the other employee that was there looked like, or what his name was?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  Sir, I said I don't remember.

BY MR. DIEPPA:

Q    Was it a male?

A    I just said I don't remember.  What I know is that he was an assistant server, and unfortunately, I really don't remember.  It's been a long time whether it was a female or a male.

Q    Okay.

ORIGINAL TRANSCRIPT

25

A    They just told me there was a guest looking for a manager on duty.

Q    Okay.  How long had you been working in this area when this accident occurred on July 24, 2022?

A    July 24, I think on Conquest that would have been my -- maybe four weeks, four or five weeks because I was transferred in June, I think.  June, yeah.

Q    Okay.  So you had been working there four weeks, and obviously, you weren't the only person working there.  There were other servers that worked with you in the area of the ship you were assigned to?

A    Yes.

Q    Okay.  All right.  So we were provided with a list of names here.  And you can tell me if maybe they sound familiar to you.  I'm just going to run through them.

If the name sounds familiar to you in terms of that person may have been there at the time of this incident, just please stop me and let me know.  Okay?

A    Okay.

Q    We have Juan Jonathan Morales (ph).  Does that sound familiar?

A    Juan Jonathan?  No.

Q    Iputu Agus Sukuma?

**ORIGINAL TRANSCRIPT**

26

A    Yes.

Q    Bobby -- Yes?  Okay.

That name sound familiar to you?  That may have been someone who was there?

A    Agus Sukuma could be my waiter.

Q    Could have been your waiter?

Okay.  What about Bobby Christian?  Lengkong (ph)?

A    No.  No.

Q    What about Putu Kana Putra (ph)?

A    Putu who?  Sorry.

Q    Putu Kana Putra?

A    I think, yes.

Q    Okay.  Possibly could have been in the area when you arrived at the scene of the incident on the Lido deck?

A    That I'm not sure because, you know, the Lido deck is a big deck.  They could be anywhere cleaning the tables or refilling the beverage.

Q    Okay.  And did you do anything to investigate the cause of this accident at all?

A    So when I met the guest, I offered her medical assistance.  I took her down to medical center, and because if she had, like the picture showed, it's after the visit to the medical center.  I

27

think this was when she had come back.  To be a (inaudible), I just escorted her there and then I came to my -- you know, to resume my duties.

And then there was a security officer who came to investigate the area.  So we removed the Lexans from there.  And that's all that I did on my part.

Q    Okay.  My question was actually did you yourself do anything to investigate the cause of the incident?

A    No.

Q    Were you aware from anyone who was at the scene how the incident involving Ms. Eureka Cole occurred?

A    Would you repeat that, please?

Q    Yes.  At any point in time were you made aware as to how the incident involving Ms. Eureka Cole occurred on July 24, 2022?

A    Yes, the guest herself and also her husband.

Q    Okay.  What did she tell you?

A    She told me that the -- so we call it a Lexan, white Lexan, the lid of that white Lexan, it, you know, it flew over and it hit her on her -- on the back of the shoulder.

Q    Okay.  Was she sitting at the dining table

28

when she told you that?

A    Yes.

Q    Did you look around and see if -- I think you call it the white Lexan and the lid was in that area?

A    Yes, it was still there.

Q    Okay.  Where was it?

A    It was still on the side stand.

Q    Okay.  Was it on the ground or was it still on the side stand?

A    No, it was not on the ground.  It was on the side stand.

Q    Okay.  Was there anyone else there with you when you saw it on the side stand besides Ms. Cole?

A    Her husband --

Q    Okay.

A    -- and I think two of her friends.  It looked like a family of four.

Q    Okay.  Anyone else?

A    There were other guests at the back.

Q    Well, who was operating that side stand with the containers in it?

A    I don't know.  Like, I'm not sure on that.  If somebody was operating or, you know, using that side stand.

**ORIGINAL TRANSCRIPT**

29

Q    Did the containers have anything in them?

A    No.  They were empty.

Q    Did you look inside of them?

A    Yes, I did, but --

Q    Okay.  It's your testimony under oath, under penalty of perjury, that the containers were empty?

A    Yes, sir.

MR. DIEPPA:  Okay.  All right.  I'm going to show you what I'll mark as Exhibit 2 to your deposition.

(EXHIBIT 2 MARKED FOR IDENTIFICATION.)

BY MR. DIEPPA:

Q    This is a photograph of the containers.  Can you see that?

A    Yes.

Q    Okay.  Do those containers look empty to you?

A    The right one with the black is not, but the one with which she said, the lid of it is empty.  So that's probably how I was pretty much sure.  Because the lid of the container that flew over, the guest was claiming was empty.

Q    Ma'am, I asked you if the containers were empty.

A    As far as I remember --

30

Q    Ma'am, let me finish my question.  Ma'am, I asked you if the containers were empty.  Looking at this photograph, does it look to you that all of the containers are empty?

A    No.

Q    Okay.  What does it look like is in the container on the right side?

A    On the right side, these are the racks we use to keep the forks and the spoons.

Q    Okay.  So the racks that are used to keep the forks and the spoons.  Okay.  So now is a person from Carnival supposed to be putting those forks and spoons on and off the tables?

A    No.  These we put on the line, on the buffet line.

Q    On the buffet lines, okay.

A    Yes.

Q    And the other one, the container next to that farther to the left, can you tell what that blue item would have been?

A    Maybe something was in the glasses, no, but blue, no.  Blue, we use in the back dining room.  I'm not really sure what is that.  Maybe some paper towels.

Q    All right.  And the back of the chair that

31

we see at the bottom of this photograph, that would have been the chair where Ms. Cole was sitting?

A    Yes.

Q    All right.  Did you take photographs of this area after the incident?

A    No, sir.

Q    Okay.  Do you know who did?

A    Security maybe.

Q    Do you know if when security took photographs, they decided to take anything out of the containers so they could take pictures of the containers when they were empty?

A    No, I don't know.

Q    Okay.  Now, the person that was responsible for putting the forks and spoons in the container away, do you recall who that would have been at the time?

A    No, I don't.

Q    Okay.  Do you recall what the weather was like at the time you arrived at this incident?

A    Yes, I do.  It was windy.

Q    Do you recall how windy it was?

A    Pretty much.  I mean, yeah, that's how I can explain it.  It was quite windy.

Q    Okay.  So had that, from your recollection,

32

been going on throughout the day, that it was quite windy?

A    No.

Q    So it was like a sudden gust of wind that had picked up?

A    The weather changed because, I think, you know, people were coming back from the pool, and we were -- I mean, the ship was about to leave.  And that's how I remember that the weather got changed.  I mean, it's not that we were leaving, but yeah.  But it wasn't like that for all the day.

Q    Okay.  I mean, there was a change in the weather on the deck of the ship and the wind had picked up.  Is that what you recall?

A    Yes.

Q    And did you ever get to see or find out who it was that had picked up the containers off the ground and put them back when you arrived?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  No.

BY MR. DIEPPA:

Q    Okay.  You would agree with me that looking at Exhibit 2, there's no lids on the containers on the top of this cart, correct?

A    Yes.

ORIGINAL TRANSCRIPT

33

Q    Okay.  Do you know where those lids would have been?

A    No.

Q    Okay.  Were you called to the scene, or did you arrive at the scene of this accident by coincidence?

A    I was called to the scene.

Q    Okay.  Who called you?

A    One of my assistant servers.

Q    Okay.  And do you recall their name?

A    I don't recall unfortunately.

Q    The person that called you, were they involved in the incident?  How did they know about it?

A    Some of my assistants told me, "There are guests who want to see the manager on duty."

I said, "What happened?"

They said, "I don't know.  But the guests want to see the manager on duty."

