**EUREKA COLE vs CARNIVAL CORPORATION**
**Eureka L. Cole on 08/02/2023**

                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA

                       CASE No.: 23-cv-60532-RAR

    EUREKA COLE,

            Plaintiff,


    vs.


    CARNIVAL CORPORATION,

            Defendant.

    _____/


    Deposition of:  EUREKA L. COLE


    Date Taken:      Wednesday, August 2, 2023


    Time:            10:38 a.m. - 2:20 p.m.


    Taken By:        The Defendant


    Location:        VIA VIDEOCONFERENCE


    Reported By:     Alyssa Zumpano,
                     Stenograph Shorthand Reporter and
                     Notary Public, State of Florida at Large.

A P P E A R A N C E S:

RAYMOND R. DIEPPA, ESQUIRE
Florida Legal, LLC
12550 Biscayne Boulevard, Suite 405
North Miami, Florida  33132
(305) 901-2209
(786) 870-4030
rda@floridalegal.law

      On behalf of the Plaintiff


W. COOPER JARNAGIN, ESQUIRE
Gray Robinson, P.A.
515 North Flagler Drive, Suite 650
West Palm Beach, Florida  33401
(561) 268-5727
(561) 268-5738
cooper.jarnagin@gray-robinson.com

      On behalf of the Defendant

I N D E X

TESTIMONY OF EUREKA L. COLE

Direct Examination by Mr. Jarnagin                 4

Cross-Examination by Mr. Dieppa                    105

CERTIFICATE OF OATH                                119
CERTIFICATE OF REPORTER                            120
ERRATA SHEET                                       121
READ AND SIGN LETTER                               122

DEFENDANT'S EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Movement Report | 29 |
| Exhibit 2 | Sign & Sail statement | 31 |
| Exhibit 3 | PHOTO: (1) laser color copy | 43 |
| Exhibit 4 | Case Summary | 61 |
| Exhibit 5 | Passenger Injury Statement | 65 |
| Exhibit 6 | HCA Florida Westside Hospital Record | 72 |
| Exhibit 7 | Plaintiff's Notice of Answers and Objections to Defendant's Interrogatories | 95 |
| Exhibit 8 | Facebook & TikTok Screenshots | 103 |

- - - - -

S T I P U L A T I O N S

It is hereby stipulated by and between counsel for the respective parties that the reading and signing of the deposition be reserved.

P R O C E E D I N G S

Thereupon,

the following proceedings began at 10:38 a.m.:

THE REPORTER:  Would you, please, raise your right hand.

THE WITNESS:  (The witness complies.)

THE REPORTER:  Do you swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

EUREKA L. COLE

having first been duly sworn, testified under oath as follows:

DIRECT EXAMINATION

BY MR. JARNAGIN:

Q.    Good morning.  My name is Cooper Jarnagin. I'm the attorney on behalf of the Defendant Carnival Corporation in this matter.  And can we start off by please having you state your full legal name for the record?

A.    Eureka Latonya Cole.

Q.    Have you ever gone by any other legal names?

A.    Yes, Eureka Latonya Thomas and Eureka Latonya Dains.

Q.    Can you spell that name for me, please?

A.    Eureka, E-U-R-E-K-A, Latonya, L-A-T-O-N-Y-A, Dains, D-A-I-N-S.

Q.    Have you ever given a deposition before?

A.    No, I have not.

Q.    So I'll just lay out a few instructions and rules to help the process go a little smoother.  So I'll be asking you a series of questions and I ask that you just let me finish the question before you respond so that the court reporter here is able to get a clear record.  If you don't understand a question I ask, you can ask me to rephrase it.  If you do answer the question, I'll assume that you understood the question that I asked.  Okay?

A.    Okay.

Q.    So I don't think this is going to be a very long deposition today.  But if at any point you need a break, you just let me know and we'll take one.  Okay?

MR. DIEPPA:  Yeah, and just so you know, she is diabetic.  So she may have to take some normal breaks throughout the course of the deposition, but I don't think it will be a problem.

BY MR. JARNAGIN:

Q.    Absolutely, you just let me know.

A.    Okay.  Thank you.

Q.    Ms. Cole, where were you born?

A.    Miami, Florida.

Q.    Have you lived in the South Florida area your entire life?

A.    Yes, I have.

Q.    Where did you go to high school?

A.    Miami Northwestern Senior High.

Q.    Did you complete education beyond high school?

A.    I started college but I didn't finish.

Q.    Okay.  So you don't have a degree from any college?

A.    I have a phlebotomy degree.

Q.    Where did you complete that?

A.    I did it through a program with DaVita Dialysis.  I believe, I'm not too sure, that the name is global.

Q.    Is that a program offered by hospitals or what's the nature of that?

A.    Yes, it was offered by DaVita Dialysis.

Q.    And I'm assuming you work as a phlebotomist?

A.    Yes, I did.

Q.    So you are making a lost wages claim in this case, so I do want to go through your employment history

for a little bit.  Okay?

A.    Okay.

Q.    So starting with after graduating from high school, can you give me just a kind of summary of, you know, where you started working up to the present day?

A.    Okay.  Straight out of high school, I went into teacher's aide.  I worked at Twin Lakes Elementary, that was in 1990.  And I went over to Holmes Elementary in '92.  That was my last year working with the school board.  Then after that I had several jobs working at Attorneys' Title Funding branch.  I can't remember the year of that.  Also, I went into the medical, I worked in the parking system in 1995.

Q.    Okay.

A.    And then I started working over at Jackson Hospital in 2002 into the present year now.

Q.    So you started at Jackson Hospital in 2002?

A.    Yes.

Q.    And you're still currently employed by Jackson Hospital?

A.    Yes.

Q.    Is that Jackson Memorial Hospital in Miami?

A.    No.  I'm in Pompano, Monday, Tuesday, Wednesday, at the transplant clinic.  Thursday and Friday, I'm in Plantation.

Q.    And when you started at Jackson Hospital in 2002, what was your entry position?

A.    Pathology associate 2.

Q.    And what were your day-to-day responsibilities as a pathology associate?

A.    Receiving -- if a nurse bring a sample to the laboratory, I would receive it and make sure the identifiers match up.  And I would get it to the correct laboratory, everyone from microbiology, histology.  I got it to the right --

Q.    Are you still currently a pathology associate at Jackson?

A.    Yes, I would still be considered under that category, pathology associate 2.

Q.    When did you go from pathology associate 1 to pathology associate 2?

A.    It always started as 2.

Q.    Since 2002, have you ever received a promotion from Jackson Hospital?

A.    I wouldn't say a promotion.  I went from different laboratories.  I went from chemistry to microbiology, then back to chemistry again.  And then I took the course, the phlebotomist, and I became a phlebotomist, I believe, in 19- -- sorry, 2017, '18.

Q.    So in 2017 or 2018, you took a phlebotomist

course and then you started assuming phlebotomist duties?

A.    Correct.

Q.    And what kind of course is it, is it several months or is it a weekend course?  How does that work?

A.    No, I believe it was two months.

Q.    How did your job responsibilities change, if at all, after completing that course?

A.    How did my job responsibilities change after completing that course?  I wasn't really processing blood or specimens anymore.  I was administrating blood from patients.

Q.    Now, specifically in July of 2022, prior to going on the cruise, how much were you paid on a monthly basis by Jackson Hospital for your job?

A.    Okay.  Prior to that I was making -- I don't have the correct numbers for that.  I don't remember exactly.  I know I was bringing home every two weeks about -- I want to say, 14-, 1,400.

Q.    Okay.  So every two weeks you were getting around $1,400 deposited in your bank account for your job responsibilities at Jackson Hospital?

A.    Yes.

Q.    Were you working five days a week at Jackson Hospital prior to you going on this cruise?

A.    Yes.

Q.    Now, I'm going to jump ahead a little bit. So I know that following the cruise in September you had shoulder surgery, right?

A.    Correct.

Q.    Did you miss any work due to your shoulder surgery?

A.    Yes.

Q.    Okay.  How much work did you miss?

A.    I was out of work from September 15 to November 16 or 17.

Q.    So roughly about two months, right?

A.    Months, yes, correct.

Q.    During that two-month period you were not going to Jackson Hospital and not performing your job?

A.    I couldn't.  No.  No, I did not.

Q.    Did you receive any sick pay from Jackson Hospital during that two-month period?

A.    Not the whole two-month period.  My PO time had run out.

Q.    Now, when you have PO time, does that mean that you can take time off and you're still going to get paid by Jackson?

A.    You wouldn't get the whole amount, you would get a percentage.

Q.    What is that percentage you would be paid for

the PO?

A.    Once you get your PO.  Your PO is -- you get your whole eight hours your PO, but -- I jumped the gun a little.  You get your whole eight hours of PO.  But once the PO run out, you get short-term or long-term disability in which I didn't have, that's where you get the percentage.  It's like -- it wouldn't be 100 percent. I think it would be like 35, 40 percent.  But I didn't have long-term or short-term at the time.

Q.    Other than any PO payment that you received during that two-month period, did you have any insurance that was paying you for any time taken off work?

A.    No.

Q.    So the only money that would have come during that two-month period would have been from Jackson Hospital?

A.    Correct.

Q.    Do you know how much money you received from Jackson Hospital during that two-month period when you were not going to work?

A.    No, I do not, offhand.

Q.    Okay.  Do you have a way to calculate that based on either your bank statements or any type of pay stub from Jackson Hospital?

A.    No, and I don't want to guess.  I really

don't.

Q.   I understand you don't want to guess.  As the lawsuit moves forward, I will request from your attorney, you know, specifically any payment received during that time period, so you would be able to either look at your bank statements or look at pay stubs.  Is that your understanding?

A.   Yes.

MR. DIEPPA:  Yeah, and we'll agree to produce that.  And, obviously, if you need to subpoena her employer for the records, that's fine.

MR. JARNAGIN:  Okay.

BY MR. JARNAGIN:

Q.   So after November 16th through 17th, did you go back to your job at Jackson Hospital?

A.   No, I did not -- oh, I'm sorry.  You say after November?

Q.   Yeah.

A.   Yes, I went back to work, light duty.

Q.   When you went back to work on light duty, did you go back for the five days a week like you were doing before?

A.   I went back to work five days a week, but I no longer draw blood anymore.

Q.   So tell me once you went back to work after

November 16th through 17th, 2022, how did your job responsibilities change if at all?

A.   It changed tremendously, because, again, I don't no longer draw blood.  I sit in the office now, I just do paperwork.  I correspond with the nurses.  I make sure patients have appointments.  If I have to speak on the phone with a nurse.  But administration of the blood, I can no longer do.

Q.   And why can you no longer do administration of the blood?

A.   It hurts with my left -- with my left side.

Q.   It's physically painful for you to use your left arm to draw the blood from any patients?

A.   Yes.

Q.   Is that continued up until the present day, you have not administered or performed administration of any blood on any patient?

A.   Correct.

Q.   Since November 2022, have you attempted to perform administration of blood?

A.   When I went back to work, I try, and that's when I noticed that I couldn't do it anymore.

Q.   So now you're at a computer and you're corresponding with nurses and you're doing more administrative work?

A.   Yes.

Q.   Has your pay changed at all from before the cruise ship incident?

A.   Well, the only thing that have changed is the 8 percent COLA, of cost-of-living like that.

Q.   So I know the economy is terrible and inflation is awful.  But as far as, I guess, Jackson Hospital paying you around the $1,400 bi-weekly, is that still the same amount you're receiving today?

A.   No.  No, it's not.

Q.   Has it gone up or down?

A.   It went up.

Q.   So what is your current bi-weekly take-home pay from Jackson Hospital?

A.   Now, I take home about 16-, 1,600 and something.

Q.   And do you have any other jobs other than working at Jackson Hospital?

A.   No, I don't.

Q.   Do you have any side income or side hustles that you do to generate any money?

A.   No.

Q.   Now, we're rewinding and I'm going to go back to some more basic information about you.  Okay?

A.   Okay.

Q.   What is your current residential address?

.

Q.   And what type of residence is that?  Is it a house or --

A.   Apartment.

Q.   Is it in a high-rise building or --

A.   No, just two stories.  That's it.

Q.   How many bedrooms?

A.   Two bedrooms, one bath.

Q.   How long have you resided at that apartment?

A.   A year.

Q.   Who lives with you at that apartment?

A.   Me and my husband.

Q.   Lucien?

A.   Yes, Lucien Cole.

Q.   Did I say that correct?

A.   Uh-hm.

.

Q.   How long did you reside at that address?

A.   I believe I resided there about two years.

Q.   Is that the address that you were at when you

went on this cruise in July 2022?

A.   No, I was at 2670.

Q.   Okay.  And the 530 address, was that also an apartment?

A.   No, that was a house.

Q.   Is there a reason that you went from a house to an apartment?

A.   Yeah, we was renting.  And that house we was renting from somebody and the house wasn't, like, livable to live in.  There was a lot of problems in that house.

