UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
CASE NO. 23-cv-60532


EUREKA COLE,                              Fort Lauderdale, Florida

            Plaintiff,                    May 29, 2024

      vs.                                 9:35 a.m. - 3:19 p.m.

CARNIVAL CORPORATION,                     Volume 1

            Defendant.                    Pages 1 - 197
_____

                        BENCH TRIAL - DAY 1
            BEFORE THE HONORABLE MELISSA DAMIAN
                 UNITED STATES DISTRICT JUDGE

APPEARANCES:



FOR THE PLAINTIFF:              RAYMOND R. DIEPPA, ESQUIRE
                                FLORIDA LEGAL
                                150 Southeast 2nd Avenue
                                Suite 1001
                                Miami, Florida 33131

FOR THE DEFENDANT:              MICHAEL DRAHOS, ESQUIRE
                                W. COOPER JARNAGIN, ESQUIRE
                                ASHLEY N. GENOESE, ESQUIRE
                                GRAYROBINSON, P.A.
                                515 North Flagler Drive
                                Suite 650
                                West Palm Beach, Florida 33130



STENOGRAPHICALLY REPORTED BY:

                    MAIRELYS ALBO, RPR
                    OFFICIAL COURT REPORTER
                    United States District Court
                    Southern District of Florida
                    299 East Broward Boulevard
                    Fort Lauderdale, Florida 33301

                              I N D E X

WITNESS                                                          PAGE

LUCIEN COLE

DIRECT EXAMINATION BY MR. DIEPPA                                    42
CROSS-EXAMINATION BY MR. DRAHOS                                     85
REDIRECT EXAMINATION BY MR. DIEPPA                                 106

DR. JOSEPH CHALAL

DIRECT EXAMINATION BY MR. DRAHOS                                   110
CROSS-EXAMINATION BY MR. DIEPPA                                    160
RECROSS-EXAMINATION BY MR. DRAHOS                                  194

CERTIFICATE OF REPORTER                                           197


                              EXHIBITS



Exhibit                                   Marked      Received
Plaintiff's 2-9                                       41
Joint 1-10                                            41
Defense 1-6                                           56
Defense 16                                            56

(Case called to order of the Court at 9:35 a.m.)

COURTROOM DEPUTY:  All rise.

The United States District Court for the Southern District of Florida is now in session with the Honorable Melissa Damian presiding.

The Court calls Case No. 23-cv-60532-Damian, Cole v. Carnival Corporation.

Counsel, please state your appearances, beginning with the plaintiff.

MR. DIEPPA:  Good morning, Your Honor.  Raymond Dieppa here for the plaintiff, Eureka Cole.

THE COURT:  Good morning.

MR. DRAHOS:  Good morning, Your Honor.  Michael Drahos from the law firm of GrayRobinson on behalf of the defendant, Carnival Corporation.

MR. JARNAGIN:  Walter Cooper Janragin on behalf of defendant Carnival Corporation.

MS. GENOESE:  And Ashley Genoese on behalf of Carnival Corporation.

THE COURT:  All right.  And who else is -- is this your corporate representative?

What's your name?

MS. BORCEGUE:  Monica Borcegue.

THE COURT:  Good morning.  Everybody can be seated.

So we are here.  I'm sure you feel, Ms. Cole, like

finally.

We are here for the final trial of Ms. Cole's claims against Carnival Corporation.  I think we talked about it the other day, that I think it would be a good idea for you all to give an opening to sort of introduce your theory of the case going forward.  We have a weird day scheduling-wise.  We tried to give you all a heads up just for your own planning purposes.

We are going to have to break for a sentencing, and I might have freed up one of the things midday.  But it's going to be a little choppy today so we just tried to let you all know to plan on a very short day today.

But I did want to hear openings and get rolling and then we will spend a much longer day.  We've tried to free up as much as possible for you all tomorrow.

MR. DRAHOS:  Thank you, Your Honor.  I did want to address that right out of the gates if possible.  We have one scheduling snafu in that regard.  Our expert witness, Dr. Chalal, he is actually in surgery at the moment, but he's on standby with me.  He's going to text me as soon as the surgery is over.  He can only testify today.

THE COURT:  Okay.

MR. DRAHOS:  His surgical schedule on Thursday and Friday conflicts him.  So we talked to plaintiff's counsel about this to let him know that we would be taking Dr. Chalal out of order.  I just wanted to know if there's a possibility

as to how long we would be going today so that I can give Dr. Chalal some guidance in terms of when he should be here.

THE COURT:  And roughly how long do you think his testimony will take on direct?

MR. DRAHOS:  Well, we plan for two hours.  But depending upon the Court's availability, if the Court is saying we are going to be ending much sooner today, I'm going to be much more expeditious in my questioning to make sure we get it done.

THE COURT:  Okay.  Let's kind of think through this.

How long did you plan your openings out for?

MR. DIEPPA:  Your Honor, I mean, probably like 15, 20 minutes.  The only issue is -- and I did discuss this with counsel for defense before today.  You know, and I don't know if Your Honor is ruling on objections.  We did wish to raise an objection to the testimony of Dr. Chalal based on the basis for his testimony under 702.  But other than that, you know, I'm happy to try to accommodate counsel for the defense in terms of scheduling, although it might result in Dr. Chalal being the first witness in the case.

THE COURT:  Okay.  So -- and were you also around the 15, 20-minute mark on openings?

MR. JARNAGIN:  Yes.  Our opening is only going to take about five minutes.

THE COURT:  Okay.  Great.

All right.  So I -- let's see.

So we can do openings.  And then otherwise you would start with the plaintiff or what was your intention?  How were you going to start?

MR. DIEPPA:  Because of what we were advised in terms of timing, I was going to start with the plaintiff's husband. A shorter witness.  You know, and --

THE COURT:  Short in duration, not in stature.

MR. DIEPPA:  Yes.  Shorter in duration.  Absolutely, Your Honor.

So, you know, that's the issue.  And then obviously there's some objections that were raised to some of the exhibits.  And Your Honor has made some initial rulings on motions in limine.  And I only say that, Your Honor, because the prior scheduling order had a prohibition on filing motions in limine and that's why none were filed.

THE COURT:  Yeah.  Because it's me.  It's a bench trial.

Okay.  So then if we took openings, and Mr. Cole, and then I will break and do the sentencing, and then -- then who would your next witness have been?

MR. DIEPPA:  Time-wise, at that point I can either play a video or put Ms. Cole on the stand.  Obviously I would like to have Ms. Cole done on the same day.  So, you know, I've got flexibility.  I've got video witnesses as I've advised the

Court. So, you know, it probably would be a video one, assuming that the Court had to end early today.

THE COURT: So I would say I need to end around 2:00 at the latest. So I don't -- I mean, I can't imagine Ms. Cole will be that -- I mean, able to finish direct and cross so quick.

So what if we tried to take your expert. I can hear argument regarding the expert after the sentencing and then just plan on assuming he testifies. Plan on him around 1:00?

MR. DRAHOS: Okay. Thank you, Your Honor.

THE COURT: I mean, you know, my sentencing will take not even an hour. I can bring you guys -- have you going again at 12:00. Sorry, you won't really get a lunch break today. Maybe take it during the sentencing. And then obviously I need to give our court reporter a break to eat something.

So I am thinking, you know, we start a little after 12:00, have some argument, and then have the expert. We will play around there. Maybe a video first, maybe -- you see when the expert is available. Just know I've got 'til about 2:00. So we will have two hours to work for argument, the expert, and possibly a video depending logically how everything works out.

MR. DIEPPA: Would Your Honor like a copy of the authorities? They were already provided to opposing counsel. I can give it to you at 12:00.

THE COURT: I have the argument. You mean just the

copies of the cases?

MR. DIEPPA:  Yeah.  There's no motion so for Dr. Chalal it will just be a copy of the cases.

THE COURT:  Sure.  You have an extra copy for us or you want us to make a copy?

MR. DIEPPA:  No.  I have extra copies for the Court.

May I approach?

THE COURT:  Yes.

MR. DIEPPA:  And Dr. Chalal's deposition transcript was already entered with the court.  I can provide the Docket Entry.

THE COURT:  Where is my binders?

MR. DRAHOS:  Your Honor, may I raise one point before the Court begins to read?  I don't know if you're planning to review that case law now.

THE COURT:  Not yet.

Where are my binders?  Do my clerks have them or no?

MR. JARNAGIN:  I can approach with a binder.

COURTROOM DEPUTY:  Thank you.

THE COURT:  So "Chalal" is C-h-a-l-a-l.  You have that? I don't know if you have -- you have the witness list?

Okay.  So you want to take up Dr. Chalal now or you want to wait until after the break?

Why don't we have -- well, before we go with openings, tell me what other pretrial issues we should address so I know

as we're moving into other witnesses.

MR. DIEPPA: There's some objections to some exhibits, Your Honor.

THE COURT: Okay.

MR. DIEPPA: Not many. Actually, we've been able to agree. So I don't know if Your Honor want us to enter this evidence with the clerk already because most of it is stipulated to.

THE COURT: Okay.

MR. DIEPPA: There's a couple of objections to certain exhibits, which, you know, we can probably deal with in a short amount of time.

THE COURT: So what are you pointing at there? What is that?

MR. DIEPPA: This? This is the trial notebook. I believe you guys were bringing a copy for the judge; right?

THE COURT: I have -- that's what I have.

MR. DIEPPA: Yeah. This is just --

THE COURT: So tell me where the objections are.

MR. DIEPPA: Yeah. They were noted on the exhibit -- there should be an index on the first couple of pages, Your Honor.

MR. JARNAGIN: And as far as a few of plaintiff's objections to defendant's exhibits, we're going to be able to take some of our exhibits out so there won't need to be any

argument heard.

THE COURT:  Okay.  Tell me what those are.

MR. JARNAGIN:  All right.  So that's going to be Exhibit 11 and 12, the CVs of Dr. Chalal and Dr. Courtney.

THE COURT:  Right.

MR. JARNAGIN:  And then we will also be taking out Defense Exhibit 14, studies cited by Amy Courtney.

THE COURT:  Okay.  Well, they have been marked in case they are needed, all of those are the kind of thing if somebody has to cross somebody with it, it's fine.  But you're saying you're not going to enter it in as substantive evidence.

MR. DIEPPA:  And, Your Honor, as to defense objection to Plaintiff 1, Your Honor's ruled on that, and the reason we offer it is on the basis of conditional relevance.  And I can provide that argument.  But it would only be conditionally relevant, conditionally admissible at this time and I can explain to the Court why.

THE COURT:  Well, okay.  I would imagine that would just depend on what's coming, but you tell me.

MR. DIEPPA:  Yes, Your Honor.

So Your Honor initially ruled that the prior incident information was not substantially similar and we understand that.  The reason that we are proffering it is because the nature in which this incident happened, and as Your Honor said, the velocity of the winds and whether the wind was blowing is

very important in this case.  You will hear testimony that there was a Carnival employee handling and stacking these containers immediately before the accident.  So the reason we offer it is because if ultimately the argument becomes from Carnival that the wind did not knock this over, could not have knocked this over for whatever reason, then it's more likely than not that this person dropped it on Ms. Cole --

THE COURT:  Okay.

MR. DIEPPA:  -- because as you will see -- and then the incident still becomes similar because there's incidents --

THE COURT:  Right.  Of people dropping things.

MR. DIEPPA:  Of people dropping things.

THE COURT:  That makes sense.  That's just going to depend, you know, on the evidence.

MR. DIEPPA:  Depends on the way it shakes out.

THE COURT:  And then I imagine the Defendants 6, 7, 8, 9, and 10 to which plaintiff objected on relevance grounds, and 13, which are demonstratives, 15, the weather report, let's -- you know, these are the kinds of things, let's see how you intend to use them.

MR. DIEPPA:  Yeah.  The issue with the weather report, Your Honor, is that there's no dispute that the incident happened after the cruise ship left the terminal and was underway in the middle of the ocean.  The weather report that's being offered by the defense is from the Nassau Airport.  The

Nassau Airport -- and I have the Google Maps to show you -- is minimum ten miles away from the cruise terminal, and who knows how far away from where the ship actually was.

Additionally, the corporate rep admitted that they had no knowledge or measurement of what the wind speeds are on the ship, and I can provide that testimony to Your Honor.

Finally, it's being offered through Ms. Courtney; Ms. Courtney was not disclosed as a meteorologist.

THE COURT:  Right.

MR. DIEPPA:  And I don't think she has any qualifications to say meteorologically what the winds would've been.  But obviously if it's happening ten miles away on land in the airport in the middle of Nassau, has no relevance to what's happening to a ship out in the ocean, you know, more than -- at least ten miles away, but probably more because the ship had been moving for sometime, had left port.

THE COURT:  I mean, I -- so without having heard Dr. Courtney's testimony, and I actually did take a look at this, I'm guessing it's going to be something like, you know, if the winds are such and such and we are on a ship out here and we're in this location, this is how, you know, fast the plastic lid might be going.

And how did you make your determinations?  Well, I relied on the weather report that day.  And then you can say let's just talk about how different that weather report is from

what it was on the ship?

MR. DIEPPA:  That would normally be true, Your Honor. But Ms. Courtney did not provide that opinion in her report. In her report she simply included the report, but when I asked her if she had an opinion she actually said in her deposition testimony that she was not a meteorologist, that she was --

THE COURT:  Right.  I don't think she's testifying what the weather was.  I don't think that's her job.  I think her job is if the winds are going this fast or, you know, if the conditions are like this, right, then what happens?

MR. DIEPPA:  She wasn't a Rule 26 meteorologist, and those are not her Rule 26 opinions which is the issue there.

THE COURT:  No.  Her opinions are -- what are her opinions?  She's going to tell us how fast the lid --

MR. DIEPPA:  No.

THE COURT:  What kind of force it was going to have, is that what it was?

MR. DIEPPA:  No.

THE COURT:  Oh.

MR. DIEPPA:  She didn't make any calculations, Your Honor, when I deposed her.

THE COURT:  Okay.  Wait.  Wait.  Hold on.

What are you offering her for?

MR. DRAHOS:  She's a biomechanics expert.  She's going to attest the impact of body mechanics on injury proclivity.

So she's going to talk about the direction in which this impact came into contact with Ms. Cole, how that would effect the body, and ultimately why that type of an impact could not possibly cause what they're claiming here.

MR. DIEPPA:  But in terms of -- and this is at pages 25 to 26 of her deposition -- the wind and the force of impact, she testified that she would not be offering opinions and had no opinions on those two issues.

THE COURT:  Right.  She's not going to offer an opinion on what the wind speed was; she's going to be offering an opinion that if the wind speed were X, then the force --

MR. DIEPPA:  No.

THE COURT:  -- would be --

MR. DIEPPA:  She's not doing that either.

MR. DRAHOS:  She can talk about the impact as it relates to Ms. Cole due to some circumstantial evidence; like the absence of certain kind of findings that you would expect with a certain degree of force.

THE COURT:  Okay.

MR. DRAHOS:  So they're making a claim -- well, at least during discovery, that the force of the impact was equatable to being hit by a truck.

Dr. Courtney, being an expert in trauma and biomechanics, is going to be able to address that and say if that were indeed the case, there would be certain types of

markers that would be consistent with that kind of an impact, which could not be possible with this type of an object.

MR. DIEPPA:  Your Honor, I will just read from her deposition.  This is page 26, line 3 through 6.

My question to her:  "Am I correct in that understanding that you don't have a measurement of the speed or force of impact in the report?

"In the report" --

"ANSWER:  That's correct."

She goes on here -- and this is at page 11, line -- page 26, line 11.

"Okay.  But I know there's a report.  Did you form an opinion as to the estimated wind speed at the time of the incident?

"Not independent opinion.  I would have just relied on contemporaneous weather reports.

"Okay.  So you didn't come up with an opinion; correct?

"ANSWER:  I'm not a meteorologist.  I did research on that information."

That's her testimony there.  So there's nothing there that says she made a measurement or a calculation as to impact. That's what she told me at her deposition.  There's no calculation in her report, absolutely none.  So I would be very uncomfortable for Ms. Courtney being put on the stand to offer that opinion on this point, and then relying on a weather

report that has -- it's undisputed is miles and miles and miles away from where the incident occurred and not even specific to the time the incident occurred.

THE COURT:  I don't -- do I have that testimony?  Where is that?

MR. DIEPPA:  This is docketed for Your Honor.

THE COURT:  Is it in my notebook?

MR. DIEPPA:  It was filed with the court -- I'm not sure if it's in the notebook, Your Honor.  But we did make sure to file it.

And it is at 93, Docket Entry 93-6, deposition of Amy Courtney.

And if you're looking for Dr. Chalal's deposition, that was filed at Docket Entry 93-5.

THE COURT:  All right.  Well, she's not testifying today in any event so I will be able to take a look at her testimony and her deposition later.

Dr. Chalal -- so, and the reason you are bringing all this up anyway is because you don't want her -- you don't want the defense to offer the weather reports?

MR. DIEPPA:  Yeah.  It's also hearsay, Your Honor.  Because it's not --

THE COURT:  The weather reports?

MR. DIEPPA:  Yeah.

THE COURT:  For sure.

MR. DIEPPA:  It's not even like a NOAA report.

THE COURT:  I mean, I don't think they are trying -- are you trying to offer it as like put it into evidence, the actual weather report?

MR. DRAHOS:  No.  We can give -- the Court can take judicial notice of the weather.  I think the arguments that are being made by the plaintiff here are really more to the weight than as it relates to the admissibility.  If he thinks that Dr. Courtney's reliance upon this weather study is invalid then he can challenge the merits of her opinion during cross-exam.

THE COURT:  Agreed.

MR. DIEPPA:  The issue is that it's -- that weather report is not in the category of things that Court can take judicial notice of because it's not a government weather report, and it's not a document that's not subject to debate or, you know, whose accuracy is in question.  So I don't think it would fall within the categories of items the Court can take judicial notice of.

THE COURT:  But I don't even -- so the weather report -- how far away was the ship from Nassau?

MR. DIEPPA:  The cruise terminal is about ten miles from the -- from the airport.  But the ship undoubtedly was underway according to all the witnesses and according to Carnival -- Carnival's corporate representative testified that

the ship was already underway so it wasn't even at the cruise terminal when this incident had happened.  It had been underway for some time according to the testimony of Carnival's corporate representative.

THE COURT:  Okay.  So, once again, she -- just to make sure I'm clear on this, she will testify that she relied on weather reports to get a sense of what the weather was in the area and wind speed was in the area in forming her opinions; right?

MR. DRAHOS:  Correct.

THE COURT:  So if you want to -- again, it probably works to your advantage because now we know you are going to be able to pick apart at how, you know, the weight of her testimony because you are going to be able to say, well, that's all well and good, but that's not where the ship was located at the time.

MR. DIEPPA:  And Your Honor is correct.  Really it is. It's because it was being offered as substantive evidence that she can rely on it and then mention in her report.  You know, experts can almost mention anything in their reports.

THE COURT:  Right.

MR. DIEPPA:  But the fact it's coming in substantively is an issue I had.

THE COURT:  I mean, let's just see if the defense attempts to offer it substantively then they're going to have

to give the reasons why it's not hearsay or why it should be excepted from the hearsay rule, or if they want me to take judicial notice of it, let's cross that bridge when we get to it.

But you have gotten to where I was, which is if she's going to say she relied on weather reports at the time, and you have the weather report that she relied on, you know, she can say that and then you can pick apart how strong her testimony is if she was relying on weather reports from a ship that was ten miles away from where the report -- relying on weather reports that are based on a location ten miles away from where the ship was at the time.

Okay.  I get it.

Tell me about Dr. Cha- --

MR. DIEPPA:  Chalal?

THE COURT:  Chalal.  Sorry.

Dr. Chalal, what is the issue on Dr. Chalal?

MR. DIEPPA:  Yes, Your Honor.

MR. DRAHOS:  Actually, may I start?

THE COURT:  Hold on.

MR. DRAHOS:  I do want to raise an objection in that regard because there hasn't been any 7.1 on this argument.  I have no idea what he is going to claim to the Court is wrong with Dr. Chalal's testimony.

THE COURT:  So Dr. Chalal -- right.

So Dr. Chalal was noticed up as an expert.  You had notice.  You had his report.  You had -- okay.  You did not file a motion with the court.

MR. DIEPPA:  Not permitted to, Your Honor.

THE COURT:  Well, I asked for no motions in limine.  If you want to seek to strike an expert, you would at least give notice to the other side that you have an issue with their expert.

MR. DIEPPA:  I did do that, Your Honor.  And I had a conversation with Mr. Jarnagin about it.  And Mr. Jarnagin and I agreed that the pretrial order prohibited Daubert motions as well.  And I did raise, in fact, the issues with Dr. Courtney and the issues with Dr. Chalal.  And at that time it was agreed that, well, you know, we can't bring it up on a Daubert motion so I guess we will have to bring it up to the judge another way.  So there was discussion on it.  I provided the authorities on it.  It's really a single undisputed issue.  And the issue is this, Your Honor.  And this is in Dr. Chalal's testimony in multiple areas, but you can read it on page 49.

And the issue is this, Dr. Chalal is going to testify that although he believes some treatment was related to the plaintiff's injury, he believes that the plaintiff's shoulder tear was not causally related.  There's no prior medical evidence in this case before the plaintiff's injury on 7/24/22 documenting any prior injury to the shoulder at all.

So during Dr. Chalal's depo I asked him if he did a differential diagnosis, I asked him how he could exclude the most likely cause which was the acute injury, and Dr. Chalal was basically in his words is he believe it's preexisting, he doesn't agree with the MRI report, and that's solely based on his training and experience of 33 years being a board-certified orthopedic surgeon.

The case law in the 11th Circuit interpreting Rule 702 across the board states that an expert that solely comes in and gives a scientific medical causation opinion, not purely a medical opinion, but a scientific medical opinion saying that this injury could not have caused this tear requires more than just simply sitting there, no matter how qualified they are, and saying that, well, because I have been a doctor for 33 years this is not related and that's my opinion.  It's simply not sufficient.

And we provided the case law, you know, from the 11th Circuit.  Most recently the Arevalo case.  But the propositions in those cases are not controversial.  They simply say that a doctor, a medical doctor cannot come in with solely that and give a causation opinion.

And in the Arevalo case that I provided to Your Honor --

THE COURT:  Okay.  So tell me what is the support for -- do I have his report?

MR. DIEPPA:  His deposition is filed.

THE COURT:  What about his report?

MR. DIEPPA:  His report I don't believe was filed.

MR. DRAHOS:  Well, it wouldn't be an exhibit.  So we were planning on obviously having him testify to the report. If Your Honor would like to see it, of course we have a copy here we can provide.

THE COURT:  I mean, because I want to know.  Obviously if you're going to be moving to strike him, you're relying on his deposition testimony, on his report?  Just because his report will tell me what his opinion is.

MR. DIEPPA:  Yeah.  His opinion -- we can get you his report, Your Honor.  But his opinion and the basis for his opinion did not differ from his report.  He did not rely on anything further in his report other than his training and experience.  And it's -- you know, if you read page 49 of his deposition, you read any part of his deposition, you will see that I questioned him exhaustively, "Dr. Chalal, what's your basis for this if there's no prior medical evidence of a preexisting injury and there's an MRI saying that this was an acute tear?

And he says, "It's just my, you know, 33 years as an orthopedist, that's why I believe it."

He will get on the stand and say the same thing.  I know him.  But the issue is under 702, it's simply not

permitted to bring in a medical expert that solely relies on their opinion to give that type of -- you know, to give that type of causation opinion.

So all we're asking is that the Court review the authorities, review Dr. Chalal's transcript, and make a ruling on that. Not that maybe Dr. Chalal can't testify, but maybe the Court, you know, takes into consideration the weight or admissibility of his testimony on that point because he is the only medical causation witness that the defense has.

MR. DRAHOS: So first, this is the first substantive part of this argument we've heard. There's numerous erroneous claims that have been made here that are rather egregious, and, I'm sorry, but I have to point them out.

Dr. Chalal specifically testified in the case that he agrees with the radiologist's finding on the MRI. He's not challenging how the radiologist just describes the pathology.

So what I just heard there was not really a Daubert argument. Daubert deals with does he have sufficient knowledge, is he experienced, is he capable? He's a board-certified orthopedic surgeon with 32 years experience with a subspecialty in shoulder surgery. Where is his methodology flawed? He's not coming into this court and saying this is a degenerative tear, it's not an acute injury because I said so. He is going to talk about all the clinical findings that were made leading up to the diagnosis. He's going to talk

about his interpretation of the MRI.  And that's the part, Your Honor, that I wanted to focus on here in this response, which is he is going to put that image up on the screen and explain to the Court why those -- that pathology is degenerative, why it takes years for that to develop.  And based upon the fact that that pathology which he is trained to look at and interpret, it's something that is known in the community as being a long-standing chronic type of condition, he can rule out an acute injury.

So not only is he relying upon his clinical interpretation of the findings on exam, he's also going to be relying upon the images, on the MRI themselves, and his interpretation of those images.  And then finally he did examine Ms. Cole so he's got more than enough methodology here to reach the conclusions -- and which, by the way, the MRI does not say it's an acute tear.  All it says is there's a tear there.  The radiologist is not going to opine on whether or not it's a acute or chronic.  He has no -- that's not his role. He's looking at the image, just like Dr. Chalal, and saying this is what I see.

They're going to try to argue those images mean acute. We are going to argue those images mean degenerative.

THE COURT:  Okay.  All right.  I get it.  I understand. I'm actually familiar with Arevalo.

MR. DIEPPA:  I just want to -- I was accused of

something, Your Honor, that Dr. Chalal -- actually, just to clear the record, in his deposition, page 16, 13, I specifically asked him:  "One moment.  I want to get what you're saying clear.  So in terms of the MRI finding from Dr. Martinez it states that there's an irregularity and a tearing in the labrum.

"You disagree?"

Dr. Chalal's answer:  "Right."

So Dr. Chalal does disagree with the MRI findings.  He said in his deposition:  "I disagree with that characterization."

But to move on with this issue, Your Honor, I think if you read his deposition testimony it will be self-evident what my argument is.

THE COURT:  So, I mean, at this point I think what I need to hear is his testimony.  I don't think -- you know, and to the defense's point, you are not saying that he's not qualified.  So this is not a qualified as an expert type argument.  You are saying he shouldn't be able to offer his causation opinion because he has not given any -- we will say he sort of lacks scientific support or he hasn't offered any bases for his opinion on causation other than his experience.

Let's see what he has to say.  If you want to pick apart at that, you know, on cross, and if you want to revisit this and after he testifies, you know, again, you know, renew

your motion that this is not a -- you know, that he should be stricken all together because he hasn't offered sufficient support for his opinion.  We can revisit that at the time.  But I need to hear his testimony.  This is not, even if this came to me as a Daubert motion, this is not a motion -- you know, a motion under Daubert or the rules because you're not telling me that he's not qualified, you're not telling me that his methodologies -- it doesn't even sound like you're telling me that his methodologies were not --

MR. DIEPPA:  That is -- yeah.  Because his methodology also is -- and when he gets on the stand we will go over it.

But, you know, the differential diagnosis methodology is lacking.  You know, that will be established.  And we can take it up, Your Honor.  But, you know, my point is, you know, Rule 702 doesn't stop applying just because it's a bench trial.

THE COURT:  No.  And I absolutely agree.

But, again, it doesn't -- it doesn't sound like you're coming to me saying that he's not qualified to testify as an expert or even that his opinions -- I think we are right on the edge.  You are challenging methodology.  I want to hear what he says his methodology was.

And, again, I'm not -- if you want to revisit it after he testifies, that is fine.  But, you know, I don't see a reason not to permit him to come in and testify.

So to the extent it's a motion to exclude the expert from testifying, I'm denying that.  But it's without prejudice to you to revisit it after he testifies if you think that he has not satisfied 702.

MR. DIEPPA:  Yes, Your Honor.  If I could just put the authorities on the record I'm relying on?

THE COURT:  Sure.  And I -- yeah.  I have your -- are you talking about the cases that you gave me?

MR. DIEPPA:  Yes.  Also one we -- you know, just I can read them in.

Arevalo v. Mentor Worldwide LLC, and that is reported at -- that's WL 2148771.

Rapoport v. Classic Cruise Holdings, and that was Southern District of Florida.

And --

THE COURT:  Wait.  I don't think you got -- so actually Arevalo -- and this is the case I have seen, and actually I think you read the prior history.

So it's -- the Arevalo case is 2022 WL 16753646.

MR. DIEPPA:  That's correct, Your Honor.

THE COURT:  The Rapoport case is -- it's a -- I will give the docket case in the Southern District of Florida, which is Case No. 08-cv-60629 Garber, and it's an opinion that was decided September 10, 2009, which is an omnibus order.

And then I have not read, but you gave me also

McDowell v. Brown -- actually I'm not sure if I have read it or not, but I'll take a look at it.  It's an 11th Circuit opinion which is published at 392 F.3d 1283, and decided December 8, 2004, McDowell v. Brown.

So I have all of those.

MR. DIEPPA:  One more, Your Honor.  Just the case -- the seminole case on all these opinions which is cited in the Arevalo case, and you're probably familiar with it, Hendrix v. Evenflo Co., 609 F.3d 1183.

THE COURT:  Okay.  Great.

MR. DRAHOS:  Your Honor, may I approach the bench?

THE COURT:  Sure.

MR. DRAHOS:  We have a case.  Again, this is a little bit unusual because we haven't seen the motions, didn't really the know the argument, but we have a case we would like to cite in opposition.

THE COURT:  Okay.

MR. DRAHOS:  And just for purposes of the record, it's Geyer v. NCL, 203 F.Supp.3d 1212, Southern District of Florida, August 2016.

THE COURT:  You can hand it to Johanna.

MR. DRAHOS:  Thank you, Your Honor.

THE COURT:  Geyer was G-e-y-e-r.

MR. DRAHOS:  Thank you.

THE COURT:  Okay.  All right.

So I have all of those and I can review those when we get a little break.

Why don't we go ahead then, it's 10:10, why don't we go ahead and let me hear openings.

MR. DIEPPA:  Your Honor, may I approach?

THE COURT:  Wherever you are most comfortable.  You might be most comfortable at the podium.  Just as long as you're talking into a microphone.

MR. DIEPPA:  Grab some water.

May it please the Court?

THE COURT:  Yes.

MR. DIEPPA:  Your Honor, in this case, Eureka Cole v. Carnival Corporation, the evidence will show that on July 22nd, 2022, Ms. Cole was a fare-paying passenger aboard the Carnival Conquest.

At the time Ms. Cole was a 51-year-old woman with no prior history of injuries to her left shoulder.  That is undisputed.

On July 24th, 2024, after Ms. Cole had been aboard the ship for approximately two days, there were extremely high winds on the lido deck of the ship.  The winds, you will hear, and the evidence will show from multiple witnesses, including the headwaiter working for Carnival, Shruti Bhatia; plaintiff's husband, Lucien Cole; and the plaintiff that the winds had been blowing at very high speed -- given the description,

approximately gale force because it was difficult to even walk on the deck -- had been persisting for the entirety of the day, according to what you will hear from the plaintiff's husband and Ms. Bhatia, you know, two to three hours before this incident occurred.

You will also hear that despite the high winds that had been persisting on the deck for that time -- and once again, this evidence is undisputed because the only witnesses who have testified to the wind speed at the time of the incident are those three witnesses.  Those are the only ones that exist. Despite that, no effort was made by Carnival to restrict access to the lido deck, secure any loose items, or otherwise warn passengers of the potential danger presented by flying objects.

The evidence will also show that in the words of Carnival's own corporate representative, they were aware of this risk and this danger.  In the words of Carnival's corporate representative, which you will hear in her deposition testimony:  "Anybody sitting outside in a cruise ship can expect that wind can pick up at any time and that items can be picked up with wind.  That wind does happen on a cruise ship, it's a possibility that wind can pick up any time."

And those are the words I'm quoting from Carnival's corporate representative.

The evidence will also show that Carnival's own employees in charge of the lido deck dining area, they had been

trained to secure items on the ship's lido deck in the event of high winds.  They were specifically trained to do this, according to the evidence, to prevent injuries to passengers and to prevent items from being picked up.

Furthermore, the unrebutted testimony from the plaintiff and her husband Lucien Cole will establish that it was a Carnival employee who stacked a number of plastic lids in a precariously high position in the midst of high winds in a busy dining area without regard to the safety of the passengers.

You will hear, notwithstanding the arguments from Carnival, that plaintiff was struck by not one, but three container lids.  And the first one that struck her was actually two container lids stuck together.  You will hear argument from Carnival about the weight of the lid.  One thing you will not hear from Carnival is any accounting of the fact that Ms. Cole, according to the sole eyewitness to the incident that could be identified, was actually struck with two container lids, i.e., double the mass, and then was struck with one -- a third one shortly thereafter.

You will see evidence as to the weight of those lids being weighed appropriately with a crane scale, meaning, you know, because of the dimensions of the lid, you can't really, you know, weigh it on a normal scale.  You gotta kind of weigh it like when you catch a fish and you hang it up.  You will see

evidence of what each lid appropriately weighed or approximately weighed.

You will hear testimony once again from Carnival's own employee, the ship's head physician. You will hear from him, Dr. Vanegas, who is, you know, a trained medical physician, who was the chief physician aboard the ship that not only did plaintiff indeed suffer an injury to her shoulder, but he also confirmed that this injury to her shoulder was not due to any preexisting condition. That no alcohol was involved in the incident. That she was not under the influence at the time of the incident.

And you will also hear that she -- Carnival's own physician advised the plaintiff to seek follow-up medical treatment, which she did. Immediately after leaving the ship the following day she went straight to HCA Hospital emergency room. She was again treated for injuries to her shoulder and referred for follow-up treatment.

Two days after that Ms. Cole underwent an MRI. The only MRI that Your Honor will see, and the Court will see in this case, in that MRI she presented with adema, which is acute swelling, and had multiple tears in her left shoulder's labrum supraspinatus tendon.

After undergoing two months of physical therapy, Ms. Cole underwent arthroscopy, shoulder surgery performed by Dr. Wilkerson on September 15, 2022. However, that was only

after going through a course of treatment that included Carnival's own doctors, HCA Hospital, a course of physical therapy, and multiple consultations with orthopedic physicians.

Now, you may hear from Carnival's experts that Ms. Cole did not complain of an injury to her shoulder, that she was actually pointing to her trapezius. This is completely incorrect. The reason we know that is because the person who first took Ms. Cole's history or patient injury, Nurse Ong, another Carnival employee, testified that Ms. Cole's complaint was to her left shoulder.

Because the way it went is she saw Ms. Ong, Nurse Ong first, then she saw Dr. Vanegas. And you will see the ship's infirmary report where this is all documented.

You will also hear from the plaintiff's rebuttal biomechanical engineer Andrew Liberti who actually did make some calculations in his report that the force was more than sufficient to cause this type of injury.

You will also hear from Dr. Wilkerson who also happens to be fellowship-trained in biomechanics in addition to being board-certified in plastic surgery and saw Ms. Cole on multiple occasions both before and after her surgery. That her injuries and the force and the movement and the mechanism was completely consistent and sufficient to cause the tear in her shoulder.

As I said in argument before we started, openings, you will not hear from any defense expert that there's evidence of

a prior medical record, a scan, or a witness indicating that the plaintiff ever had a preexisting injury or degenerative change to her shoulder.

You will hear from Dr. Chalal that in his opinion, because looking at the MRI, he disagrees with the radiologist and he thinks it's preexisting.  You will not hear more than that from Dr. Chalal because Dr. Chalal was never provided with any other medical record prior to the date of this incident, July 24, 2022.

You will also hear from Dr. Chalal that he doesn't dispute that Ms. Cole was injured and at least some of her care and treatment was causally related to the injury.  What you will hear from Dr. Chalal is he agrees that all of her treatment was appropriate given the type of injury she had and that she did have an injury, but he takes issue with the need for surgery.  Does not take issue with the way the surgery was performed, just takes issue with the surgery and the surgery being related.

You will also hear from Dr. Chalal that plaintiff has not yet recovered from her injuries as of the last time she -- well, as of the time she presented at the CME.  Dr. Chalal indicated that she still has limited range of motion, she still has lack of full use of her shoulder.  You will hear that from the defense expert who testified to that during deposition.

Based on that, we ask that the Court weigh the evidence

and we believe that after the Court weighs the evidence you will find that the plaintiff has met her burden establishing that Carnival was on notice of this incident and/or its employee was negligent and failed to use reasonable care in securing the containers and that the plaintiff's injuries are sufficiently casually related and enter judgment for the plaintiff.

Thank you, Your Honor.

THE COURT: Thank you.

MR. JARNAGIN: Good morning. May it please the Court.

Just as a refresher, my name is Cooper Janragin. I'm also joined today by Michael Drahos who is lead counsel for Carnival, we also have Attorney Ashley Genoese who has assisted us throughout the case and will be trying to navigate the technology in the courtroom, and then also here today with us is the corporate representative for Carnival, Ms. Monica Borcegue who also sat as a 30(b)(6) witness in this case. All together our team is privileged to have you hear Carnival's case over the next few days.

This is a case where Ms. Cole is claiming that a plastic container lid struck her on the lido dec of the Carnival Conquest on July 24th, 2022, and she's claiming that this is due to Carnival's negligence or a negligent employee.

Ms. Cole needs to meet her burden on every element of negligence, whether through direct liability or vicarious

liability in order to sustain a judgment.

Now, as to the duty and breach elements of negligence the evidence will show that it was not foreseeable to Carnival that this plastic container lid that struck Ms. Cole ever posed a risk to any of its passengers.

The Court will hear testimony from Monica Borcegue. Ms. Borcegue will address that in the five years prior to Ms. Cole's claim, Carnival has never had an incident involving a passenger being struck by any object on the lido deck of the Conquest which is where Ms. Cole was located.

You will also hear testimony from Ms. Borcegue that Carnival never had any incident involving this particular plastic container lid injuring any passenger.

And you will also hear that the weather conditions onboard the lido deck that day were the Coles remained for three hours prior to this incident did not merit any warnings or actions by Carnival.

The Court will hear from security officer Vikram Thapa. Mr. Thapa investigated Ms. Cole's accident and provided testimony that he has never encountered a similar incident since working for Carnival back in 2009.

You will not hear from either party, any expert testimony that the manner in which Carnival or any of its employees maintained the plastic containers on the lido deck fell below any industry standard. But the Court will hear from

the Coles spent a great time on the lido deck in the days leading up to the incident and in the three hours prior to the incident before she was hit with a lid.

Ms. Cole has a burden of proving causation in addition to duty and breach. And for causation Carnival has retained two experts to address this from two different perspectives. The first is Dr. Joseph Chalal.

Dr. Chalal is a board-certified orthopedic surgeon who has been practicing in South Florida for over 30 years. He reviewed Ms. Cole's medical records, her left shoulder MRI taken following the incident, and also performed a physical examination of her.

Dr. Chalal will explain that the pathology in Ms. Cole's shoulder that she ultimately underwent surgery for has been there a long time and predated her incident onboard the cruise ship.

The Court will also hear from Amy Courtney. Dr. Courtney is a Harvard and MIT educated biomechanical engineer and Dr. Courtney will explain that the biomechanical forces involved in Ms. Cole's claimed incident could not have caused a torn rotator cuff.

After the Court weighs the evidence on both the duty and breach elements of negligence and the causation elements of negligence we ask that the Court find judgment in Carnival's favor on all counts.

Thank you.

THE COURT:  Okay.  Thank you.

So do you want to put Mr. Cole on for direct and then I can do the sentencing, and -- what did you say, how long do you roughly think his direct will be?

MR. DIEPPA:  Probably 20 to 30 minutes, Your Honor. And then I don't know how long the cross will be.  I can, if you wish, I don't know what the situation is with Dr. Chalal, I guess he's coming after lunch we can start him.

THE COURT:  No.  For your convenience if you think tat there's -- if we can start Mr. Cole, if there's a logical point to take a break in the middle of his testimony.  I mean, or -- because that may have to happen.

MR. DIEPPA:  I can put Mr. Cole on.  We just have -- there's a couple more exhibits we would need to have ruled on before I put Mr. Cole on.

THE COURT:  Okay.

MR. DIEPPA:  But, yeah.  He is here.  He is ready to go.

THE COURT:  So tell me what the exhibits are.

MR. DIEPPA:  They are the social media posts.  I don't believe any of these are from the day of the incident.  I believe the prior ones I believe are being offered to show that Ms. Cole and Mr. Cole were drinking, but they're dated from prior to the incident and their own ship's physician said that

there was no alcohol involved in the incident.  So we would dispute the relevance of those photographs.

The ones after the surgery, they don't show her doing anything with her shoulder.  You know, so I -- minimal relevance.  And, you know, that's why we don't believe they should be offered because it's not -- you know, alcohol is not an issue in this case, intoxication is not an issue in this case, so, you know, I'm not sure why those would be offered and that's Defense 8 and 9.

THE COURT:  And 10?

MR. DIEPPA:  10.  Yeah.  10 is post.

THE COURT:  Right.

MR. DIEPPA:  So they don't show her doing anything with her shoulder.  They show her standing around.  You know, so I don't -- even for impeachment value, I don't know what the impeachment value would be.  And that would be our objection to 10.

THE COURT:  So tell me about No. 8 which is the social media posts during the cruise.  Those are all pre -- No. 8 is pre-incident?

MR. DIEPPA:  Yes, Your Honor.

So --

THE COURT:  Well, let me hear from Mr. Drahos.

MR. DRAHOS:  That's correct, Your Honor.

THE COURT:  What's the relevance of the social media

posts before the incident?

MR. DRAHOS:  So it would be difficult for us to predict that specific answer right now because we don't know how she's going to testify.

THE COURT:  Okay.

MR. DRAHOS:  So, yes, we do intend to use them for impeachment.  I can comfortably say we have no intention to offer them to try and prove intoxication or -- that's not part of our plan.

THE COURT:  Okay.  Well, let's -- I mean, I -- so your objection is based on relevance, and I agree.  We need to see what they are being used for before I can decide whether they're relevant.

So why don't we -- your objection is noted.

Let's go ahead and you can renew them at the time they are being offered.  It probably won't come up on his direct any way.

MR. DIEPPA:  Understood, Your Honor.  As long as they -- we will deal with it then.

If I can have a minute to setup the exhibits on the screen?

THE COURT:  No problem.

MR. DIEPPA:  Madam Clerk?

And are we just -- can I assume that the stuff not objected to is already in evidence or --

THE COURT:  If everything is -- is it stipulated or it's admissible, all of the joint exhibits?

MR. DIEPPA:  Either stipulated or not objected to.

THE COURT:  Yeah.  There's a difference.

MR. DRAHOS:  We agree.

THE COURT:  So the joint exhibits, which are Joint Nos. 1 through 10 are stipulated and admissible.  So they're admitted into evidence so you can use them and publish them freely.

(Joint Exhibits 1 through 10 were received in evidence.)

THE COURT:  It looks like there's only the objection that we already discussed as to Exhibit No. 1, which plaintiff will only use if it becomes relevant.

As to 2 through 9 of plaintiff's exhibits, there's no objection?

MR. DRAHOS:  That's correct, Your Honor.

(Plaintiff's Exhibits 2 through 9 were received in evidence.)

THE COURT:  Okay.  So those are all -- as they are used, they can be used freely.  And the joint exhibits I'm already admitting, we can pre-admit those.  We will see if you use all of Plaintiffs 2 through 9, and as you use them they are admissible, but we don't necessarily have to have them admitted unless they are used.

MR. DIEPPA:  All right.  Plaintiff calls Lucien Cole to

the stand.

(Lucien Cole sworn by CRD.)

THE WITNESS:  Yes, ma'am.

COURTROOM DEPUTY:  Please have a seat and state and spell your name for the record.

THE WITNESS:  My name is Lucien Cole, L-u-c-i-e-n C-o-l-e.

MR. DIEPPA:  Your Honor, may I proceed?

THE COURT:  Yes.

DIRECT EXAMINATION

BY MR. DIEPPA:

Q.  Good morning, Mr. Cole.

A.  Good morning, sir.

Q.  How are you doing today?

A.  Good.

Q.  Where do you live?

A.  Where do --

Q.  Where do you live?

A.  Commercial.  Florida.

Q.  What's your address?

A.  Oh.  Just moved to that address.  I don't remember the address.

Q.  Okay.  And where were you born?

A.  Jamaica.

Q.  In what part of Jamaica?

A.   May Pen.

Q.   How long have you been in the United States?

A.   Nine years, ten years.

Q.   You married?

A.   Yes, sir.

Q.   Who are you married to?

A.   Eureka Cole.

Q.   And tell me a little bit about when you guys met and how you guys met.

A.   I was working at a hotel in St. Maarten where I used to live, and then she came for a wedding and that's where we met.

Q.   Okay.  If you could speak a little bit closer into the microphone.

A.   Okay.

THE COURT:  And let me just ask you, because I missed and I think the court reporter did too, what part of Jamaica were you born?

THE WITNESS:  May Pen.

THE COURT:  May Pen.  Okay.  That's what I missed.

Because I can see everything that the court reporter is writing so I can see when she misses something, and if she misses it and I miss it, that means we both didn't hear it.

THE WITNESS:  Okay.

BY MR. DIEPPA:

Q.   And how long have you been married to Ms. Cole?

A.   We married ten years.

Q.   Okay.  Have any children?

A.   No.

Q.   And you ever go to school?  What's your highest level of education?

A.   I went to high school.

Q.   Graduate?

A.   Yeah.

Q.   Back in July of 2022, did you go on a cruise with Ms. Cole, Ms. Eureka Cole?

A.   Yes, sir.

Q.   Okay.  Remember the reason for that cruise?

A.   It was her birthday.

Q.   Whose birthday?

A.   I don't remember the lady name.  It was a birthday.

Q.   Okay.  Was it just you and Ms. Cole, were there more people on the cruise?

A.   No.  There were a lot of us.

Q.   And when you boarded the ship, did you board with Ms. Cole?

A.   Yes, sir.

Q.   Okay.  So tell me about the first day on the cruise.  What was that like?

A.   The first day of the cruise, it was okay.

Q.   All right.  Were you out in the water?  What was the first destination?

A.   The first destination was in the water.

Q.   Did you ultimately reach a port or was it like a cruise to nowhere?

A.   Yeah.  It was like a cruise to nowhere.

Q.   I mean, did you reach a port, did you stop at a port?

A.   No.  No.  Not --

Q.   When I say "port," like did you have a destination in the cruise where you got off the ship?

A.   Bahamas.

Q.   Okay.  Where in Bahamas?

A.   We were in Bahamas.  I think in Freeport.

Q.   You mean Nassau?

A.   Nassau.  Nassau.

Q.   And according to the evidence in this case, that appears to have been a stop on July 24th, 2022.

Do you recall that?

A.   Excuse me?

Q.   The stop at Nassau, would that have been around July 24th, 2022?

A.   Yes, sir.

Q.   Okay.  Tell me about that day.  Were you with Ms. Cole that day?

A.   Yeah.  All of us was --

THE STENOGRAPHER:  I'm sorry, sir?

A.   All of us was on the deck.

BY MR. DIEPPA:

Q.   Did you go off the ship first?

A.   Oh, yeah.  We went off the ship.

Q.   Okay.  Where did you go?  Tell me what you did when you went off the ship.

A.   Went off the ship and we -- we walk around, looking around. Stop a few places.

Q.   Okay.  And do you recall around what time you got back onto the ship?

A.   I don't quite remember.  Around like 4:00 or 3:00.

Q.   You said 4:00 or 3:00?

A.   Yeah.  I don't quite remember.

Q.   Would that have been in the afternoon?

A.   Yeah.

Q.   And when you got back on the ship, tell me where on the ship you went to after you got back on the ship on July 24th, 2022.

A.   When we got back on the ship I think we went on the lido deck.  Was playing dominos.

Q.   Okay.  And that would have been in the afternoon?

A.   Yeah.

Q.   All right.  You recall what the weather was like when you got onto the lido deck?

A.   Yeah.

Q.   What was it like?

A.   We're on 29, 30.

Q.   29, 30 what, sir?

A.   Wind.

Q.   Do you mean 29, 30 miles per hour?

A.   Yeah.

Q.   Okay.  So was it windy?

A.   A lot.

Q.   Okay.  When you walked on the deck, did the wind effect the way you were able to walk?

A.   Yeah.  We have to -- like a little bit more firmer because it was so windy.

Q.   Okay.  I'm showing you -- and it's on the screen in front of you, you can see it.  This is exhibit -- Joint Exhibit J5, photographs of a table and photos of the lid.

Can you see that?

A.   Yes, sir.

Q.   Okay.  Does that show the area of the lido deck that you were walking to with Ms. Cole?

A.   Yes, sir.

Q.   Okay.  And my understanding is that -- were there other people that you knew on the deck at that time?

A.   Yes, sir.

Q.   Okay.  Were you playing any games?

A.   Dominos.

Q.   Okay.  And at some point when you got to the lido deck was

Ms. Cole there also?

A.   Yeah.

Q.   Okay.  Now, when you first got to the lido deck and as you said it was windy, it was difficult to walk, do you recall anyone from Carnival Cruise Line telling you that the lido deck was closed because it was windy?

A.   No, sir.

Q.   Okay.  Do you recall anyone from Carnival Cruise Line, either, you know, verbally telling you or telling Ms. Cole that you should be careful because the winds were high and something could fly and hit you?

          MR. DRAHOS:  Objection.  Leading.

A.   No, sir.

          THE COURT:  Overruled.

          It's okay.  Go ahead.

BY MR. DIEPPA:

Q.   Did -- did you see when you were on the deck with Ms. Cole, Carnival employees out on the lido deck?

A.   Yes, sir.

Q.   Okay.  What were they doing, the ones that you saw?

A.   Some was bringing in the containers and some was standing around.

Q.   Okay.  When you say containers -- Defense Exhibit 15.

     When you say containers, were they containers that although these are -- may not have been exactly like this, were they

similar to this?

A.   Yes, sir.

Q.   Okay.  And going back to Joint Exhibit 5 that's on your screen, can you see at least some of those containers in this photograph?

A.   Yes, sir.

Q.   Okay.  Now, the containers, were the containers or the items that struck Ms. Cole, are they depicted or do they appear anywhere on this photograph?

A.   Yes, sir.

Q.   Okay.  Where do they appear on this photograph?

A.   They on the second level.

Q.   Okay.  Now, before this incident happened, were you sitting in the vicinity of Ms. Cole?

A.   Yes, sir.  I was sitting there eating.

Q.   Okay.  Did -- like, how did that happen, how did Ms. Cole get to your table?

A.   So I was playing domino and we was playing dominos so if I lost, I get up.  So I lost and I get up.  Went over and get some food, started to eat.  She was sitting with some ladies and then she look over and see me by myself and she come over there and sit down.

Q.   Okay.  In terms of --

        THE COURT:  So you weren't playing dominos at that table that's in the picture?

THE WITNESS:  No.

THE COURT:  Okay.  That's where you came over to -- you were sitting by yourself at that table?

THE WITNESS:  Uh-huh.

BY MR. DIEPPA:

Q.  In terms of the seating arrangement, when Ms. Cole came to join you, where was she sitting in relation to you?

A.  I was sitting this way, she was sitting that side right there.

Q.  Okay.  When she sat down were you able to see these plastic lids and containers that we see in Exhibit 5?

A.  When she sit?

Q.  Yeah.

A.  Yes.

Q.  Now, at that moment in time were the winds still blowing in the way they were when you first arrived at the lido deck?

A.  Yeah, it was.  It was blowing.

Q.  All right.  Were there still guests and waiters walking about the deck?

A.  Yes, sir.

Q.  Okay.  Now, in this photograph, Joint Exhibit 5, do you -- were there Carnival employees in the vicinity of this cart and these containers?

A.  Yes, sir.

Q.  Okay.  Describe for me as specifically as you can what that

waiter or what that person was doing.

A.   So he was -- he was standing in the back just standing looking with a mic, phone, whatever thing on his waist just standing around.

Q.   Okay.  And were there -- these lids that I'm showing you, were they -- where were they stacked on the cart that we can see in --

A.   They were stacked on the extreme top.

Q.   Okay.  Can you repeat that?

A.   They were stacked on the top of the cart.

Q.   So when you say the top of the cart, it would have been this area here at the top of the cart?

A.   Yes, sir.

Q.   So does that mean that the lids we see here at the bottom, they would have been at the top?

A.   They was at the top.

Q.   Okay.  And how high were they stacked at that point in time?

A.   They were stacked like around 2 feet.

Q.   Okay.  So the lids, these things, they were stacked 2 feet high?

A.   Yes.

Q.   And this part, the bottom part of the container --

A.   That wasn't on top.  That was underneath.

Q.   Okay.

THE COURT:  So it was just lids --

THE WITNESS:  The lids.

THE COURT:  -- stacked 2 feet high?  No -- this picture shows, just for the record clarity, even though the picture that we're looking at, which is Joint Exhibit 5, shows containers on the top, at the time you are saying they were just lids stacked up on the top?

BY MR. DIEPPA:

Q.  Is what the judge asked you, is that correct?

A.  Yeah.  It was stacked -- the container was on the other side and the lid stacked by itself up.

THE COURT:  So there was a container there too, but the lids were on one side?

THE STENOGRAPHER:  I'm sorry?

A.  The lid was on the side of the container stacked by itself.

BY MR. DIEPPA:

Q.  Does this photograph show where the lids were put after the incident?

A.  Yeah.

Q.  Okay.  Now, in terms of where Ms. Cole was sitting, looking at Joint Exhibit 5, can you tell us where she was sitting?

A.  She was sitting at the end chair.

Q.  Okay.  When you say "the end chair," I know you can't point --

MR. DIEPPA:  May I approach the witness, Your Honor?

THE COURT:  I think he can, by the way.

MR. DIEPPA:  He can?  It works.

THE COURT:  So if you -- just with his finger -- it's on?

COURTROOM DEPUTY:  Correct.

THE COURT:  You can touch it.

No?  It's not working.  So optimistic there.

All right.  So then Mr. Dieppa is going to have to do -- well, it's -- right now I see a circle on there.

You see a circle on there?

THE WITNESS:  Yeah.  I saw this white circle on there.

THE COURT:  So is that her seat?

MR. DIEPPA:  I don't see it from my view, Your Honor.

THE COURT:  Well, now it's gone.

MR. DIEPPA:  Sorry.

THE COURT:  There.

THE WITNESS:  Yeah.

THE COURT:  Oh, it's not on your computer?  You don't see the circle?

COURTROOM DEPUTY:  It's the circle around the chair.

MR. DIEPPA:  That circle was already there.

THE COURT:  Oh, okay.

MR. DIEPPA:  That circle is part of the exhibit.

If I may approach the witness, Your Honor?

THE COURT:  Yes.

BY MR. DIEPPA:

Q.   You were indicating -- okay.

A.   Yeah.  This one.

Q.   So I placed a blue mark on that chair.  The area, the spot there where I placed the blue mark, does that correspond to where Ms. Eureka Cole was sitting immediately before the incident?

A.   Yes, sir.

Q.   And what was Ms. Cole doing immediately before the incident?

A.   She was eating.

Q.   What was she eating?

A.   She was eating some salad and chicken.

Q.   Okay.  Okay.

So you are out on the deck, it's very windy.  So it appears from here that you kind of -- you two sat in this area that's kind of behind the stage there or a staircase?

A.   Yes, sir.

Q.   Okay.  And at this point in the few -- in the moments before this incident happens, as far as you recall, is the ship underway, moving?

A.   I think we was moving.  But a boat, next boat was like taking on water, it got so much wind so they stopped and was trying to help there on the boat.

Q.   Okay.  So when you say another -- there was like another

boat?

A.   Yeah.   Next boat was taking on water so they radioed the ship and say they have to wait 'til they get -- so the Coast Guard came and drop like a pump, they say, to bail off the water from the next boat then we started moving.

Q.   Okay.

THE COURT:   So I think this is a good time for me to take a break.   I need to meet with the probation officer and get everybody set up for the sentencing.

So what we are going to do is we will pick up right here.   If you can just leave -- so the defendant for my sentencing is going to be sitting over on your side, so if you want -- we just have a policy that, you know, they can't have access to anything that they can throw.

So you might -- maybe just kind of move your stuff back.

And then I will ask you, Mr. Cole, since I know the plaintiff is your wife, it's fine if you all hang out on the break, but you may not talk about your testimony because right now you're in the middle of your testimony.   So you can talk to -- to Ms. Cole, you can talk to Mr. Dieppa, but you cannot talk about your testimony.

THE WITNESS:   Okay.   I will sit inside.   They can go outside.

THE COURT:   But everybody can go out, you can have a

bite to eat, and then I would say we will be ready to pick back up again probably before 12:00, but why don't you just be around a quarter to 12:00.  Okay?

MR. DIEPPA:  11:45?

THE COURT:  Basically an hour.

All right?  So when you come back you will still be under oath and we will pick up right where you left off.

COURTROOM DEPUTY:  All rise.  Court is in recess.

(A brief recess was taken from 10:50 a.m. to 12:10 p.m.)

COURTROOM DEPUTY:  All rise.  This court is back in session.

THE COURT:  Okay.  Welcome back, everybody.

So, Mr. Cole, why don't we bring you back up to the stand.

And just remember that you are still under oath.  Okay?  We won't have to give you the oath again.

THE WITNESS:  Thank you.

MR. DIEPPA:  Just one thing before we come back, we did stipulate to a number of defendant exhibits.

THE COURT:  Okay.

MR. DIEPPA:  So 1 through 6 can come in by stipulation.  And 16, which I have already used the exemplar, as long as the record is clear that it's an exemplar, it's not the --

THE COURT:  -- the actual one.  Right.

And it's actually -- it's described on the list as a

"container lid," but you have actually been using the entire container and lid?

MR. DIEPPA:  Yeah.

THE COURT:  Okay.  Got it.

(Defense Exhibits 1-6 were received in evidence.)

(Defense Exhibit 16 was received in evidence.)

MR. DIEPPA:  I'm ready to proceed, Your Honor.

THE COURT:  All right.  Go ahead.

BY MR. DIEPPA:

Q.   Welcome back, Mr. Cole.

A.   Yeah.

Q.   Before we took a break we were talking about the lido deck.

Now, we were talking about the arrangement of the containers, and I will show you what has been entered into evidence as Defense Exhibit 3.

And I am directing your attention to the fourth photograph in Defense Exhibit 3.

Can you see that?

A.   Yes, sir.

Q.   Okay.  So when you say the containers were stacked 1 to 2 feet high, are you speaking solely of the lids?

A.   Yes, sir.

Q.   Okay.  And during this time when you observed the containers being stacked 1 to 2 feet high, were the winds still blowing at the same velocity as when you first arrived at the

lido deck?

A.   Yes, sir.

Q.   And approximately from the time the incident occurred 'til you first got onto the lido deck and you observed the winds blowing as hard as they were, as you said, 29 miles per hour, how much time had passed between first time you walked out there with Ms. Cole and Ms. Cole's incident?

A.   How much time?

Q.   Yeah.

A.   About an hour.

Q.   About an hour?

A.   Yeah.

Q.   Okay.  During that time were there Carnival employees also on the deck?

A.   Yes, sir.

Q.   Now, you gave a number there, 29 miles per hour.

     Is that estimate, did you reach that estimate based on what you felt on the deck when you were walking on the deck that day?

A.   Yes, sir, based on when I was walking.

Q.   Have you experienced winds like that before in your personal experience?

A.   Yes, sir.

Q.   Okay.  Like when you say in your personal experience, you mean like during storms or something like that or --

A.   No.  Regular.

Q.   Regular?  Okay.

So it wasn't the first time you experienced winds at that speed?

A.   No, sir.

Q.   And then at the time you experienced that walking across the deck and sitting with Ms. Cole, did you also observe that wind blowing, you know, against the other Carnival employees that were on the lido deck at that time?

A.   Yes, sir.

Q.   Okay.  Then we got to the employee closest to you, and going back to Plaintiff's Exhibit 5 here, so where we have indicated Ms. Cole was sitting, looking at Joint Exhibit 5, that employee, how close was he to that stack of lids?

A.   He was around 5 feet away.  He's standing right -- leaning on the pole like 5 feet.

Q.   Was he facing the lids?

A.   Yes.  He facing us.

Q.   And had he been there the entire time that you were there with Ms. Cole?

A.   Yes, sir.

Q.   At that time was -- and I'm talking in the moment before the incident, was he doing anything to hold the lids down in the face of the winds or anything like that?

A.   No, sir.

Q.   Now, Ms. Cole in relation to the lids, where is she seated?

A.   Where she was seated?

Q.   Yeah.  Was she facing the lids or facing you?

A.   No.  She wasn't facing the lids.  She was facing -- not me.  I was sitting on the other side, on this side right here.  She was facing that way.

Q.   Okay.  But were you facing the lids so you can see them?

A.   Yeah.  I can see them.

Q.   Now, the lids that you observed that day, some of which are depicted in the photograph --

        MR. DIEPPA:  And, Your Honor, may I approach the witness?

        THE COURT:  Yes.

BY MR. DIEPPA:

Q.   I'm going to show you Defense Exhibit 16.  This is not the lid or one of the lids that was involved in the incident, but one that has been represented to be similar and I want you to hold it.

     Okay.  Now, Mr. Cole, you were -- you were there on the day of the incident?

A.   Yes, sir.

Q.   The lid you are holding, Defense Exhibit 16, is that the same type of lid as that which struck Ms. Cole?

A.   No, sir.

Q.   Why not?

A.   The lid was a little more thicker.

Q.   Thicker.

Was it heavier?

A.   And heavier.  Yeah.  It's more --

THE STENOGRAPHER:  I'm sorry?

A.   It's more larger and deeper.

BY MR. DIEPPA:

Q.   And how do you know that from being there at the scene?

A.   Because when it hit her, they was picking it up and I was looking at it, like, what they was doing.

Q.   Did you have a chance to touch one of the lids at the scene?

A.   No, sir.

Q.   Okay.  So it was just from your observation --

A.   Yes, sir.

Q.   -- at the time?

What about the dimensions, the size, was the size the same?

A.   No.  It was a little bit more bigger.

Q.   In your personal experience or your work experience have you worked with containers similar in nature or lids similar in nature as to the ones that struck your wife on the day --

A.   Yes, sir.

Q.   -- of the incident?

How so?

A.   I was working at --

Q. Speak up, please.

A. I was working at Hard Rock Casino.

THE COURT: Arbor?

THE WITNESS: Hard Rock.

THE COURT: Oh, Hard Rock.

A. That's where we bring the plates around in.

BY MR. DIEPPA:

Q. What were you working there as?

A. We --

THE STENOGRAPHER: I'm sorry?

A. Cleaning. Cleaning. Cleaning service.

BY MR. DIEPPA:

Q. Okay. So in your work experience before this incident at Hard Rock --

A. Right.

Q. -- you had encountered and touched lids similar to the ones that struck Ms. Cole?

A. Yes, sir.

Q. So now that we have set the scene a bit, as you said earlier in your testimony, Ms. Cole's sitting kind of like off to the side to you, not directly opposite you?

A. No. This chair, the chair with a circle, it was way back more.

Q. And she had just sat down I think you said to --

A. -- eat.

Q.   -- eat some chicken?

A.   I was sitting by myself so she came over to keep me company.

Q.   So describe for me what happens after that.

A.   After she get the hit?

Q.   Yeah.  Describe for me the hit, as you said.  Describe for me how the incident occurs according to what you saw.

A.   I was sitting down eating.  When she came over to sit down the wind was blowing, and then it's like two -- two of the lids double together hit her and then the next one hit her.

Q.   Where did they hit her?

A.   On her shoulder.

Q.   Which side?

     For the record, you're indicating to your left shoulder?

A.   Yes, sir.

Q.   Now, just going back to what you stated here, you observed at least two lids --

A.   -- stacked.

Q.   -- stacked?

A.   Yes, sir.

Q.   And that would have been the first blow to her left shoulder?

A.   Yes, sir.

Q.   Okay.  What was the angle of the impact?

A.   It was the edge.  Like the edge of the thing hit her

like --

Q.   You can indicate.

     If I can approach?

A.   It was like the edge of it hit like --

Q.   Okay.  So -- and since Ms. Cole is here, you can tell me
for the benefit of the court, the corner, are you saying --

A.   The corner.  Right.

Q.   -- the corner --

A.   Hit her.

Q.   -- on her left shoulder?

A.   Yes, sir.

Q.   And what caused this stack of lids to move?

A.   The wind.

Q.   The wind.  Okay.

     So when you say "the wind," are you describing that the
wind actually picked up the lids?

A.   Yes, sir.

Q.   Okay.  So it wasn't that -- so correct me if I'm wrong, it
wasn't that the lids just kind of fell?

A.   No.  The wind picked up the lids.

Q.   Okay.  Now, once again, going back to the point of impact,
how did Ms. Cole move in reaction to the first impact?

A.   When she got the impact she was like kind of like that.

Q.   Okay.  Did she brace herself after the impact?

A.   Brace?

Q.   Yeah.

MR. DRAHOS:  Objection.  Leading.

THE COURT:  I mean, sustained.  But he re-asked the question anyway.

And then, just for the record, he was indicating that she was leaning --

THE WITNESS:  Yeah.  Once she get the hit she was like --

THE COURT:  -- leaning down towards the side?

THE WITNESS:  Side she got the hit at.  Yeah.

BY MR. DIEPPA:

Q.   What about the food she was holding?

A.   Well, the food was on the table.  The food in her mouth was like falling out.  Like she was eating and everything fall out and she was like --

Q.   What hand was she using to put the food in her mouth?

A.   I think the right hand.  Yeah.

Q.   Okay.  So when she gets the first impact, how does she move in relation to the impact?

A.   First she like -- like frightened and then go like this and was --

Q.   Kind of forward and to the side from what you're indicating?

A.   She was like -- yeah.

Q.   And then after that was there another impact?

A.   Yeah.

Q.   Okay.

A.   The other one is just one.  It was the first one is two,
and the next one is one.

Q.   Okay.  So the first one would have been with a single lid?

A.   No.  The second one is a single lid.

Q.   I'm sorry.  The second one is a single lid?

A.   Right.

Q.   And would the second one have impacted in the same manner?

A.   It hit her the same place, but I don't know from which --
it hit her; the point, I don't know.

Q.   Okay.

A.   Right.

        THE COURT:  Meaning you don't know what part of the lid
hit her the second time?

        THE WITNESS:  Right.

BY MR. DIEPPA:

Q.   And once the lids hit her, where did they go?

A.   Oh, they fell on the floor and some were scattered all
over.

Q.   Okay.  Did anyone from Carnival Cruise Line react after the
wind picked up the lids and struck Ms. Cole?

A.   Yes, sir.  They started to pick up all the lids.

Q.   Okay.  And going back to the point of impact, when Ms. Cole
was hit by the -- I guess the first two lids that hit her

together, was she able to see that coming?

A.   No.

Q.   Okay.  How would you -- since you saw the impact, how would you have described that moment of impact in terms of force?

        MR. DRAHOS:  Objection.  Vague.

        THE COURT:  I mean, I don't know how he's going to answer that.  That is a weird question.

        What are you trying to ask him?

        MR. DIEPPA:  Well, he already -- there's a foundation that he saw the impact.  I'm asking how hard he believed the impact was in terms of force.

        THR COURT:  So you want him to compare it to something?

        MR. DIEPPA:  I mean, I was -- I'm not sure what he's going to answer to.

        THE COURT:  I mean, I don't know how you answer that question.

BY MR. DIEPPA:

Q.   I will re-ask the question.

     Mr. Cole, when you saw the impact of these lids against the -- Ms. Eureka Cole's shoulder, can you describe the impact for me?  What did it look like or sound like or feel like to you?

        MR. DRAHOS:  Same objection.  Compound as well.

        THE COURT:  Well, I mean, yeah.  He's not going to know how it felt for her, but he can describe the sound or what

he -- you can describe what you saw.

A.   So all I saw when it hit her and the hit when she go back, that's -- I can't tell you the speed, how it feel, but I can see her go back and then fell.  Shoulder fell.

BY MR. DIEPPA:

Q.   All right.  Did it hit her hard?

A.   Yes, sir.

Q.   Okay.  How hard?

          MR. DRAHOS:  Objection.

          THE COURT:  Let me hear the answer.

          How are you going to answer that?

A.   I would say from 1 to like 10?

BY MR. DIEPPA:

Q.   However you would like to describe it.

          MR. DRAHOS:  Same objection.

          THE COURT:  Okay.  Let me hear the answer.

          Go ahead.  You can answer.

A.   Repeat the question.

BY MR. DIEPPA:

Q.   Yeah.  When you saw the first set of lids hit Ms. Cole, how hard was the impact?

A.   It was hard.

Q.   Okay.  Can you compare it to anything in your personal experience?

A.   No.  I can't compare it.

Q.   Okay.  And when I say that, it's like --

         MR. DIEPPA:  Sorry, Your Honor.  Just pulling something up.

BY MR. DIEPPA:

Q.   When you say that, after the impact did you see anyone from Carnival Cruise Line that appeared to work for Carnival Cruise Line react to the incident?

A.   So the guy, the worker was there.  He walk, he came over and radio some cap- -- I don't know if it's the captain or who he radio, and then the other employee was taking up the lids.

Q.   Okay.  And what did they -- how do you know they worked for Carnival, what did they look like to you?

A.   Oh.  They was in a uniform.  Blue shirt.

Q.   You can -- okay.

     And the other one?

A.   Same blue.  They was in uniform.

Q.   Okay.  And did they speak to you or did they speak to Ms. Cole after that?

A.   I think they was talking to Ms. Cole.

Q.   Okay.  And after the impact, how did your wife appear?

A.   After the impact?

Q.   Yeah.  Was she okay or --

A.   No, she wasn't okay.

Q.   How was she not okay?

A.   Because she was hurt.

Q.   How was she hurt?  Where do you -- when you observed her, where did she appear to be hurt?

A.   On the shoulder.

Q.   Okay.  Was it the same shoulder where the lids had hit her?

A.   Yes, sir.

Q.   What did they do for her at that time, the Carnival employees?

A.   So they take her down to -- so I don't know where they take her because I was trying to go and they say I cannot come -- go.  So they take her by herself so I was just waiting on her until she come back.

Q.   Okay.  Did they provide anything for her at the scene like --

A.   One of them, one of the worker was like, "Get some ice." But the next one said, "No," call the captain or somebody, I don't know who they call, but they call someone and then they take her down.

Q.   Okay.

A.   Yeah.

     MR. DIEPPA:  Your Honor, permission to refresh the witness's recollection?

     THE COURT:  Because he doesn't remember what they did for her?

     MR. DIEPPA:  Yes -- actually, it's on -- actually on a prior issue that the witness could not recall.

THE COURT:  Wait.  Refreshing his recollection as to what question?

MR. DIEPPA:  As to what he -- how he described the impact.  So I just would like to refresh his recollection as to that.

THE COURT:  From his deposition?

MR. DIEPPA:  From his prior statement, yes.

THE COURT:  His prior statement being his deposition?

MR. DIEPPA:  Being his deposition, yes.

THE COURT:  Okay.  So then you are going back to when he described -- he asked you to describe what how hard the impact was?

MR. DIEPPA:  How hard the impact was, yes.

THE COURT:  And you couldn't -- you are saying he can't remember?  I mean, I just don't recall him saying he can't remember.

MR. DIEPPA:  I can -- I will lay a foundation, Your Honor.

THE COURT:  Okay.

BY MR. DIEPPA:

Q.  Mr. Cole, you recall exactly how you described Ms. Eureka Cole's impact when she was hit with the lids at your deposition?  Do you recall your exact words?

A.  Excuse me?

Q.  Do you recall your exact words you used to describe the

impact during Ms. Cole's deposition?

MR. DRAHOS: Objection.

THE WITNESS: If I can recall it?

THE COURT: Like, say it again. Like a what?

A. If I can call -- tell you how hard is it?

BY MR. DIEPPA:

Q. Yeah. Do you recall what you said at your deposition, how you described it?

A. I don't understand.

Q. Okay.

MR. DIEPPA: Permission to refresh the witness's recollection?

THE COURT: So you -- I mean, the question is, it sounds like you did describe the impact --

THE WITNESS: Right.

THE COURT: -- before.

You gave some way of describing it before. Do you remember how you described it before?

THE WITNESS: No. I don't remember.

THE COURT: Okay. So it's okay. I mean, I understand. It's not really a proper refreshing of recollection, you're -- but you want -- you just don't like that he's not giving you the answer that he gave you at the deposition. I get that.

MR. DIEPPA: Yeah. I'd like to go through the procedure, allow him to review it silently and then ask him

again if it refreshes his memory and then ask him the question again.

THE COURT:  Okay.  It's unusual, but it's fine.  It's me.  I mean, normally I would -- I would worry about a jury hearing new testimony or I don't know if it's even hearsay from before, but go ahead and show him his deposition testimony from before.

I understand your objection.  It's not a proper refreshing of recollection, but go ahead and show him his deposition testimony.  It's fine.

By the way, do I have the deposition testimony?

MR. DIEPPA:  It's been filed, Your Honor.

THE COURT:  All right.  Go ahead.

BY MR. DIEPPA:

Q.  Mr. Cole, as the judge described, I'm going to show you a portion of your deposition transcript.  It should pop up on the screen there in a second.

THE COURT:  Why don't you --

MR. DRAHOS:  Can you direct me where --

THE COURT:  Now you're going to be showing me his deposition transcript which has been filed.

BY MR. DIEPPA:

Q.  Mr. Cole, looking at page 11, lines 5 through 23 of your deposition, I would like for you to read those silently and tell me when you finished reading them.

A.   Number what, 5?

Q.   Lines 5 through 23.

MR. DRAHOS:  Which page was that, Counsel?

MR. DIEPPA:  Page 11, lines 5 through 23.

MR. DRAHOS:  I understand the Court's ruling, Your Honor, but I do want to just state another objection on the record.  It's not even really what he's attempting to try to refresh his recollection on.  The question was asked:  "Can you describe" --

THE COURT:  Lines what?

MR. DRAHOS:  Lines 5 through 23 on page 11, the question that was asked was could he describe the nature of the impact is what I thought he was being asked.

THE COURT:  He actually answered this question already, and he answered it:  "She was struck two separate times by three plastic lids, two hit her like bomb."

Like you want him to say "like a bomb," is that what you want?

MR. DIEPPA:  Yeah.  That's what he did not say.

THE COURT:  I mean, okay.  Because otherwise --

MR. DIEPPA:  Otherwise it's the same.

THE COURT:  -- it's his same testimony.  So I get that you wanted him to say that it was like a bomb.

MR. DIEPPA:  And, Your Honor, I only do it this way because the other way I would have to lead him, and I think

this is the more correct way.

THE COURT:  Okay.  All right.

Well, that's fine.  You don't have to -- you can take the testimony down.

BY MR. DIEPPA:

Q.   Okay.  Did you have the opportunity to review your -- this portion on the screen, Mr. Cole?

A.   Yes, sir.

Q.   Okay.  So you had the opportunity to read it?

A.   Yes, sir.

Q.   Okay.  So can you state for me how the two container lids appeared to hit Ms. Cole at the moment of impact when you personally observed it?

MR. DRAHOS:  Objection, Your Honor.  Sorry.  Just feel like we have been down this road.

THE COURT:  I know.  We have.

So now that you have read that, do you remember how you previously described it?

THE WITNESS:  Yeah.  I remember I did say it hit her like a bomb.

THE COURT:  Is that how you still feel, like a -- is that a good word for it?

THE WITNESS:  I still feel that way.

THE COURT:  Okay.  All right.

Go ahead and move on.

BY MR. DIEPPA:

Q.  All right.  And you described it as like a bomb?

A.  Yeah.

Q.  So after the impact, does -- and going to the next photograph here, still part of Plaintiff's J-5, can you see what's depicted in this photograph?

A.  Yes, sir.

Q.  Okay.  Do you know who brought that to your table?

A.  I think -- I think it was a lady bring the ice.  I don't remember.

Q.  Okay.  Did they -- who did they bring it for?

A.  Ms. Cole.

Q.  Okay.  When you say a lady brought the ice, do you know who that lady was probably working for?

MR. DRAHOS:  Objection.

A.  The Carnival.

THE COURT:  Sustained.  But it's okay.

BY MR. DIEPPA:

Q.  Can you describe the lady for me?

A.  It was a short long-haired lady.

Q.  Was she wearing uniform?

A.  Yes, sir.

Q.  Okay.  Was it a uniform for the cruise lines?

A.   Yes, sir.

Q.   And did Ms. Cole apply that ice?

A.   Yeah.  I think, yeah, she did put a little ice in it.

Q.   Okay.  Was this before she went to the infirmary or after?

A.   My recollect I think it's after.

Q.   All right.  And after the lids had -- I guess who picked the lids up off the floor?

A.   So it was a guy and a lady picked up the lids.

Q.   And were they wearing uniforms?

A.   Yes, sir.

Q.   Okay.  Did those uniforms appear to be cruise line uniforms?

A.   Yes, sir.

Q.   Did any of those workers that were picking up the lids make any statements to you or Ms. Cole that you heard?

A.   Excuse me?

Q.   Did they say anything, any of the people picking up the lids or that responded to Ms. Cole's accident, did they say anything or did they make any statements that you heard?

A.   I think one of the guy ask her if she all right, if she hurt, and she say yes.

Q.   After you -- after Ms. Cole came from the infirmary, did -- where did she go?  When did you see her next?

A.   She came up.  After she come up, she came up, and then we went to the room.

Q.   The following day was that the end of the cruise?

A.   The following day?  Yes, sir.  I think it was the end of the cruise.

Q.   And after you got off the ship did -- well, did they let you come off the ship faster because Ms. Cole was injured?

A.   Yes, sir.

Q.   Okay.  And after you got off the ship with Ms. Cole, where did you go?

A.   We go to the emergency room.

Q.   And then after you go to the emergency room, did Ms. Cole, from what you recall, receive additional medical treatment?

A.   Yes, sir.

Q.   Okay.  And do you recall like any of that medical treatment, what it entailed?

          MR. DRAHOS:  Objection.

          THE COURT:  Overruled.  I mean, on what ground?

          MR. DRAHOS:  Predicate, one.  Two --

          THE COURT:  Whether he remembers what the --

          MR. DRAHOS:  He wasn't in the room for any of the medical care.

          MR. DIEPPA:  That's not what I said.

          THE COURT:  Well, he asked if he remembered what any of the medical care entailed.

          MR. DRAHOS:  Does he even know what medical care would be?

THE COURT:  Okay.  So -- so maybe lead up to that a little.  Like, how would he know?  It's a valid point.  I mean, how does he know what kind of medical care, was he there?

MR. DIEPPA:  Well, he just said they went to the emergency room, Your Honor.

THE COURT:  With her?

MR. DIEPPA:  It's -- you know, this is her husband.  I mean, I can lay a further predicate if you wish.

THE COURT:  No.  But, I mean, was he -- were you in the room with her when she went to the emergency room?

THE WITNESS:  No.

THE COURT:  Okay.  So how -- how do you know what kind of treatment she had?

MR. DIEPPA:  Your Honor, I will take care of it.

THE COURT:  Okay.

BY MR. DIEPPA:

Q.  After Ms. Cole was injured, did you have to take her to any medical appointments?

A.  After, after?

Q.  Yeah.  After the injury.  At any point after the injury did you have to take her to any medical appointments?

A.  Yeah.  When she go to Citi and the surgeon.

Q.  Okay.  Did you have to care for her after she saw the surgeon?

A.  Yes, sir.  Even before.

Q.   Okay.  And so in terms of going back to my original question, what did her medical treatment entail?  When she went to the surgeon, what did they do for her?

A.   I don't know what it called, what -- I don't know what it called.

Q.   You don't know what the procedure was called?

A.   Yeah.

Q.   Okay.  Do you know where the procedure was performed?

A.   I think somewhere in Miami.

Q.   No.  Where in her body?

A.   Where in body?  Oh.  Her left shoulder.

Q.   Did Ms. Cole ever tell you that she had undergone a surgery to her left shoulder?

A.   Before?

Q.   After the incident.

A.   Question, excuse me?

Q.   Did Ms. Cole ever tell you that she had surgery to her left shoulder after the accident?

A.   After the accident, yeah.

Q.   Okay.  Did you have to help take care of her after she had that surgery?

A.   Yes, sir.

Q.   Do you recall how much time she was out of work because of that surgery?

A.   I don't recall the full particulars.  Like about a month.

Q. Can you describe for me anything that you had to do to take care of Ms. Cole as a result of the injuries she suffered on the cruise line on July 24, 2022?

A. Yes. Yes, sir. I have to give her a bath, morning and evening lotion her skin, get her dressed. So it's like every day do it, morning and evening.

Q. Okay. What about bathing?

A. Yeah. Give her a shower. Yeah.

Q. And since the incident is there anything that you have observed that Ms. Cole can't do in the same way she used to be able to do before the incident?

A. Yes, sir. When we used to go to supermarket she used to like help me bringing in the bags, now it's me. She can't lift it up no more. She even bring like two, it's like in the right hand.

Q. Now, going back to the events on the cruise line there, from what you saw since you were there, do you think that Carnival Cruise Line, the defendant in this case, could have done anything differently to avoid this incident?

A. Yes, sir.

Q. Okay. What do you think they could have done differently on that day to avoid this incident with your wife?

A. Put the lids underneath the right place.

Q. So to put the lids underneath --

A. The right place, yeah.

Q. Anything else?

A. Right. Yeah.

Q. Anything else?

A. The stuff --

THE STENOGRAPHER: I'm sorry, sir?

A. The thing, where the lids is at, it's on a wheeled, so they could like wheel it away, move it away.

BY MR. DIEPPA:

Q. If they had told you that it was too windy to be out there, would you have not been out there in the first place?

THE WITNESS: No.

MR. DRAHOS: Objection.

THE COURT: Sustained.

BY MR. DIEPPA:

Q. Could they have closed the lido deck?

MR. DRAHOS: Objection.

A. Yes, sir.

THE COURT: I mean, could -- meaning could --

THE STENOGRAPHER: I'm sorry, sir?

A. It was a lot of wind so --

THE COURT: Sustained.

Unless what you want to ask him is if he had previously seen the lido deck closed. I don't know if he had on this cruise.

MR. DIEPPA: I'm just asking if he would have complied,

really, is what I'm getting at.

THE COURT: If they had closed the lido deck would you have not gone to the lido deck?

MR. DIEPPA: Would he have complied. Yeah.

THE COURT: That's fine. Go ahead.

BY MR. DIEPPA:

Q. If Carnival had told you that day was too windy for you to go out and eat on the lido deck with your wife, would you have followed Carnival's directions and eaten somewhere else?

A. Yes, sir.

THE COURT: It is speculation, but I will allow it.

BY MR. DIEPPA:

Q. Anything else in terms of the way Ms. Cole's life is different today versus before this incident occurred?

MR. DRAHOS: Objection. Calls for narrative. Anything else about her life? I think we've covered this, but --

THE COURT: I mean, I understand the objection. But I can't imagine it's going to be a long narrative so I will overrule the objection.

BY MR. DIEPPA:

Q. You could answer, sir.

A. Can you repeat the question?

Q. Anything else that you can recall regarding how Ms. Cole's life is different after the accident versus before the accident?

A.   After the accident it's different because she, as I say, she couldn't do a lot of stuff.  Like cleaning, bringing the groceries, she can't draw.  Like her profession is drawing blood, she can't draw blood no more.  So --

Q.   You said professionally draw blood?

A.   Yeah.

Q.   What does Ms. Cole do for work?

A.   She work at the --

THE STENOGRAPHER:  I'm sorry, sir?

A.   She work at the hospital pulling -- I don't know the name. Draw blood.

BY MR. DIEPPA:

Q.   Which hospital?

A.   Jackson Hospital.

THE COURT:  Is that a phlebotomist?

THE WITNESS:  Phlebotomist, yeah.

MR. DIEPPA:  All right, Mr. Cole.  That concludes my questions on direct for you.  I may have some follow-up questions.

THE WITNESS:  Okay, sir.

THE COURT:  All right, Mr. Dieppa.

You're ready to go ahead with cross?

MR. DRAHOS:  Well, Your Honor, I was going to ask what the Court felt about that.

I'm happy to do a cross.  However, I have Dr. Chalal in

the hallway, and if the Court wants to conclude today at 2:00, would it be possible for us to put Dr. Chalal on the stand and maybe do the cross of Mr. Cole tomorrow?

MR. DIEPPA:  Mr. Cole is not available tomorrow.

THE COURT:  Go ahead with the cross.  I have a little bit more flexibility.  I called.  I can probably leave here a little after 2:00.

Go ahead with the cross and let's see -- how long do we need for the doctor?

MR. DRAHOS:  Well, maybe two hours is what I had reserved.

THE COURT:  Oh.  Okay.  I gotcha.

MR. DRAHOS:  That's just a guess, Your Honor.

THE COURT:  Okay.  And how long do you think cross is going to be?

MR. DRAHOS:  I'm going to try to get this done really quick, especially if he's not available tomorrow.

MR. DIEPPA:  He's got to work.  He was just here for today.

THE COURT:  Go ahead with the cross.

MR. DRAHOS:  Thank you, Your Honor.

May I proceed?

THE COURT:  Yes.

CROSS-EXAMINATION

BY MR. DRAHOS:

Q.   Mr. Cole, my name is Michael Drahos, I'm counsel for Carnival.  I don't think we have had the pleasure of meeting yet.

Let me ask you first, how good is your memory, sir?

A.   Excuse me?

Q.   How good is your memory?

A.   Pretty good.

Q.   Have you ever had issues with your memory before?

A.   No, sir.

Q.   Have you ever been tested for memory issues?

A.   No, sir.

Q.   Had any specialized schooling or rehabilitation as it relates to cognition or memory at all?

A.   No, sir.

Q.   So how long have you been living at your current address?

A.   Maybe around about a month.

Q.   One month?

A.   Yeah.

Q.   And what is your address, sir?

A.   I don't remember my address that much.

Q.   You live with Ms. Cole?

A.   Yes, sir.

Q.   So you and Ms. Cole both have moved within the last month?

A.   Yes, sir.

Q.   And you're from the Caribbean; right?

A.   Yes, sir.

Q.   But in this particular case you didn't recall whether or not this ship was in Freeport or Nassau?

A.   I'm not from Freeport.  I'm from Jamaica.

MR. DIEPPA:  Objection.  Misstates his testimony, Your Honor.

THE COURT:  Overruled.  He didn't -- go ahead.

BY MR. DRAHOS:

Q.   Sir, originally when you were questioned about where the ship was located, did you tell the Court the ship was in Freeport?

A.   I did.

Q.   And you understand Freeport and Nassau to be two totally different places?

A.   Yes, sir.

Q.   Okay.  And when you were asked questions about what time you got back onto the ship, you were in Nassau at the time with Ms. Cole; correct?

A.   Yes, sir.

Q.   When the ship went into port?

And you told us here today that you got back on the ship around 3:00 or 4:00 is what you said; correct?

A.   Yeah.

Q.   All right.   But you were asked that same question during your deposition, were you not?

A.   I don't recall.

Q.   All right.   So what I would like to do is I'm going to hand you a copy of your transcript, sir.

MR. DRAHOS:   May I approach the witness, Your Honor?

THE COURT:   Sure.

MR. DIEPPA:   Your Honor, that's improper impeachment. He's got to impeach him with a statement, not the entire transcript.

MR. DRAHOS:   I'm going to hand it to him so I can question him about --

MR. DIEPPA:   That's not -- that -- he's got to question him on a statement or -- and impeach him on a statement.

THE COURT:   Okay.   Wait.   Hold on.

So he asked him -- he said today he testified that he got back to the ship around 3:00 or 4:00.

You were asked the same question during your deposition.

I don't recall.

MR. DIEPPA:   So now --

THE COURT:   Okay.   He doesn't recall if he was asked that same question during his deposition.

So now you are going to ask him if something would help him remember?

BY MR. DRAHOS:

Q.   Yes, sir.  If I showed you a copy of your deposition transcript, would that help refresh your recollection as to what time specifically you got back on the ship on the day in question?

A.   I can't tell you yes or no.  I don't know if I can remember.

MR. DRAHOS:  Your Honor, with the Court's permission I'd like to approach?

THE COURT:  Yes.  That's fine.

MR. DIEPPA:  Your Honor, I will object to the improper impeachment.

THE COURT:  Well, it's not improper refreshing of recollection.  He couldn't remember so if his recollection is refreshed then we will know if it's proper impeachment based on what he said before.

BY MR. DRAHOS:

Q.   Mr. Cole if you could please turn to page 8 of the transcript.

If you look on the upper right hand corner, it has the page numbers there.

MR. DRAHOS:  Your Honor, may I help him?  I was just going to direct him to the right page.

THE COURT:  So can you see the page numbers at the top?

THE WITNESS:  I see 6, 9.

BY MR. DRAHOS:

Q.  Yes, sir.  That's the correct page.

On the upper right hand corner you see where it says page 8 there?

THE COURT:  He's got it.

BY MR. DRAHOS:

Q.  All right.  And you testified in the case on Wednesday, August 2nd of 2023; correct?

A.  Yes, sir.

Q.  Okay.  And if you'll turn to page 8, were you asked the question:  "And I believe you got back on the ship around 3:00 that afternoon?"

Was your answer:  "Yes"?

A.  As I said, I can't recollect -- I remember around 3:00 or 4:00.

Q.  Okay.  When you were asked that question in the deposition under oath you said around 3:00; correct, sir?

Ms. Genoese, can you please go to Defendant's Exhibit 1 for us?

MR. DRAHOS:  And, Your Honor, permission to publish Defendant's Exhibit 1?

THE COURT:  Okay.

BY MR. DRAHOS:

Q.  Sir, what we put up on the screen there is called a Movement Detail Report.  It's generated by Carnival.  And it

tracks every time passengers get on and off the ship.  If according to Carnival's records Ms. Cole would've got back on the ship at 3:06 p.m., do you have any reason to dispute the accuracy of that report as you sit here today?

MR. DIEPPA:  Your Honor, objection.  It's as to Ms. Cole, it's not as to Mr. Lucien Cole.  So I'm not sure why he's asking a question about Eureka Cole.  And the exhibit doesn't have his name on it, it has movement for Eureka Cole only.

THE COURT:  Oh.  I thought that he had previously said they came back together; is that not true?

MR. DRAHOS:  I could ask that question.

THE COURT:  Yeah.  Why don't you ask that question.

BY MR. DRAHOS:

Q.   Mr. Cole, did you and your wife come back on the ship at the same time from Nassau?

A.   Yes, sir.

Q.   And if according to Carnival's records Ms. Cole would have gotten back on the ship at 3:06 p.m., are you here today to tell the Court that you came on the ship at any different time than that?

A.   No.  As I said, I didn't know -- I wasn't watching the time exactly so I can't tell you exactly.

Q.   What time did this incident occur?

A.   I don't quite remember the exact time it happened.  As I

say, after -- when we come back on the ship, that's -- sitting and was playing domino, so I can't tell you the exact time.

Q.   Right.  Can you give us an estimate?

A.   No.

MR. DRAHOS:  So, Ms. Genoese, can you go to Plaintiff's Exhibit 1 for us, please.

BY MR. DRAHOS:

Q.   Sir, I've put up on the board what is Plaintiff's Exhibit Number 1.  This is a Passenger Injury Statement that was completed by your wife.

If according to your wife --

MR. DRAHOS:  Could you put that back up?

Oh.  You're right.  I gave you the wrong number.

Joint 1.  Thank you.

BY MR. DRAHOS:

Q.   Sir, so we've put up on the screen there what is Joint Exhibit Number 1, this was a Passenger Injury Statement completed by your wife.  If she indicates there on the form that the time of the incident was 6:20 p.m., do you have any contrary evidence here today to dispute the accuracy of that time?

A.   I'm not disputing, but I just don't remember the time.

Q.   All right.  So you told us that you got back on the ship and you went right to the lido deck; correct?

A.   Yes, sir.

Q.   And so if you got back on the ship at 3:00, or 3:06, how long did it take you to get to the lido deck?

A.   Didn't take much time.  We were sitting down before we started to eat.

Q.   Right.  So then can we conclude, sir, that if you got on the ship around 3:06 and it didn't take you that long to get on the lido deck, and as you testified earlier, you stayed out there the entire time, that would mean that you and your wife were out on the lido deck for over three hours before this incident occurred; is that correct?

A.   Yes, sir.

Q.   Okay.  And during the course of the three hours that you were out there, you told us that the winds were gusting; right?

A.   Yes, sir.

Q.   As a matter of fact, you told us that those winds were 29 to 30 miles per hour according to your estimate?

A.   Yes, sir, it was.

Q.   That's a really specific number, sir.  Where did you come up to that?

A.   Because I been in those winds before.

Q.   Do you have any training in meteorology?

A.   No, sir.

Q.   Did you use any devices or anything to help you come to that figure?

A.   No, sir.

Q. You're just guessing here today, are you not?

A. I'm not really guessing. Like --

Q. Can you give us any scientific basis for why you believe the winds were 29 to 30 miles an hour?

A. No, sir.

Q. And you told us that you were out on the deck playing dominos; correct?

A. Yes, sir.

Q. Are you any good?

A. Excuse me?

Q. Are you any good?

A. For dominos?

Q. Yes.

A. I could -- yeah, I good. But you have people better than me.

Q. How long have you been playing for?

A. Domino?

Q. Yes, sir.

A. Quite a while.

Q. You were out there on the deck playing with family, right, and friends?

A. Yes, sir.

Q. Okay. And as you told us, you sit there at the table and you play until you lose and then you got to get up and call it is what you said; right?

A.   Excuse me?

Q.   You told us before that when you play dominos out there at the table when you lose you call it and you get up from the table; right?

A.   Yeah.

Q.   Is that correct?

A.   So once you playing and you lost, you count less, you got to get up.

Q.   Okay.  And there's a specific table on the lido deck for dominos, is there not?

A.   No.

Q.   Where did you play, sir?

A.   We was in the corner, closer to the bathroom.

Q.   Okay.  Out on the lido deck?

A.   Yes, sir.

Q.   All right.  And so during the time that you were out there playing dominos, this would have been while the winds were gusting at 29 to 30 miles an hour?

A.   Yes, sir.

Q.   What are those dominos made out of, sir?

A.   I don't know what to call it, but -- I don't know what to call it.

Q.   I'm sorry?

A.   I don't know what they make of.

Q.   Plastic?

A.    No.

Q.    So what's the make, wood?

A.    No.  It's like -- it's like more like a little like glossy weighty stuff.  I don't know what they make of.  Chalk? Something, something.

Q.    How heavy are those dominos?

A.    They have a little weight.

Q.    Are they heavier than the plastic lid that you picked up and held before the court a moment ago?

A.    No, sir.

Q.    So you told us that when you got up from the lido -- or from the dominos table, you went over to the area in question to have something to eat?

A.    Yes, sir.

Q.    That was your testimony?

      Okay.  And you said that you were eating there for a while and then your wife came over to join you because you were eating by yourself?

A.    Right.

Q.    And you were shown some photographs of the particular area.

      What I would like to show you is --

      MR. DRAHOS:  Ms. Genoese, can you go to Defense 6, please.

      Permission to publish, Your Honor.

      THE COURT:  Sure.

BY MR. DRAHOS:

Q.   So I put before you a photograph which is Defense Exhibit 3-6.

Does this photograph here accurately depict the area of the subject incident?

A.   Yes, sir.

Q.   It does?

And you would agree that the entire area is covered by a roof; correct, sir?

A.   I --

THE STENOGRAPHER:  I'm sorry?

A.   I seen it now.  I know it's covered roof.

BY MR. DRAHOS:

Q.   Okay.  You've seen it now.

Would you agree that on the date in question where you all were seating was covered by a roof?

A.   No.  That day I didn't see the roof.  I saw it now.

Q.   Okay.  Does that then mean, sir, that on the day in question that roof wasn't there or are you just saying you don't remember?

A.   I don't know.  I don't remember seeing the roof.

Q.   But you told us specifically how high you remember the lids on the container to be?

A.   Yes, sir.

Q.   You told us 2 feet high; correct?

A.   Yes, sir.

Q.   So that means you got a pretty good look at those lids before this incident, didn't you?

A.   Yeah.  Because they was workers stacking them so I saw them stacking it.

MR. DRAHOS:  Ms. Genoese, can you go to -- it was a photograph that was shown before.  I think it was Joint -- it's Joint 5-2, please.

BY MR. DRAHOS:

Q.   Sir, showing you what was previously identified as Joint Exhibit 5-2.

Are you telling us, sir, that the stacks that are seen there are 2 feet high?

MR. DIEPPA:  Object to form.  Misstates his testimony.

THE COURT:  I mean, you can re-ask it.

BY MR. DRAHOS:

Q.   Sir, how high do you think the stacks are there in that photograph?

THE COURT:  The stacks of lids?

MR. DRAHOS:  The stacks of the lids.

Thank you, Your Honor.

A.   There's no lid on top where it was now.  You have a container on top.  The lids is underneath right now so I can't tell you.

BY MR. DRAHOS:

Q.   Okay.  Understood.

But you see those lids there now; correct?

A.   Yes, sir.

Q.   All right.  So earlier you told us that the lids that were involved in the incident were 2 feet high.

How high are those lids that are depicted in Joint Exhibit 5-2?

MR. DIEPPA:  Object to form again.  Misstates his testimony, Your Honor.  He specifically described where the lids were, and they weren't in the position they were in that photograph.  He specifically stated that.

THE COURT:  Okay.  Overruled.  I heard his testimony before.  He's asking him to describe how high the lids in the photo are so it's different.

A.   These lids underneath right now?  It's like 5 inches.

BY MR. DRAHOS:

Q.   5 inches?

A.   Yes, sir.

Q.   Okay.  Where are the other lids that were involved in the incident?

A.   Where they are?

Q.   Yes, sir.

A.   They was right in top of the cart.

Q.   Understood.

But where are they depicted in the photograph there?

A.   Underneath.

Q.   So all of the lids that were involved in the incident are all depicted in Joint Exhibit 5-2?

A.   I don't understand.

Q.   So I asked you where the lids were that were involved in the incident; right?

Did you tell me you don't know?

A.   No.  You just asked me where they at now.

Q.   Okay.  Can you tell me in looking at Joint Exhibit 5-2, whether all the lids that were involved in the incident are all depicted in that photograph?

A.   All of them is not in that photograph.

Q.   Where did they go, sir?

A.   I don't know where you guys put them.

Q.   You testified earlier that the crew came over and they cleaned them up and put them underneath the container?

A.   Yeah.  They stacked them and they removed them.

Q.   When was that photograph taken, sir?

A.   I don't know when the photograph was taken.

Q.   Who took the photograph?

A.   I don't know.

Q.   Why was it taken?

A.   I don't know.

Q.   Who drew that circle around the chair there?

A.   That circle?

Q.   Yes, sir.

A.   I don't know.

Q.   Do you know what time of the day that photographs was taken?

A.   No, sir.

Q.   So it's your testimony in this case, Mr. Cole, that when your wife sat down and these stacks of lids were contained there on that station, that shortly after she sat down these lids came in her direction; right?  That's what you told us?

A.   Yes, sir.

Q.   All right.  And I want to be very clear about something. Your testimony in this case is that she was hit two separate times?

A.   Yes, sir.

Q.   You are sure of that, sir?

A.   Positive.

Q.   Okay.  And you told us here today when you described how her body moved that she went back in response to being hit, that's what you said?

A.   No.  I said she went drop.

Q.   Did you testify here today in this courtroom --

A.   Dropped.

Q.   Did you testify here today in this courtroom that when she was hit with the lid she went back?

A.   She went drop.  Like that.

Q.   So is it your testimony that she went back or not?

MR. DIEPPA:  Object to form, Your Honor.  Asked and answered.

THE COURT:  It is asked and answered.

BY MR. DRAHOS:

Q.   So she went drop.  Can you show me again one more time how you did that?

MR. DIEPPA:  Objection.  Asked and answered, Your Honor.  Four times.

THE COURT:  Well, he's asking him to illustrate how it happened.  That's fine.

MR. DIEPPA:  Which he has done.

BY MR. DRAHOS:

Q.   All right.  So you have done that four times; right?

A.   Yeah.

Q.   And you would agree that none of the four times that you did that did your left hand make contact with the table in front of you.  Agreed?

A.   No.  My hand don't make contact with the table.

Q.   All right.  Thank you, sir.

So we already talked about the fact that you were out there for over two hours before this incident occurred.

A.   Yes, sir.

Q.   And you told us that when Ms. Cole was taken to the medical center you also remained in the area; correct?

A.   Yes.

Q.   And how long were you remaining in the area there while she was seeking medical care?

A.   It was a while so I can't tell you the exact how long, but it was a while.

Q.   More than two hours?

A.   As I said, I can't tell you the time, exact time, but it was a while.  They even -- some of the friends was like, "You ain't going down there to check on your wife?"

I say, "I'm just going to wait on her."

Q.   Sir, can you turn to page 16 of your deposition?  So page 16, line 19, were you asked the question in deposition:

"QUESTION:  Did you remain in the area?

"ANSWER:  Yeah.  I sat right there until she came back.

"QUESTION:  Did you continue to play dominos?

"ANSWER:  No.  I was just sitting down waiting."

A.   Yeah.

Q.   "QUESTION:  Okay.  Well, my understanding is your wife was in the medical center for about two hours?

"ANSWER:  Yeah.  I stay right there until she come back."

So were you there for about two hours?

MR. DIEPPA:  Your Honor, under 106 I would request that page 17, 1 through 4 also be read.

THE COURT:  So in any event, let's just start here.  Isn't that what he just said?

MR. DRAHOS:  So he was questioned specifically about how long he was there for.  He said he didn't know.  When he was questioned in deposition, specifically two hours, he said, yes.  And then I'm happy to read the portion that counsel would like, that's page 17, line 1.

"Did you just sit in the seat for two hours and not do anything else?

"ANSWER:  Sit around -- sit and move around, but sit -- mostly sit like waiting.

MR. DIEPPA:  Two hours.

BY MR. DRAHOS:

Q.  So, sir, I guess the question that prompted all of this was, do you have any reason to dispute or change your testimony as it relates to how long you were there for?  Were you there for two hours?

A.  I can't change it.  I'm not going to change it.  But I'm not recall of the how long I was there.  But I was sitting there for a while.

Q.  So let's just say conservatively were you in the lido deck area for approximately four hours on the day in question?

MR. DIEPPA:  Object to form.  Misstates his testimony, Your Honor.  I mean --

THE COURT:  Well --

MR. DIEPPA:  He didn't say that in his depo, he didn't say that on the stand.

THE COURT:  I mean, I'm listening to his testimony. And he said they got back on the ship.  -I mean, my math might be a little different.  But if they got back on the ship a little after 3:00, the incident happens a little after 6:00, and then he's sitting around for two hours waiting for her, it's actually five hours, no?

MR. DIEPPA:  Yeah.  And it's not what he said.

MR. DRAHOS:  Five hours.  That's fine.

BY MR. DRAHOS:

Q.  Mr. Cole?

A.  Yes, sir.

Q.  Would you say, would it be fair to say that you were out in the lido deck for five hours on the day in question?

A.  I wasn't checking the time so I don't want to say I was there for a certain amount of hours.

Q.  Okay.  During the entire time that you were out there, though, from the moment you first got on the lido deck until the time that you finally left, would you agree that you didn't see anybody else get hit by any lids?

A.  No, I didn't see anybody else get hit.

MR. DRAHOS:  And, Ms. Genoese, can you put up Joint 5-1 for us.

BY MR. DRAHOS:

Q.  Mr. Cole, do you see Plaintiff's -- sorry, Joint Exhibit 5-1 there on the screen?

A.   Yes, sir.

Q.   That was a picture of ice that you were shown earlier during your direct; correct?

A.   Yes, sir.

Q.   Do you know who took this photograph?

A.   No.

Q.   Was it you or your wife?

A.   I don't recall if it's me or my wife.  I don't remember.

Q.   Why were you guys taking a photograph of ice, sir?

A.   I don't know.  I don't know if it's me taking it.  I don't remember.

Q.   Do you know why either you or your wife would have taken a picture of a bag of ice?

A.   No, sir.

        MR. DRAHOS:  Thank you.  That's all I have.

        THE COURT:  Any redirect?

        MR. DIEPPA:  Yes, Your Honor.

                    REDIRECT EXAMINATION

BY MR. DIEPPA:

Q.   All right.  Mr. Cole, you were asked during cross-examination about the photograph entered into evidence as Defense Exhibit 3.  It's about the sixth photograph here.

     See that photograph there on your screen?

     I guess we have to switch over to the plaintiff there.

     Okay.  All right.  Mr. Cole, do you see that photograph?

A. Yes, sir.

Q. Okay. On the right, on the right side of that photograph is there a wall?

A. There's a wall? No.

Q. Okay. And looking at the other photograph here, same exhibit from the defense, do you see a wall in this area I'm indicating here?

A. No, sir.

Q. Okay. And outside of that is that the ship's deck?

A. Yes, sir.

Q. And how tall are you, sir?

A. 5'5, 5'4.

Q. Okay. Since you were in this area here, do you know how high the ceiling was?

A. No, sir.

Q. Okay. Was it high enough for you to walk through?

A. Yes, sir.

Q. Was it too high for you to touch the roof?

A. Yes, sir.

Q. Meaning that you would have to stretch out your hands and however far your hands would stretch out and you wouldn't be able to touch the roof?

A. No, sir.

Q. You were asked about winds, scientific meteorologist. You're from Jamaica?

A.   Right.

Q.   Ever had a hurricane or a tropical storm?

A.   Oh, yes, sir.

Q.   Okay.  Ever felt the winds?

A.   Yes, sir.

MR. DRAHOS:  Objection, Your Honor.

THE COURT:  "Ever felt the winds," what's the objection?

MR. DRAHOS:  Are they trying to relate the winds of a hurricane to the winds on the ship?  If so --

THE COURT:  Oh, I didn't take it as that.  I see what you're saying, though.

MR. DIEPPA:  Your Honor?

THE COURT:  You're saying has he ever felt wind; right?

MR. DIEPPA:  Your Honor, under the law in the state of Florida, and under the rules of evidence, a witness is able to estimate speed within personal experience.  And that is why it's being offered.

THE COURT:  Okay.  So -- but the question was:  "Have you ever been in a hurricane" --

MR. DIEPPA:          -- "or tropical storm" --

THE COURT:  -- "or tropical storm?

"Yes."

MR. DIEPPA:  And:  "Have you ever felt the winds?"

THE COURT:  That's -- okay.  And he said:  "Yes," of a

tropical storm.

I was missing the flow of the question.  Okay.  So we've got that you've felt the winds of a tropical storm before.  I think any of us in South Florida have.

BY MR. DIEPPA:

Q.   Okay.  So that's all I'm saying, when you gave that number in direct examination, you're estimating, but that's based on your personal experience?

A.   Right.

Q.   Living in Florida, living in Jamaica?

A.   Yes, sir.

Q.   And dealing with the weather we all deal with here?

A.   Yes, sir.

MR. DIEPPA:  Thank you, Mr. Cole.

THE WITNESS:  You're welcome, sir.

THE COURT:  All right.  Thank you.

You can step down, Mr. Cole.

THE WITNESS:  Should I --

THE COURT:  You can return that back.  Thank you.

Do you need a break or you want to go ahead and call doctor --

MR. DRAHOS:  We would like to go ahead and call the doctor if the Court is able and the court reporter as well.

THE COURT:  Everybody good?

MR. DRAHOS:  Thank you.

It's okay if I go and set up?

THE COURT:  Of course.

MR. DIEPPA:  I have an objection to one demonstrative they intend to show, Demonstrative 9.

THE COURT:  Wait.  You mean Defense Exhibit 9?

MR. DIEPPA:  Yes.  Defense -- it says "demonstratives." Defense 13, it says "demonstratives."

THE COURT:  Oh.

MR. DIEPPA:  Oh, you're not showing him that?

MR. DRAHOS:  No.  No.  I think the joints is wrong.  So the MRI would be --

MR. DIEPPA:  Oh, there's no objection to that.

THE COURT:  Come on in.

(Dr. Joseph Chalal sworn by CRD.)

THE WITNESS:  I do.

COURTROOM DEPUTY:  Thank you.  Please have a seat. State and spell your name for the record.

THE WITNESS:  Joseph Chalal, C-H-A-L-A-L.

DIRECT EXAMINATION

BY MR. DRAHOS:

Q.  Good afternoon, Dr. Chalal.  Can you please give us your professional address?

A.  6056 Boynton Beach Boulevard, Boynton Beach, Florida.

Q.  And what is your current occupation?

A.  I'm an orthopedic surgeon.

Q.   Can you please provide the Court with the benefit of your educational background starting with college?

A.   After four years of college I went to the University of Pennsylvania School of Medicine.  I did my internship in general surgical residency at Beth Israel Medical Center.  I did my orthopedic surgical residency at Columbia Presbyterian Medical Center.  I did a sports medicine fellowship at North Sydney Sports Medicine.  And I have been in practice in Palm Beach County since 1988.

Q.   So how does it work in medical education, as you advance your studies, do you have an opportunity to pick a particular field that you want to focus in?

A.   So in orthopedic surgery there's a lot of subspecialties. There's -- in my case, I did a fellowship which is additional training in sports medicine.  There's hand surgery, there's spine surgery.  There's pediatric surgery.  There's oncologic surgery, meaning cancers of the tumors, both benign and malignant, of the musculoskeletal system which are the bones, ligaments, tendons of the body.

     So within orthopedics you can either be a general orthopedic surgeon or you can also have a subspecialty which is what I chose to do.

Q.   Okay.  And are you board certified?

A.   I'm board certified in orthopedic surgery and I'm also board certified in sports medicine.

Q.   How do you become board certified?

A.   In orthopedic surgery if you -- after successful completion of a residency, you sit for a written examination, if you pass the written examination, 22 months into practice you can then take an oral examination.  So I took my oral examination 1990, which is two years after I started practice.  I was board certified orthopedics in 1990.  Our certifications are good for ten years.  So we have to get recertified every ten years through a mechanism of various ways.

So I was board recertified in 2000.  Sometime after 2000 they came out with some subspecialty board certification.  So in 2009 I took my board recertification for orthopedic surgery and my board certification for sports medicine.  So since 2010 I have been board certified in both sports medicine as well as orthopedic surgery.

I just got recertified in 2020, which takes me to 2030, but the way it works in orthopedics is it's an ongoing process to get recertified.  So I'm sort of in the process now, even though I'm board recertified 'til 2030, you have to do it over the ten year period if you want to get recertified for the following decade.

Q.   So tell us a little bit about your practice in particular, sir.

A.   My practice is an orthopedic surgical practice.  It's more of a general orthopedic practice.  My subspecialty is sports

medicine and my surgical practice is predominantly arthroscopic shoulder and arthroscopic knee surgery.  And I sort of say it's probably about 49 percent knees, 49 percent shoulders, and 2 percent other sports-related injuries.  It could be elbows, it could be Achilles tendons.  Things along those lines.  And with my practice I will still see patients with other body parts other than shoulder and knees, because if a patient comes to me and wants to stay with me, I will treat their other body parts.  But surgically I'm predominantly shoulder and knee surgery.

Q.   Okay.  And, remind me, how many years have you been practicing medicine?

A.   Since 1988 in Florida.  So it's coming 36 years.

Q.   Okay.  36 years.

     And throughout the course of your 36 years have you always focused on the shoulder and knee surgeries as you have talked about?

A.   Yes.  When you start off in any group you are often doing general orthopedic surgery.  You're doing trauma call, you're doing -- we were part of a level two trauma center so you're doing major catastrophic injuries as well.  But as you hone down over the years, you become -- it's a little easier to become a little more specific.  So I'm no longer doing hip fractures, things like that.  So for the last I'd say 20 years I have been pretty much shoulder and knee surgery.

Q.   Okay.  And over the course of that 20 years could you even

estimate how many shoulder surgeries you have performed?

A.   You know, it's been thousands and thousands of shoulder surgeries and thousands and thousands of knee surgeries over the years.

Q.   And when's the last time you performed a shoulder surgery?

A.   At 7:15 this morning.

Q.   And what kind of surgery was that?

A.   That was an arthroscopic shoulder surgery.

Q.   What kind of surgery did Ms. Cole have?

A.   She had arthroscopic shoulder surgery as well.

Q.   Do you have hospital privileges anywhere?

A.   I do.  I have hospital privileges at Delray Medical Center. But my surgeries for the last 20 years, because they are typically arthroscopic related, are done at a surgery center. So I'm on staff at a hospital, but I do my surgeries at a surgery center.

Q.   So how did you get involved in this case?

A.   Your office reached out to me and it was -- because I do a lot of shoulders, a lot of knees, sometimes offices will reach out to me and say, "Can you perform a compulsory evaluation, can you do a records review?"  And that's how --

Q.   What were you asked to do in this case specifically?

A.   I was asked basically to evaluate Ms. Cole for her shoulder injury that she related to an accident that occurred on July 22nd, 2022.  And that would involve being sent records

from her prior treatment, from her injury, from the prior treatment, from her prior surgery.  I did a compulsory medical evaluation on September 19th, 2023, where I revaluated Ms. Cole, I reviewed her MRI scan, I reviewed all her records, and I came up with my impressions and recommendations.

Q.   So how much do you charge for these services typically?

A.   A compulsory medical evaluation is $1,200, and then we charge $580 an hour for the records review, which can include x-rays, MRI scans, or just records themselves.

Q.   And do you know how much you charged specifically in this case?

A.   I don't have -- I actually brought the bills with me.  But I think I previously provided them.  But I don't know the specifics, but I'm happy to --

Q.   Okay.  We will get into that if we have the time, but thank you.

How much are you being paid to be here today?

A.   I get paid $1,200 an hour.

Q.   So you told us that you were asked to review information, you listed medical records and MRI films.  How is this information helpful to you in terms of rendering opinions in cases like these?

A.   Well, it's like in my office, you know, I need to -- you talk to the patient, you get records review, sometimes I have patients tat are coming in from other doctors.  Sometimes

they're coming from emergency rooms, sometimes they are coming from urgent care.  So you're taking a history, the medical records help set the stage; what has been the treatment to date before I saw them.

So those records are important to come to my ultimate conclusions which is, you know, how I go about making my diagnoses, my recommendations, and any decisions thereafter.

Q.   And so does record review, does it include analysis of MRI films as well?

A.   It does.  You know, as an orthopedic surgeon I routinely review MRI scans, because basically by the time they get to see me, as a specialist, they're either coming in with an MRI scan and they all have radiology reports.  But I do my own readings. I've been -- I probably look at 15 to 20 MRI scans a week now. You do that for two reasons.  There's always -- I'm not a radiologist, and the radiologist also does a reading.  But I'm the one who is ultimately responsible to make the decisions on whether it's surgical, nonsurgical.  And also because I have a clinical basis, it's different than a radiologist who is just looking at it as these are the MRI scans or these are the x-rays.  I have a history, I have an age, I've got a lot of other factors and it helps me determine what the problem is on an MRI scan, is it acute, is it chronic, is it age related.  So it's something I routinely do.

And particularly if I'm going into surgery, it's important

for me to go ahead and review that scan ahead of time because at the end of the day the responsibility is on me to make the decision whether they're indicated for surgery to ensure I can do everything to make sure they do as well as they can.

Q.   So in reviewing medical records, including MRI films, did you do anything differently here as it relates to your analysis of Ms. Cole than you do when you analyze patients who come in for second opinions or for opinion on how their treatment should be rendered?

A.   No.  It's -- my methodology is the same no matter where it's coming from.  It's just that Ms. Cole would have come from more extensive records, but not more than other patients that maybe is coming for a second opinion and they have gone to someone, another physician, who did surgery, did not do surgery.  A patient may or may not be doing well, may or may not need additional surgery.  So -- but the methodology is the same.  It's, you know, a thought process that I have and that's just based on doing this for a very long time.

Q.   Are you familiar with biomechanical science?

A.   I'm familiar with it.  I'm not a biomechanical expert.  I don't --

MR. DIEPPA:  Your Honor, I object.  He stated he had no biomechanical opinion in this case.

MR. DRAHOS:  I was going to get to that.  All I did was ask him if he understood what it was.

THE COURT:  Right.

MR. DIEPPA:  Based on his answer I have to object, Judge.

THE COURT:  Overruled.

MR. DIEPPA:  Because he's not offering biomechanical opinions in this case.

THE COURT:  All right.  Overruled.

BY MR. DRAHOS:

Q.  I will get to the point.

Are you intending to offer any biomechanical opinions in this case?

A.  No.

MR. DRAHOS:  So at this time, Your Honor, defense would like to tender Dr. Joseph Chalal as an expert in orthopedic surgery and sports medicine.

THE COURT:  Any objection?

MR. DIEPPA:  Your Honor, based on the motion raised prior to trial, we would object.  And of course we would ask the Court to reserve ruling on the proffer of Dr. Chalal until after his testimony is completed.

THE COURT:  Okay.  Well, I don't believe -- earlier you told me you don't have an objection to his qualifications as an expert.  You have an objection to his opinion about causation; right?

MR. DIEPPA:  Yeah.  But the line -- one kind of bleeds

into the other.  So I would like to --

THE COURT:  Do you object to his qualification to render an opinion about causation generally?

MR. DIEPPA:  Not in this case.

THE COURT:  Right.  Generally --

MR. DIEPPA:  I object to that, yes.

THE COURT:  But generally speaking he is qualified to render an opinion I find that based on his background and experience he is qualified to render an opinion about causation.  You have an objection to his opinion about causation in this case based on how he got there; right?

MR. DIEPPA:  Yes, Your Honor.  And I don't object that he is qualified to testify as a medical doctor, as an orthopedic surgeon.  That's a different set of facts.

THE COURT:  Okay.  I hear -- no.  I get it.

So I overrule to the extent there was an objection because it's -- I don't think it's clear there was.  I find that he is qualified to testify as an expert in this case.  I also find that he's qualified to render an opinion about causation in a case like this and with respect to an injury like this.

I would like to hear his testimony regarding causation.  Your objection regarding his opinion in this case regarding causation based on having seen his deposition and reviewed his report is noted, but I want to hear his opinion and then we can

revisit why you think that there's not a basis for that.

MR. DIEPPA:  I understand, Your Honor.  And I just want to preserve my opportunity to --

THE COURT:  That's fine.  That's fine.

Go ahead.

MR. DRAHOS:  Thank you, Your Honor.

BY MR. DRAHOS:

Q.  So, Doctor, you said that as part of your analysis as it relates to Ms. Cole you reviewed medical records.

Where did your review of those medical records begin?

A.  They began at Carnival Conquest Medical Center.  That was the first medical record after the injury of 7/22/2022.

Q.  And in review of -- well, specifically what records did you review as it relates to the medical care aboard the Carnival vessel?

A.  Well, I'm sorry.  Are you asking me of all the records I reviewed?

Q.  No.  So you said your review began with the medical care that was rendered on the ship.  What specific records did you review in that regard?

A.  Gotcha.  Okay.

So she went to Carnival Conquest Medical Center on July 22, 2022.

Q.  And what complaints did Ms. Cole make upon presentation to the medical staff aboard the vessel?

A.    She had complaints of left shoulder pain.

Q.    And was a triage performed, Doctor?

A.    Yes.

Q.    And what were the pertinent findings upon your review of the particular triage that was done on her?

A.    She had pain in the left trapezius which is the muscle adjacent to the shoulder.  It's not the shoulder.  She had full range of motion.  There was no open wounds.  There was no adema, there's no ecchymosis, meaning no black and blueness.  No clinical signs of a dislocation.  No clinical signs of a rotator cuff impingement or tear.

Q.    So what significance, if any, does the absence of any limitation and range of motion have upon your analysis?

A.    Well, it's very important.  Because if someone has an acute injury, such as a dislocation or an acute rotator cuff tear or what we would call an acute labral tear -- the labrum is the lining around your shoulder.  You have a ball in the socket. Well, in order for the ball not to fall out of the socket there's a bumper around the socket called the labrum.

So sometimes -- and typically it's when you're in your twenties, and maybe early thirties -- you will have a labral tear, an acute labral tear from throwing a baseball or from a fall on an outstretched arm.  And those are very painful conditions.  So you would not typically have a full range of motion.

The fact that she had a full range of motion is very important because that is an indication that there was not a major interarticular injury.  When I say "interarticular injury," I'm talking about rotator cuff labrum dislocation.  Because if someone has an acute injury such as those you are not moving your shoulder.

Q.  So this was a triage that was done by who?

A.  It was done at Carnival Conquest Medical Center.

Q.  Okay.  After the triage was performed was she also examined by the ship's doctor?

A.  Yes.

Q.  And what specific findings did the ship's doctor make that were pertinent to your analysis?

A.  Again, it's the range of motion, everything else that we talked about earlier.  And then there was also review of x-rays which were basically unremarkable with no soft tissue abnormality noted by the -- I don't know if it was the doctor, the radiologist who was reading it for the doctor at the time.

Q.  So was there any evidence of any bruising on Ms. Cole in the area of her shoulder?

A.  There was not.

Q.  So earlier you had made mention of the fact that there was a focus on the trapezius muscle.

A.  Correct.

Q.  Tell me what is the basis for your understanding in that

regard.

A.   So on the physical examination it stated that she has pain on palpation on the left trapezius.  The trapezius is the muscle that sort of comes from the neck area down in this area.  But it stops short of the shoulder.  So if you look at this report, she was having pain in the trapezius, but she was not having what I will call intrinsic shoulder pain.

Q.   Would it help, Doctor, if I put up an illustration for you to be able to explain to the Court the significance of the trapezius versus the shoulder?

A.   Absolutely.

THE COURT:  I have a question.

She goes for the -- the triage, and then she goes to the ship's doctor?

MR. DRAHOS:  So the triage was done by the nurse when she first walked in, the nurse finds out what's wrong with her, and then sends her to the doctor.

THE COURT:  Thank you.

MR. DRAHOS:  Ms. Genoese, can you put up 13-1.

Permission to publish Defense 13-1?

THE COURT:  That's already in?

MR. DRAHOS:  Yes.

THE COURT:  Yes.

BY MR. DRAHOS:

Q.   Okay.  Doctor, can you see what's on the screen there?

A.   I can.

Q.   And what do you recognize that to be?

A.   Well, this is looking at the body from the rear.

Q.   Is that a true and accurate depiction of the body as it relates to the trapezius, deltoid, and triceps muscles?

A.   Yes, it is.

Q.   And in looking at that photograph can you explain to us, please, where the trapezius is versus where a rotator cuff is.

A.   The trapezius encompasses the area where you can see the arrow.  But it's basically more the upper back area, but it does extend into the neck as you can see, the muscle.  So the trapezius is coming from down here through the upper back, but it really stops short of the shoulder itself.

     And you will see the deltoid, which is on the outside of the shoulder.  So there's a demarcation between the trapezius and the deltoid.

Q.   So Ms. Cole came in complaining of shoulder pain, but why is the doctor talking about the trapezius muscle?

A.   Again, I think the layperson says --

     MR. DIEPPA:  Objection, Your Honor.  He can't testify as to why the doctor did something, another doctor, and speculate as to why he did something.

     MR. DRAHOS:  Well --

     THE COURT:  It's a valid point.  So the records that he reviewed show that she was complaining of --

MR. DRAHOS:  Can I rephrase the question, Your Honor?

THE COURT:  Yes.

BY MR. DRAHOS:

Q.  How did the doctor identify the trapezius muscle as being the one where the pain was originating from?

MR. DIEPPA:  Same objection, Your Honor.

THE COURT:  That's -- I mean, overruled.

A.  Basically when you're examining someone, the first thing you do is, again, same methodology for everyone, you're palpating, where does it hurt.

So when the -- when someone palpates around the shoulder, and then goes to the trapezius, Ms. Cole was complaining of pain of the left trapezius.

Again, the important part about it is the statement after the pain on palpation in the trapezius.  We've already stated the trapezius does not effect the shoulder proper.  And right after that there's a full range of motion.

So we have.

A full range of motion in the shoulder, which conf- -- which is consistent with someone who had trapezius discomfort, which is, another way of looking at it would be upper back discomfort in that area as opposed to an issue with the actual shoulder itself.

MR. DIEPPA:  Your Honor, I would ask that the rest of that record that the doctor is reading from, beginning at the

top of page 1 of that record, patient complaints be also read. I'm entitled to have the rest of that portion read because he's only reading a part of it.

THE COURT:  He's testifying from it.  So if you want, on cross, if you believe that he's leaving something out, you can get to that on cross.

MR. DIEPPA:  Well, the issue is it's not his record.

THE COURT:  Right.  No.  He's testifying based on his review of medical records and he's telling us what the medical records that he -- the point that he thinks is important from that portion of the medical records.  I'm fine with that.  If you think there are other portions that, you know, would change that, then you can bring them up on cross.

MR. DIEPPA:  That was my request under 106, rule of completion.

THE COURT:  I know the rule of completion.  But I don't think this is a rule of completion issue so I'm overruling. You can bring it up on cross.

MR. DIEPPA:  All right.

BY MR. DRAHOS:

Q.   Doctor, were any imaging studies taken aboard the Carnival Conquest?

A.   Yes.

Q.   What imaging studies were taken?

A.   A left shoulder x-ray.

Q.   And what findings, if any, were made from the left shoulder x-ray?

A.   It was basically an unremarkable examination.

Q.   Was there any evidence of dislocation?

A.   No evidence of dislocation.  There was no soft tissue abnormality noted.  It was basically no fracture noted.

Q.   Okay.  And what were the next records that you reviewed in your analysis?

A.   They were emergency room records from HCA Florida Westside Hospital emergency room on 7/25/2022, and that was the next day.

Q.   And how did Ms. Cole present to HCA Hospital on 7/25?

A.   Based on the records, she presented stating that she was hit in the left upper back, which again is consistent with the records from the day before, the trapezius, the left upper back.  She has pain in that area.  Again, there's no swelling, bruising, ecchymosis, also known as black and blueness.  She states that she was hit by a corner of a container.  And --

Q.   Did she present with any type of an assistive device or a medical brace of any sort?

A.   I believe I don't -- I believe she may have had a cervical collar on at the time.

Q.   What is a cervical collar?

A.   It's a neck brace.

Q.   Does it have any clinical relationship to a shoulder at

all?

A.   No.

Q.   Does it provide any relief for shoulder pain?

A.   It does not.

Q.   Is there any therapeutic benefit to wearing a cervical collar if you've suffered a shoulder injury?

A.   There is none.

Q.   What area of the body did Ms. Cole describe as being impacted to the HCA physicians?

A.   Left upper back.

Q.   Is that consistent with the shoulder?

A.   No.

Q.   Or trapezius?

A.   It's consistent with the trapezius.

Q.   And what level of pain did she describe to the physicians that she was currently experiencing during that visit?

A.   My recollection, it was minimal.  But I don't have it in front of me.  But I don't have it on my report as far as I can see.  But if you want to hand me that record, I can look at it. But I believe it was minimal from what I recall.

        MR. DRAHOS:  May I approach, Your Honor?

        THE COURT:  Well --

        MR. DRAHOS:  He doesn't have the records in front of him, but I certainly do.  I can lay a predicate.

        THE COURT:  Okay.  So his independent recollection was

that it was minimal.

MR. DRAHOS: Yeah. And I just want him to be able to read specifically for the Court what that level was.

THE COURT: Okay.

MR. DRAHOS: May I approach?

THE COURT: Sure.

BY MR. DRAHOS:

Q. Doctor, I'm handing you a copy of Joint Exhibit 7.

Do you recognize those documents, Doctor?

A. Correct. It's what I summarized -- or at least summarized. But in this, this is the complete record, and it said her present current level of pain was 1 out of 10.

Q. What does that mean?

A. So zero is no pain, 10 is the worst pain you could have. This was a 1 out of 10.

Q. What significance, if any, does that have on you and your analysis?

A. What I would state, it's consistent with someone who sustained a contusion to her left trapezius or upper back.

Q. Is it consistent with an acute rotator cuff tear?

A. No. Acute rotator cuff tears or acute labral tears, that's a memorable painful, you know, injury.

Q. Was the physical exam performed on her at HCA as well?

A. Yes.

Q. Were there any clinical findings significant for rotator

cuff pathology during that exam?

A.   No.

Q.   What was the diagnosis that the physicians reached at HCA following their exam?

A.   A contusion on the left upper back.

Q.   What does that suggest to you, Doctor?

A.   It's, again, the trapezius area.

Q.   What were the next records you reviewed?

A.   Ms. Cole went to CitiMed Hollywood on 7/27/2022.

Q.   And how did she describe her condition to the CitiMed physician on 7/27?

A.   She was -- complained of immediate pain in her left shoulder, neck, and back after the accident.  She had what she stated was bilateral neck pain, which means pain on both sides of the neck which was intermittent and mild.  She had left thoracic pain which was intermittent and moderate to severe. Thoracic pain is that upper back pain.  She also described left shoulder pain which was intermittent and severe.

Q.   Was a physical exam performed?

A.   Yes.  And the physical examination showed a limited range of motion to the left shoulder and increased pain with passive motion, what's called a positive Neer's.  And that's a specific test to determine if there's some problem with what we call the subacromial space.  It's related to something called impingement which is a group of diagnoses within the shoulder.

Q.   Is this a different clinical presentation than the one that presented on the day prior at HCA and the day prior to that at the Carnival Medical Center?

A.   Yes.

Q.   Does it -- if a patient suffers an acute injury, acute shoulder tear injury, does it take awhile for the pain to set in?

A.   No.  An acute injury, an acute rotator cuff tear is a very painful injury and it's acute.  It's a painful process.  It's a rip.  It's -- and you are not moving your shoulder.  So an acute rotator cuff tear is, I describe it as a memorable event. People who walk into my office with an acute rotator cuff tear, their arm is hanging, they're not moving it, and they're in distress typically.

Q.   In other words, having full range of motion on two different exams and then suddenly limited range of motion, is that consistent -- is that consistent with your understanding of how shoulder tears present?

        MR. DIEPPA:  Leading, Judge.

BY MR. DRAHOS:

Q.   Acute shoulder tears.

        THE COURT:  Overruled.

A.   It is not consistent with an acute rotator cuff tear or an acute labral tear.

BY MR. DRAHOS:

Q.   Were there any diagnostic images taken at CitiMed?

A.   There were.

Q.   What specifically was taken?

A.   There was a left shoulder MRI performed on 7/27/2022.

Q.   Did you review this left shoulder MRI?

A.   I did.

MR. DRAHOS:  Your Honor, with the Court's permission I would like to publish Joint Exhibit 9 which is the CitiMed MRI.

THE COURT:  Okay.  Go ahead.

MR. DRAHOS:  Is there a device that would allow him to manipulate that?

Okay.  May I approach, Your Honor?

Actually, let me lay a predicate first.

BY MR. DRAHOS:

Q.   Doctor, do you recognize what's on the screen?

A.   Yes.

Q.   What is that, sir?

A.   This is the left shoulder MRI of Ms. Cole dated July 27, 2022.

Q.   And is this the left shouter MRI that you reviewed in support of your opinions in the case?

A.   It is.

Q.   And is it just like every other MRI that you review for every other patient that you have done for the last 30-some-odd years?

A.   That is correct.

Q.   Was it of sufficient quality for you to be able to ready and interpret it?

A.   Yes.

MR. DRAHOS:  May I approach, Your Honor?

THE COURT:  Sure.

BY MR. DRAHOS:

Q.   Here you go, Doctor.

So, Doctor, when you are reviewing these MRI images, are there things you are capable of doing in order to be able to see various different viewpoints?

A.   Yes.  So an MRI is basically three dimensional.  The easiest way of explaining it is it's almost like a meat cutter. It goes in 3 or 4 millimeter increments.  And you can either go from the front to the back.  That's called a coronal view.  You can go from the side, the outside to the inside, which are called sagittal views.  Or you can do oblique cuts which gives you axial.  And it's the combination of those three ways of looking at a scan, allows you to get a three dimensional understanding of what's going on in the shoulder.  So it's just basically all three different angles that you are looking at it, and each one tells you something different in the sense -- or adds to the equation so you can come up with your diagnosis.

Q.   So when you're looking at MRIs like this, whether it's Ms. Cole or any other patient, are you evaluating it for the

degree of the tear, the nature of the tear, how long it's been there?  Tell us what is going through your thought process when you review films like this.

A.  Well, you are looking at it for all diagnostic purposes. So you're looking at rotator cuff, you're looking for arthritis.  You're looking at the labrum.  Looking for bursa fluid.  You are looking for congenital abnormalities.  You know, for instance, Ms. Cole has something called os acromiale. That is something that you can see right here.  And, again, it's on my pointer there.  But that little area, she was born with what's called an unfused epiphysis.  That's a growth plate.  We see os acromiale.

So there's a lot of things.  And that's just something that most people fuse their bone over time, in this particular time it's called an os acromiale, it's a finding that we have.

Q.  So are you able to --

THE COURT:  Can you spell that?

A.  Os, o-s; Acromiale, a-c-r-o-m-i-a-l-e.

So that little line right there, without having an understanding of shoulders, without reviewing MRI scans -- and both the radiologist and I pointed this out.  It's called an os acromiale.  It's a finding.  So you're always looking at MRIs in conjunction with everything.

This is just we mention it as a simple thing, but it's something that you have to understand when you are looking at

an MRI, that's not a fracture, that's something that she has had forever.

BY MR. DRAHOS:

Q.   Okay.  And that's really the next question I wanted to be able to ask you was.

When you look at images like this, are you able to determine based upon what you see in the image, how long that particular pathology has been there?

A.   Well, there are certain things you can determine how long. So we know for instance the os acromiale has been there for -- you know, it's supposed to fuse by somewhere in the 20 year range.  And if Ms. Cole was 52 or so at the time of the scan, it was there for, you know, 30 years.  We can see arthritis on this MRI in two different areas.  So we know that that arthritis takes years and years and years to develop.

And she has arthritis -- if you want I can sort of point out what I'm referring to, if that's something --

Q.   Yes, please.

A.   -- you'd like me to jump to.

Q.   Well, so what I would like to first ask you, and then we can talk about it is, upon your review of the MRI images, did you find any pathology in the left shoulder of an acute nature?

A.   No.

Q.   So was all the pathology that you found related to Ms. Cole all of a degenerative nature?

A.   Age, activity, and degenerative nature.  That is correct.

Q.   Can you explain to the Court the specific findings here on the film that support your conclusion that this pathology was degenerative?

A.   Sure.  So a couple of things.  There are certain things that are arthritis.  Arthritis takes years to form.

So if you look at this, this is what's called a coronal view.  And we're going to start on the front.  This is again from the front of the shoulder, and I'm going front to back.

And so just for a quick -- that's called a coracoid process which is this little prominence in the front, that's how we know we're at the beginning.

This is the rotator cuff muscle and this is the tendon.

As we go forward -- sorry.  As we go forward -- I'm going to do a cut every 3 millimeters -- we begin to see the rotator cuff right here.

But at the same time, the joint -- I'm going to skip a little ahead.  The joint here has got degenerative arthritis.

So the way we can determine that is you have -- as we talked about before -- a ball and a socket.  But on the layering on top of the socket and on the ball there's the joint surface.

A normal joint surface has plenty of space.  In her particular case she has moderate arthritis in her shoulder.  We know that took years.  I call it intermediate grade arthritis.

The radiologist calls it moderate.  It's really mild, moderate, severe.  I call it intermediate -- low grade intermediate or high grade.  So she has chronic arthritis in that shoulder. And that's in one area.

The other area she also has arthritis is what's called the acromioclavicular joint.  That's the top portion up here.  So these are two areas that take years and years to develop these findings.  We also have another finding of that os acromiale, and then the final arthritic finding is this cyst.  This little white area here is a cyst in the bone.  It's called a degenerative cyst.  I think I'm just putting my pointer right up to it.  So that is a cyst that's associated with arthritis. Arthritis eats away at the bones.  Sometimes you develop these little cysts.

So that's the background of we knowing this is an arthritic shoulder.

Now I'm going to go back to the meat cutter.  When I go ahead -- and I'm starting in the front, I've got the rotator cuff, and I've got this tiny little dot here which measures about 3 millimeters, which 3 millimeters is, you know, perhaps the width of if I folded the Kleenex three times, by the width of that is 3 millimeters.

If you think about a rotator cuff being about 30 millimeters in size, 35 millimeters in size, she's got a 3 millimeter partial tear.  But look what happens when I go

forward with that little white spot.

What's right adjacent to it?  That little -- that big cyst, and -- sorry.  So she's got that tiny partial tear, which is low grade, 3 millimeters, adjacent to a degenerative cyst.  The reason why that's important is when you have degeneration it causes tearing.  It's like having two pieces of sandpaper rubbing or in this case one area of sandpaper.  If you have a smooth rotator cuff and you have a piece of sandpaper rubbing against that, what's going to happen to that little rotator cuff?  You might get a little tiny tear.

So in this particular situation she's got this degenerative cyst next to this extremely tiny tear and that's why within medical probability that's called a degenerative low grade partial thickness rotator cuff tear.

Again, if you have an acute rotator cuff tear or a partial rotator cuff tear, your symptoms are immediate.  So that's the thought process.  That's, again, my methodology to show that this is a degenerative-type situation.

Q.   In other words, her symptoms were not immediate and there are findings on this film that are consistent with degeneration; correct?

A.   They are degeneration of both the joint, cyst within the bone itself, and then the labrum is in a similar situation.  She has degeneration of the labrum.  I'm going to go to this -- these are called the axial cuts.  And this is the labrum I'm

pointing to.

That's the anterior labrum and that's the posterior labrum. And the point being is that associated just where that labrum is, I call it degeneration; the radiologist called it a tear. But we are both saying degeneration of the anterior inferior labrum is exactly where the arthritis is in the socket.

So everything correlates well to a degenerative anterior inferior labral tear, a degenerative tiny, tiny, tiny -- I can't tell you how tiny that little rotator cuff tear is there.

And the way of showing it is I'm going to go back to this photo. I'm going to start from the back. You've got a muscle and you've got the posterior rotator cuff, the infraspinatus, 7 millimeters let's say or 5 millimeters. Still perfect. So now we are up to 10 or 12 millimeters.

(Stenographer clarification.)

A. And then we go another one, so we have 15 millimeters or 18 millimeters there. And I keep going forward, again, still no tiny tear. We are up to 21 millimeters. And then get this tiny, tiny little area which happens to be adjacent to that cyst.

So at the end of the day, there is no indication of any acute findings on this MRI. And it's consistent with a person whose got moderate arthritis with a tin- -- with some degeneration of the labrum and associated findings with some tiny tearing of the rotator cuff.

BY MR. DRAHOS:

Q.   So what is your understanding of what happened to Ms. Cole on the subject ship?

A.   On the ship?  It sounds like, based on the records from the ship, and the ER, she got hit -- she had a bruise to her upper back.  Contusion-type situation.

Q.   So based upon your review of the records, your review of this film, can you state within a reasonable degree of medical probability that this container lid did not cause the tear that Ms. Cole is complaining of in this case?

A.   Yes.

Q.   Yes, it did not?  I guess it was the way I asked --

A.   Yes.  It did not cause -- it was -- the MRI findings which I describe were not causally related to the incident that occurred on 7/24/2022 on the ship.

Q.   So let me jump ahead.  When a patient presents with pathology like this and a history that you reviewed, would you have operated on that shoulder that you see there on the MRI?

A.   I would not have operated on this shoulder.

Q.   Why not?

A.   Well, because these are degenerative findings.  And based on the history, Ms. Cole, I would say you sustained a left upper back contusion.  And this will just get better over time, but there's -- operating on the shoulder would not help you.

Q.   How many physical therapy treatments did Ms. Cole undergo

in this case before the treating surgeon recommended surgery?

A.   I believe she had about six.

Q.   Is that -- -- is that a sufficient amount of therapy?

A.   Well, it's -- it's -- the key is waiting it out.  I mean, her surgery was done less than two months after the upper back contusion.  Sometimes it can take three months.  But at the end of the day this is when we -- I say, listen, the good news is you don't need surgery and this will get better.  But certainly there can be additional therapy required.  But also I think it's just time related as well.

Q.   Did you review the operative report in this case?

A.   I did.

Q.   And were there any findings in particular in the operative report which are consistent with your belief that this was a chronic degenerative condition in her shoulder?

A.   Yes.  I mean, it's the second line with Dr. Wilkerson where he talks about glenoid chondromalacia was also present.

     (Stenographer clarification.)

A.   I'm sorry.  I apologize.  I will go slower.

     Dr. Wilkerson's second, third, and fourth lines where he basically states:  "Glenoid chondromalacia was also present."

     Chondromalacia is another term for arthritis.  So Dr. Wilkerson is confirming the arthritis in the shoulder in the location that we talked about.

Q.   Did you also -- well, strike that.

Are there photographs taken of operations like the one that Ms. Cole had?

A.   Yes.

Q.   How does that -- can you tell us briefly how is it that you can do a photograph of the inside of somebody's shoulder?

A.   I would have brought some from this morning.  You're snapping a -- we're on a camera, it's -- you know, it's a bit like a video game, arthroscopic surgery.  You have a camera, you're looking at a screen like this, one hand is holding the camera, and the other hand is doing the procedure.  So at any given moment on a camera you really just press a button and you can get any photo that you'd like.

Q.   Were there operative photographs taken of Ms. Cole's surgery?

A.   Yes, there were.

Q.   Did you review those photographs?

A.   I did.

Q.   Were there anything in those photographs that were consistent with an acute injury versus a degenerative condition?

A.   There was nothing to indicate anything different than what we have already talked about.

Q.   So you reviewed the MRI, the operative note, and the operative photographs.  Is there anything else that you would have needed to review in this case in order to determine

whether or not Ms. Cole suffered an acute injury?

A.   Yeah.  As I said I think very important was the presentation to the cruise doctor or the clinic where there's a left trapezius, and then a presentation to the ER the following day where there was an upper back contusion.  And I believe they are saying the same thing; different verbiage maybe, but one is saying trapezius, one is saying upper back.  But it's the same location and neither of which are the shoulder.  And again, the MRI, there's nothing to indicate anything acute.

Q.   Okay.  Let me again fast forward, Doctor.  Did you also -- well, strike that.

     Is it your opinion here today that the surgery that Ms. Cole underwent was causally related to the subject incident?

A.   It was not causally related to the 7/22 -- the 7/22/2022 incident.

Q.   Did you review the charges that were levied for that surgery?

A.   I did.

Q.   And I would like to go through those quickly.

     Do you also perform those same procedures that were done on Ms. Cole?

A.   I do perform those same.  And today I performed some of those procedures.

Q.   And when you perform those procedures do you physically

enter the cost codes that are associated with those as a part of your practice?

A.  I do.  I order -- I basically put together the codes that I did for my procedures today and then they will populate the charge.

Q.  So those cost codes are like a uniform way for all of you doctors to be able to look and see what the charge was versus the procedure?

A.  Well, for us, for our office, it's -- and I think most offices are the same -- you are putting down a code and you have a fee schedule.

MR. DIEPPA:  Your Honor, this opinion was not disclosed in his report, and the doctor did not state that he performed any of these cost code analysis which he's testifying to about.

THE COURT:  Okay.  So he hasn't expressed an opinion yet.  Now he is just talking about what he does.

MR. DIEPPA:  He didn't -- yeah.  And that's what I'm saying, that wasn't -- his methodology that he is disclosing now is not something that he did in his report or disclosed so it's not something that was disclosed in his Rule 26 report or at his deposition.

THE COURT:  Okay.  But he's -- so overruled to the extent you are -- you are objecting to his testimony regarding what he typically does in his practice.

MR. DIEPPA:  Yeah.  And, just not to interrupt again,

and if he does intend to testify as to what in his opinion is reasonable and customary, we would object to the foundation of that. We don't believe there is a foundation.

THE COURT: And I would have a question about that too.

Are you going to have him testify about the reasonable and customary costs or the costs --

MR. DRAHOS: Yes.

THE COURT: I mean, he's testifying that typically he will put in the cost code for the surgery that he's doing; right?

MR. DRAHOS: Correct.

THE COURT: Okay. So --

MR. DRAHOS: I was about ready to ask him is he able to render an opinion on the usual and customary charges for the procedures that were performed, and I was going to ask him to explain how it was that he got there. And we would disagree. He did put this in his report.

THE COURT: So that was going to be my next question.

Maybe tell Mr. Dieppa where in the report it talks about his expertise.

THE WITNESS: Page 16.

MR. DRAHOS: I will do it, Doctor.

For purposes of the Court and for Mr. Dieppa, page 16 of the doctor's report, he has CPT 29807, and a charge associated with that; CPT 29821, and a charge associated with

that; so on and so forth.  So it was -- and I'm happy to provide a copy --

THE COURT:  Let's have Mr. Dieppa take a look at that.

MR. DIEPPA:  Yeah.  And, Your Honor, what I am saying is on page 50 and 51 of his deposition I asked Dr. Chalal how he reached those numbers and his testimony was not that.  His testimony was that he, you know, had looked in his office, but he wasn't sure what anyone else charged.

MR. DRAHOS:  Where is that?

MR. DIEPPA:  Talks about -- page 42 and page 43.

He says:  "I can't tell you specifically what our charge is.  I can look it up for you if you want to."

That's his testimony regarding his charges.  And that's 42, 24 through 43, 15.

THE COURT:  Okay.  So hold on.

So are the cost codes in evidence?

MR. DRAHOS:  Sorry?

MR. DIEPPA:  No, Your Honor.

THE COURT:  So he's going to testify what the cost codes are.

MR. DRAHOS:  Based upon his reports.

THE COURT:  Right.

MR. DRAHOS:  And then what the usual and customary charges would be for those cost codes.

MR. DIEPPA:  It's lack of personal knowledge, Your

Honor.  I mean, he's testifying as to cost codes from where?  Are they from Medicare?  Are they from his office?  Are they from an insurance company?  We don't know.  And when he was asked he wasn't sure at his deposition.  So --

THE COURT:  So wait.  He can testify what his own cost codes are in his practice.

MR. DIEPPA:  But the standard is what is reasonable and customary in the community.

THE COURT:  Right.  It is different.  So -- but you are saying then, Mr. Drahos, that he put in his report the usual and customary in the community?

MR. DRAHOS:  Yes.  He put specifically, Your Honor -- I will just take one for example.

THE COURT:  What's the Docket Entry number for his report?  Or do I have his report?

MR. DRAHOS:  Does the Court have the report?

MR. JARNAGIN:  I don't have a physical copy of it.

THE WITNESS:  Your Honor, I have one right here if that helps.

THE COURT:  Mr. Dieppa, you have a copy of it also?

MR. DIEPPA:  Yeah.  I have to download it.

THE COURT:  All right.  So I'm borrowing Dr. Chalal's report just to take a look here.

And I'm on page 16.

So on page 16 of his report he opines as to the

reasonable and customary charge for each of these procedures.

MR. DIEPPA:  But based on what, Your Honor?  That's the issue.  Because it's just ipse dixit if it says I think this is reasonable and customary because I think it's reasonable and customary because I charge this in my office.  But Dr. Chalal was asked if he had talked to anyone else, or, you know, done any sort of survey which would support that, and I don't think he did.  And it doesn't state in his report that he did.

Normally in this type of evidence the medical coding expert or whatever is going to say they called, you know, so many facilities, so many surgical centers and that's not what is in Dr. Chalal's report and that's not what he testified to earlier.

THE COURT:  And, Mr. Drahos, what is -- what would be the basis for the doctor to be able to testify as to the reasonable and customary charges for these procedures?  I mean, I can see he can testify as to what his office's typical charges are for these procedures, and I can see he's able to see what was charged for these procedures, but how do we get to the leap to what's reasonable and customary for these procedures?

MR. DRAHOS:  I can ask one or two more questions for the Court.

THE COURT:  Okay.

MR. DIEPPA:  We can go one by one.

BY MR. DRAHOS:

Q. So, Dr. Chalal, you told us that as a part of your practice you see patients for second opinions; correct?

A. That is correct.

Q. And during the analysis of your second opinions, do you also see what the physicians charged for those procedures?

A. That is correct. And that's where my usual and customary -- I have been in practice now for 36 years. I see thousands of shoulders and thousands of knees a year. I have second opinions coming in from other doctors in the area, and this is a usual and customary based on review of multiple practices in our area. The specifics I can't give you because I'm not keeping a log specifically, but this is where these numbers come from. And what I can state is looking at our personal charges, they fall within the usual and customary. I can't tell you off the top of my head what my own personal charge is, but I can certainly look that up in one minute.

But the point being is that this usual and customary comes from being involved in the community, doing my own coding. And I'm not a coding expert, but I do my own coding for all my surgeries. And being involved with seeing these other charges for various reasons in the community, that's where the usual and customary comes from.

Q. And there's a website called Florida Health Price Finder; correct?

A.   That is correct.

Q.   What is that --

A.   But that's -- that is regarding -- that's something --

        MR. DIEPPA:  Objection.  Hearsay, Your Honor.

        THE COURT:  Well, hold on.  He just asked what it is and I'm curious.

A.   So that comes from the state.  It's based on -- it's provided by the state to try to provide some transparency on charges for the facility; not the physician, for the facility.

     So if you go to floridapricefinder.com, the website, it will show you for an arthroscopic labral repair what the range of charges are with the various facilities.  It could be in Palm Beach County, it could be in the state of Florida, and it could also be national.  So what it was -- purpose of it was to go ahead and try to allow the community to know what a reasonable charge is.

     Are you paying $4 for your gas?  Are you paying $5 for your gas?  Are you paying $50 for that gallon of gas?  So all it is is educational.  I don't have anything to do with it, but it's something provided by the state I believe to provide transparency.

        THE COURT:  But it doesn't -- the website, let me make sure I understand this website.

        The website is like how much does this particular facility charge for this particular procedure?

THE WITNESS: Right. Gives you a range.

THE COURT: That that facility will charge for that procedure.

THE WITNESS: No. It gives a range of all the facilities in Palm Beach County that are participating in this or all the ones provided in the state. So it gives you a range of what they would believe is the range of a charge for like a rotator cuff repair at an outpatient --

THE COURT: So it's like a survey of --

THE WITNESS: Yeah. It's hundreds of thousands of whatever. I mean, there's a little blurb at the very top of it -- again, I have nothing to do with it, but it's utilized to provide a guide, if a patient wants to go ahead and say I'm going to go ahead and have rotator cuff surgery --

THE COURT: -- in Delray beach, what --

THE WITNESS: -- in Delray beach, they can then look and find out. So it gives you a range. It's not saying this is what you have to charge, it just gives you a range. And that's only regarding the facility, not the physician charges.

THE COURT: All right.

MR. DIEPPA: Your Honor, I mean --

THE COURT: Hold on. So I agree with Mr. Dieppa that this doctor is not claiming to be an expert regarding the usual and customary charges for procedures.

And I agree that the information from that website,

it's hearsay.  Can an expert come in and rely on hearsay?  Yes.
But I don't think that that, that relying on hearsay can
actually close the gap for an expert who is not an expert in a
specific area to now become an expert in a specific area.

So to the extent you are offering -- is it Chalal?

THE WITNESS:  Chalal.

THE COURT: -- Dr. Chalal as an expert regarding the
usual and customary charges for these procedures, I am not
finding him an expert on that.

But does he have experience with these procedures and
what he charges for it and what he sees as a matter of fact,
what he sees, I am fine with that.  But I am not -- he's not an
expert on the usual and customary so that is sustained.

MR. DRAHOS:  And just on that point, Your Honor, can I
ask one more question just for purposes of the record?

THE COURT:  And what you have asked him so far is fine,
but to the extent in his report he is saying what the usual and
customary is, that's not an expert opinion is what I'm saying
and I'm not finding that that is an expert opinion.

But you can continue with your questions as long as
you're not asking him as an expert to opine what the usual and
customary is.

MR. DRAHOS:  Just want to make sure I stay within the
limits of the Court's ruling, so may I ask him what he charges
for these procedures?

THE COURT:  Yes.

MR. DRAHOS:  Okay.  Thank you, Your Honor.

BY MR. DRAHOS:

Q.  Okay.  Doctor, so if we can please, I want to try to be sensitive as to the time.  Can we go through each of the procedures?  I want to maybe expedite this.

So can you tell us, let's go one-by-one, what was the first procedure that was charged to Ms. Cole?

A.  An arthroscopic labral repair which is CPT 29807.

Q.  And how much was she charged?

A.  $9,919.

Q.  How much do you charge for that procedure?

A.  I'd have to look it up specifically.  I just don't have it. I can pull up my fee schedule if I have something and tell you specifically.  But it's somewhere between 3500 and 4800.

Q.  Okay.  Thank you.

And what was the next procedure that she was charged for?

A.  Next procedure was an arthroscopic complete synovectomy.

Q.  And what is that procedure?

A.  So that's a procedure, the synovium lines all joints.  So whether it's the shoulder, the knee, the ankle, the synovium is the little fine tissue that lines it.

The only indication for a complete synovectomy is when you have an underlying condition such as rheumatoid arthritis or something inflammatory.  There's no indication for a complete

synovectomy in an acute injury or even in a degenerative process unless it's rheumatoid arthritis.  And, again, the American Academy of Orthopedic Surgeons, which I'm a member of as being board certified --

MR. DIEPPA:  Objection, Your Honor.  Bolstering.

THE COURT:  Overruled.

You are saying he is bolstering himself?

MR. DIEPPA:  No.  He is bolstering because you can't use an outside organization or practice standard to bolster your testimony at trial, Your Honor.

THE COURT:  Okay.  Overruled.

A.   So what I'm saying, the American Academy of Orthopedic Surgeons does not -- has stated you should only use 29821, which is a complete synovectomy, if you are dealing with a rheumatoid patient, an inflammatory arthritic-type condition.

So the fact -- again, so my point with that is, 29821 never would be utilized for me in this condition because it's not warranted.  You don't do complete synovectomies on someone who has an acute injury.

BY MR. DRAHOS:

Q.   Okay.  What was the next procedure that was charged?

A.   The next procedure was extensive debridement, that's 29823, and the charge was 5969.  And my fee runs somewhere between the $2200 and 2900 range.

Q.   Okay.  And the next procedure?

A.   What's called a arthroscopic subacromial decompression.
That was $5,808.  And my charge is somewhere between 600 and
$1,000.

Q.   By the way, how long does that procedure take, the
arthroscopic subacromial decompression?

A.   It's somewhere typically about one and four minutes.

Q.   One to four minutes?
     And what was the next procedure that was billed?

A.   And then an arthroscopic rotator cuff repair which was
9,515.  My charge is somewhere between 3300 and 5800.  I don't
know exactly, as I stated.

Q.   So these were the charges that the surgeon charged
Ms. Cole; correct?

A.   Correct.

Q.   Were there other charges assessed as well for this
procedures?

A.   Well, then you have the facility charges.

Q.   And how much did the facility charge her?

A.   The facility charged -- the total charges for the facility
were 65,488.28.

Q.   How long was this procedure in total from beginning 'til
end?

A.   The actual surgical procedure was 85 minutes, one hour and
25 minutes.

Q.   So they billed $65,000 for an 85 minute procedure?

A.   Yes.   The actual procedure codes for that is correct.

Q.   And how much does your outpatient center typically charge for this?

A.   Again, it all depends on the coding.   But, you know, typically you're dealing for this type of procedure, rotator cuff, probably in the $15,000 range type situation.

Q.   So did you have an opportunity to evaluate Ms. Cole?

A.   I did.

Q.   And what was the date of the examination?

A.   September 19, 2023.

Q.   And where did the examination take place?

A.   It took place down in Broward.

Q.   And what did she report to you, Doctor?

A.   Ms. Cole told me that she was having left shoulder pain every day and it was worse with activity.   She said she couldn't hold up her arm up for any period of time, and she could not draw blood any longer.   She was taking over-the-counter Motrin and was on a home exercise program for about three times a week.   She had not had any recent treatment or had any follow-up appointments scheduled with Dr. Wilkerson. And she is right-hand dominant.   And she told me she had no prior significant left shoulder problems before this accident.

Q.   So she had had the surgery done, she had finished her treatment, and she had not seen anybody else before she saw you?

MR. DIEPPA:  Object to form.  Leading.

A.  Well --

THE COURT:  I mean, it's -- it's fine.  I mean, it's -- it is a leading question.

MR. DRAHOS:  I'm trying --

THE COURT:  We are streamlining here.

MR. DRAHOS:  I'm getting a little --

THE COURT:  I'm fine with that.

MR. DRAHOS:  Thank you, Your Honor.

A.  She was seen it looks like by Dr. Wilkerson on January 6, 2023, and I saw her September 19, 2023, approximately eight months later.

BY MR. DRAHOS:

Q.  So did she have any future appointments scheduled with any other doctors to your knowledge?

A.  Not to my knowledge, no.

Q.  And did you perform a physical exam?

A.  I did.

Q.  What were your findings?

A.  She had limited active range of motion, meaning that active when someone is complaining of pain I don't move their shoulder; I ask them to move their shoulder.  If I move someone's shoulder, that's passive, but if I ask them to move it, that's active.  So she had limited active range of motion on her left shoulder.

Q.   This condition in her shoulder, is it expected to worsen over time?

A.   Well, I'm not sure which -- the condition?  She has arthritis in her shoulder.

Q.   That's what I meant.

A.   Underlying arthritis can worsen over time.

Q.   Okay.  So does that mean as she gets older her mobility in her shoulder is going to reduce?

A.   It's possible.  You know, unfortunately she's got reduced range of motion.  If you remember before surgery she had full range of motion on some of the exams.

Q.   Does she have any work restrictions?

A.   Not as it relates to the July 22nd, 2022 accident.

Q.   Does she have any restrictions in her activities of daily living?

A.   Not as it relates to the July 22nd, 2022 accident.

Q.   Would you recommend any future surgery for her?

A.   Not as it relates to the July 22nd, 2022 surgery {sic}.

Q.   Would she require any future medical treatment?

A.   Not as it relates to the July 22nd, 2022 accident.

Q.   During your examination did she demonstrate any signs or symptoms that you concluded were a direct result of the July incident aboard the Carnival vessel?

A.   No.

Q.   Have all your opinions here today been expressed within a

reasonable degree of medical probability?

A.   Yes.

MR. DRAHOS:  Thank you, Doctor.  Those are all the questions I have.

THE COURT:  Thank you.

MR. DIEPPA:  Your Honor, if I can have a few minutes to --

THE COURT:  Why don't we give everybody a couple minute break.  I have -- roughly what are you thinking is going to be your cross?

MR. DIEPPA:  You know, I think the last time we may have done this with him was probably 30, 45 minutes, I would think.  Depends on Dr. Chalal's answer.  But I think Dr. Chalal is very direct witness.  So --

THE COURT:  Okay.  Because I can -- I have to be out of here at 3:00.  So --

MR. DIEPPA:  30 minutes?

THE COURT:  25.  Especially if we're going to take a couple minute break.

Do you need a break?

THE WITNESS:  Nope.  I'm good to go.

THE COURT:  Okay.  So we are going to take just a couple minute break just so everybody -- so that the staff can get up and take a quick break.

COURTROOM DEPUTY:  All rise.  Court is in recess.

(A brief recess was taken from 2:23 p.m. to 2:28 p.m.)

COURTROOM DEPUTY:  All rise.

This court is back in session.

THE COURT:  You can all be seated.

MR. DIEPPA:  May I proceed, Your Honor?

THE COURT:  Go ahead.

CROSS-EXAMINATION

BY MR. DIEPPA:

Q.  Good afternoon, Dr. Chalal.  We've met before?

A.  We did.  Good afternoon.

Q.  Yes.  I believe the last time we met was at your deposition on February 8, 2024; is that correct?

A.  I don't remember the exact date, but that sounds about right.

Q.  Okay.  You remember the day of your deposition?

A.  Well, I remember being deposed, I don't remember the specifics of the day.

No problem.

MR. DIEPPA:  Madam Clerk, can you switch over the screen?

BY MR. DIEPPA:

Q.  So do you recall telling counsel for Carnival Cruise Line that someone who had had the injury that is being claimed in this case, a left shoulder tear, an acute left shoulder tear would have been in pain -- in very serious pain if that were

the case?

A.   I don't remember specifically what I said on February 8th, but --

Q.   No.   I'm referring to what you just testified to on direct.

A.   Well, typically if you have an acute tear you're going to have pain right away.

Q.   And you read Ms. Cole's deposition; correct?

A.   If it was provided to me, I did.   I don't know if I have a record of Ms. Cole's deposition.

Q.   Okay.  You don't recall reviewing Ms. Cole's deposition where she states she was in immediate pain right after the incident?

A.   Again, I don't -- I'm looking at the records that I reviewed and I don't have Ms. Cole's deposition listed.

Q.   Okay.  Am I to understand then you're not sure what she testified to whether or not she was in pain immediately after the incident?

A.   No.   I was going with the records that I was provided.   But I don't believe I had Ms. Cole's deposition where she stated that.

Q.   Okay.  I will represent to you immediately after the incident Ms. Cole was in severe pain.

You have not read anything that was provided by defense counsel to dispute that point; correct, Doctor?

A.   The only thing I have was the Carnival Conquest Medical

Center records and the ER the following day.

Q.   Yes.  And you claim that if -- she had to have been in pain, and it's not consistent with the records, but isn't it true, Doctor, that when she was initially seen in the ship's medical center she had already been given pain medication?

A.   I can't tell you that one way or the other.

Q.   Well, I will refer you to Joint Exhibit 2, which was shown to you by counsel for Carnival.

It's up on your screen, Doctor.

A.   Sure.

Q.   Yeah.  Doesn't it state that she was given ibuprofen, 200 milligrams?

A.   Right.  Ibuprofen is one -- 200 milligrams is one Advil. Yes, it does say that.

Q.   Okay.  It doesn't say how many she was given, it just says the dosage; correct?

A.   Well, ibuprofen -- Advil is 200 milligrams, which is ibuprofen, so that's one tablet.

Q.   Okay.  I'm just saying it doesn't state in the record we are looking at, the record you were shown by counsel for defense how many ibuprofens she was given?

A.   Says ibuprofen 200 milligrams.  That's correct.

Q.   And you didn't review, at least from what you can recollect, you didn't review Ms. Cole's deposition testimony to know how many Advil she may have taken when she was in the

infirmary?

A.   That's correct.

Q.   And then you said it's inconsistent that she doesn't present with sufficient pain in HCA Hospital, but isn't it true that in HCA Hospital they had, in fact, prescribed her 600 milligrams of pain killer?

A.   Okay.

Q.   You don't have a reason to dispute that, Doctor?

A.   Right.  But there's a difference between acute rotator cuff pain, which is a memorable experience as I said, a memorable moment.  So I'm not disputing that she was -- had Motrin 600 milligrams or ibuprofen the same thing.  But --

Q.   In the HCA records, HCA records that you reviewed as part of your opinion and report and which you were asked about on direct examination, you would agree that it states home medication, active prescriptions, ibuprofen 600 milligrams?

A.   That is correct.

Q.   And so you don't know how much ibuprofen 600 milligrams Ms. Cole had been taking when she presented to the emergency room at HCA?

A.   Correct.

Q.   Okay.  And you don't know if that would have effected her pain levels or not?

A.   Well, she was having pain because she was diagnosed as having a contusion to her left upper back.  So no one is saying

she wasn't having any pain.  There's a difference between ibuprofen type pain for an acute rotator cuff tear versus contusion pain which -- so that's the only thing I can state.

Q.   You keep saying "contusion to left upper back," but that's not what's in the ship's infirmary record; correct, Doctor?

In fact, the ship's infirmary records state that she was complaining specifically of left shoulder pain.

A.   Well, what the records state is:  "Patient walked into the medical center conscious, coherent, and alert.  GCS-15 with complaints of left shoulder pain."

That's what Ms. Cole stated.  But then you go to the physician who diagnosed her, well, it's not the shoulder; she's tender on the trapezius.

So it's not unusual for someone to say, hey, my shoulder bothers me.  In this particular case the physician stated it was the trapezius.

Q.   But that's not true either, Doctor, because wasn't it Nurse Ong the nurse who triaged Ms. Cole before she actually went in to see the ship's doctor?

A.   Right.

Q.   Okay.

A.   She was triaged and then she went to the ship's doctor.

Q.   And were you provided by counsel for Carnival Cruise Line the testimony of the nurse that initially examined Ms. Cole?

A.   Are you talking about in a deposition, is that what you're

asking me?

Q.   Yeah.  You reviewed her testimony as to what Ms. Cole's complaints were at the infirmary.

A.   I don't know if I have -- I don't see that I have that deposition.

Q.   Okay.  And I will -- I will proffer to you, and it's on your screen, this is the deposition of Nurse Ong.

At page 18, 22 to page 19, 4.

And you would agree with me that in her testimony the nurse that examined Ms. Cole in response to my question states that she had an injury to her left shoulder.

That's -- that's her answer:  "It was hurting, the left shoulder.  Yes."

A.   Okay.

Q.   Okay.  So in terms of what you are stating, that it was a trapezius, or that the nurse found that it was a trapezius, you don't have any reason to dispute the testimony of the nurse that examined Ms. Cole, do you?

A.   Well, I'm not disputing what the nurse told -- Ms. Cole told the nurse.  What I'm stating is that the physician who saw the patient, who did the physical examination, stated she had pain in the left trapezius, and that most importantly had full range of motion.

If you are having an acute tear, if you have had an acute tear, full -- it's not within medical probability that someone

is going to have a full range of motion with an acute tear of the rotator cuff or an acute tear of the labrum.

Q.   You don't recall how long you examined Ms. Cole for; right?

A.   I don't specifically, unless you had a videographer present or something.  But I don't time my exams.  That is correct.

Q.   Okay.  And I asked you at your deposition regarding the medical evidence that you reviewed.  And when I mean "medical evidence," I mean prior medical records, testimony, diagnostic studies.

Did you review in this case anything before July 24th, 2022?

A.   No.

Q.   Okay.  So, just to be clear, your opinion that you just gave in this case, your causation opinion that Ms. Cole's shoulder tears were preexisting, that is not based on any medical record or diagnostic study that you reviewed predating Ms. Cole's incident on July 24, 2022?

A.   I have no records predating.  But I have, again, my methodology of taking a history, reviewing the records, reviewing the MRI scan myself, along with the radiologist, which we concur.  That's what's it's based upon that it's degenerative, not any prior history, if that's what you're asking me.

Q.   Okay.  You're stating that you and the radiologist, Dr. Gonzalez, concur.  But you recall at your deposition when I

asked you -- and that's at page 13 -- page 16, lines 13 through 8 on your screen, when I asked you:  "I want to get what you're saying is clear.  So in terms of the MRI finding from Dr. Martinez it states there's an irregularity, a tearing in the anterior labrum."

You said -- I asked you:  "You disagree?"

You said:  "Right."

A.   Well --

Q.   Correct?

MR. DRAHOS:  Objection.

A.   I think you need to keep going on two things.  It was Dr. Martinez, but if you go on it's stating -- I'm basically saying there's an anterior -- I think you have to -- again, you are showing me lines 13 to 18, but if you keep going to 20, 21, 22, which are partially hidden there, I'm basically saying as an orthopedic surgeon I look at this and I say you have anterior inferior labral degeneration.  It can be a degenerative tear.

So Dr. Martinez says anterior labral tear.  I call it a labral degeneration because at that same place which is if you think about a labrum, it's a clock.  You have 12:00, 6:00, 3:00, and 9:00.

Anterior and inferior, where Dr. Martinez says there's a tear, that's the exact place where there's that arthritic area that Dr. Martinez and I both discuss in both of our MRI

reports.  So I call it labral degeneration because I know from a clinical point of view that's what that is.  I state in my deposition it can be degenerative labral tearing.  So that's where I'm saying that we're basically saying the same thing.

Q.   Doctor, I asked you if you disagreed with the MRI report, and Joint Exhibit 9 is a copy of the MRI report.

Looking at Joint Exhibit 9, which is -- this is the MRI report that you were discussing at your deposition; right?

A.   That is correct.

Q.   Can you tell me where on this MRI report does Dr. Martinez state that all the tears are preexisting and degenerative?

A.   He's not ageing it.

Q.   Does he say that in the report?

THE COURT:  Wait.  Wait.  What?

MR. DRAHOS:  Got to let him answer the question.

BY MR. DIEPPA:

Q.   Please tell me yes or no if he says that in the report.

THE COURT:  Wait.  Go back.  What was the question?

BY MR. DIEPPA:

Q.   Can you tell me please anywhere in Dr. Martinez's report does he say what you testified to, that the tears in Ms. Cole's labrum and supraspinatus tendon are degenerative and preexisting and not related to this accident?

A.   So my response to this is the following.  This is the radiologist.  His job is to report the findings.  He's not

asked to -- in this particular case he is not asked to age the findings.  So he is not going ahead and stating, well, it's probably degenerative or not.  So, no, he doesn't say anything about that, but that doesn't mean that's not the case.  If someone -- if a radiologist is asked to age a findings they will do so.

Q.   Thank you, Doctor.

You agree that there's a notation of adema in the MRI report; correct?

A.   That is correct.

Q.   Okay.  And you agree that adema can be characteristic of an acute injury?

A.   It can.  But it's not within medical probability in this particular case because the same place that you have adema is the same place that Ms. Cole has arthritis in her shoulder.

So, again, arthritis -- adema can be caused by an acute injury, but if you are going to have sufficient pain, if you are going to have sufficient injury to create adema in the bone you are not going to walk in and have full range of motion; you are going to walk in holding that arm to your side.

So the point is that this is where you have to understand that adema does not mean an acute injury.  It can.  But when adema is associated with arthritis -- arthritis, that rubbing, those pieces of sandpaper cause adema.  This is a person that had adema in their acromioclavicular joint, they had adema in

their glenoid right where the tear is.  They even had adema along that os acromiale, the photo I showed.  Just having adema does not mean it's an injury.  So that's the answer.

Q.   Okay.  I see that.

And since you brought that up, Dr. Chalal, we can agree that what you just stated, that's just based solely on your experience as an orthopedic physician?

A.   Well, it's based on my training, my education.  It's based on treating, you know, for 34 years.  It's based on the literature.  It's based on the fact that I just took my updated board certification which is peer review articles.  I mean, it's based on all of this.  So I don't know if you mean as just an orthopedic surgeon.  I mean, this is what I do every day, I evaluate patients and I say this is what you have and this is my thought process of what needs to be done.

Q.   What I'm saying, Doctor, is that in this case you did not identify any peer reviewed study, any piece of scientific literature that you relied on to reach your opinions today from what I understand?  Because if I recall, at your deposition I asked you, you know, what your opinions were based on and you told me they were based on your training and experience as an orthopedic physician; correct?

A.   There's not a specific article I'm referencing, but my whole knowledge, my whole skill set, my whole methodology, how I go about doing is based on my readings, when you're board

certified that includes -- when you're asking me a question, can I pull a particular article that says in a 52-year old woman who gets hit with a container, I don't have an article with that.

But this is how you get board certified.  You take -- in our particular case every year I have 15 peer reviewed articles I happen to look it up this time.  And the ones I did three weeks ago, 12 of the 15 were on shoulders.  So I can't name you a specific one, which is what I told you.  I don't have that. But my whole -- the whole process is interrelated to -- to reading and things like that.  But if you're asking me a specific, no.

Q.   And, Doctor, just your testimony is what you told me in your deposition here on page 49; correct?  And where I asked you:  "Are your opinions here today, they're based solely on your training and experience as an orthopedic physician; correct?"

And your answer was:  "That's my training, education, experience being in practice 33 years, being a board certified orthopedic surgeon, fellowship trained board certified in sports medicine as well, and taking care of shoulder patients for the last 33 years," that's what you told me your opinion was based on correct?

A.   And nothing has changed with that.  But those opinions all include everything that allows me to become board certified

every ten years which is readings, which is literature.  So like I said --

Q.   And I will stop you right there because in your report you did not identify any literature, in your deposition you did not identify any scientific literature that would support the opinions you gave today regarding degeneration, regarding the age of the injury in the MRI, and there's nothing that you offered scientifically on a peer reviewed basis or any other basis other than your own experience that you offered in your report or you identified at your deposition; correct, Doctor?

A.   When you are board certified orthopedic surgeon you are relying on articles, you are relying on the most updated situation.  I'm not giving you a specific article.  Yes, I don't have in here a specific reference.  But being a board certified orthopedic surgeon, being board certified in sports medicine, operating on patients, patients come in to me like Ms. Cole all the time.  I don't sit there and go, well, my thought process is this is the -- this is the appropriate methodology to come to whatever conclusion I go with.  And that can be based on all the things we just talked about.  So you can't just break -- at least in my mind --

Q.   Doctor, I'm talking about in this case --

         THE COURT:  Hold on.  Let him finish his sentence.

A.   -- it's my knowledge, it's my -- you know, my education, it's my experience, it's my training, it's the fact that I

am -- have ongoing every year -- every three years I need 120 CME hours.  So it's my audio views.  It's what I did two weekends ago when I had to go through 15 peer review articles.  So I'm constantly updating it so I would respectfully disagree that it's not all interrelated.  My conclusions are based on everything up here which involves everything I just stated.

BY MR. DIEPPA:

Q.   Doctor, it's a straightforward question.

You did not identify any such study that you have been referencing in your report or during your deposition?  There was no scientific study that you relied on that said, you know, this MRI indicates degeneration of X amount of years?  You did not identify any specific studies or scientific literature to support your opinion at your deposition or in your report; correct, Doctor?

A.   Well, that is correct.

Q.   Thank you.

A.   But I still need to -- we're talking about I'm looking at an MRI report.  I'm looking at an MRI report based on whether it's Ms. Cole's or anyone else of the 15 or 20 in a week that I look at.  I'm not sitting there going, what article did this come that said this is an acute injury.  It's all part of the process of coming to the conclusion.  You've got to be consistent.  It's got to be reliable, and that's what I do.

And you're correct.  I didn't put a notation of a

particular article here.  You are 100 percent correct with that.  But that does not take away the fact that all the articles that are read, that allow me to maintain my certification, that's all interrelated.

Q.   Okay.  And in relation to that I asked you in your deposition about your differential diagnosis.  And in terms of the medical history that you have of Ms. Cole, we can agree that the only event involving acute trauma to her left shoulder was her injury on the cruise ship on July 24, 2022; correct?

A.   Well, again, the acute injury, the first doctor said was the trapezius.  The second doctor said upper back.  So at most if we give the benefit of the doubt it can be a shoulder contusion.  But the first two physicians, neither them mention shoulder.  And, again, if there's an acute shoulder injury, such as a rotator cuff tear, you're not going to have a full range of motion.

Q.   Okay.  I asked you in her medical history as far as acute injuries go, are you aware of any other acute injury other than the July 24, 2022, injury she suffered on the Carnival Cruise Line ship?

        MR. DRAHOS:  Objection.

        THE COURT:  Whether he's aware -- if he's aware he is.

        MR. DRAHOS:  Okay.  I thought he answered it.

A.   No.  I'm not aware of any other, other than what was described.

BY MR. DIEPPA:

Q.   Okay.  And so in terms of differential diagnosis how were you able to exclude the fact that she had an acute trauma and there's no possible way that acute trauma could have resulted in tears to her shoulder, were you able to do that?

A.   Yes, I can do that.  I can state that within the differential diagnosis -- no one is saying that she may not have sustained a contusion to her trapezius or to her upper back.  But it's not within medical probability that an acute tear that was seen on the MRI was present and the reasons and the rationale behind that is that we have degenerative arthritis in multiple areas of her shoulder on that MRI.  Right where the tears are are degenerative changes.

     And, again, the best analogy I can give you, it's sandpaper rubbing against those areas.  You're not going to expect them.  These are age and activity appropriate findings within medical probability.  So the differential diagnosis is at most the contusion to the trapezius, at most the contusion to the upper back, but you don't have an acute tear with a full range of motion within medical probability.

Q.   You agree that the MRI depicted that she had a tear in her shoulder; correct?

A.   Well, the MRI depicted exactly what I stated; she had a degenerative tear in her anterior inferior labrum which corresponds to the arthritis.  She had a tiny -- we're talking

3 to 4 millimeters of a tiny partial tear in her supraspinatus adjacent to that degenerative cyst.  These are findings that I see routinely in my office and these are degenerative findings. And the fact that she had a trapezius contusion or upper back contusion does not indicate, just because we got a shoulder MRI, that all findings are related to that.  It's not within medical probability these MRI findings were related to the accident.

Q.   Okay.  But you recall at your deposition when I asked you: "There's no disagreement that she had a tear in the labrum of her shoulder; right?  I mean, there's no disagreement on that point?"

     Your answer:  "Well, again she had what we call a degenerative inferior labral tear.

     My question:  "A tear?"

     "And I can agree with that, yes."

     That was your testimony; correct?

A.   Correct.  I'm saying that she had a degenerative anterior inferior labral degeneration which can be a degenerative tear.

Q.   Okay.  And you are saying that despite having no medical records, no medical history, no medical evidence prior to July 24, 2022; correct?

A.   Yes.  This is like saying as you gently age you develop gray hair that's an injury.  This is part of life.  When you are out there every day, your shoulder at 50 years old does not

look like your shoulder at 20 years old. So gray hair is not a disease. Degenerative labral tears and degenerative rotator cuff tears is not a disease, this is part of the normal ageing process. So most people don't have injuries, yet you develop gray hair. You have -- if you MRI'd everybody you would have abnormalities all over the place. The most important thing is to operate on the patient and not the MRI findings.

Q. And once again you're not here to offer any biomechanical opinions or --

A. No biomechanical --

Q. -- opinions as to the forces on the plaintiff or how she moved; correct?

A. No biomechanical opinions.

Q. Now, you do agree that at least Ms. Cole did suffer an injury on the cruise ship and at least part of her medical treatment was causally related to the injury that she suffered on the Carnival cruise ship; correct?

A. What I stated, my point at most -- this is giving Ms. Cole the benefit of the doubt. At most this is what I stated in that report on pages -- towards the end. But that's based on the subjective testimony of Ms. Cole. And that's what page 19 tells you all about that. That is correct.

But, again, refer back to the fact that the first two doctors saw her had no shoulder complaints. I'm not taking away the deposition, but I have two MDs that are basically

saying there was nothing, the shoulder had full range of motion on day one and day two.

Q.   Are you disputing that she suffered a contusion on July 24, 2022?

A.   I'm not stating she suffered -- sustained a shoulder contusion.  The first doctor said trapezius contusion.  The second doctor stated a upper back contusion.  I'm not stating either of those are not the case.  But that -- neither of those indicate it was the shoulder itself.  And, again, full range of motion is a key component of that.

Q.   Okay.  But you agree in your deposition when I asked you:

     "QUESTION:  And to go one step further, to paraphrase it, you don't have so much of an issue with the fact that this injury occurred and the way that it was related by Ms. Cole to the fact that she did need some medical treatment, but you do dispute the extent of the injury and the need for certain medical treatment.  Have I stated that correctly?"

     And your answer was that you refer to page 19 of your CME report; correct?

A.   Right.  That is correct.

     MR. DRAHOS:  Judge, I need to object at this point.  This is improper impeachment.  He's not saying anything different here on the stand that's been said in the deposition.

     MR. DIEPPA:  It is different, Judge.  It's very different.

THE COURT:  Right.  Actually, I have the same question.

So what's -- what is the impeachment here?

MR. DIEPPA:  Okay.  During the deposition he related that certain medical treatment from the injury was related and was reasonable and necessary, and it appears that his answer on the stand is different from his answer at a deposition because in deposition he said he doesn't take issue with the medical treatment.  I guess -- his answer was:  "Well, I stated after six -- after the treatment up until Dr. Wilkerson on August 12, 2022, perhaps six to eight weeks of physical therapy."

It goes on after that.

So the impeachment was his relating at least some of the medical treatment to the injury and saying it was reasonable.

THE COURT:  I still don't see the inconsistency.

So you're saying that because in his deposition he thought the physical therapy -- wait.  Wait.  Stop moving it.

MR. DIEPPA:  I just wanted to present it for you there, Judge.  But it's what he said there.  I can zoom-in if you need me to.

THE COURT:  I mean, I still don't necessarily see the inconsistency.  Because he has been testifying that she stated that she got hurt by -- with the container thing, whatever. The lid is hitting her.  She had a contusion.  I think the only

distinction here is it's not her shoulder, it's her trapezius.

THE WITNESS:  Trapezius.

THE COURT:  Trapezius.

And -- okay.  So whether -- I mean, so your point is he originally agreed that some of the medical treatment that she has had was causally related?

MR. DIEPPA:  Yes.

THE COURT:  And here it's just that the physical therapy was warranted; is that right?

MR. DIEPPA:  Well, it's not just that, Your Honor.  I believe he goes on and says the treating up through -- up into Dr. Wilkerson on August 12, 2022.  And, you know -- again, you know, we will get into that next.  But that's what he said.  He is going up through August 12th, 2022.  It's in his report that he describes the medical treatment he doesn't really take issue with and that was the purpose of that line of questioning.

THE WITNESS:  But, Counselor, I say "perhaps."

MR. DRAHOS:  Let me answer, Doctor.

Herein lies the basis for the objection.  This is improper impeachment for this very reason.  He is trying to take a snippet of one answer and applying it to the doctor's testimony today.

THE COURT:  No.  I agree.

And you're also taking the opportunity to read the doctor's transcript into the record.  So the question, why

don't you just ask him the question today.  I see what you are trying to do is say it's inconsistent.  I mean, I see what you are saying, but, I mean, I have heard his testimony, see that there's a "perhaps" there which is the point that the doctor is raising.

Okay.  Why don't you just make your point.  What's your point?

MR. DIEPPA:  Sure.

BY MR. DIEPPA:

Q.   Dr. Chalal, in terms of Ms. Cole's injury and her history do you find anything to dispute the consistency of her statements to her medical providers regarding specifically how the injury occurred?

MR. DRAHOS:  Objection.

A.   Well, again, she -- no.  I'm not sure I fully understand the question.  The question -- I have two doctors saying she got hit by a container and one said she had a trapezius contusion, the other said that she had an upper back contusion.  Is that what you're asking me?

Q.   Doctor, did you not testify on page 51, line 13 and 14 of your deposition, your answer to that question was:  "No.  I mean, she stated she got hit by containers."

Wasn't that your testimony?

A.   Right.  That's exactly right.  She stated she got hit by the container so I'm not disagreeing with anything that I've

said in my depo and I'm not saying anything different here.

Perhaps this is based on my whole thing on page 19 other than perhaps, other than perhaps, other than perhaps, that's all based on because this is Ms. Cole stating she got hurt. That's why I use the term "perhaps."

Q. Okay. Don't you agree that it was medically reasonable and necessary for her to be seen by the ship's physician based on the medical history provided?

A. Again, she stated she got hit from a container so perhaps that would be reasonable. And that's all I've said. I said that in my report, perhaps it can be based on an accurate -- giving the benefit of the doubt that there was an injury, then perhaps it's okay. I don't know how else -- the same thing I said in my depo is the same thing I'm saying here and the same thing I'm saying in my report which is well-detailed on page 19.

Q. And that "perhaps" that you're saying, as you're phrasing it, it would also include the treatment up until I think you said here August 12, 2022?

A. Perhaps with Dr. Wilkerson. That is correct.

Q. Okay. In terms of the reasonableness of Ms. Cole's medical bills, you don't have anything as we sit here today that indicates that you spoke to any other medical center besides your own office regarding the reasonableness of Ms. Cole's medical bills; correct?

A. No. That's not what I stated. Being in practice -- and that's an accumulation of usual and customary over the years of seeing people with second opinions and everything else, that's where the usual and customary comes in. It's nothing to do with my office charge per se. Usual and customary is based on what I have seen over the years.

Q. Okay. When I asked you at your deposition what was the basis for your $3500 charge for the debridement, you would agree with me that you didn't have those figures at the time; correct?

MR. DRAHOS: Once again, Judge, I'm going to object.

THE COURT: Right. Where's -- why are we reading from his deposition again?

MR. DIEPPA: I will rephrase the question, Judge.

BY MR. DIEPPA:

Q. Can you name one source, one medical center besides your own office that supports your testimony as to what the reasonable medical charges should have been in Ms. Cole's case? Besides your office can you name one specifically?

A. What I stated, there's multiple groups and multiple orthopedics that I have seen the billing from over time. That's what I've stated. You know, I have been in the area, I see second opinions, it's the same thing I stated earlier so that's where that comes from.

Q. And in preparing your opinions and report -- I mean, you

didn't call any other facility or anything like that and take a survey of what the reasonable charges were for in the community where Ms. Cole resides; correct?

A.   I just stated earlier that it's from being in practice and seeing charges come through as part of medical records sent to me for second opinions and everything else.  That's where this comes from so I didn't need to call anyone because I've seen the various charges for the various procedures.

Q.   I mean, do you know where Ms. Cole resides?

A.   Well, I saw her down in Broward, so -- but I don't know where she resides, no.  And Dr. Wilkerson's surgery was down in that direction, but I don't know specifically where she resides, no.

Q.   And those figures that you gave at least on the stand right now, did you distinguish between, you know, what the workers compensation work that you do, or the charges that you would perform, you know, according to like a different insurance company or anything like that?

A.   Our fee schedule is the fee schedule.  It doesn't matter -- everyone gets the same fee schedule.  Our charges are the charges.  It doesn't vary based on a liability versus work comp versus anything else.  We have one fee schedule for one code. So whatever it is, it doesn't change based on insurance is what you're asking me I believe.

Q.   No.  What I was asking is when you were giving that

opinion -- once again, besides your own practice, did you make any effort to determine, you know, if the charges you are claiming are appropriate are effected by workers compensation or effected by self-pay or have any bearing on, you know, the numbers that you are giving for the cost of this medical treatment?

A.   Again, a fee schedule is a fee schedule.  It should not vary based on any particular situation.  This is the charge.

Q.   I mean, do you have -- the surgical center, do you have a surgical center in your office?

A.   No.

Q.   Okay.  So how would you know what the surgical center should charge if it's not part of your office?

A.   Because I have been working out of a surgical center for 25 years and I know what the charge is from the various surgical centers that I was -- at one time I had ownership in surgical centers.  So I know what surgical center charges are. I see that in the same situation with a local community. People come in, I had surgery done, here's my records.  I'm still having a problem with my shoulder, please tell me what to do.  So a lot of times that comes with records that people bring me.

Q.   The surgical centers you are referring, to, they are not named in your report; correct?

A.   No.  But, again, as far as the surgery center, I was taking

the numbers from the -- that website, that transparency website.

Q.   The numbers you claim you've obtained from the transparency website, you did not include those in your report and you did not bring them with you today?

MR. DRAHOS:  Objection.

THE COURT:  Overruled.

You can answer.

A.   I'm not sure what you mean bring what with me.  And I can't bring the website with me.  The website is the website.  And the charges that I talked about for the surgical facility charges, I gave them in my report.

BY MR. DIEPPA:

Q.   Okay.  The data you are referring to from this website, you didn't bring that data with you today?

A.   The hundreds and hundreds of thousands of things they talk about in the website, no.

Q.   You did not include them in your report either?

A.   I don't know what you mean "include."  I gave the name of the website.  I don't know the website.  You can have access to.  I don't have that.  So I don't even know what the question --

Q.   The results from the website that you are claiming you would have gotten, you didn't include those in your report?

A.   I did include in my report.  The numbers are in the report.

Q.   The numbers from your accessing this website, you printed out the website and that's in your report?

A.   I didn't print out the website.  I wrote down the website, I said this was the number that came out and I put it in.  I don't understand the question.

Q.   Okay.  You didn't copy and paste anything from the website, you didn't include the search terms you used in this website, did you?

A.   I typed in the website number, I type in "labral repair." I type in -- there.  I'm not quite sure what --

Q.   And you would agree that notwithstanding the condition of Ms. Cole's shoulder as you have testified to, someone like that can still have an injury that would aggravate that preexisting condition; correct?

A.   Could you repeat that one more time?

Q.   You would agree that someone with the shoulder in the condition that Ms. Cole had can have an injury that would aggravate her shoulder even given that condition?

A.   It's not within medical probability that somebody would have an aggravation of an underlying arthritic issue and walk in with a full range of motion.

Q.   Okay.  Doctor, you recall in your deposition on page 39, line 15, where I asked you:  "Okay.  And do you also agree that someone with a shoulder in the condition that you opine Ms. Cole had her shoulder can have an injury that aggravates

her shoulder?"

And your answer was:  "It's possible.  Yes"?

A.  Well, that's what I just stated.  Anything -- as you're well aware, anything is possible.  But when you talk about medical probability, that's not the case in this particular situation.  But, yes, it's possible.

Q.  And you would agree that according to your testimony you had no criticism of the care provided by Dr. Wilkerson; correct?

A.  Well, what I stated, Dr. Wilkerson was the treating physician and he indicated Ms. Cole for the surgery.

Q.  When I asked you in your deposition:  "Okay.  And I just want to be clear here, you're not criticizing the medical treatment that was provided by Dr. Wilkerson; correct?"

And you said you were not criticizing it; correct?

MR. DRAHOS:  Objection.  Once again it --

THE COURT:  Yeah.  It's not inconsistent.  He is not criticizing today either.

MR. DIEPPA:  Well, he said earlier that he wouldn't have done the same surgery that Dr. Wilkerson would have done and he wouldn't have done many things Dr. Wilkerson actually did to the patient.  He criticized the synovectomy that was performed as part of the operative procedure and said that that was not appropriate.

THE COURT:  Okay.  So, I mean, I get the distinction

which is he's been saying it wasn't necessary.  He's not saying -- correct me if I'm wrong -- that Dr. Wilkerson did not do a good job with whatever it was that he did.  I mean, is that what you're trying to get at?

MR. DIEPPA:  If an expert is claiming that a doctor did something that is not necessary, I mean, that's a serious allegation.  Because doing something that is not necessary is as bad as not doing it or doing it improperly.

THE COURT:  Okay.  So that point has been made.  Just move on.

THE WITNESS:  But that's regarding a coding issue. Dr. Wilkerson coded for a synovectomy.  All I stated was the American Academy of Orthopedic Surgery does not recommend coding for a complete synovectomy unless you are rheumatoid or inflammatory arthritic component.  That's what that states.

BY MR. DIEPPA:

Q.   Okay.  But you are not here to say any of the procedures performed by Dr. Wilkerson were performed improperly or below the standard of medical care?

A.   What I stated earlier is Dr. Wilkerson indicated her for the procedures that he did.

Q.   Yeah.  And that's -- and I asked you this at your deposition too, but you would agree that arthroscopic surgery is a recognized and recommended way to repair a labral tear and a supraspinatus tendon tear, that's something that those

surgeries allow to have repaired?

MR. DRAHOS:  Same objection.

THE COURT:  Well, wait.  What's the objection now?

MR. DRAHOS:  So what the doctor has been stating repeatedly is that if Dr. Wilkerson wants to do the surgery on a degenerative tear, he's able to do that.  Where Dr. Chalal is taking issue is that he doesn't believe it's causally related to the incident.  So he's not criticizing the doctor's decision to do a surgery.  He is saying that decision to do that surgery was not necessary due to the incident in question.

MR. DIEPPA:  My question is different.

THE COURT:  Well, the question here was you would agree that this type of surgery is a recognized way to repair a labral tear and both of these kinds of tears, that is something that those surgeries allow to have repaired.  And that's -- that's not criticizing Dr. Wilkerson.  And he can answer that question, whether he would agree that that type of surgery can be done to repair those types of injuries.  That's fine.

MR. DRAHOS:  Okay.  Thank you, Your Honor.

A.  I repair labral tears.  I do not repair degenerative labral tears.  I repair rotator cuff tears if they are indicated.  A 3 millimeter to 4 millimeter rotator cuff tear, what I call low grade, is not one of my indications for fixing a rotator cuff repair.  It usually has to be more than 50 percent of the tendon.  And this was a low grade.  Again, Dr. Wilkerson makes

his own decisions with that.

BY MR. DIEPPA:

Q.   When you do repair these tears, do perform those surgeries arthroscopically?

A.   Yes.

Q.   And you stated that from the last time or the only time you saw Ms. Cole she had limited range of motion in her shoulder?

A.   Correct.

Q.   Okay.  She -- was she still complaining of pain in her left shoulder?

A.   Yes.

Q.   So you would agree that at least when you examined her she did have limited range of motion in her shoulder?

A.   Correct.

Q.   Okay.  She did have complaints of pain?

A.   Correct.

Q.   How often have you worked with Carnival Cruise Line?

A.   Over the years, you know, there's an occasional case.  I don't have the specifics.  I think we may have told you can get that from Carnival.  I don't know, but occasionally I will do a -- I will do an evaluation for Carnival, but I don't have the specifics.

Q.   You said you may have worked for them in the past?

A.   No.  I did work for them in the past.  I just don't know the -- you asked me -- I can't give you a specific -- whatever

your question, how often or whatever.  But I've worked with them in the past, I just don't know the numbers.  But you can get that from Carnival, should be able to provide you that information.

Q.   And you testify approximately 80 to 85 percent solely for the defense; correct?

A.   80 to 85 percent defense and 15 to 20 percent plaintiff.  Correct.

Q.   In terms of your business relationship with Carnival, it's purely for litigation meaning that you don't treat patients for Carnival, you only do medical examinations for Carnival?

A.   Well, I have patients that have been on Carnival trips that have come to see me, if that -- I don't know what you mean.

Q.   Well, you don't bill Carnival for those patients, do you?  I hope not.

A.   No.  No.

So, yeah.  These would be compulsory medical evaluations similar to this sometime over the last five years.  Carnival can tell you how often it's happened.

Q.   Okay.  Do you know if the nature of your opinions, whether you found an injury was related or not related, has effected the amount of times Carnival has hired you in the past few years?

A.   I would hope not.  I would hope Carnival is asking for the truth, which is all I'm giving you.  I mean, I have no --

listen, I think most people, they just want to know if someone was injured or not.  And -- but in this particular case my opinions are thought out and based on everything we've already talked about.  So whether Carnival wants that -- is looking for a particular opinion, I think most people know that for how long I've been here that I'm going to give the opinion that I feel is appropriate.

Q.   And how much are you charging to be here today?

A.   $1,200 an hour as we talked about.

Q.   And how long have you been here?  Is that portal to portal?

     I'm sorry.  How long have you been here and is that portal to portal?

A.   It is portal to portal.  And I've been here since I left surgery so I got here around -- forget about parking -- around noon, somewhere in that vicinity.  I don't know exactly.  And, you know, so -- but I left surgery and came here.

Q.   And do you have the total of your charges that you billed for the entirety of this case with you?

A.   No.  I have charges up until this time.  But I think as I stated and we talked about, I think you have a copy of that already.  But --

Q.   Do you charge different, like other than $1,200 an hour for testimony, are your charges for, you know, reviewing files, do those differ at all?

A.   I stated it's 580 an hour for records review.

Q.   What about for the CME, how much did you charge?

A.   $1,200.

MR. DIEPPA:  Thank you, Doctor.

THE WITNESS:  You're welcome.

THE COURT:  If you have redirect it's got to be really short.

MR. DRAHOS:  Extremely brief.

THE COURT:  Okay.

RECROSS-EXAMINATION

BY MR. DRAHOS:

Q.   Doctor, submit your reimbursement for your parking, sir.

A.   I'm sorry?  I didn't hear that.

Q.   Please submit your parking reimbursement.

So I just wanted to ask, you were asked a question about the MRI report and whether or not it indicated anywhere within the findings that it was stated to be degenerative.

Did it state anywhere within the MRI report that those findings were acute?

A.   No.

Q.   The findings are the findings; correct?

A.   That's what a radiologist typically does, which is why I need to see it myself.

Q.   Do you need to review peer reviewed literature in order to interpret MRI images?

A.   Yes.  It's all peer review literature is like I said it's

an ongoing thing, but yes.

Q.   And over the course of the years that you've evaluated patients and reviewed their MRI films have you gone and reviewed peer reviewed literature before you go and determine what those images show you or are you relying upon your years of experience?

A.   Well, it's all part of the process.  My years of experience include being board certified, recertified, recertified, recertified, and the most recertifications are based on five years consecutive years of peer review articles every year.  So it's an ongoing process.  That's why it's hard for me to differentiate.  They are interrelated.  But I deal with peer review articles all the time including two weekends ago when I took my most recent 2024 exam.

Q.   Point being though is that when you see a film do you need to look at it and say, well, let me check to see what the peer review literature says that is or are you able to visualize it and render your own impression?

A.   That's exactly correct.

       MR. DRAHOS:  Thank you.

       THE COURT:  All right.  Thank you very much.  You can step down.

       THE WITNESS:  Thank you very much.  Good luck.

       THE COURT:  Okay.  So we are going to break for the day.  And we should get started tomorrow -- if you guys -- we

can try and get you here about 9:00, I would say we will be off to the races around 9:15.  Is that okay?

MR. DRAHOS:  That's great.

We don't have an order of proof so I am expecting we have to be done by Friday.  So I have my biomechanics expert coming Friday.  I don't expect that we will be finished by tomorrow.  But I --

MR. DIEPPA:  Mine is coming Friday too.  But on rebuttal.  So yours will have to go first.

MR. DRAHOS:  Okay.

MR. DIEPPA:  Unless you want to mess with the order of proof.

But you are planning on bringing her Friday?

MR. DRAHOS:  Yes.  So she will be here Friday.  You and I can talk outside.  Just need to know what witnesses you are calling.

MR. DIEPPA:  Yeah.  I will get you that.

THE COURT:  And then if you want to update Johanna, if there's anything she needs to know.  But it doesn't matter to me which -- what order it's going in as long as you guys are in agreement and you know who to have ready.  Okay?

COURTROOM SECURITY OFFICER:  All rise.

COURTROOM DEPUTY:  Court is adjourned.

(Court was adjourned at 3:19 p.m.)

C E R T I F I C A T E


        I hereby certify that the foregoing is an

accurate transcription of the proceedings in the

above-entitled matter.



DATE:   July 2, 2024                /s/Mairelys Albo
                                    MAIRELYS ALBO, RPR
                                    Official Court Reporter
                                    United States District Court
                                    Southern District of Florida
                                    299 East Broward Boulevard
                                    Fort Lauderdale, Florida 33301

**$**

**$1,000** [1] - 155:3
**$1,200** [5] - 115:7, 115:18, 193:9, 193:22, 194:2
**$15,000** [1] - 156:6
**$2200** [1] - 154:24
**$3500** [1] - 183:8
**$5,808** [1] - 155:2
**$50** [1] - 150:18
**$580** [1] - 115:8
**$65,000** [1] - 155:25
**$9,919** [1] - 153:11

**/**

**/s/Mairelys** [1] - 197:11

**0**

**08-cv-60629** [1] - 27:23

**1**

**1** [22] - 1:7, 1:8, 1:9, 10:13, 41:7, 41:10, 41:12, 56:21, 57:20, 57:24, 68:12, 90:18, 90:21, 92:6, 92:9, 92:14, 92:17, 103:23, 104:5, 126:1, 129:12, 129:15
**1-10** [1] - 2:14
**1-6** [2] - 2:14, 57:5
**10** [13] - 11:17, 27:24, 39:10, 39:11, 39:17, 41:7, 41:10, 68:12, 129:12, 129:14, 129:15, 139:14
**100** [1] - 174:1
**1001** [1] - 1:15
**106** [3] - 2:5, 103:22, 126:14
**10:10** [1] - 29:3
**10:50** [1] - 56:9
**11** [6] - 10:4, 15:10, 15:11, 73:23, 74:4, 74:11
**110** [1] - 2:7
**1183** [1] - 28:9
**11:45** [1] - 56:4
**11th** [3] - 21:8, 21:17, 28:2
**12** [6] - 10:4, 139:14, 171:8, 179:10, 180:12, 182:19

**120** [1] - 173:1
**1212** [1] - 28:19
**1283** [1] - 28:3
**12:00** [6] - 7:13, 7:17, 7:24, 56:2, 56:3, 167:21
**12:10** [1] - 56:9
**12th** [1] - 180:14
**13** [7] - 11:18, 25:2, 110:7, 167:1, 167:14, 181:20
**13-1** [2] - 123:19, 123:20
**14** [2] - 10:7, 181:20
**15** [14] - 5:12, 5:22, 11:18, 32:25, 48:23, 116:14, 139:16, 146:14, 171:6, 171:8, 173:3, 173:20, 187:23, 192:7
**150** [1] - 1:14
**16** [13] - 2:15, 25:2, 56:22, 57:6, 60:15, 60:22, 103:11, 103:12, 145:21, 145:23, 147:24, 147:25, 167:1
**160** [1] - 2:7
**16753646** [1] - 27:19
**17** [2] - 103:23, 104:5
**18** [3] - 139:17, 165:8, 167:14
**19** [8] - 103:12, 156:10, 157:11, 165:8, 177:21, 178:18, 182:2, 182:16
**194** [1] - 2:8
**197** [2] - 1:8, 2:9
**1988** [2] - 111:9, 113:12
**1990** [2] - 112:5, 112:7
**19th** [1] - 115:3
**1:00** [1] - 7:9

**2**

**2** [14] - 41:14, 41:17, 41:22, 51:19, 51:20, 52:3, 57:21, 57:24, 97:25, 98:13, 99:5, 113:3, 162:7, 197:11
**2-9** [1] - 2:13
**20** [11] - 5:13, 38:6, 113:23, 113:25, 114:13, 116:14, 135:11, 167:14, 173:20, 177:1, 192:7
**20-minute** [1] - 5:22

**200** [4] - 162:11, 162:13, 162:17, 162:22
**2000** [2] - 112:10
**2004** [1] - 28:4
**2009** [3] - 27:24, 36:21, 112:12
**2010** [1] - 112:13
**2016** [1] - 28:20
**2020** [1] - 112:16
**2022** [27] - 27:19, 29:14, 32:25, 34:9, 35:22, 44:9, 45:15, 45:19, 46:17, 81:3, 114:25, 120:23, 132:19, 158:13, 158:16, 158:18, 158:20, 166:11, 166:17, 174:9, 174:19, 176:22, 178:4, 179:10, 180:12, 180:14, 182:19
**2023** [5] - 90:8, 115:3, 156:10, 157:11
**2024** [5] - 1:5, 29:19, 160:12, 195:14, 197:11
**203** [1] - 28:19
**2030** [2] - 112:16, 112:19
**21** [2] - 139:18, 167:14
**2148771** [1] - 27:12
**22** [4] - 112:4, 120:22, 165:8, 167:15
**22nd** [6] - 29:14, 114:25, 158:13, 158:16, 158:18, 158:20
**23** [4] - 73:23, 74:2, 74:4, 74:11
**23-cv-60532** [1] - 1:2
**23-cv-60532-Damian** [1] - 3:6
**24** [8] - 34:9, 81:3, 146:14, 166:17, 174:9, 174:19, 176:22, 178:3
**24th** [6] - 29:19, 35:22, 45:15, 45:18, 46:16, 166:10
**25** [4] - 14:5, 155:24, 159:18, 185:15
**26** [6] - 13:11, 13:12, 14:6, 15:4, 15:11, 144:20
**27** [1] - 132:18
**29** [9] - 1:5, 47:1, 47:2, 47:4, 58:5, 58:16, 93:15, 94:4, 95:18

**2900** [1] - 154:24
**29807** [2] - 145:24, 153:9
**29821** [3] - 145:25, 154:13, 154:16
**29823** [1] - 154:22
**299** [2] - 1:25, 197:14
**2:00** [4] - 7:3, 7:19, 85:1, 85:7
**2:23** [1] - 160:1
**2:28** [1] - 160:1
**2nd** [2] - 1:14, 90:8

**3**

**3** [13] - 15:4, 57:15, 57:17, 106:22, 133:14, 136:15, 137:20, 137:22, 137:24, 138:4, 176:1, 190:22
**3-6** [1] - 97:3
**30** [12] - 37:9, 38:6, 47:1, 47:2, 47:4, 93:16, 94:4, 95:18, 135:13, 137:23, 159:12, 159:17
**30(b)(6** [1] - 35:17
**30-some-odd** [1] - 132:24
**32** [1] - 23:20
**33** [5] - 21:6, 21:15, 22:22, 171:19, 171:22
**3300** [1] - 155:10
**33130** [1] - 1:19
**33131** [1] - 1:15
**33301** [2] - 1:25, 197:14
**34** [1] - 170:9
**35** [1] - 137:24
**3500** [1] - 153:15
**36** [4] - 113:12, 113:13, 113:14, 149:8
**39** [1] - 187:22
**392** [1] - 28:3
**3:00** [11] - 46:10, 46:11, 87:24, 88:17, 90:12, 90:14, 90:17, 93:1, 105:4, 159:16, 167:22
**3:06** [4] - 91:3, 91:19, 93:1, 93:6
**3:19** [2] - 1:6, 196:24

**4**

**4** [6] - 103:23, 133:14, 150:17, 165:8,

**176:1, 190:22**
**41** [2] - 2:13, 2:14
**42** [3] - 2:4, 146:10, 146:14
**43** [2] - 146:10, 146:14
**45** [1] - 159:12
**4800** [1] - 153:15
**49** [5] - 20:19, 22:16, 113:3, 171:14
**4:00** [5] - 46:10, 46:11, 87:24, 88:17, 90:15

**5**

**5** [18] - 49:3, 50:11, 50:21, 52:5, 52:21, 59:12, 59:13, 59:15, 59:16, 73:23, 74:1, 74:2, 74:4, 74:11, 99:15, 99:17, 139:13, 150:17
**5'4** [1] - 107:12
**5'5** [1] - 107:12
**5-1** [2] - 105:21, 105:25
**5-2** [5] - 98:8, 98:11, 99:7, 100:3, 100:9
**50** [3] - 146:5, 176:25, 190:24
**51** [2] - 146:5, 181:20
**51-year-old** [1] - 29:16
**515** [1] - 1:18
**52** [1] - 135:12
**52-year** [1] - 171:2
**56** [2] - 2:14, 2:15
**580** [1] - 193:25
**5800** [1] - 155:10
**5969** [1] - 154:23

**6**

**6** [6] - 11:16, 15:4, 56:21, 89:25, 96:22, 157:10
**600** [5] - 155:2, 163:5, 163:11, 163:16, 163:18
**6056** [1] - 110:23
**609** [1] - 28:9
**65,488.28** [1] - 155:20
**650** [1] - 1:19
**6:00** [2] - 105:4, 167:21
**6:20** [1] - 92:19

**7**

**7** [3] - 11:16, 129:8, 139:13
**7.1** [1] - 19:22

**7/22** [1] - 143:15
**7/22/2022** [2] - 120:12, 143:15
**7/24/2022** [1] - 140:15
**7/24/22** [1] - 20:24
**7/25** [1] - 127:12
**7/25/2022** [1] - 127:10
**7/27** [1] - 130:11
**7/27/2022** [2] - 130:9, 132:4
**702** [5] - 5:17, 21:8, 22:25, 26:16, 27:4
**7:15** [1] - 114:6

## 8

**8** [10] - 11:16, 28:4, 39:9, 39:18, 39:19, 89:18, 90:3, 90:10, 160:12, 167:2
**80** [2] - 192:5, 192:7
**85** [5] - 2:4, 155:23, 155:25, 192:5, 192:7
**8th** [1] - 161:2

## 9

**9** [11] - 11:17, 39:9, 41:14, 41:17, 41:22, 89:25, 110:4, 110:5, 132:8, 168:6, 168:7
**9,515** [1] - 155:10
**93** [1] - 16:11
**93-5** [1] - 16:14
**93-6** [1] - 16:11
**9:00** [2] - 167:22, 196:1
**9:15** [1] - 196:2
**9:35** [2] - 1:6, 3:1

## A

**a-c-r-o-m-i-a-l-e** [1] - 134:18
**a.m** [3] - 1:6, 3:1, 56:9
**able** [31] - 7:5, 9:5, 9:24, 14:24, 16:16, 18:13, 18:14, 25:19, 47:9, 50:10, 67:1, 81:11, 107:22, 108:16, 109:23, 123:9, 129:2, 133:2, 133:10, 134:16, 135:5, 135:6, 144:7, 145:13, 148:15, 148:18, 175:3, 175:5, 190:6, 192:3, 195:17
**abnormalities** [2] - 134:7, 177:6

**abnormality** [2] - 122:17, 127:6
**aboard** [7] - 29:14, 29:19, 32:6, 120:14, 120:25, 126:21, 158:23
**above-entitled** [1] - 197:9
**absence** [2] - 14:17, 121:12
**absolutely** [4] - 6:9, 15:23, 26:17, 123:11
**Academy** [3] - 154:3, 154:12, 189:13
**access** [3] - 30:11, 55:14, 186:20
**accessing** [1] - 187:1
**accident** [16] - 11:3, 36:19, 77:18, 80:18, 80:19, 83:24, 83:25, 84:1, 114:24, 130:13, 156:22, 158:13, 158:16, 158:20, 168:23, 176:8
**accommodate** [1] - 5:18
**according** [14] - 17:24, 18:3, 30:3, 31:3, 31:17, 45:14, 63:7, 91:2, 91:18, 92:11, 93:16, 184:17, 188:7
**accounting** [1] - 31:16
**accumulation** [1] - 183:2
**accuracy** [3] - 17:17, 91:4, 92:20
**accurate** [3] - 124:4, 182:11, 197:8
**accurately** [1] - 97:4
**accused** [1] - 24:25
**Achilles** [1] - 113:5
**acromiale** [7] - 134:8, 134:12, 134:15, 134:22, 135:10, 137:8, 170:2
**Acromiale** [1] - 134:18
**acromioclavicular** [2] - 137:6, 169:25
**actions** [1] - 36:17
**active** [5] - 157:20, 157:24, 163:16
**activities** [1] - 158:14
**activity** [3] - 136:1, 156:15, 175:16
**actual** [5] - 17:4, 56:24, 125:22, 155:23, 156:1
**acute** [57] - 21:3,

22:21, 23:23, 24:9, 24:16, 24:18, 24:21, 32:20, 116:23, 121:14, 121:15, 121:16, 121:22, 122:5, 129:20, 129:21, 131:5, 131:8, 131:9, 131:11, 131:12, 131:21, 131:23, 131:24, 135:22, 138:15, 139:22, 142:19, 143:1, 143:9, 154:1, 154:19, 160:24, 161:5, 163:9, 164:2, 165:24, 166:1, 166:2, 169:12, 169:16, 169:22, 173:22, 174:8, 174:10, 174:14, 174:17, 174:18, 175:3, 175:4, 175:9, 175:19, 194:18
**addition** [2] - 33:19, 37:4
**additional** [4] - 78:11, 111:14, 117:16, 141:9
**additionally** [1] - 12:4
**address** [12] - 4:16, 8:25, 14:24, 36:7, 37:6, 42:20, 42:21, 42:22, 86:17, 86:21, 86:22, 110:22
**adds** [1] - 133:23
**adema** [14] - 32:20, 121:9, 169:8, 169:11, 169:14, 169:16, 169:18, 169:22, 169:23, 169:24, 169:25, 170:1, 170:2
**adjacent** [5] - 121:7, 138:2, 138:4, 139:19, 176:2
**adjourned** [2] - 196:23, 196:24
**admissibility** [2] - 17:8, 23:8
**admissible** [4] - 10:16, 41:2, 41:7, 41:23
**admit** [1] - 41:21
**admitted** [3] - 12:4, 41:8, 41:23
**admitting** [1] - 41:21
**advance** [1] - 111:10
**advantage** [1] - 18:12
**Advil** [3] - 162:13,

162:17, 162:25
**advised** [3] - 6:5, 6:25, 32:13
**afternoon** [6] - 46:13, 46:20, 90:12, 110:21, 160:9, 160:10
**age** [8] - 116:21, 116:23, 136:1, 169:1, 169:5, 172:7, 175:16, 176:23
**ageing** [2] - 168:12, 177:3
**aggravate** [2] - 187:13, 187:18
**aggravates** [1] - 187:25
**aggravation** [1] - 187:20
**ago** [4] - 96:9, 171:8, 173:3, 195:13
**agree** [32] - 9:6, 21:5, 26:17, 40:11, 41:5, 97:8, 97:15, 102:16, 105:18, 151:22, 151:25, 163:15, 165:9, 169:8, 169:11, 170:5, 174:7, 175:21, 176:16, 177:14, 178:11, 180:23, 182:6, 183:9, 187:11, 187:16, 187:23, 188:7, 189:23, 190:12, 190:17, 191:12
**agreed** [5] - 17:12, 20:11, 20:13, 102:18, 180:5
**agreement** [1] - 196:21
**agrees** [2] - 23:15, 34:13
**ahead** [30] - 29:3, 29:4, 40:15, 48:15, 57:8, 68:17, 73:6, 73:9, 73:13, 76:2, 83:5, 84:22, 85:5, 85:8, 85:20, 87:9, 109:20, 109:22, 117:1, 120:5, 132:9, 136:18, 137:18, 140:16, 150:15, 151:13, 151:14, 160:6, 169:2
**ain't** [1] - 103:9
**Airport** [2] - 11:25, 12:1
**airport** [2] - 12:13, 17:23

162:17, 162:25
**ALBO** [2] - 1:23, 197:12
**Albo** [1] - 197:11
**alcohol** [3] - 32:9, 39:1, 39:6
**alert** [1] - 164:9
**allegation** [1] - 189:7
**allow** [7] - 72:25, 83:11, 132:10, 150:15, 174:3, 190:1, 190:15
**allows** [2] - 133:19, 171:25
**almost** [2] - 18:20, 133:13
**American** [3] - 154:3, 154:12, 189:13
**amount** [5] - 9:12, 105:15, 141:3, 173:12, 192:22
**Amy** [3] - 10:7, 16:11, 37:17
**analogy** [1] - 175:14
**analysis** [9] - 116:8, 117:6, 120:8, 121:13, 122:13, 127:8, 129:17, 144:14, 149:5
**analyze** [1] - 117:7
**Andrew** [1] - 33:15
**angle** [1] - 63:24
**angles** [1] - 133:21
**ankle** [1] - 153:21
**ANSWER** [6] - 15:9, 15:18, 103:14, 103:16, 103:20, 104:8
**answer** [29] - 25:8, 40:3, 67:7, 67:14, 67:15, 68:10, 68:11, 68:16, 68:17, 72:23, 83:21, 90:13, 118:2, 159:13, 165:12, 168:15, 170:3, 171:18, 176:13, 178:18, 179:5, 179:6, 179:8, 180:18, 180:21, 181:21, 186:8, 188:2, 190:16
**answered** [6] - 74:14, 74:15, 102:3, 102:4, 102:8, 174:23
**anterior** [10] - 139:2, 139:5, 139:7, 167:5, 167:13, 167:17, 167:19, 167:23, 175:24, 176:18
**anyway** [2] - 16:19, 65:4

**apart** [3] - 18:13, 19:8, 25:24
**apologize** [1] - 141:19
**appear** [5] - 49:8, 49:11, 69:20, 70:2, 77:11
**APPEARANCES** [1] - 1:11
**appearances** [1] - 3:8
**appeared** [2] - 69:6, 75:14
**apply** [1] - 77:2
**applying** [2] - 26:16, 180:21
**appointments** [4] - 79:18, 79:21, 156:20, 157:14
**approach** [14] - 8:7, 8:18, 28:11, 29:5, 52:25, 53:24, 60:11, 64:3, 88:6, 89:9, 128:21, 129:5, 132:12, 133:5
**appropriate** [6] - 34:14, 172:18, 175:16, 185:3, 188:24, 193:7
**appropriately** [2] - 31:22, 32:1
**Arbor** [1] - 62:3
**area** [39] - 18:8, 30:25, 31:9, 47:17, 51:12, 54:4, 54:16, 96:12, 96:20, 97:4, 97:8, 102:25, 103:2, 103:13, 104:20, 107:6, 107:13, 122:20, 123:4, 124:9, 124:10, 125:22, 127:16, 128:8, 130:7, 134:10, 137:4, 137:5, 137:10, 138:7, 139:19, 149:10, 149:12, 152:4, 167:24, 183:22
**areas** [5] - 20:19, 135:14, 137:7, 175:12, 175:15
**Arevalo** [7] - 21:18, 21:22, 24:24, 27:11, 27:17, 27:19, 28:8
**argue** [2] - 24:21, 24:22
**argument** [15] - 7:8, 7:17, 7:20, 7:25, 10:1, 10:15, 11:4, 19:22, 23:11, 23:18, 25:14, 25:19, 28:15,

31:14, 33:24
**arguments** [2] - 17:6, 31:11
**arm** [4] - 121:23, 131:13, 156:16, 169:20
**arrangement** [2] - 50:6, 57:13
**arrived** [2] - 50:16, 57:25
**arrow** [1] - 124:10
**arthritic** [6] - 137:9, 137:15, 154:15, 167:24, 187:20, 189:15
**arthritic-type** [1] - 154:15
**arthritis** [27] - 134:6, 135:13, 135:15, 135:16, 136:6, 136:18, 136:24, 136:25, 137:3, 137:5, 137:12, 137:13, 139:6, 139:23, 141:22, 141:23, 153:24, 154:2, 158:4, 158:6, 169:15, 169:16, 169:23, 175:12, 175:25
**arthroscopic** [13] - 113:1, 113:2, 114:8, 114:10, 114:14, 142:8, 150:11, 153:9, 153:18, 155:1, 155:5, 155:9, 189:23
**arthroscopically** [1] - 191:4
**arthroscopy** [1] - 32:24
**article** [6] - 170:23, 171:2, 171:3, 172:13, 173:21, 174:1
**articles** [7] - 170:11, 171:6, 172:12, 173:3, 174:3, 195:10, 195:13
**ASHLEY** [1] - 1:17
**Ashley** [2] - 3:18, 35:13
**assessed** [1] - 155:15
**assisted** [1] - 35:13
**assistive** [1] - 127:19
**associated** [7] - 137:12, 139:3, 139:24, 144:1, 145:25, 169:23
**assume** [1] - 40:24

**assuming** [2] - 7:2, 7:9
**attempting** [1] - 74:7
**attempts** [1] - 18:25
**attention** [1] - 57:16
**attest** [1] - 13:25
**Attorney** [1] - 35:13
**audio** [1] - 173:2
**August** [6] - 28:20, 90:8, 179:10, 180:12, 180:14, 182:19
**authorities** [4] - 7:23, 20:17, 23:5, 27:6
**availability** [1] - 5:6
**available** [3] - 7:19, 85:4, 85:17
**Avenue** [1] - 1:14
**avoid** [2] - 81:19, 81:22
**aware** [6] - 30:15, 174:18, 174:22, 174:24, 188:4
**awhile** [1] - 131:6
**axial** [2] - 133:18, 138:25

## B

**background** [3] - 111:2, 119:8, 137:15
**bad** [1] - 189:8
**bag** [1] - 106:13
**bags** [1] - 81:13
**Bahamas** [3] - 45:9, 45:10, 45:11
**bail** [1] - 55:4
**ball** [4] - 121:17, 121:18, 136:20, 136:21
**baseball** [1] - 121:22
**based** [53] - 5:16, 19:11, 21:5, 24:5, 34:25, 40:11, 58:17, 58:20, 89:15, 109:7, 117:18, 118:2, 118:17, 119:8, 119:11, 119:24, 126:8, 127:13, 135:7, 140:4, 140:7, 140:21, 146:21, 148:2, 149:11, 150:7, 166:15, 166:21, 170:6, 170:8, 170:9, 170:10, 170:12, 170:20, 170:21, 170:25, 171:15, 171:23, 172:20, 173:5, 173:19,

177:20, 182:2, 182:4, 182:7, 182:11, 183:5, 184:21, 184:23, 185:8, 193:3, 195:9
**bases** [1] - 25:22
**basis** [13] - 5:16, 10:14, 22:13, 22:19, 94:3, 116:19, 120:1, 122:25, 148:15, 172:8, 172:9, 180:19, 183:8
**bath** [1] - 81:4
**bathing** [1] - 81:7
**bathroom** [1] - 95:13
**beach** [2] - 151:15, 151:16
**Beach** [6] - 1:19, 110:23, 111:9, 150:13, 151:5
**bearing** [1] - 185:4
**become** [5] - 112:1, 113:21, 113:22, 152:4, 171:25
**becomes** [3] - 11:4, 11:10, 41:13
**BEFORE** [1] - 1:10
**began** [2] - 120:11, 120:18
**begin** [2] - 120:10, 136:15
**beginning** [4] - 3:8, 125:25, 136:12, 155:21
**begins** [1] - 8:14
**behalf** [3] - 3:14, 3:16, 3:18
**behind** [2] - 54:17, 175:11
**belief** [1] - 141:14
**believes** [2] - 20:21, 20:22
**below** [2] - 36:25, 189:18
**bench** [3] - 6:17, 26:16, 28:11
**BENCH** [1] - 1:9
**benefit** [6] - 64:6, 111:1, 128:5, 174:12, 177:19, 182:12
**benign** [1] - 111:17
**best** [1] - 175:14
**Beth** [1] - 111:5
**better** [3] - 94:14, 140:23, 141:8
**between** [9] - 58:6, 124:15, 153:15, 154:23, 155:2, 155:10, 163:9,

164:1, 184:15
**Bhatia** [2] - 29:23, 30:4
**big** [1] - 138:2
**bigger** [1] - 61:18
**bilateral** [1] - 130:14
**bill** [1] - 192:14
**billed** [3] - 155:8, 155:25, 193:17
**billing** [1] - 183:21
**bills** [3] - 115:12, 182:22, 182:25
**binder** [1] - 8:18
**binders** [2] - 8:12, 8:17
**biomechanical** [11] - 33:15, 37:18, 37:19, 117:19, 117:20, 117:23, 118:5, 118:10, 177:8, 177:10, 177:13
**biomechanics** [4] - 13:24, 14:24, 33:19, 196:5
**birthday** [3] - 44:13, 44:14, 44:15
**bit** [9] - 28:14, 43:8, 43:12, 47:10, 61:18, 62:19, 85:6, 112:22, 142:7
**bite** [1] - 56:1
**black** [2] - 121:9, 127:17
**bleeds** [1] - 118:25
**blood** [5] - 84:4, 84:5, 84:11, 156:17
**blow** [1] - 63:21
**blowing** [8] - 10:25, 29:25, 50:15, 50:17, 57:25, 58:5, 59:8, 63:9
**blue** [4] - 54:4, 54:5, 69:13, 69:16
**blueness** [2] - 121:9, 127:17
**blurb** [1] - 151:11
**board** [29] - 21:6, 21:9, 23:20, 33:20, 37:8, 44:19, 92:8, 111:23, 111:24, 111:25, 112:1, 112:6, 112:10, 112:11, 112:12, 112:13, 112:14, 112:19, 154:4, 170:11, 170:25, 171:5, 171:19, 171:20, 171:25, 172:11, 172:14, 172:15, 195:8

**board-certified** [4] - 21:6, 23:20, 33:20, 37:8
**boarded** [1] - 44:19
**boat** [6] - 54:22, 54:24, 55:1, 55:2, 55:5
**body** [11] - 13:25, 14:3, 80:10, 80:11, 101:18, 111:19, 113:6, 113:8, 124:3, 124:4, 128:8
**bolster** [1] - 154:9
**bolstering** [3] - 154:5, 154:7, 154:8
**bomb** [5] - 74:16, 74:17, 74:23, 75:22, 76:4
**bone** [4] - 134:14, 137:10, 138:23, 169:18
**bones** [2] - 111:18, 137:13
**BORCEGUE** [1] - 3:23
**Borcegue** [5] - 3:23, 35:17, 36:6, 36:7, 36:11
**born** [3] - 42:23, 43:17, 134:10
**borrowing** [1] - 147:22
**bothers** [1] - 164:15
**bottom** [2] - 51:14, 51:23
**Boulevard** [3] - 1:25, 110:23, 197:14
**Boynton** [2] - 110:23
**brace** [4] - 64:24, 64:25, 127:20, 127:24
**breach** [3] - 36:2, 37:5, 37:23
**break** [18] - 4:8, 6:20, 7:13, 7:15, 8:23, 29:2, 38:12, 55:8, 55:19, 57:12, 109:20, 159:9, 159:19, 159:20, 159:23, 159:24, 172:21, 195:24
**bridge** [1] - 19:3
**brief** [3] - 56:9, 160:1, 194:7
**briefly** [1] - 142:4
**bring** [16] - 7:12, 20:14, 20:15, 23:1, 56:13, 62:6, 76:11, 76:13, 81:14, 126:13, 126:18, 185:22, 186:5,

186:9, 186:10, 186:15
**bringing** [6] - 9:16, 16:18, 48:21, 81:13, 84:2, 196:13
**brought** [5] - 76:10, 76:15, 115:12, 142:6, 170:5
**Broward** [4] - 1:25, 156:12, 184:10, 197:14
**Brown** [1] - 28:1
**brown** [1] - 28:4
**bruise** [1] - 140:5
**bruising** [2] - 122:19, 127:17
**bumper** [1] - 121:19
**burden** [3] - 35:2, 35:24, 37:4
**bursa** [1] - 134:6
**business** [1] - 192:9
**busy** [1] - 31:9
**button** [1] - 142:11
**BY** [93] - 1:22, 2:4, 2:4, 2:5, 2:7, 2:7, 2:8, 42:11, 43:24, 46:1, 48:16, 50:5, 52:8, 52:16, 54:1, 57:9, 60:14, 61:7, 62:7, 62:12, 65:11, 66:17, 67:17, 68:5, 68:13, 68:19, 69:4, 71:20, 72:6, 73:14, 73:22, 75:7, 76:3, 76:20, 79:16, 82:8, 82:14, 83:6, 83:12, 83:20, 84:12, 86:2, 87:10, 89:1, 89:17, 90:1, 90:6, 90:23, 91:14, 92:7, 92:15, 97:1, 97:13, 98:9, 98:16, 98:25, 99:16, 102:5, 102:13, 104:11, 105:9, 105:23, 106:19, 109:5, 110:20, 118:8, 120:7, 123:24, 125:3, 126:20, 129:7, 131:20, 131:25, 132:14, 133:7, 135:3, 140:1, 149:1, 153:3, 154:20, 157:13, 160:8, 160:21, 168:16, 168:19, 173:7, 175:1, 181:9, 183:15, 186:13, 189:16, 191:2, 194:10

**C**

**C-H-A-L-A-L** [1] - 110:18
**C-h-a-l-a-l** [1] - 8:20
**C-o-l-e** [1] - 42:7
**calculation** [2] - 15:21, 15:23
**calculations** [2] - 13:20, 33:16
**camera** [4] - 142:7, 142:8, 142:10, 142:11
**cancers** [1] - 111:17
**cannot** [3] - 21:20, 55:21, 70:9
**cap** [1] - 69:9
**capable** [2] - 23:19, 133:10
**captain** [2] - 69:9, 70:15
**care** [17] - 34:11, 35:4, 78:20, 78:23, 78:24, 79:3, 79:14, 79:23, 80:20, 81:2, 103:3, 116:2, 120:14, 120:18, 171:21, 188:8, 189:19
**careful** [1] - 48:10
**Caribbean** [1] - 87:2
**CARNIVAL** [1] - 1:7
**Carnival** [70] - 3:7, 3:15, 3:17, 3:18, 4:3, 11:2, 11:5, 17:25, 29:13, 29:15, 29:23, 30:11, 31:7, 31:12, 31:15, 31:16, 33:9, 35:3, 35:13, 35:16, 35:22, 36:3, 36:8, 36:12, 36:17, 36:21, 36:23, 37:5, 48:5, 48:8, 48:18, 50:22, 58:13, 59:8, 66:21, 69:6, 69:12, 70:6, 76:18, 81:18, 83:7, 86:4, 90:25, 120:11, 120:14, 120:22, 122:8, 126:21, 131:3, 158:23, 160:22, 161:25, 162:8, 164:23, 174:19, 177:17, 191:17, 191:20, 191:21, 192:3, 192:9, 192:11, 192:12, 192:14, 192:18, 192:22, 192:24, 193:4
**Carnival's** [16] - 17:25, 18:3, 30:15, 30:16,

30:22, 30:24, 32:3, 32:12, 33:2, 33:4, 35:18, 35:23, 37:24, 83:9, 91:2, 91:18
**cart** [6] - 50:22, 51:6, 51:10, 51:11, 51:12, 99:23
**Case** [3] - 3:1, 3:6, 27:23
**case** [71] - 4:5, 5:20, 8:15, 10:8, 11:1, 14:25, 20:24, 21:8, 21:17, 21:18, 21:22, 23:14, 27:17, 27:19, 27:21, 27:22, 28:6, 28:7, 28:8, 28:13, 28:15, 29:12, 32:20, 35:14, 35:17, 35:19, 35:20, 39:7, 39:8, 45:14, 81:18, 87:4, 90:7, 101:6, 101:12, 111:14, 114:17, 114:22, 115:11, 117:23, 118:6, 118:11, 119:4, 119:11, 119:18, 119:20, 119:23, 132:21, 136:24, 138:7, 140:10, 141:1, 141:11, 142:25, 160:24, 161:1, 164:15, 166:10, 166:14, 169:1, 169:4, 169:14, 170:16, 171:6, 172:22, 178:8, 183:18, 188:5, 191:18, 193:2, 193:18
**CASE** [1] - 1:2
**cases** [5] - 8:1, 8:3, 21:19, 27:8, 115:22
**Casino** [1] - 62:2
**casually** [1] - 35:6
**catastrophic** [1] - 113:20
**catch** [1] - 31:25
**categories** [1] - 17:18
**category** [1] - 17:14
**causally** [8] - 20:23, 34:12, 140:14, 143:13, 143:15, 177:16, 180:6, 190:7
**causation** [17] - 21:10, 21:21, 23:3, 23:9, 25:20, 25:22, 37:4, 37:5, 37:23, 118:23, 119:3, 119:10, 119:11, 119:20, 119:22, 119:24,

166:14
**caused** [4] - 21:12, 37:21, 64:12, 169:16
**causes** [1] - 138:6
**ceiling** [1] - 107:14
**Center** [8] - 111:5, 111:7, 114:12, 120:11, 120:22, 122:8, 131:3, 162:1
**center** [16] - 102:25, 103:19, 113:19, 114:14, 114:16, 156:2, 162:5, 164:9, 182:23, 183:16, 185:9, 185:10, 185:12, 185:14, 185:17, 185:25
**centers** [4] - 148:11, 185:16, 185:17, 185:23
**certain** [9] - 9:10, 14:17, 14:18, 14:25, 105:15, 135:9, 136:5, 178:16, 179:4
**certainly** [3] - 128:24, 141:8, 149:17
**CERTIFICATE** [1] - 2:9
**certification** [4] - 112:11, 112:13, 170:11, 174:4
**certifications** [1] - 112:7
**certified** [20] - 21:6, 23:20, 33:20, 37:8, 111:23, 111:24, 111:25, 112:1, 112:7, 112:14, 154:4, 171:1, 171:5, 171:19, 171:20, 171:25, 172:11, 172:15, 195:8
**certify** [1] - 197:7
**cervical** [3] - 127:21, 127:23, 128:5
**Cha** [1] - 19:14
**chair** [7] - 52:22, 52:23, 53:20, 54:4, 62:22, 100:24
**CHALAL** [1] - 2:6
**Chalal** [54] - 4:18, 4:24, 5:2, 5:16, 5:19, 8:2, 8:20, 8:22, 10:4, 16:18, 19:15, 19:16, 19:17, 19:25, 20:1, 20:13, 20:20, 21:3, 22:18, 23:6, 23:14, 24:19, 25:1, 25:9, 34:4, 34:7, 34:10, 34:13, 34:19, 34:21,

37:7, 37:8, 37:13, 38:8, 84:25, 85:2, 110:14, 110:18, 110:21, 118:14, 118:19, 146:5, 148:5, 149:2, 152:5, 152:6, 152:7, 159:13, 160:9, 170:5, 181:10, 190:6

**Chalal's** [10] - 8:9, 16:13, 19:24, 20:18, 21:1, 23:5, 25:8, 147:22, 148:12, 159:13

**chalk** [1] - 96:4

**challenge** [1] - 17:10

**challenging** [2] - 23:16, 26:21

**chance** [1] - 61:11

**change** [6] - 34:3, 104:13, 104:16, 126:12, 184:23

**changed** [1] - 171:24

**changes** [1] - 175:13

**characteristic** [1] - 169:11

**characterization** [1] - 25:11

**charge** [29] - 30:25, 115:6, 115:8, 144:5, 144:7, 145:24, 145:25, 146:12, 148:1, 148:5, 149:17, 150:16, 150:25, 151:2, 151:7, 151:18, 153:12, 154:23, 155:2, 155:10, 155:18, 156:2, 183:5, 183:8, 185:8, 185:13, 185:15, 193:22, 194:1

**charged** [10] - 115:10, 146:8, 148:19, 149:6, 153:8, 153:10, 153:17, 154:21, 155:12, 155:19

**charges** [33] - 143:17, 145:14, 146:13, 146:24, 148:16, 148:18, 149:15, 149:21, 150:9, 150:12, 151:19, 151:24, 152:8, 152:11, 152:24, 155:12, 155:15, 155:17, 155:19, 183:18, 184:2, 184:5, 184:8,

184:16, 184:20, 184:21, 185:2, 185:17, 186:11, 186:12, 193:17, 193:19, 193:23

**charging** [1] - 193:8

**check** [2] - 103:9, 195:16

**checking** [1] - 105:14

**chicken** [2] - 54:13, 63:1

**chief** [1] - 32:6

**children** [1] - 44:2

**chondromalacia** [2] - 141:17, 141:21

**Chondromalacia** [1] - 141:22

**choppy** [1] - 4:10

**chose** [1] - 111:22

**chronic** [5] - 24:8, 24:18, 116:23, 137:3, 141:15

**circle** [10] - 53:9, 53:10, 53:11, 53:19, 53:20, 53:21, 53:23, 62:22, 100:24, 100:25

**Circuit** [3] - 21:8, 21:18, 28:2

**circumstantial** [1] - 14:16

**cite** [1] - 28:15

**cited** [2] - 10:7, 28:7

**Citi** [1] - 79:22

**CitiMed** [4] - 130:9, 130:10, 132:1, 132:8

**claim** [5] - 14:20, 19:23, 36:8, 162:2, 186:3

**claimed** [2] - 37:20, 160:23

**claiming** [7] - 14:4, 35:20, 35:22, 151:23, 185:3, 186:23, 189:5

**claims** [2] - 4:2, 23:12

**clarification** [2] - 139:15, 141:18

**clarity** [1] - 52:4

**Classic** [1] - 27:13

**cleaned** [1] - 100:16

**cleaning** [4] - 62:11, 84:2

**clear** [9] - 18:6, 25:2, 25:4, 56:23, 101:11, 119:17, 166:13, 167:3, 188:13

**clerk** [1] - 9:7

**Clerk** [2] - 40:23, 160:19

**clerks** [1] - 8:17

**clinic** [1] - 143:3

**clinical** [9] - 23:24, 24:10, 116:19, 121:10, 127:25, 129:25, 131:1, 168:2

**clock** [1] - 167:21

**close** [2] - 59:14, 152:3

**closed** [4] - 48:6, 82:15, 82:23, 83:2

**closer** [2] - 43:12, 95:13

**closest** [1] - 59:11

**CME** [4] - 34:21, 173:2, 178:18, 194:1

**Co** [1] - 28:9

**Coast** [1] - 55:3

**code** [4] - 144:10, 144:14, 145:9, 184:22

**coded** [1] - 189:12

**codes** [9] - 144:1, 144:3, 144:6, 146:16, 146:20, 146:24, 147:1, 147:6, 156:1

**coding** [7] - 148:9, 149:19, 149:20, 156:4, 189:11, 189:14

**cognition** [1] - 86:15

**coherent** [1] - 164:9

**Cole** [169] - 3:6, 3:11, 3:25, 6:19, 6:23, 7:4, 11:7, 14:2, 14:16, 24:14, 29:12, 29:14, 29:16, 29:19, 29:24, 31:6, 31:16, 32:18, 32:24, 33:4, 33:20, 34:11, 35:20, 35:24, 36:4, 36:10, 37:4, 38:3, 38:11, 38:14, 38:16, 38:24, 41:25, 42:2, 42:6, 42:12, 43:7, 43:25, 44:9, 44:10, 44:16, 44:19, 45:21, 47:18, 48:1, 48:9, 48:17, 49:8, 49:14, 49:16, 50:6, 52:20, 54:6, 54:9, 55:17, 55:21, 56:13, 57:10, 58:7, 59:7, 59:13, 59:20, 60:1, 60:19, 60:23, 62:17, 64:5, 64:22, 66:22, 66:24, 67:19, 68:20, 69:18, 69:19, 71:21, 73:15, 73:23, 75:9, 75:14, 76:14, 77:2,

77:15, 77:22, 78:5, 78:7, 78:10, 79:17, 80:12, 80:17, 81:2, 81:10, 84:7, 84:17, 85:3, 85:4, 86:3, 86:23, 86:25, 87:20, 89:18, 91:2, 91:6, 91:7, 91:8, 91:15, 91:18, 101:6, 102:24, 105:10, 105:24, 106:20, 106:25, 109:14, 109:17, 114:9, 114:23, 115:4, 117:7, 117:11, 120:9, 120:24, 122:19, 124:17, 125:12, 127:12, 128:8, 130:9, 132:18, 133:25, 134:8, 135:12, 135:24, 140:2, 140:10, 140:22, 140:25, 142:2, 143:1, 143:13, 143:22, 153:8, 155:13, 156:7, 156:14, 161:22, 163:19, 164:11, 164:18, 164:24, 165:10, 165:18, 165:19, 166:3, 169:15, 172:17, 174:7, 177:14, 177:18, 177:21, 178:14, 182:4, 184:3, 184:9, 187:17, 187:25, 188:11, 191:7

**cole** [1] - 6:24

**COLE** [2] - 1:4, 2:3

**Cole's** [33] - 4:2, 33:8, 33:9, 36:8, 36:19, 37:10, 37:14, 37:20, 58:7, 62:20, 67:20, 71:22, 72:1, 77:18, 83:13, 83:23, 142:13, 161:7, 161:9, 161:10, 161:14, 161:19, 162:24, 165:2, 166:14, 166:17, 168:21, 173:20, 181:10, 182:21, 182:24, 183:18, 187:12

**Coles** [2] - 36:15, 37:1

**collar** [3] - 127:22, 127:23, 128:6

**college** [2] - 111:2,

111:3

**Columbia** [1] - 111:6

**combination** [1] - 133:18

**comfortable** [2] - 29:6, 29:7

**comfortably** [1] - 40:7

**coming** [18] - 10:19, 18:22, 23:22, 26:19, 38:9, 67:1, 113:12, 115:25, 116:1, 116:12, 117:11, 117:13, 124:12, 149:10, 173:23, 196:6, 196:8

**commercial** [1] - 42:19

**community** [8] - 24:7, 147:8, 147:11, 149:19, 149:22, 150:15, 184:2, 185:18

**comp** [1] - 184:21

**company** [3] - 63:3, 147:3, 184:18

**compare** [3] - 67:12, 68:23, 68:25

**compensation** [2] - 184:16, 185:3

**complain** [1] - 33:5

**complained** [1] - 130:12

**complaining** [7] - 124:17, 124:25, 125:12, 140:10, 157:21, 164:7, 191:9

**complaint** [1] - 33:9

**complaints** [7] - 120:24, 121:1, 126:1, 164:10, 165:3, 177:24, 191:15

**complete** [7] - 129:11, 153:18, 153:23, 153:25, 154:14, 154:18, 189:14

**completed** [3] - 92:10, 92:18, 118:20

**completely** [2] - 33:6, 33:22

**completion** [4] - 112:2, 126:15, 126:16, 126:17

**complied** [2] - 82:25, 83:4

**component** [2] - 178:10, 189:15

**compound** [1] - 67:23

**compulsory** [4] - 114:20, 115:2,

115:7, 192:17
**computer** [1] - 53:18
**conclude** [2] - 85:1, 93:5
**concluded** [1] - 158:22
**concludes** [1] - 84:17
**conclusion** [3] - 136:3, 172:19, 173:23
**conclusions** [3] - 24:15, 116:6, 173:5
**concur** [2] - 166:21, 166:25
**condition** [15] - 24:8, 32:9, 130:10, 141:15, 142:20, 153:24, 154:15, 154:17, 158:1, 158:3, 187:11, 187:14, 187:17, 187:18, 187:24
**conditional** [1] - 10:14
**conditionally** [2] - 10:15, 10:16
**conditions** [3] - 13:10, 36:14, 121:24
**conf** [1] - 125:19
**confirmed** [1] - 32:8
**confirming** [1] - 141:23
**conflicts** [1] - 4:23
**congenital** [1] - 134:7
**conjunction** [1] - 134:23
**Conquest** [8] - 29:15, 35:22, 36:10, 120:11, 120:22, 122:8, 126:22, 161:25
**conscious** [1] - 164:9
**consecutive** [1] - 195:10
**conservatively** [1] - 104:19
**consideration** [1] - 23:7
**consistency** [1] - 181:11
**consistent** [17] - 15:1, 33:23, 125:20, 127:14, 128:11, 128:14, 129:18, 129:20, 131:17, 131:23, 138:20, 139:22, 141:14, 142:19, 162:3, 173:24
**constantly** [1] - 173:4
**consultations** [1] -

33:3
**contact** [3] - 14:2, 102:17, 102:19
**contained** [1] - 101:7
**container** [23] - 31:13, 31:14, 31:18, 35:21, 36:4, 36:13, 51:23, 52:10, 52:12, 52:15, 57:1, 57:2, 75:13, 97:23, 98:23, 100:16, 127:18, 140:9, 171:3, 179:24, 181:17, 181:25, 182:9
**containers** [18] - 11:3, 35:5, 36:24, 48:21, 48:23, 48:24, 49:4, 49:7, 50:11, 50:23, 52:6, 57:14, 57:20, 57:24, 61:20, 181:22
**contemporaneous** [1] - 15:16
**continue** [2] - 103:15, 152:20
**contrary** [1] - 92:20
**controversial** [1] - 21:19
**contusion** [22] - 129:19, 130:5, 140:6, 140:23, 141:6, 143:5, 163:25, 164:3, 164:4, 174:13, 175:8, 175:18, 176:4, 176:5, 178:3, 178:6, 178:7, 179:25, 181:18
**contusion-type** [1] - 140:6
**convenience** [1] - 38:10
**conversation** [1] - 20:10
**Cooper** [2] - 3:16, 35:11
**COOPER** [1] - 1:17
**copies** [2] - 8:1, 8:6
**copy** [15] - 7:22, 8:3, 8:4, 8:5, 9:16, 22:6, 88:5, 89:2, 129:8, 146:2, 147:17, 147:20, 168:6, 187:6, 193:20
**coracoid** [1] - 136:10
**corner** [7] - 64:6, 64:7, 64:8, 89:20, 90:3, 95:13, 127:18
**coronal** [2] - 133:15, 136:7
**corporate** [8] - 3:21,

12:4, 17:25, 18:4, 30:15, 30:17, 30:23, 35:16
**CORPORATION** [1] - 1:7
**Corporation** [6] - 3:7, 3:15, 3:17, 3:19, 4:3, 29:13
**correct** [90] - 15:5, 15:9, 15:17, 18:10, 18:17, 27:20, 39:24, 41:16, 52:9, 53:5, 64:18, 75:1, 87:20, 87:24, 90:2, 90:8, 90:17, 92:24, 93:10, 94:7, 95:6, 97:9, 97:25, 99:2, 102:25, 106:3, 122:24, 129:10, 133:1, 136:1, 138:21, 145:11, 149:3, 149:4, 149:7, 149:25, 150:1, 155:13, 155:14, 156:1, 160:12, 161:7, 161:24, 162:16, 162:22, 163:2, 163:17, 163:21, 164:5, 166:5, 167:9, 168:9, 169:9, 169:10, 170:22, 171:14, 171:17, 171:23, 172:10, 173:15, 173:16, 173:25, 174:1, 174:9, 175:22, 176:17, 176:18, 176:22, 177:12, 177:17, 177:22, 178:19, 178:20, 182:20, 182:25, 183:10, 184:3, 185:24, 187:14, 188:9, 188:14, 188:15, 189:2, 191:8, 191:14, 191:16, 192:6, 192:8, 194:20, 195:19
**correctly** [1] - 178:17
**correlates** [1] - 139:7
**correspond** [1] - 54:5
**corresponds** [1] - 175:25
**cost** [10] - 144:1, 144:6, 144:14, 145:9, 146:16, 146:19, 146:24, 147:1, 147:5, 185:5
**costs** [2] - 145:6

**Counsel** [1] - 74:3
**counsel** [13] - 3:8, 4:23, 5:14, 5:18, 7:23, 35:12, 86:3, 104:4, 160:22, 161:24, 162:8, 162:20, 164:23
**Counselor** [1] - 180:17
**count** [1] - 95:7
**counter** [1] - 156:18
**counts** [1] - 37:25
**County** [3] - 111:9, 150:13, 151:5
**couple** [7] - 9:10, 9:21, 38:15, 136:5, 159:8, 159:19, 159:23
**course** [9] - 22:6, 33:1, 33:2, 93:12, 110:2, 113:14, 113:25, 118:18, 195:2
**Court** [45] - 1:24, 3:1, 3:3, 3:6, 5:6, 7:1, 7:2, 8:6, 8:14, 10:17, 17:5, 17:14, 17:18, 19:23, 23:4, 23:7, 24:4, 29:10, 32:19, 34:25, 35:1, 35:10, 36:6, 36:18, 36:25, 37:17, 37:22, 37:24, 84:24, 85:1, 87:12, 91:20, 109:23, 111:1, 118:19, 123:9, 129:3, 136:2, 145:23, 147:16, 148:23, 159:25, 196:24, 197:12, 197:13
**COURT** [301] - 1:1, 1:23, 3:12, 3:20, 3:24, 4:21, 5:3, 5:10, 5:21, 5:25, 6:8, 6:17, 7:3, 7:11, 7:25, 8:4, 8:8, 8:12, 8:16, 8:20, 9:4, 9:9, 9:13, 9:17, 9:19, 10:2, 10:5, 10:8, 10:18, 11:8, 11:11, 11:13, 11:16, 12:9, 12:17, 13:7, 13:13, 13:16, 13:19, 13:22, 14:9, 14:13, 14:19, 16:4, 16:7, 16:15, 16:23, 16:25, 17:2, 17:12, 17:20, 18:5, 18:11, 18:21, 18:24, 19:16, 19:20, 19:25, 20:5, 21:24, 22:2, 22:8, 24:23,

25:15, 26:17, 27:7, 27:16, 27:21, 28:10, 28:12, 28:17, 28:21, 28:23, 28:25, 29:6, 29:11, 35:9, 38:2, 38:10, 38:17, 38:20, 39:10, 39:12, 39:18, 39:23, 39:25, 40:5, 40:10, 40:22, 41:1, 41:4, 41:6, 41:11, 41:19, 42:9, 43:15, 43:19, 48:14, 49:24, 50:2, 52:1, 52:3, 52:12, 53:1, 53:3, 53:6, 53:12, 53:14, 53:16, 53:18, 53:22, 53:25, 55:7, 55:25, 56:5, 56:12, 56:20, 56:24, 57:4, 57:8, 60:13, 62:3, 62:5, 65:3, 65:9, 66:14, 67:6, 67:12, 67:15, 67:24, 68:10, 68:16, 70:22, 71:1, 71:6, 71:8, 71:10, 71:14, 71:19, 72:4, 72:13, 72:16, 72:20, 73:3, 73:13, 73:18, 73:20, 74:10, 74:14, 74:20, 74:22, 75:2, 75:18, 75:23, 76:1, 76:19, 78:16, 78:18, 78:22, 79:1, 79:6, 79:9, 79:12, 79:15, 82:13, 82:18, 82:21, 83:2, 83:5, 83:11, 83:17, 84:15, 84:21, 85:5, 85:12, 85:14, 85:20, 85:23, 87:9, 88:7, 88:15, 88:22, 89:10, 89:13, 89:24, 90:5, 90:22, 91:10, 91:13, 96:25, 98:15, 98:19, 99:12, 102:4, 102:10, 103:24, 104:23, 105:1, 106:16, 108:7, 108:11, 108:14, 108:19, 108:22, 108:25, 109:16, 109:19, 109:24, 110:2, 110:5, 110:8, 110:13, 118:1, 118:4, 118:7, 118:16, 118:21, 119:2, 119:5, 119:7, 119:15, 120:4, 123:12, 123:18, 123:21, 123:23, 124:24, 125:2, 125:7, 126:4, 126:8,

126:16, 128:22, 128:25, 129:4, 129:6, 131:22, 132:9, 133:6, 134:17, 144:15, 144:22, 145:4, 145:8, 145:12, 145:18, 146:3, 146:15, 146:19, 146:22, 147:5, 147:9, 147:14, 147:20, 147:22, 148:14, 148:24, 150:5, 150:22, 151:2, 151:9, 151:15, 151:20, 151:22, 152:7, 152:16, 153:1, 154:6, 154:11, 157:3, 157:6, 157:8, 159:5, 159:8, 159:15, 159:18, 159:22, 160:4, 160:6, 168:14, 168:18, 172:23, 174:22, 179:1, 179:16, 179:22, 180:3, 180:8, 180:23, 183:12, 186:7, 188:17, 188:25, 189:9, 190:3, 190:12, 194:5, 194:8, 195:21, 195:24, 196:18

**court** [14] - 7:15, 8:10, 16:8, 20:3, 23:22, 43:16, 43:20, 56:8, 56:10, 64:6, 96:9, 109:23, 160:3, 196:23

**Court's** [5] - 5:6, 74:5, 89:8, 132:7, 152:24

**Courtney** [12] - 10:4, 10:7, 12:7, 12:8, 13:3, 14:23, 15:24, 16:12, 20:12, 37:17, 37:18, 37:19

**Courtney's** [2] - 12:18, 17:9

**COURTROOM** [12] - 3:2, 8:19, 42:4, 53:5, 53:20, 56:8, 56:10, 110:16, 159:25, 160:2, 196:22, 196:23

**courtroom** [3] - 35:15, 101:21, 101:23

**covered** [4] - 83:16, 97:8, 97:12, 97:16

**CPT** [3] - 145:24, 145:25, 153:9

**crane** [1] - 31:22

**CRD** [2] - 42:2, 110:14

**create** [1] - 169:18

**crew** [1] - 100:15

**criticism** [1] - 188:8

**criticized** [1] - 188:22

**criticizing** [5] - 188:13, 188:15, 188:18, 190:8, 190:16

**CROSS** [4] - 2:4, 2:7, 86:1, 160:7

**cross** [19] - 7:5, 10:10, 17:11, 19:3, 25:24, 38:7, 84:22, 84:25, 85:3, 85:5, 85:8, 85:14, 85:20, 106:21, 126:5, 126:6, 126:13, 126:18, 159:10

**cross-exam** [1] - 17:11

**cross-examination** [1] - 106:21

**CROSS-EXAMINATION** [4] - 2:4, 2:7, 86:1, 160:7

**Cruise** [11] - 27:13, 48:5, 48:8, 66:21, 69:6, 81:18, 160:22, 164:23, 174:19, 191:17

**cruise** [27] - 11:23, 12:2, 17:22, 18:1, 30:18, 30:20, 37:16, 39:19, 44:9, 44:12, 44:17, 44:21, 44:23, 45:2, 45:4, 45:8, 76:25, 77:11, 78:1, 78:3, 81:3, 81:16, 82:24, 143:3, 174:9, 177:15, 177:17

**cuff** [37] - 37:21, 121:11, 121:15, 122:4, 124:8, 129:20, 129:21, 130:1, 131:8, 131:11, 131:12, 131:23, 134:5, 136:13, 136:16, 137:19, 137:23, 138:8, 138:10, 138:14, 138:15, 138:16, 139:9, 139:12, 139:25, 151:8, 151:14, 155:9, 156:6, 163:9, 164:2, 166:2,

174:15, 177:3, 190:21, 190:22, 190:23

**curious** [1] - 150:6

**current** [3] - 86:17, 110:24, 129:12

**customary** [24] - 145:2, 145:6, 145:14, 146:23, 147:8, 147:11, 148:1, 148:4, 148:5, 148:16, 148:20, 149:8, 149:11, 149:15, 149:18, 149:23, 151:24, 152:8, 152:13, 152:18, 152:22, 183:2, 183:4, 183:5

**cut** [1] - 136:15

**cuts** [2] - 133:17, 138:25

**cutter** [2] - 133:13, 137:17

**CVs** [1] - 10:4

**cyst** [10] - 137:9, 137:10, 137:11, 137:12, 138:2, 138:4, 138:12, 138:22, 139:20, 176:2

**cysts** [1] - 137:14

# D

**daily** [1] - 158:14

**DAMIAN** [1] - 1:10

**Damian** [1] - 3:5

**danger** [2] - 30:13, 30:16

**data** [2] - 186:14, 186:15

**DATE** [1] - 197:11

**date** [5] - 34:8, 97:15, 116:3, 156:9, 160:13

**dated** [2] - 38:24, 132:18

**Daubert** [6] - 20:11, 20:14, 23:17, 23:18, 26:5, 26:6

**DAY** [1] - 1:9

**days** [4] - 29:20, 32:18, 35:19, 37:1

**deal** [4] - 9:11, 40:19, 109:12, 195:12

**dealing** [3] - 109:12, 154:14, 156:5

**deals** [1] - 23:18

**debate** [1] - 17:16

**debridement** [2] - 154:22, 183:8

**dec** [1] - 35:21

**decade** [1] - 112:21

**December** [1] - 28:4

**decide** [1] - 40:12

**decided** [2] - 27:24, 28:3

**decision** [3] - 117:3, 190:8, 190:9

**decisions** [3] - 116:7, 116:17, 191:1

**deck** [49] - 29:21, 30:2, 30:7, 30:12, 30:25, 31:1, 36:9, 36:15, 36:24, 37:1, 45:25, 46:19, 46:23, 47:8, 47:17, 47:21, 47:25, 48:3, 48:5, 48:17, 48:18, 50:16, 50:19, 54:15, 57:12, 58:1, 58:4, 58:14, 58:18, 59:7, 59:9, 82:15, 82:23, 83:2, 83:3, 83:8, 92:24, 93:2, 93:7, 93:9, 94:6, 94:20, 95:9, 95:14, 104:19, 105:13, 105:17, 107:9

**decompression** [2] - 155:1, 155:5

**deeper** [1] - 61:6

**defendant** [5] - 3:14, 3:17, 55:11, 56:19, 81:18

**Defendant** [1] - 1:8

**DEFENDANT** [1] - 1:16

**Defendant's** [2] - 90:18, 90:21

**defendant's** [1] - 9:24

**Defendants** [1] - 11:16

**Defense** [18] - 2:14, 2:15, 10:7, 39:9, 48:23, 57:5, 57:6, 57:15, 57:17, 60:15, 60:22, 96:22, 97:2, 106:22, 110:5, 110:6, 110:7, 123:20

**defense** [15] - 5:14, 5:18, 10:12, 11:25, 16:20, 18:24, 23:9, 33:25, 34:24, 107:6, 118:13, 161:23, 162:21, 192:6, 192:7

**defense's** [1] - 25:17

**degeneration** [13] - 138:5, 138:21, 138:22, 138:24, 139:4, 139:5,

139:24, 167:17, 167:20, 168:1, 172:6, 173:12, 176:19

**degenerative** [38] - 23:23, 24:4, 24:22, 34:2, 135:25, 136:1, 136:4, 136:18, 137:11, 138:4, 138:11, 138:13, 138:18, 139:7, 139:8, 140:21, 141:15, 142:19, 154:1, 166:22, 167:18, 168:3, 168:11, 168:22, 169:3, 175:11, 175:13, 175:24, 176:2, 176:3, 176:14, 176:18, 176:19, 177:2, 190:6, 190:20, 194:16

**degenerative-type** [1] - 138:18

**degree** [4] - 14:18, 134:1, 140:8, 159:1

**Delray** [3] - 114:12, 151:15, 151:16

**deltoid** [3] - 124:5, 124:14, 124:16

**demarcation** [1] - 124:15

**demonstrate** [1] - 158:21

**demonstrative** [1] - 110:3

**Demonstrative** [1] - 110:4

**demonstratives** [3] - 11:18, 110:6, 110:7

**denying** [1] - 27:2

**depict** [1] - 97:4

**depicted** [9] - 49:8, 60:10, 76:8, 99:6, 99:25, 100:3, 100:11, 175:21, 175:23

**depiction** [1] - 124:4

**depo** [4] - 21:1, 104:24, 182:1, 182:14

**deposed** [2] - 13:21, 160:16

**deposition** [78] - 8:9, 13:5, 14:6, 15:4, 15:22, 16:11, 16:13, 16:17, 22:1, 22:10, 22:17, 25:2, 25:10, 25:13, 30:17, 34:24,

71:6, 71:8, 71:9, 71:23, 72:1, 72:7, 72:23, 73:6, 73:10, 73:11, 73:16, 73:21, 73:24, 88:2, 88:19, 88:23, 89:2, 90:16, 103:11, 103:12, 104:3, 119:24, 144:21, 146:5, 147:4, 160:11, 160:15, 161:7, 161:9, 161:10, 161:14, 161:19, 162:24, 164:25, 165:5, 165:7, 166:6, 166:25, 168:3, 168:8, 170:19, 171:14, 172:4, 172:10, 173:10, 173:14, 174:6, 176:9, 177:25, 178:11, 178:23, 179:3, 179:6, 179:7, 179:17, 181:21, 183:7, 183:13, 187:22, 188:12, 189:23

**DEPUTY** [11] - 3:2, 8:19, 42:4, 53:5, 53:20, 56:8, 56:10, 110:16, 159:25, 160:2, 196:23

**describe** [21] - 50:25, 63:4, 63:6, 67:20, 67:25, 68:1, 68:14, 71:11, 71:25, 72:14, 74:9, 74:12, 76:21, 81:1, 99:13, 128:8, 128:15, 130:10, 131:11, 140:14

**described** [14] - 56:25, 67:4, 71:3, 71:11, 71:21, 72:8, 72:18, 73:15, 75:20, 76:4, 99:9, 101:17, 130:17, 174:25

**describes** [2] - 23:16, 180:15

**describing** [2] - 64:15, 72:17

**description** [1] - 29:25

**despite** [3] - 30:6, 30:11, 176:20

**destination** [3] - 44:25, 45:1, 45:7

**Detail** [1] - 90:25

**detailed** [1] - 182:15

**determinations** [1] - 12:23

**determine** [8] -

116:22, 130:23, 135:7, 135:9, 136:19, 142:25, 185:2, 195:4

**develop** [6] - 24:5, 135:15, 137:7, 137:13, 176:23, 177:4

**device** [2] - 127:19, 132:10

**devices** [1] - 93:23

**diagnosed** [2] - 163:24, 164:12

**diagnoses** [2] - 116:7, 130:25

**diagnosis** [9] - 21:2, 23:25, 26:13, 130:3, 133:23, 174:6, 175:2, 175:7, 175:17

**diagnostic** [4] - 132:1, 134:4, 166:8, 166:16

**DIEPPA** [234] - 1:13, 2:4, 2:5, 2:7, 3:10, 5:12, 6:5, 6:9, 6:22, 7:22, 8:2, 8:6, 8:9, 9:2, 9:5, 9:10, 9:15, 9:18, 9:20, 10:12, 10:20, 11:9, 11:12, 11:15, 11:21, 12:10, 13:2, 13:11, 13:15, 13:18, 13:20, 14:5, 14:12, 14:14, 15:3, 16:6, 16:8, 16:21, 16:24, 17:1, 17:13, 17:22, 18:17, 18:22, 19:15, 19:18, 20:4, 20:9, 22:1, 22:3, 22:12, 24:25, 26:10, 27:5, 27:9, 27:20, 28:6, 29:5, 29:9, 29:12, 38:6, 38:14, 38:18, 38:21, 39:11, 39:13, 39:21, 40:18, 40:23, 41:3, 41:25, 42:8, 42:11, 43:24, 46:1, 48:16, 50:5, 52:8, 52:16, 52:25, 53:2, 53:13, 53:15, 53:21, 53:23, 54:1, 56:4, 56:18, 56:21, 57:3, 57:7, 57:9, 60:11, 60:14, 61:7, 62:7, 62:12, 65:11, 66:17, 67:9, 67:13, 67:17, 68:5, 68:13, 68:19, 69:2, 69:4, 70:20, 70:24, 71:3, 71:7, 71:9, 71:13, 71:17, 71:20, 72:6, 72:11, 72:24, 73:12,

73:14, 73:22, 74:4, 74:19, 74:21, 74:24, 75:7, 76:3, 76:20, 78:21, 79:4, 79:7, 79:14, 79:16, 82:8, 82:14, 82:25, 83:4, 83:6, 83:12, 83:20, 84:12, 84:17, 85:4, 85:18, 87:7, 88:8, 88:13, 88:21, 89:11, 91:5, 98:14, 99:8, 102:2, 102:8, 102:12, 103:22, 104:10, 104:21, 104:24, 105:7, 106:17, 106:19, 108:13, 108:15, 108:21, 108:24, 109:5, 109:14, 110:3, 110:6, 110:9, 110:12, 117:22, 118:2, 118:5, 118:17, 118:25, 119:4, 119:6, 119:12, 120:2, 124:20, 125:6, 125:24, 126:7, 126:14, 126:19, 131:19, 144:12, 144:17, 144:25, 146:4, 146:10, 146:18, 146:25, 147:7, 147:21, 148:2, 148:25, 150:4, 151:21, 154:5, 154:8, 157:1, 159:6, 159:11, 159:17, 160:5, 160:8, 160:19, 160:21, 168:16, 168:19, 173:7, 175:1, 178:24, 179:3, 179:19, 180:7, 180:10, 181:8, 181:9, 183:14, 183:15, 186:13, 188:19, 189:5, 189:16, 190:11, 191:2, 194:3, 196:8, 196:11, 196:17

**Dieppa** [9] - 3:10, 53:8, 55:21, 84:21, 145:19, 145:23, 146:3, 147:20, 151:22

**differ** [2] - 22:14, 193:24

**difference** [3] - 41:4, 163:9, 164:1

**different** [28] - 12:25,

37:6, 83:14, 83:24, 84:1, 87:16, 91:20, 99:14, 105:3, 116:19, 119:14, 131:1, 131:16, 133:11, 133:21, 133:22, 135:14, 142:21, 143:6, 147:9, 178:23, 178:24, 178:25, 179:6, 182:1, 184:17, 190:11, 193:22

**differential** [6] - 21:2, 26:13, 174:6, 175:2, 175:7, 175:17

**differentiate** [1] - 195:12

**differently** [3] - 81:19, 81:21, 117:6

**difficult** [3] - 30:1, 40:2, 48:4

**dimensional** [2] - 133:12, 133:19

**dimensions** [2] - 31:23, 61:17

**dining** [2] - 30:25, 31:9

**DIRECT** [4] - 2:4, 2:7, 42:10, 110:19

**direct** [15] - 5:4, 7:5, 35:25, 38:3, 38:5, 40:16, 73:19, 84:18, 89:23, 106:3, 109:7, 158:22, 159:14, 161:4, 163:15

**directing** [1] - 57:16

**direction** [3] - 14:1, 101:9, 184:12

**directions** [1] - 83:9

**directly** [1] - 62:21

**disagree** [6] - 25:7, 25:9, 25:10, 145:16, 167:6, 173:4

**disagreed** [1] - 168:5

**disagreeing** [1] - 181:25

**disagreement** [2] - 176:10, 176:11

**disagrees** [1] - 34:5

**disclosed** [4] - 12:8, 144:12, 144:19, 144:20

**disclosing** [1] - 144:18

**discomfort** [2] - 125:20, 125:22

**discovery** [1] - 14:21

**discuss** [2] - 5:13, 167:25

**discussed** [1] - 41:12

**discussing** [1] - 168:8

**discussion** [1] - 20:16

**disease** [2] - 177:2, 177:3

**dislocation** [5] - 121:10, 121:15, 122:4, 127:4, 127:5

**dispute** [11] - 11:22, 34:11, 39:2, 91:3, 92:20, 104:13, 161:24, 163:8, 165:17, 178:16, 181:11

**disputing** [4] - 92:22, 163:11, 165:19, 178:3

**distinction** [2] - 180:1, 188:25

**distinguish** [1] - 184:15

**distress** [1] - 131:14

**DISTRICT** [3] - 1:1, 1:1, 1:10

**District** [9] - 1:24, 1:24, 3:3, 3:4, 27:14, 27:22, 28:19, 197:13, 197:13

**DIVISION** [1] - 1:2

**dixit** [1] - 148:3

**Docket** [4] - 8:10, 16:11, 16:14, 147:14

**docket** [1] - 27:22

**docketed** [1] - 16:6

**Doctor** [27] - 120:8, 121:2, 123:8, 126:21, 129:9, 130:6, 132:15, 133:8, 133:9, 143:10, 145:22, 156:13, 159:3, 161:24, 162:4, 162:9, 163:8, 164:5, 164:17, 169:7, 170:16, 171:13, 172:10, 173:15, 180:18, 181:20, 194:3

**doctor** [39] - 21:14, 21:20, 85:9, 109:21, 109:23, 119:13, 122:10, 122:12, 122:17, 122:18, 123:14, 123:17, 123:25, 124:18, 124:21, 125:4, 125:25, 129:8, 143:3, 144:13, 148:15, 151:23, 153:4, 164:19,

164:22, 168:5, 172:22, 173:8, 174:10, 174:11, 178:6, 178:7, 181:4, 187:22, 189:5, 190:4, 194:11

**doctor's** [4] - 145:24, 180:21, 180:25, 190:8

**doctors** [7] - 33:2, 115:25, 144:7, 149:10, 157:15, 177:24, 181:16

**document** [1] - 17:16

**documented** [1] - 33:13

**documenting** [1] - 20:25

**documents** [1] - 129:9

**dominant** [1] - 156:21

**domino** [3] - 49:18, 92:2, 94:17

**dominos** [13] - 46:19, 47:24, 49:18, 49:24, 94:7, 94:12, 95:2, 95:10, 95:17, 95:20, 96:6, 96:12, 103:15

**done** [25] - 5:9, 6:24, 81:19, 81:21, 85:16, 102:12, 102:14, 114:14, 121:5, 122:7, 122:8, 123:15, 132:24, 141:5, 143:21, 148:6, 156:23, 159:12, 170:15, 185:19, 188:20, 188:21, 190:18, 196:5

**dosage** [1] - 162:16

**dot** [1] - 137:19

**double** [2] - 31:19, 63:10

**doubt** [3] - 174:12, 177:19, 182:12

**down** [26] - 49:22, 50:10, 59:23, 62:24, 63:8, 65:9, 70:8, 70:17, 75:4, 75:17, 93:3, 101:7, 101:8, 103:9, 103:16, 109:17, 113:21, 123:4, 124:12, 144:10, 156:12, 184:10, 184:11, 187:3, 195:22

**download** [1] - 147:21

**Dr** [100] - 4:17, 4:24, 5:2, 5:16, 5:19, 8:2, 8:9, 8:22, 10:4,

12:18, 14:23, 16:13, 16:18, 17:9, 19:14, 19:17, 19:24, 19:25, 20:1, 20:12, 20:13, 20:18, 20:20, 21:1, 21:3, 22:18, 23:5, 23:6, 23:14, 24:19, 25:1, 25:5, 25:8, 25:9, 32:5, 32:25, 33:12, 33:18, 34:4, 34:7, 34:10, 34:13, 34:19, 34:21, 37:7, 37:8, 37:13, 37:18, 37:19, 38:8, 84:25, 85:2, 110:14, 110:21, 118:14, 118:19, 141:16, 141:20, 141:23, 146:5, 147:22, 148:5, 148:12, 149:2, 152:7, 156:20, 157:10, 159:13, 160:9, 166:25, 167:4, 167:12, 167:19, 167:23, 167:25, 168:10, 168:20, 170:5, 179:9, 180:12, 181:10, 182:20, 184:11, 188:8, 188:10, 188:14, 188:20, 188:21, 189:2, 189:12, 189:18, 189:20, 190:5, 190:6, 190:16, 190:25

**DR** [1] - 2:6

**Drahos** [6] - 3:13, 35:12, 39:23, 86:3, 147:10, 148:14

**DRAHOS** [164] - 1:16, 2:4, 2:7, 2:8, 3:13, 4:15, 4:22, 5:5, 7:10, 8:13, 13:24, 14:15, 14:20, 17:5, 18:10, 19:19, 19:21, 22:4, 23:10, 28:11, 28:13, 28:18, 28:22, 28:24, 39:24, 40:2, 40:6, 41:5, 41:16, 48:12, 65:2, 67:5, 67:23, 68:9, 68:15, 72:2, 73:19, 74:3, 74:5, 74:11, 75:16, 76:17, 78:15, 78:17, 78:19, 78:24, 82:12, 82:16, 83:15, 84:23, 85:10, 85:13, 85:16, 85:21, 86:2, 87:10, 88:6, 88:11, 89:1, 89:8,

89:17, 89:22, 90:1, 90:6, 90:20, 90:23, 91:12, 91:14, 92:5, 92:7, 92:12, 92:15, 96:22, 97:1, 97:13, 98:6, 98:9, 98:16, 98:20, 98:25, 99:16, 102:5, 102:13, 104:1, 104:11, 105:8, 105:9, 105:21, 105:23, 106:15, 108:6, 108:9, 109:22, 109:25, 110:10, 110:20, 117:24, 118:8, 118:13, 120:6, 120:7, 123:15, 123:19, 123:22, 123:24, 124:23, 125:1, 125:3, 126:20, 128:21, 128:23, 129:2, 129:5, 129:7, 131:20, 131:25, 132:7, 132:10, 132:14, 133:5, 133:7, 135:3, 140:1, 145:7, 145:11, 145:13, 145:22, 146:9, 146:17, 146:21, 146:23, 147:12, 147:16, 148:22, 149:1, 152:14, 152:23, 153:2, 153:3, 154:20, 157:5, 157:7, 157:9, 157:13, 159:3, 167:10, 168:15, 174:21, 174:23, 178:21, 180:18, 181:14, 183:11, 186:6, 188:16, 190:2, 190:4, 190:19, 194:7, 194:10, 195:20, 196:3, 196:10, 196:14

**draw** [5] - 84:3, 84:4, 84:5, 84:11, 156:17

**drawing** [1] - 84:3

**dressed** [1] - 81:5

**drew** [1] - 100:24

**drinking** [1] - 38:24

**Drive** [1] - 1:18

**drop** [4] - 55:4, 101:20, 101:25, 102:6

**dropped** [2] - 11:7, 101:22

**dropping** [2] - 11:11, 11:12

**due** [4] - 14:16, 32:8, 35:23, 190:10

**duration** [2] - 6:8, 6:9

**during** [24] - 7:14, 14:21, 17:10, 21:1, 34:24, 39:19, 57:23, 58:13, 58:25, 72:1, 88:1, 88:18, 88:23, 93:12, 95:16, 105:16, 106:3, 106:20, 128:16, 130:1, 149:5, 158:21, 173:10, 179:3

**duty** [3] - 36:2, 37:5, 37:22

## E

**early** [2] - 7:2, 121:21

**easier** [1] - 113:21

**easiest** [1] - 133:13

**East** [2] - 1:25, 197:14

**eat** [8] - 7:15, 49:20, 56:1, 62:25, 63:1, 83:8, 93:4, 96:13

**eaten** [1] - 83:9

**eating** [8] - 49:15, 54:11, 54:12, 54:13, 63:8, 65:14, 96:16, 96:18

**eats** [1] - 137:13

**ecchymosis** [2] - 121:9, 127:17

**edge** [4] - 26:21, 63:25, 64:4

**educated** [1] - 37:18

**education** [5] - 44:5, 111:10, 170:8, 171:18, 172:24

**educational** [2] - 111:2, 150:19

**effect** [3] - 14:2, 47:8, 125:16

**effected** [4] - 163:22, 185:3, 185:4, 192:21

**effort** [2] - 30:11, 185:2

**egregious** [1] - 23:12

**eight** [2] - 157:11, 179:10

**either** [13] - 6:22, 14:14, 36:22, 41:3, 48:9, 106:12, 111:20, 116:12, 133:14, 164:17, 178:8, 186:18, 188:18

**elbows** [1] - 113:4

**element** [1] - 35:24

**elements** [3] - 36:2, 37:23

**emergency** [9] - 32:15, 78:9, 78:10, 79:5, 79:10, 116:1, 127:9, 127:10, 163:19

**employee** [9] - 11:2, 31:7, 32:4, 33:9, 35:4, 35:23, 59:11, 59:14, 69:10

**employees** [7] - 30:25, 36:24, 48:18, 50:22, 58:13, 59:8, 70:7

**encompasses** [1] - 124:9

**encountered** [2] - 36:20, 62:16

**end** [11] - 7:2, 7:3, 52:22, 52:23, 78:1, 78:2, 117:2, 139:21, 141:6, 155:22, 177:20

**ending** [1] - 5:7

**engineer** [2] - 33:15, 37:19

**ensure** [1] - 117:3

**entail** [1] - 80:2

**entailed** [2] - 78:14, 78:23

**enter** [4] - 9:6, 10:11, 35:6, 144:1

**entered** [3] - 8:10, 57:14, 106:21

**entire** [6] - 57:1, 59:19, 88:9, 93:8, 97:8, 105:16

**entirety** [2] - 30:2, 193:18

**entitled** [2] - 126:2, 197:9

**Entry** [4] - 8:11, 16:11, 16:14, 147:14

**epiphysis** [1] - 134:11

**equatable** [1] - 14:22

**equation** [1] - 133:23

**ER** [3] - 140:5, 143:4, 162:1

**erroneous** [1] - 23:11

**especially** [2] - 85:17, 159:18

**ESQUIRE** [4] - 1:13, 1:16, 1:17, 1:17

**establish** [1] - 31:6

**established** [1] - 26:14

**establishing** [1] - 35:2

**estimate** [6] - 58:17,

92:3, 93:16, 108:17, 114:1
**estimated** [1] - 15:13
**estimating** [1] - 109:7
**EUREKA** [1] - 1:4
**Eureka** [9] - 3:11, 29:12, 43:7, 44:10, 54:6, 67:20, 71:21, 91:7, 91:8
**evaluate** [3] - 114:23, 156:7, 170:14
**evaluated** [1] - 195:2
**evaluating** [1] - 133:25
**evaluation** [4] - 114:20, 115:3, 115:7, 191:21
**evaluations** [1] - 192:17
**Evenflo** [1] - 28:9
**evening** [2] - 81:5, 81:6
**event** [5] - 16:16, 31:1, 103:24, 131:11, 174:8
**events** [1] - 81:16
**evidence** [40] - 9:7, 10:11, 11:14, 14:16, 17:3, 18:18, 20:24, 22:19, 29:13, 29:22, 30:8, 30:14, 30:24, 31:3, 31:21, 32:1, 33:25, 34:25, 35:1, 36:3, 37:22, 40:25, 41:8, 41:10, 41:18, 45:14, 57:5, 57:6, 57:15, 92:20, 106:21, 108:16, 122:19, 127:4, 127:5, 146:16, 148:9, 166:7, 166:8, 176:21
**evident** [1] - 25:13
**exact** [8] - 71:23, 71:25, 91:25, 92:2, 103:4, 103:7, 160:13, 167:24
**exactly** [10] - 48:25, 71:21, 91:23, 139:6, 155:11, 175:23, 181:24, 193:15, 195:19
**exam** [8] - 17:11, 24:11, 129:23, 130:1, 130:4, 130:19, 157:17, 195:14
**EXAMINATION** [12] - 2:4, 2:4, 2:5, 2:7, 2:7, 2:8, 42:10, 86:1,

106:18, 110:19, 160:7, 194:9
**examination** [15] - 37:12, 106:21, 109:7, 112:3, 112:4, 112:5, 123:2, 127:3, 130:20, 156:9, 156:11, 158:21, 163:15, 165:21
**examinations** [1] - 192:11
**examine** [1] - 24:14
**examined** [6] - 122:9, 164:24, 165:10, 165:18, 166:3, 191:12
**examining** [1] - 125:8
**example** [1] - 147:13
**exams** [3] - 131:16, 158:11, 166:5
**excepted** [1] - 19:2
**exclude** [3] - 21:2, 27:1, 175:3
**excuse** [7] - 45:17, 71:24, 77:16, 80:16, 86:7, 94:10, 95:1
**exemplar** [2] - 56:22, 56:23
**exercise** [1] - 156:18
**exhaustively** [1] - 22:18
**exhibit** [6] - 9:20, 22:4, 47:13, 53:23, 91:7, 107:6
**Exhibit** [36] - 2:13, 10:4, 10:7, 41:12, 47:13, 48:23, 49:3, 50:11, 50:21, 52:5, 52:21, 56:6, 57:15, 57:17, 59:12, 59:13, 60:15, 60:22, 90:18, 90:21, 92:6, 92:8, 92:17, 97:3, 98:11, 99:6, 100:3, 100:9, 105:24, 106:22, 110:5, 129:8, 132:8, 162:7, 168:6, 168:7
**Exhibits** [3] - 41:10, 41:17, 57:5
**exhibits** [13] - 6:13, 9:2, 9:11, 9:24, 9:25, 38:15, 38:20, 40:20, 41:2, 41:6, 41:14, 41:20, 56:19
**EXHIBITS** [1] - 2:10
**exist** [1] - 30:10
**expect** [4] - 14:17, 30:19, 175:15, 196:6
**expected** [1] - 158:1
**expecting** [1] - 196:4

**expedite** [1] - 153:6
**expeditious** [1] - 5:8
**experience** [23] - 21:6, 22:16, 23:20, 25:22, 58:22, 58:24, 61:19, 62:13, 68:24, 108:17, 109:8, 119:9, 152:10, 163:10, 170:7, 170:21, 171:16, 171:19, 172:9, 172:25, 195:6, 195:7
**experienced** [4] - 23:19, 58:21, 59:3, 59:6
**experiencing** [1] - 128:16
**expert** [38] - 4:17, 7:7, 7:8, 7:17, 7:19, 7:20, 13:24, 14:23, 20:1, 20:6, 20:8, 21:9, 23:1, 25:18, 26:20, 27:1, 33:25, 34:24, 36:22, 117:20, 118:14, 118:23, 119:18, 148:10, 149:20, 151:23, 152:1, 152:3, 152:4, 152:7, 152:9, 152:13, 152:18, 152:19, 152:21, 189:5, 196:6
**expertise** [1] - 145:20
**experts** [3] - 18:20, 33:4, 37:6
**explain** [8] - 10:17, 24:3, 37:13, 37:19, 123:9, 124:7, 136:2, 145:16
**explaining** [1] - 133:13
**expressed** [2] - 144:15, 158:25
**extend** [1] - 124:11
**extensive** [2] - 117:12, 154:22
**extent** [6] - 27:1, 119:16, 144:23, 152:5, 152:17, 178:16
**extra** [2] - 8:4, 8:6
**extreme** [1] - 51:8
**extremely** [3] - 29:20, 138:12, 194:7
**eyewitness** [1] - 31:17

# F

**F.3d** [2] - 28:3, 28:9
**F.Supp.3d** [1] - 28:19

**face** [1] - 59:24
**facilities** [3] - 148:11, 150:12, 151:5
**facility** [11] - 150:9, 150:25, 151:2, 151:19, 155:17, 155:18, 155:19, 184:1, 186:11
**facing** [8] - 59:17, 59:18, 60:3, 60:4, 60:6, 60:7
**fact** [20] - 18:22, 20:12, 24:5, 31:16, 93:15, 102:21, 122:1, 122:22, 152:11, 154:16, 163:5, 164:6, 170:10, 172:25, 174:2, 175:3, 176:4, 177:23, 178:13, 178:15
**factors** [1] - 116:22
**facts** [1] - 119:14
**failed** [1] - 35:4
**fair** [1] - 105:12
**fall** [5] - 17:18, 65:14, 121:18, 121:23, 149:15
**falling** [1] - 65:14
**familiar** [4] - 24:24, 28:8, 117:19, 117:20
**family** [1] - 94:20
**far** [9] - 9:23, 12:3, 17:21, 54:20, 107:21, 128:18, 152:16, 174:17, 185:25
**fare** [1] - 29:14
**fare-paying** [1] - 29:14
**fast** [4] - 12:21, 13:9, 13:14, 143:10
**faster** [1] - 78:5
**favor** [1] - 37:25
**February** [2] - 160:12, 161:2
**fee** [9] - 144:11, 153:14, 154:23, 184:19, 184:20, 184:22, 185:7
**feet** [10] - 51:19, 51:20, 52:3, 57:21, 57:24, 59:15, 59:16, 97:25, 98:13, 99:5
**fell** [5] - 36:25, 64:19, 66:19, 68:4
**fellowship** [4] - 33:19, 111:7, 111:14, 171:20
**fellowship-trained** [1] - 33:19

**felt** [8] - 58:18, 67:25, 84:24, 108:4, 108:7, 108:14, 108:24, 109:3
**few** [6] - 9:23, 35:19, 46:7, 54:19, 159:6, 192:22
**field** [1] - 111:12
**figure** [1] - 93:24
**figures** [2] - 183:9, 184:14
**file** [2] - 16:10, 20:3
**filed** [7] - 6:16, 16:8, 16:14, 22:1, 22:3, 73:12, 73:21
**files** [1] - 193:23
**filing** [1] - 6:15
**film** [4] - 136:3, 138:20, 140:8, 195:15
**films** [5] - 115:20, 116:9, 117:5, 134:3, 195:3
**final** [2] - 4:2, 137:9
**finally** [4] - 4:1, 12:7, 24:13, 105:18
**Finder** [1] - 149:24
**findings** [30] - 14:17, 23:24, 24:11, 25:9, 121:4, 122:12, 127:1, 129:25, 136:2, 137:8, 138:20, 139:22, 139:24, 140:13, 140:21, 141:13, 157:19, 168:25, 169:2, 169:5, 175:16, 176:2, 176:3, 176:6, 176:7, 177:7, 194:16, 194:18, 194:20
**fine** [19] - 10:10, 26:24, 55:18, 73:3, 73:10, 75:3, 83:5, 89:10, 102:11, 105:8, 120:4, 126:11, 152:12, 152:16, 153:22, 157:3, 157:8, 190:18
**finger** [1] - 53:3
**finish** [2] - 7:5, 172:23
**finished** [3] - 73:25, 156:23, 196:6
**firm** [1] - 3:14
**firmer** [1] - 47:10
**first** [42] - 5:20, 7:18, 9:21, 23:10, 31:13, 33:8, 33:12, 37:7, 44:21, 44:23, 44:24, 45:1, 46:2, 48:3,

50:16, 57:25, 58:4, 58:6, 59:3, 63:21, 64:22, 65:18, 65:20, 66:3, 66:5, 66:25, 68:20, 82:10, 86:6, 105:17, 120:12, 123:16, 125:8, 132:13, 135:20, 153:7, 174:10, 174:13, 177:23, 178:6, 196:9

**fish** [1] - 31:25

**five** [7] - 5:24, 36:7, 105:6, 105:8, 105:13, 192:18, 195:9

**fixing** [1] - 190:23

**Flagler** [1] - 1:18

**flawed** [1] - 23:22

**flexibility** [2] - 6:25, 85:6

**floor** [2] - 66:19, 77:7

**FLORIDA** [2] - 1:1, 1:14

**Florida** [21] - 1:4, 1:15, 1:19, 1:24, 1:25, 3:4, 27:14, 27:22, 28:19, 37:9, 42:19, 108:16, 109:4, 109:10, 110:23, 113:12, 127:9, 149:24, 150:13, 197:13, 197:14

**floridapricefinder. com** [1] - 150:10

**flow** [1] - 109:2

**fluid** [1] - 134:7

**fly** [1] - 48:11

**flying** [1] - 30:13

**focus** [3] - 24:2, 111:12, 122:23

**focused** [1] - 113:15

**folded** [1] - 137:21

**follow** [4] - 32:13, 32:17, 84:18, 156:20

**follow-up** [4] - 32:13, 32:17, 84:18, 156:20

**followed** [1] - 83:9

**following** [9] - 32:15, 37:11, 78:1, 78:2, 112:21, 130:4, 143:4, 162:1, 168:24

**food** [5] - 49:20, 65:12, 65:13, 65:16

**FOR** [2] - 1:13, 1:16

**force** [11] - 13:16, 14:6, 14:11, 14:18, 14:21, 15:7, 30:1, 33:16, 33:22, 67:4,

67:11

**forces** [2] - 37:20, 177:11

**foregoing** [1] - 197:7

**foreseeable** [1] - 36:3

**forever** [1] - 135:2

**forget** [1] - 193:14

**form** [8] - 15:12, 92:18, 98:14, 99:8, 102:2, 104:21, 136:6, 157:1

**forming** [1] - 18:8

**FORT** [1] - 1:2

**Fort** [3] - 1:4, 1:25, 197:14

**forth** [1] - 146:1

**forward** [7] - 4:6, 65:22, 136:14, 138:1, 139:17, 143:10

**foundation** [4] - 67:9, 71:17, 145:2, 145:3

**four** [7] - 102:9, 102:14, 102:16, 104:20, 111:3, 155:6, 155:7

**fourth** [2] - 57:16, 141:20

**fracture** [2] - 127:6, 135:1

**fractures** [1] - 113:23

**free** [1] - 4:13

**freed** [1] - 4:9

**freely** [2] - 41:9, 41:20

**Freeport** [5] - 45:11, 87:5, 87:6, 87:13, 87:15

**Friday** [6] - 4:23, 196:5, 196:6, 196:8, 196:13, 196:14

**friends** [2] - 94:21, 103:8

**frightened** [1] - 65:20

**front** [10] - 47:12, 102:18, 128:18, 128:23, 133:15, 136:8, 136:9, 136:11, 137:18

**full** [18] - 34:23, 80:25, 121:7, 121:24, 122:1, 125:17, 125:19, 131:15, 158:10, 165:22, 165:25, 166:1, 169:19, 174:15, 175:19, 178:1, 178:9, 187:21

**fully** [1] - 181:15

**furthermore** [1] - 31:5

**fuse** [2] - 134:14,

135:11

**future** [3] - 157:14, 158:17, 158:19

## G

**G-e-y-e-r** [1] - 28:23

**gale** [1] - 30:1

**gallon** [1] - 150:18

**game** [1] - 142:8

**games** [1] - 47:23

**gap** [1] - 152:3

**Garber** [1] - 27:23

**gas** [3] - 150:17, 150:18

**gates** [1] - 4:16

**GCS-15** [1] - 164:9

**general** [4] - 111:5, 111:20, 112:25, 113:18

**generally** [3] - 119:3, 119:5, 119:7

**generated** [1] - 90:25

**Genoese** [8] - 3:18, 35:13, 90:18, 92:5, 96:22, 98:6, 105:21, 123:19

**GENOESE** [2] - 1:17, 3:18

**gently** [1] - 176:23

**Geyer** [2] - 28:19, 28:23

**given** [9] - 25:20, 29:25, 34:14, 142:11, 162:5, 162:11, 162:15, 162:21, 187:18

**glenoid** [3] - 141:17, 141:21, 170:1

**glossy** [1] - 96:3

**Gonzalez** [1] - 166:25

**Google** [1] - 12:1

**gotcha** [2] - 85:12, 120:21

**gotta** [1] - 31:24

**government** [1] - 17:15

**grab** [1] - 29:9

**grade** [7] - 136:25, 137:2, 137:3, 138:4, 138:13, 190:23, 190:25

**graduate** [1] - 44:7

**gray** [3] - 176:24, 177:1, 177:5

**GrayRobinson** [1] - 3:14

**GRAYROBINSON** [1] - 1:18

**great** [4] - 5:25, 28:10,

37:1, 196:3

**groceries** [1] - 84:3

**ground** [1] - 78:16

**grounds** [1] - 11:17

**group** [2] - 113:17, 130:25

**groups** [1] - 183:20

**growth** [1] - 134:11

**Guard** [1] - 55:4

**guess** [9] - 20:15, 38:9, 66:25, 77:6, 85:13, 104:12, 106:24, 140:12, 179:8

**guessing** [3] - 12:19, 94:1, 94:2

**guests** [1] - 50:18

**guidance** [1] - 5:2

**guide** [1] - 151:13

**gusting** [2] - 93:13, 95:18

**guy** [3] - 69:8, 77:8, 77:20

**guys** [8] - 7:12, 9:16, 43:8, 43:9, 100:14, 106:9, 195:25, 196:20

## H

**hair** [3] - 176:24, 177:1, 177:5

**haired** [1] - 76:22

**hallway** [1] - 85:1

**hand** [15] - 28:21, 65:16, 65:17, 81:15, 88:4, 88:11, 89:20, 90:3, 102:17, 102:19, 111:15, 128:19, 142:9, 142:10, 156:21

**handing** [1] - 129:8

**handling** [1] - 11:2

**hands** [2] - 107:20, 107:21

**hang** [2] - 31:25, 55:18

**hanging** [1] - 131:13

**happy** [5] - 5:18, 84:25, 104:4, 115:14, 146:1

**hard** [10] - 58:5, 67:10, 68:6, 68:8, 68:21, 68:22, 71:11, 71:13, 72:5, 195:11

**Hard** [4] - 62:2, 62:4, 62:5, 62:14

**Harvard** [1] - 37:18

**HCA** [13] - 32:15, 33:2, 127:9, 127:12,

128:9, 129:23, 130:3, 131:2, 163:4, 163:5, 163:13, 163:20

**head** [2] - 32:4, 149:16

**heads** [1] - 4:7

**headwaiter** [1] - 29:23

**Health** [1] - 149:24

**hear** [43] - 4:12, 7:7, 11:1, 25:16, 26:4, 26:21, 29:4, 29:21, 30:3, 30:6, 30:17, 31:11, 31:14, 31:16, 32:3, 32:4, 32:12, 33:4, 33:14, 33:18, 33:25, 34:4, 34:6, 34:10, 34:13, 34:19, 34:23, 35:18, 36:6, 36:11, 36:14, 36:18, 36:22, 36:25, 37:17, 39:23, 43:22, 68:10, 68:16, 119:15, 119:22, 119:25, 194:12

**heard** [8] - 10:1, 12:17, 23:11, 23:17, 77:15, 77:19, 99:12, 181:3

**hearing** [1] - 73:5

**hearsay** [8] - 16:21, 19:1, 19:2, 73:5, 150:4, 152:1, 152:2

**heavier** [3] - 61:3, 61:4, 96:8

**heavy** [1] - 96:6

**held** [1] - 96:9

**help** [10] - 54:24, 80:20, 81:13, 88:24, 89:3, 89:22, 93:23, 116:3, 123:8, 140:24

**helpful** [1] - 115:21

**helps** [2] - 116:22, 147:19

**Hendrix** [1] - 28:8

**hereby** [1] - 197:7

**herein** [1] - 180:19

**herself** [2] - 64:24, 70:10

**hidden** [1] - 167:15

**high** [24] - 29:20, 29:25, 30:6, 31:2, 31:8, 44:6, 48:10, 51:17, 51:21, 52:3, 57:21, 57:24, 97:22, 97:25, 98:13, 98:17, 99:5, 99:6, 99:13, 107:14, 107:16, 107:18, 137:3

**highest** [1] - 44:4

**himself** [1] - 154:7

**hip** [1] - 113:22
**hired** [1] - 192:22
**history** [14] - 27:18, 29:17, 33:8, 116:2, 116:21, 140:17, 140:22, 166:19, 166:22, 174:7, 174:17, 176:21, 181:10, 182:8
**hit** [42] - 14:22, 37:3, 48:11, 61:9, 63:5, 63:6, 63:10, 63:11, 63:25, 64:4, 64:9, 65:7, 65:10, 66:10, 66:11, 66:15, 66:18, 66:25, 68:2, 68:6, 68:20, 70:4, 71:22, 74:16, 75:14, 75:21, 101:12, 101:18, 101:24, 105:19, 105:20, 127:14, 127:18, 140:5, 171:3, 181:17, 181:22, 181:24, 182:9
**hitting** [1] - 179:25
**hold** [10] - 13:22, 19:20, 59:23, 60:18, 88:15, 146:15, 150:5, 151:22, 156:16, 172:23
**holding** [4] - 60:22, 65:12, 142:9, 169:20
**Holdings** [1] - 27:13
**Hollywood** [1] - 130:9
**home** [2] - 156:18, 163:15
**hone** [1] - 113:20
**Honor** [121] - 3:10, 3:13, 4:15, 5:12, 5:15, 6:10, 6:13, 6:14, 7:10, 7:22, 8:13, 9:3, 9:6, 9:22, 10:12, 10:20, 10:21, 10:24, 11:22, 12:6, 13:2, 13:21, 15:3, 16:6, 16:9, 16:21, 18:17, 19:18, 20:4, 20:9, 20:18, 21:23, 22:6, 22:13, 24:2, 25:1, 25:12, 26:15, 27:5, 27:20, 28:6, 28:11, 28:22, 29:5, 29:12, 32:19, 35:8, 38:6, 39:21, 39:24, 40:18, 41:16, 42:8, 52:25, 53:13, 53:24, 57:7, 60:11, 69:2, 70:20, 71:18, 73:12, 74:6, 74:24, 75:16,

79:5, 79:14, 84:23, 85:13, 85:21, 87:8, 88:6, 88:8, 89:8, 89:11, 89:22, 90:20, 91:5, 96:24, 98:21, 99:9, 102:2, 102:9, 103:22, 104:22, 106:17, 108:6, 108:13, 108:15, 117:22, 118:13, 118:17, 119:12, 120:2, 120:6, 124:20, 125:1, 125:6, 125:24, 128:21, 132:7, 132:12, 133:5, 144:12, 146:4, 146:18, 147:1, 147:12, 147:18, 148:2, 150:4, 151:21, 152:14, 153:2, 154:5, 154:10, 157:9, 159:6, 160:5, 180:10, 190:19
**Honor's** [1] - 10:13
**Honorable** [1] - 3:4
**HONORABLE** [1] - 1:10
**hope** [3] - 192:15, 192:24
**hospital** [5] - 84:10, 84:13, 114:11, 114:12, 114:15
**Hospital** [7] - 32:15, 33:2, 84:14, 127:10, 127:12, 163:4, 163:5
**hotel** [1] - 43:10
**hour** [16] - 7:12, 47:4, 56:5, 58:5, 58:10, 58:11, 58:16, 93:16, 94:4, 95:18, 115:8, 115:18, 155:23, 193:9, 193:22, 193:25
**hours** [23] - 5:5, 7:20, 30:4, 36:16, 37:2, 85:10, 93:9, 93:12, 102:22, 103:6, 103:19, 103:21, 104:3, 104:6, 104:10, 104:15, 104:20, 105:5, 105:6, 105:8, 105:13, 105:15, 173:2
**hundreds** [3] - 151:10, 186:16
**hurricane** [3] - 108:2, 108:10, 108:20

**hurt** [7] - 69:25, 70:1, 70:2, 77:21, 125:10, 179:24, 182:4
**hurting** [1] - 165:12
**husband** [5] - 6:6, 29:24, 30:3, 31:6, 79:7

## I

**i.e** [1] - 31:18
**ibuprofen** [8] - 162:11, 162:17, 162:18, 162:22, 163:12, 163:16, 163:18, 164:2
**Ibuprofen** [1] - 162:13
**ibuprofens** [1] - 162:21
**ice** [8] - 70:14, 76:11, 76:15, 77:2, 77:3, 106:2, 106:9, 106:13
**idea** [2] - 4:4, 19:23
**identified** [3] - 31:18, 98:10, 172:10
**identify** [6] - 125:4, 170:17, 172:4, 172:5, 173:9, 173:13
**illustrate** [1] - 102:10
**illustration** [1] - 123:8
**image** [3] - 24:3, 24:19, 135:7
**images** [10] - 24:12, 24:13, 24:21, 24:22, 132:1, 133:9, 135:6, 135:21, 194:24, 195:5
**imagine** [4] - 7:4, 10:18, 11:16, 83:18
**imaging** [2] - 126:21, 126:24
**immediate** [4] - 130:12, 138:16, 138:19, 161:11
**immediately** [6] - 11:3, 32:14, 54:6, 54:9, 161:16, 161:21
**impact** [37] - 13:25, 14:1, 14:3, 14:6, 14:15, 14:21, 15:1, 15:7, 15:21, 63:24, 64:21, 64:22, 64:23, 64:24, 65:18, 65:19, 65:25, 66:24, 67:3, 67:4, 67:10, 67:11, 67:19, 67:20, 68:21, 69:5, 69:20, 69:21, 71:4, 71:12, 71:13, 71:22, 72:1, 72:14, 74:13, 75:14, 76:6

**impacted** [2] - 66:9, 128:9
**impeach** [2] - 88:9, 88:14
**impeachment** [10] - 39:15, 39:16, 40:7, 88:8, 89:12, 89:15, 178:22, 179:2, 179:13, 180:20
**impingement** [2] - 121:11, 130:25
**important** [10] - 11:1, 116:5, 116:25, 121:14, 122:2, 125:14, 126:10, 138:5, 143:2, 177:6
**importantly** [1] - 165:22
**impression** [1] - 195:18
**impressions** [1] - 115:5
**improper** [5] - 88:8, 89:11, 89:13, 178:22, 180:20
**improperly** [2] - 189:8, 189:18
**inches** [2] - 99:15, 99:17
**incident** [71] - 10:21, 10:24, 11:10, 11:22, 15:14, 16:2, 16:3, 18:2, 30:5, 30:9, 31:17, 32:10, 32:11, 34:8, 35:3, 36:8, 36:12, 36:16, 36:20, 37:2, 37:3, 37:11, 37:15, 37:20, 38:22, 38:25, 39:1, 39:20, 40:1, 49:13, 52:18, 54:7, 54:10, 54:20, 58:3, 58:7, 59:23, 60:16, 60:20, 61:23, 62:13, 63:7, 69:7, 80:15, 81:9, 81:11, 81:19, 81:22, 83:14, 91:24, 92:19, 93:10, 97:5, 98:3, 99:5, 99:20, 100:2, 100:6, 100:10, 102:22, 105:4, 140:14, 143:14, 143:16, 158:23, 161:12, 161:17, 161:22, 166:17, 190:8, 190:10
**incidents** [1] - 11:10
**include** [11] - 115:8, 116:8, 171:25, 182:18, 186:4,

186:18, 186:19, 186:24, 186:25, 187:7, 195:8
**included** [2] - 13:4, 33:1
**includes** [1] - 171:1
**including** [3] - 29:22, 117:5, 195:13
**inconsistency** [2] - 179:16, 179:23
**inconsistent** [3] - 163:3, 181:2, 188:17
**incorrect** [1] - 33:7
**increased** [1] - 130:21
**increments** [1] - 133:14
**indeed** [2] - 14:25, 32:7
**independent** [2] - 15:15, 128:25
**index** [1] - 9:21
**indicate** [5] - 64:2, 142:21, 143:9, 176:5, 178:9
**indicated** [7] - 34:22, 59:13, 117:3, 188:11, 189:20, 190:21, 194:15
**indicates** [3] - 92:18, 173:12, 182:23
**indicating** [6] - 34:1, 54:2, 63:14, 65:5, 65:23, 107:7
**indication** [4] - 122:2, 139:21, 153:23, 153:25
**indications** [1] - 190:23
**industry** [1] - 36:25
**inferior** [7] - 139:5, 139:8, 167:17, 167:23, 175:24, 176:14, 176:19
**infirmary** [7] - 33:13, 77:4, 77:22, 163:1, 164:5, 164:6, 165:3
**inflammatory** [3] - 153:25, 154:15, 189:15
**influence** [1] - 32:10
**information** [6] - 10:22, 15:19, 115:19, 115:21, 151:25, 192:4
**infraspinatus** [1] - 139:12
**initial** [1] - 6:13
**injured** [4] - 34:11, 78:5, 79:17, 193:2
**injuries** [12] - 29:17,

31:3, 32:16, 33:21, 34:20, 35:5, 81:2, 113:4, 113:20, 174:18, 177:4, 190:18
**injuring** [1] - 36:13
**injury** [66] - 13:25, 20:22, 20:24, 20:25, 21:3, 21:12, 22:20, 23:23, 24:9, 32:7, 32:8, 33:5, 33:8, 33:17, 34:2, 34:12, 34:14, 34:15, 79:20, 114:24, 115:1, 119:20, 120:12, 121:15, 122:3, 122:4, 122:5, 128:6, 129:22, 131:5, 131:6, 131:8, 131:9, 142:19, 143:1, 154:1, 154:19, 160:23, 165:11, 169:12, 169:17, 169:18, 169:22, 170:3, 172:7, 173:22, 174:9, 174:10, 174:14, 174:18, 174:19, 176:24, 177:15, 177:16, 178:14, 178:16, 179:4, 179:14, 181:10, 181:13, 182:12, 187:13, 187:17, 187:25, 192:21
**Injury** [2] - 92:9, 92:17
**inside** [3] - 55:23, 133:16, 142:5
**instance** [2] - 134:8, 135:10
**insurance** [3] - 147:3, 184:17, 184:23
**intend** [4] - 11:20, 40:6, 110:4, 145:1
**intending** [1] - 118:10
**intention** [2] - 6:3, 40:7
**interarticular** [2] - 122:3
**intermediate** [3] - 136:25, 137:2
**intermittent** [3] - 130:15, 130:16, 130:18
**internship** [1] - 111:4
**interpret** [3] - 24:7, 133:3, 194:24
**interpretation** [3] - 24:1, 24:11, 24:13
**interpreting** [1] - 21:8

**interrelated** [4] - 171:10, 173:5, 174:4, 195:12
**interrupt** [1] - 144:25
**intoxication** [2] - 39:7, 40:8
**intrinsic** [1] - 123:7
**introduce** [1] - 4:5
**invalid** [1] - 17:9
**investigated** [1] - 36:19
**involve** [1] - 114:25
**involved** [12] - 32:9, 37:20, 39:1, 60:16, 99:5, 99:19, 100:2, 100:5, 100:10, 114:17, 149:19, 149:21
**involves** [1] - 173:6
**involving** [3] - 36:8, 36:12, 174:8
**ipse** [1] - 148:3
**irregularity** [2] - 25:5, 167:4
**Israel** [1] - 111:5
**issue** [29] - 5:13, 6:11, 11:21, 13:12, 17:13, 18:23, 19:17, 20:7, 20:17, 20:18, 20:20, 22:25, 25:12, 34:15, 34:16, 34:17, 39:7, 70:25, 125:22, 126:7, 126:17, 148:3, 178:13, 179:7, 180:15, 187:20, 189:11, 190:7
**issues** [6] - 8:25, 14:8, 20:12, 20:13, 86:10, 86:12
**items** [6] - 17:18, 30:12, 30:19, 31:1, 31:4, 49:8
**itself** [6] - 52:11, 52:15, 124:13, 125:23, 138:23, 178:9

### J

**J-5** [1] - 76:7
**J5** [1] - 47:13
**Jackson** [1] - 84:14
**Jamaica** [6] - 42:24, 42:25, 43:16, 87:6, 107:25, 109:10
**Janragin** [2] - 3:16, 35:11
**January** [1] - 157:10
**JARNAGIN** [9] - 1:17,

3:16, 5:23, 8:18, 9:23, 10:3, 10:6, 35:10, 147:17
**Jarnagin** [2] - 20:10
**job** [4] - 13:8, 13:9, 168:25, 189:3
**Johanna** [2] - 28:21, 196:18
**join** [2] - 50:7, 96:17
**joined** [1] - 35:12
**Joint** [23] - 2:14, 41:6, 41:10, 47:13, 49:3, 50:21, 52:5, 52:21, 59:13, 92:16, 98:7, 98:8, 98:10, 99:6, 100:3, 100:9, 105:21, 105:24, 129:8, 132:8, 162:7, 168:6, 168:7
**joint** [11] - 41:2, 41:6, 41:20, 92:14, 136:17, 136:18, 136:21, 136:23, 137:6, 138:22, 169:25
**joints** [2] - 110:10, 153:20
**Joseph** [4] - 37:7, 110:14, 110:18, 118:14
**JOSEPH** [1] - 2:6
**JUDGE** [1] - 1:10
**judge** [5] - 9:16, 20:15, 52:9, 73:15, 178:21
**Judge** [6] - 118:3, 131:19, 178:24, 179:20, 183:11, 183:14
**judgment** [3] - 35:6, 36:1, 37:24
**judicial** [4] - 17:6, 17:15, 17:19, 19:3
**July** [24] - 29:14, 29:19, 34:9, 35:22, 44:9, 45:15, 45:18, 46:16, 81:3, 114:25, 120:22, 132:18, 158:13, 158:16, 158:18, 158:20, 158:22, 166:10, 166:17, 174:9, 174:19, 176:22, 178:3, 197:11
**jump** [2] - 135:19, 140:16
**jury** [1] - 73:4

### K

**keep** [5] - 63:2, 139:17, 164:4, 167:11, 167:14
**keeping** [1] - 149:13
**key** [2] - 141:4, 178:10
**killer** [1] - 163:6
**kind** [18] - 5:10, 10:9, 13:16, 14:17, 15:1, 31:24, 54:16, 54:17, 55:15, 62:20, 64:19, 64:23, 65:22, 79:3, 79:12, 114:7, 114:9, 118:25
**kinds** [2] - 11:19, 190:14
**Kleenex** [1] - 137:21
**knee** [6] - 113:2, 113:9, 113:15, 113:24, 114:3, 153:21
**knees** [4] - 113:3, 113:7, 114:19, 149:9
**knock** [1] - 11:5
**knocked** [1] - 11:6
**knowing** [1] - 137:15
**knowledge** [7] - 12:5, 23:19, 146:25, 157:15, 157:16, 170:24, 172:24
**known** [2] - 24:7, 127:17
**knows** [1] - 12:2

### L

**labral** [21] - 121:16, 121:21, 121:22, 129:21, 131:24, 139:8, 150:11, 153:9, 167:17, 167:19, 167:20, 168:1, 168:3, 176:14, 176:19, 177:2, 187:9, 189:24, 190:14, 190:20
**labrum** [20] - 25:6, 32:21, 121:16, 121:19, 122:4, 134:6, 138:23, 138:24, 138:25, 139:2, 139:3, 139:6, 139:24, 166:2, 167:5, 167:21, 168:22, 175:24, 176:10
**lack** [2] - 34:23, 146:25

**lacking** [1] - 26:14
**lacks** [1] - 25:21
**ladies** [1] - 49:20
**lady** [7] - 44:15, 76:11, 76:15, 76:16, 76:21, 76:22, 77:8
**land** [1] - 12:12
**larger** [1] - 61:6
**last** [11] - 34:20, 86:25, 113:23, 114:5, 114:13, 132:24, 159:11, 160:11, 171:22, 191:6, 192:18
**latest** [1] - 7:4
**LAUDERDALE** [1] - 1:2
**Lauderdale** [3] - 1:4, 1:25, 197:14
**law** [5] - 3:14, 8:15, 21:8, 21:17, 108:15
**lay** [4] - 71:17, 79:8, 128:24, 132:13
**layering** [1] - 136:21
**layperson** [1] - 124:19
**lead** [3] - 35:12, 74:25, 79:1
**leading** [6] - 23:25, 37:2, 65:2, 131:19, 157:1, 157:4
**Leading** [1] - 48:12
**leaning** [3] - 59:15, 65:6, 65:9
**leap** [1] - 148:20
**least** [14] - 12:15, 14:21, 20:6, 34:11, 49:4, 63:17, 129:10, 162:23, 172:21, 177:14, 177:15, 179:13, 184:14, 191:12
**leave** [2] - 55:11, 85:6
**leaving** [2] - 32:14, 126:5
**left** [53] - 11:23, 12:16, 29:17, 32:21, 33:10, 37:10, 56:7, 63:14, 63:21, 64:10, 80:11, 80:13, 80:17, 102:17, 105:18, 121:1, 121:6, 123:3, 125:13, 126:25, 127:1, 127:14, 127:15, 128:10, 129:19, 130:5, 130:12, 130:15, 130:17, 130:21, 132:4, 132:5, 132:18, 132:20, 135:22, 140:22,

143:4, 156:14, 156:22, 157:25, 160:24, 163:25, 164:4, 164:7, 164:10, 165:11, 165:12, 165:22, 174:8, 191:9, 193:13, 193:16
**LEGAL** [1] - 1:14
**less** [2] - 95:7, 141:5
**level** [6] - 44:4, 49:12, 113:19, 128:15, 129:3, 129:12
**levels** [1] - 163:23
**levied** [1] - 143:17
**liability** [3] - 35:25, 36:1, 184:21
**Liberti** [1] - 33:15
**lid** [27] - 12:22, 13:14, 31:15, 31:23, 32:1, 35:21, 36:4, 36:13, 37:3, 47:14, 52:11, 52:15, 57:1, 57:2, 60:16, 60:22, 60:23, 61:1, 66:5, 66:6, 66:7, 66:14, 96:8, 98:22, 101:24, 140:9, 179:25
**lido** [36] - 29:21, 30:12, 30:25, 31:1, 35:21, 36:9, 36:15, 36:24, 37:1, 46:18, 46:23, 47:17, 47:25, 48:3, 48:5, 48:18, 50:16, 57:12, 58:1, 58:4, 59:9, 82:15, 82:23, 83:2, 83:3, 83:8, 92:24, 93:2, 93:7, 93:9, 95:9, 95:14, 96:11, 104:19, 105:13, 105:17
**lids** [70] - 31:7, 31:13, 31:14, 31:18, 31:21, 50:11, 51:5, 51:14, 51:20, 52:1, 52:2, 52:7, 52:13, 52:17, 57:21, 59:14, 59:17, 59:23, 60:1, 60:3, 60:4, 60:7, 60:9, 60:16, 61:11, 61:20, 62:16, 63:9, 63:17, 64:12, 64:16, 64:19, 64:20, 66:18, 66:22, 66:23, 66:25, 67:19, 68:20, 69:10, 70:4, 71:22, 74:16, 75:13, 77:6, 77:7, 77:8, 77:14, 77:18, 81:23, 81:24, 82:6, 97:22,

98:2, 98:19, 98:20, 98:23, 99:2, 99:4, 99:6, 99:10, 99:13, 99:15, 99:19, 100:2, 100:5, 100:10, 101:7, 101:9, 105:19
**lies** [1] - 180:19
**life** [4] - 83:13, 83:16, 83:24, 176:24
**lift** [1] - 81:13
**ligaments** [1] - 111:19
**likely** [2] - 11:6, 21:3
**limine** [3] - 6:14, 6:16, 20:5
**limitation** [1] - 121:13
**limited** [7] - 34:22, 130:20, 131:16, 157:20, 157:24, 191:7, 191:13
**limits** [1] - 152:24
**Line** [10] - 48:5, 48:8, 66:21, 69:6, 69:7, 81:18, 160:22, 164:23, 174:20, 191:17
**line** [14] - 15:4, 15:10, 15:11, 77:11, 81:3, 81:16, 103:12, 104:5, 118:25, 134:19, 141:16, 180:16, 181:20, 187:23
**lines** [12] - 73:23, 74:2, 74:4, 74:10, 74:11, 76:25, 113:5, 141:20, 153:20, 153:22, 167:1, 167:14
**lining** [1] - 121:17
**list** [2] - 8:21, 56:25
**listed** [2] - 115:20, 161:14
**listen** [2] - 141:7, 193:1
**listening** [1] - 105:1
**literature** [10] - 170:10, 170:18, 172:1, 172:4, 172:5, 173:13, 194:23, 194:25, 195:4, 195:17
**litigation** [1] - 192:10
**live** [4] - 42:16, 42:18, 43:11, 86:23
**living** [4] - 86:17, 109:10, 158:15
**LLC** [1] - 27:11
**local** [1] - 185:18
**located** [3] - 18:15, 36:10, 87:12

**location** [4] - 12:21, 19:11, 141:24, 143:8
**log** [1] - 149:13
**logical** [1] - 38:11
**logically** [1] - 7:21
**long-haired** [1] - 76:22
**long-standing** [1] - 24:8
**look** [27] - 12:18, 16:16, 24:6, 28:2, 49:21, 67:21, 69:12, 89:20, 98:2, 116:14, 123:5, 128:19, 135:6, 136:7, 137:25, 144:7, 146:3, 146:12, 147:23, 149:17, 151:16, 153:13, 167:16, 171:7, 173:21, 177:1, 195:16
**looked** [1] - 146:7
**looking** [35] - 16:13, 24:19, 34:5, 46:6, 51:3, 52:5, 52:20, 59:13, 61:10, 73:23, 100:9, 107:5, 116:20, 124:3, 124:7, 125:21, 133:19, 133:21, 133:24, 134:4, 134:5, 134:6, 134:7, 134:22, 134:25, 142:9, 149:14, 161:13, 162:20, 168:7, 173:18, 173:19, 193:4
**looks** [2] - 41:11, 157:10
**loose** [1] - 30:12
**lose** [2] - 94:24, 95:3
**lost** [3] - 49:19, 95:7
**lotion** [1] - 81:5
**low** [5] - 137:2, 138:4, 138:13, 190:22, 190:25
**LUCIEN** [2] - 2:3, 42:6
**Lucien** [6] - 29:24, 31:6, 41:25, 42:2, 42:6, 91:6
**luck** [1] - 195:23
**lunch** [2] - 7:13, 38:9

## M

**ma'am** [1] - 42:3
**Maarten** [1] - 43:10
**madam** [1] - 160:19
**Madam** [1] - 40:23

**maintain** [1] - 174:3
**maintained** [1] - 36:24
**MAIRELYS** [2] - 1:23, 197:12
**major** [2] - 113:20, 122:3
**malignant** [1] - 111:18
**manipulate** [1] - 132:11
**manner** [2] - 36:23, 66:9
**Maps** [1] - 12:1
**mark** [3] - 5:22, 54:4, 54:5
**marked** [1] - 10:8
**Marked** [1] - 2:13
**markers** [1] - 15:1
**married** [4] - 43:4, 43:6, 43:25, 44:1
**Martinez** [7] - 25:5, 167:4, 167:12, 167:19, 167:23, 167:25, 168:10
**Martinez's** [1] - 168:20
**mass** [1] - 31:19
**math** [1] - 105:2
**matter** [7] - 21:13, 93:15, 117:10, 152:11, 184:19, 196:19, 197:9
**McDowell** [2] - 28:1, 28:4
**MDs** [1] - 177:25
**mean** [78] - 5:12, 7:4, 7:5, 7:11, 7:25, 12:17, 17:2, 18:24, 22:8, 24:21, 24:22, 25:15, 38:12, 40:10, 45:5, 45:12, 47:4, 51:14, 58:25, 65:3, 67:6, 67:13, 67:15, 67:24, 71:15, 72:13, 72:20, 73:4, 74:20, 78:16, 79:2, 79:8, 79:9, 82:18, 83:17, 93:8, 97:18, 98:15, 104:22, 105:1, 105:2, 110:5, 125:7, 129:13, 141:4, 141:16, 145:8, 147:1, 148:16, 151:11, 151:21, 157:3, 158:7, 166:7, 166:8, 169:4, 169:22, 170:3, 170:11, 170:12, 170:13, 176:11, 179:22, 180:4, 181:2, 181:3, 181:22, 183:25,

184:9, 185:9, 186:9, 186:19, 188:25, 189:3, 189:6, 192:13, 192:25
**meaning** [8] - 31:22, 66:14, 82:18, 107:20, 111:17, 121:9, 157:20, 192:10
**means** [3] - 43:22, 98:2, 130:14
**meant** [1] - 158:5
**measurement** [3] - 12:5, 15:6, 15:21
**measures** [1] - 137:19
**meat** [2] - 133:13, 137:17
**mechanics** [1] - 13:25
**mechanism** [2] - 33:22, 112:9
**media** [3] - 38:21, 39:19, 39:25
**Medical** [8] - 111:5, 111:7, 114:12, 120:11, 120:22, 122:8, 131:3, 161:25
**medical** [87] - 20:23, 21:10, 21:11, 21:20, 22:19, 23:1, 23:9, 32:5, 32:13, 34:1, 34:8, 37:10, 78:11, 78:13, 78:20, 78:23, 78:24, 79:3, 79:18, 79:21, 80:2, 102:24, 103:3, 103:19, 111:10, 115:2, 115:7, 115:20, 116:2, 117:5, 119:13, 120:9, 120:10, 120:12, 120:14, 120:18, 120:25, 126:9, 126:11, 127:20, 138:13, 140:8, 148:9, 158:19, 159:1, 162:5, 164:9, 165:25, 166:7, 166:8, 166:16, 169:13, 174:7, 174:17, 175:9, 175:16, 175:20, 176:7, 176:20, 176:21, 177:15, 178:15, 178:17, 179:4, 179:7, 179:14, 180:5, 180:15, 181:12, 182:8, 182:21, 182:23, 182:25, 183:16, 183:18,

184:5, 185:5, 187:19, 188:5, 188:13, 189:19, 192:11, 192:17
**medically** [1] - 182:6
**Medicare** [1] - 147:2
**medication** [2] - 162:5, 163:16
**Medicine** [2] - 111:4, 111:8
**medicine** [10] - 111:7, 111:15, 111:25, 112:13, 112:14, 113:1, 113:11, 118:15, 171:21, 172:16
**meet** [2] - 35:24, 55:8
**meeting** [1] - 86:4
**Melissa** [1] - 3:5
**MELISSA** [1] - 1:10
**member** [1] - 154:3
**memorable** [4] - 129:22, 131:11, 163:10
**memory** [6] - 73:1, 86:6, 86:8, 86:10, 86:12, 86:15
**mention** [5] - 18:19, 18:20, 122:22, 134:24, 174:13
**Mentor** [1] - 27:11
**merit** [1] - 36:16
**merits** [1] - 17:10
**mess** [1] - 196:11
**met** [6] - 35:2, 43:8, 43:9, 43:11, 160:9, 160:11
**meteorologically** [1] - 12:11
**meteorologist** [5] - 12:8, 13:6, 13:11, 15:18, 107:24
**meteorology** [1] - 93:21
**methodologies** [2] - 26:8, 26:9
**methodology** [14] - 23:22, 24:14, 26:11, 26:13, 26:21, 26:22, 117:10, 117:16, 125:9, 138:17, 144:18, 166:19, 170:24, 172:19
**Miami** [2] - 1:15, 80:9
**mic** [1] - 51:3
**MICHAEL** [1] - 1:16
**Michael** [3] - 3:13, 35:12, 86:3
**microphone** [2] - 29:8, 43:13

**midday** [1] - 4:9
**middle** [4] - 11:24, 12:13, 38:12, 55:20
**midst** [1] - 31:8
**might** [7] - 4:9, 5:19, 12:22, 29:7, 55:15, 105:2, 138:10
**mild** [2] - 130:15, 137:1
**miles** [15] - 12:2, 12:12, 12:15, 16:1, 17:22, 19:10, 19:11, 47:4, 58:5, 58:16, 93:16, 94:4, 95:18
**milligrams** [8] - 162:12, 162:13, 162:17, 162:22, 163:6, 163:12, 163:16, 163:18
**millimeter** [4] - 133:14, 137:25, 190:22
**millimeters** [14] - 136:15, 137:20, 137:22, 137:24, 138:4, 139:13, 139:14, 139:16, 139:17, 139:18, 176:1
**mind** [1] - 172:21
**mine** [1] - 196:8
**minimal** [4] - 39:4, 128:17, 128:20, 129:1
**minimum** [1] - 12:2
**minute** [6] - 40:20, 149:17, 155:25, 159:8, 159:19, 159:23
**minutes** [10] - 5:13, 5:24, 38:6, 155:6, 155:7, 155:23, 155:24, 159:6, 159:12, 159:17
**miss** [1] - 43:22
**missed** [2] - 43:15, 43:19
**misses** [2] - 43:21, 43:22
**missing** [1] - 109:2
**misstates** [4] - 87:7, 98:14, 99:8, 104:21
**MIT** [1] - 37:18
**mobility** [1] - 158:7
**moderate** [5] - 130:16, 136:24, 137:1, 139:23
**moment** [10] - 4:18, 25:3, 50:15, 59:22, 67:4, 75:14, 96:9,

105:17, 142:11, 163:11
**moments** [1] - 54:19
**Monica** [3] - 3:23, 35:16, 36:6
**month** [4] - 80:25, 86:18, 86:19, 86:25
**months** [5] - 32:23, 112:4, 141:5, 141:6, 157:12
**morning** [11] - 3:10, 3:12, 3:13, 3:24, 35:10, 42:12, 42:13, 81:4, 81:6, 114:6, 142:6
**most** [20] - 9:7, 21:3, 21:18, 29:6, 29:7, 134:14, 144:9, 165:22, 172:12, 174:11, 175:17, 175:18, 177:4, 177:6, 177:18, 177:19, 193:1, 193:5, 195:9, 195:14
**mostly** [1] - 104:9
**motion** [35] - 8:2, 20:3, 20:14, 26:1, 26:5, 26:6, 27:1, 34:22, 118:17, 121:8, 121:13, 121:25, 122:1, 122:14, 125:17, 125:19, 130:21, 130:22, 131:15, 131:16, 157:20, 157:24, 158:10, 158:11, 165:23, 166:1, 169:19, 174:16, 175:20, 178:1, 178:10, 187:21, 191:7, 191:13
**motions** [5] - 6:14, 6:15, 20:5, 20:11, 28:14
**Motrin** [2] - 156:18, 163:11
**mouth** [2] - 65:13, 65:16
**move** [13] - 25:12, 55:15, 64:12, 64:22, 65:18, 76:2, 82:7, 104:8, 157:21, 157:22, 157:23, 189:10
**moved** [4] - 42:21, 86:25, 101:18, 177:12
**movement** [2] - 33:22, 91:8

**Movement** [1] - 90:25
**moving** [10] - 9:1, 12:16, 22:9, 54:21, 54:22, 55:5, 122:6, 131:10, 131:13, 179:18
**MR** [404] - 2:4, 2:4, 2:5, 2:7, 2:7, 2:8, 3:10, 3:13, 3:16, 4:15, 4:22, 5:5, 5:12, 5:23, 6:5, 6:9, 6:22, 7:10, 7:22, 8:2, 8:6, 8:9, 8:13, 8:18, 9:2, 9:5, 9:10, 9:15, 9:18, 9:20, 9:23, 10:3, 10:6, 10:12, 10:20, 11:9, 11:12, 11:15, 11:21, 12:10, 13:2, 13:11, 13:15, 13:18, 13:20, 13:24, 14:5, 14:12, 14:14, 14:15, 14:20, 15:3, 16:6, 16:8, 16:21, 16:24, 17:1, 17:5, 17:13, 17:22, 18:10, 18:17, 18:22, 19:15, 19:18, 19:19, 19:21, 20:4, 20:9, 22:1, 22:3, 22:4, 22:12, 23:10, 24:25, 26:10, 27:5, 27:9, 27:20, 28:6, 28:11, 28:13, 28:18, 28:22, 28:24, 29:5, 29:9, 29:12, 35:10, 38:6, 38:14, 38:18, 38:21, 39:11, 39:13, 39:21, 39:24, 40:2, 40:6, 40:18, 40:23, 41:3, 41:5, 41:16, 41:25, 42:8, 42:11, 43:24, 46:1, 48:12, 48:16, 50:5, 52:8, 52:16, 52:25, 53:2, 53:13, 53:15, 53:21, 53:23, 54:1, 56:4, 56:18, 56:21, 57:3, 57:7, 57:9, 60:11, 60:14, 61:7, 62:7, 62:12, 65:2, 65:11, 66:17, 67:5, 67:9, 67:13, 67:17, 67:23, 68:5, 68:9, 68:13, 68:15, 68:19, 69:2, 69:4, 70:20, 70:24, 71:3, 71:7, 71:9, 71:13, 71:17, 71:20, 72:2, 72:6, 72:11, 72:24, 73:12, 73:14, 73:19, 73:22, 74:3, 74:4, 74:5, 74:11, 74:19, 74:21, 74:24,

75:7, 75:16, 76:3, 76:17, 76:20, 78:15, 78:17, 78:19, 78:21, 78:24, 79:4, 79:7, 79:14, 79:16, 82:8, 82:12, 82:14, 82:16, 82:25, 83:4, 83:6, 83:12, 83:15, 83:20, 84:12, 84:17, 84:23, 85:4, 85:10, 85:13, 85:16, 85:18, 85:21, 86:2, 87:7, 87:10, 88:6, 88:8, 88:11, 88:13, 88:21, 89:1, 89:8, 89:11, 89:17, 89:22, 90:1, 90:6, 90:20, 90:23, 91:5, 91:12, 91:14, 92:5, 92:7, 92:12, 92:15, 96:22, 97:1, 97:13, 98:6, 98:9, 98:14, 98:16, 98:20, 98:25, 99:8, 99:16, 102:2, 102:5, 102:8, 102:12, 102:13, 103:22, 104:1, 104:10, 104:11, 104:21, 104:24, 105:7, 105:8, 105:9, 105:21, 105:23, 106:15, 106:17, 106:19, 108:6, 108:9, 108:13, 108:15, 108:21, 108:24, 109:5, 109:14, 109:22, 109:25, 110:3, 110:6, 110:9, 110:10, 110:12, 110:20, 117:22, 117:24, 118:2, 118:5, 118:8, 118:13, 118:17, 118:25, 119:4, 119:6, 119:12, 120:2, 120:6, 120:7, 123:15, 123:19, 123:22, 123:24, 124:20, 124:23, 125:1, 125:3, 125:6, 125:24, 126:7, 126:14, 126:19, 126:20, 128:21, 128:23, 129:2, 129:5, 129:7, 131:19, 131:20, 131:25, 132:7, 132:10, 132:14, 133:5, 133:7, 135:3, 140:1, 144:12, 144:17, 144:25,

145:7, 145:11, 145:13, 145:22, 146:4, 146:9, 146:10, 146:17, 146:18, 146:21, 146:23, 146:25, 147:7, 147:12, 147:16, 147:17, 147:21, 148:2, 148:22, 148:25, 149:1, 150:4, 151:21, 152:14, 152:23, 153:2, 153:3, 154:5, 154:8, 154:20, 157:1, 157:5, 157:7, 157:9, 157:13, 159:3, 159:6, 159:11, 159:17, 160:5, 160:8, 160:19, 160:21, 167:10, 168:15, 168:16, 168:19, 173:7, 174:21, 174:23, 175:1, 178:21, 178:24, 179:3, 179:19, 180:7, 180:10, 180:18, 181:8, 181:9, 181:14, 183:11, 183:14, 183:15, 186:6, 186:13, 188:16, 188:19, 189:5, 189:16, 190:2, 190:4, 190:11, 190:19, 191:2, 194:3, 194:7, 194:10, 195:20, 196:3, 196:8, 196:10, 196:11, 196:14, 196:17

**MRI** [64] - 21:5, 22:20, 23:15, 24:1, 24:12, 24:15, 25:4, 25:9, 32:18, 32:19, 32:20, 34:5, 37:10, 110:11, 115:4, 115:9, 115:20, 116:8, 116:11, 116:12, 116:14, 116:20, 116:23, 117:5, 132:4, 132:5, 132:8, 132:18, 132:20, 132:23, 133:9, 133:12, 134:20, 135:1, 135:14, 135:21, 139:22, 140:13, 140:18, 142:23, 143:9, 166:20, 167:3, 167:25, 168:5,

168:6, 168:7, 168:10, 169:8, 172:7, 173:12, 173:19, 175:10, 175:12, 175:21, 175:23, 176:6, 176:7, 177:7, 194:15, 194:17, 194:24, 195:3

**MRI'd** [1] - 177:5
**MRIs** [2] - 133:24, 134:22
**MS** [2] - 3:18, 3:23
**multiple** [9] - 20:19, 29:22, 32:21, 33:3, 33:20, 149:11, 175:12, 183:20
**muscle** [8] - 121:6, 122:23, 123:4, 124:11, 124:18, 125:4, 136:13, 139:11
**muscles** [1] - 124:5
**musculoskeletal** [1] - 111:18

## N

**name** [13] - 3:22, 35:11, 42:5, 42:6, 44:15, 84:10, 86:3, 91:8, 110:17, 171:8, 183:16, 183:19, 186:19
**named** [1] - 185:24
**narrative** [2] - 83:15, 83:18
**Nassau** [12] - 11:25, 12:1, 12:13, 17:21, 45:12, 45:13, 45:18, 87:5, 87:15, 87:19, 91:16
**national** [1] - 150:14
**nature** [9] - 10:24, 61:20, 61:21, 74:12, 134:1, 135:22, 135:25, 136:1, 192:20
**navigate** [1] - 35:14
**NCL** [1] - 28:19
**necessarily** [2] - 41:23, 179:22
**necessary** [6] - 179:5, 182:7, 189:1, 189:6, 189:7, 190:10
**neck** [6] - 123:4, 124:11, 127:24, 130:13, 130:14, 130:15
**need** [27] - 7:3, 7:14,

9:25, 25:16, 26:4, 34:15, 38:15, 40:11, 55:8, 85:9, 109:20, 115:23, 117:16, 141:8, 159:20, 167:11, 173:1, 173:18, 178:15, 178:16, 178:21, 179:20, 184:7, 194:22, 194:23, 195:15, 196:15

**needed** [2] - 10:9, 142:25
**needs** [3] - 35:24, 170:15, 196:19
**Neer's** [1] - 130:22
**negligence** [5] - 35:23, 35:25, 36:2, 37:23, 37:24
**negligent** [2] - 35:4, 35:23
**never** [5] - 34:7, 36:8, 36:12, 36:20, 154:16
**new** [1] - 73:5
**news** [1] - 141:7
**next** [23] - 6:21, 35:19, 54:22, 55:2, 55:5, 63:10, 66:4, 70:15, 76:6, 77:23, 127:7, 127:10, 130:8, 135:4, 138:12, 145:18, 153:17, 153:18, 154:21, 154:22, 154:25, 155:8, 180:13
**nine** [1] - 43:3
**NO** [1] - 1:2
**NOAA** [1] - 17:1
**none** [4] - 6:16, 15:23, 102:16, 128:7
**nonsurgical** [1] - 116:18
**noon** [1] - 193:15
**normal** [3] - 31:24, 136:23, 177:3
**normally** [3] - 13:2, 73:4, 148:9
**North** [2] - 1:18, 111:7
**Nos** [1] - 41:7
**notation** [2] - 169:8, 173:25
**note** [1] - 142:23
**notebook** [3] - 9:15, 16:7, 16:9
**noted** [6] - 9:20, 40:14, 119:25, 122:17, 127:6
**nothing** [8] - 15:20, 142:21, 143:9, 151:12, 171:24,

172:7, 178:1, 183:4
**notice** [7] - 17:6, 17:15, 17:19, 19:3, 20:2, 20:7, 35:3
**noticed** [1] - 20:1
**notwithstanding** [2] - 31:11, 187:11
**nowhere** [2] - 45:3, 45:4
**Number** [2] - 92:9, 92:17
**number** [10] - 31:7, 56:19, 58:16, 74:1, 92:13, 93:18, 109:6, 147:14, 187:4, 187:9
**numbers** [10] - 89:21, 89:24, 146:6, 149:14, 185:5, 186:1, 186:3, 186:25, 187:1, 192:2
**numerous** [1] - 23:11
**Nurse** [4] - 33:8, 33:11, 164:17, 165:7
**nurse** [9] - 123:15, 123:16, 164:18, 164:24, 165:9, 165:16, 165:17, 165:19, 165:20

## O

**oath** [4] - 56:7, 56:15, 56:16, 90:17
**Object** [1] - 99:8
**object** [16] - 15:2, 36:9, 89:11, 98:14, 102:2, 104:21, 117:22, 118:2, 118:18, 119:2, 119:6, 119:12, 145:2, 157:1, 178:21, 183:11
**objected** [3] - 11:17, 40:25, 41:3
**objecting** [1] - 144:23
**objection** [50] - 5:16, 10:12, 19:21, 39:16, 40:11, 40:14, 41:11, 41:15, 48:12, 65:2, 67:5, 67:23, 68:9, 68:15, 72:2, 73:8, 74:6, 75:16, 76:17, 78:15, 82:12, 82:16, 83:15, 83:17, 83:19, 87:7, 91:5, 102:8, 108:6, 108:8, 110:3, 110:12, 118:16, 118:22, 118:23, 119:10, 119:16, 119:23, 124:20,

125:6, 150:4, 154:5, 167:10, 174:21, 180:19, 181:14, 186:6, 188:16, 190:2, 190:3
**objections** [6] - 5:15, 6:12, 9:2, 9:10, 9:19, 9:24
**objects** [1] - 30:13
**oblique** [1] - 133:17
**observation** [1] - 61:14
**observe** [1] - 59:7
**observed** [7] - 57:23, 58:4, 60:9, 63:16, 70:1, 75:15, 81:10
**obtained** [1] - 186:3
**obviously** [6] - 6:11, 6:23, 7:14, 12:12, 22:5, 22:8
**occasional** [1] - 191:18
**occasionally** [1] - 191:20
**occasions** [1] - 33:21
**occupation** [1] - 110:24
**occur** [1] - 91:24
**occurred** [11] - 16:2, 16:3, 30:5, 58:3, 83:14, 93:10, 102:22, 114:24, 140:15, 178:14, 181:13
**occurs** [1] - 63:7
**ocean** [2] - 11:24, 12:14
**OF** [2] - 1:1, 2:9
**offer** [11] - 10:14, 11:4, 14:9, 15:24, 16:20, 17:3, 18:25, 25:19, 40:8, 118:10, 177:8
**offered** [12] - 11:25, 12:7, 18:18, 25:21, 26:2, 38:23, 39:6, 39:8, 40:16, 108:18, 172:8, 172:9
**offering** [5] - 13:23, 14:7, 14:10, 118:5, 152:5
**office** [14] - 114:18, 115:23, 131:12, 144:9, 146:7, 147:2, 148:5, 176:3, 182:24, 183:5, 183:17, 183:19, 185:10, 185:13
**office's** [1] - 148:17
**OFFICER** [1] - 196:22
**officer** [2] - 36:18,

55:8

**offices** [2] - 114:19, 144:10

**Official** [1] - 197:12

**OFFICIAL** [1] - 1:23

**often** [4] - 113:17, 191:17, 192:1, 192:19

**old** [3] - 171:2, 176:25, 177:1

**older** [1] - 158:7

**omnibus** [1] - 27:24

**onboard** [2] - 36:15, 37:15

**once** [11] - 18:5, 30:7, 32:3, 64:21, 65:7, 66:18, 95:7, 177:8, 183:11, 185:1, 188:16

**oncologic** [1] - 111:16

**one** [81] - 4:9, 4:16, 7:1, 8:13, 25:3, 27:9, 28:6, 31:12, 31:13, 31:15, 31:19, 52:13, 54:3, 56:18, 56:24, 60:16, 60:17, 61:11, 63:10, 66:3, 66:4, 66:5, 66:6, 66:7, 66:9, 69:15, 70:14, 70:15, 77:20, 78:17, 86:19, 102:6, 110:3, 116:17, 118:25, 125:5, 131:1, 133:22, 137:4, 138:7, 139:16, 142:1, 142:9, 143:7, 147:13, 147:18, 148:22, 148:25, 149:17, 152:15, 153:7, 155:6, 155:7, 155:23, 162:6, 162:13, 162:18, 163:25, 171:9, 175:7, 178:2, 178:12, 180:21, 181:17, 183:16, 183:19, 184:22, 185:16, 187:15, 190:23

**one-by-one** [1] - 153:7

**ones** [8] - 30:10, 38:23, 39:3, 48:20, 61:21, 62:16, 151:6, 171:7

**Ong** [5] - 33:8, 33:11, 164:18, 165:7

**ongoing** [4] - 112:17, 173:1, 195:1, 195:11

**open** [1] - 121:8

**opening** [2] - 4:5, 5:23

**openings** [8] - 4:12, 5:11, 5:22, 6:2, 6:19, 8:24, 29:4, 33:24

**operate** [1] - 177:7

**operated** [2] - 140:18, 140:19

**operating** [2] - 140:24, 172:16

**operations** [1] - 142:1

**operative** [6] - 141:11, 141:13, 142:13, 142:23, 142:24, 188:23

**opine** [3] - 24:17, 152:21, 187:24

**opines** [1] - 147:25

**opinion** [52] - 13:3, 13:5, 14:9, 14:11, 15:13, 15:15, 15:17, 15:25, 17:10, 21:10, 21:11, 21:15, 21:21, 22:11, 22:12, 22:13, 22:14, 23:2, 23:3, 25:20, 25:22, 26:3, 27:23, 28:2, 34:4, 117:8, 117:13, 117:23, 118:23, 119:3, 119:8, 119:9, 119:10, 119:19, 119:23, 119:25, 143:12, 144:12, 144:15, 145:1, 145:14, 152:18, 152:19, 163:14, 166:13, 166:14, 171:22, 173:14, 185:1, 193:5, 193:6

**opinions** [31] - 13:12, 13:13, 13:14, 14:7, 14:8, 18:8, 26:20, 28:7, 115:21, 117:8, 118:6, 118:10, 132:21, 149:3, 149:5, 149:10, 158:25, 170:18, 170:20, 171:15, 171:24, 172:6, 177:9, 177:11, 177:13, 183:3, 183:23, 183:25, 184:6, 192:20, 193:3

**opportunity** [6] - 75:8, 75:11, 111:11, 120:3, 156:7, 180:24

**opposed** [1] - 125:22

**opposing** [1] - 7:23

**opposite** [1] - 62:21

**opposition** [1] - 28:16

**optimistic** [1] - 53:7

**oral** [2] - 112:5

**order** [14] - 3:1, 4:25, 6:15, 20:11, 27:24, 36:1, 121:18, 133:10, 142:25, 144:3, 194:23, 196:4, 196:11, 196:20

**organization** [1] - 154:9

**original** [1] - 80:1

**originally** [2] - 87:11, 180:5

**originating** [1] - 125:5

**orthopedic** [26] - 21:7, 23:20, 33:3, 37:8, 110:25, 111:6, 111:13, 111:21, 111:24, 112:2, 112:12, 112:15, 112:24, 112:25, 113:18, 116:10, 118:14, 119:14, 167:16, 170:7, 170:13, 170:22, 171:16, 171:20, 172:11, 172:15

**Orthopedic** [3] - 154:3, 154:12, 189:13

**orthopedics** [4] - 111:20, 112:7, 112:17, 183:21

**orthopedist** [1] - 22:23

**os** [7] - 134:8, 134:12, 134:15, 134:21, 135:10, 137:8, 170:2

**Os** [1] - 134:18

**OS** [1] - 134:18

**otherwise** [4] - 6:2, 30:12, 74:20, 74:21

**outpatient** [2] - 151:8, 156:2

**outside** [7] - 30:18, 55:24, 107:9, 124:14, 133:16, 154:9, 196:15

**outstretched** [1] - 121:23

**over-the-counter** [1] - 156:18

**overrule** [2] - 83:19, 119:16

**overruled** [12] - 48:14, 78:16, 87:9, 99:12, 118:4, 118:7, 125:7, 131:22, 144:22, 154:6, 154:11, 186:7

**overruling** [1] - 126:17

**own** [18] - 4:7, 30:15,

30:24, 32:3, 32:12, 33:2, 38:25, 116:13, 147:5, 149:16, 149:19, 149:20, 172:9, 182:24, 183:17, 185:1, 191:1, 195:18

**ownership** [1] - 185:16

---

## P

**P.A** [1] - 1:18

**p.m** [8] - 1:6, 56:9, 91:3, 91:19, 92:19, 160:1, 196:24

**page** [40] - 15:4, 15:10, 15:11, 20:19, 22:16, 25:2, 73:23, 74:3, 74:4, 74:11, 89:18, 89:20, 89:23, 89:24, 90:2, 90:3, 90:10, 103:11, 103:23, 104:5, 126:1, 145:21, 145:23, 146:5, 146:10, 147:24, 147:25, 165:8, 167:1, 171:14, 177:21, 178:18, 181:20, 182:2, 182:15, 187:22

**PAGE** [1] - 2:2

**pages** [3] - 9:21, 14:5, 177:20

**Pages** [1] - 1:8

**paid** [2] - 115:17, 115:18

**pain** [48] - 121:1, 121:6, 123:2, 123:6, 123:7, 124:17, 125:5, 125:13, 125:15, 127:16, 128:3, 128:15, 129:12, 129:14, 130:12, 130:14, 130:16, 130:17, 130:18, 130:21, 131:6, 156:14, 157:21, 160:25, 161:6, 161:11, 161:16, 161:22, 162:3, 162:5, 163:4, 163:6, 163:10, 163:23, 163:24, 164:1, 164:2, 164:3, 164:7, 164:10, 165:22, 169:17, 191:9, 191:15

**painful** [4] - 121:23,

129:22, 131:9

**Palm** [4] - 1:19, 111:8, 150:13, 151:5

**palpates** [1] - 125:11

**palpating** [1] - 125:10

**palpation** [2] - 123:3, 125:15

**paraphrase** [1] - 178:12

**parking** [3] - 193:14, 194:11, 194:13

**part** [26] - 22:17, 23:11, 24:1, 40:8, 42:25, 43:16, 51:23, 53:23, 66:14, 76:7, 113:19, 120:8, 125:14, 126:3, 144:1, 149:2, 163:13, 173:22, 176:24, 177:3, 177:15, 184:5, 185:13, 188:23, 195:7

**partial** [5] - 137:25, 138:3, 138:14, 138:15, 176:1

**partially** [1] - 167:15

**participating** [1] - 151:5

**particular** [23] - 36:12, 87:4, 96:20, 111:11, 112:22, 121:5, 134:14, 135:8, 136:24, 138:11, 141:13, 150:24, 150:25, 164:15, 169:1, 169:14, 171:2, 171:6, 174:1, 185:8, 188:5, 193:2, 193:5

**particularly** [1] - 116:25

**particulars** [1] - 80:25

**parts** [2] - 113:6, 113:8

**party** [1] - 36:22

**pass** [1] - 112:3

**passed** [1] - 58:6

**passenger** [3] - 29:14, 36:9, 36:13

**Passenger** [2] - 92:9, 92:17

**passengers** [5] - 30:13, 31:3, 31:10, 36:5, 91:1

**passive** [2] - 130:21, 157:23

**past** [4] - 191:23, 191:24, 192:2, 192:22

paste [1] - 187:6
pathology [10] - 23:16, 24:4, 24:6, 37:13, 130:1, 135:8, 135:22, 135:24, 136:3, 140:17
patient [15] - 33:8, 113:7, 115:24, 117:15, 126:1, 131:5, 132:24, 133:25, 140:16, 151:13, 154:15, 164:8, 165:21, 177:7, 188:22
patients [13] - 113:6, 115:25, 117:7, 117:12, 149:3, 170:14, 171:21, 172:16, 192:10, 192:12, 192:14, 195:3
pay [1] - 185:4
paying [4] - 29:14, 150:17, 150:18
pediatric [1] - 111:16
peer [11] - 170:11, 170:17, 171:6, 172:8, 173:3, 194:23, 194:25, 195:4, 195:10, 195:12, 195:16
Pen [3] - 43:1, 43:18, 43:19
Pennsylvania [1] - 111:4
people [14] - 11:11, 11:12, 44:16, 47:21, 77:17, 94:14, 131:12, 134:14, 177:4, 183:3, 185:19, 185:21, 193:1, 193:5
per [5] - 47:4, 58:5, 58:16, 93:16, 183:5
percent [8] - 113:3, 113:4, 174:1, 190:24, 192:5, 192:7
perfect [1] - 139:13
perform [7] - 114:20, 143:21, 143:23, 143:25, 157:17, 184:17, 191:3
performed [17] - 32:24, 34:17, 37:11, 80:8, 114:1, 114:5, 121:2, 122:9, 129:23, 130:19, 132:4, 143:23, 144:13, 145:15, 188:23, 189:18

perhaps [14] - 137:20, 179:10, 180:17, 181:4, 182:2, 182:3, 182:5, 182:9, 182:11, 182:13, 182:17, 182:20
period [2] - 112:20, 156:16
permission [7] - 70:20, 72:11, 89:8, 90:20, 96:24, 123:20, 132:7
permit [1] - 26:25
permitted [2] - 20:4, 23:1
persisting [2] - 30:2, 30:7
person [5] - 11:7, 33:7, 51:1, 139:22, 169:24
personal [9] - 58:22, 58:24, 61:19, 68:23, 108:17, 109:8, 146:25, 149:15, 149:16
personally [1] - 75:15
perspectives [1] - 37:6
pertinent [2] - 121:4, 122:13
phlebotomist [1] - 84:15
Phlebotomist [1] - 84:16
phone [1] - 51:3
photo [4] - 99:14, 139:11, 142:12, 170:2
photograph [30] - 49:5, 49:9, 49:11, 50:21, 52:17, 57:16, 60:10, 76:7, 76:8, 97:2, 97:4, 98:7, 98:18, 99:11, 99:25, 100:11, 100:12, 100:18, 100:19, 100:20, 106:5, 106:9, 106:21, 106:22, 106:23, 106:25, 107:2, 107:5, 124:7, 142:5
photographs [9] - 39:2, 47:14, 96:20, 101:3, 142:1, 142:13, 142:16, 142:18, 142:24
photos [1] - 47:14
phrasing [1] - 182:17
physical [14] - 32:23, 33:2, 37:11, 123:2,

129:23, 130:19, 130:20, 140:25, 147:17, 157:17, 165:21, 179:10, 179:18, 180:8
physically [1] - 143:25
physician [17] - 32:4, 32:5, 32:6, 32:13, 38:25, 117:14, 130:11, 150:9, 151:19, 164:12, 164:15, 165:20, 170:7, 170:22, 171:16, 182:7, 188:11
physicians [6] - 33:3, 128:9, 128:15, 130:3, 149:6, 174:13
pick [10] - 18:13, 19:8, 25:23, 30:19, 30:21, 55:10, 56:1, 56:7, 66:23, 111:11
picked [8] - 30:20, 31:4, 64:16, 64:20, 66:22, 77:6, 77:8, 96:8
picking [3] - 61:9, 77:14, 77:17
picture [5] - 49:25, 52:3, 52:4, 106:2, 106:13
piece [2] - 138:8, 170:17
pieces [2] - 138:6, 169:24
place [11] - 66:10, 81:23, 81:25, 82:10, 156:11, 156:12, 167:20, 167:24, 169:14, 169:15, 177:6
placed [2] - 54:4, 54:5
places [2] - 46:7, 87:16
Plaintiff [2] - 1:5, 10:13
plaintiff [20] - 3:9, 3:11, 6:3, 11:17, 17:7, 29:24, 31:6, 31:12, 32:7, 32:13, 34:2, 34:19, 35:2, 35:7, 41:12, 41:25, 55:18, 106:24, 177:11, 192:7
PLAINTIFF [1] - 1:13
Plaintiff's [7] - 2:13, 41:17, 59:12, 76:7, 92:5, 92:8, 105:24
plaintiff's [11] - 4:23, 6:6, 9:23, 20:22,

20:24, 29:23, 30:3, 33:14, 35:5, 41:14
Plaintiffs [1] - 41:22
plan [6] - 4:11, 5:5, 5:11, 7:9, 40:9
planning [4] - 4:7, 8:14, 22:5, 196:13
plastic [11] - 12:22, 31:7, 33:20, 35:21, 36:4, 36:13, 36:24, 50:10, 74:16, 95:25, 96:8
plate [1] - 134:12
plates [1] - 62:6
play [6] - 6:22, 7:18, 94:24, 95:2, 95:12, 103:15
playing [11] - 46:19, 47:23, 49:18, 49:24, 92:2, 94:6, 94:16, 94:20, 95:7, 95:17
pleasure [1] - 86:4
plenty [1] - 136:23
podium [1] - 29:7
point [38] - 6:22, 8:13, 15:25, 23:8, 23:13, 25:15, 25:17, 26:15, 38:11, 47:25, 51:17, 52:24, 54:19, 64:21, 66:11, 66:24, 79:2, 79:20, 118:9, 124:24, 126:10, 135:16, 139:3, 149:18, 152:14, 154:16, 161:24, 168:2, 169:21, 176:12, 177:18, 178:21, 180:4, 181:4, 181:6, 181:7, 189:9, 195:15
pointed [1] - 134:21
pointer [2] - 134:10, 137:11
pointing [3] - 9:13, 33:6, 139:1
pole [1] - 59:16
policy [1] - 55:13
pop [1] - 73:16
populate [1] - 144:4
port [6] - 12:16, 45:2, 45:5, 45:7, 87:22
portal [6] - 193:10, 193:11, 193:12, 193:13
portion [6] - 73:16, 75:9, 104:4, 126:2, 126:11, 137:6
portions [1] - 126:12
posed [1] - 36:4
position [2] - 31:8,

99:10
positive [2] - 101:16, 130:22
possibility [2] - 4:25, 30:21
possible [9] - 4:14, 4:16, 15:2, 85:2, 158:9, 175:4, 188:2, 188:4, 188:6
possibly [2] - 7:21, 14:4
post [1] - 39:11
posterior [2] - 139:2, 139:12
posts [3] - 38:21, 39:19, 40:1
potential [1] - 30:13
practice [19] - 111:8, 112:4, 112:6, 112:22, 112:24, 112:25, 113:1, 113:6, 144:2, 144:24, 147:6, 149:2, 149:8, 154:9, 171:19, 183:1, 184:4, 185:1
practices [1] - 149:12
practicing [2] - 37:9, 113:11
pre [3] - 39:19, 39:20, 41:21
pre-admit [1] - 41:21
pre-incident [1] - 39:20
precariously [1] - 31:8
predated [1] - 37:15
predating [2] - 166:16, 166:18
predicate [4] - 78:17, 79:8, 128:24, 132:13
predict [1] - 40:2
predominantly [2] - 113:1, 113:9
preexisting [9] - 21:4, 22:20, 32:9, 34:2, 34:6, 166:15, 168:11, 168:23, 187:13
prejudice [1] - 27:2
preparing [1] - 183:25
Presbyterian [1] - 111:6
prescribed [1] - 163:5
prescriptions [1] - 163:16
present [10] - 127:12, 127:19, 129:12, 131:18, 141:17, 141:21, 163:4, 166:4, 175:10,

179:19
**presentation** [4] - 120:24, 131:1, 143:3, 143:4
**presented** [6] - 30:13, 32:20, 34:21, 127:13, 131:2, 163:19
**presents** [1] - 140:16
**preserve** [1] - 120:3
**presiding** [1] - 3:5
**press** [1] - 142:11
**pretrial** [2] - 8:25, 20:11
**pretty** [3] - 86:9, 98:2, 113:24
**prevent** [2] - 31:3, 31:4
**previously** [5] - 75:20, 82:22, 91:10, 98:10, 115:13
**Price** [1] - 149:24
**print** [1] - 187:3
**printed** [1] - 187:1
**privileged** [1] - 35:18
**privileges** [2] - 114:11, 114:12
**probability** [11] - 138:13, 140:9, 159:1, 165:25, 169:13, 175:9, 175:17, 175:20, 176:7, 187:19, 188:5
**probation** [1] - 55:8
**problem** [5] - 40:22, 116:22, 130:23, 160:18, 185:20
**problems** [1] - 156:22
**procedure** [24] - 72:25, 80:6, 80:8, 142:10, 144:8, 150:25, 151:3, 153:8, 153:12, 153:17, 153:18, 153:19, 153:20, 154:21, 154:22, 154:25, 155:4, 155:8, 155:21, 155:23, 155:25, 156:1, 156:5, 188:23
**procedures** [20] - 143:21, 143:24, 143:25, 144:4, 145:15, 148:1, 148:16, 148:18, 148:19, 148:21, 149:6, 151:24, 152:8, 152:10, 152:25, 153:6, 155:16, 184:8,

189:17, 189:21
**proceed** [4] - 42:8, 57:7, 85:22, 160:5
**proceedings** [1] - 197:8
**process** [15] - 112:17, 112:18, 117:17, 131:9, 134:2, 136:10, 138:17, 154:2, 170:15, 171:10, 172:18, 173:23, 177:4, 195:7, 195:11
**proclivity** [1] - 13:25
**profession** [1] - 84:3
**professional** [1] - 110:22
**professionally** [1] - 84:5
**proffer** [2] - 118:19, 165:6
**proffering** [1] - 10:23
**program** [1] - 156:18
**prohibited** [1] - 20:11
**prohibition** [1] - 6:15
**prominence** [1] - 136:11
**prompted** [1] - 104:12
**proof** [2] - 196:4, 196:12
**proper** [4] - 72:21, 73:8, 89:15, 125:16
**propositions** [1] - 21:18
**prove** [1] - 40:8
**provide** [13] - 8:10, 10:15, 12:6, 13:3, 22:7, 70:12, 111:1, 128:3, 146:2, 150:8, 150:20, 151:13, 192:3
**provided** [17] - 7:23, 20:16, 21:17, 21:22, 34:7, 36:19, 115:13, 150:8, 150:20, 151:6, 161:8, 161:18, 161:23, 164:23, 182:8, 188:8, 188:14
**providers** [1] - 181:12
**proving** [1] - 37:4
**publish** [5] - 41:8, 90:20, 96:24, 123:20, 132:8
**published** [1] - 28:3
**pull** [2] - 153:14, 171:2
**pulling** [2] - 69:2, 84:10
**pump** [1] - 55:4
**purely** [2] - 21:10,

192:10
**purpose** [2] - 150:14, 180:16
**purposes** [5] - 4:7, 28:18, 134:4, 145:23, 152:15
**put** [31] - 6:23, 15:24, 17:3, 24:3, 27:5, 38:3, 38:14, 38:16, 52:17, 65:16, 77:3, 81:23, 81:24, 85:2, 90:24, 92:8, 92:12, 92:16, 97:2, 100:14, 100:16, 105:21, 123:8, 123:19, 144:3, 145:9, 145:17, 147:10, 147:12, 173:25, 187:4
**putting** [2] - 137:11, 144:10

# Q

**qualification** [1] - 119:2
**qualifications** [2] - 12:11, 118:22
**qualified** [10] - 21:13, 25:18, 26:7, 26:19, 119:7, 119:9, 119:13, 119:18, 119:19
**quality** [1] - 133:2
**quarter** [1] - 56:3
**QUESTION** [4] - 103:13, 103:15, 103:18, 178:12
**questioned** [4] - 22:18, 87:11, 104:1, 104:3
**questioning** [2] - 5:8, 180:16
**questions** [6] - 84:18, 84:19, 87:18, 148:22, 152:20, 159:4
**quick** [4] - 7:6, 85:17, 136:10, 159:24
**quickly** [1] - 143:20
**quite** [5] - 46:10, 46:12, 91:25, 94:19, 187:10
**quoting** [1] - 30:22

# R

**races** [1] - 196:2
**radio** [2] - 69:9, 69:10
**radioed** [1] - 55:2

**radiologist** [15] - 23:16, 24:17, 34:5, 116:16, 116:19, 122:18, 134:21, 137:1, 139:4, 166:20, 166:24, 168:25, 169:5, 194:21
**radiologist's** [1] - 23:15
**radiology** [1] - 116:13
**raise** [4] - 5:15, 8:13, 19:21, 20:12
**raised** [2] - 6:12, 118:17
**raising** [1] - 181:5
**range** [35] - 34:22, 121:8, 121:13, 121:24, 122:1, 122:14, 125:17, 125:19, 130:20, 131:15, 131:16, 135:12, 150:11, 151:1, 151:4, 151:6, 151:7, 151:17, 151:18, 154:24, 156:6, 157:20, 157:24, 158:10, 158:11, 165:23, 166:1, 169:19, 174:16, 175:19, 178:1, 178:9, 187:21, 191:7, 191:13
**Rapoport** [2] - 27:13, 27:21
**rather** [1] - 23:12
**rationale** [1] - 175:11
**ray** [2] - 126:25, 127:2
**RAYMOND** [1] - 1:13
**Raymond** [1] - 3:10
**rays** [3] - 115:9, 116:21, 122:15
**re** [3] - 65:3, 67:18, 98:15
**re-ask** [2] - 67:18, 98:15
**re-asked** [1] - 65:3
**reach** [6] - 24:15, 45:2, 45:5, 58:17, 114:19, 170:18
**reached** [3] - 114:18, 130:3, 146:6
**react** [2] - 66:21, 69:7
**reaction** [1] - 64:22
**read** [22] - 8:14, 15:3, 20:19, 22:16, 22:17, 25:13, 27:10, 27:18, 27:25, 28:1, 73:24, 75:11, 75:19,

103:23, 104:4, 126:1, 126:2, 129:3, 161:7, 161:23, 174:3, 180:24
**reading** [7] - 73:25, 116:16, 122:18, 125:25, 126:3, 171:11, 183:12
**readings** [3] - 116:13, 170:25, 172:1
**ready** [7] - 38:18, 56:1, 57:7, 84:22, 133:2, 145:13, 196:21
**really** [19] - 7:13, 17:7, 18:17, 20:17, 23:17, 28:14, 31:23, 72:21, 74:7, 83:1, 85:16, 93:18, 94:2, 124:13, 135:4, 137:1, 142:11, 180:15, 194:5
**rear** [1] - 124:3
**reason** [14] - 10:13, 10:23, 11:3, 11:6, 16:18, 26:25, 33:7, 44:12, 91:3, 104:13, 138:5, 163:8, 165:17, 180:20
**reasonable** [18] - 35:4, 140:8, 145:2, 145:5, 147:7, 148:1, 148:4, 148:16, 148:20, 150:16, 159:1, 179:5, 179:15, 182:6, 182:10, 183:18, 184:2
**reasonableness** [2] - 182:21, 182:24
**reasons** [4] - 19:1, 116:15, 149:22, 175:10
**rebuttal** [2] - 33:14, 196:9
**receive** [1] - 78:11
**Received** [1] - 2:13
**received** [4] - 41:10, 41:17, 57:5, 57:6
**recent** [2] - 156:19, 195:14
**recently** [1] - 21:18
**recertification** [1] - 112:12
**recertifications** [1] - 195:9
**recertified** [9] - 112:8, 112:10, 112:16, 112:18, 112:19, 112:20, 195:8, 195:9
**recess** [4] - 56:8, 56:9, 159:25, 160:1

**recognize** [3] - 124:2, 129:9, 132:15
**recognized** [2] - 189:24, 190:13
**recollect** [3] - 77:5, 90:14, 162:24
**recollection** [12] - 70:21, 71:1, 71:4, 72:12, 72:21, 73:9, 74:8, 89:3, 89:14, 128:17, 128:25
**recommend** [2] - 158:17, 189:13
**recommendations** [2] - 115:5, 116:7
**recommended** [2] - 141:1, 189:24
**record** [26] - 25:2, 27:6, 28:18, 34:1, 34:8, 42:5, 52:4, 56:23, 63:14, 65:5, 74:7, 110:17, 116:8, 120:12, 125:25, 126:1, 126:7, 128:19, 129:11, 152:15, 161:9, 162:19, 162:20, 164:5, 166:16, 180:25
**records** [47] - 37:10, 91:2, 91:18, 114:21, 114:25, 115:4, 115:8, 115:9, 115:20, 115:24, 116:3, 116:5, 117:5, 117:12, 120:9, 120:10, 120:13, 120:16, 120:19, 124:24, 126:9, 126:10, 126:11, 127:7, 127:9, 127:13, 127:15, 128:23, 130:8, 140:4, 140:7, 161:13, 161:18, 162:1, 162:3, 163:13, 164:6, 164:8, 166:8, 166:18, 166:19, 176:21, 184:5, 185:19, 185:21, 193:25
**recovered** [1] - 34:20
**RECROSS** [2] - 2:8, 194:9
**RECROSS-EXAMINATION** [2] - 2:8, 194:9
**redirect** [2] - 106:16, 194:5

**REDIRECT** [2] - 2:5, 106:18
**reduce** [1] - 158:8
**reduced** [1] - 158:9
**refer** [3] - 162:7, 177:23, 178:18
**reference** [1] - 172:14
**referencing** [2] - 170:23, 173:10
**referred** [1] - 32:17
**referring** [4] - 135:17, 161:4, 185:23, 186:14
**refresh** [5] - 70:20, 71:4, 72:11, 74:8, 89:3
**refreshed** [1] - 89:15
**refresher** [1] - 35:11
**refreshes** [1] - 73:1
**refreshing** [4] - 71:1, 72:21, 73:9, 89:13
**regard** [5] - 4:17, 19:22, 31:9, 120:20, 123:1
**regarding** [17] - 7:8, 83:23, 119:22, 119:23, 144:23, 146:13, 150:3, 151:19, 151:23, 152:7, 166:6, 172:6, 181:12, 182:24, 189:11
**regular** [2] - 59:1, 59:2
**rehabilitation** [1] - 86:14
**reimbursement** [2] - 194:11, 194:13
**relate** [1] - 108:9
**related** [27] - 20:21, 20:23, 21:15, 34:12, 34:18, 35:6, 113:4, 114:14, 114:24, 116:23, 130:24, 135:24, 140:14, 141:10, 143:13, 143:15, 168:23, 176:6, 176:7, 177:16, 178:14, 179:3, 179:4, 180:6, 190:7, 192:21
**relates** [12] - 14:16, 17:8, 86:15, 104:14, 117:6, 120:9, 120:14, 124:5, 158:13, 158:16, 158:18, 158:20
**relating** [1] - 179:13
**relation** [4] - 50:7, 60:1, 65:19, 174:5
**relationship** [2] -

127:25, 192:9
**relevance** [7] - 10:14, 11:17, 12:13, 39:2, 39:5, 39:25, 40:11
**relevant** [3] - 10:16, 40:13, 41:13
**reliable** [1] - 173:24
**reliance** [1] - 17:9
**relied** [7] - 12:24, 15:15, 18:6, 19:6, 19:7, 170:18, 173:11
**relief** [1] - 128:3
**relies** [1] - 23:1
**rely** [3] - 18:19, 22:14, 152:1
**relying** [11] - 15:25, 19:9, 19:10, 22:9, 24:10, 24:12, 27:6, 152:2, 172:12, 195:5
**remain** [1] - 103:13
**remained** [2] - 36:15, 102:25
**remaining** [1] - 103:2
**remember** [32] - 42:21, 44:12, 44:15, 46:10, 46:12, 56:15, 70:22, 71:15, 71:16, 72:18, 72:19, 75:19, 75:21, 76:12, 86:22, 88:25, 89:7, 89:14, 90:14, 91:25, 92:22, 97:20, 97:21, 97:22, 106:8, 106:11, 158:10, 160:13, 160:15, 160:16, 161:2
**remembered** [1] - 78:22
**remembers** [1] - 78:18
**remind** [1] - 113:10
**removed** [1] - 100:17
**render** [6] - 119:3, 119:8, 119:9, 119:19, 145:14, 195:18
**rendered** [2] - 117:9, 120:19
**rendering** [1] - 115:21
**renew** [2] - 25:25, 40:15
**rep** [1] - 12:4
**repair** [13] - 150:11, 151:8, 153:9, 155:9, 187:9, 189:24, 190:13, 190:18, 190:20, 190:21, 190:24, 191:3
**repaired** [2] - 190:1, 190:15
**repeat** [4] - 51:9,

68:18, 83:22, 187:15
**repeatedly** [1] - 190:5
**rephrase** [2] - 125:1, 183:14
**report** [88] - 11:18, 11:21, 11:24, 12:24, 12:25, 13:3, 13:4, 15:7, 15:8, 15:12, 15:23, 16:1, 17:1, 17:4, 17:14, 17:16, 17:21, 18:19, 19:7, 19:10, 20:2, 21:5, 21:25, 22:2, 22:3, 22:5, 22:10, 22:11, 22:13, 22:14, 22:15, 33:13, 33:16, 91:4, 119:25, 123:6, 128:18, 141:11, 141:14, 144:13, 144:19, 144:20, 145:17, 145:19, 145:24, 147:10, 147:15, 147:16, 147:23, 147:25, 148:8, 148:12, 152:17, 156:13, 163:14, 168:5, 168:6, 168:8, 168:10, 168:13, 168:17, 168:20, 168:25, 169:9, 172:3, 172:10, 173:10, 173:14, 173:19, 177:20, 178:19, 180:14, 182:11, 182:15, 183:25, 185:24, 186:4, 186:12, 186:18, 186:24, 186:25, 187:2, 194:15, 194:17
**Report** [1] - 90:25
**reported** [1] - 27:11
**REPORTED** [1] - 1:22
**Reporter** [1] - 197:12
**reporter** [4] - 7:15, 43:16, 43:20, 109:23
**REPORTER** [2] - 1:23, 2:9
**reports** [11] - 15:16, 16:20, 16:23, 18:7, 18:20, 19:6, 19:9, 19:11, 116:13, 146:21, 168:1
**represent** [1] - 161:21
**representative** [7] - 3:21, 17:25, 18:4, 30:15, 30:17, 30:23, 35:16
**represented** [1] -

60:17
**request** [2] - 103:22, 126:14
**require** [1] - 158:19
**required** [1] - 141:9
**requires** [1] - 21:12
**research** [1] - 15:18
**reserve** [1] - 118:19
**reserved** [1] - 85:11
**residency** [3] - 111:5, 111:6, 112:3
**resides** [4] - 184:3, 184:9, 184:11, 184:13
**respect** [1] - 119:20
**respectfully** [1] - 173:4
**responded** [1] - 77:18
**response** [4] - 24:2, 101:18, 165:10, 168:24
**responsibility** [1] - 117:2
**responsible** [1] - 116:17
**rest** [2] - 125:24, 126:2
**restrict** [1] - 30:11
**restrictions** [2] - 158:12, 158:14
**result** [3] - 5:19, 81:2, 158:22
**resulted** [1] - 175:4
**results** [1] - 186:23
**retained** [1] - 37:5
**return** [1] - 109:19
**revaluated** [1] - 115:3
**review** [43] - 8:15, 23:4, 23:5, 29:1, 72:25, 75:8, 114:21, 115:8, 115:19, 115:24, 116:8, 116:11, 117:1, 120:10, 120:13, 120:14, 120:18, 120:20, 121:4, 122:15, 126:9, 132:5, 132:23, 134:3, 135:21, 140:7, 141:11, 142:16, 142:25, 143:17, 149:11, 162:23, 162:24, 166:10, 170:11, 173:3, 193:25, 194:23, 194:25, 195:10, 195:13, 195:17
**reviewed** [24] - 37:10, 115:4, 119:24, 120:9, 120:17,

124:25, 127:7, 130:8, 132:20, 140:17, 142:23, 161:14, 163:13, 165:2, 166:7, 166:16, 170:17, 171:6, 172:8, 194:23, 195:3, 195:4

**reviewing** [7] - 117:5, 133:9, 134:20, 161:10, 166:19, 166:20, 193:23

**revisit** [5] - 25:24, 26:3, 26:23, 27:3, 120:1

**rheumatoid** [4] - 153:24, 154:2, 154:15, 189:14

**right-hand** [1] - 156:21

**rip** [1] - 131:10

**rise** [6] - 3:2, 56:8, 56:10, 159:25, 160:2, 196:22

**risk** [2] - 30:16, 36:5

**road** [1] - 75:17

**Rock** [4] - 62:2, 62:4, 62:5, 62:14

**role** [1] - 24:18

**rolling** [1] - 4:12

**roof** [8] - 97:9, 97:12, 97:16, 97:17, 97:19, 97:21, 107:18, 107:22

**room** [11] - 32:16, 77:25, 78:9, 78:10, 78:19, 79:5, 79:10, 127:9, 127:10, 163:20

**rooms** [1] - 116:1

**rotator** [37] - 37:21, 121:11, 121:15, 122:4, 124:8, 129:20, 129:21, 129:25, 131:8, 131:11, 131:12, 131:23, 134:5, 136:13, 136:15, 137:18, 137:23, 138:8, 138:9, 138:14, 138:15, 138:16, 139:9, 139:12, 139:25, 151:8, 151:14, 155:9, 156:5, 163:9, 164:2, 166:2, 174:15, 177:2, 190:21, 190:22, 190:23

**roughly** [3] - 5:3, 38:5,

159:9

**routinely** [3] - 116:10, 116:24, 176:3

**RPR** [2] - 1:23, 197:12

**rubbing** [4] - 138:7, 138:8, 169:23, 175:15

**Rule** [5] - 13:11, 13:12, 21:8, 26:16, 144:20

**rule** [5] - 19:2, 24:8, 126:14, 126:16, 126:17

**ruled** [3] - 10:13, 10:21, 38:15

**rules** [2] - 26:6, 108:16

**ruling** [5] - 5:15, 23:5, 74:5, 118:19, 152:24

**rulings** [1] - 6:13

**runs** [1] - 154:23

## S

**safety** [1] - 31:9

**sagittal** [1] - 133:17

**salad** [1] - 54:13

**sandpaper** [5] - 138:6, 138:7, 138:8, 169:24, 175:14

**sat** [7] - 35:17, 50:10, 54:16, 62:24, 101:7, 101:8, 103:14

**satisfied** [1] - 27:4

**saw** [23] - 33:11, 33:12, 33:20, 48:20, 53:11, 63:7, 67:3, 67:10, 67:19, 68:1, 68:2, 68:20, 79:23, 81:17, 97:17, 98:4, 116:4, 156:24, 157:11, 165:20, 177:24, 184:10, 191:7

**scale** [2] - 31:22, 31:24

**scan** [8] - 34:1, 115:4, 116:12, 116:23, 117:1, 133:19, 135:12, 166:20

**scans** [5] - 115:9, 116:11, 116:14, 116:20, 134:20

**scattered** [1] - 66:19

**scene** [4] - 61:8, 61:12, 62:19, 70:12

**schedule** [9] - 4:22, 144:11, 153:14, 184:19, 184:20, 184:22, 185:7

**scheduled** [2] - 156:20, 157:14

**scheduling** [4] - 4:6, 4:17, 5:19, 6:15

**scheduling-wise** [1] - 4:6

**school** [2] - 44:4, 44:6

**School** [1] - 111:4

**schooling** [1] - 86:14

**science** [1] - 117:19

**scientific** [9] - 21:10, 21:11, 25:21, 94:3, 107:24, 170:17, 172:5, 173:11, 173:13

**scientifically** [1] - 172:8

**screen** [17] - 24:3, 40:21, 47:12, 49:4, 73:17, 75:9, 90:24, 92:16, 105:25, 106:23, 123:25, 132:15, 142:9, 160:20, 162:9, 165:7, 167:2

**se** [1] - 183:5

**search** [1] - 187:7

**seat** [4] - 42:4, 53:12, 104:6, 110:16

**seated** [4] - 3:24, 60:1, 60:2, 160:4

**seating** [2] - 50:6, 97:16

**second** [18] - 49:12, 66:6, 66:7, 66:9, 66:15, 73:17, 117:8, 117:13, 141:16, 141:20, 149:3, 149:5, 149:10, 174:11, 178:7, 183:3, 183:23, 184:6

**secure** [2] - 30:12, 31:1

**securing** [1] - 35:5

**SECURITY** [1] - 196:22

**security** [1] - 36:18

**see** [89] - 6:1, 7:18, 11:9, 11:19, 18:24, 22:6, 22:17, 24:20, 25:23, 26:24, 31:21, 31:25, 32:19, 33:12, 40:11, 41:21, 43:20, 43:21, 47:13, 47:15, 48:17, 49:4, 49:21, 50:10, 50:11, 51:7, 51:14, 53:9, 53:10, 53:13, 53:19, 57:18, 60:7, 60:8, 67:1, 68:4, 69:5, 76:7,

77:23, 85:8, 89:24, 89:25, 90:3, 97:17, 99:2, 105:19, 105:20, 105:24, 106:23, 106:25, 107:6, 108:11, 113:6, 116:11, 123:25, 124:9, 124:11, 124:14, 128:19, 133:11, 134:9, 134:12, 135:7, 135:13, 136:15, 140:18, 144:7, 148:17, 148:18, 148:19, 149:3, 149:6, 149:8, 164:19, 165:4, 170:4, 176:3, 179:16, 179:22, 181:1, 181:2, 181:3, 183:23, 185:18, 192:13, 194:22, 195:15, 195:16

**seeing** [4] - 97:21, 149:21, 183:3, 184:5

**seek** [2] - 20:6, 32:13

**seeking** [1] - 103:3

**sees** [2] - 152:11, 152:12

**self** [2] - 25:13, 185:4

**self-evident** [1] - 25:13

**self-pay** [1] - 185:4

**seminole** [1] - 28:7

**sends** [1] - 123:17

**sense** [3] - 11:13, 18:7, 133:22

**sensitive** [1] - 153:5

**sent** [2] - 114:25, 184:5

**sentence** [1] - 172:23

**sentencing** [8] - 4:8, 6:20, 7:8, 7:11, 7:14, 38:4, 55:9, 55:12

**separate** [2] - 74:15, 101:12

**September** [5] - 27:24, 32:25, 115:3, 156:10, 157:11

**serious** [2] - 160:25, 189:6

**service** [1] - 62:11

**services** [1] - 115:6

**session** [3] - 3:4, 56:11, 160:3

**set** [8] - 55:9, 62:19, 68:20, 110:1, 116:3, 119:14, 131:6, 170:24

**setup** [1] - 40:20

**severe** [4] - 130:16, 130:18, 137:2, 161:22

**shakes** [1] - 11:15

**ship** [66] - 11:23, 12:3, 12:6, 12:14, 12:16, 12:20, 13:1, 17:21, 17:23, 18:1, 18:15, 19:9, 19:12, 29:20, 29:21, 30:18, 30:20, 32:6, 32:14, 37:16, 44:19, 45:8, 46:2, 46:3, 46:5, 46:6, 46:9, 46:15, 46:16, 46:18, 54:20, 55:3, 78:4, 78:5, 78:7, 87:5, 87:12, 87:19, 87:22, 87:23, 88:17, 89:4, 90:11, 91:1, 91:3, 91:15, 91:19, 91:20, 92:1, 92:23, 93:1, 93:6, 105:2, 105:3, 108:10, 120:19, 140:3, 140:4, 140:5, 140:15, 174:9, 174:20, 177:15, 177:17

**ship's** [14] - 31:1, 32:4, 33:12, 38:25, 107:9, 122:10, 122:12, 123:14, 162:4, 164:5, 164:6, 164:19, 164:22, 182:7

**shirt** [1] - 69:13

**short** [7] - 4:11, 6:8, 9:11, 76:22, 123:5, 124:13, 194:6

**shorter** [2] - 6:7, 6:9

**shortly** [2] - 31:20, 101:8

**shoulder** [132] - 20:22, 20:25, 23:21, 29:17, 32:7, 32:8, 32:16, 32:24, 33:5, 33:10, 33:23, 34:3, 34:23, 37:10, 37:14, 39:4, 39:14, 63:12, 63:14, 63:22, 64:10, 67:20, 68:4, 70:3, 70:4, 80:11, 80:13, 80:18, 113:2, 113:7, 113:9, 113:15, 113:24, 114:1, 114:2, 114:5, 114:8, 114:10, 114:23, 121:1, 121:7, 121:17, 122:6, 122:20, 123:5, 123:7,

123:10, 124:13, 124:15, 124:17, 125:11, 125:16, 125:19, 125:23, 126:25, 127:1, 127:25, 128:3, 128:6, 128:11, 130:13, 130:18, 130:21, 130:25, 131:6, 131:10, 131:18, 131:21, 132:4, 132:5, 132:18, 133:20, 135:22, 136:9, 136:24, 137:3, 137:16, 140:18, 140:19, 140:24, 141:15, 141:23, 142:5, 143:8, 153:21, 156:14, 156:22, 157:22, 157:23, 157:25, 158:1, 158:4, 158:8, 160:24, 164:7, 164:10, 164:12, 164:14, 165:11, 165:13, 166:15, 169:15, 171:21, 174:8, 174:12, 174:14, 175:5, 175:12, 175:22, 176:5, 176:11, 176:25, 177:1, 177:24, 178:1, 178:5, 178:9, 180:1, 185:20, 187:12, 187:16, 187:18, 187:24, 187:25, 188:1, 191:7, 191:10, 191:13

**shoulder's** [1] - 32:21

**shoulders** [5] - 113:3, 114:19, 134:20, 149:9, 171:8

**shouter** [1] - 132:20

**show** [24] - 12:1, 29:13, 29:22, 30:14, 30:24, 36:3, 38:23, 39:3, 39:13, 39:14, 47:17, 52:17, 57:14, 60:15, 73:6, 73:9, 73:15, 96:21, 102:6, 110:4, 124:25, 138:17, 150:11, 195:5

**showed** [3] - 89:2, 130:20, 170:2

**shower** [1] - 81:8

**showing** [7] - 47:12, 51:5, 73:20, 98:10,

110:9, 139:10, 167:14

**shown** [5] - 96:20, 98:7, 106:2, 162:7, 162:20

**shows** [2] - 52:4, 52:5

**Shruti** [1] - 29:23

**sic}** [1] - 158:18

**side** [16] - 20:7, 50:8, 52:11, 52:13, 52:15, 55:12, 60:5, 62:21, 63:13, 65:9, 65:10, 65:22, 107:2, 133:16, 169:20

**sides** [1] - 130:14

**significance** [3] - 121:12, 123:9, 129:16

**significant** [2] - 129:25, 156:22

**signs** [3] - 121:10, 158:21

**silently** [2] - 72:25, 73:24

**similar** [10] - 10:22, 11:10, 36:20, 49:1, 60:17, 61:20, 62:16, 138:23, 192:18

**simple** [1] - 134:24

**simply** [5] - 13:4, 21:13, 21:16, 21:19, 22:25

**single** [4] - 20:17, 66:5, 66:6, 66:7

**sit** [14] - 49:22, 50:12, 55:23, 63:8, 91:4, 94:23, 104:6, 104:8, 104:9, 112:3, 172:17, 182:22

**sitting** [26] - 21:13, 30:18, 49:13, 49:15, 49:20, 50:3, 50:7, 50:8, 52:20, 52:21, 52:22, 54:6, 55:12, 59:7, 59:13, 60:5, 62:20, 63:2, 63:8, 92:1, 93:3, 103:16, 104:17, 105:5, 173:21

**situation** [10] - 38:8, 138:11, 138:18, 138:23, 140:6, 156:6, 172:13, 185:8, 185:18, 188:6

**six** [3] - 141:2, 179:9, 179:10

**sixth** [1] - 106:22

**size** [4] - 61:17, 137:24

**skill** [1] - 170:24

**skin** [1] - 81:5

**skip** [1] - 136:17

**slower** [1] - 141:19

**smooth** [1] - 138:8

**snafu** [1] - 4:17

**snapping** [1] - 142:7

**snippet** [1] - 180:21

**social** [3] - 38:21, 39:18, 39:25

**socket** [6] - 121:17, 121:18, 121:19, 136:20, 136:21, 139:6

**soft** [2] - 122:16, 127:5

**sole** [1] - 31:17

**solely** [8] - 21:5, 21:9, 21:20, 23:1, 57:21, 170:6, 171:15, 192:5

**someone** [18] - 70:16, 117:14, 121:14, 122:5, 125:8, 125:11, 125:20, 129:18, 154:18, 157:21, 160:23, 164:14, 165:25, 169:5, 187:12, 187:16, 187:24, 193:1

**sometime** [3] - 12:16, 112:10, 192:18

**sometimes** [7] - 114:19, 115:24, 115:25, 116:1, 121:20, 137:13, 141:6

**somewhere** [9] - 80:9, 83:9, 135:11, 153:15, 154:23, 155:2, 155:6, 155:10, 193:15

**soon** [1] - 4:19

**sooner** [1] - 5:7

**sorry** [24] - 7:13, 19:16, 23:13, 45:24, 52:14, 53:15, 61:5, 62:10, 66:7, 69:2, 75:16, 82:5, 82:19, 84:9, 95:23, 97:11, 105:24, 120:16, 136:14, 138:3, 141:19, 146:17, 193:11, 194:12

**sort** [8] - 4:5, 25:21, 112:18, 113:2, 123:4, 127:20, 135:16, 148:7

**sound** [4] - 26:8, 26:18, 67:21, 67:25

**sounds** [3] - 72:14,

140:4, 160:13

**source** [1] - 183:16

**South** [2] - 37:9, 109:4

**Southeast** [1] - 1:14

**Southern** [6] - 1:24, 3:3, 27:14, 27:22, 28:19, 197:13

**SOUTHERN** [1] - 1:1

**space** [2] - 130:24, 136:23

**speaking** [2] - 57:21, 119:7

**specialist** [1] - 116:12

**specialized** [1] - 86:14

**specific** [18] - 16:2, 40:3, 93:18, 95:9, 113:22, 120:19, 122:12, 130:22, 136:2, 152:4, 170:23, 171:9, 171:12, 172:13, 172:14, 173:13, 191:25

**specifically** [26] - 23:14, 25:3, 31:2, 50:25, 89:4, 97:22, 99:9, 99:11, 104:1, 104:3, 114:22, 115:10, 120:13, 129:3, 132:3, 146:11, 147:12, 149:13, 153:13, 153:15, 161:2, 164:7, 166:4, 181:12, 183:19, 184:12

**specifics** [5] - 115:14, 149:12, 160:17, 191:19, 191:22

**speculate** [1] - 124:22

**speculation** [1] - 83:11

**speed** [10] - 14:10, 14:11, 15:6, 15:13, 18:8, 29:25, 30:9, 59:4, 68:3, 108:17

**speeds** [1] - 12:5

**spell** [3] - 42:5, 110:17, 134:17

**spend** [1] - 4:13

**spent** [1] - 37:1

**spine** [1] - 111:16

**sports** [10] - 111:7, 111:15, 111:25, 112:13, 112:14, 112:25, 113:4, 118:15, 171:21, 172:15

**Sports** [1] - 111:8

**sports-related** [1] -

113:4

**spot** [2] - 54:4, 138:1

**St** [1] - 43:10

**stack** [2] - 59:14, 64:12

**stacked** [17] - 31:7, 51:6, 51:8, 51:10, 51:17, 51:19, 51:20, 52:3, 52:7, 52:10, 52:11, 52:15, 57:20, 57:24, 63:18, 63:19, 100:17

**stacking** [3] - 11:2, 98:4, 98:5

**stacks** [5] - 98:12, 98:17, 98:19, 98:20, 101:7

**staff** [3] - 114:15, 120:25, 159:23

**stage** [2] - 54:17, 116:3

**staircase** [1] - 54:17

**stand** [11] - 6:23, 15:24, 22:24, 26:11, 42:1, 56:14, 85:2, 104:25, 178:23, 179:6, 184:14

**standard** [4] - 36:25, 147:7, 154:9, 189:19

**standby** [1] - 4:19

**standing** [7] - 24:8, 39:14, 48:21, 51:2, 51:4, 59:15

**start** [11] - 6:3, 6:4, 6:6, 7:16, 19:19, 38:9, 38:11, 103:24, 113:17, 136:8, 139:11

**started** [7] - 33:24, 49:20, 55:5, 66:23, 93:4, 112:6, 195:25

**starting** [2] - 111:2, 137:18

**state** [25] - 3:8, 42:4, 74:6, 75:13, 108:15, 110:17, 129:18, 140:8, 144:13, 148:8, 149:14, 150:7, 150:8, 150:13, 150:20, 151:6, 162:11, 162:19, 164:3, 164:6, 164:8, 168:2, 168:11, 175:6, 194:17

**Statement** [2] - 92:9, 92:17

**statement** [6] - 71:7, 71:8, 88:9, 88:14, 125:14

**statements** [3] - 77:15, 77:19, 181:12

**STATES** [2] - 1:1, 1:10

**States** [4] - 1:24, 3:3, 43:2, 197:13

**states** [9] - 21:9, 25:5, 127:18, 141:21, 161:11, 163:15, 165:10, 167:4, 189:15

**stating** [10] - 127:13, 165:15, 165:20, 166:24, 167:12, 169:2, 178:5, 178:7, 182:4, 190:4

**station** [1] - 101:8

**stature** [1] - 6:8

**stay** [3] - 103:20, 113:8, 152:23

**stayed** [1] - 93:7

**STENOGRAPHER** [8] - 45:24, 52:14, 61:5, 62:10, 82:5, 82:19, 84:9, 97:11

**Stenographer** [2] - 139:15, 141:18

**STENOGRAPHICALLY** [1] - 1:22

**step** [3] - 109:17, 178:12, 195:22

**still** [20] - 11:10, 34:22, 50:15, 50:18, 56:6, 56:15, 57:24, 75:23, 75:25, 76:7, 113:6, 139:13, 139:17, 173:18, 179:16, 179:22, 185:20, 187:13, 191:9

**stipulate** [1] - 56:19

**stipulated** [4] - 9:8, 41:1, 41:3, 41:7

**stipulation** [1] - 56:21

**stop** [7] - 26:16, 45:5, 45:15, 45:18, 46:7, 172:3, 179:18

**stopped** [1] - 54:23

**stops** [2] - 123:5, 124:13

**storm** [5] - 108:2, 108:21, 108:22, 109:1, 109:3

**storms** [1] - 58:25

**straight** [1] - 32:15

**straightforward** [1] - 173:8

**streamlining** [1] - 157:6

**stretch** [2] - 107:20, 107:21

**stricken** [1] - 26:2

**strike** [4] - 20:6, 22:9, 141:25, 143:11

**strong** [1] - 19:8

**struck** [13] - 31:12, 31:13, 31:18, 31:19, 35:21, 36:4, 36:9, 49:8, 60:23, 61:21, 62:17, 66:22, 74:15

**stuck** [1] - 31:14

**studies** [6] - 10:7, 111:11, 126:21, 126:24, 166:9, 173:13

**study** [5] - 17:9, 166:16, 170:17, 173:9, 173:11

**stuff** [5] - 40:24, 55:15, 82:4, 84:2, 96:4

**subacromial** [3] - 130:24, 155:1, 155:5

**subject** [4] - 17:16, 97:5, 140:3, 143:13

**subjective** [1] - 177:21

**submit** [2] - 194:11, 194:13

**subspecialties** [1] - 111:13

**subspecialty** [4] - 23:21, 111:21, 112:11, 112:25

**substantially** [1] - 10:22

**substantive** [3] - 10:11, 18:18, 23:10

**substantively** [2] - 18:22, 18:25

**successful** [1] - 112:2

**suddenly** [1] - 131:16

**suffer** [2] - 32:7, 177:14

**suffered** [7] - 81:2, 128:6, 143:1, 174:19, 177:16, 178:3, 178:5

**suffers** [1] - 131:5

**sufficient** [10] - 21:16, 23:18, 26:2, 33:17, 33:23, 133:2, 141:3, 163:4, 169:17, 169:18

**sufficiently** [1] - 35:6

**suggest** [1] - 130:6

**Suite** [2] - 1:15, 1:19

**summarized** [2] - 129:10

**supermarket** [1] - 81:12

**support** [8] - 21:24,

25:21, 26:3, 132:21, 136:3, 148:7, 172:5, 173:14

**supports** [1] - 183:17

**supposed** [1] - 135:11

**supraspinatus** [4] - 32:22, 168:22, 176:1, 189:25

**surface** [2] - 136:22, 136:23

**surgeon** [17] - 21:7, 23:20, 37:8, 79:22, 79:24, 80:3, 110:25, 111:21, 116:10, 119:14, 141:1, 155:12, 167:16, 170:13, 171:20, 172:11, 172:15

**Surgeons** [2] - 154:3, 154:13

**surgeries** [10] - 113:15, 114:1, 114:3, 114:13, 114:15, 149:21, 190:1, 190:15, 191:3

**surgery** [69] - 4:18, 4:20, 23:21, 32:24, 33:20, 33:21, 34:16, 34:17, 37:14, 39:3, 80:12, 80:17, 80:21, 80:24, 111:13, 111:15, 111:16, 111:17, 111:24, 112:2, 112:12, 112:15, 113:2, 113:9, 113:18, 113:24, 114:5, 114:7, 114:8, 114:9, 114:10, 114:14, 114:16, 115:2, 116:25, 117:3, 117:14, 117:15, 117:16, 118:15, 141:1, 141:5, 141:8, 142:8, 142:14, 143:12, 143:18, 145:9, 151:14, 156:23, 158:10, 158:17, 158:18, 184:11, 185:19, 185:25, 188:11, 188:20, 189:23, 190:5, 190:9, 190:13, 190:17, 193:14, 193:16

**Surgery** [1] - 189:13

**surgical** [17] - 4:22, 111:5, 111:6, 112:24, 113:1, 116:18, 148:11,

155:23, 185:9, 185:10, 185:12, 185:14, 185:16, 185:17, 185:23, 186:11

**surgically** [1] - 113:9

**survey** [3] - 148:7, 151:9, 184:2

**sustain** [1] - 36:1

**sustained** [9] - 65:3, 76:19, 82:13, 82:21, 129:19, 140:22, 152:13, 175:8, 178:5

**swelling** [2] - 32:21, 127:16

**switch** [2] - 106:24, 160:19

**sworn** [2] - 42:2, 110:14

**Sydney** [1] - 111:8

**symptoms** [3] - 138:16, 138:19, 158:22

**synovectomies** [1] - 154:18

**synovectomy** [7] - 153:18, 153:23, 154:1, 154:14, 188:22, 189:12, 189:14

**synovium** [2] - 153:20, 153:21

**system** [1] - 111:18

**T**

**table** [13] - 47:14, 49:17, 49:25, 50:3, 65:13, 76:10, 94:23, 95:3, 95:4, 95:9, 96:12, 102:17, 102:19

**tablet** [1] - 162:18

**talks** [3] - 141:17, 145:19, 146:10

**tall** [1] - 107:11

**tat** [2] - 38:10, 115:25

**team** [1] - 35:18

**tear** [60] - 20:23, 21:12, 22:21, 23:23, 24:16, 33:23, 121:11, 121:15, 121:16, 121:22, 129:20, 131:6, 131:8, 131:11, 131:12, 131:23, 131:24, 134:1, 137:25, 138:3, 138:10, 138:12, 138:14, 138:15,

138:16, 139:4, 139:8, 139:9, 139:18, 140:9, 160:24, 161:5, 164:2, 165:24, 165:25, 166:1, 166:2, 167:18, 167:19, 167:24, 170:1, 174:15, 175:10, 175:19, 175:21, 175:24, 176:1, 176:10, 176:14, 176:15, 176:19, 189:24, 189:25, 190:6, 190:14, 190:22

**tearing** [5] - 25:6, 138:6, 139:25, 167:4, 168:3

**tears** [17] - 32:21, 129:21, 131:18, 131:21, 166:15, 168:11, 168:21, 175:5, 175:13, 177:2, 177:3, 190:14, 190:20, 190:21, 191:3

**technology** [1] - 35:15

**ten** [12] - 12:2, 12:12, 12:15, 17:22, 19:10, 19:11, 43:3, 44:1, 112:8, 112:20, 172:1

**tender** [2] - 118:14, 164:13

**tendon** [5] - 32:22, 136:13, 168:22, 189:25, 190:25

**tendons** [2] - 111:19, 113:5

**term** [2] - 141:22, 182:5

**terminal** [4] - 11:23, 12:2, 17:22, 18:2

**terms** [21] - 5:2, 5:18, 6:5, 14:5, 25:4, 49:23, 50:6, 52:20, 67:4, 67:11, 80:1, 83:13, 115:21, 165:15, 167:3, 174:6, 175:2, 181:10, 182:21, 187:7, 192:9

**test** [1] - 130:23

**tested** [1] - 86:12

**testified** [15] - 14:7, 17:25, 23:14, 30:9, 33:9, 34:24, 88:16, 90:7, 93:7, 100:15, 148:12, 161:4, 161:16, 168:21,

187:12

**testifies** [4] - 7:9, 25:25, 26:24, 27:3

**testify** [21] - 4:20, 18:6, 20:20, 22:5, 23:6, 26:19, 26:25, 40:4, 101:21, 101:23, 119:13, 119:18, 124:20, 145:1, 145:5, 146:19, 147:5, 148:15, 148:17, 181:20, 192:5

**testifying** [9] - 13:7, 16:15, 27:2, 126:4, 126:8, 144:14, 145:8, 147:1, 179:23

**testimony** [71] - 5:4, 5:16, 5:17, 11:1, 12:6, 12:18, 13:6, 15:20, 16:4, 16:17, 18:3, 18:14, 19:8, 19:24, 20:19, 22:10, 23:8, 25:13, 25:16, 26:4, 30:18, 31:5, 32:3, 36:6, 36:11, 36:20, 36:23, 38:12, 55:19, 55:20, 55:22, 62:20, 73:5, 73:6, 73:10, 73:11, 74:22, 75:4, 87:7, 96:15, 98:14, 99:9, 99:12, 101:6, 101:12, 102:1, 104:13, 104:21, 105:1, 118:20, 119:22, 144:23, 146:6, 146:7, 146:13, 154:10, 162:24, 164:24, 165:2, 165:9, 165:17, 166:8, 171:13, 176:17, 177:21, 180:22, 181:3, 181:23, 183:17, 188:7, 193:23

**text** [1] - 4:19

**Thapa** [2] - 36:18, 36:19

**THE** [351] - 1:10, 1:13, 1:16, 3:12, 3:20, 3:24, 4:21, 5:3, 5:10, 5:21, 5:25, 6:8, 6:17, 7:3, 7:11, 7:25, 8:4, 8:8, 8:12, 8:16, 8:20, 9:4, 9:9, 9:13, 9:17, 9:19, 10:2, 10:5, 10:8, 10:18, 11:8, 11:11, 11:13, 11:16, 12:9, 12:17, 13:7,

13:13, 13:16, 13:19, 13:22, 14:9, 14:13, 14:19, 16:4, 16:7, 16:15, 16:23, 16:25, 17:2, 17:12, 17:20, 18:5, 18:11, 18:21, 18:24, 19:16, 19:20, 19:25, 20:5, 21:24, 22:2, 22:8, 24:23, 25:15, 26:17, 27:7, 27:16, 27:21, 28:10, 28:12, 28:17, 28:21, 28:23, 28:25, 29:6, 29:11, 35:9, 38:2, 38:10, 38:17, 38:20, 39:10, 39:12, 39:18, 39:23, 39:25, 40:5, 40:10, 40:22, 41:1, 41:4, 41:6, 41:11, 41:19, 42:3, 42:6, 42:9, 43:15, 43:18, 43:19, 43:23, 45:24, 48:14, 49:24, 50:1, 50:2, 50:4, 52:1, 52:2, 52:3, 52:12, 52:14, 53:1, 53:3, 53:6, 53:11, 53:12, 53:14, 53:16, 53:17, 53:18, 53:22, 53:25, 55:7, 55:23, 55:25, 56:5, 56:12, 56:17, 56:20, 56:24, 57:4, 57:8, 60:13, 61:5, 62:3, 62:4, 62:5, 62:10, 65:3, 65:7, 65:9, 65:10, 66:14, 66:16, 67:6, 67:15, 67:24, 68:10, 68:16, 70:22, 71:1, 71:6, 71:8, 71:10, 71:14, 71:19, 72:3, 72:4, 72:13, 72:15, 72:16, 72:19, 72:20, 73:3, 73:13, 73:18, 73:20, 74:10, 74:14, 74:20, 74:22, 75:2, 75:18, 75:21, 75:23, 75:25, 76:1, 76:19, 78:16, 78:18, 78:22, 79:1, 79:6, 79:9, 79:11, 79:12, 79:15, 82:5, 82:11, 82:13, 82:18, 82:19, 82:21, 83:2, 83:5, 83:11, 83:17, 84:9, 84:15, 84:16, 84:20, 84:21, 85:5, 85:12, 85:14, 85:20, 85:23, 87:9, 88:7, 88:15, 88:22, 89:10, 89:13, 89:24, 89:25, 90:5, 90:22, 91:10,

91:13, 96:25, 97:11, 98:15, 98:19, 99:12, 102:4, 102:10, 103:24, 104:23, 105:1, 106:16, 108:7, 108:11, 108:14, 108:19, 108:22, 108:25, 109:15, 109:16, 109:18, 109:19, 109:24, 110:2, 110:5, 110:8, 110:13, 110:15, 110:18, 118:1, 118:4, 118:7, 118:16, 118:21, 119:2, 119:5, 119:7, 119:15, 120:4, 123:12, 123:18, 123:21, 123:23, 124:24, 125:2, 125:7, 126:4, 126:8, 126:16, 128:22, 128:25, 129:4, 129:6, 131:22, 132:9, 133:6, 134:17, 144:15, 144:22, 145:4, 145:8, 145:12, 145:18, 145:21, 146:3, 146:15, 146:19, 146:22, 147:5, 147:9, 147:14, 147:18, 147:20, 147:22, 148:14, 148:24, 150:5, 150:22, 151:1, 151:2, 151:4, 151:9, 151:10, 151:15, 151:16, 151:20, 151:22, 152:6, 152:7, 152:16, 153:1, 154:6, 154:11, 157:3, 157:6, 157:8, 159:5, 159:8, 159:15, 159:18, 159:21, 159:22, 160:4, 160:6, 168:14, 168:18, 172:23, 174:22, 179:1, 179:16, 179:22, 180:2, 180:3, 180:8, 180:17, 180:23, 183:12, 186:7, 188:17, 188:25, 189:9, 189:11, 190:3, 190:12, 194:4, 194:5, 194:8, 195:21, 195:23,

195:24, 196:18

**themselves** [2] - 24:12, 115:9

**theory** [1] - 4:5

**therapeutic** [1] - 128:5

**therapy** [8] - 32:23, 33:3, 140:25, 141:3, 141:9, 179:11, 179:18, 180:9

**thereafter** [2] - 31:20, 116:7

**thicker** [2] - 61:1, 61:2

**thickness** [1] - 138:14

**thinking** [2] - 7:16, 159:9

**thinks** [3] - 17:8, 34:6, 126:10

**third** [2] - 31:19, 141:20

**thirties** [1] - 121:21

**thoracic** [2] - 130:16, 130:17

**thousands** [8] - 114:2, 114:3, 149:9, 151:10, 186:16

**THR** [1] - 67:12

**three** [17] - 30:4, 30:10, 31:12, 36:16, 37:2, 74:16, 93:9, 93:12, 133:12, 133:18, 133:19, 133:21, 137:21, 141:6, 156:19, 171:7, 173:1

**throughout** [2] - 35:14, 113:14

**throw** [1] - 55:14

**throwing** [1] - 121:22

**Thursday** [1] - 4:22

**time-wise** [1] - 6:22

**timing** [1] - 6:6

**tin** [1] - 139:23

**tiny** [14] - 137:19, 138:3, 138:10, 138:12, 139:8, 139:9, 139:18, 139:19, 139:25, 175:25, 176:1

**tissue** [3] - 122:16, 127:5, 153:22

**today** [39] - 4:10, 4:11, 4:20, 5:1, 5:7, 5:14, 7:2, 7:13, 16:16, 35:12, 35:15, 42:14, 83:14, 85:1, 85:19, 87:23, 88:16, 91:4, 91:19, 92:20, 94:1, 101:17, 101:21, 101:23, 115:17, 143:12, 143:23,

144:4, 158:25, 170:18, 171:15, 172:6, 180:22, 181:1, 182:22, 186:5, 186:15, 188:18, 193:8

**together** [7] - 26:2, 31:14, 35:18, 63:10, 67:1, 91:11, 144:3

**tomorrow** [6] - 4:14, 85:3, 85:4, 85:17, 195:25, 196:7

**took** [11] - 6:19, 33:8, 57:12, 100:20, 106:5, 112:5, 112:12, 136:25, 156:12, 170:10, 195:14

**top** [18] - 51:8, 51:10, 51:11, 51:12, 51:15, 51:16, 51:24, 52:6, 52:7, 89:24, 98:22, 98:23, 99:23, 126:1, 136:21, 137:6, 149:16, 151:11

**torn** [1] - 37:21

**total** [3] - 155:19, 155:21, 193:17

**totally** [1] - 87:15

**touch** [4] - 53:6, 61:11, 107:18, 107:22

**touched** [1] - 62:16

**towards** [2] - 65:9, 177:20

**tracks** [1] - 91:1

**trained** [6] - 24:6, 31:1, 31:2, 32:5, 33:19, 171:20

**training** [9] - 21:6, 22:15, 93:21, 111:15, 170:8, 170:21, 171:16, 171:18, 172:25

**transcript** [9] - 8:9, 23:5, 73:16, 73:21, 88:5, 88:10, 89:3, 89:19, 180:25

**transcription** [1] - 197:8

**transparency** [4] - 150:8, 150:21, 186:1, 186:3

**Trapezius** [1] - 180:3

**trapezius** [39] - 33:6, 121:6, 122:23, 123:3, 123:6, 123:10, 124:5, 124:8, 124:9, 124:12, 124:15,

124:18, 125:4, 125:12, 125:13, 125:15, 125:16, 125:20, 127:15, 128:13, 128:14, 129:19, 130:7, 143:4, 143:7, 164:13, 164:16, 165:16, 165:22, 174:11, 175:8, 175:18, 176:4, 178:6, 180:1, 180:2, 181:17

**trauma** [6] - 14:23, 113:18, 113:19, 174:8, 175:3, 175:4

**treat** [2] - 113:8, 192:10

**treated** [1] - 32:16

**treating** [4] - 141:1, 170:9, 180:11, 188:10

**treatment** [29] - 20:21, 32:14, 32:17, 33:1, 34:12, 34:14, 78:11, 78:14, 79:13, 80:2, 115:1, 115:2, 116:3, 117:8, 156:19, 156:24, 158:19, 177:16, 178:15, 178:17, 179:4, 179:8, 179:9, 179:14, 180:5, 180:15, 182:18, 185:6, 188:14

**treatments** [1] - 140:25

**triage** [6] - 121:2, 121:5, 122:7, 122:9, 123:13, 123:15

**triaged** [2] - 164:18, 164:22

**TRIAL** [1] - 1:9

**trial** [6] - 4:2, 6:18, 9:15, 26:16, 118:18, 154:10

**triceps** [1] - 124:5

**tried** [4] - 4:6, 4:10, 4:13, 7:7

**trips** [1] - 192:12

**tropical** [5] - 108:2, 108:21, 108:22, 109:1, 109:3

**truck** [1] - 14:22

**true** [6] - 13:2, 91:11, 124:4, 162:4, 163:4, 164:17

**truth** [1] - 192:25

**try** [9] - 5:18, 24:21, 40:8, 74:7, 85:16,

150:8, 150:15, 153:4, 196:1

**trying** [11] - 17:2, 17:3, 35:14, 54:24, 67:8, 70:9, 108:9, 157:5, 180:20, 181:2, 189:4

**tumors** [1] - 111:17

**turn** [3] - 89:18, 90:10, 103:11

**twenties** [1] - 121:21

**two** [51] - 5:5, 7:20, 14:8, 29:20, 30:4, 31:14, 31:18, 32:18, 32:23, 37:6, 54:16, 63:9, 63:17, 66:3, 66:25, 74:15, 74:16, 75:13, 78:17, 81:14, 85:10, 87:15, 101:12, 102:22, 103:6, 103:19, 103:21, 104:3, 104:6, 104:10, 104:15, 105:5, 112:6, 113:19, 116:15, 131:15, 135:14, 137:7, 138:6, 141:5, 148:22, 167:11, 173:2, 174:13, 177:23, 177:25, 178:2, 181:16, 195:13

**type** [21] - 14:3, 15:2, 23:2, 23:3, 24:8, 25:18, 33:17, 34:14, 60:23, 127:19, 138:18, 140:6, 148:9, 154:15, 156:5, 156:6, 164:2, 187:9, 187:10, 190:13, 190:17

**typed** [1] - 187:9

**types** [2] - 14:25, 190:18

**typical** [1] - 148:17

**typically** [12] - 114:14, 115:6, 121:20, 121:24, 131:14, 144:24, 145:8, 155:6, 156:2, 156:5, 161:5, 194:21

**U**

**ultimate** [1] - 116:5

**ultimately** [5] - 11:4, 14:3, 37:14, 45:2, 116:17

**uncomfortable** [1] - 15:24

**under** [11] - 5:17, 22:25, 26:6, 32:10, 56:7, 56:15, 90:17, 103:22, 108:15, 108:16, 126:14

**undergo** [1] - 140:25

**undergoing** [1] - 32:23

**undergone** [1] - 80:12

**underlying** [3] - 153:24, 158:6, 187:20

**underneath** [7] - 51:24, 81:23, 81:24, 98:23, 99:15, 100:1, 100:16

**understood** [4] - 40:18, 99:1, 99:24, 117:25

**underway** [5] - 11:24, 17:24, 18:1, 18:2, 54:21

**underwent** [4] - 32:18, 32:24, 37:14, 143:13

**undisputed** [4] - 16:1, 20:17, 29:18, 30:8

**undoubtedly** [1] - 17:23

**unfortunately** [1] - 158:9

**unfused** [1] - 134:11

**uniform** [5] - 69:13, 69:16, 76:23, 76:25, 144:6

**uniforms** [3] - 77:9, 77:11, 77:12

**UNITED** [2] - 1:1, 1:10

**United** [4] - 1:24, 3:3, 43:2, 197:13

**University** [1] - 111:3

**unless** [6] - 41:24, 82:22, 154:2, 166:4, 189:14, 196:11

**unrebutted** [1] - 31:5

**unremarkable** [2] - 122:16, 127:3

**unusual** [3] - 28:14, 73:3, 164:14

**up** [90] - 4:7, 4:9, 4:13, 8:22, 15:17, 16:19, 20:1, 20:14, 20:15, 23:25, 24:3, 26:15, 30:19, 30:20, 30:21, 31:4, 31:25, 32:13, 32:17, 37:2, 40:16, 49:19, 52:7, 52:11, 55:9, 55:10, 56:2, 56:7, 56:13, 61:9, 62:1, 64:16, 64:20, 66:22, 66:23, 69:3,

69:10, 73:16, 77:7, 77:8, 77:14, 77:17, 77:24, 79:1, 81:14, 84:18, 90:24, 92:8, 92:12, 92:16, 93:19, 94:24, 95:3, 95:8, 96:8, 96:11, 100:16, 105:21, 110:1, 115:5, 123:8, 123:19, 126:13, 126:18, 133:23, 137:6, 137:12, 139:14, 139:18, 146:12, 149:17, 153:13, 153:14, 156:16, 156:20, 159:24, 162:9, 170:5, 171:7, 173:6, 179:9, 180:11, 180:14, 182:18, 193:19

**update** [1] - 196:18

**updated** [2] - 170:10, 172:12

**updating** [1] - 173:4

**upper** [24] - 89:20, 90:3, 124:10, 124:12, 125:21, 127:14, 127:15, 128:10, 129:19, 130:5, 130:17, 140:5, 140:23, 141:5, 143:5, 143:7, 163:25, 164:4, 174:11, 175:8, 175:18, 176:4, 178:7, 181:18

**urgent** [1] - 116:2

**usual** [16] - 145:14, 146:23, 147:10, 149:7, 149:11, 149:15, 149:18, 149:22, 151:23, 152:8, 152:13, 152:17, 152:21, 183:2, 183:4, 183:5

**utilized** [2] - 151:12, 154:17

**V**

**vague** [1] - 67:5

**valid** [2] - 79:2, 124:24

**value** [2] - 39:15, 39:16

**Vanegas** [2] - 32:5, 33:12

**various** [7] - 112:9, 133:11, 149:22, 150:12, 184:8,

185:15

**vary** [2] - 184:21, 185:8

**velocity** [2] - 10:25, 57:25

**verbally** [1] - 48:9

**verbiage** [1] - 143:6

**versus** [9] - 83:14, 83:24, 123:10, 124:8, 142:19, 144:7, 164:2, 184:21, 184:22

**vessel** [3] - 120:15, 120:25, 158:23

**vicarious** [1] - 35:25

**vicinity** [3] - 49:14, 50:22, 193:15

**video** [6] - 6:23, 6:25, 7:1, 7:18, 7:21, 142:8

**videographer** [1] - 166:4

**view** [4] - 53:13, 133:15, 136:8, 168:2

**viewpoints** [1] - 133:11

**views** [2] - 133:17, 173:2

**Vikram** [1] - 36:18

**visit** [1] - 128:16

**visualize** [1] - 195:17

**Volume** [1] - 1:7

**vs** [1] - 1:6

**W**

**waist** [1] - 51:3

**wait** [16] - 8:23, 13:22, 27:16, 55:3, 71:1, 88:15, 103:10, 110:5, 147:5, 168:14, 168:18, 179:18, 190:3

**waiter** [1] - 51:1

**waiters** [1] - 50:18

**waiting** [5] - 70:10, 103:16, 104:9, 105:5, 141:4

**walk** [10] - 30:1, 46:6, 47:9, 48:4, 69:8, 107:16, 131:12, 169:19, 169:20, 187:20

**walked** [4] - 47:8, 58:6, 123:16, 164:8

**walking** [5] - 47:18, 50:18, 58:18, 58:20, 59:6

**wall** [3] - 107:3, 107:4, 107:6

**Walter** [1] - 3:16

**wants** [5] - 85:1, 113:8, 151:13, 190:5, 193:4

**warn** [1] - 30:12

**warnings** [1] - 36:16

**warranted** [2] - 154:18, 180:9

**watching** [1] - 91:22

**water** [6] - 29:9, 44:24, 45:1, 54:23, 55:2, 55:5

**ways** [2] - 112:9, 133:18

**wearing** [3] - 76:23, 77:9, 128:5

**weather** [25] - 11:18, 11:21, 11:24, 12:24, 12:25, 13:8, 15:16, 15:25, 16:20, 16:23, 17:4, 17:6, 17:9, 17:13, 17:15, 17:20, 18:7, 19:6, 19:7, 19:9, 19:10, 36:14, 46:22, 109:12

**website** [24] - 149:24, 150:10, 150:22, 150:23, 150:24, 151:25, 186:1, 186:2, 186:4, 186:10, 186:14, 186:17, 186:20, 186:23, 187:1, 187:2, 187:3, 187:6, 187:7, 187:9

**wedding** [1] - 43:11

**Wednesday** [1] - 90:7

**week** [3] - 116:14, 156:19, 173:20

**weekends** [2] - 173:3, 195:13

**weeks** [2] - 171:8, 179:10

**weigh** [3] - 31:24, 34:25

**weighed** [3] - 31:22, 32:1, 32:2

**weighs** [2] - 35:1, 37:22

**weight** [6] - 17:7, 18:13, 23:7, 31:15, 31:21, 96:7

**weighty** [1] - 96:4

**weird** [2] - 4:6, 67:7

**welcome** [4] - 56:12, 57:10, 109:15, 194:4

**well-detailed** [1] - 182:15

**West** [1] - 1:19

**Westside** [1] - 127:9

**wheel** [1] - 82:7

**wheeled** [1] - 82:6

**white** [3] - 53:11, 137:10, 138:1

**whole** [6] - 170:24, 171:10, 182:2

**width** [2] - 137:21

**wife** [17] - 55:18, 61:21, 69:20, 81:22, 83:8, 91:15, 92:10, 92:11, 92:18, 93:8, 96:17, 101:7, 103:9, 103:18, 106:7, 106:8, 106:12

**Wilkerson** [21] - 32:25, 33:18, 141:16, 141:23, 156:20, 157:10, 179:9, 180:12, 182:20, 188:8, 188:10, 188:14, 188:20, 188:21, 189:2, 189:12, 189:18, 189:20, 190:5, 190:16, 190:25

**Wilkerson's** [2] - 141:20, 184:11

**wind** [26] - 10:25, 11:5, 12:5, 14:6, 14:10, 14:11, 15:13, 18:8, 30:9, 30:19, 30:20, 30:21, 47:3, 47:8, 54:23, 59:8, 63:9, 64:13, 64:14, 64:15, 64:16, 64:20, 66:22, 82:20, 108:14

**winds** [29] - 10:25, 12:11, 12:20, 13:9, 29:21, 29:24, 30:6, 31:2, 31:8, 48:10, 50:15, 57:24, 58:4, 58:21, 59:3, 59:24, 93:13, 93:15, 93:20, 94:4, 95:17, 107:24, 108:4, 108:7, 108:9, 108:10, 108:24, 109:3

**windy** [7] - 47:6, 47:11, 48:4, 48:6, 54:15, 82:9, 83:7

**wise** [2] - 4:6, 6:22

**wish** [3] - 5:15, 38:8, 79:8

**WITNESS** [43] - 2:2, 42:3, 42:6, 43:18, 43:23, 50:1, 50:4, 52:2, 53:11, 53:17, 55:23, 56:17, 62:4, 65:7, 65:10, 66:16,

72:3, 72:15, 72:19, 75:21, 75:25, 79:11, 82:11, 84:16, 84:20, 89:25, 109:15, 109:18, 110:15, 110:18, 145:21, 147:18, 151:1, 151:4, 151:10, 151:16, 152:6, 159:21, 180:2, 180:17, 189:11, 194:4, 195:23

**witness** [15] - 4:17, 5:20, 6:7, 6:21, 8:21, 23:9, 34:1, 35:17, 52:25, 53:24, 60:12, 70:25, 88:6, 108:16, 159:14

**witness's** [2] - 70:21, 72:11

**witnesses** [7] - 6:25, 9:1, 17:24, 29:22, 30:8, 30:10, 196:15

**WL** [2] - 27:12, 27:19

**woman** [2] - 29:16, 171:3

**wood** [1] - 96:2

**word** [1] - 75:24

**words** [8] - 21:4, 30:14, 30:16, 30:22, 71:23, 71:25, 131:15, 138:19

**worker** [2] - 69:8, 70:14

**workers** [4] - 77:14, 98:4, 184:15, 185:3

**works** [4] - 7:21, 18:12, 53:2, 112:17

**Worldwide** [1] - 27:11

**worry** [1] - 73:4

**worse** [1] - 156:15

**worsen** [2] - 158:1, 158:6

**worst** [1] - 129:14

**would've** [2] - 12:11, 91:2

**wounds** [1] - 121:8

**writing** [1] - 43:21

**written** [2] - 112:3, 112:4

**wrote** [1] - 187:3

**X**

**x-ray** [2] - 126:25, 127:2

**x-rays** [3] - 115:9, 116:21, 122:15

**Y**

**year** [6] - 112:20, 135:11, 149:9, 171:6, 173:1, 195:10

**years** [52] - 21:6, 21:15, 22:22, 23:20, 24:5, 36:7, 37:9, 43:3, 44:1, 111:3, 112:6, 112:8, 113:10, 113:12, 113:13, 113:14, 113:21, 113:23, 113:25, 114:4, 114:13, 132:25, 135:13, 135:15, 136:6, 136:25, 137:7, 149:8, 170:9, 171:19, 171:22, 172:1, 173:1, 173:12, 176:25, 177:1, 183:2, 183:6, 185:15, 191:18, 192:18, 192:23, 195:2, 195:5, 195:7, 195:10

**yourself** [2] - 50:3, 96:18

**Z**

**zero** [1] - 129:14

**zoom** [1] - 179:20

**zoom-in** [1] - 179:20