Q    Okay.  And when you got to the scene, who was the first person you spoke to?

A    The lady guest as she was sitting.  I said, "Yes, ma'am."  You know, "How can I help you?"

Q    And do you recall what she looked like?

A    No.

Q    Okay.  I mean, do you recall -- was she a

34

white lady, was she a black lady?  Do you remember?

A    I don't remember.  I just remember that she was wearing a tube top and I could see her -- (inaudible) I don't know, but yeah, the back of her shoulder was visible.

Q    Okay.  And did she indicate to you that she had been injured?

A    Yes.

Q    Okay.  Did she explain to you how she had been injured?

A    Yes.

Q    Okay.  And how did she explain to you that she had been injured?

A    She said that, you know, "I was sitting there."  The same chair you showed me.  "And then this Lexan cover flew and hit me on my back."

Q    Okay.  When you got to the scene was that item, the Lexan Tupperware, in the area where her injury had occurred?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  (Cross talk.)

MR. DIEPPA:  I'm sorry.  Can you repeat your answer?

THE WITNESS:   No.

BY MR. DIEPPA:

35

Q    Okay.  So looking at Exhibit 2, does that show Lexan Tupperware or not?

A    Are you showing me the same picture?

Q    Yes.  The same picture I showed you -- we just looked at.

A    Okay.  Could you repeat your question again, please?

Q    Looking at Exhibit 2, does that show Lexan Tupperware or not?

A    It doesn't.

Q    It doesn't?  What are those white containers in the photograph?  How would you describe those?

A    These are white Lexans without their lids.

Q    Are there lids on the bottom?

A    No.

Q    Okay.  So you're saying that these items here, the bottom of this photograph are not lids for the Tupperware?

A    No, no, no.  They are by her hand.  The ones inside the side stand, they have the lids.

Q    Okay.  So when you got to the scene, going back to my original question, did you see the cart with the Tupperware containers?

A    No.

Q    So the cart was empty?

**ORIGINAL TRANSCRIPT**

36

A   I didn't see the lids.  I thought I saw these two containers there, yes, if that's the question.  These two containers were there.

Q   Yes.

A   They were there.

Q   Okay.  You saw the containers without the lids?

A   Yes, yes.

Q   Okay.  And are the containers supposed to come with lids?

A   Yes.

Q   Okay.  So you weren't able to determine where the lids were?

A   Right.

Q   Okay.  And Ms. Cole had explained to you she had been struck by some plastic containers.  And at least, we can see part of those containers are on this cart which we can see on this photograph we've marked on Exhibit 2, correct?

A   Correct.

Q   Okay.  And based on what Ms. Cole told you about the accident, did she also indicate to you that she was in pain?

A   Yes.

Q   Okay.  Did she indicate to you that she

37

wished to have medical attention?

A     Yes.

Q     Okay.  So after she told you that, what did you do?

A     It was actually on the way down.  So I asked her if she would like to have medical assistance.  She said, "Yes."  And then I took her down to the medical center.  I went there and I seen the doctor that she got in to, and then that's it.  I left from the medical center, and I came back to the Lido deck.

Q     Okay.  Did anyone speak to you about this incident that day after it occurred?

A     That day after?

Q     Yeah, later that day.

A     I don't remember.  But I do know that the security guards know.  He did come upstairs to, you know, investigate the area.  And then he called me.  But I am not sure if it was -- during that day or if it was the other day.

Q     Okay.  When the security person called you, whenever that was, do you recall what you spoke about?

A     Yes.

Q     Okay.  What did you speak about?

A     Well, basically started asking me, "You know, I'm here for this incident.  She got -- or

38

there's a guest who claims she got hit by the Lexan (inaudible).  So I showed him, "Yes, this was the chair where she was seated."  And I had no idea.  I did not see that, you know, happening in front of my eyes.  But there was this one assistant server and he called me, so I went to the scene.  And then the guest describe me.  So this is a size 10.  There were two Lexans there.  And it was windy, and the guest stated that, you know, the lid flew over and hit her on the back.

Q    So the assistant server that called you over at least, that was a male?

A    I'm not sure.

MR. JARNAGIN:  Objection, form.

BY MR. DIEPPA:

Q    Well, you said, "He."  He called you over. Was it a male?

A    I have two -- he or she.  I'm not sure. Sincerely, I'm not sure on that.

Q    And just as far as the other names of the people working the dining area that were provided to us, we have a Lilis Teti (ph), Kareem Hesborne Odel (ph), Mayurin Inpumet Pairin (ph), Juan Moela (ph), Ida Bagus Trisna (ph), Putu Hendra Sanjaya (ph), Bernice Bongales (ph), Zabrina Bunga Ardhiyanti (ph).

39

MR. DIEPPA:  And Madam Court Reporter, I'll provide the spelling of these names to you by email after the deposition.

BY MR. DIEPPA:

Q    But Ma'am, in terms of those names that I just read off, do any of those ring a bell in terms of a person that may have been there at the time of this incident?

A    Well, generally speaking, I can be of a help if along with their names I know their positions. Because these are very common names.  We have crew members with these names, you know, in all of the departments.

MR. DIEPPA:  Okay.  Yeah, I was not really provided with too much detail on that.  But regarding where you were at the time of this incident, and I'll show you what we'll mark as Exhibit 3.

(EXHIBIT 3 MARKED FOR IDENTIFICATION.)

BY MR. DIEPPA:

Q    This is a diagram of deck 9, the Lido deck. Can you see that on your screen, Ma'am?

A    Yes, sir.

Q    Okay.  So in terms of where this incident happened, would this have been near the pool area or closer to the grand buffet area as you recall?

40

A    Nearer to the pool area, aft.

Q    Okay.  So it would have been kind of like in this area here?  I placed a red circle.  Is that kind of the area?

A    No.  It's still -- see the aft?  Behind the spa.

Q    I see it on -- so when you say, "aft", you mean all the way towards -- okay.  I see where you're saying, towards the pool area.

A    No, the back of the ship.

Q    The back of the ship?  Got it, aft.  So it would have been farther back here?

A    Yes.

Q    Okay.  And do you recall where you would have been at the time you were notified regarding this incident?

A    Yes.  That much I remember.  I was -- I don't know how to show you.  But by the grand buffet side, so it was starboard side.

Q    Okay.  Starboard side, grand buffet side, like around here?

A    Yes.  Because I was -- because I don't even remember a time, so I was, you know, on my rounds.

Q    Okay.

A    Checking everybody out.  So I was somewhere

41

(inaudible).

Q    All right.  So where I placed the red arrow, that was your approximate area when you were notified about this incident?

A    Actually, not that exactly.  But towards the -- if you could come a little bit towards the aft of the ship, where you see these four guys -- you know, these four chairs.  No, no, the big -- yeah, yeah.

Q    Okay.

A    Somewhere in there.

Q    Were you the person responsible for overseeing this general area?

A    Okay.  So for the Lido deck, for the restaurant, yes.  For the open deck, you know where she is -- I mean, I am the manager, but they just asked who's the manager, and they came and found me.

Q    Okay.  So you mentioned that it got quite windy around the time of this incident.  And as far as the approximate time of this incident, do you recall it being around 6:00, 6:20 p.m.?  Does that sound right to you?

A    I'm not sure on the timing.

Q    All right.  Was it in the afternoon?

A    It was after folks had left for (inaudible) because that's when I closed this floor.  We close at

42

8:00.  So that's why -- that's how I don't recall it. And we, you know, the ship was leaving, and had probably left.  I'm not really sure.  But I was just checking all the areas, and that means, maybe the Bistro was not open.  I'm really not sure again.  It could be between 4:00 to 6:00 on a wide scale.