Q.   Before the 530 Southwest house, what was your residential address?

A.   Okay.  So 4328 Southwest 4th Street, Plantation, Florida 33317, Apartment 206.

Q.   How long did you reside at that address?

A.   I believe I resided there between four and five years.

Q.   Okay.  And that sounds like an apartment?

A.   Yes, two-story.  Or should I say, two floors, yeah.

Q.   Now, you say you are currently married?

A.   Yes.

Q.   To Lucien?

A.   Yes.

Q.   Have you been married previously to Lucien?

A.    Yes.

Q.    How many times?

A.    Once.

Q.    How long have you been married to Lucien for?

A.    We've been married 9 years, together 11.

Q.    What was your previous husband's name?

A.    Karnis O'Neil Danes.

Q.    How do I spell Karnis?

A.    K-A-R-N-I-S.

Q.    How long were you married to him for?

A.    2002 -- I think eight -- around eight years. He died in 2007.

Q.    Do you have any children?

A.    Yes.

Q.    How many?

A.    I had four, one deceased.  I have three living.

Q.    For the children that are still with us, can you tell me their names and ages, please?

A.    Sure.  Rashawn Thomas, she's 35.  Ernest Price, he's 31.  And Karnicia, I can spell that for you, K-A-R-N-I-C-I-A, Danes.  She's 21.  Did you need the one that's deceased?

Q.    No, that's okay.  Thank you, though.

A.    Uh-hm.

Q.    Were any of your children on the subject cruise with you?

A.    No.

Q.    Was your husband on the cruise with you?

A.    Yes.

Q.    What's your current age?

A.    52.

Q.    Prior to filing this lawsuit against Carnival, have you been a party to any lawsuit or litigation?

A.    Never.

Q.    Prior to filing this lawsuit against Carnival, have you ever made a workers' compensation claim?

A.    No.

Q.    And now I'm going to go into your prior medical history before the cruise.

A.    Okay.

Q.    Prior to going on the subject cruise in July of 2022, had you ever been medically treated for any issues with your left shoulder?

A.    No.

Q.    Prior to going on the cruise in July of 2022, had you ever medically treated for any issues with your right shoulder?

A.    No.

Q.    Prior to going on the cruise in July of 2022, had you ever been medically treated for any neck issues?

A.    I'm not sure.  I know I had been in, like, a bump from behind before.  But I'm not sure if I had any neck injuries.

Q.    Okay.  So sitting here today you don't know if you've ever medically treated for any neck injuries?

A.    No.  May or may not, I don't.

Q.    And you've never medically treated for any left shoulder or right shoulder injuries prior to this cruise in July of 2022?

A.    No.

Q.    Prior to the cruise in July of 2022, had you ever treated for any lower back injuries?

A.    I'm not sure.

Q.    Have you ever been involved in a motor vehicle accident?

A.    Yes.

Q.    Have you ever medically treated after being involved in a motor vehicle accident?

A.    Yes.

Q.    Okay.  How many times?

A.    To my recollection, twice.

Q.    What year was the first motor vehicle

accident that you medically treated for?

A.   June 1989.  And the next one had to be in 2011 or 2012.

Q.   In the 1989 motor vehicle accident, what did you medically treat for following the incident?

A.   I can't remember which leg.  I don't know if it was the right or the left, but it was the leg.

Q.   Now, for the 2011 or 2012 motor vehicle accident, what did you medically treat for following that?

A.   Same thing, my leg.  I can't remember which one.

Q.   So of the two motor vehicle accidents that you medically treated for, you did not medically treat for any shoulder or neck issues?

A.   No, not to my recollection.

Q.   Where did the 2011, 2012 motor vehicle accident take place?  What county?

A.   Dade County.

Q.   Where did you go for medical treatment following that motor vehicle accident?

A.   North Shore Hospital.

Q.   Is that in Broward?

A.   No, Dade County, 95th Street.

Q.   And what was wrong with your leg?

A.    I believe I had a cut.

Q.    So you didn't undergo any type of physical therapy following that Dade County motor vehicle accident?

A.    I don't remember.  I don't remember.  I don't think so.  I don't remember.

Q.    Prior to the cruise in July of 2022, had you ever undergone any surgeries?

A.    Yes, I had an endometrial ablation that was in '21.  I believe that was 2000- -- it could have been 2005, 2006.  Also, I had a surgery in September 1997. Actually, I don't know if it was actually surgery.  They insert ink into my leg.  I was shot with a gun to my left leg.  And this surgery here to my left shoulder, that's all I recall.

Q.    So prior to the cruise in July of 2022, you had never had any type of surgery on either your left shoulder or your right shoulder?

A.    No.

Q.    Prior to the cruise in July of 2022, you had never had any type of knee surgery?

A.    No.

Q.    Prior to the cruise in July of 2022, had you ever medically treated for any pain in your joints, and that can be your shoulders, your elbows, your knees?

A.    I can't recall.  I probably had pain all through my life.  No specific places.  That would be the answer.  But I believe I had pain in my legs after the accident, around that time.  I can't remember all the pain I had.

Q.    Okay.  Prior to the cruise in July of 2022, had you ever medically treated for any shoulder pain?

A.    No.

Q.    At the time you went on the cruise in July of 2022, were you currently taking any medications?

A.    Yes.

Q.    What medications were you taking?

A.    Ozempic, metformin and Jardiance.  And I also take vitamin D.

Q.    Why were you taking the Ozempic?

A.    Diabetic.

Q.    You have a doctor that treats you for diabetes?

A.    Yes.

Q.    What is his or her name?

A.    Her name is Lea, L-E-A, Harracksingh.

Q.    Spell that for me.

A.    I believe it's H-A-R-R-A-C-S-S-I-N-G [sic].  It 's hard.

Q.    Yeah.  Does she work for a particular

hospital or medical facility?

A.   She works for a medical facility.

Q.   What's the name of the medical facility?

A.   I don't know it offhand.

Q.   Is it in Broward County?

A.   Yes, it is.  They are all over Florida.

Q.   How often do you see Dr. Lea to treat your diabetes?

A.   Every three months.

Q.   And then why were you taking the metformin at the time of the cruise?

A.   I take that medicine to keep my numbers down.

Q.   Is that also a prescription from Dr. Lea?

A.   Yes.

Q.   And how about the Jardiance?

A.   Also a prescription from her.

Q.   For diabetes?

A.   Correct.

Q.   At the time of July 2022, were you seeing any doctors regularly other than Dr. Lea?

A.   No.  Unless you send me for referrals for mammograms or Pap smears, no.

Q.   Prior to the cruise in July of 2022, had you ever regularly attended appointments with a pain management doctor?

A.    Repeat that again.

Q.    Sure.  Prior to the cruise in July of 2022, had you ever treated with a pain management doctor related to any ongoing chronic pain?

A.    Oh, no.

MR. DIEPPA:  Counsel, can you just clarify when you say July of 2022, the date of the accident, the date in July you're referring to?

MR. JARNAGIN:  Sure.

MR. DIEPPA:  Thanks.

BY MR. JARNAGIN:

Q.    At the time you boarded the cruise on July 22nd of 2022, did you have any pending medical appointments for after the cruise?

A.    No.

Q.    Prior to going on this particular cruise in July of 2022, had you ever gone on any other cruises?

A.    Yes.

Q.    About how many cruises had you gone on previously?

A.    This was my conga (ph) cruise.  This was my third cruise.

Q.    So you had been on two previous cruise ships before going on this one?

A.    Yes.

Case 0:23-cv-60532-MD   Document 74-14   Entered on FLSD Docket 03/15/2024   Page 25 of 120
EUREKA COLE vs CARNIVAL CORPORATION
Eureka L. Cole on 08/02/2023

Page 25

Q.    Were both of those cruises with Carnival?

A.    Yes.  I went on other cruise ships before other than Carnival.

Q.    Okay.

A.    I went on Celebration once.  And that was, like, I want to say, eight -- about eight years ago.  And about 20 years ago, I went on Discovery.

Q.    The Discovery, was that a Carnival cruise ship?

A.    No.

Q.    Do you remember what cruise line that was?

A.    That was it, Discovery Cruise Line.

Q.    Okay.  And then the Celebration cruise eight years prior, was that Carnival?

A.    No.

Q.    What cruise was that?

A.    Celebration Paradise.  It just goes to Freeport and back to West Palm.

Q.    Got you.  When you went on the Celebration cruise about eight years ago, did you ever need to visit the medical center for any reason?

A.    No.

Q.    So the July 2022 cruise that we're here to talk about, that was your first Carnival cruise?

A.    That was my third Conga cruise.

Q.    Okay.  So now we're talking specifically about you going on Carnival cruise ships.

A.    Yes.

Q.    What was the year of your first Carnival cruise?

A.    It was -- I want to say, 2017, approximately, 2018.

Q.    What was the name of the cruise ship that you went on in 2017 or 2018?

A.    I want to say it was -- I don't remember.

Q.    Okay.

A.    I don't remember that.  I know it was Carnival.  I don't know which boat.  It was the three-day, I remember that.

Q.    Do you know where the cruise ship was going, what port it stopped?

A.    Yes, it went to Freeport.  I'm sorry, it went to Nassau, Bahamas.

Q.    So that was the first one, right?

A.    Yes.

Q.    When was the second?

A.    The second one was February.  I believe, this one was the first one February 2014, because I renewed my vows and I left from Fort Lauderdale port.  And that was a seven-day.

Q.    What was the name of that Carnival cruise ship?

A.    I don't remember, but I went to three different islands on that one.

Q.    Have you been on any other Carnival cruises other than the February 2014 one, the second one in 2017 or 2018 and then the July 2022 cruise?

A.    No.

Q.    For the 2014 or 2018 cruise, did you ever visit the ship's medical center for any reason?

A.    On the 2018 I was with my family and my nephew got bit by a dog on the cruise ship.  And I took him down to the clinic until his mom come.

Q.    That's the first time I've ever heard of anything like that.  There was a dog on the cruise?

A.    Yeah, they said it was a service animal.  But when my nephew went to touch it, it bit him.  So my sister walked off at the time and they had me bring him down.

Q.    It doesn't seem like a very good service animal.  Other than your nephew being treated for the dog bite, have you been to the medical center for any reason on the 2014 or 2018 cruises?

A.    No.

Q.    Did you sustain any physical injury on the

2014 or 2018 cruises?

A. No.

Q. Okay. Now, we're going to discuss the subject cruise. Why did you decide to book the subject cruise in July of 2022?

A. It was someone in the group's birthday. It was a surprise, what her husband gave her, so we all went on the cruise.

Q. So how many people did you personally know that were going on this particular cruise?

A. About 20.

Q. Who was the birthday girl or boy?

A. Her name was Toya Strachan.

Q. How do I spell her last name?

A. S-T-R-A-C-H-A-N.

Q. Who did you share a cabin with on the July 2022 cruise?

A. Myself and Lucien.

Q. Of the 20 or so people you knew that were going on this cruise, did you have a core group of people that you hung out with in particular for the three days?

A. Not really. Everybody pretty much did they own thing on the ship until -- and we met up to play dominoes or whatever.

Q. How did you communicate with other people in

the traveling party on the cruise?  Were your phones working or --

A.    Not really.  Wi-Fi was really bad.  But if we had a question, WhatsApp.

Q.    At the time that you boarded the cruise, did you bring any medications with you?

A.    Yes.

Q.    Which medications were those?

A.    Metformin and Jardiance and my vitamins. Ozempic is done once a week on Wednesdays, so there was no need for that.

Q.    Okay.  And where did this cruise ship leave from, what port?

A.    Miami.

Q.    If I told you the ship left on July 22nd and returned July 25th, does that sound correct?

A.    Correct.  The 25th in the morning, correct.

MR. JARNAGIN:  I'm going to mark as Defendant's Exhibit 1 a copy of the movement report.

(Defendant's Exhibit No. 1 was marked for identification.)

BY MR. JARNAGIN:

Q.    I don't expect you to have ever seen this before.  But it was produced to us in discovery and I'm

just going to refer to this document to help us with the time line on the cruise.  Okay?

A.    Okay.

MR. DIEPPA:  Okay.  Just take a look at it for a minute.  Wait for his questions while you're doing that.

THE WITNESS:  Okay.

BY MR. JARNAGIN:

Q.    So, Ms. Cole, Defendant's Exhibit 1 states that you boarded the subject cruise at around 11:24 a.m. on July 22nd.  Does that sound accurate?

A.    Yes.

Q.    What did you do that first day upon boarding the cruise?

A.    The first day we had to go and get an acknowledgment of using a raft if any disaster happens. And then we all went up to Lido Deck 9 to eat.

Q.    So you did the marshalling drills and then you went to Lido Deck 9 to eat?

A.    Yes.

Q.    Did you eat in the same area where your incident eventually happened?

A.    No, I ate closer, like, more inside because it was hot.

Q.    Did you eat at one of the open restaurants on

the Lido deck?