Q    Did you recall what meal you were serving? Were you serving dinner at the time?

A    We don't -- I mean, the bistro, yes.  They were opening dinner on Lido.

Q    And do you recall how long it had been since it had got quite windy, and the winds had been picking up prior to you being notified of this incident?

A    No, sir.

Q    Okay.  When it gets very windy on the Lido deck are there any precautions that you've been trained to take when that happens?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  No.

BY MR. DIEPPA:

Q    Okay.  So no matter how windy it is on the Lido deck, you as one of the managers there responsible for that area, you're not provided with any instruction or training as to what to do if the winds are too high on the Lido deck?

43

A     See, if the winds are too high, we are instructed to secure our plates, and cups and glasses in the open area if you find, you know, dirty tables that needs to be cleaned as soon as possible.

Q     Okay.  So you are instructed if the winds are too high to put away and secure certain things that are on the tables?

A     No, actually we do that irrespectable (sic) if the winds are high or no.  Okay, so on the open deck when I see usually getting secured are the sun bathing chairs, and that's done by housekeeping.

Q     I mean, do you have procedures to close the Lido deck if the winds are too high?

A     No.

Q     Okay.  So even if there's a hurricane, people can still be out on the Lido deck?

          MR. JARNAGIN:  Objection, form.

          THE WITNESS:  I have never been in a hurricane.

          BY MR. DIEPPA:

Q     Okay.  I understand.  My question is, is it your understanding that no matter how bad the conditions are or high -- how high the winds are out on the Lido deck, the Lido deck is always to remain open?

## ORIGINAL TRANSCRIPT

44

A    We do close the area, like, when this (inaudible).  We got in stuck in between a storm, so we had to close the one on that side (inaudible), so yes, we do.

Q    Okay.  So what is the procedure to close and secure the Lido deck if the winds are too high or the conditions outside are not good?

A    If you have to close the Lido deck, it has to come from the head of the department.

Q    How do you know what to do in terms of closing and securing the Lido deck once you're informed of that decision by the head of the department?

A    How do I know?  I'm sorry (cross talk) --

Q    Yeah, how do you know what to do?  Like, if you're told you need to close and secure the Lido deck, how do you know what to do?  How do you go about that?

A    You just close the area.  So you take out, you know, all the plates and everything and we just let the guests know that this area has been closed. We put the signs, "Sorry for the inconvenience" and all that.

Q    Okay.  And does that also include in those incidences where you are required to put things away

45

to empty the side carts of any containers, any silverware, and other things that might blow away in the wind?

A    Yes.

Q    So there is a procedure for that.  It's just not necessarily a written procedure.  It's something that your managers train you on?

A    Yes.  So we -- it's basically everything boils down to doing guest safety.

Q    Uh-huh.

A    Accordingly, nothing is in -- as I told you, nothing we deal with anything that happens.  That was just the general, you know, layout of the ship and everything.  But, it's like basically, you know, like common sense.  Okay, here's the situation.  What are you supposed to do?

Q    Yeah, I mean, common sense in terms of -- because you don't -- even if it's windy, you don't have to close the Lido deck.  The employees just might need to be more careful when they're serving the food and, you know, bringing out the items that are necessary for the food service, correct?

A    It could -- specifically if it's not so windy.  You are asking if it is windy.  And especially the aft and the forward of the ship, those decks are

46

windy.  But in extreme cases, as you are mentioning, we don't.  As I said, we close the area out.  We apologize for the inconvenience, and we let them know that we have to take the safety precautions.  And probably, some of the things have got relocated into the interior area on the Lido deck.  The inside.

Q   I see.  In this case on this date, July 24, 2022, even though it was windy, there was no decision to close the Lido deck, correct?  The food service continued?

A   Correct.

Q   Okay.  So in that case would the servers just need to take some additional precaution when they are, you know, serving the food and the silverware because it's windier that day?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  No.  Things were not, like, really, you know, flying here and there, and the ship was not going from left to right.

BY MR. DIEPPA:

Q   Yeah, I mean, not quite my question.  My question is, on a day where it's more windy than ordinary is it your understanding that you and the other servers just need to take common sense precautions so, you know, nothing falls on somebody?

47

Or nothing blows away is what I mean.

A    Correct.

Q    Yes?  Okay.

And this wasn't the first time that it had become windy on the Lido deck at a time when passengers were out there having their dinner or having another meal, correct?  That had happened in the past?

A    Correct.

Q    Okay.  And that's something at least through your training with Carnival and your management training, you're equipped and capable of dealing with by taking ordinary precautions, correct?

A    Correct.

Q    Okay.  And I know you weren't at this incident, but in terms of the individuals that load and unload these carts, they're aware that if it's windier, they, you know, need to be aware of that when they are loading and unloading these carts with containers, correct?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  I don't know how to answer this question really.

BY MR. DIEPPA:

Q    Have you ever participated in the loading

48

and unloading of these carts like the one we see in Exhibit 2?

A    No.

Q    Okay.  Have you ever observed the loading and unloading of these carts like we see in Exhibit 2?

A    Seeing Exhibit 2, the one you had just shown --

Q    Yes.

A    -- yes.

Q    Okay.  And the people who load and unload these carts, at least on the day of this incident, they were under your supervision as assistant servers?

A    No.

Q    You were not supervising anyone at the time this happened?

A    I do have my assistant servers whom I was supervising, but they were not taking care of this cart.

Q    They were not -- excuse me -- they were not there?

A    No.  I mean, this particular side stand, they were not doing anything -- we were opening the line.  So basically, they were taking care of the lines and the tables, but not this particular side stand.  Or maybe I didn't get your question properly.

49

Q    Yeah.  The people who load and unload the side stand as you call it, the one that's shown in Exhibit 2, at the time this happened, those people would have been under your supervision and direction, correct?

A    Yes, yeah.

Q    Okay.  But as far as this side stand here, you're not aware of who loaded it or who unloaded it, correct?

A    Correct.

Q    Okay.  And you're not aware if it was left unattended or not?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  Correct.

BY MR. DIEPPA:

Q    And you're not aware when the winds picked up if anyone that had loaded it or was working on it did anything to secure it when the winds had picked up, correct?

A    Yes.

Q    Okay.  Are these side stands ordinarily supposed to be left unattended when there's high winds on the Lido deck?

A    You know, I really don't know how to answer this question.

50

Q    Okay.  I'll try to be more specific.

In Exhibit 2, we see that this side cart as you refer to it, looks to be loaded, right?  There's items on the shelves of the cart?

A    Yes.

Q    Okay.  When it's loaded in that way and the winds are high on the Lido deck are you supposed to keep it unattended?

A    Should have.

Q    Okay.  In the case of this particular cart, you're not aware of who was supposed to be attending to this cart at the time of Ms. Cole's incident, correct?

A    Correct.

Q    Now, ordinarily, would the proper procedure be if the side cart's in use and it's loaded as we see in this photograph that there should be someone there that's observing the side cart to make sure it's properly secured?

A    Could you repeat that again, please?

Q    Yes.  In the event that the side cart is loaded as we see in Exhibit 2, should there be someone there from Carnival monitoring the side cart to make sure that it's properly secured?

MR. JARNAGIN:  Objection, form.

**ORIGINAL TRANSCRIPT**

51

THE WITNESS:  No.

BY MR. DIEPPA:

Q    Okay.  So it's okay to leave the side cart unattended for, I guess as -- for any period of time, I guess, right?  You can just leave it unattended, and the employee can go on and do other things?

A    You know, these side stands are meant to keep the Lexans.  So we just cannot just -- you know, I mean, you put your stuff and there are so many operations that you take care of.  Normally, myself or my assistants would.  But in windy in case, as I mentioned in extreme weather, that maybe was supposed to be secured.  We take care of that.  But, however, in general situations, this is perfectly fine.