A.    We ate at the -- how they have the food bar, when you pick what you want.

MR. JARNAGIN:  I'm going to mark as Defendant's Exhibit 2 the Sign & Sail statement. And this is just a document generated at the end of the cruise that tells you the charges made on your Sign & Sail card.  And I'm going to refer to that also to help with the time line a little bit. Okay.

(Defendant's Exhibit No. 2 was marked for identification.)

MR. DIEPPA:  Take a look at it.

THE WITNESS:  Uh-hm.

BY MR. JARNAGIN:

**Q.    About how long on the first day, July 22nd, were you eating on the Lido deck?**

A.    Well, I can't quite remember when.  Because you couldn't go into your rooms yet, you had to wait while they were putting the luggage by your room door. And they would leave the key at the door.  So we was there pretty much for a while.  And we walked around, I want to say -- I don't want to guess.  We was out a while.  I don't remember, like, how many hours or whatever.

Q.    Okay.  Eventually, you went to your room that day?

A.    Uh-hm.

Q.    What do you recall doing that evening on the first night?

A.    I remember eating dinner that night, walking around, viewing the boat.  Oh, the pool area.  They have a DJ out and that's when everybody pretty much stand around and they have line dances.

Q.    Was that on the Lido deck?

A.    Yes.

Q.    Did you participate in the line dancing?

A.    No.

Q.    About what time did you make it back to your cabin on that first night?

A.    I don't know.  I know I had to go back to shower for dinner.  I don't remember what time.  I don't remember.

Q.    Did you have dinner that first night in one of the formal dining areas?

A.    Yes.

Q.    Was it with the large 20-people party you were with?

A.    Yes.

Q.    On the second day, July 23rd, about what time

did you wake up?

A.    About 6 -- 6:00 a.m., around 6:00 a.m.

Q.    And on that day you didn't go to any port, it was completely a sea day, right?

A.    Yes.

Q.    What did you do that morning after waking up on that second day?

A.    Took a shower, got dressed, went up to Lido Deck 9 to eat breakfast by myself.  My husband was still asleep.

Q.    All right.  And what did you do after eating breakfast on Lido Deck 9?

A.    Went back to the room.

Q.    Okay.  Did your husband eventually wake up?

A.    Yes.

Q.    Okay.  What did you and your husband do that morning for the rest of the time?

A.    Walked around the ship, went to the casino, walked around window shopping.  I believe we went to a show on the cruise ship.  And then later that night we went to dinner and then we went to a comedy show after dinner.

Q.    On Defense Exhibit 2, July 23rd, there's an entry for pool bar.  Did you order a drink at the pool bar at some point that day?

A.    I don't believe so.  Because I remember the card -- my husband, we was just using each other card.  I don't remember me ordering.

Q.    Did you visit the pool at all that day?

A.    Yes.

Q.    Is the pool on Lido Deck 9 on that ship?

A.    They have several pools.  They have one where the big area and they have one that -- I want to say, I don't know if it's the front of the ship or the back.  But I was in the Jacuzzi, not the pool.

MR. DIEPPA:  And I'll point out there's no description of the charge other than the pool bar.

BY MR. JARNAGIN:

Q.    So on July 23rd, that particular day, you were in the Jacuzzi?

A.    Yes.

Q.    Was the Jacuzzi on the Lido deck?

A.    Yes.

Q.    Okay.  About how long were you in the Jacuzzi area that day?

A.    I want to say -- in the water or just the area?

Q.    Just the area itself.

A.    Oh, the area.  That was pretty much the main area where everybody met up at to play cards or dominoes.

Q.   So how long were you on the Lido deck for that particular day, the second day of the cruise, July 23rd?

A.   I don't recall how many hours.  But we was out there a little while every morning, three hours, less than five.

Q.   Okay.  And I know you had breakfast on the Lido deck that morning, did you have lunch at the Lido deck as well?

A.   I believe so.

Q.   And then for dinner that night, did you also eat in a formal dining area?

A.   Yes, that was the night where you dress up.  Saturday night, yes.

Q.   And then you went to a comedy show after the dinner?

A.   Yes.

Q.   After the comedy show did you go anywhere else on the ship that evening before going back to your cabin?

A.   Yes, we walked around and it was a nightclub on the floor.  We went in there less than like 30 minutes.  It was too many kids and we went back.

Q.   Did you have any alcohol or drinks on that second day, July 23rd, while you were on board the ship?

A.    I believe I had some wine, my own wine.

Q.    So that's just wine that you brought on board the ship with you?

A.    Yes.  Yes.

Q.    Did you recall ordering any drinks from Carnival crew members at all that day?

A.    No.  I don't recall.

Q.    So now we're going to the third day of the cruise, which is July 24th?

A.    Yes.

Q.    And on this particular day, the ship is pulling into Nassau, Bahamas, right?

A.    Correct.

Q.    Tell me what you did that morning prior to leaving the cruise ship.

A.    Okay.  That morning prior to leaving I got up early as usual, went to get a light breakfast.  Me and my husband at that time, we exit off the boat.  We walk down to get out of the boat facility.  And we had arrived from a taxi, we sightsee around.  Then we went to an area where they serve food, Arawak Cay, I think that's the name of it.  We went there and we had some food.  And we waited for some of the other party that was on the cruise.  Me and my husband, we're by ourselves, they were later and we're early birds.  We went there and we ate.

And we didn't stay on the island.  And once we sightseeing and ate, we didn't stay out too long because it was hot on the island.  So we went back to the ship about -- we got off, like, between 7:30 and 8:00.  We got back on the ship about, I want to say, like, 1:00.  I'm not too sure of that time about when we got off the ship.  And when we went back on the ship, we went upstairs to Lido Deck 9 to get something to eat.

Q.   And looking at Defense Exhibit 1, so the movement report will tell you about what time you got off the ship and what time you got on.  So if it says you got off the ship to get to Nassau, Bahamas at 8:30 a.m. and returned 3:07 p.m., does that sound roughly correct?

A.   Yes.  Uh-hm.

MR. JARNAGIN:  Okay.  I'm going to take a ten-minute break.  We can go off the record.

(Off the record from 11:31 a.m. to 11:42 a.m.)

MR. JARNAGIN:  Back on the record.

BY MR. JARNAGIN:

Q.   So, Ms. Cole, before our break, you were telling me about going to Nassau, Bahamas, on July 4th?

A.   I'm sorry, July 24th.

Q.   July 24th.  Yep.  So when you went to the Bahamas that day, you walked around and looked at shops

or what in particular did you do?

A.   No, we got in, like, a taxi carrier to sightsee the island.  And then we went over to the food area, the name of it is Arawak Cay.

Q.   The spelling is --

A.   That's where we ate lunch.

Q.   The spelling is --

A.   A-R-A-K-A-Y [sic].

Q.   And the taxi carrier, did you get off the ship and just hail a taxi and ride around or was this --

A.   No, they would be out waiting with signs and police officers be out there to make sure you get in, in a safe environment.

Q.   Was it just you and your husband in the taxi carrier sightseeing?

A.   Yes.

Q.   And then when you went to Arawak Cay, about what time did you get there that day?

A.   I want to say like -- I want -- I think like 10-something.  And because the restaurant didn't open until 11, we couldn't eat yet.  We had to wait.

Q.   And is this an outdoor restaurant or --

A.   Yes.

Q.   Okay.  About how long were you at Arawak Cay?

A.   Maybe -- I want to say, approximately,

probably, like, three -- three hours.

Q.   Was anyone at Arawak Cay other than you and your husband that you knew?

A.   No.

Q.   So no members of your 20 or so traveling party were at Arawak Cay with you?

A.   They came later.  They came later.  They didn't eat where we ate.  They ate further down at Twin Brothers.  I remember their restaurant.

Q.   And the three or so hours that you were at Arawak Cay, did you consume any alcoholic beverages?

A.   I had one Bahama Mama.

Q.   And when you left Arawak Cay, how did you get back to the cruise ship?

A.   Back with the transportation of the taxi that brought us there.

Q.   And when you say a taxi carrier, is this literally a car or what type of vehicle?

A.   Yeah, I would say, like, here in the States Uber is similar to that in Nassau.

Q.   So when you got the taxi carrier back to the ship, was it just you and your husband?

A.   Yes, it was.

Q.   And then based on Defense Exhibit 1, you boarded the ship around 3:00 p.m. that day?

A.   Yes, that sounds about correct.

Q.   **Once you boarded the ship, where did you go?**

A.   Lido Deck 9.

Q.   **With your husband?**

A.   Yes.

Q.   **When you got to Lido Deck 9, did you meet with any members of your traveling party or were they still on the shore?**

A.   No.  I have to backtrack a little.  Something just came to mind.  The rest of the party that came later, it was two, two more of the party members was ready to go.  They didn't want to wait with their group, so they rode back with us with the taxi.  So it was two going, me and my husband, but going back, a couple rode back with us.

Q.   **What was the names of the couple that rode back with you in the taxi to the ship?**

A.   Chakita, C-H-A-K-I-T-A, Wilson, and the guy was Travis, I don't remember his last name.

Q.   **Had you met Chakita prior to the cruise?**

A.   No.

Q.   **Okay.  So once you're back on -- go ahead.**

A.   Sorry.  That question you say -- like, did I just met her then or did I know her previously?

Q.   **Did you meet Chakita on the cruise?**

A.   Oh, no.

Q.   So you knew Chakita from back home?

A.   Yes.  Yes.

Q.   How long had you known Chakita?

A.   All my life.

Q.   Is she a relative?

A.   Yes.

Q.   Is she a cousin or a sister?

A.   Cousin.

Q.   Once you got back to the cruise ship that afternoon on July 24th and you boarded around 3:00 that day, you and your husband go to the Lido deck, do Chakita and Travis go with you as well?

A.   Travis went.

Q.   And once you, Lucien and Travis got to the Lido deck, what did you do?

A.   We sat -- sat around waiting to see if more of the party would be joining us soon once they get back on the ship.

Q.   And when you were sitting around, were you sitting around the pool or the Jacuzzi or what part of the Lido deck?

A.   Actually, we were sitting in a corner.  Yes.

Q.   Were you playing any games or --

A.   No, we wasn't playing games as of yet,

because it wasn't enough people in our party out there yet.

Q.    Now, the incident that you're suing over happened that afternoon, right?

A.    Correct.

Q.    Okay.  Around what time did it happen?

A.    Between 5:30 and 6:30.

Q.    And it happened on the Lido deck, right?

A.    Correct.

Q.    So now I'm going to ask you specifically about that time period of when you got to the Lido deck up until your incident happened.  Okay?

A.    Okay.

Q.    In that time period did anyone else from your traveling party join you, Lucien and Travis?

A.    A little later a guy, his name is Casey.  I met him the time of the ship.  He was a part of the group.

Q.    And how do you spell his first name?

A.    C-A-S-E-Y, Casey Keelings, K-E-E-L-I-N-G-S.

Q.    And you met him on the ship?

A.    Yes.  He was with the party, the birthday party.  And I didn't know a lot of them, but we met.

Q.    Did anyone else you knew join you on the Lido deck before your incident happened?

A.    Yes, Arthur Strachan.

Q.    **I think you spelled that last name earlier.**

A.    Yes.  That's the birthday girl's husband, yes.

Q.    **Anyone besides Casey and Arthur?**

A.    Some workers were around us, some cruise ship workers, some more guests.  They wasn't with our party, but they joined in on the dominoes.  And one more guest, Casey's wife, but she's deceased now.  She died since then.  Her name is Naquisha (ph) Keelings.  She's not with us no longer.

Q.    **Okay.  Once you got back on the Lido deck that day sometime after 3:00 p.m. and before your incident, did you have any alcohol beverages on the Lido deck?**

A.    No.

MR. JARNAGIN:  I'm going to mark as Defense Exhibit 3 a photo taken on the Lido deck.

MR. DIEPPA:  Do you have a date on this photo or it's just --

MR. JARNAGIN:  No.  So we can go off the record for a second.

(Defendant's Exhibit No. 3 was marked for identification.)

(Off the record from 11:53 a.m. to 11:53 a.m.)

BY MR. JARNAGIN:

Q.   Ms. Cole, do you recognize what's depicted in Defense Exhibit 3?

A.   Yes.

Q.   Is this the Lido deck?

A.   Yes, it is.

Q.   Was this the area that you were in when your subject incident occurred?

A.   Yes, it is.

Q.   Prior to your incident happening, for how long were you in this particular area depicted in Defense Exhibit 3?

A.   Maybe about -- before the incident, about -- maybe, like, three hours.

Q.   Were you sitting at a table that's depicted in Defense Exhibit 3?

A.   Okay.  At first I was sitting at the table with the young ladies.  My husband was sitting at this table here in Exhibit 3 by himself.  I went over to sit with him because he was by himself and I sat at the chair in the Exhibit 3.