Q    Okay.  These side carts are they used for bussing the tables?

A    No.

Q    So what are they used for specifically?

A    Other side, but not only this particular side stand, but all the side stands that we have, you can put your Lexans, and these are the items that you find in Lexans and (inaudible).  You know, we are not to using them in the operation.  We just to store them.

Q    Okay.  So you just store things out there.

52

I mean, for example, the silverware that you said was in one of the containers, what would a person do with that?  Would they put the silverware in the buffet area, or would they put it on the tables?  How does that procedure work?

A    This was silverware in that Lexan.  It's their stand.  The black is the side in which we put the silverware.  So it's just, you know, just an empty container.

Q    Okay.

A    Now silverware --

Q    Yeah, what I'm asking you is, how is it used?  Do you put the -- do you store the silverware and then take it out?  Do you put the silverware back in there?  What else do you put in there?  That's what I'm trying to find out, Ma'am.

A    At this time, we already had the silverware on the line in similar containers.  And then those -- my servers, they refill them.  Taking the silverware from the galley and then just refill the containers.

Q    Okay.  Anything else put in the containers besides silverware?

A    No.  It's just forks, knives and spoons.

Q    Okay.  Did you see any silverware on the ground when you arrived at the scene of Ms. Cole's

53

incident?

A    No, sir.

Q    Going back to Exhibit 3, in the area where you were working and where this incident occurred, how many surveillance cameras are in those areas?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  I don't know.

BY MR. DIEPPA:

Q    Okay.  Have you seen cameras in those areas?

A    I'm too busy managing my own operations, no. I don't get enough time to.

Q    Do you recall ever observing a camera in the Lido deck area?

A    I think by the bags.

Q    When this incident occurred, did you make any effort to review the camera footage to see what happened?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  No, sir.

BY MR. DIEPPA:

Q    Do you know if the security guard that you spoke to ever mentioned to you that he had reviewed security camera footage of this incident?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  No.

54

BY MR. DIEPPA:

Q    In speaking to security regarding this incident, do you know if the security guard ever attempted to locate video depicting how this incident occurred?

A    No.

Q    Do you know who the employee was that brought ice to Ms. Cole to put on her shoulder?

A    No.

Q    When you spoke to Ms. Cole, other than telling you that she was in pain and she had been struck by these containers, did she make any other statements to you?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  No.  We spoke pretty much about it.  The cover hit her, and she was in pain.  I asked if she wanted medical assistance, and that's it.

BY MR. DIEPPA:

Q    And when you asked her if she wanted medical assistance, she confirmed that she did want medical assistance?  She wanted to see a doctor?

A    Yes.

Q    Okay.

A    And both of us left immediately.

Q    Okay.  Did you go in with her to the

55

doctor's examining room?

A    Yes.

Q    Okay.  So you were there when the doctor examined her?

A    No.  I took her to the medical center, and I told the doctor, "Ma'am, I have this guest and, you know, she got hit with this Lexan top -- with this Lexan cover."  And that's it.  Doctor took care of the case, and I -- because I was only manager, I had to, you know, go back.

Q    Okay.  Now, in terms of the incident reports, which we'll mark as Exhibit 4.

(EXHIBIT 4 MARKED FOR IDENTIFICATION.)

BY MR. DIEPPA:

Q    I believe the title of this document is "Passenger Injury Statement".  Have you seen this document before, Ma'am?

A    No, I haven't.

Q    Okay.  Do you know who would have provided this form to Ms. Cole for her to fill out and complete?

A    Just give me a second.  Medical or security.

Q    Okay.  And in terms of what's stated here, the section here that says, "Are you hurt?  If so, please explain."  And the answer is, "Yes.  Hard pain

56

in my left shoulder."  Is that consistent with what Ms. Cole told you when you arrived at the scene?

A    Yes.

Q    And where it says here, "Who was with you or nearby at the time of the accident?"  And she says, "My husband and another guest."  Is that consistent with what you recall seeing when you arrived at the scene?

A    Yes.

Q    Okay.  And then in the statement here, "Please state in detail what happened at the time of the accident."  And it states, "I was eating.  Some stacked up containers hit me in the back on my left shoulder as the wind was blowing."  Is that consistent with what Ms. Cole related to you at the scene?

A    Yes.

Q    Okay.  And in terms of the wind blowing, that was something you personally observed as you stated earlier in your deposition, the winds had picked up quite high at that point?

MR. JARNAGIN:  Objection, form.

MR. DIEPPA:  You can answer.

THE WITNESS:  As I said earlier in this case, you know, it was pretty much windy.  I don't -- for lack of word, I -- that's how I can explain it.

57

BY MR. DIEPPA:

Q    Yeah, you said -- I think your words were "quite windy", correct?

A    Yes.  Quite windy, yes.

Q    And in terms of containers -- I know you didn't see the incident, but at the very least as we discussed earlier, there were some stacked up containers on that cart which we saw in the photograph I showed you which I marked as Exhibit 2, correct?

A    Correct.

Q    Okay.  And in terms of the location, that was consistent as well when you encountered Ms. Cole. It was in the Lido deck behind the hot tub area?

A    Yes, correct.

Q    Other than this incident, during the time that you worked as an employee for Carnival Cruise Line which I think you mentioned was about 2014 to the present.

A    Yes.  Uh-huh.

Q    Have you observed any items falling or shifting on the deck of a cruise ship at Carnival?

A    No, I haven't.

Q    Okay.  So, meaning like, not furniture or nothing?  You've never seen a piece of furniture, any piece of equipment ever shift or move with the

58

movement of the ship or because the wind --

A    I have not -- I have not experienced that in my career.

Q    Okay.  So the times that you were instructed to close the Lido deck because there was a storm, during those times, nothing was -- you never observed anything moving on the deck or shifting on the deck of any sort?

A    No.

Q    At the time that you arrived at the incident, did you see any alcoholic drinks in the vicinity of Ms. Cole?

A    All four of them were -- they looked intoxicated, but I don't remember if I saw any, you know -- glasses maybe.

Q    Okay.

A    But yeah.

Q    You said they looked intoxicated.  Did you take any measurements to indicate that?

A    No.

Q    Okay.  Do you have any formal training that would permit you to determine if a person was intoxicated?

A    The body language.

Q    No, I mean like formal training.  Like a

59

police officer, a medical or anything like that?

A    No, no, no.

Q    Okay.  Are you aware of what the physicians said when they examined Ms. Cole as to whether she was intoxicated or not?

A    No.

MR. DIEPPA:  Okay.  I'm going to show you Exhibit 5 here.

(EXHIBIT 5 MARKED FOR IDENTIFICATION.)

THE WITNESS:  Okay.

BY MR. DIEPPA:

Q    All right.  This is Ms. Cole's case summary and medical report from the ship's infirmary.  Can you see that?

A    Yes.

Q    You see it?

A    Yeah, I can see it.

Q    Okay.  And I'm looking here at page 5 what the doctor said.  Do you see that statement there?

A    Yes, I see it's a "No."

Q    Okay.  So in the medical report for the infirmary where you took Ms. Cole, on the question, "Could alcohol/drugs have contributed to the incident?"  What did the doctor say there?

A    "No."

ORIGINAL TRANSCRIPT

60

Q    Okay.  And once again, you didn't see any alcoholic drinks in the vicinity of Ms. Cole?

A    I don't remember if I saw anything, those glasses or drinks that you are talking about.

Q    Okay.  Do you remember or not?  I mean --

MR. JARNAGIN:  Objection, form.  Asked and answered.