Q.   So the chair that you were sitting at, at the time your incident happened, is depicted in Exhibit 3?

A.    Correct.

Q.    How long were you sitting in the chair before that incident?

A.    We had just picked up some salad and chicken tenders from the bar.  And as soon as I sat down to eat, a strong, like, hit to my left side.

Q.    Okay.  And just so I have a clear record. I'm going to mark an X on this chair.

A.    Sure.

Q.    So I've marked the X, is that the chair you were sitting in at the time the incident happened?

A.    Yes.

Q.    And so you went and got salad and chicken tenders and you sat down in the chair.  And did the incident immediately happen after you sat down?

A.    No.  When I got the chicken and salad, I sat at another table first with some more girls.  My husband sat at this table here in Exhibit 3 by himself.  Once I saw that he was sitting by himself, I left them and went and sat with him.  He was sitting on the opposite side, so I sat here.  And right when I got ready to eat, a strong -- just hit me.  I didn't know what it was.

Q.    Uh-hm.  So once you sat down with your husband in that chair, how much time passed before you felt the strong hit?

A.   It had to be like a minute or two because I was just taking the first bite.

Q.   And prior to sitting in that chair with your husband with your salad and chicken tenders, had you sat at that table whatsoever that entire afternoon?

A.   No.

Q.   Was anyone else sitting at that table with you at the time that you felt the strong hit other than your husband?

A.   No, just me and my husband.

Q.   Did your husband witness what the strong hit was that you felt?

A.   Yes, he did.

Q.   And he was sitting directly across from you?

A.   Correct.

Q.   So the ship's in the Bahamas, you had gotten back on board around 3:00 p.m., and this incident happens between 5:30 and 6:30?

A.   Correct.

Q.   What was the weather like that afternoon when you were on the Lido deck?

A.   Windy.  I remember it good because I had to walk forward to not fall.  Very windy.

Q.   Was it very windy for the entire time you were on the Lido deck that afternoon?

A.    Yes.

Q.    So it was about two or three hours of you being on the Lido deck and it was windy throughout the entire time?

A.    Yes.

Q.    So in Defense Exhibit 3 we see the chair with the X, that's the chair you were sitting at, at the time of the incident, right?

A.    Yes.

Q.    Behind the chair we see some type of working station, right?

A.    Correct.

Q.    Did you observe the working station prior to sitting in the chair?

A.    No, I did not observe the working station. It was just an area where everybody sits, so I just sat at the table with my husband to eat.

Q.    And this photo was taken after your incident. Do you recall seeing the working station at all prior to your incident?

A.    No, I don't recall.

Q.    Do you recall whether there were plastic containers on the working station prior to your incident?

A.    After I was hit, I didn't know what I was hit with.  All I remember are the workers, there was plenty

of workers around coming and they was picking up several containers off the ground.  I remember that.  And they started placing them at the bottom, which is this area here.  So they was all stacked at the top.  They was --

Q.   So when you felt that strong hit after sitting down --

A.   Uh-hm.

Q.   -- what did you do next and what did you observe?

A.   What I did next was, I -- I startled, like, I made a sound and, like, dropped the food.  And the worker ran to me and asked me did I need to go to the hospital of the ship, the infirmary.  And he called someone and they rushed up and they took me down to the infirmary by myself.  Me and them, we walked down.  I was holding my arm up because I was in a lot of pain.  And they took me downstairs and we had to wait outside before we could get in.  And I was sitting waiting and they started doing X-rays and gave me some Motrin.

Q.   So you didn't see what hit you, right?

A.   No, my back was turned towards it.

Q.   And just tell me specifically where you felt the hit on your body?

A.   Yes.  Right to my left back of my shoulder.

Q.   Did you have a conversation with your husband

about what had hit you?

A. Well, after I saw them picking up the containers off the floor, the workers and it was a couple of people around, I knew then. But when I got hit at the time, I didn't know what hit me.

Q. Okay. Did your husband tell you what he saw?

A. Yes.

Q. And what did your husband tell you?

A. He said it was like -- "Oh, my God, like, these things hit my wife." You know, and that's it. But in a rage, you know, needing me to get help.

Q. What did your husband tell you had hit you?

A. Some containers, some sharp containers.

Q. After you felt the hit, are the containers that you observed on the ground the containers that are depicted in Defense Exhibit 3?

A. Yes.

Q. Now, these containers also have plastic lids on the top?

A. Yes.

Q. Did you observe plastic lids on the ground or did you observe the entire, complete container?

A. I observed several lids on the ground. Not the bottom containers, several lids.

Q. So what you observed on the ground are the

lids that are resting on top of the plastic containers?

A.    Correct, in which they placed down, yes.

Q.    And you observed the lids on the ground after you felt the hit?

A.    Yes.

Q.    How many lids did you observe?

A.    When I looked back at the time, I saw about three.

Q.    Okay.  So you sit down with your salad and chicken, a minute or so passes and you feel the hit?

A.    Yes.

Q.    In that minute or so, were any of the plastic lids on the ground?

A.    No.

Q.    So after you feel the hit, at that point you observe plastic lids on the ground?

A.    Yes.

Q.    And then how long does it take for a crew member to come and speak with you?

A.    It was like less than five minutes, because the worker, the one, called who witnessed it.

Q.    Okay.  So after you felt the hit, a crew member comes and talks to you within a about a five-minute period?

A.    After I got the hit, the worker that was in

the area -- there was several workers working, he came over to ask me if I was okay, you know, do I need assistance.  And he called somebody and they came, like, right away.

Q.    The worker that spoke with you, was it a male or female?

A.    A male.  Filipino.

Q.    Do you know his name?

A.    No.

Q.    What was he wearing?

A.    I believe the regular uniform, white pants, they wear jackets and a black bottom.

Q.    So were his pants white or black?

A.    Black.  The one who came and got me had on all white.  I believe all white.  It was a lady.

Q.    Okay.  After you felt the hit, how long did you remain on the Lido deck before you walked down to the infirmary?

A.    She got there like about five, five to six minutes and she took me straight down.

Q.    So in that five- to six-minute period, how many crew members did you speak with?

A.    Just the guy who -- the worker who saw everything and that young lady who took me down.

Q.    The male Filipino that you described, do you

recall what color his pants were, were they white or black?

A.   They wasn't white.  He was a regular worker who cleans the area.

Q.   What did he say to you?

A.   He said to me was I okay.  He said:  "I saw that.  I saw the thing.  I saw."

Q.   Uh-hm.  What did you say in response?

A.   Well, I wasn't really saying -- I was in shock.  It was everybody else around me speaking what happened.

Q.   Did the male Filipino crew member say anything else to you besides "Are you okay?"

A.   No.  He only said something to me when I got back, that he brought ice for me.  But the ice melted because I was downstairs a while.

Q.   Do you recall anything you said to the male Filipino crew member?

A.   No, we never had a conversation.

Q.   And then you spoke to the young lady in the white uniform?

A.   Yes, who took me down the infirmary.

Q.   Did she come to your table that you were sitting at in Defense Exhibit 3 and speak to you?

A.   Yes, she did.

Q.    What did she say to you when she got to the table?

A.    She asked me was I in pain, did I need to go to the infirmary and I said "yes."

Q.    Did you have any other discussions with the young lady in the white uniform other than that?

A.    No, like, short conversations.  I was sitting down eating and then pretty much in -- I explained to her -- I said:  "Oh, my God, Friday, I almost slipped when I got on Friday because the floor was wet, but I didn't fall."  And I told the worker that "You all need to put something down on the floor, it's wet."  You know, I was telling them about that.

Q.    Okay.  So the young lady in the white uniform came to you and asked if you were okay and you said you were in pain?

A.    Yes.

Q.    Any other discussions with her while you were at that table before she took you down to the infirmary?

A.    No.

Q.    Did you see crew members picking up the plastic lids from the ground?

A.    Yes, the same Filipino gentleman.

Q.    And the young lady that met you at the table, was she white or Black or --

A.   She was Filipino as well, yes.

Q.   And she's the one who escorted you to medical infirmary?

A.   Yes.

Q.   And you walked with her down to the medical center?

A.   Yes.

Q.   Your husband didn't go with you?

A.   No, no one, just me and her.

Q.   Why did he remain at the table?

A.   I don't think he could have gone.  You know, he said -- like, he wanted to go, but I can't quite remember if she said:  "It's okay."  I don't remember the exact words, but they waited for me at the table.

Q.   Okay.  When you initially felt that hit, did you experience any pain?

A.   Yes.

Q.   Okay.  And where was the pain?

A.   My left shoulder.

Q.   Okay.  Was it -- strike that.  I mean, how forceful of a hit was this against your left shoulder?  Was it like --

A.   Like if -- if you was in a car and somebody hit you from the back in a truck, like, forceful.

Q.   And when you felt the hit, you said you

dropped your food?

A.   Yes.

Q.   When you dropped your food, was it just a knife and a fork or --

A.   The fork with the chicken with the salad, getting ready to put it in my mouth.

Q.   Was there any movement of your body from feeling the hit on your left shoulder?

A.   Can you rephrase the question?

Q.   When you felt the hit, did your body move whatsoever?

A.   Oh, yes, it jerked up, in that form.

Q.   Did your body strike anything as a result of feeling the hit?

A.   No.

Q.   And you told me your husband observed what happened, right?

A.   Yes.

Q.   You had other people in the area as part of your traveling party?

A.   Yes.

Q.   Did anyone else observe what happened to you?

A.   Yes.

Q.   Okay.  Who else observed it?

A.   Casey and Arthur and it was the worker.  And

it was some gentleman, he wasn't with our party, he witnessed it.  And Latoya, she saw the after.  She didn't see when it hit me.  She saw when they was picking up the containers off the floor.

Q.    Okay.  Casey and Arthur were not sitting at the same table as you?

A.    No, they was at another table to the right side of us.

Q.    What did Casey tell you that he observed?

A.    He say:  "I saw it.  I saw it.  I saw them hit."  You know, because like I said, I didn't know what hit me.  All I know I was banged pretty bad in the back.

Q.    What did Arthur say he observed?

A.    Same thing, that he saw them hit me.

Q.    And when they say they saw them hit you, what are they referring to?

A.    The lids.

Q.    Did anyone tell you that the wind blew the lids and then the lids struck your left shoulder?

A.    No.  No one didn't have to tell me that, because before we sat there, you actually had to hold forward to walk.  That's how strong the winds was.

Q.    Did anyone tell you that a crew member dropped anything on you and that's what caused you to feel the hit?

A.    No.

Q.    Okay.  So no crew member dropped anything on your left shoulder while you're on the Lido deck?

A.    No.

Q.    Okay.  And when you say workers observed what happened to you --

A.    Yes.

Q.    -- are you referring to the male Filipino that you spoke with?

A.    Yes.  And there was more workers over in the area.  They just was looking, but that particular one was more speaking.

Q.    Okay.  And you didn't have any conversations with any other workers other than the male Filipino and then the woman in the white uniform that came after?

A.    No.  When the officer of the ship took me back to the scene to explain what happened, the young lady who took me to the infirmary, she had a worker take me and get me something to eat.  And get me -- you know, get something to drink, bring it back to the table for me and get me something to drink.  That's the only conversation.  You know, I told her "Thank you."  You know, "She got injured, you know, go serve her."

Q.    So other than the male Filipino -- and this is before you go down to the medical infirmity -- you

didn't speak to any other crew member that observed what happened to you, right?

A.    No.

Q.    You mentioned some gentleman also observed what happened to you?

A.    Yes.

Q.    Did you have any conversations with that gentleman or did you he just -- he was in the same area?

A.    No, he was one of the guys playing dominoes with the guys, and he witnessed everything.  I don't know him.

Q.    So I know you didn't see what happened to you.

A.    Correct.

Q.    But is your understanding that the wind blew one of these lids off the plastic container at the workstation depicted in Exhibit 3, and that's what caused you to feel the hit on your left shoulder?

A.    Yes.  It was real windy and, you know, it was a lot of workers around.  You know, honestly, I believe they -- where you see them at, at the bottom in Exhibit 3.

Q.    Uh-hm.

A.    This is where they belong.  If the workers around cleaning and doing everything, they should have

had in the correct compartment.  Because when you know you have cruise -- guests on the cruise ship, you shouldn't pile up.

Q.    Do you know if anyone else on the Lido deck was hit by a plastic lid at the same time that you were?

A.    I don't know.

Q.    Did you ever overhear anyone else discussing that they were also hit by a plastic lid?

A.    No.

Q.    So the young Filipino woman escorts you down to the medical center?

A.    Correct.

Q.    About how long are you in medical center for?

A.    Probably, maybe, like, two -- two -- about two hours.  Two hours.

Q.    And you told me briefly earlier what was done to medically treat you.  But if you could just walk me through, once you arrive to the medical center, who did you speak with and, you know, what did they do to treat your pain?