MR. DIEPPA:  You can answer, Ma'am.  Do you remember at all?

THE WITNESS:  I don't remember.

BY MR. DIEPPA:

Q    Okay.  Do you remember if there was anything on the table?  Any glasses at all?

A    That I really don't remember.

Q    Okay.

A    You know, it's been a while, yeah.

Q    Okay.  So other than your speculation, you did not observe any evidence of alcohol at the time you arrived at the scene with Ms. Cole, correct?

MR. JARNAGIN:  Objection, form.

MR. DIEPPA:  Is that correct?

THE WITNESS:  Yeah.

BY MR. DIEPPA:

Q    You did not speak to the server to see if they were being served any alcohol at the time of this

61

incident, did you?

A    No.

Q    Okay.  Ms. Cole never made any statements to you saying she was drinking either, correct?

A    Correct.

Q    And the doctors that you took Ms. Cole to see, examined Ms. Cole, and they said she wasn't intoxicated.  Correct?  Because that's indicated in her medical report.

MR. JARNAGIN:  Objection, form.

THE WITNESS:  Yes, as it states, yes.

BY MR. DIEPPA:

Q    Okay.  And this was the first time you had met Ms. Cole, correct?

A    Correct.

Q    You had not observed her earlier in the day at any point in time drinking any alcohol; is that correct?

A    Correct.  I didn't observe any of the quests.

Q    Well, Ms. Cole in particular, at no point during -- any time before this happened, did you ever see her consuming any alcohol?

A    This right now to this question because twice I was speaking with her.  We have so many guests

62

out there and I'm, you know, looking at my operations on the tables, are they clean, and the area.

Q    Yeah.  Uh-huh.

A    We meet the guests, but yeah.  As a matter of fact, I don't speak for any of the guests.

Q    Yeah, and I'm just asking in terms of Ms. Cole.  It's correct, you didn't see her consuming any alcohol before this incident happened, correct?

A    I don't know how to answer that question.  I didn't see her at all.

Q    Yeah, exactly.  You didn't see her at all ever until you arrived at the scene of this incident, correct?

A    Yeah.

Q    Okay.  And no one had ever spoken to you before this incident to tell you that Ms. Cole was consuming any alcohol?  That's correct as well?

A    What's the question again?

Q    No one had ever approached you or made any statement to you before this incident that Ms. Cole was consuming alcohol at all, correct?

A    Yes, correct; nobody.

Q    And even though you claimed Ms. Cole appeared intoxicated to you, you had never met Ms. Cole before that incident, so you're not really aware

63

of how she normally acts or how she normally conducts herself, correct?

A     Correct.

Q     Okay.  And then you did state that when you got to the infirmary, you spoke to the medical staff. You told them what had happened?

A     Yes.

Q     Okay.  So you are aware that in the medical history that's in the infirmary's report, there's no mention of any alcohol or that you believe that Ms. Cole was intoxicated.  You are aware of that, correct?

A     Correct.

Q     So you probably didn't mention that to the medical staff either?

A     I'm sorry.  What's that?

Q     I said, you most likely did not mention that Ms. Cole was intoxicated to the medical staff because it doesn't appear in the record, correct?

A     Yes, I did not.

Q     In terms of the injury that Ms. Cole was diagnosed with are you aware of what that injury was?

A     I'm sorry?

Q     I'm sorry.  In terms of the injury that Ms. Cole was diagnosed with are you aware of what that injury was?

**ORIGINAL TRANSCRIPT**

64

A    Well, yeah, on her left shoulder.

Q    Yes.  Do you know how the doctors on the Carnival Cruise ship diagnosed it?

A    I took the guest to the medical, and I told them that she got hit by, you know, the Lexan cover.

Q    Okay.  Did they tell you what she had? Like, if she had a bruise?  Or if she had a contusion? A fracture?  Do you know what the doctors ultimately determined was wrong with her?

A    No.

Q    Okay.  Do you know if they gave her medicine?

A    I got to know that through the report you showed me.

Q    Okay.  Other than that, you don't recall?

A    No.

Q    When you walked with Ms. Cole to the ship's infirmary, where is the ship's infirmary located on the ship?

A    It's on Deck Zero.

Q    Okay.  So did you have to take an elevator?

A    Yes.

Q    Did anyone go with you besides Ms. Cole when you were taking her to the infirmary?

A    No, I think it was me and Ms. Cole.

65

Q    Okay.  Do you ever instruct the servers that are working on the side carts with the plastic containers to make sure that the lids are securely fastened onto these containers, so they don't blow away?

A    I do tell them to cover up the Lexans.

Q    And when you tell them to cover up the Lexans is part of the reason so if it's windy, they don't, you know, fall on anybody?

A    Yes, and I've told, you know, it's part of the cleanliness procedure.  The USPH procedure, we have to cover up the Lexans.

Q    I'm sorry, U-S-C-H, you said?  Or U-S --

A    No.  U-S-P-H.

Q    U-S-P-H?

A    (Inaudible.)

Q    Do you know what that stands for?

A    That's United States Public Health.

Q    I guess, so in addition to keeping them from falling, it's a health requirement to make sure that the containers are securely covered?

A    Yeah.

Q    And is this instruction that you provide to the servers in writing or by a video, or is it purely verbal?

66

A    This is verbal.

Q    And what is your highest level of education?

A    I have done -- I'm a certified financial planner.  I've done, CFP.  It's a full graduation.

Q    Sure.  So, I guess, and excuse me.  I'm not sure how it works in India, is that like equivalent to a Bachelor's degree or a Master's degree?

A    Master's.

Q    Master's degree, okay.  Are you currently under contract with Carnival?

A    Yes.

Q    All right.  Are you currently working on the same ship where this incident occurred?  The Carnival Conquest?

A    Currently, I am at home and my last shift was not Conquest.

Q    Okay.  So I guess you are due to return to, I guess, whatever ship Carnival assigns you next?

A    Correct.

Q    At the time this incident occurred were you working as an employee or crew member of Carnival Cruise Lines?

A    Yes.

Q    Okay.  And as far as you know, the other individuals who were responsible for the area where

67

this incident occurred with Ms. Cole were they also working as crew members and employees of Carnival Cruise Line?

A    Yes.

Q    And this incident, do you recall what day of cruise it occurred?  Was it the first day or the last day?

A    No, I don't recall that.

Q    Do you recall if it had been windy on the days preceding this date while on the cruise?

A    No, sir.  I don't recall that.

Q    Is there anything that you observed or where told regarding this incident that you have already -- or not already told me today at this deposition?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  Nothing.

BY MR. DIEPPA:

Q    Okay.  After you spoke to the security guard, I believe his name was Vikram (ph)?  Zeta Vikram Thapa?  Do you recall that?

A    I recall the name but not the face.

Q    After you spoke to Vicrum, did you speak to any other Carnival employees regarding this incident, not including your attorneys?

A    Could be my boss.  I'm supposed to tell her,

ORIGINAL TRANSCRIPT

68

you know.

Q    Uh-huh.

A    Any big/small incident.

Q    Do you know the name of that person?

A    Forgive me, I don't remember.

Q    Okay.  After you took Ms. Cole to the infirmary, do you recall ever seeing her again?

A    I do recall that I did ask her, "Ma'am," you know, "how are you feeling?  Are you feeling better?"

She said, "Yes, I'm feeling better.  You know, they gave me this medicine."

I don't remember if it was later in that day or the next day.

Q    Okay.  And after that interaction, do you recall ever seeing or speaking to her again after that?

A    No.

Q    All right, Ma'am.  And just to confirm, all your answers today have they been true under penalty of perjury and pursuant to the laws of the United States?