A.    Okay.  Once I got in the medical facility, I sat down, I filled out some paperwork.  The young lady in the front asking me my name and different stuff.  And she explained to me that I wasn't going to be charged for this, because it was on their negligence.  And I said

EUREKA COLE vs CARNIVAL CORPORATION
Eureka L. Cole on 08/02/2023                                Page 60

"Okay."  And I sign off on it.  She was having problems getting me to pick up the signature.  She was having problems with that.  Then I was sitting down waiting. And then more people start coming in who was getting injured on the boat.  And I still was waiting.  And then finally she took me in the back room.  She said she was going to do X-rays.  And I waited in that room about 30 minutes for her to come back.  Then she took the X-rays of me and then I went back out, sat in the waiting room again.  And another guy came, I don't know if he was a doctor or what.  He took me in a room and he said -- I can't remember the exact term, but he was saying he sees swelling.  And I would have to look, I don't know the exact terms.  But he was going to prescribe some pain meds.  And for me when I get back to the cabin, call room service and tell them to bring me some ice and consult with my doctor.  And then they sent me back -- after him talking to me, they sent me back to the waiting area and told me to wait for the officer to take me back to the scene.

Q.    Okay.  So you said that you were in the medical center for maybe about two hours?

A.    Uh-hm.

Q.    Do you have any complaints about how you were medically treated by the medical staff on board the ship?

MR. DIEPPA:  Object to form.  You can answer.

THE WITNESS:  I just felt like when they gave me the prescription and just told me:  "Oh, go back to the cabin, you know, and ask the -- call room service for ice."  I felt like -- I explained to you all I'm in pain, you know, I just felt like that was -- at that point, they didn't care.  That's how I felt.

BY MR. JARNAGIN:

Q.    Did a doctor or nurse explain to you any findings from the X-rays that were taken?

A.    No.  I can't quite remember what he said.  I remember he just said swelling and something else.  I can't quite remember the terms.  You know, they talked in big medical words.

Q.    Did the doctor give you any instructions on what to do moving forward?

A.    Yes, consult with my doctor.  I can't remember if he said three days or how many days.  But he said consult with my physician.

MR. JARNAGIN:  I'm going to mark as Defense Exhibit 4 the onboard medical chart.

(Defendant's Exhibit No. 4 was marked for identification.)

THE WITNESS:  Okay.

BY MR. JARNAGIN:

Q.    Ms. Cole, have you reviewed your onboard medical chart prior to your deposition today?

A.    No.

Q.    When you presented to the medical center --

A.    Uh-hm.

Q.    -- you didn't have a chance to observe your left shoulder, did you?

A.    No.

Q.    Do you know if you had any redness or swelling on your left shoulder as a result of feeling the hit?

A.    Yes.

Q.    Okay.  Did someone tell you that you had swelling or redness?

A.    No, they didn't tell me.  When I was doing -- while I was in there, I was trying to see, you know, at the time.

Q.    On the first page of the medical chart under "Notes and Triage," it states "No redness nor swelling noted.  No wound and no abrasion.  Do you have any basis to disagree with what's in the record here?

MR. DIEPPA:  Object to form and misstates the record.  You can answer, if you know.

THE WITNESS:  Yeah, I disagree.

BY MR. JARNAGIN:

Q.    Okay.  Are you saying that you did have redness or you did have swelling?

A.    Yes, you could see the redness and you could see the swelling.

Q.    Do you have any photographs of your shoulder having redness or swelling from that particular day, July 24th?

A.    I have to look.  I'm not sure.  I have to look.

Q.    Did you have any cut or wound on your left shoulder as a result of the hit?

A.    No.

Q.    If you turn to page 4 of 6, looking at the bottom right here, and then I'm looking at "Note."

A.    Note.  Okay.

Q.    So the record states:  "X-ray left shoulder was done.  Ibuprofen was given.  Patient was discharged. Left medical center walking in good condition."  Were you given any other medication other than the ibuprofen?

A.    No.

Q.    You don't remember if any findings from the X-ray of the left shoulder were explained to you?

A.    He said -- he was saying a lot of stuff. Like I said, I don't quite remember the exact words.

Q.    And did you leave the medical center walking?

A.    Yes.

Q.    Okay.  So you were able to walk okay?

A.    Yes.

Q.    Turn one more page.

A.    Uh-hm.  5 of 6?

Q.    Yep.

A.    Okay.

Q.    I'm looking at "Instructions" right here.

A.    Uh-hm.

Q.    "Follow up with her doctor back at home."  So that's what you told me?

A.    Yes.

Q.    "Ice 20 minutes four times a day."  Do you recall him telling you that?

A.    Yes.  I don't remember the ice 20 minutes. But he did say the ice because he told me to get it from housekeeping, when you call on the phone.

Q.    All right.  And did the doctor tell you to call 911 if you experienced any new symptoms with your left shoulder?

A.    I don't remember that.  But I do remember it was still in a lot of pain.  And when we got off the ship, I went straight to the ER.

Q.    So this was the last night of the cruise,

right, when your incident happened?

A.   Yes.

Q.   So you disembarked the ship the next day?

A.   Correct.

Q.   Did you ever return to the medical center before disembarking the ship?

A.   No, I went back to the cabin.

Q.   Did you request any other medications or treatment from the medical center after leaving the medical center that night?

A.   No.

Q.   You told me that a security officer came to the medical center; is that correct?

A.   Yes.

Q.   Did you fill out a statement form about what had happened to you?

A.   Yes.  At the time I was inside the infirmary.

MR. JARNAGIN:  So I'm going to mark as Defense Exhibit 5, passenger injury statement.

MR. DIEPPA:  Is that the whole statement?

MR. JARNAGIN:  Yep.

(Defendant's Exhibit No. 5 was marked for identification.)

BY MR. JARNAGIN:

Q.   Ms. Cole, do you recognize Defense Exhibit 5?

A.    Yes, I do.

Q.    Okay.  Is this a form that was completed by you and the medical center?

A.    Yes, it is.

Q.    Is this your handwriting on the form?

A.    Yes, it is.

Q.    Okay.  So a little bit over halfway down the page it says:  "Please state in detail what happened at the time of the accident."

A.    Yes.

Q.    You state:  "I was eating, some stacked-up containers hit me in the back on my left shoulder as the wind was blowing."

A.    Correct.

Q.    So that's similar to what you told me earlier, right?

A.    Correct.

Q.    So you didn't see a plastic lid hit your left shoulder, but you were told by other people?

A.    As they was picking them up, that's what I saw, yeah.

Q.    So when you're referring to stacked-up containers, you're talking about the lid of the containers hitting you in the left shoulder?

A.    Correct.

Q.   And then when it says:  "What do you believe caused this accident?"  You put "Wind."

A.   Yes, it was a strong wind.

Q.   Okay.  And then that's your signature at the bottom of the page?

A.   Yes, it is.

Q.   After the medical center a security officer took you directly back up to the Lido deck where the accident happened?

A.   Yes.  Yes.

Q.   Was anyone else with the security officer?

A.   No, he was just on the radio talking.

Q.   All right.  Do you recall the nationality or race of the security officer?

A.   Filipino.

Q.   When you went back up to the scene, was your husband still there at the table?

A.   Yes.

Q.   Did you tell the security officer what had happened to you?

A.   Yes.  He asked me, yeah, what hit me.  And I point and he made a just -- on his face like wow.

Q.   Did you tell the security officer that the plastic lid on top of the containers that we see in Defense Exhibit 3 had struck you on your left shoulder?

A.    Yes.

Q.    Was any other crew member with the security officer while he was investigating the scene?

A.    That same worker was in the area.  The one who was interacting with -- and there was more workers on the opposite side.  But they didn't say anything to me, just that one.

Q.    Okay.  So when you went back to the scene, was the security officer the only person that you were discussing about what had happened -- was the security officer?

A.    With the security officer, correct.

Q.    About how long was the security officer there with you at the scene?

A.    Not long.  It had to be like -- not like -- probably less than ten minutes.

Q.    Did you observe him taking photographs?

A.    No, I didn't pay attention to that.

Q.    All right.  Once the security officer left, did you remain at the scene in the area?

A.    Yes.

Q.    Was your husband there?

A.    Yes, he was.

Q.    Did your husband talk to the security officer at all?

A.   I don't remember that.

Q.   Did anyone else talk to the security officer other than you when he was investigating the scene?

A.   I don't remember.

Q.   About how much longer did you remain in the area after the security officer left?

A.   The lady that took me down to the infirmary, she was back over there.  She came back.  And she had another worker walk me to get me something to eat.

Q.   Did you have any conversations with the worker that was helping you get some food?

A.   No, but thank you.

Q.   So then this would have been around, what, like 8:00 at night now?

A.   Correct.

Q.   So you got some food, did you sit down back in the area and eat?

A.   I tried, but I was in pain so I couldn't.

Q.   So how much longer did you remain in this area depicted in Defense Exhibit 3?

A.   Probably about 30, 30 more minutes when she got back with security and she got my food, about 30 more minutes after that.  And then I went back to my room.

Q.   Had your husband and Casey and Arthur remained in this Lido deck area depicted in Defense

Exhibit 3 the entire time you had been in the medical center?

A.    That I can't answer for.  But I know when I got back, they were there with more of the party.

Q.    So about what time did you make it back to your cabin that night?

A.    I stayed there until about 30 minutes later because I was trying to eat, but I was in pain.  I went back -- so I probably got to the cabin about, probably, 8:45, 9 and stayed there until the duration of that morning.

Q.    Okay.  So you didn't go anywhere else on board that night?

A.    No.

Q.    So the following morning, the ship is back in Miami and you're disembarking, right?

A.    Correct.

Q.    Did you require any assistance leaving the ship?

A.    I called down to the front desk and explained to them that I got hurt and that I didn't want to be -- because I don't know if you've been on a cruise, but everybody bundles up to try to get off.  Well, they let me and my husband go down to the main deck in the VIP area, and we was able to get off first.

Q.    So you were provided with whatever assistance you requested?

A.    Yes.  Uh-hm.

Q.    After you disembark the ship, you went to a hospital?

A.    Yes.  I went to the parking lot first to get our car.  And my husband -- we stopped by the house and he got out and I went straight to Plantation.

Q.    The hospital that you went to, that's not the one you work at, is it?

A.    No, it's not.

Q.    Had your pain changed at all from initially feeling the hit the night before and the time that you went to the hospital in Plantation the following day?

A.    Yes, it was throbbing pretty bad.  That's what made me get off the ship and go straight -- straight there.

Q.    And when you got to the hospital in Plantation, what was done to assess your pain in your left shoulder?

A.    From what I remember, I remember the lady saying it was swollen and bruised.  I remember her saying that.  She gave me some stronger, I think, 800 or 600 -- I'm not sure which one it was -- ibuprofen.  And she gave me three or four days off from work.

Q.   Was any diagnostic imaging taken of your left shoulder when you went to Plantation Hospital that day you got off the cruise?

A.   No, it was not.

Q.   So you didn't have any X-rays or MRIs or CT scan?

A.   I had an MRI, I believe, a few days later.  I had an MRI done.

Q.   So just no diagnostic imaging from the first hospital visit on July 25th?

A.   No, there was not.

MR. JARNAGIN:  I'm going to mark as Defense Exhibit 6 a hospital record from your visit that day.  This was produced by you to us in discovery.

(Defendant's Exhibit No. 6 was marked for identification.)

BY MR. JARNAGIN:

Q.   So I think you're looking at the same page as me.

A.   One?

Q.   The second one.

A.   Uh-hm.

Q.   So under "Presentation," there is "Chief Complaint."  And it states in part:  "She states she feels pain in the area.  On exam noted a scratch.  No

swelling, bruising, ecchymosis noted on exam.  The patient has a picture of the container.  It is a small plastic container.  She states she was hit by the corner. She states this happened on Saturday.  She also reports that on Saturday, she slipped on water and fell, but she did report the fall.  No complaints of numbness or weakness in the ER, she has of the left shoulder."  So from what is written in the record, here it mentions a slip and fall on Saturday.

A.    Uh-hm.

Q.    Did you slip and fall at some point on Saturday?

A.    Oh, yeah, I forgot all about.  Yes.  On Saturday I was on Lido Deck 9, I was going to get some hot tea and I slipped as I was going for breakfast that morning.

Q.    Okay.  So you were on Lido Deck 9 and you were going to get hot tea for breakfast?

A.    Hot tea, yes.  And I slipped over by the station.

Q.    Around what time was it that you slipped?

A.    I went to breakfast, like, 7:00 that morning. It had to be like 7:15, 7:20.

Q.    Did you fall?

A.    Yes.

Q.    On the ground?

A.    Yes.

Q.    Was the hot tea station in an inside area on the Lido deck?

A.    No, outside area.

Q.    Okay.  Where was the hot tea station located close to?

A.    Where I was sitting at here, around the corner.  So I was sitting --

Q.    So it would have been in an outdoor area --

A.    Not that side, the next side.

Q.    The opposite side?

A.    Uh-hm.  I forgot about that fall there, because I got right up and got my tea and sat down and ate.

Q.    So you did slip and fall on Saturday between 7 and 7:15 a.m.?

A.    Yes.

Q.    And you fell onto the ground?

A.    Yes.

Q.    What part of your body hit the ground?

A.    The front, frontwards.

Q.    Frontwards?

A.    Uh-hm.

Q.    All right.  How long did you remain on the

ground floor after you fell?