A    Yes.

Q    Okay.  Have you understood all my questions up to this point?

A    Yes, only those that I said, "I don't know

ORIGINAL TRANSCRIPT

69

what to say."  Probably, I don't know.

Q    Okay.  Other than the ones you indicate otherwise, have you understood all my questions?

A    Yes, I did.

MR. DIEPPA:  Okay.

Now, this concludes your deposition.  Your attorney may have some follow-up questions for you.

THE WITNESS:  Awesome.

CROSS-EXAMINATION

BY MR. JARNAGIN:

Q    Good evening.  Thank you for your time, especially on vacation.

I just have a few follow-up questions.

Earlier, Mr. Dieppa showed you what's called Exhibit 2, a photo of the Lexans.  Do you recall that?

A    Yes.

Q    Do you know who took the photos of those Lexans?

A    No.

Q    Do you know at what time or date that those photos were taken?

A    No.

Q    When you went to the scene after an assistant server notified you that Ms. Cole wanted to speak with a manager, did you observe any other items

70

being blown around by the wind on Lido deck 9?

A     No.

MR. JARNAGIN:  I don't have any further questions for you.  Thank you.

MR. DIEPPA:  Thank you.

I will take a copy.  And Madam Court Reporter, do you want me to send those names I mentioned over in an email with the exhibits?

COURT REPORTER:  Can you tell me your exhibits again?  I had gotten kicked off.

MR. DIEPPA:  Yeah, I have 1 through 5.

COURT REPORTER:  I only have four of them. Can you -- I'm missing one of them.

MR. DIEPPA:  Yeah, 5 would be the case summary and ship's infirmary report.

COURT REPORTER:  Thank you, sir.

MR. JARNAGIN:  And you are free to go.

MR. DIEPPA:  Thank you.

COURT REPORTER:  Is she going to read or waive?

MR. JARNAGIN:  She's going to read.

COURT REPORTER:  Okay.  Thank you.

MR. JARNAGIN:  You're good.

THE WITNESS:  Okay.  Thank you.  Bye bye.

COURT REPORTER:  Off the record at 12:37

ORIGINAL TRANSCRIPT

71

p.m.

(DEPOSITION CONCLUDED AT 12:37 P.M.)

**ORIGINAL TRANSCRIPT**

72

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF MIAMI-DADE

I, the undersigned, certify that the witness in the foregoing transcript personally appeared before me and was duly sworn.

Identification:  Produced Identification

_____

KRISTEN WAY

Court Reporter, Notary Public

State of Florida

Commission Expires: 8/24/2026

Commission Number:  HH305004

**ORIGINAL TRANSCRIPT**

73

CERTIFICATE OF REPORTER


STATE OF FLORIDA

COUNTY OF MIAMI-DADE


        I, KRISTEN WAY, Notary Public in and for the State of Florida at Large, do hereby certify that I made an accurate and complete digital recording of the deposition in the above-styled case.

        I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties, attorney or counsel connected with the action, nor financially interested in the action.


        Dated this 12th day of September, 2023.




_____

        KRISTEN WAY

**ORIGINAL TRANSCRIPT**

74

CERTIFICATE OF TRANSCRIPTIONIST

I, LUANN H. PARKS, Legal Transcriptionist, do hereby certify:

That the foregoing is a complete and true transcription of the original digital audio recording of the testimony and proceedings captured in the above-entitled matter.  As the transcriptionist, I have reviewed and transcribed the entirety of the original digital audio recording of the proceeding to ensure a verbatim record to the best of my ability.

I further certify that I am neither attorney for nor a relative or employee of any of the parties to the action; further, that I am not a relative or employee of any attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this matter.

IN WITNESS THEREOF, I have hereunto set my hand this 6th day of September 2023.

_____

LUANN H. PARKS





Ex. 2

Ex. 3



Lido • Deck 9

CQ03072222

**Ex.4**

CCLCQMEA202200124V

### Carnival

Ship and Voyage No. _____

## PASSENGER INJURY STATEMENT

_____

### THE FOLLOWING IS TO BE FILLED BY THE PASSENGER IN HIS OR HER HANDWRITING

Last Name _Cole_

First Name _EUREKA_

Cabin No. _1418_  Nationality _American_  Place of Birth _____  Occupation _Pathology Associate 2_

Age _51_  Height _5'4_  Weight _238_  Sex _F_  Marital Status: Divorced (Married)/Single / Widower (Circle One)

Home Address _2670 SW 8th St #4_  City _Fort Lauderdale_  State _FL_

Zip/Postal Code _33312_  Country _U.S.A._  Home Phone _786-716-2808_  Work Phone _____

E-mail _EUREKACOK@YAHOO.COM_  What kind of shoes were you wearing? _Slippers_

Do you wear glasses or contact lenses? _YES_  Did you have them on when the accident occurred? _NO_

Name of staff member accident reported to _Not sure of name_  Date of accident _7/24/2022_

Time of accident _6:20pm_  AM/(PM)  Date reported _7/24/2022_  Time reported _6:23_  AM/(PM)

If not reported immediately, please explain why? _____

Are you hurt? If so, please explain. _yes! HARD PAIN on my left Shoulder_

Who witnessed the accident? _Guest_

Who was with you, or nearby, at the time of the accident? _My Husband + Another guest_

Please state what you were doing at the time of the accident. _Eating At the table_

Please state in detail what happened at the time of the accident. _I was eating Some stacked up containers hit me in the back on my left Shoulder As the wind was blowing_

Please state in detail the location of the exact accident. _LIDO DECK Behind the Hot tub_

What do you believe caused this accident? _WIND_

What equipment, if any, was involved in the accident? _Plastic Container_

Please state what you could have done to avoid the accident. _Nothing really it came out of No where_

_7/24/22_
DATE

_E. L. Cole_
SIGNATURE

REVISION 8/24/2011

GR000026



# CASE SUMMARY

CQ0724221646S - Carnival Conquest - CQ20220722003 (Jul 22, 2022 - Jul 25, 2022) - Jul 24, 2022 19:06 UTC-04:00

| PATIENT ID | NAME | DATE OF BIRTH | GENDER | CABIN |
|---|---|---|---|---|
| 75060 | COLE, EUREKA LATONYA | Feb 8, 1971 | F | 1418 |

## Triage

| DOCUMENTED DATE | DOCUMENTED USER | VISIT REASON |
|---|---|---|
| Jul 24, 2022 19:34 UTC-04:00 | Ong, Alexandra RN | Injury |

| LAST UPDATED DATE | LAST UPDATED USER |
|---|---|
| Jul 24, 2022 19:34 UTC-04:00 | Ong, Alexandra RN |

PRIORITY

NON-URGENT

CHIEF COMPLAINTS

**Patient attends clinic for left shoulder pain**

NOTES

patient walked into the medical center, conscious, coherent and alert, GCS 15

with complaints of left shoulder pain

patient verbalized that she was sitting at lido deck when container hit her left shoulder onset 06:20pm

With proper range of motion on her both shoulder

no redness nor swelling noted

no wound and no abrassion

## Vitals

| DATE | PERFORMED BY |
|---|---|
| Jul 24, 2022 19:40 UTC-04:00 | ONG, ALEXANDRA RN |

**VITAL SIGNS**

| TEMPERATURE | BLOOD PRESSURE | MAP |
|---|---|---|
| 97.9 F 36.6 C I | 130/80 RA sit | 96 |

| HEART RATE | SPO2 | RESPIRATORY RATE |
|---|---|---|
| 79 bpm | 100 SpO2 Finger Room air | 17 breaths/min |