A.    I grabbed my shoes, got right back up and got my tea.

Q.    Were you in any pain after you fell that morning?

A.    No.  I got my tea and breakfast on the table and I got to the table and I sat down and ate.

Q.    Did anyone witness you fall that morning?

A.    I believe the pool guy saw -- saw me, because he was standing right there at the edge of the pool.  But due to I got right back up, he didn't come over.  Maybe if I would have screamed or, you know, made a sound.  But he [sic] said it was, like, a trip, and right back up.

Q.    So you hit the front part of your body when you landed?

A.    Yes.

Q.    Do you know how you fell?

A.    It was -- the floor was moist, and I had on some slippers.  And how I remember it good is because I was tippy-toeing due to the moisture, so that's why I was able to block (ph) down and block (ph) right back up.

Q.    Did you tell anyone within your traveling party that you had slipped and fallen that morning?

A.    I don't remember because I forgot about it. I don't remember.  I remember telling a few guests:

"Hey, walk slow, the floor's moist" that morning.

Q.   Did you report to anyone on board -- and by that I mean any crew member, that you had slipped and fallen on Saturday morning?

A.   No.

Q.   And you're saying that you weren't hurt at all from having slipped and fallen that Saturday morning?

A.   Not at all.

Q.   All right.  So you don't believe that you having slipped and fallen on Saturday morning has anything to do with your left shoulder surgery and injury?

A.   No.  Because I went -- it happened again, like, 7, 7:15 in the morning, the whole day Saturday went, also Sunday.  No.

Q.   Upon leaving the hospital on July 25th from Plantation, did they give you any discharge instructions or any medications?

A.   The ibuprofen, I believe, it was 600 -- 600 milligrams.

Q.   Were you told to follow up in a certain period of time?

A.   They probably did.  I don't remember, but I know that's a routine.  They always tell you, follow up or if you feel pain again, come back to the emergency

room.

Q.   Okay.  When was the next time that you presented for treatment for your left shoulder?

A.   Well, what I did because I knew something was wrong, I still wasn't feeling right.  So I Googled like -- like, therapy stuff.  And I found something near me, in my area, and I went there.  Yeah, and they had me fill out a few papers.  And they had wanted to do an MRI to see -- because I was complaining that something isn't right.  And that's when they request for me -- I went to -- the name of the place, I know -- did a few, but the one closest to me was CitiMED.

Q.   Okay.

A.   And they request -- the pain and the tenderness, I was -- when they touched -- the MRI -- and that's when I found out further findings.

Q.   Other than going to the hospital in Plantation and then presenting to CitiMED a few days later, did you go to any other medical facilities for left shoulder pain?

A.   No, just that and the MRI place.

Q.   Okay.  Did the people at CitiMED tell you to go get the MRI?

A.   They asked me -- once they felt my shoulder, the pain I was saying I was having, they request that I

do an M- -- I can't remember the exact words, but an MRI needs to be done.  So we scheduled that MRI.  And that's when I found out further what was going on with my shoulder.

MR. JARNAGIN:  Okay.  All right.  We're going to take a brief five-minute break.  And then it will be about 45 more minutes.

So off the record.

(Off the record from 12:47 p.m. to 1:15 p.m.)

MR. JARNAGIN:  Back on the record.

BY MR. JARNAGIN:

Q.   Okay.  So, Ms. Cole, after you presented to the hospital in Plantation on July 25th, a few days later you went to the CitiMED facility?

A.   Yes.

Q.   And then you underwent an MRI?

A.   Correct.

Q.   Did a doctor explain to you the results of the MRI?

A.   Yes.

Q.   Which doctor was that?

A.   I believe it was Dr. Colon.

Q.   How do you spell the last name?

A.   I believe it's C-O-L-O-N, Colon.

Q.   And I have medical records with a doctor by

the name of John P. Wilkerson?

A.   Yes.

Q.   That's a different doctor?

A.   Who did the surgery, correct.

Q.   What was Colon's first name?

A.   I don't know.

Q.   Does Dr. Colon work at the same facility as Dr. Wilkerson?

A.   Yes.

Q.   And what did Dr. Colon say that the MRI showed?

A.   Again, those medical terms I don't know like that, but it didn't look good.

Q.   Now, you had a shoulder surgery on --

A.   September 15th.

Q.   September 15th?

A.   Correct.

Q.   Was Dr. Colon the one that recommended the shoulder surgery or was it another doctor?

A.   It was doctor -- they had another -- Eliza. It was another doctor.  When I had to go in and speak with her and she went -- was telling me the findings.

Q.   Is Dr. Eliza also with CitiMED?

A.   Yes.

Q.   So from the time that you first went to

CitiMED, which I believe was the last week of July or the first week of August?

A.    Yes, in July.  Yes.

Q.    Okay.  In July up until the time you had your shoulder surgery, did you see any other doctors outside of CitiMED?

A.    No.

Q.    How long in advance was it recommended that you have the shoulder surgery until the time you actually underwent the shoulder surgery?

A.    After I had the MRI, I don't remember the exact date.  I had to wait until, I guess, they get the results back.  When I came back, I did some therapy.  And the Dr. Liz [sic] I think Bula [sic] , I think, that's her last name.  Eliza Bula, if I'm saying it correctly, her last name.  But I remember the first name was Dr. Eliza.  That's when I was told that I needed the surgery.

Q.    Okay.  Do you recall about how many physical therapy appointments you attended before it was eventually recommended that you have the shoulder surgery?

A.    No, I don't.

Q.    Okay.  And does Eliza Burdier, B-U-R-D-I-E-R, does that sound --

A.    That sounds right, yes.

Q.    Okay.  Did any of the doctors from CitiMED tell you that you needed the left shoulder surgery because of the plastic lid hitting you on board the cruise ship?

A.    No, I don't remember them saying that. They're saying to the injury, I guess, the findings that they saw, that I needed the -- I think it was lateral-something cuff, something like that.

Q.    Did any doctor ever tell you that the pathology in your left shoulder was due to anything degenerative?

A.    I don't recall.

Q.    After you got home from the cruise and before you underwent your left shoulder surgery, were you going to work every day?

A.    Yes, I went back to work after -- well, I contact my job after the hospital visit.  I contact my boss and explained to her that I got hurt and I had to go to the hospital and they give me days off.  I sent her the paperwork.  When I send her the paperwork, I told her that I needed to be on light duty.  I couldn't draw blood, but I needed documents, you know, to support that.

Q.    And are you left-handed or right-handed?

A.    Right-handed.

Q.    So your dominant hand is your right one?

A.    Yes.

Q.    When you went for your left shoulder surgery, did you stay in the medical facility overnight or were you discharged the same day as surgery?

A.    Discharged the same day.

Q.    Okay.  And you returned home to your current residence?

A.    Correct.

Q.    And at that point in time just you and your husband lived there?

A.    Yes.

Q.    Did you ever require any additional assistance around your home outside of your husband helping you?

A.    Yes.  I have a cousin that lived around the corner, she used to take me back and forth to therapy, bring me food.

Q.    And then you're out of work for two months, right?

A.    Correct.

Q.    When you got home after having your surgery, did you wear any type of device on your left shoulder?

A.    Yes.

Q.    And what type of device is that?

A.   Are you meaning like a sling?  Okay.  All right.  So, yes, it was a sling with a big piece in the middle that props it up.

Q.   And how long did you wear that sling for?

A.   I wore that for two months.

Q.   I'm assuming that two months after the surgery you went back to your surgeon Dr. Wilkerson?

A.   Yes.

Q.   And he told you that you were able to return to your job?

A.   He didn't say I was -- well, after the surgery, I was still going to therapy with the arm.  I had to show some type of improvement, like, trying to move it.  They wanted me to be out of work longer.  They wanted me to be out like six months.  But I couldn't afford to be out, because I wasn't getting paid any longer and, you know, bills had to get paid.

Q.   And who wanted you to be off work longer, was it the physical therapist or was it Dr. Wilkerson?

A.   It was Dr. Eliza.  That's who I mainly had spoken with, Dr. Eliza.

Q.   Did you wear the left arm sling every day for the two months and then after the two months you discontinued using it?

A.   Yes.

Q.   So since November of 2022, have you used any type of device to support your left shoulder?

A.   Well, I have a heating pad device.  I have a stimulator, when I get pain.  I still use it now.  I put the patches and give it a little juice.  And I have a heating pad.

Q.   So we're in November of 2022, you're back to work, did you continue going to physical therapy appointments?

A.   Yes.

Q.   Okay.  So in the two-month period from September, after you had your surgery up until, you know, the time you went back to work, November of 2022, how often were you going to physical therapy a week?

A.   Three times.

Q.   Three times a week for two months?

A.   Yeah.

Q.   And then once you returned to work, how many times were you going to physical therapy?

A.   Twice.

Q.   Are you still going to physical therapy?

A.   Not as of yet.  I am supposed to make an appointment because I'm still having -- not much movement in this arm.

Q.   After you returned to work and you were going

to physical therapy twice a week, how long until you stopped going to physical therapy?

A.    I believe it was January the 6th.

Q.    And why did you ultimately stop attending physical therapy?

A.    I started doing a few exercises myself at home.  After it wasn't so intense, the workouts that they was doing, so I ordered some stuff on Amazon myself.  And I was doing it myself.

Q.    From the time that this incident happened on July 24th up until your physical therapy, you elected to stop or stop going in January of 2023, were you covered by health insurance?

MR. DIEPPA:  Object to form.  You can answer.

THE WITNESS:  No.

BY MR. JARNAGIN:

Q.    I believe in your answers to interrogatories or in some document you say you had Obama health insurance?

A.    Oh, yes.  I forgot all about that.  Yes, I do have Obama medical insurance.  Yes.

Q.    So at this point has Obamacare covered your physical therapy and physical therapy appointments?

MR. DIEPPA:  Object to form.  You can answer if you know.

THE WITNESS:  No.

BY MR. JARNAGIN:

Q.    Are you in possession of any bills from medical providers requesting that you pay them the amounts owed?

A.    Yes, I am.

Q.    Are you aware if any of these medical providers have any medical lien on your care that you've been given?

A.    I'm not aware of that.  But I do get mail, like, what my bills are due to my surgery and my physical therapist.

Q.    Do you have all of those bills?

A.    It's somewhere, I believe, in the house.

Q.    Have you paid anything for your left shoulder surgery?

A.    No, I did not.

Q.    Have you paid anything for your physical therapy?

A.    No, I did not.

Q.    So you don't have health insurance through your job at Jackson Hospital?

A.    No, I do not.

Q.    Under Obamacare, do you have a health insurance policy?

A.    Rephrase that question.

Q.    When you went to CitiMED and they asked you for your health insurance information, did you fill out, like, a policy number?

A.    No, I did not.

Q.    Okay.  Did you tell CitiMED that you had health insurance?

A.    I don't remember if I had that conversation. I don't remember.

Q.    If you have Obamacare, when did you initially apply for this care?

A.    When did I apply for Obamacare?  About when Obama was first in the presidential, the first four years, then, when it first came out.

MR. DIEPPA:  Noting for the record my objection to the reference to any collateral sources at trial, but I'm going to allow her to answer subject to that.

BY MR. JARNAGIN:

Q.    When you are treating for your diabetes, are you paying out of pocket or is some type of health insurance paying for your medications and your treatment?

A.    I make a copayment.

Q.    Okay.  So from July of 2020 up until the present, you have been covered by some type of health

insurance through Obamacare?

A.    Yes, with my regular medical.  Yes.

Q.    **And your name is on the health insurance policy?**

A.    Yes, it is.

Q.    **Do you know the specific medical health insurance that you have?**

A.    Molina, Molina Healthcare.

Q.    **And do you have documents that talk about what you're covered for under Molina Healthcare, like, a policy?**

A.    I'm not sure if I have documents with that, because I only just go to the regular physician, you know, mammogram or pap, OB/GYN.

Q.    **Do you have a health insurance card that identifies what type of health insurance you have?**

A.    Actually it just says Molina Healthcare marketplace.

Q.    **Can you spell Molina for me?**

A.    Yes, M-O-L-I-N-A.

Q.    **And you don't know if Molina has paid for your left shoulder surgery or any physical therapy?**

A.    No, I never used that during this incident.

Q.    **Why not?**

A.    I wasn't asked about Molina.

Q. So you had previously given health insurance information to your doctor that treats you for diabetes, Dr. Lea, right?

A. Yes.

Q. But you just didn't give your health insurance information for any treatment related to your left shoulder?

A. No.

MR. DIEPPA: Object to form. You can answer.