A.V.P.U

A

INCLUDE IN VITAL SIGN CHECKS

Yes

COMMENTS

--

## Allergy

| IDENTIFIED WHEN | IDENTIFIED BY | LAST REACTION |
|---|---|---|
| -- | by the patient | **--** |

| ALLERGY NAME | SEVERITY | REACTION |
|---|---|---|
| **seafood** | Minor | swelling |

| COMMENTS | TREATMENT |
|---|---|
| -- | **n/a** |

## Medical History

| DATE ONSET | DATE OF RESOLUTION | DOCUMENTED BY |
|---|---|---|
| -- | -- | Ong, Alexandra RN |

CONDITION
**J45.9 - Asthma, unspecified**

NOTES
--

| DATE ONSET | DATE OF RESOLUTION | DOCUMENTED BY |
|---|---|---|
| -- | -- | Ong, Alexandra RN |

CONDITION
**E11 - Type 2 diabetes mellitus**

NOTES
--

## Social History

| | |
|---|---|
| Marital Status: | Married |
| Number of children: | 3 |
| Smoking History: | No |
| Alcohol History: | No |
| Recreational Drugs Use: | No |
| Caffeine Use: | Yes |
| Type: | Tea |
| How many cups a day? | 1 |
| Exercise: | Yes |

## HPI

| DATE | PERFORMED BY |
|---|---|
| Jul 24, 2022 19:40 UTC-04:00 | Vanegas Gonzalez, Juan Esteban |

SHOULDER INJURY
Coming walking to the medical center stating that she was on the lido deck, and accidentally a plastic container fell on the left trapezius area, she says that it was windy, and the wind blew it, now is feeling localized pain, no head injury, no loss of consciousness, no numbness or tingling, no open wounds

## Physical Examination

DATE
Jul 24, 2022 19:37 UTC-04:00

PERFORMED BY
Vanegas Gonzalez, Juan Esteban

GENERAL
Well developed, well nourished, alert and cooperative, and appears to be in no acute distress.

MUSCULOSKELETAL
Additional Note: Pain on palpation over the left trapezius, full range of motion, no open wounds, no edema, no ecchymoses, no clinical signs of dislocationof the shoulder or clinical signs of rotator cuff inpingement or tear.

NEUROLOGICAL
Oriented to person, place, and date. CN II-XII intact. Strength and sensation symmetric and intact throughout. Patellar, Brachial, and brachioradialis reflexes 2+ bilaterally. Steady gait, negative Romberg test. Inspection: Normal. Higher cortical function: Normal. Mood and affect: Normal. Mental status: Alert, Oriented: Person, Oriented: Place and Oriented: Time. Memory: Normal. Speech and language: Normal. Upper limbs: Inspect: Normal symmetry, no deformities, no muscle wasting, no fasciculation's, no tremors and No Pronator drift. Tone: Normal tone. Power: Shoulder normal, Elbow normal, Wrist normal and Fingers normal.

PSYCHIATRIC
Demonstrates good judgment and reason, without abnormal affect or abnormal behaviors during the examination.

## Physician Orders

| STATUS | TASK | ORDERED | ORDER ID |
|---|---|---|---|
| **Completed** | SHOULDER X-RAY, DIGITAL SERIES & RADIOLOGIST'S REPORT | Jul 24, 2022 19:40 UTC-04:00 by Vanegas Gonzalez, Juan Esteban | 719527 |
| FREQUENCY/TIMES | LOCATION | PRIORITY | NOTES |
| once | -- | -- | -- |

| ACTION | USER | DATE |
|---|---|---|
| Completed | Vanegas Gonzalez, Juan Esteban | Jul 24, 2022 19:40 UTC-04:00 |

DOCUMENTS
 COLE, EUREKA LATONYA_XRAY REPORT_CQ 2022 07 25 004

| FINDINGS | COMMENTS |
|---|---|
| no signs of dislocation or fracture | -- |

## Current Medications

JARDIANCE
25 Milligram once daily

METFORMIN
500 Milligram twice daily

## New Medications

IBUPROPHEN 200MG PO
200 Milligram four times daily starting Jul 24, 2022 19:41 UTC-04:00 for 3 day(s)

## Diagnosis

| DOCUMENTED DATE | DOCUMENTED USER |
|---|---|
| Jul 24, 2022 | Vanegas Gonzalez, Juan Esteban |

| LAST UPDATED DATE | LAST UPDATED USER |
|---|---|
| Jul 24, 2022 | Vanegas Gonzalez, Juan Esteban |

| TYPE | DIAGNOSIS |
|---|---|
| Final | **M62.6 - Muscle strain** |

NOTES
--

## Note

| DATE | PERFORMED BY |
|---|---|
| Jul 24, 2022 19:42 UTC-04:00 | Ong, Alexandra RN |

NOTES
patient was seen and examined by Dr. Vanegas
Xray left shoulder was done, image was seen by Dr.
Ibuprofen 200mg was given as per instruction of Dr. Vanegas
Injury report done with security officer
patient was discharged left medical center walking in good condition

## Disposition

| MEDICAL DEPARTMENT DECIDED TO | DOCUMENTED USER | DOCUMENTED DATE |
|---|---|---|
| **Discharge from our care, follow up if required** | Vanegas Gonzalez, Juan Esteban | Jul 24, 2022 19:34 UTC-04:00 |

| LAST UPDATED USER | LAST UPDATED DATE |
|---|---|
| Vanegas Gonzalez, Juan Esteban | Jul 24, 2022 19:34 UTC-04:00 |

COMMENTS
--

DETAILS

Provider                                           --

DISCHARGE DOCUMENTS

Clinical Note

Instructions

Prescriptions

## PATIENT SIGNATURE



COLE, EUREKA LATONYA
Jul 24, 2022 19:34 UTC-04:00

## INSTRUCTIONS

Follow up with her Doctor back home

Ice 20 minutes 4 times a day

If there's any new symptoms call 911.

# Injury

| INJURY SEVERITY<br>Beyond First Aid | INJURY DATE<br>Jul 24, 2022 18:20<br>UTC-04:00 | TREATING DOCTOR ID NUMBER<br>448488 | SEAEVENT<br>REPORT NUMBER<br>CCLCQHEA2022<br>00124V |
| --- | --- | --- | --- |
| DATE REQUESTED MEDICAL ATTENTION<br>Jul 24, 2022 18:40 UTC-04:00 | DATE FIRST SEEN BY<br>MEDICAL STAFF<br>Jul 24, 2022 19:06<br>UTC-04:00 | LOCATION WHERE FIRST SEEN BY<br>MEDICAL STAFF<br>Ship's Medical Center | |
| INJURY TYPE<br>Bruise/Contusion | SEVERITY OF VISION<br>IMPAIRMENT<br>-- | DIRECT INJURY CAUSE<br>Struck By Object | |
| GENERAL BODY REGION<br>Trunk | SPECIFIC BODY PART<br>Upper back | DISPOSITION<br>Return to Normal Activity | |
| DURATION OF ADMISSION TO SHIP'S<br>MEDICAL CENTER<br>-- | DATE PRONOUNCED<br>DEAD<br>-- | | |
| DATE OF DISEMBARKATION<br>-- | DISEMBARKATION<br>METHOD<br>-- | WAS THE PATIENT TAKEN TO A<br>HEALTHCARE FACILITY?<br>-- | |

COULD PRE-EXISTING MEDICAL
CONDITIONS(S) HAVE CONTRIBUTED TO
THE INCIDENT?
No

COULD ALCOHOL/DRUGS HAVE CONTRIBUTED TO THE INCIDENT?
No

## Case Diagnosis

M62.6 - Muscle strain

## CARNIVAL Conquest Medical Department

**Guest Consultation Form**



| Date | MM/DD/YYYY 07-24-2022 | Time | | A.M. P.M. | **PLEASE PRINT CLEARLY** | | | | |
|---|---|---|---|---|---|---|---|---|---|