THE WITNESS: No, I did not.

BY MR. JARNAGIN:

Q. Is there any other agreement that you have between the doctors that treated you for your left shoulder?

A. Meaning?

Q. Did you sign any paperwork that gives the doctors any right to seek compensation from other people for your treatment?

A. Not to my knowledge.

Q. Since you completed physical therapy in January of 2023, have you seen any other doctor related to your left shoulder?

A. No.

Q. So you haven't undergone any further treatment for any left shoulder complaints since

January 2023?

A.   No.

Q.   Do you currently have any appointments to treat for your left shoulder?

A.   Not yet, no.

Q.   Since the July 2022 cruise, have you been on any other cruises?

A.   No.

Q.   Since the July 2022 cruise, have you been on any other vacations?

A.   Yes.

Q.   Okay.  Where have you gone?

A.   I went to Jamaica and I went to New Orleans.

Q.   When did you go to Jamaica?

A.   March 2023.

Q.   For how many days?

A.   Three days.

Q.   Any special occasion?

A.   Yeah, it was a previous birthday trip paid for.

Q.   And when did you go to New Orleans?

A.   July of 2023.

Q.   Okay.  So a few weeks ago?

A.   Yes.

Q.   Did you fly to New Orleans?

A.    Yes.

Q.    How long did you stay there for?

A.    Three days.

Q.    Any special occasion?

A.    Yes, a previous -- my husband's birthday.

Q.    Do you have any current plans for any vacations?

A.    No.

Q.    Do you currently have any physical limitations in your left shoulder?

A.    Yes.

Q.    Tell me what those are.

A.    I can move it very lightly.  If I was at a 10, I believe now I'm at, like, a 3 or 4.  It takes me slower time to move this arm here.  I don't have much leverage in it.  I can't put on a brassiere.  I can't bend my arm backwards.  I can't reach.

Q.    Do you have any limitations on how high or low you can raise your left arm?

A.    Yes.

Q.    Okay.  What are those limitations?

A.    I can't reach above, like, I have to have my husband to get something out of the kitchen cabinet.  Or if I'm in church, I can't praise with both hands.  I only can praise with one.

Q.    Do you have any limitation on how much you can pick up with your left arm versus your right arm?

A.    Yes.

Q.    What's the difference?

A.    The difference is this arm is pretty sturdy, I can pick up a lot.  But this one here, I can't.

Q.    Were you given any physical restrictions by any doctor that treated you for your left shoulder?

A.    Yes.

Q.    And what are those restrictions?

A.    I can't lift over, I believe, it was 5 to 8 pounds.

Q.    And who gave you that restriction?

A.    Dr. Eliza.

Q.    And when was that restriction given?

A.    When I was released to go back to work.

Q.    When is the last time you saw Dr. Eliza?

A.    That last visit.  I think it was January.

Q.    So I get the impression that you go to church?

A.    Yes.

Q.    Prior to the incident, what activities, you know, did you enjoy doing?  So I know you work five days a week and then hopefully you have some off time to enjoy your life.  So what do you do?

A.    I like to dance.  I like to go to karaoke.  I like to cook.  I like to serve on a food bank at church.  I like picnics.  I like to bowl.

Q.    Since undergoing your left shoulder surgery, have you been restricted in any of these things that you enjoy doing?

A.    Yes.

Q.    Tell me how.

A.    Well, I can't bowl because I bowl with two hands.  I can't really serve on a food bank, because I can't lift the boxes.  I can hold a mic with one hand at karaoke.  I can do that.  I can't really cook like that.  I need, like, pretty much assistance to hold the pot sturdy, when I need to lift it and strain or something.  And I can't do phlebotomy anymore.  When we have storage coming in, like, with supplies, I can't help out with that.

Q.    Are you able to use your left arm to lift?

A.    Nothing heavy.  I can lift a purse, like, a small bag.  I can lift a water, soda, stuff like that, but nothing heavy.

Q.    Are you able to drive?

A.    I'm starting to use my left arm now.

Q.    At any point after your left shoulder surgery, were you unable to drive?

A.    No, I couldn't drive.

Q.    For how long?

A.    I didn't drive for -- after surgery, I didn't drive for, like, about two months and -- two months, like, and a week.

Q.    Okay.  What church do you attend?

A.    Hope Church of Christ.

Q.    Is that in Fort Lauderdale?

A.    Yes.

Q.    And you have three children that are still with us?

A.    Yes.

Q.    Do you have any grandchildren?

A.    No.

Q.    Do your children live in Fort Lauderdale too?

A.    No.  Only one lives in Tampa, and two -- one lives in Miami and one lives in Fort Lauderdale.

Q.    None of those children were on the cruise?

A.    No.

Q.    Did any of those children take care of you in the two months following your left shoulder surgery?

A.    Well, just in -- I think it's some -- Instacart, send food.

MR. JARNAGIN:  Are we on Exhibit 7?  I'm going to mark as Defense Exhibit 7 Plaintiff's

Notice of Answers and Objections to Defendant's Initial Interrogatories.

     (Defendant's Exhibit No. 7 was marked for identification.)

BY MR. JARNAGIN:

Q.    Ms. Cole, have you seen these answers to interrogatories before today?

A.    No.

Q.    Did you sign these answers to interrogatories electronically?  I'm looking at the last page.

A.    Yes, that's my signature.

Q.    You can turn to Interrogatory Number 10.

A.    Let me count because they don't have numbers.

Q.    I know.  Let me help you.

A.    Oh, okay.

Q.    So Interrogatory Number 10 asks if you've ever suffered from any medical problems in the same area of your body as identified in Interrogatory Number 8, so your left shoulder.  So you've never, prior to going on the cruise in July of 2022, have been medically treated for any issues with your left shoulder, right?

     MR. DIEPPA:  Object to form.  That's not what the interrogatory says.

BY MR. JARNAGIN:

Q.    Prior to going on the cruise in July 2022,

you've never been medically treated for any issues with your left shoulder?

MR. DIEPPA: Same objection.

BY MR. JARNAGIN:

Q. You can answer.

A. No.

Q. Prior to going on the cruise in July of 2022, have you ever had any MRI, X-ray or CT scan taken of your left shoulder?

A. No.

Q. And if you can turn to Number 21.

A. Okay.

Q. As of July 22nd, 2022, did you have any social media accounts, like, TikTok, Facebook or Instagram?

A. As of July -- I had -- I'm on Facebook before. Yes, I had Facebook before. And TikTok, yes.

Q. So as of July 22nd, 2022, you had Facebook and TikTok?

A. Yes.

Q. And you would post to Facebook and TikTok?

A. Say that again.

Q. You would post content to Facebook and TikTok?

A. Yes.

Q.    So at the end of answer to Interrogatory Number 21, it says, "Plaintiff does not maintain any social media accounts."  What did you mean by stating that in your answers to interrogatories?

A.    Rephrase that again.

Q.    So I'm looking at 21 and then we have an objection on the first part.  And then the last sentence is, "Plaintiff does not maintain any social media accounts."

A.    Yeah, I have an Instagram, but I'm not on it as active.  I don't quite remember.

Q.    Okay.  So is there a reason that you answered that you do not maintain any social media accounts?

A.    No, there's no reason.

Q.    Okay.  So you did maintain social media accounts between July 22nd, 2022, and July 25th, 2022, correct?

A.    Correct, to my knowledge.

Q.    And you said Facebook and TikTok, right?

A.    Yes.

Q.    And sometimes Instagram?

A.    Yes.

Q.    Did you post content to TikTok from July 22nd through July 25th, 2022?

A.    I don't recall.  I just, like, watch videos.

Q.    Did you post content on Facebook from July 22nd, 2022, through July 25th, 2022?

A.    Maybe.  Always post, like, scriptures or post sayings or TV shows somewhat.

Q.    Is your Facebook account still active?

A.    No, I've been off of Facebook.

Q.    For how long?

A.    I'm going to say probably now about -- I had got reborn again April, meaning, baptized over.  And I fast away from social media.

Q.    Do you still have a TikTok account?

A.    No, I do not.

Q.    When did you stop using the TikTok account?

A.    I believe around the same time, when I was reborn again or in April.

Q.    Is there any reason why you stopped using social media as part of being reborn again with your faith?

A.    Yes, a lot of negativity.  Every time you look on it, you see a lot of evilness or racial profiling going on.  And I wanted to block my mind from all of that.

Q.    As we sit here today in August of 2023, do you maintain any social media accounts?

A.    No.

Q.    Now, I'm going down to 24 on the same page, this asks about motor vehicle accidents.

A.    Uh-hm.

Q.    So we have a 2018 auto accident in Hollywood, Florida, that's listed?

A.    Yes.

Q.    I don't think we discussed that one earlier. What happened in 2018?

A.    I was sitting at a corner and someone in the back bumped the back of my car.

Q.    Did you seek medical treatment after this person bumped the back of your car?

A.    No.  But I did go to physical therapy by my house.

Q.    And what physical therapy did you attend?

A.    I think the name of it is Plantation -- Plantation Therapy, it's on Broward Boulevard and 441.

Q.    And you have lower back injury listed under this?

A.    Yes.

Q.    Did you injure your lower back?

A.    Well, when he hit me, I felt a little sting down in the bottom.  And I went there for, like -- I want to say, like, two weeks.

Q.    Other than going to the physical therapy for

two weeks, did you see any doctors as a result of this auto accident?

A.  No.

Q.  Did you file any type of lawsuit as a result of that auto accident in 2018?

A.  No.  Only thing, my car -- they paid for my car to get fixed.

Q.  So you made a --

A.  A claim.

Q.  Strike that.  So you made a claim through your car insurance?

A.  Yes.

Q.  Do you have the same car insurance today?

A.  Yes.

Q.  And what car insurance do you have?

A.  Progressive.

Q.  Did you file any claim for bodily injury with Progressive as a result of the auto accident?

A.  No.

Q.  You didn't see any other doctors, you just attended two weeks of physical therapy?

A.  Correct.

Q.  And then 2012 auto accident, I believe, we did discuss that one?

A.  Correct.

Q.    Have you been involved in any other motor vehicle accidents since 2012 other than these two?

A.    Not to my knowledge.

Q.    And you did not see any type of cash settlement as a result of the 2018 auto accident?

A.    No.

Q.    And you did not receive any type of cash settlement as a result of the 2012 auto accident?

A.    I believe I did for bodily, yes.

Q.    Did that settlement -- okay.  So let's talk about the 2012.

A.    Okay.

Q.    Did you retain an attorney?

A.    Yes.

Q.    Okay.  What was the name of the attorney that you retained?

A.    I don't remember.

Q.    Did you retain an attorney in Fort Lauderdale?

A.    No.  I was living in Miami at 10325 at the time.

Q.    When you retained the attorney, how much time passed before you received a cash settlement?

A.    Oh, a while.  I can't remember, but it was a while.

Q.    Did you give any statement under oath as part of that proceeding?

A.    I don't remember.

Q.    And you don't know the name of your attorney?

A.    I don't.  It been so long, I can't recall.

Q.    Did you give deposition testimony like you're giving here today?

A.    Yes, someone came out to the house -- no, like, I guess the attorney.

MR. DIEPPA:  Don't say anything that you spoke with that attorney, don't repeat anything that you spoke about with him or anyone from his office.  If you can't answer the question, you can't answer the question.

BY MR. JARNAGIN:

Q.    Okay.  So I can't ask anything about conversations between you and your own attorney as part of that.  Did any other attorney ever question you, like, you know, we're doing here today with a court reporter?

A.    Oh, no.  No.

Q.    Do you know if a lawsuit was filed in court as a result of the 2012 auto accident?

A.    No, it wasn't a lawsuit.  It was, like, the insurance, like, bodily injury.

Q.    Yeah.  And did you see doctors as a result of

the 2012 auto accident?

A.    I'm not sure.  I don't remember.

Q.    Earlier I think you told me you went to North Shore Hospital?

A.    Yes.

Q.    Does that sound right?

A.    Yes.

Q.    Did you see any other medical providers outside of North Shore Hospital as a result of the 2012 auto accident?

A.    No.

MR. JARNAGIN:  I'm going to mark as Defense Exhibit 8.

(Defendant's Exhibit No. 8 was marked for identification.)

BY MR. JARNAGIN:

Q.    This is basically a document of screenshots that I believe is your Facebook account and then some TikTok screenshots, and all I want to do with this is confirm that these were your accounts.

A.    Okay.

Q.    All right.

A.    Okay.

Q.    So on the first page of Defense Exhibit 8, this Eureka Cole screenshot we're seeing at the top of

the page, was that your Facebook account?

A. Yes.

Q. Did anyone else have access to your Facebook account and was able to post content other than yourself?

A. No, I don't believe so.

Q. And then I'm looking at page 2, which consists of screenshots of videos posted to TikTok. In the upper left-hand corner it says "Eureka Cole," were these screenshots of videos from your TikTok account?