**Full Name** — Last Name: Cole   First Name: EUREKA   Cabin Number: 1418   Folio Number: 75060

**Date of Birth** MM/DD/YYYY: 02-08-1971   Age: 51   Street Address: 2670 SW 8th St #4

**City:** Fort Lauderdale   **State:** FL   **Country:** U.S.A.   **Zip or Postal Code:** 33312

**Phone Number:** 786-216-2808   **Emergency Contact Name and Phone Number:**

Do you have any medical problems? **YES** / NO

If yes and any of these, **please encircle:**

Hypertension.              Depression.            Cancer.                Pulmonary Embolism.
(Diabetes,)                Anxiety.               Kidney stones.         Deep Vein Thrombosis.
(Asthma.)                  Heart Problems.        Bleeding Disorder.     Back Problems.
COPD.                      Alzheimer's.           Migraine.              Seizures.
Arthritis.                 Thyroid Problems.      Stroke.                Diverticulosis.
Gout.                      Osteoporosis.          Gastritis.             Previous surgery:

**Other, please list:** N/A

Are you taking ANY medication presently (including birth control pills and over the counter)? **YES** / NO

**If yes, please list:** metformine  Jardiance
Ozempic

Any FAMILIAL MEDICAL history? Y E S / (N O)  If Yes, Please specify
Paternal: _____
Maternal: _____
Sibling: _____

Any ALLERGIES? Y E S / (N O)
If Yes, Please list: _____

ALCOHOL: Beer ____/ Week  Wine____/Week  Liquor_____/Week

Do you smoke? Y E S / N O
If yes, how many sticks per day? _____
Do you Exercise? Y E S / N O   How many times a week:_____

| For Medical Staff Only. | BP | HR | RR | Temp | Spo2 | BS | WT: | HT: |
|---|---|---|---|---|---|---|---|---|

**Reason for Today's Visit:** Container blew off work station and hit me on my Shoulder (left Side)

I am responsible for payment of all fees for physician and/or nurse consultations, medications, supplies provided onboard or shore side as well as any administrative fees and transportation costs related and incurred for the coordination of medical treatment for myself or my child. The fees will be applied to my Sail and Sign card. If my Sail and Sign account does not have sufficient funds to cover the cost of all medical services and supplies provided during the cruise, shipboard or shore side, I will be responsible for providing alternative form of payment, which may include signing a promissory note.

**SIGNATURE:** ✗ ...... Cole ......

Rev.00 – 12/30/2016

**HEADER**

| QUESTIONNAIRE | DATE |
|---|---|
| HQ012 HQ012 / PHS / COVID-19 Pre-boarding Health Declaration / US Ships | Jul 22, 2022 15:08 UTC+00:00 |

| COMPLETED BY | COMPLETED ON |
|---|---|
| EUREKA COLE | POMMED23 |

| PHASE | PORT |
|---|---|
| Embarkation | DEFAULT |

**ANSWERS**

1A. IN THE 10 DAYS BEFORE BOARDING, HAVE YOU HAD ANY ONE OR MORE OF THE FOLLOWING SYMPTOMS: COUGH, SHORTNESS OF BREATH, DIFFICULTY BREATHING, FEVER OR CHILLS, NEW LOSS OF TASTE OR NEW LOSS OF SMELL?

No

1B. IN THE 10 DAYS BEFORE BOARDING, HAVE YOU HAD ANY TWO OR MORE OF THE FOLLOWING SYMPTOMS: CONGESTED OR RUNNING NOSE, SORE THROAT, MUSCLE OR BODY ACHES, EXTREME TIREDNESS, HEADACHE, VOMITING OR DIARRHEA?

No

2. IN THE 10 DAYS BEFORE BOARDING, HAVE YOU TESTED POSITIVE FOR COVID-19?

No

3. IN THE 10 DAYS BEFORE BOARDING, WERE YOU IN CONTACT WITH A PERSON WHO HAD CONFIRMED COVID-19 OR COVID-19 SYMPTOMS?

No

4. ARE YOU FULLY VACCINATED WITH AN AUTHORIZED COVID-19 VACCINE AT LEAST 14 DAYS BEFORE EMBARKATION? ( FULLY VACCINATED IS YOU RECEIVED THE LAST DOSE IN A PRIMARY VACCINATION SERIES AT LEAST 14 DAYS BEFORE EMBARKATION. )

Yes

5. PRE-TRAVEL COVID-19 TEST VALIDATED:

Negative

6. EMBARKATION DAY COVID-19 TEST VALIDATED (IF APPLICABLE):

N/A

7. COVID-19 VACCINATION STATUS VALIDATED:

Fully Vaccinated

8. FOR DESTINATIONS WHERE UP TO DATE VACCINES ARE REQUIRED:

Not applicable

10. OUTCOME OF HEALTH SCREENING

Permit boarding

**CUSTOM ATTRIBUTES**

Patient: COLE, EUREKA LATONYA - ID: T37DM9-18 - Printed: Sep 08, 2022 11:09 UTC-04:00                                                  Page 1 of 2

CUSTOM1

--

CUSTOM2

--

CUSTOM3

--

**HEADER**

| QUESTIONNAIRE | DATE |
|---|---|
| HQ009 HQ009 / PHS / Pre-cruise Health Declaration | Jul 8, 2022 21:36 UTC+00:00 |

| COMPLETED BY | COMPLETED ON |
|---|---|
| EUREKA COLE | -- |

| PHASE | PORT |
|---|---|
| -- | -- |

**ANSWERS**

ARE YOU, OR WILL YOU BE FULLY VACCINATED WITH A WHO OR FDA AUTHORIZED COVID-19 VACCINE AT LEAST 14 DAYS BEFORE BOARDING? (FULLY VACCINATED IS YOU RECEIVED THE FINAL DOSE OF A VACCINE SERIES AT LEAST 14 DAYS BEFORE EMBARKATION.)

Yes

**CUSTOM ATTRIBUTES**

CUSTOM1

--

CUSTOM2

--

CUSTOM3

--

**HEADER**

DATE

Jul 24, 2022 19:40 UTC-04:00

TAKEN BY

Ong, Alexandra RN

TAKEN ON

--

PHASE

--

PORT

--

**VITALS**

TEMPERATURE

97.9 F, 36.6 C

TAKEN METHOD

Infrared/Thermal

SPO2

100 %

Finger Room air

RESPIRATORY RATE

17 breaths/min



COLE_EUREKA_LEFT SHOULDER-XRAY-2022-07-24.JPG

# X-Ray Report

**PATIENT:**      EUREKA COLE,
**PATIENT ID:**   191145
**REFERRING PHYSICIAN:**   NAVARATNAM, S DR.
**INSTITUTION:** Carnival Conquest

**DOB:** 2/8/1971 12:00:00 AM
**DOS:** 7/24/2022 2:18:00 PM

EXAMINATION: Left shoulder.

INDICATION: Pain following injury.

COMPARISON: None.

FINDINGS: AP views of the left shoulder with the humerus in internal and external rotation and a Y view show no fracture or dislocation. The joint spaces are normally maintained. There is no bony erosion or periarticular calcification. No bony tumors are visualized. The visualized ribs are intact. The visualized lung is clear. There is no soft tissue abnormality.

IMPRESSION: Negative left shoulder.

Electronically signed by: Gregory Downing MD 7/25/2022 8:21 AM CDT Workstation: 109-95134R0

M.D.

Community Radiology Associates, PA

7/25/2022 8:23:20 AM

Transcribed by:

July 25 2022.