A. Yes.

Q. So you posted the videos to your TikTok account?

A. I believe, yes.

Q. And this particular screenshot that we're looking at on page 2 at the top, is that you in Jamaica?

A. Yes, it is.

Q. So you're riding a horse in Jamaica?

A. Yes.

Q. And you vacationed there in March of 2023, this year, right?

A. Yes. Uh-hm.

Q. Are you currently taking any medications for your left shoulder?

A. I take ibuprofen if I'm having pain.

Q. Is -- strike that. Are you currently taking

any medication prescribed by your doctor for your left shoulder?

A.    No, not at this time.

MR. JARNAGIN:  Thank you, Ms. Cole.  I don't have any further questions for you.

THE WITNESS:  Thank you.

CROSS-EXAMINATION

BY MR. DIEPPA:

Q.    Ms. Cole, I just wanted to follow up on some things you were asked here about your accident on July 24th, 2022.  Okay?

A.    Yes.

Q.    Okay.  First, regarding the incident, do you recall if there were crew members, meaning employees of the cruise ship, whether they were working in a dining area or anything else -- do you recall seeing those in the area where you were injured before the incident?

A.    Yes.

Q.    Okay.  The Filipino, I guess he was a waiter, was he in the area of that station before your incident occurred?

A.    Yes.

Q.    Okay.  And at the time you saw him before the incident occurred, were the winds still blowing like you said before?

A.    Yes, it was.

Q.    Okay.  And in terms of the containers, you were shown a photograph here, Exhibit 3.  From my understanding of your testimony, the objects that hit you weren't the containers themselves but they were several lids from the containers?

A.    Correct.

Q.    Okay.  So that's not what's depicted in Exhibit 3, is it?

A.    Correct.

Q.    Okay.  And after the incident I think you testified that you looked and you saw several lids of containers on the floor?

A.    Correct.

Q.    You were also asked about how the incident happened.  And I know you were facing away at the time of the incident.

A.    Correct.

Q.    But you did speak to your husband after the incident about how it occurred?

A.    Yes.

Q.    Okay.  Did he tell you that multiple containers hit you in the back?

A.    Yes, he did.

Q.    And did that contribute to your understanding

of how this incident happened?

A.    Yes.

Q.    And from what you could see, given the position where he was sitting, would he have been able to see the entire incident?

A.    Yes, he would have.

Q.    Okay.  If you hadn't been sitting there, would those container lids have continued on and possibly struck your husband?

A.    Yes, in the face.

Q.    And if you know, the worker who was closest to you prior to the time this incident occurred, can you estimate for me how close he would have been approximately right before the incident happened?

A.    About from me to about the court reporter, like, how many feet.

Q.    All right.  So I call that around, like, between 5 to 6 feet.

A.    Okay.

Q.    Okay.  And did -- you mentioned you -- when the incident -- when you got struck, he stated something to that employee?

A.    Yes.

Q.    What was it that he stated again?

A.    He was mentioning that the employee was like,

"Whoa, did you see that?"

Q.   And then did he after that call the additional employees?

A.   Yes, correct.

Q.   So that five- to six-minute period there was already one employee there --

A.   Yes.

Q.   -- that witnessed the incident and that was the time you waited for the other individuals that worked for the ship to show up?

A.   Correct.

Q.   And you were asked about a medical record here from the ship's doctor, Exhibit 4.  Can you see that?  Do you recall being asked about this document?

A.   Yes.

Q.   Okay.  And here -- there's some statements here, "Patient verbalized she was sitting at the Lido deck when container hit her left shoulder onset 6:20 p.m."  Do you recall stating that to the physician?

A.   Yes.

Q.   Okay.  And you were asked about if you had redness or swelling.  And looking at page 5, can you see the injury that the ship's doctor diagnosed you with here?

A.   Yes.

Q.    And what would that be?

A.    "Bruise and contusion."

Q.    Got it.  And they did put a cause of the injury here in the record, didn't they?  What did they put as injury cause?

A.    "Struck by object."

Q.    And you didn't write this, this would have been the ship's doctor?

A.    Correct.

Q.    And in terms of the severity of the injury, can you see the notation here from the doctor from Carnival cruise line?

A.    Yes.

Q.    And what did he indicate as the cause of your injury was?

A.    Beyond first aid.

Q.    Is that what he told you, that you were going to need further treatment beyond the ship?

A.    Yes.

Q.    Okay.  And then the doctor who examined you -- the employee of Carnival cruise line who examined you, he also made some other entries here.  Do you see where he said "Could a preexisting medical condition could have contributed to the incident?"  Do you see that?

MR. JARNAGIN:  Objection to form.

THE WITNESS:  Yes.

BY MR. DIEPPA:

Q.    What did he say in his note, the doctor that examined you?

A.    No.

Q.    So according to the Carnival cruise line doctor, he said that preexisting medical condition would not have contributed to this incident?

A.    Yes, he did.

Q.    All right.  And he also examined you to see if alcohol or drugs would have contributed to the incident.  What did the doctor say according to the record?

A.    No.

Q.    No.  Okay.  And you say you had a -- you slipped and fell on the Saturday --

A.    Yes.

Q.    -- before your shoulder was injured.  But from my understanding is that you actually had no injury, it was just you slipped and fell?

A.    Correct.

Q.    And after you went to the ship's doctor, you did pursue first aid, you went to the emergency room at HCA Hospital, I believe?

A.    Yes.

Q.    All right.  And in terms of your injuries and the parts of your injuries, parts of your body you complained of injuries, is this hospital record more or less an accurate description that you were having pain in your shoulder and your back area?

A.    Correct.

Q.    Okay.  In terms of the description we see here on page 5, and we're looking at Exhibit 6, you also, according to the record, had acute back pain?

A.    Yes.

Q.    And that would have also been related to the containers hitting your back?

MR. JARNAGIN:  Objection to form.

THE WITNESS:  Correct.

BY MR. DIEPPA:

Q.    And you were asked about your -- the treatment you received at CitiMED.  You've seen your CitiMED records and you went to CitiMED, right?

A.    Yes, correct.

Q.    Is the only reason you went there because of the incident that happened with you on July 24th, 2022?

A.    Yes.

Q.    Okay.  And in terms of the pain in your shoulder, is that pain that you were treated for that

manifested, meaning that it appeared first on July 24th, 2022?

A.   Yes.

Q.   Okay.  And you were asked about your interrogatories, where it states here these interrogatories were answered by the plaintiff, Eureka Cole, and with the assistance of counsel.  You do recall my office contacting you to help you answer these questions?

A.   Yes.

Q.   And you were asked many questions about the injuries you suffered as a result of this incident looking at Interrogatory Number 9, there's a list there. Can you see that?

A.   Yes.

Q.   Does that list reflect the injuries you were diagnosed with as a result of this incident?

A.   Yes.  Arthroscope, yes.

Q.   And you were asked some questions about your medical history and I think you did the best job you could do.  But how old are you today, as we sit here today?

A.   I'm 52 years old.

Q.   Okay.  Do you remember every incident of medical treatment you've ever had since the day you were

born?

A.    No, I do not.

Q.    Do you remember if you bruised your knee when you were in kindergarten or not?

A.    No, I do not.

Q.    Fair to state in terms of whether you had X-rays, MRIs or any medical treatment to any parts of your body, you would rely on your medical records, your medical history and whatever is stated in there?

A.    Correct.

Q.    Would that be more accurate than your memory today at this deposition?

A.    Yes, it will.

Q.    Okay.  So if it turned out that in the past in a moment where you maybe forgot a medical record, had a notation about treatment to a part of your body or a doctor that you saw, would you defer to that medical record over your testimony here today?

MR. JARNAGIN:  Objection to form.

THE WITNESS:  Yes.

BY MR. DIEPPA:

Q.    And once again that's only because today you're testifying as to the best of your memory and recollection?

A.    Yes, I am.

Q.    Okay.  And you were shown some photographs from your Facebook page concerning a horse riding and things like that.  First, let me ask you, have you ever agreed to allow anyone from the defendant or anyone working for the defendant or attorney from the defendant to add themselves as a friend to your social media?

A.    No.

Q.    Did you ever post that for the benefit of any attorney or investigator from the defendant?

A.    No.

Q.    Okay.  Did you intend for all those photographs to be private?

A.    Yes.

Q.    Okay.  Did anyone notify you when they were downloading or pulling those photographs from the Internet?

A.    No, they did not.

Q.    Okay.  So anyways since they were able to get ahold of your private moments without your permission, the photograph of the -- or the video of you horseback riding, you -- at that point in time you had already had your shoulder surgery?

A.    Yes.

Q.    Was it relatively successful at that point in time?

A.    If they notice in the video, the left arm is stiff.  But like I said, I never said that I couldn't use it, it's just to a disadvantage.  The right arm is the strength.

Q.    That's not your horse, is it?

A.    No.

Q.    Was that an excursion where you were helped to get onto the horse?

A.    Yes.

Q.    Who helped you get onto the horse?

A.    Two gentlemen.

Q.    And you rode the horse and you enjoyed the ride?

A.    Yes.

Q.    Did they also help you get off?

A.    Yes.

Q.    You would not have been able to get on that horse?

A.    Get on or off, no.

Q.    Okay.  And that's fine -- I mean, you had the surgery and at least it restored some function to your shoulder that you did not have before?

A.    Yes.

Q.    And as far as the vacation that you had to Jamaica, were you able to do everything and enjoy

everything to the same level as you would have been prior to this injury?

A.    No.

Q.    Okay.  Elaborate for me some of the things you couldn't do on that vacation that you would have normally done.

A.    I wanted to do the -- how you -- it -- I think it's the hang glide.  Where you have to put both arms up in the air and slide down on, like, a -- it's like an iron -- I think it's hang gliding.  You go from the top --

Q.    Zip-lining?

A.    Zip-line.

Q.    Couldn't do that?

A.    Couldn't do that, yeah.

MR. DIEPPA:  Can I see the exhibit there?  The last one you marked.  Thank you, sir.

BY MR. DIEPPA:

Q.    And you were able to look through these photographs.  There's several pages here.  Can you see yourself lifting anything heavy with your shoulder in any of these photographs?

A.    No.

Q.    And there's also -- well, it's not a page number, but there's a post here.  July 28th, 2022, and it

states:  "Happy heavenly birthday to my son Karnis O'Neil Dames II.  He would have been 22 years old today.  May he RIP.  Mommy will always love you."  Do you know why you made that post?

A.    Yes.

Q.    Why?

A.    As I indicated earlier, I had a son that passed away.  And that was his birthday, July 28th.

Q.    Okay.  Does that have anything to do with your injury that you're here about today?

A.    No.

Q.    Do you know why --

A.    Or the tattoo with my deceased son.

Q.    That's a tattoo you have?

A.    Yes, here.

Q.    Oh, it's there.  What is it, your right?

A.    My right arm, yes.

Q.    Okay.  Do you think your post here, about your son who passed away, has any -- I mean, relevance to whether or not you're injured or not today?

A.    No.

Q.    Is that post -- and I'm sorry to ask about your son.  I hate to have to ask this, is that something that you do every day, you know, things like that, to just kind of remember him?

A.    Uh-hm, like, yeah.

MR. DIEPPA:  That is all, Ms. Cole.  Thank you.

MR. JARNAGIN:  I don't have any further questions.  Thank you for your time.

THE WITNESS:  You're welcome.

THE REPORTER:  Read or waive?

MR. DIEPPA:  She will read.

THE REPORTER:  Are you ordering?

MR. JARNAGIN:  Yes.

THE REPORTER:  Do you want a copy?

MR. DIEPPA:  Send an e-mail with an estimate.

(The deposition concluded at 2:20 p.m.)

CERTIFICATE OF OATH

STATE OF FLORIDA:
COUNTY OF BROWARD:

I, Alyssa Zumpano, Stenograph Shorthand Reporter, certify that EUREKA L. COLE personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 2nd day of August, 2023.

_____
Alyssa Zumpano,
Stenograph Shorthand Reporter
Notary Public State Of Florida
Commission No: HH 188364
Commission Expires: February 5, 2026

CERTIFICATE OF REPORTER

STATE OF FLORIDA:
COUNTY OF BROWARD:

I, Alyssa Zumpano, Stenograph Shorthand Reporter, certify that I was authorized to and did stenographically report the foregoing deposition of EUREKA L. COLE; that the review of the transcript was requested; and that the foregoing Pages 4 through 118, inclusive, are a true and complete record of my stenograph notes.

I further certify that I am not a relative or employee of any of the parties, nor am I a relative or counsel connected with the parties' attorneys or counsel connected with the action, nor am I financially interested in the outcome of the action.

DATED this 4th day of September, 2023.

_____
Alyssa Zumpano,
Stenograph Shorthand Reporter