UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
CASE NO. 23-cv-60532

EUREKA COLE,                                Fort Lauderdale, Florida

                    Plaintiff,              May 30, 2024

        vs.                                 9:46 a.m. - 5:19 p.m.

CARNIVAL CORPORATION,                       Volume 2

                    Defendant.              Pages 1 - 122
_____

BENCH TRIAL - DAY 2
BEFORE THE HONORABLE MELISSA DAMIAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:


FOR THE PLAINTIFF:          RAYMOND R. DIEPPA, ESQUIRE
                            FLORIDA LEGAL
                            150 Southeast 2nd Avenue
                            Suite 1001
                            Miami, Florida 33131

FOR THE DEFENDANT:          MICHAEL DRAHOS, ESQUIRE
                            W. COOPER JARNAGIN, ESQUIRE
                            ASHLEY N. GENOESE, ESQUIRE
                            GRAYROBINSON, P.A.
                            515 North Flagler Drive
                            Suite 650
                            West Palm Beach, Florida 33130



STENOGRAPHICALLY REPORTED BY:

                    MAIRELYS ALBO, RPR
                    OFFICIAL COURT REPORTER
                    United States District Court
                    Southern District of Florida
                    299 East Broward Boulevard
                    Fort Lauderdale, Florida 33301

2

```
                        I N D E X

WITNESS                                             PAGE

EUREKA COLE

DIRECT EXAMINATION BY MR. DIEPPA                     14
CROSS-EXAMINATION BY MR. JARNAGIN                    45
REDIRECT EXAMINATION BY MR. DIEPPA                   76

MONICA BORCEGUE (by video deposition)              103

SHRUTI BHATIA (by video deposition)                108

ALEXANDRA ONG (by video deposition)                110

DR. JUAN VANEGAS GONZALEZ (by video deposition)    115

CERTIFICATE OF REPORTER                            122
```

(Case called to order of the Court at 9:46 a.m.)

COURTROOM SECURITY OFFICER:  All rise.

COURTROOM DEPUTY:  The United States District Court for the Southern District of Florida is now in session with the Honorable Melissa Damian presiding.

THE COURT:  Good morning everybody.

COURTROOM DEPUTY:  The court is back on the record with Case No. 23-cv-60532-Damian, Cole v. Carnival Corporation.

Counsel, please state your appearances beginning with the plaintiff.

MR. DIEPPA:  Good morning, Your Honor.  Raymond Dieppa here on behalf of the plaintiff, Eureka Cole.

THE COURT:  Good morning.

MR. DRAHOS:  Good morning, Your Honor.  Michael Drahos on behalf of Carnival.

MR. JARNAGIN:  Good morning.  Cooper Jarnagin on behalf of Carnival.  And here with us is also Monica Borcegue as a corporate representative.

THE COURT:  And Ms. Genoese, good morning.

All right.  So what are we doing next?

MR. DIEPPA:  We have Ms. Cole up.  There was an issue raised that we can take up now, it probably won't take up too much of the Court's time regarding a witness that plaintiff intends to call by video.

So I guess it's the defendant's objection to the

witness, it's -- it's their lead nurse that we discussed yesterday.

THE COURT:  Right.

MR. DIEPPA:  But I guess I will let Mr. Drahos explain the basis for the objection.

MR. DRAHOS:  I was going to raise that -- we can talk about it now if Your Honor would like.

THE COURT:  Sure.

MR. DRAHOS:  So Nurse Ong is a nurse who works on our ship.  She did prepare and treat in the medical chart which are in evidence in the case.  Yesterday Dr. Chalal testified as to his interpretation of those records during which I think material part of his testimony was she came in and complained of left shoulder pain, but ultimately the doctor performed an assessment and determined the pain was in the trapezius area due to his palpation.  So we were notified afterwards that they intended to call Nurse Ong to impeach Dr. Chalal's testimony. She is not listed as a trial witness on the final trial list. She is on the initial list, but she's not on the one that was for purposes of the trial.

So I just don't see the point here.  I don't think that Nurse Ong has anything to say that's contrary to what Dr. Chalal testified to.  Not only that, but again, she wasn't listed on the trial witness list.

MR. DIEPPA:  Your Honor, if I can respond?

THE COURT: Uh-huh.

MR. DIEPPA: Yeah. So Nurse Ong was listed by the defendants. Nurse Ong is their employee.

THE COURT: She's on their witness list or as a person with knowledge?

MR. DIEPPA: No. Was listed on their initial witness list, Docket Entry 79-3.

She was deposed. She did testify she was the lead nurse. The reason we wish to call her -- and, by the way, her video testimony is all of 20 minutes long, the entire deposition is.

Based on Dr. Chalal's testimony regarding the pain, because Dr. Chalal made numerous statements that if she would have really been hurt and really had her shoulder -- she would have been in pain. Nurse Ong testified she gave ibuprofen to Ms. Cole in the ship's infirmary. Ms. Ong also testified -- and I brought a copy of the transcript to Your Honor -- that she complained directly of pain in her shoulder. So it goes directly to contradict, not only Dr. Chalal's testimony, but Carnival's theory of the case.

In terms of prejudice, there is none, Your Honor. They produced Nurse Ong as a witness. They've had the transcript. They listed Nurse Ong initially, and they're the ones who have introduced this issue of Ms. Cole not complaining of pain when she went for treatment.

So on the issue of the ibuprofen that she was given, Nurse Ong testifies to -- and I can provide that to the Court, a copy of the transcript.  She, you know, technically would be a rebuttal witness.  But --

THE COURT:  Right.

MR. DIEPPA:  -- Your Honor yesterday made a comment that it's not relevant to you in which order the witnesses go.

THE COURT:  Well, I was -- it's not that it's not relevant, it helps with the flow.  But I was just saying I can figure it out.

MR. DIEPPA:  And lastly, Your Honor, on an evidentiary basis because Nurse Ong was the lead nurse, an employee of Carnival acting within the course and scope of her employment, her deposition testimony is not hearsay under Rule 801.  It would fall completely out of hearsay and be admissible against Carnival as an admission against interest and substantively as evidence.  So even if she wasn't a witness, her statements would come into evidence on those grounds.

THE COURT:  My recollection of Dr. Chalal's testimony -- well, first of all, doesn't the nurse fill something out herself?

MR. DIEPPA:  She did fill part of the initial infirmary report which Dr. Chalal commented on.  She was the author of that.  She was the first person to speak to Ms. Cole.

Also, Your Honor, if you recall, I did impeach

Dr. Chalal with Nurse Ong's deposition testimony and there was no objection.  Because I did show those excepts of Nurse Ong's testimony to Dr. Chalal regarding the complaints as to the shoulder.

THE COURT:  Okay.  Where is the initial infirmary --

MR. DIEPPA:  Yes, Your Honor.

THE COURT:  -- paper that Nurse Ong started to fill out that Dr. Chalal was referring to?

MR. DIEPPA:  Yes.  That is going to be Joint Exhibit --

THE COURT:  Okay.

MR. DIEPPA:  Joint Exhibit 2.

THE COURT:  Oh.  It is 2.

MR. DIEPPA:  So basically all the -- the statements here that she is listed as the documented user, so she would have been the first person to encounter Ms. Cole in the ship's infirmary after the injury.

MR. DRAHOS:  You know, again, none of which we're contesting, none of which Dr. Chalal contested.

THE COURT:  I was going to say, my recollection is that Dr. Chalal acknowledged that -- that Ms. Cole came in complaining of shoulder pain.  In fact, Ms. Cole has always complained of shoulder pain.  It was just that -- and, in fact, he made -- started to make a statement which was basically -- and I can see it.  A layperson -- you know, a layperson has any pain in the area between their lower neck and shoulder, they

may very complain of shoulder pain.  That was his point.

I don't think anybody is disputing that Ms. Cole immediately complained of shoulder pain, walked in told the nurse she had shoulder pan.

MR. DIEPPA:  The issue is --

THE COURT:  I don't think -- I'm not going to take, just because Dr. Chalal interpreted that as, you know, she didn't know exactly -- she didn't mean her shoulder, that doesn't take away from the fact that Ms. Cole herself is going to testify that she had, I except, shoulder -- you know, had shoulder pain.  And all the other documentation says she was complaining of shoulder pain.  I mean, I don't know --

MR. DIEPPA:  What I'm getting at, Your Honor, is -- and Dr. Chalal did say that.  The problem is that he made a comment and he gave an opinion as to the level of pain; not just the pain, but the level of pain.

THE COURT:  Okay.  Well, that's different.

The level of pain, if you're saying -- okay.  So then let's talk about that.

He was saying if she had an acute tear type injury she would have been in a lot of pain.  That's basically the point.  And he is saying, you know, she had some pain, they gave her some ibuprofen.  That's really the point; right?

MR. DIEPPA:  That's the point, Your Honor.  Because Dr. Chalal in his direct examination testimony glossed over the

fact that she had been given pain medication and cast doubt on Ms. Cole's -- the severity of her pain by saying, well, someone with a shoulder injury would've been in a lot more pain than what she presented in her records.

THE COURT:  So then are you telling me that Nurse Ong is going to, to the contrary, say she came in and she was in a lot of pain?  Is that what we are looking for here?

MR. DIEPPA:  She's going to come in and say that she was in pain, specifically in her shoulder, and that she gave her ibuprofen initially.

And, remember, it's a two-hour stay in the infirmary which is relevant.  Because if the argument here as to causation is, well, someone with a torn shoulder would have had a lot more pain than Ms. Cole had -- even though that is pure speculation because Dr. Chalal didn't have personal knowledge -- then it's relevant that Nurse Ong is the first person to see her, gives her a bottle of ibuprofen -- which we have a picture of --

THE COURT:  Okay.  So then --

MR. DIEPPA:  -- receives her complaint of shoulder pain, not trapezius pain.  And that's going to be another issue down the road, because Dr. Courtney is going to say it's the trapezius.  There are other biomechanics, that's what her anticipated testimony is.

THE COURT:  So hold on.  So then let's go back.

Are you trying to offer just the actual deposition or you want to call her as a video?

MR. DIEPPA:  No, Judge.  She's on a ship somewhere.

THE COURT:  So you want to call her as a rebuttal witness by video.  And is she going to say something different than what's in her deposition?

MR. DIEPPA:  No.

THE COURT:  Offer her deposition, she's 100-some-odd miles away, and if they agree to, do you care if her deposition is used or parts of it?

MR. DRAHOS:  The only reason why I even raise this, Your Honor, is because she doesn't say anything contrary to Dr. Chalal.  So he is trying to represent to the Court we have to call this witness who was not on the final witness list because Dr. Chalal said something that is contrary to what she said.  Well, point to where in the deposition she said something contrary.  Because all she said is what Dr. Chalal said.  She came in complaining of shoulder pain and we gave her ibuprofen.

THE COURT:  I think what he is saying is she was in a lot of pain according to the -- what the nurse will say and Dr. Chalal was downplaying the amount of pain.

My question is, do you want to take a look at the transcript?  Was she on video for her depo?

MR. DIEPPA:  Yeah.  She was on video.  The defendants

produced her, the defendants had a chance to cross-examine her on all of this testimony.  So --

THE COURT:  If you want to really read through the transcript and maybe by -- you know, we can wait because this is a rebuttal witness either way.  If you want to see if you could agree that portions of the transcript where she talks about the level of pain that Ms. Cole was in could be used in their rebuttal case -- as their rebuttal case instead of having to call the nurse.  I mean, I'm just trying to think of a more efficient way to do it.  I haven't read the transcript.  If there's things in that transcript you don't want to come in, that's totally your prerogative.

MR. DIEPPA:  I have an extra copy for Your Honor I can --

THE COURT:  Well, I'm going to let them go through that and decide that.  You don't have to decide right now.  I'm just thinking, you know, if the -- if the door is open -- because, remember, he was called as part of your case out of turn so now they want to rebut things that he put in.  And they are -- I get your issue.  Not a definite disagreement.  And actually I thought they were talking about the shoulder versus trapezius. But if it's about the level of pain, you know, it's an important issue and I think the door is open to it because Dr. Chalal definitely made the point repeatedly that, you know, if this had been that kind of an injury she would have been in

a lot more pain.  If this transcript is going to say she was in a lot of pain when she came in, that's rebuttal.

MR. DIEPPA:  Okay.  Thank you, Your Honor.

THE COURT:  So take a look at the transcript and maybe you guys want to -- you know, in one of the breaks today or later today you can decide whether it's okay for -- for the plaintiff to offer the transcript or portions of the transcript as their rebuttal -- as part of their rebuttal.  Okay?

MR. DRAHOS:  Thank you, Your Honor.

THE COURT:  And we've got to decide that today so that everybody can alert Ms. Ong -- Ong, O-n-g -- if she is going to be available.

MR. DRAHOS:  I have no idea in the world where she is.

THE COURT:  That's the great thing about these cruise cases.

MR. DRAHOS:  I think we will review the transcript and come back to Your Honor with a solution.

THE COURT:  At the end of the day, you know, I heard both of you.  I understand both of your points.  But I'm not going to deny the plaintiff the ability to have rebuttal, putting aside the procedural issues with calling a witness who is who knows where.

Do they like only -- I always do this, I look at the cruise ship company lawyers as if you're in-house and you know all the details of how the cruise ships work.  For example, if

Nurse Ong was on a cruise, this was a Caribbean or Bahamas cruise, could she now be on one of the Mediterranean or do they stay on the same ship?

MR. DRAHOS:  No.  They're assigned to different vessels.

THE COURT:  So she would be --

MR. DRAHOS:  Or she can be in contract -- I think Nurse Ong is from the Philippines.  So at this point --

THE COURT:  Interesting.  Might be more efficient to try and bring her in by deposition.

MR. DIEPPA:  Yeah.  I actually had to have a letter issued for the doctor in Colombia.

THE COURT:  Yeah.  I know.  Believe me, I have been involved in issuing those.

So okay.  So let's then proceed.

And you are up, Mr. Dieppa, with your witness.

MR. DIEPPA:  Plaintiff calls Eureka Cole.

(Eureka Cole sworn by CRD.)

THE WITNESS:  I do.  I do.

COURTROOM DEPUTY:  Thank you.

Please have a seat and state and spell your name for the record.

THE WITNESS:  Good morning.  My name is Eureka Cole, E-u-r-e-k-a C-o-l-e.

MR. DIEPPA:  All right.  Madam Clerk?

COURTROOM DEPUTY:  Oh.  Yes.

MR. DIEPPA:  Thank you.

May I proceed?

THE COURT:  Yes.

DIRECT EXAMINATION

BY MR. DIEPPA:

Q.   Good morning, Ms. Cole.

A.   Good morning.

Q.   Please tell us a little bit about yourself starting with where you're born.

A.   I was born here in Miami, Florida at Jackson Memorial Hospital.  I'm 53 years old.  I have three kids.  I have a total of four, one deceased.  I work at Jackson Memorial Hospital.  I started there in 2002 as a Pathology Associate II.  I later started drawing blood as a phlebotomist up until 2022.  I now reside in Fort Lauderdale, Florida.  Pretty much.

Q.   Where did you go to high school?

A.   I went to Miami Northwestern Senior High.

Q.   And are you married?

A.   Yes, I am married.  I have been with my husband 12 years.  Married ten.

Q.   What's your husband's name?

A.   Lucien Cole.

Q.   And back on July 24, 2022, how old were you?

A.   51.

Q.   Are there any hobbies or things you enjoy in life?

A.   Yes.  I love to dance.  I love to cook.  I love to travel. I love to go bowling.

Q.   And in the summer of 2022, in July, did you take a cruise?

A.   Yes, I did.

Q.   And tell us about that cruise.  Did you buy a ticket?

A.   Yes, I did.  I brought a ticket.  I went on a cruise on July 22nd, 2022.  It was for one of my girlfriend's birthday. Her name was Latoya.  It was her 40th.

Q.   Now, prior to getting on this cruise ship, and prior to July 24th of 2022, had you ever had an injury to your left shoulder?  The shoulder that you are claiming was injured in this case.

A.   No, I did not.

Q.   Okay.  Now, you have had accidents in the past?

A.   Yes, I have.

Q.   Did you injure your shoulder in those accidents?

A.   No, I did not.

Q.   So when you went on this Carnival Cruise Line -- is that the Carnival Conquest?

A.   Yes, it was.

Q.   And did you buy a ticket?

A.   Yes, I did.

Q.   And did you buy a ticket for your husband or did you buy -- or did your husband buy a ticket to go with you?

A.   No.   I purchased both tickets over the Internet.

Q.   All right.   And was there any special reason for going on the cruise?

A.   Yes.   We celebrated someone's 40th birthday.

Q.   And who would that have been?

A.   Latoya, a girlfriend of mine.

Q.   So I know you bought a ticket for yourself and your husband, did you have other people that I guess were planning on joining you on the trip on the cruise?

A.   Yes.

Q.   You recall the destination of the cruise?

A.   Yes.   The first day we was on sea, the second day we was in Nassau, Bahamas, and then the third day back on the sea.

Q.   Okay.   So sounds like a total of a three-day cruise?

A.   Correct.

Q.   So the morning of -- I guess the first day of the cruise, would that have been July 22nd?

A.   Yes.

Q.   All right.   And what did you do that day?

A.   That day we entered the ship and we had to go to the -- it's an area where they show you if there's an emergency, like how to use the boat, wear your life jacket.   And then they have you go back to, you know, another area where you can get yourself something to eat.

Q.   And the following day, would that have been July 23rd,

2022?

A.   Correct.

Q.   Was there any destination that day where the cruise ship docked?

A.   No.  It was the whole day at sea.

Q.   And what did you do that day?

A.   On that day we sat around on the lido deck, played some cards.  Of course I watch because I'm not familiar with spades.  I don't play cards.  Made jokes.  Had something to eat.  Some people brought some wine which we're allowed to bring on the ship.

Q.   Did you have some of that?

A.   Yes, I did.

Q.   All right.  And did you -- I recall you saying earlier that you -- like you tumbled, you fell at some point?

A.   Yes.  Actually Friday when we went up to the food area -- I slipped Friday, but I gripped the wall and I got somebody to come and dry the floor up.

Saturday I was going to get some tea and I slipped.  At this point I fell on my knee, but I got right back up, dust my knee off and got my tea and sat down and ate.

Q.   All right.  So it doesn't sound like you were injured as a result?

A.   No, not at all.

Q.   And not including your shoulder?

A.   No.  I slipped on my knee.

Q.   So tell us about July 24th, 2022.  How did that day start off?

A.   Okay.  July 24th, that was Sunday morning, we got up, we went and ate breakfast.  After we ate breakfast we got off the ship I want to say around about 8:00ish, between 8:00 or 9:00.  We got a ride to sightsee the island.  Then we went over to an area called Arawak Cay and we sat around and we had some food.  And at that point I had one Bahama mama from the island.  I had that and we went around again sightseeing, buying T-shirt souvenirs.  At that point I think we got back on the ship maybe around 3:00ish.  We got back on the ship, we went back upstairs to lido deck nine.

Q.   All right.  Slow down a bit.

A.   Oh, okay.  Sorry.

Q.   So in terms of where you got off, you recall the port where you got off, the island you got off?

A.   Yes.  Nassau, Bahamas.

Q.   You recall more or less the time that you disembarked from the ship?

A.   Yes.

Q.   What time more or less would that have been?

A.   That morning we disembarked the ship about 8:30.  8:30 I want to say.  Yeah.  Because I'm an early morning person.

Q.   All right.  And when you disembarked the ship was that like

at the cruise terminal?

A.   Yes, it was.

Q.   Okay.  And how long did -- how much time did you spend off the island?

A.   We got back on the ship like 3:00, so we had to be on the island about five hours.

Q.   Okay.  Now, when you got back on the ship was there anyone with you?

A.   Yes.  My husband was with me.

Q.   Okay.

A.   And a few more of the group.

Q.   Your husband Lucien Cole?

A.   Yes, Lucien Cole.

Q.   And where did you go on the ship when you re-embarked, when you got back on the ship?

A.   I went back upstairs on the inside of lido deck nine to get something to eat.

Q.   What was the weather like when you got to the lido deck?

A.   It was very windy.  Because I remember walking forward trying to hold my balance.

Q.   Okay.  How would you estimate the winds?

A.   Well, growing up in Bahamas after I went there as a child, I would say 25, 30 miles an hour.

Q.   When you got on the deck, I guess you were going there to eat?

A.  Correct.

Q.  Were there other people in your group there on the deck?

A.  Yes, there was.

Q.  Okay.  So when you sat on the far side -- and I will show you a photograph here which is part of Defense 3.

Okay.  Looking at this photograph here, Defense 3, a series of photographs, when you sat in this area of the lido deck, was it because the winds were blowing?

A.  Correct.

Q.  Okay.  And --

THE COURT:  When you say you "when you sat in this area," you mean the red -- where you circled in red?

MR. DIEPPA:  No.  Sorry.  That's an old mark up there. I will clarify.

THE COURT:  She sat in front of the containers; correct?

BY MR. DIEPPA:

Q.  Yeah.  Just to clarify, due to the Court's question, ma'am, when you -- you sat in the area that's further inside, kind of like this area here?

A.  Yes.

Q.  All right.  And more specifically going to Joint Exhibit 5, would it have been the area we see here?

A.  Yes.

Q.  Okay.  And were you out -- were you out on the lido deck to

get some food?

A.   Yes.  I was out there.  At that point when -- once I went, got my food from the inside, I went out to the outside to eat with my friends.

Q.   So even though it was -- the wind was blowing the way you remembered it, they were still serving food?

A.   Yes.

Q.   Did you see any Carnival employees out on the deck while you were experiencing those windy conditions?

A.   Yes.  There were several workers because they was there wiping tables and carrying containers.

Q.   Okay.  You said "carrying containers."  Do you mean carrying containers similar to this one, Defense Demonstrative 16?

A.   Yes, similar to that.

Q.   While you were out there did you see any of the Carnival workers or employees making any attempts to secure the containers, to tie them down or anything like that?

A.   No, I did not.

Q.   While you were out on the lido deck however long you were out there before the incident, did anyone from Carnival Cruise Line tell you that it was too windy to be out on the lido deck?

A.   No, they did not.

Q.   Did anyone tell you that lido deck was going to be closed due to high winds?

A.   No, they did not.

Q.   Okay.  Were there any other events relating to the weather or high winds that caused the ship to stop along its route?

A.   Yes, there was.

Q.   Tell me about that.

A.   It was a small ship we had to stop for.  I guess it obtained like too much water.  Was blowing.  I remember they came over the loud speaker saying that we couldn't leave like on a route until someone else come.  I guess in distress the boat, like they couldn't just leave the people out there like that.  They had to wait 'til someone come out and relieve them.

Q.   And at the time you heard that announcement were the winds still blowing at the speed that you recall?

A.   Yes, it was.

Q.   So was the -- I guess was the ship rocking with the wind as well?

A.   Yes.  But it's -- you can say not really like rocking like that, but I had to move forward to get by.

Q.   Okay.  Now, how long were -- do you recall being out on the lido deck in the area that we discussed before your injury occurred?  How long do you estimate you were out there?

A.   When we got on, like 3:00, we had to wait in line, which the lines be very long because it's a lot of people in the ship.  So we probably waited in line like 30 to 35 minutes for food.  And so I want to say I probably was out there on the

deck from like 3:45 to like 6:00-something.  Because I remember going to the infirmary, it was after 6:00.

Q.   Okay.  And just looking at Joint Exhibit 1, this would have been the injury statement that you filled out.

Can you see it there on the screen?

A.   Yes.  That would be correct.

Q.   Okay.  So you estimated that the time of your injury -- is that what you estimated there, what we see here?

A.   Yes, that's correct.

Q.   And can you read that out as far as the time?

A.   Yes.  Time of incident will be 6:20 p.m.

Q.   Okay.  For the time that you were out there were the Carnival employees also out there for the entirety of the time you were out on the lido deck before your injury?

A.   Yes.

Q.   During that time when the wind was blowing and you were sitting out there with your friends and family, did you see any of the Carnival employees do anything to mitigate or protect against the wind?

A.   No, I did not.

Q.   Okay.  Did you see them do anything to keep anything from flying away or hitting somebody?

A.   No.

Q.   So we spoke to your husband yesterday, he was here, and you heard some of his testimony.

Do you recall that?

A.   Yes.

Q.   So my understanding, at least from what your husband said, is that at some point when you're sitting on the lido deck I guess you get up and sit next to him?

A.   Correct.

Q.   So I just want to walk you through that moment, and when I say "the moment," I mean the moment where you are getting up from the one table and you're going to join your husband's table.

You recall about more or less the distance between those two tables?

A.   Yes.  About where the container is there, I was sitting there with my girlfriends.  And when I looked over he was sitting by himself like where I'm at now.

Q.   All right.  I mean, to me it looks like ballpark 15 to 20 feet?

A.   Correct.

Q.   Now, when you stand up and you look towards the table do you see Carnival employees in that area where you're going to go sit?

A.   Yes.  They're all there.

Q.   Okay.  Now, when you're walking towards the table, and, you know, going back to the photographs in Joint Exhibit 5, when you're walking in the direction of the table, do you also

notice that the -- the employees had stacked these containers?

A.   Yes.

Q.   Did you expect anything was going to happen at that point when you're walking towards the table?

A.   Never.

Q.   So ultimately you sit down?

A.   Yes, I sat.  When I went from that table, I went and sat over with my husband to eat.

Q.   All right.  And did you already have food with you that you were bringing to the table?

A.   Yes.

Q.   Okay.  But was that -- and, just to clarify, the food you had, is that food you brought from the other table or food you brought from the buffet area?

A.   Food from the other table.

Q.   What type of food was it?

A.   It was some chicken fingers with like a side salad.

Q.   Got it.

Now, when you sit down, looking at Joint Exhibit 5 here, how are you seated in relation to this cart and the containers?

A.   Okay.  Where I was sitting at is where the blue mark is.  I sat there.  And my husband was sitting facing me over where the container is, the bottle container.

THE COURT:  The water bottle?

THE WITNESS:  Yes.

BY MR. DIEPPA:

Q.   Kind of like do you recall -- and looking at this photograph here which is part of Defense 3, in terms of your distance away from the cart, do you recall being more or less the distance that we see here in this photograph?

A.   That's correct.

Q.   All right.  So what -- I mean, that looks to me like maybe 5, 6 feet.  Do you recall that more or less being the distance you were seated from the cart?

A.   Yes.

Q.   Now, when you sit down are the winds still blowing more or less the same speed that you recall them blowing when you first got on the lido deck?

A.   Yes.

Q.   And are the employees still there in the vicinity?

A.   Yes, they are.

Q.   So tell me what happens after that.

A.   Okay.  At that point when I was sitting eating, I don't know how long before when I sat, but I felt like a -- a "boom." And I was eating with my right hand.  I remember because everything dropped and I braced up upwards.  And the pain was like you can -- you can pretty much feel like a -- "Creak!" -- and I just went --

Q.   You made a sound there?

A.   Yeah.  Like a -- "Creak!" -- like a sound, like a rip.

Q. Okay.

A. That sort of thing.

Q. A rip where?

A. My left shoulder.

Q. All right. And were you hit a second time?

A. The way it hit me, like, I -- I really don't know the significance, because it was like -- "Boom!" -- like -- but -- and when -- braced up to the table. I'm trying to remember, I'm trying to go back again. It's been two years now.

Q. I will rephrase it for you.

Your husband testified yesterday that you got hit twice.

Do you recall being hit twice?

A. It was like a boom. It felt like if somebody like -- it could have been two times like that hit me in my back.

Q. And when you say "like a boom," was like -- was the force -- like, can you describe the force with more specificity?

A. As if I had an enemy on the ship and somebody just came from behind and knocked the wind out of me. It was that type of hit. Like --

Q. Like a cannon?

A. Like a canon ball, like -- yeah. Because I braced up with my left hand, I dropped the food, and the pain, you could feel it and I just went over to my left side.

Q. Okay. So when we're -- we're talking about these

containers, at least the last time you saw them, they were somewhere like in this in relation to the distance?

A.   Yes.

Q.   And then they -- I guess better way to put it, from your recollection the wind would have had to have been such that it was able to pick, according to what your husband said, at least 2 inches and propel them into your shoulder?

A.   Correct.

Q.   And did -- after this incident happened, your husband is sitting next to you, did you have to report this incident to the Carnival employees?

A.   Well, the worker who was there, because he was like hysterical when it hit me, he the one that called someone.

Q.   So he called someone?

A.   Yes.

Q.   Were you still seated?

A.   Yes.

Q.   Okay.   Your husband, was -- how did he react when this happened?

A.   "Wifey, you're okay?   You're okay?"

Q.   And what did you tell him at that point?

A.   No.   I was in pain.   You can feel it like right at the hit the pain was like throbbing.

Q.   Okay.   And in terms of level of pain, was it extreme pain?

A.   Very extreme.

Q. At that point, your left shoulder, were you having trouble moving it?

A. Yes. I had to walk with my hand up holding my elbow.

Q. So the -- the containers, when you look on the floor, do you see them?

A. Actually, no. No. I didn't see anything. Like I said, when I got hit, it's so hard, I didn't know what it was.

Q. How did you find out?

A. Because everyone around the area started making noise and, "oh, those containers hit her," you know, making noise, and that's how I know what happened.

Q. Did your husband also tell you what happened?

A. Yes.

MR. DIEPPA: Now, Your Honor, may I approach the witness?

THE COURT: Yes.

BY MR. DIEPPA:

Q. Now, in terms of the pain that you recall, the specific location of the pain, you understand the difference between your trapezius and your shoulder; correct?

A. Correct.

Q. Okay. The pain that you reported to the ship's infirmary, where was it?

A. My left shoulder.

Q. So that worker when he first came up to you, how was he

dressed?

A.   It was a lady.  Well, the lady who -- but it was a worker, a Filipino guy, he was the one who was like really hysterical when it happened; he called someone.  The lady that came, she was a short Filipino lady with a ponytail and she had on all white.

Q.   Who was it that took you to the ship's infirmary?

A.   The young lady with the all white.

Q.   So going back to Joint Exhibit 5, plaintiff's photograph -- and I'm going to try to zoom in here.

     Can you see that?

     I don't know if --

A.   It look blurry.

Q.   A little blurry?

     It's a pill bottle?

A.   Yes.  Correct.

Q.   All right.  When you got to the ship's infirmary, did the nurse give you painkillers?

A.   Yes, she did.

Q.   Was the nurse the first I guess medical worker that you encountered?

A.   Yes.

Q.   Okay.  And I recall from Mr. Cole's testimony that you were gone for about two hours in the infirmary; is that what you recall?

A.   Yes.  About two hours and some.

Q.   Did you have to wait a while to see the doctor after you had been given the ibuprofen?

A.   Yes.

Q.   When you were given the bottle of ibuprofen, how many did you take?

A.   Since it was 200 milligrams, I took three at one time to make it 600.

Q.   600?

A.   Uh-huh.

Q.   Okay.  Did they kick in?

A.   It didn't kick in right away.  It took a little time, probably like 20 to 30 minutes to set in.

Q.   Okay.  Did it kick in by the time the doctor got around to seeing you?

A.   Not really.  You could still feel the pain.

Q.   But, I mean, was it taking --

A.   Yes.

Q.   So at least from what you recall, you get to the infirmary, they give you ibuprofen, and you take -- you take three ibuprofens.  And then at the time you're being examined by the ship's doctor you had taken three ibuprofen?

A.   Yes.

Q.   And did you continue to take those ibuprofens after you left the ship's infirmary?

A.   Yes.

Q.   From this photograph, this bottle, was it provided to you by the ship's infirmary?

A.   Yes.

Q.   So did you continue to take the ibuprofen from the bottle the night of the incident?

A.   Yes.

Q.   Okay.  Did you continue to take the ibuprofen the next day after you got off the ship and when you went to the emergency room?

A.   Yes.

Q.   When you got to the ship's infirmary did anyone make any statement to you regarding whether you were going to be charged for a visit to the infirmary?

A.   Yes.

Q.   What was that?

A.   It was the nurse that was in the front who I had the first encounter with, when she had me filling papers out, like, you know, I asked the question -- I was like, "Am I going to be charged for this?"  Because I know they charge you a lot on your cards.

     And she said to me, no, I wasn't going to be charged, it was on their negligence.

Q.   From what you experienced and the injury that you suffered as a result of this incident, do you believe there was anything

that Carnival Cruise Line could have done better to keep this from happening?

A.   Yes.

Q.   Could you tell me about that.

A.   Well, first I believe if it was high winds, 25 to 30 miles an hour, they should have had the area secluded because there's plenty of places -- other places that you could have gone. They shouldn't have the cart -- the containers secured at the bottom, where the open slot is supposed to be, not stacked at the top.  Or they could have had some type of signs warning, you know, objects can fly during high winds and then that would have been up to the person in the cruise ship, up to their discretion if they wanted to still be there although they saw all those.

Q.   Okay.  Now Carnival in this case has made some statements that when you buy a ticket to be a passenger on a cruise ship you should expect that the winds are going to blow and something is going to hit you.

Is that something that you would ordinarily expect?

A.   No.

Q.   What was your opinion of the treatment you received at the ship's infirmary?

A.   I was totally disappointed.

Q.   Why is that?

A.   Because after they saw me, they told me to sit, have a seat

and wait for I guess the ship officer. And he walked me back to the scene of the accident and I had to explain to him what happened. But they gave me an empty bag, a clear bag, and they told me -- and in the pills. And they told me that when I get back to the room to ask one of the -- I guess one of the guys that clean, ask them for ice. And that was pretty much it.

Q. So the ice that we see in this photograph, was that also provided to you by Carnival?

A. Yes.

Q. What -- by the time that person came to talk to you about the incident, I believe you -- they come to like your room?

A. No. I had to wait for him to come to the infirmary.

Q. The infirmary. Okay.

So it was after you were done with the infirmary?

A. Yes.

Q. And then he asked you to go back and show the area?

A. Yes. What hit me and where I was sitting at.

Q. All right. Was the weather still blowing by the time you got back?

A. Yes, it was.

Q. So that would have been maybe around 8:30 doing the math?

A. 8:00, 8:15. Yeah. Around that time.

Q. How did you sleep that night, the night of July 24, 2022?

A. Not good at all.

Q. The pain in your shoulder, was it getting better or was it

increasing?

A.   No.   It was very excruciating.

Q.   Did that cause you to increase your dosage of ibuprofen?

A.   Yes.   Because when they gave me 200 I was like, with this pain I feel like I should've taken three at a time taking it up to 600 milligrams.

Q.   So tell us, you get off the ship.   Where do you go right after you get off the ship?

A.   When we got off the ship my husband Lucien Cole put all the luggage to the parking lot and we went home.   And then went over to Plantation.   He couldn't go in with me.   Yeah.   So I went over to Plantation Hospital which is HCA Healthcare.

Q.   And did you tell them what had happened?

A.   Yes.

Q.   And at that point did you tell them that you had pain in your shoulder?

A.   Yes.

Q.   Okay.   Did they prescribe you additional pain medication?

A.   Yes.

Q.   Did they recommend that you follow up?

A.   Yes.

Q.   Okay.   Either -- you didn't get an MRI either in the ship's infirmary or at HCA Plantation; right?

A.   No, I did not.

Q.   So afterwards did you get an MRI?

A.   Yes, I did.

Q.   According to the records in this case, would that have been July 27th, 2022?

A.   Correct.

Q.   And after that did you start receiving treatment for your shoulder?

A.   Yes, I did.

Q.   Okay.  So from the records that I see, it appears that you didn't go straight into surgery, you started receiving some physical therapy?

A.   Correct.

Q.   And how did you respond to the physical therapy?

A.   I think I felt -- did pretty good.  You could tell there was an intense in my left shoulder.

Q.   And then you -- I guess you spoke to some doctors.  Did you also speak to Dr. Wilkerson?

A.   Yes, I did.

Q.   So tell me about what Dr. Wilkerson told you about your injury and about the way to treat it.

A.   When I first saw him he explained to me the MRI, what the findings was, and due to my injury and the way I braced myself, you know, that would cause I needed surgery on the shoulder.

     Yeah.  To be honest, I was afraid, you know, because I've never been through something like this.

Q.   So based on what Dr. Wilkerson told you, did you undergo

the surgery?

A.   Yes, I did.

Q.   After the surgery did you have at least some improvement in your symptoms?

A.   Yes.

Q.   Now, you did see -- you did go to a compulsory medical examination with Dr. Chalal.

     Do you recall that?

A.   Yes.

Q.   All right.  Do you recall how long Dr. Chalal actually saw you?

A.   Exactly 12 to 15 minutes.

Q.   Were you wearing a cervical collar when you went to that visit?

A.   No.

Q.   And did you still have -- tell Dr. Chalal you still had some pain in your shoulder, some limited range of motion?

A.   Yes.

Q.   So since the accident -- I know we heard a little bit about this from Mr. Cole, but can you tell us since the accident what your life has been like, what you know, how has your life changed?  Let's start with that.

A.   Like I said, my profession, Pathology Associate II, I always worked in microbiology with biopsies and different stuff.  But later I wanted to take it easy and draw blood.  And

I started doing phlebotomist now about five years, still with Jackson Memorial Hospital.  But up until my incident I haven't drawn blood.  I pretty much now just do troubleshooting with the physicians and the nurses and take care of like the transplant patient issues.

I also used to like to bowl.  And I'm not a good bowler -- so I don't bowl anymore.  I don't -- I don't have much strength as I used to have in this left arm.  I can now drive.  I have been driving now a year -- like 17 months I been driving on my own now with two hands.

Q.   Okay.  And looking at Plaintiff's Exhibit 7, which has been stipulated into evidence, medical bill summary for Eureka Cole, do you see that?

A.   Yes.

Q.   Okay.  You have looked at your bills before today, you have seen them?

A.   Yes.

Q.   Okay.  Does this amount that we see here, a total amount of $141,264.11 accurately reflect the amount of your medical bills incurred as a result of this incident?

A.   Correct.

Q.   Now, how long were you out of work due to this surgery?

A.   They wanted me to be out a total of six months.  I was out a total of two months exactly.  I had surgery September 15th or the 19th.  I can't remember.  And I went back to work

November 13th. And the reason why I went back to work because I didn't have no more time. I exhaust all my time.

Q. So what -- about total of that is two months or --

A. Yes. I was out two months.

Q. And so how much money do you make a month or were you making a month at the time you were out?

A. At the time I was out I was making -- if I was making 14 every two weeks, I was making 28 a month. 2,800 a month.

Q. Okay. So if you were out two months, would your total of 5,600 --

MR. JARNAGIN: Objection, Your Honor. My understanding was there was no lost wage claim being made.

MR. DIEPPA: Loss of earning capacity.

That's fine. I will --

THE COURT: Right. So it wouldn't be relevant to a lost wages claim, but I can see the relevance to a loss of earning capacity.

MR. DIEPPA: Yeah. And what I was going to get into is --

BY MR. DIEPPA:

Q. And, Ms. Cole, after you came back from this accident are you, in fact, being paid more?

A. Yes.

Q. Okay. And you're not claiming money for loss of earning capacity?

A.   No, I'm not.

Q.   I think you said physically the phlebotomy you still can't do it, but you did get a raise in pay?

A.   Yes.  I had got a -- it was I think a 6 percent cost of living, and I had got my year annual raise.

THE COURT:  Can I just -- the -- you said that you went back to work because you were out of time.  Like time off?

THE WITNESS:  Yes, ma'am.

THE COURT:  Were you on paid leave?

THE WITNESS:  Yes, I had exhaust all my personal leave.

THE COURT:  Okay.  So you didn't -- you didn't have time where you weren't getting paid?

THE WITNESS:  No.  At that point I didn't have short term disability.

THE COURT:  Okay.  Jackson, good benefits; right?

THE WITNESS:  Yes.

BY MR. DIEPPA:

Q.   And during that time what was the recovery like for your shoulder surgery?

A.   Well, I would say women could understand.  A shoulder surgery is the worst surgery.  It's worst than having a child.  It's unbearable.

Q.   Let's talk about that.

So when -- the day you completed surgery, did somebody come to pick you up?

A.   Yes.  My husband Lucien Cole was there with me the whole time.

Q.   Were you bandaged up?

A.   Correct.

Q.   Were you able to sleep in your normal bed?

A.   No.  I slept on the sofa for the whole two months.

Q.   Okay.  You couldn't sleep next to your husband, you had to sleep on a sofa?

A.   Correct.

Q.   And did you have to take also pain medications as a result of the surgery?

A.   Yes.

Q.   So I guess the postsurgical pain, the additional pain you had beyond your injury, how long did that last for?

A.   It's like even now when the weather is bad you feel the spasms.  So the pain haven't gone.

Q.   And after -- I guess the last -- let's go to the last time you saw Dr. Wilkerson after this surgery.  At that point did Dr. Wilkerson tell you there was anything else he could do for you?

A.   Actually, Dr. Wilkerson said to me if I needed to come back, that I could have, you know, depending.  They really didn't want to release me.

Q.   Have you been back?

A.   No.  No, I have not.

Q.   Did Dr. Wilkerson discuss with you the impairment rating that he gave you?

A.   No.

Q.   Did Dr. Wilkerson tell you like, you know, this is --

MR. JARNAGIN:  Objection.  Hearsay.

THE COURT:  It's hard for me to know until I know what the question is.

MR. DIEPPA:  Yeah.  I'm asking about a statement that was made to her, not -- it's fine.  I mean, it's a statement as to present medical diagnosis so it's a hearsay admission fully.

THE COURT:  I mean, it could be what was your diagnosis, is that what you're asking her?

MR. DIEPPA:  I will state the question and, Your Honor -- and I will state the question with predicate that it's being offered as a statement of present medical diagnosis.

THE COURT:  Okay.

BY MR. DIEPPA:

Q.   Okay.  Ms. Cole, when you spoke to Dr. Wilkerson and after the surgery and after, you know, some time had passed, did he tell you something to the effect that, you know, this is as good as your shoulder is going to get?

A.   Yes.

THE COURT:  It would've come out if you asked it a different way.  It was still not -- it's fine.

MR. DIEPPA:  Yeah.

BY MR. DIEPPA:

Q. And, in fact, you know, sitting here today, May 30th, 2024, is your shoulder back to the way it was before this accident?

A. No, it's not.

Q. Are you still having some pain in your shoulder or discomfort in your shoulder as we sit here today?

A. Yes.

Q. Did you have some pain in your shoulder, discomfort in your shoulder when you rose out of bed this morning?

A. Every night.

Q. And what do you do for that pain when it flares up?

A. I have some ibuprofen at home.

Q. And I think after this incident you went on some -- you went on a vacation?

A. Yes.

Q. Where did you go?

A. I went to Jamaica in March for another friend birthday.

Q. Did you ride horses there or try to ride horses?

A. Well, they have this thing where they have a stand and you step up on it and they pull you through the water with the horse.

Q. And were you able to get on that horse by yourself?

A. No. Of course not.

Q. How many people had to help you?

A. It was two. Two men.

Q.   Have you since your accident and your subsequent surgery and treatment attempted to live and enjoy your life as best you can within your limitations?

A.   Yes.

Q.   I think your husband mentioned something about the groceries.  Does -- do you have difficulty carrying grocery bags?

A.   Correct.

Q.   What about the bowling, are you still able to bowl?

A.   No.  I haven't bowled.

Q.   Are you like -- you bowl left-handed?

A.   I bowl with two hands.

Q.   Oh, two hands.  I don't know much about bowling.

     Before this incident ever happened, did any doctor ever tell you you had arthritis in your shoulder?

A.   Never heard that.

Q.   I mean, before this accident in terms of your left shoulder, did you feel, I mean, that it was degenerating in any way or not as good as before?

A.   Never.

          MR. DIEPPA:  Thank you, Ms. Cole.

          THE WITNESS:  You're welcome.

          THE COURT:  Thank you, Mr. Dieppa.

          How are you doing?  Do you need a break?

          COURTROOM DEPUTY:  No, ma'am.

THE COURT: Mairelys, how are you doing? You all right? Do you need a break?

Do you need a break?

MR. DRAHOS: We were going to ask can we take a brief bathroom break.

THE COURT: Yeah. Why don't we take a five-minute recess and get -- and then you can also get yourself set up. I don't know if you have to --

MR. DRAHOS: Thank you.

(A brief recess was taken from 10:48 a.m. to 11:00 a.m.)

COURTROOM SECURITY OFFICER: All rise.

COURTROOM DEPUTY: This court is back in session.

THE COURT: Okay. Remember you are still under oath.

THE WITNESS: Yes, ma'am.

THE COURT: And who is going to handle cross? Mr. Jarnagin. Okay.

CROSS-EXAMINATION

BY MR. JARNAGIN:

Q. Good morning, Ms. Cole.

A. Good morning, Mr. Cooper.

Q. We had an opportunity to meet back in August of 2023; correct?

A. Correct.

Q. All right. It's good to see you again even though we're in the courtroom this time.

A.   Same here.

Q.   So I want to start by going through some of your prior medical records before you went on the cruise ship in 2022. Okay?

A.   Okay.

Q.   So we spoke previously about a 2012 auto accident that you had in Miami.

Do you recall that?

A.   Correct.

Q.   And you injured your leg; right?

A.   Correct.

Q.   You don't remember which leg?

A.   No, I do not.

Q.   You don't remember if you underwent any physical therapy as a result of that car accident?

A.   No, I did not.

Q.   And we also talked about a 2018 auto accident in Hollywood, Florida; correct?

A.   Yes.

Q.   You were sitting in your car in a corner and someone bumped the back of your car?

A.   Correct.

Q.   And you previously told me that you did not seek out any medical treatment for that accident except physical therapy?

A.   Correct.

Q.   I'd like to throw up Defendant's Exhibit 6-5.

     Are you able to see that, Ms. Cole?

A.   Yes, I do.

Q.   Is this a record dated October 28, 2019, from your primary care physician?

A.   Correct.

Q.   And if we look at "past surgical history" on this document -- and I'll have Ms. Genoese help me blow that up -- did you undergo a right hand surgery in May of 2018?

A.   Correct.

     MR. DIEPPA:  Your Honor, objection.  Relevance and improper impeachment.

     THE COURT:  I don't think it's impeachment.  I think he's just going through some previous.

     MR. DIEPPA:  Objection to relevance.  Not the injury claimed in this case.

     THE COURT:  Overruled.

     MR. DIEPPA:  All right.

A.   I'm sorry, you say right hand surgery?

BY MR. JARNAGIN:

Q.   Yes, ma'am.

A.   In May 2018?

Q.   Yes, ma'am.

A.   I never had no surgery on no hand.

Q.   So is this record from your primary care physician

incorrect?

A.   They wanted me to get surgery on my right hand, but I did not do it.

Q.   Okay.  Now, what was the reason for you attending this appointment in October 2019?

A.   October 2019.  You mean the accident of 2018?

Q.   Well, this record is dated October 28, 2019, with your primary care physician.

A.   2019?  Well, I'm not familiar.  This is my regular physician.  I'm always at the doctor.  I'm diabetic.  I don't recall the incident of 2019.  If you refresh my memory maybe I do.  But I don't recall 2019.

     MR. JARNAGIN:  Ms. Genoese, can we blow up the section "reason for appointment."

BY MR. JARNAGIN:

Q.   Can you read us -- excuse me.

     Can you read for us what that says under "reason for appointment"?

A.   Yes.

     "Evaluation of injury sustained in a MVA on 10/26/2019.  Neck and back pain."

     Okay.  So it seems to me this is from 2018 accident.

Q.   But the date listed is October 26, 2019?

A.   Well, any time I go to my doctor, and she always ask me is there anything new when I go to the doctor, and I maybe brought

this up, this is what happened to me in 2018.  So anything I tell them, I do know that my doctor always notates.

Q.  Okay.  Are you saying that you were seeing your primary care physician on October 26, 2019 for a 2018 motor vehicle accident?

A.  No.  I'm always telling the physician -- as a matter of fact, I go every three months due to my condition, diabetes 2.  So any time I go to the physician I always tell them -- they always ask you, "Is there anything new with you?"  So maybe I brought this up and this is why it's in my file.

Q.  Okay.  So do you deny that you were involved in a motor vehicle accident on October 26, 2019?

A.  Yes.  I believe that was in 2018 when I was hit in the back.

Q.  So this is not a separate motor vehicle accident from the one that you told me about that occurred in 2018 in Hollywood, Florida?

A.  Well, it was one accident in -- I think if we go back, I believe it could have been 2018, it could have been 2019.  But I was in a motor vehicle accident where someone hit me as I was at the stop sign ready to go out on 441 heading north.  And I did injure my neck and my lower back.  Now, I maybe have the years mixed up.  I'm not sure.  But that did happen.

MR. JARNAGIN:  Can we turn to the next page of the exhibit, Ms. Genoese.

MR. DIEPPA:  You're still on the October 2019?

MR. JARNAGIN:  Yes.  We're on Defendant's Exhibit 6.

And let's turn to the next page.

MR. DIEPPA:  Your Honor, just renewing my objection to -- I mean, is this impeachment, is this relevance?  Where is this going?  This is clearly not related to the injury.

THE COURT:  By the way, this document is in evidence so they can ask her about it and it has to do with her and her medical history so overruled.

BY MR. JARNAGIN:

Q.  So, Ms. Cole, for Defense Exhibit 6, for the record, dated October 28, 2019, do you deny that this was an evaluation for neck and back pain following a motor vehicle accident?

A.  No.  I do not deny it.

Q.  Okay.  All right.

So, Ms. Cole, let's now go to the cruise itself.

A.  Correct.

Q.  So you boarded the Conquest on July 22nd of 2022?

A.  Yes.

Q.  On that first day you went out to the lido deck; correct?

A.  Correct.

Q.  And the ship was sailing away from port?

A.  Correct.

Q.  And you ate on the lido deck that first day?

A.  Correct.

Q.   You did not have any issues with anything striking you on the lido deck that day?

A.   No.

Q.   The following day on July 23rd the ship was sailing at sea for the entire day?

A.   Correct.

Q.   And that day you went up to the lido deck and you had breakfast by yourself?

A.   Correct.

Q.   And then you also had lunch on the lido deck?

A.   Correct.

Q.   And you spent between three to five hours on the lido deck that day?

A.   Correct.

Q.   Including going to the jacuzzi?

A.   Correct.

Q.   And members of your travelling party were playing games on the lido deck that day?

A.   Correct.

Q.   Cards?

A.   And dominos.

Q.   And dominos.

     And you did not have any issues with any items striking you on that second day on the lido deck, did you?

A.   No, I did not.

Q.   The following day, July 24th, that's the day of your incident?

A.   Correct.

Q.   And the ship was in port in Nassau, Bahamas that day?

A.   Correct.

Q.   And you went up before going to Nassau and you had breakfast on the lido deck?

A.   Correct.

Q.   And after eating breakfast you and your husband went to Arawak Cay?

A.   Correct.

Q.   And you spent five hours there at the Bahamas; correct?

A.   Correct.

Q.   And then you got back on the ship around 3:00 p.m.?

A.   Correct.

Q.   And once you got back on the ship you went to the lido deck?

A.   Correct.

          MR. DIEPPA:   Just objection to form.  I think these are statements, they're not questions.

          THE COURT:   It's cross.  It's okay.

          MR. DIEPPA:   Okay.  If it's allowed.  Every judge is different.

BY MR. JARNAGIN:

Q.   So once you got back on the ship, you're on the lido deck

with your husband Lucien Cole after 3:00 p.m.; is that right?

A.   Correct.

Q.   You remained on the lido deck up until the time of your incident, and I believe you stated that was around 6:20?

A.   Correct.

Q.   So you would have been on the lido deck for about three hours prior to your incident taking place?

A.   Correct.

Q.   Earlier you talked about estimating the wind speed on the lido deck that day.

     Do you recall that?

A.   Correct.

Q.   You gave an estimation of 25 to 30 miles per hour?

A.   Correct.

Q.   You would agree with me that you're not a meteorologist?

A.   Correct.

Q.   You would agree that you don't have any scientific expertise that would allow you to estimate the wind speeds based on miles per hour?

A.   Correct.

Q.   Now, shortly before your incident you were sitting at another table with a group of your friends?

A.   Correct.

Q.   And then you went to the bar and you served yourself chicken and salad; is that right?

A.   When we got on the ship back from Bahamas, the island, at that point that's when I went in line to get something to eat. Then I went to the seat with my friends and then I went over to my husband.  In that order.

Q.   So you -- at what point did you get the chicken and salad from the bar?

A.   When we got on the ship -- as I said earlier, when we got on the ship we went straight into the inside of the -- that same floor on nine.  You get in line, you wait in the line. Probably a line of 30, 35 minutes the most.  Got my food then went outside to the lido deck and sat to the table with my group.  When I noticed my husband was sitting by himself I removed myself from the group and I went and sat with him with the plates in my hand.

Q.   Let's pull up Defendant's Exhibit 3-2.

     Ms. Cole, do you recognize this photo?

A.   Yes, I do.

Q.   Does this depict the table that you were seated at when the incident happened?

A.   Yes.

Q.   Now, did you tell me when we met previously that you had been sitting in a chair depicted in this photograph for about one to two minutes before feeling a hit?

A.    I don't remember the time when I sat and hit, I just remember I was hit.

Q.   It was a single hit that you felt?

A.   It hit so hard -- as I said earlier, I can't really explain like -- it was like I said, it was like a -- "Boom!"

So I can't really explain if it was a two hit or a three hit or a one hit.  I really can't.  All I can explain, the significance of the boom and you feel like a -- like a -- "Creak!" -- sound.

Q.   So before you sat down at this table with your husband had you ever observed the working station that we see behind the table that contains the containers?

A.   Yes.

Q.   Is that what you told me the last time we talked?

A.   I can't recall.

Q.   So you do recall having your deposition taken in August of 2023 under oath in this matter?

A.   Yes.

MR. JARNAGIN:  I would like to approach the witness with the deposition transcript.

THE COURT:  Okay.

MR. DIEPPA:  Advise me the page and line, Counsel?

MR. JARNAGIN:  Sure.  Page 47, lines 13 through 15.

BY MR. JARNAGIN:

Q.   So question -- I'm starting at page 47, line 10.

A.   Line 10?

Q.   Yes, ma'am.

My question was:  "Behind the chair we see some type of working station; right?"

Your answer was:  "Correct."

"QUESTION:  Did you observe the working station prior to sitting in the chair?

"ANSWER:  No.  I did not observe the working station.

"Did you observe the working station prior to sitting down with your husband?

A.  Well, here it says I said no.  I don't remember.  But that station was always there.

Q.  Well, earlier you testified that you observed crew members stacking containers on this working station prior to sitting down; is that correct?

A.  Correct.

Q.  Okay.  But when you talked previously you told me that you did not observe the working station prior to sitting down with your husband.

A.  Okay.  It says on there no.  Like I said, I really don't remember being asked that question.  Sorry.

Q.  Okay.  So, Ms. Cole, you did not see what hit you; is that right?

A.  No, I did not.

Q.  But you have described the hit for us; correct?

A.  Correct.

Q.  When you felt the hit, did your body move whatsoever?

A.    Yes, it did.

Q.    And how did your body move?

A.    When the -- the compact of the hit, like I said, I was eating with my right hand.  When the boom impact, I shoved up frontwards with my left hand and then I schlopped {phonetic} over because, like I said, the pain.  And you can hear like a -- "Creak!" -- so it was like a little tear of some sort.

Q.    So earlier when we spoke in your deposition, is that the same way that you described feeling the hit?

A.    I'm not sure.

Q.    Did your body strike anything as a result of feeling the hit?

A.    I went up to the table with pretty much force.  That's how hard it hit me.

Q.    You still have the deposition transcript in front of you?

A.    Yes.  Uh-huh.

Q.    Okay.  I would like you to turn to page 55, and it's lines 13 through 15.

Are you there with me?

A.    Yes.

Q.    "QUESTION:  Did your body strike anything as a result of feeling the hit?

"ANSWER:  No."

Do you recall giving that testimony?

A.    Well, but I think honestly -- I think I pretty much

probably didn't understand the significance of the question when you said did my body strike anything as a result of the feeling of the hit and I said no. Maybe I wasn't thinking of when it brushed up to the table because that really wasn't a hit to me. I thought maybe of something else hit me.

Q. So your response is different today in trial, isn't it?

A. Yes. With the understanding of the question, yes.

Q. After you felt that hit a woman that worked for Carnival escorted you to the medical center?

A. Correct.

Q. And the ship's doctor performed a physical examination of your back and shoulder; is that right?

A. Correct.

Q. And you had full range of motion in your left shoulder?

A. No, not at the time. No.

MR. JARNAGIN: Can we pull up Joint Exhibit 2-3.

BY MR. JARNAGIN:

Q. Are you able to see this record, Ms. Cole?

A. Yes.

Q. Within this record the doctor notes that you have full range of motion.

Do you disagree with the doctor's finding?

A. Yes.

Q. And a security officer spoke with you while you were there at the medical center?

A.   Actually, he only told me to take him back to the scene of the incident.

Q.   Did you interact with a security officer while you were in the ship's medical center?

A.   As he asked me questions, yes.

Q.   Did you fill out a Passenger Injury Statement form while speaking with the security officer?

A.   No.   That was done from the first time I entered the clinic.

Q.   You filled out the Passenger Injury Statement form while you were in the medical clinic?

A.   Correct.

        MR. JARNAGIN:   Can we please pull up Joint Exhibit 1.

BY MR. JARNAGIN:

Q.   Ms. Cole, do you recall filling out this statement?

A.   Yes.

Q.   I would like to blow up the portion that speaks to witnesses of the incident.

        Ms. Cole, do you recall filling out this portion of the form that asks who witnessed the accident?

A.   Yes.

Q.   And what did you write?

A.   "Guest."

Q.   Did you write anything about any crew member having witnessed the incident?

A.   No, I did not.

Q.   Did you write anywhere else on this form that a crew member had witnessed your incident?

A.   No, I did not.

Q.   After you left the medical center you returned to the same area where you claim you were hit?

A.   Correct.

Q.   Was it still windy when you returned?

A.   It was windy still.  But not as much during that hour.

Q.   So earlier today you said the ship was still rolling?

A.   Yes.

Q.   So you went back and you described the conditions as windy and still rolling?

A.   Yes.

Q.   Okay.  But how long did you remain in that particular area of the lido deck after you returned from the medical center?

A.   Well, when I went back to the lido deck after the medical center, the same young lady that took me down with the white, she had an employee to walk with me to the line to get me some more food to eat because I couldn't even finish my food from the incident.  She brought it back to the table.  She had her get me some ice and then we went back to the room.

Q.   And when you went back to the lido deck after leaving the medical center, your husband Mr. Cole was still present in the same location?

A.   Yes, he was.

Q.   Did you tell me when we spoke the previous time that you remained in the area for about 30 minutes or so after returning from the medical center?

A.   I don't remember the time.  But I did go back.

MR. JARNAGIN:  Can we put up Joint Exhibit 5, please.

BY MR. JARNAGIN:

Q.   Ms. Cole, do you recognize this photo?

A.   Yes, I do.

Q.   What's depicted here?

A.   Excuse me?

Q.   What is depicted in the photograph?

A.   I don't understand.

Q.   What do you see when you look at this photograph?

A.   I'm sorry.  I see the -- the ibuprofen 200, I see the ice, and I see the plate with salad.

Q.   Is that plate of salad, is that the food that you received once you returned from the medical center back to this location on the lido deck?

A.   Yes.

Q.   Who took this photo?

A.   I'm not sure.  It's been two years now.  I'm not sure.

Q.   Do you know if it was yourself or your husband Mr. Cole?

A.   I can't recall.

Q.   But you did produce these photographs in discovery in this

case; is that your understanding?

A.   Yes.

Q.   Do you know the reason why these photographs were taken?

A.   No, I do not.

Q.   These photographs weren't taken because you were contemplating filing a lawsuit?

MR. DIEPPA:  Objection, Your Honor.  He can't suggest litigiousness by taking photographs.

THE COURT:  Sustained.  You can just end with --

MR. JARNAGIN:  Okay.

BY MR. JARNAGIN:

Q.   You never returned to the medical center for the remainder of the cruise; right?

A.   No.

Q.   And you disembarked the vessel the following day?

A.   Correct.

Q.   The same day you left the ship you presented at HCA Hospital in Plantation, Florida?

A.   Correct.

Q.   I would like to put up Joint Exhibit 7-3.

Did you report to HCA Westside Hospital that in addition to being hit by a container, that you had also slipped and fallen in water?

A.   Yes.  And which I indicated earlier.

Q.   And you reported the severity of your current pain level at

that time to HCA Hospital as a 1 out of 10; is that correct?

A.   A 1 out of 10?  No.  I would have never said that.

Q.   So this record is incorrect?

A.   Yes.

Q.   Let's go to the next page, Joint Exhibit 7-4.

Ms. Cole, did you present to HCA Hospital with a cervical collar in place?

A.   No.

Q.   Let's blow up the portion that speaks to the cervical collar.

Are you able to read that?

A.   Yes.

It says:  "The patient presented to the emergency department with a C-Collar in place.  With a C-Collar in place I performed additional exams and determined that the C spine -- are negative.  There is no post middle line tenderness.  The patient is not intoxicated.  There is a normal level of alertness.  There are no focal" -- sorry -- "no focal neurologic deflects and there are no distractions injury therefore the C-Collar has been removed and no imaging is required."

Never in my life have I ever worn a C-Collar.  And they can pull a videotape, whatever.  I can testify to that.  Never.

Q.   So this record contains an entire narrative of you showing up to the ER with a C-Collar in place, and you deny having worn

a C-Collar to that hospital?

A.   I deny with all I have.

Q.   Okay.  No one from HCA Hospital decided to image your shoulder; is that right?

A.   No.

Q.   And did HCA Hospital give you a referral to another medical facility?

A.   They told me to seek out with my physician or seek out another -- somewhere.  I can't quite remember the exact words. Like I said, it's been two years now.  I had to seek out if I had more pain.

Q.   Can we go to Joint 7-9.

     Let's blow up the "referral" portion.

     Did HCA Hospital refer you to Seventh Avenue Family Health Center in Fort Lauderdale?

A.   I believe so.  I was new to Broward pretty much.  So I didn't -- I believe so.

Q.   You didn't go to Seventh Avenue Family Health Center, did you?

A.   No, I did not.  I went to Associates MD.

Q.   So two days after this appointment you don't go to the medical center that's referred to you, instead you go to CitiMed; is that right?

A.   Correct.

Q.   And on that day, on July 27th, 2022, you signed a letter of

protection with CitiMed?

A.   Correct.

Q.   Let's pull up Defense Exhibit 7-3.

Ms. Cole, your signature appears on this page; correct?

A.   Yes.

Q.   Your attorney's name appears as well?

A.   Correct.

Q.   Did you report on this day, on July 27, 2022, that a working station had moved while you were onboard the cruise ship?

A.   A working station moved?

Q.   Yes, ma'am.

A.   I don't remember saying that.

Q.   Let's go to Plaintiff's 3-51.

Let's blow up the portion under "history and present illness."

Can you read that for us, Ms. Cole?

A.   Sure.

Q.   The first two sentence is fine.

A.   "Eureka Cole is a 51-year-old female patient involved in a traumatic event on 7/24/2022.  Patient was at Carnival cruise ship while she was having lunch and a workstation moved and hit her left shoulder."

Q.   So did you tell CitiMed that a working station had moved and hit your left shoulder?

A.   To me it looks like a miss type here.  I never said a station moved.  Always been consistent that I was hit with containers on the shelf.

Q.   So this CitiMed record is also inaccurate?

A.   Yes.  This is very much inaccurate.  I never said the station moved.

Q.   Following this appointment did you begin physical therapy with CitiMed?

A.   Yes.

Q.   Did you see orthopedic surgeon Dr. Wilkerson for the first time on August 12, 2022?

A.   Yes.

Q.   That's roughly 19 days following your incident onboard the cruise ship?

A.   From the 22nd until the 19th?  Somewhat, yes.

Q.   Did Dr. Wilkerson recommend a left shoulder surgery for you on your first visit with him?

A.   No, he did not.  After the MRI was done, then that's when they went over it with me and said I needed the surgery.

Q.   But your first appointment with Dr. Wilkerson was August 12th of 2022; right?

A.   I believe so.

Q.   And that is the date that Dr. Wilkerson recommended the left shoulder surgery to you?

A.   Well, he didn't recommend the shoulder surgery to me until

after the MRI was done, and I don't remember the date of that.

Q. After seeing Dr. Wilkerson for that first visit on August 12th of 2022, did you ever see Dr. Wilkerson again prior to your surgery?

A. Yes. I saw Dr. Wilkerson and I also saw -- it was another young lady, another doctor.

Q. Do you know if there's any medical records that exist that show visits to Dr. Wilkerson between August 12th and the day of your surgery September 15th?

A. I'm not sure.

Q. Now, as of August 2022, this is the month following the cruise, you did maintain a Facebook account?

A. Yes, I did.

Q. And you were the only one with access to this Facebook account?

A. Not really. I have friends who have access to it.

Q. Is that what you told me the last time?

A. No. Oh, I thought you mean like can see it, like open to the public. But, yes, I'm the only one that controls the username and password, if that's the question.

Q. Okay. You are the only one that has access to post content on your Facebook account?

A. Yes.

Q. Let's pull up Defendant's Exhibit 9-7.

Ms. Cole, are you able to see that?

A.   Yes, I do.

Q.   You recognize this photo?

A.   Yes.

Q.   Did you take this photo?

A.   Looks like it, yeah.  Looks like I'm holding my right arm out.

Q.   Where was this photo taken?

A.   At my high school class reunion.

Q.   On what date did you take the photo?

A.   Well, up in the corner it says "August 6, 2022."

Q.   Okay.  So you took the photo around August 6, 2022?

A.   Correct.

Q.   Okay.  This would have been after your incident on the cruise ship, but before meeting with Dr. Wilkerson?

A.   I don't have the dates in my head on when I met with him.

Q.   Okay.

A.   But this will be after the incident on the cruise ship.

Q.   And does an individual have her arm placed on your left shoulder in this photograph?

A.   Well, she have her hand -- if you look at it, you see her wrist is up, you know, scotch {phonetic} position.

Q.   Let's go to Defendant's Exhibit 9-9.

     Ms. Cole, do you recognize this photo?

A.   Yes.

Q.   Did you take this photo?

A.   It looks so.

Q.   Was this photo taken on the same day as the previous photograph?

A.   Yes.

Q.   Do you have both arms lifted above your shoulders taking this photo?

A.   They were not lifted above my shoulder, but both arms are up.  I never said that I couldn't lift my arm up.

Q.   Let's go to Defendant's 9-10.

     All right.  Ms. Cole, was this photo taken on the same date?

A.   Yes, it was.

Q.   Same location as we discussed?

A.   Yes.

Q.   And it looks like, again, you have both arms out stretched in front of you?

A.   Yes.

Q.   Go to Defendant's 9-21.

     Ms. Cole, do you recognize this photo.

A.   Yes.

Q.   What date was it taken?

A.   It was taken August 21st, 2022.

Q.   And you are in this photo; right?

A.   Yes, I am.

Q.   Do you have your hand resting on your shoulder in this

photo?

A.   Actually, no.  It's not resting in my shoulder.  It's rest on my neck.

Q.   You have your left arm positioned up with your left hand on your shoulder?

A.   On my neck, yes.

Q.   On your neck?

     Agreed.

     Go to Defendant's 9-24.

     You recognize this photo, Ms. Cole?

A.   Yes, I do.

Q.   Where is this photo taken?

A.   This photo was taken at a park on 36th Street and 7th Avenue.  I believe it's Arcola Park if I'm not mistaken.

Q.   And what date was this photo taken?

A.   It was taken August 21st, 2022.

Q.   This photo is taken prior to your left shoulder surgery with Dr. Wilkerson?

A.   Yes, it was before the surgery, yes.

Q.   Okay.  And let's pull up Defendant's 9-26.

     Ms. Cole, you are depicted in this photograph?

A.   Yes.

Q.   Do you have your left arm out stretched above your shoulders to take a photograph here?

A.   Actually, that's my right arm that's taking the photograph.

MR. JARNAGIN:  Ms. Genoese, can we zoom in on Ms. Cole's sunglasses.

BY MR. JARNAGIN:

Q.  All right.  Are you able to see on the reflection of your sunglasses that you have --

A.  Yes, I see.

Q.  All right.  And, Ms. Cole, all of these photographs that we just talked about on these Facebook posts, they were all taken after your claimed incident on the cruise ship, but before your surgery with Dr. Wilkerson in September of 2022?

A.  Correct.

Q.  Okay.  Now, Ms. Cole, you also had access to your Facebook while you were onboard the cruise ship?

A.  Correct.

Q.  And you did post photographs from the cruise on your Facebook?

A.  Correct.

Q.  I would like to publish Defendant's Exhibit 5, Plaintiff's Answers to Interrogatories.

Ms. Cole, do you recognize this exhibit as your answers posed by Carnival in this lawsuit?

A.  Okay.  I don't understand the question you just asked.

Q.  Are these interrogatories issued by Carnival for you to answer as part of this lawsuit?

A.  Yes.

Q.   Okay.  Do you recall completing these answers?

A.   No, I don't recall.

Q.   Let's go to Defendant's Exhibit 5-9, the signature page.

     Ms. Cole, your signature appears on the final page of this exhibit?

A.   Okay.

Q.   Is that right?

A.   Yes.

Q.   That's your signature there?

A.   Yes, it is.

Q.   And as part of answering interrogatories you affirmed under penalty of perjury that the answers you were giving were true and correct?

A.   Yes.

Q.   Let's go to Defendant's Exhibit 5-7.

     Let's blow up Interrogatory No. 21 and the response.

     All right.  Ms. Cole, are you able to read that?

A.   You want me to read both the question and answer?

Q.   Just read the question.

A.   Okay.  "Identify any and all social media sites or applications in which you post any content or images between the dates of July 22nd, '22 through July 25, '22, including, but not limited to Tik Tok, Facebook, Twitter, Instagram, Foursquare, YouTube, Pintrest, Tumblr and Snapchat."

Q.   And as part of the answer there's a legal objection and

then there's a final sentence. Can you read that for us, please.

A. Yes.

"Objection is" --

Q. I want to save you some time. You can start from the very last sentence, it begins "subject."

A. "Subject to the foregoing plaintiff does not maintain any social media accounts."

Q. Okay. You understand this question is asking whether you posted any content or images to your social media accounts during the time of the cruise?

A. Yes, I did post.

Q. Okay. But you responded that you just do not maintain any social media accounts?

A. Well, at the -- the first time you questioned me you said to me that I had a Facebook and then I no longer had it. And I explained to you that I made a change in my life. Once I got baptized last year, April, I closed out from the world because I wanted to focus more on Christ and that was my answer to you when you asked me the first time.

Q. Okay. So this decision to deactivate your social media accounts came around the same time that you were asked to answer these questions from Carnival?

A. I got baptized April, Easter, of last year. And like I want to say some weeks after that I shut down off of Facebook.

I don't -- I see the date, I can't quite remember the date again because we changed from that paper -- that page.  But I had it and then I got rid of it.

MR. DIEPPA:  Your Honor, I ask for the sake of completion to read her deposition testimony explaining this answer also.

THE COURT:  That's something you can do on redirect.

MR. DIEPPA:  Okay.

BY MR. JARNAGIN:

Q.   Let's go to Interrogatory 22, the question and answer. Please just read the question for us, Ms. Cole.

A.   Sure.

"For any account identified in Interrogatory No. 19 above, please describe in detail any and all images of or content pertaining to you that were deleted or erased on or after July 24, 2022, including but not limited to, photographs, videos, posts, and and/or tweets."

Q.   And as part of your answer again we have a legal objection. And then the last sentence beginning with "subject," can you read that for us?

A.   "Subject to the foregoing, plaintiff does not maintain any social media accounts," and which I explained that to you in our deposition.

Q.   Okay.  So this particular question is asking you to list out any content that was erased or deleted after the subject

cruise, is that how you understand the question?

A.   Now I do.

Q.   And your response was simply that you do not maintain any social media accounts?

A.   Correct.

MR. JARNAGIN:  Thank you, Ms. Cole.  No further questions for you.

THE WITNESS:  You're welcome.

THE COURT:  Thank you.

Mr. Dieppa, redirect?

MR. DIEPPA:  Yes, Your Honor.

And so in regards to the statements that you just -- deposition testimony, do you want me just to go over it with her or read it?

THE COURT:  Why don't you just ask her?  Why do you have to go to the deposition testimony?

MR. DIEPPA:  They read parts of her deposition, but they did not read other parts.

THE COURT:  Well, they did read parts of her depo on different points.

MR. DIEPPA:  Yeah.  But she also discussed her interrogatory answers in her deposition.

THE COURT:  Right.

With respect to her interrogatory answers, why don't you just ask her now to explain it.  Why does it matter what

she said in her depo about it if she can explain it now?

MR. DIEPPA:  Well, there's an impression -- I understand, Your Honor.

REDIRECT EXAMINATION

BY MR. DIEPPA:

Q.  Ms. Cole, how are you doing again?

A.  Doing great.

Q.  You still got that deposition transcript in front of you there?

A.  Yes, I do.

Q.  Okay.  Can you go to page 96 through 97.

THE COURT:  Hold on.  Before you put that depo up, don't you want to ask her?

MR. DIEPPA:  I just want to get her to the page before I ask her the question.

THE COURT:  Why don't you ask her the question first?

MR. DIEPPA:  Okay.

THE COURT:  Because, I mean, she doesn't need the depo if she remembers independently now.  Unless you are saying that they were asking her something out of context about her deposition and you want her to complete that.

MR. DIEPPA:  It's misleading, of course.  Because the issue is this, Your Honor, just to fill you in.  The issue is Mr. Jarnagin is impeaching her with an interrogatory answer and giving the impression that she was not truthful in her

interrogatory answer when, in fact, in her deposition she spent about two or three pages of her deposition explaining that she did have Facebook at one point --

THE COURT:  Okay.  So that's what I'm saying, why don't you just ask her that now?  If she told you "I don't remember why I said that in my interrogatory," that's a whole other question, but -- then you would refresh her recollection with it.

MR. DIEPPA:  I can do it that way, Your Honor.

THE COURT:  I can guess based on what she has already said what she's going to say.  So you might want to just ask her to clear up why she responded to her interrogatory questions like that.

BY MR. DIEPPA:

Q.  Okay.  Ms. Cole, after you answered your interrogatories, you appeared at a deposition with Mr. Jarnagin on August 2nd, 2023?

A.  Yes.

THE COURT:  Okay.  No.  I mean, yes, you did.

Just ask her why she answered her interrogatory questions like that.

BY MR. DIEPPA:

Q.  Okay.  Ms. Cole, is there a specific reason that you answered the interrogatory questions concerning your Facebook page at the time, and could you explain for us that reason?

A.   No.   There's not a specific reason why I answered it like that.

Q.   Did you explain the reason you answered the interrogatories the way you did during your deposition?

THE COURT:  Meaning when were the interrogatory responses signed, by the way?  Why don't you pull that exhibit back up.  Defense 9.  No.  Defense 5.

MR. DIEPPA:  June 14, 2023.

THE COURT:  Okay.  So in June 2023 you answered those interrogatory questions saying you don't have any social media accounts between June -- between the date of the incident -- pull -- pull up D 5.

MR. DIEPPA:  Between July -- the date --

THE COURT:  What does it ask in D 5, what's the date it's asking about?

MR. JARNAGIN:  Dates of the cruise, July 22nd through July 25th.

THE COURT:  So the entire period of the cruise?

MR. DIEPPA:  Yeah.

THE COURT:  All right.  So why don't you let Ms. Cole explain why she would answer an interrogatory saying she didn't have any Facebook or any social media accounts between July 22nd and July 25th.

BY MR. DIEPPA:

Q.   Ms. Cole, can you explain why you answered the

interrogatory the way you did once more.

A.   I don't know why I answered it that way because I never denied.  Like I said before, I told them I had it.  It probably was a case of really not reading and just signing at that time. But I never denied that I had social media.  I did close out on my social media in April, the end of April.  But I really don't know why I answered it that way.

Q.   Okay.  Did you give that explanation at your deposition before you came here today?

A.   To Mr. Cooper, yes.

Q.   Okay.  Did Mr. Cooper show you these interrogatories at your deposition?

A.   No, he did not.

Q.   Did he discuss them with you and ask you about Facebook accounts?

A.   He asked me did I have any accounts and I stated to him I did have it, but I got baptized and I closed out from the world and then that's when he presented pictures after that.

        MR. DIEPPA:  And, just for the record, Your Honor, because her deposition testimony is filed with the court, that testimony appears on pages 96 through 97 of her deposition transcript.

BY MR. DIEPPA:

Q.   Now, do you recall also telling Mr. Jarnagin on page 105 of your deposition and discussing with him what you had seen in

regards to the containers?

A.   Mr. Jarnagin?

Q.   Cooper.

A.   Oh, okay.  I was lost.

Cooper?  Can you rephrase --

Q.   Looking at that page do you recall giving that testimony there, 13 through 22.

MR. JARNAGIN:  Page 105 are questions asked by Mr. Dieppa.

A.   Yes.

BY MR. DIEPPA:

Q.   Okay.  Does that refresh your recollection as to the crew members that were working in the dining area and what you said at your deposition?

A.   Yes.

Q.   Okay.  And what -- now looking at that, what do you recall in terms of the crew members being in the area where your incident occurred?

A.   Yes.  There were crew members.  But if I may, the paper where I said "guests," crew members wasn't on my mind to write on that paper.  I thought the paper was pretty much pertaining to like who, you know, me, who I was with.

Q.   Okay.  And so is that -- is it accurate then your statement that you made at your deposition, we see here regarding the waiter?

A.   Yes.

Q.   Okay.  And was it accurate that you stated in your deposition in the presence of Mr. Jarnagin that he was there before the incident occurred?

A.   Yes, he was.

Q.   And looking at page 107 of your deposition there, line 11 and 16, and reviewing that testimony that you provided at your deposition -- just let me know when you read it.

A.   Yes.

Q.   Okay.  Does that refresh your memory regarding how close the worker was to you prior to your incident?

A.   Yes.

Q.   Okay.  And what do you recall that being, that testimony?

A.   Between 5 to 6 feet.

Q.   And looking at your testimony on page 108, lines 2 through 11 of your deposition -- take your time to review that.

        MR. JARNAGIN:  We are going to object on the basis of this being cumulative.  This was already covered on direct, the same questions asked by Mr. Dieppa.

        MR. DIEPPA:  This is redirect and rehabilitation of an impeachment, Your Honor.

        THE COURT:  I mean, I -- so it was that the defense, when she was on cross, she didn't recall how close any employees were to her?

        MR. DIEPPA:  Mr. Jarnagin confronted her with another

section of her deposition where she said that she doesn't recall who was -- she didn't recall who was there, there were not people there.  And then there's another part of her deposition where she did state that, in fact, there were Carnival employees that witnessed the incident.

Point being she did make a statement as to that at her deposition.  I'm entitled to have the portions of the deposition read in context.  I requested that.  So, you know, that's why it's relevant.  It's -- you know, it's redirect, Your Honor.

THE COURT:  Okay.  So the issue before the court is really what Ms. Cole -- the issue right now is what Ms. Cole remembers and is telling us about that day.  The issue is what happened that day; right?  Ms. Cole already testified that -- I know Mr. Cole did -- that there were employees on the deck at that time.

MR. DIEPPA:  You are correct, Your Honor.

THE COURT:  Right?

MR. DIEPPA:  The secondary issue is Ms. Cole's credibility.  And I don't --

THE COURT:  I mean, I get it.  So in the report that she gave when she walked into the infirmary she says, you know, who else was there, and she wrote "guest."  I get that point.  And they read -- they went over a portion of her deposition.  That's where I may be misremembering.

They went over a portion of her deposition that you find problematic because she didn't recall people there?

MR. DIEPPA:  Yeah.  Because --

THE COURT:  A woman in white?

MR. DIEPPA:  There was a portion that they read, and I fail to recall the exact portion where she had stated she didn't recall seeing anyone or didn't recall seeing the containers.  And then at the end of her deposition she clarified that point the same day, and that's the reason for reviewing that testimony.

Now, of course the Court can just read her deposition transcript, you know, later on, but I just want to make it clear that Ms. Cole's testimony included those statements at her deposition so she's not -- she was not inconsistent in her deposition on those points.

THE COURT:  Okay.

MR. DIEPPA:  Yeah.

THE COURT:  Yeah.  I don't think -- I'm telling you I don't think it really effects anything.  I guess if you are worried about her credibility being challenged, it's a couple of years ago, she didn't remember who exactly was there, but today she testified -- I remember her testifying that there was a woman wearing all white that was a Carnival employee, and there was a -- a gentleman from the Philippines who was shocked about the -- there were several employees there.

MR. DIEPPA:  Yeah.

THE COURT:  You can move on.  I get the point.

MR. DIEPPA:  Understood.

BY MR. DIEPPA:

Q.  We talked a little bit about your damages.  One point I wanted to ask you about, because it's going to be an issue for the Court to decide is, besides your medical bills, besides, you know, your loss of enjoyment of life, your pain and suffering.  Now my understanding is that your pain and suffering -- and I know it's not an amount that can be quantified, that you can put a dollar figure on.  But in my estimate would $280,000 be an approximate amount to include the entirety of your pain and suffering, past and future?

THE COURT:  Where is that coming from?

MR. JARNAGIN:  Yeah.  Objection on the record.  That's beyond the scope of cross.

THE COURT:  Well --

MR. DIEPPA:  I talked about damages.

THE COURT:  Okay.  You might want to lay a foundation for that number, how somebody is coming up with that amount.

MR. DIEPPA:  I will.  I will lay a foundation.

BY MR. DIEPPA:

Q.  Ms. Cole, so we talked earlier about the pain you've gone through, the loss of enjoyment, the inconvenience.  All of those things.

A.   Correct.

Q.   Now, in this case that's part of your claim, isn't it?

A.   Correct.

Q.   So as far as you are concerned, what amount would you be asking for from the Court?

MR. JARNAGIN:  Again, I just object.  This is beyond the scope of cross.

THE COURT:  Well, it is.  I mean, he's got to put his damages amounts in.  You did talk about some damages.  It's a stretch.  I'm just -- sorry.  I'm trying to think through.

You are going to come into closing, you're going to argue an amount of damages.  Unless there's some reason why she's coming up with that number --

MR. DIEPPA:  Yeah.  Your Honor, it's just -- there's already evidence on direct of her pain and suffering, her loss of enjoyment of life, et cetera, et cetera.  You know, so I just -- it's the opportunity to have her put a figure on it.  But, of course, it's ultimately up to the Court, if the Court deems, you know, what amount is proper.  So I just --

THE COURT:  I mean, I think you can argue what, you know, is an appropriate measure of damages for pain and suffering.  Unless there's some reason for it, I just think it's odd for Ms. Cole to be putting a dollar figure on her pain and suffering unless there's some reason for it.  Usually -- yeah.  Even think about it in a jury trial, you come in and you

tell the jury -- and I'm the jury -- you've heard about -- you've gotten it all in on your direct about her loss of enjoyment of life and pain and suffering now you put a dollar figure at closing.

MR. DIEPPA:  Yeah.  And that's what I wanted to make certain, I don't want -- it would be silly, but, you know, to get a direct verdict on -- or something like that.

THE COURT:  Well, let's talk about that right now as we're about to probably take a lunch break.  I'm a little concerned because I don't think you have put in your evidence on damages.  What's her out of pocket?  They were the ones -- I think the door is open because the defense put in in their cross that there's a letter of protection here.  So now I have a big question mark over my head.  And, by the way, she went back to work and was making money -- and I apologize, this is how it works.  I know you are right here and I mean no disrespect talking about you right here.  You're the plaintiff, separate you from a human, make you plaintiff for a moment.

Where are you going to put in your evidence of damages?

MR. DIEPPA:  Well, Your Honor, we have her medical bills and her medical summary all in evidence.

THE COURT:  That's great.  But did she pay those? There's a letter of protection here.

MR. DIEPPA:  They're still due and owing, Your Honor, so she's allowed to claim them.  Because she is personally on

the hook for all of those. And you will hear testimony from the doctor on that point.

THE COURT: So now there's a letter of protection in evidence. Okay. So there's no money out of her pocket right now. That's the evidence that's in front of me right now.

MR. DIEPPA: There's --

THE COURT: She's on -- she's on the hook if she recovers.

MR. DIEPPA: There are bills incurred. Actually the letter of protection is very clear that the bills are owed regardless of the outcome.

THE COURT: Okay. I just ask to have the letter of protection -- I need to read the letter of protection.

MR. DIEPPA: The letter of protection is always owed by the patient. It's not contingent. It doesn't mean the bills will go away. She still owes them under the language of the protection.

THE COURT: So right now -- well, maybe you are putting it in through the doctor. I don't know. But right now there is no evidence of Ms. Cole's out of pocket unless you are going to argue that those medical expenses that you put up before, I think it was 140-something-thousand.

MR. DIEPPA: Your Honor, the jury instruction in Florida and the standard jury instruction doesn't require that her damages be out of pocket. Her damages have to be her

medical bills incurred.  That's all that is required.  So -- and this is also a case that was filed prior to the law change so the law change wouldn't be relevant to this case.

So she's -- I mean, she's allowed to put in her damages, she did put in her damages, her medical bill summary is in evidence, her medical bills from all the providers are in evidence.  You know, and some of those do include money that is, you know, not under a letter of protection, including the ER bill and things of that sort.

But under the law in Florida, number one, she's allowed to board her full medical expenses.  And that's the amount that the court has to consider.  Number two, collateral sources are inadmissible until post trial.

So -- and there's not been any evidence of collateral sources from the defense.  I mean, it wasn't through Dr. Chalal so I don't know what witness they're going to introduce collateral source payments to offset the damages award.  But collateral sources are inadmissible at trial, they don't effect the consideration of damages at trial.  She has had her entirety of medical expenses introduced in evidence.  She will have testimony in terms of the reasonableness of those medical expenses and how they were incurred.  She has acknowledged those and she has acknowledged that they are owed.

THE COURT:  I don't remember her acknowledging that they are owed.  But I will take a look at the letter of

protection.  I haven't heard anything -- and I am very familiar with the collateral sources rule.  I don't know if she has insurance, I don't know if that really matters.  But I'm -- okay.  I mean, you are about -- it came up that you -- that she needs to put her damages in and I have just --

MR. DIEPPA:  It says, Your Honor -- and I will quote from the letter of protection.

"I fully understand that I am directly and fully responsible to said provider for all medical bills submitted by provider" --

(Stenographer clarification.)

MR. DIEPPA:  -- "for services rendered to me, but not including any applicable deductibles."

So it says there that she's fully responsible.

THE COURT:  Okay.  Well, I guess we're going to have argument on this.

MR. DIEPPA:  There's no body of law, Your Honor, that says that a letter of protection eliminates entitlement.

THE COURT:  No.  No.  There's not.  There's not.  But -- all right.  I just want to make sure that the evidence is in.  I guess you are going to have to argue it.  We're going to hear argument on these damages.

All right.  So --

MR. DIEPPA:  I mean, is there a rule that Your Honor is concerned about?  Because I'm trying to follow Your Honor, and

it's -- you know, it's generally how you board the medical expenses.

MR. DRAHOS:  We would object to the Court providing instruction.

THE COURT:  I know.  I know.  Just, you know, we're about to close the plaintiff, although the plaintiff is here and if plaintiff needs to be called if she has to be recalled on rebuttal I suppose she can.  I just want to make sure that the damages evidence is in.

Okay.  Anyway, it just came up because you are arguing about pain and suffering damages and I'm telling you you can just argue those.  All right.  I took you down a rabbit hole.  Sorry.  Let's go ahead and if you have -- if you have any more redirect at this point.

MR. DIEPPA:  Yes, Your Honor.

THE COURT:  And, by the way, this all came up because the objection was that there was -- that this was outside the scope of cross and then my brain went down a rabbit hole because the issue really to me was whether damages came up in cross so that you can be bringing it up in redirect.

MR. DIEPPA:  Okay.

BY MR. DIEPPA:

Q.  And on that note, Ms. Cole, I'm going to approach with Defense Exhibit 7.

MR. DIEPPA:  May I approach the witness, Your Honor?

THE COURT:  Sure.

BY MR. DIEPPA:

Q.  Defense Exhibit 7 is the letter of protection that you signed.

Can you see that, ma'am?

A.  Yes.

Q.  Can you read for me, if you can, the two highlighted sentences there?

A.  "I fully understand that I am directly and fully responsible to said provider for all medical bills submitted by provider for service rendered to me including but not limited to any applicable deductibles and co-payments as per my insurance policy and that this agreement is made for said provider's protection and is assurance of the provider awaiting payment.  I further understand that such payment is not contingent on any settlement, judgment, or verdict by which I may eventually recover."

Q.  Thank you.

And that, was that your understanding what you read there when you signed the letter of protection?

A.  Yes.

Q.  Is that your understanding today, that you still owe the bills regardless of what happens today?

A.  Yes.

Q.  And do you believe you're entitled to money for your pain

and suffering?

A.   Yes, I do.

Q.   Do you have any idea of the amount that you would request?

          MR. JARNAGIN:  Objection.  Speculative.  Lack of foundation.  Prejudicial.

          THE COURT:  Yeah.  I don't see any foundation for an amount that she is going to request for her pain and suffering. She can testify, you know, she has out of pocket expenses, but how is she going to put a number on her pain and suffering?

          MR. DIEPPA:  As long as I can argue it at closing.

          THE COURT:  You can argue what you think is a reasonable amount of damages for one's pain and suffering, but unless there's some reason, like I said before, unless there's some basis for her having a number on her pain and suffering, I don't know how one puts a number on that.

          MR. DIEPPA:  Ultimately there will have to be a number placed on that.

          THE COURT:  Correct.

BY MR. DIEPPA:

Q.   Okay.  You were asked about if your body struck anything. Do you recall specifically being asked at your deposition if you tried to brace yourself?

A.   No, I don't recall being asked did I try to brace myself.

Q.   Okay.  From what I understand what you said in direct you did brace yourself immediately after --

A. Yes, I did.

Q. Okay. The Facebook photos that you were shown, are you moving your shoulder, are you moving your arm any higher than shoulder length in any of those photos?

A. No, I'm not.

Q. Are you holding anything heavier than a phone in any of those photos?

A. No, I'm not.

Q. During the time that all those photos were taken, were you minimizing the use of your shoulder as much as possible?

A. Yes.

Q. The medical bill summary which I showed you earlier, Plaintiff's Exhibit 7, that medical bill summary, does that reflect the amount of bills that you understand that you personally are responsible for paying?

A. Yes. That's correct.

Q. Does that medical bill summary also contain the entirety of the amount of medical bills that you incurred as a result of this incident?

A. Correct.

Q. Okay. Is that the amount of medical bills that you are seeking to recover in this case?

A. Could you --

Q. Is that amount of damages you are seeking to recover in this case?

A.   No.

Q.   For your medical expenses?

A.   I -- meaning is that all?

Q.   I will rephrase.

In addition to the rest of your damages, you are trying to recover your medical expenses in this case?

A.   Yes.

Q.   And that amount is reflected in Plaintiff's Exhibit 7, medical bill summary?

A.   Yes.

Q.   And going to once again Plaintiff's Exhibit 7 which is in evidence, each of these facilities listed here, they are facilities that you treated at as a result of your injury on July 24th, 2022?

A.   Correct.

Q.   And so that would include HCA Westside, Cardiovascular Medicine Associates, Quest Diagnostics, Miami Surgical Center, Anesthesia Professional Services, Incorporated, and CitiMed?

A.   Correct.

MR. DIEPPA:   Thank you, Ms. Cole.   That is all.

THE COURT:   Thank you.

Okay.   So why don't we take a -- who is after lunch? We will take a lunch break.

MR. DIEPPA:   We are going to have videos after probably the rest of the day, Your Honor.   So I believe the next one is

going to be the video of the corporate rep for Carnival which will probably be like 20 to 30 minutes.  And then there will be video of Dr. Wilkerson, some other cruise line employees.  It will be -- for the plaintiff it will be videos until tomorrow because tomorrow is our rebuttal witness.  So after the videos are played, most likely we will rest at that point and then we have a live rebuttal witness, the one that is coming by video tomorrow.

MR. DRAHOS:  I understand part of what he just said but I need some clarity.  The rebuttal witness is coming live by video?

THE COURT:  Who is that?

MR. DIEPPA:  That's our biomechanical expert.

MR. DRAHOS:  We are going to raise an objection to Dr. Liberti, so I don't want my silence to be construed that we're waiving or that we are in agreement that he can testify. We can argue that now if you want.

MR. DIEPPA:  Your Honor, Judge Strauss already ruled that he is an expert in this case and he denied their motion to strike Dr. Liberti earlier so I just thought the Court should know that.

THE COURT:  Okay.  Hold on one second.

So you're putting in in your direct case the deposition of the corporate rep of Carnival?

MR. DIEPPA:  Yes.  It's been designated and we agreed

to it.  So we're playing those excerpts.  I did file according to the Court's direction, a notice of supplemental authority, so that is what I intend to do next.

THE COURT:  And are you putting the corporate rep on in your case?  Is it the same corporate rep?

MR. DRAHOS:  It is the same corporate rep.  She is here.  So the use of this deposition, I asked for clarity, what his intent is with that.  Because I understand there are some snippets of the prior depo he wants to play the video of her even though she's here so she is here live, Your Honor.

MR. DIEPPA:  Your Honor, we designated it by agreement.  So the portion that I'm going to play, I provided to defense counsel.  They agreed and they counter-designated what they wanted me to play.  And so they know what I'm going to play.  I am going to play the counter-designations they requested.  And there wasn't any objection to it, so I don't know why there's an objection to it now.

You know, I would like to present my evidence of the defendant's testimony as it was at the time, including her demeanor and her attitude towards the questions that I asked and what she said at the time, which I am entitled to do.  She was noticed as a 30(b)(6) witness on all these issues.  And there's more than sufficient notice, there's legal support for it, and it's a surprise to me that --

THE COURT:  What is your legal support for playing the

deposition of a witness who is here prepared to testify in person before they have said anything inconsistent with whatever it is you want to put in by her deposition?  You can put in excerpts of depositions when the person is not available.

MR. DIEPPA:  Yes, Your Honor.

My legal support was provided in the notice of filing supplemental authority that the Court asked me to file.  And I would note that there was no opposition to that supplemental authority.  And I can provide Your Honor with the authorities that were identified there on the Docket Entry.

THE COURT:  So you agreed to let the plaintiff put in deposition testimony from your witness who is here and going to be testifying?  Does --

MR. DRAHOS:  Well, we weren't sure what he was planning to use it for.  When he designated the deposition transcripts -- we can go back and forth on those designations, but ultimately how is he planning to do this assuming that it comes up in a trial.  I think we're in a position to be able to determine is he on solid evidentiary ground there or not.

MR. DIEPPA:  That's not accurate, Judge.

THE COURT:  So you -- you tell me what the authority is for playing the deposition of a witness who is here in person as substantive evidence in your case before they have testified.

MR. DIEPPA:  Yes, Your Honor.  So if you look at Docket Entry 85, the authorities were identified there.  And there's actually several authorities that because the witness is a party and a 30(b)(6) witness, there's a special rule that exists that the courts have permitted that that deposition can be played regardless of the availability of the witness, Judge.

And I remember this coming up before, we provided the case law to opposing counsel, provided the case law to the Court.  We designated the witness.  They counter-designated.  They didn't object.  They counter-designated and requested that I also play portions of that deposition.  And I did not think there was an issue until this moment.

MR. DRAHOS:  So, Your Honor, if Mr. Dieppa is going to stipulate here that he is not going to call the corporate rep live and he's only going to play that part of the transcript, then that's it, then we won't assert an objection to that presentation which is as I understand may have been the agreement between Mr. Dieppa and Mr. Jarnagin.  I was not a party to that.

MR. DIEPPA:  And that's correct.  I don't intend to go beyond anything that -- other than what I designated.  That's the extent.

THE COURT:  This is new to me.  I mean, I see -- I will take a look at these cases.  I see your authority from the Middle District of Florida and the Northern District of

Florida.  Seems odd to me to be able to use it as --

MR. DIEPPA:  Yes.

THE COURT:  -- evidence in your case in chief, but if that's -- if that's the authority, I will take a look at it.

MR. DIEPPA:  Yes, Your Honor.  As it states there, it's based on Fifth Circuit authority, pre-Eleventh Circuit Fisk authority which would still be binding.

THE COURT:  So I will take a look at it and also noting that there's no objection from the defense using the specific portions that were already designated?

MR. DRAHOS:  I was not -- I'm trying to interpret this discussion.

THE COURT:  Have you seen what he designated?  Are you okay with it?  That's really the issue.

MR. JARNAGIN:  Yes.

THE COURT:  If you're okay with it coming in I guess it's a nonissue.  As long as I'm not letting in, you know, complete hearsay, inadmissible evidence.  I just need to know what I am able to consider so I'm going to take a look at this.  But if you don't have an issue with what the corporate rep said.  The fact of the matter is they're going to be able to use it to cross the corporate rep if she says something different here today, eventually it's all going to come in at some point.  It's odd to me to use it as a part of the plaintiff's case in chief, but if you don't have a problem with

whatever was said during that portion then, I mean, we can let it roll.  But I will still take a look at it during the break.

Did you take a look at this supplemental authority?

MR. DRAHOS:  The supplemental authority?  I need to freshen up.

THE COURT:  Yeah.  I need to take a look at it too.

All right.  So you are going to play some videos, including presumably the Carnival corporate rep, and a couple others that have already gone through the defense so that will take the afternoon?

MR. DIEPPA:  It will probably take the rest of the day, Your Honor.  I think it will be done today because most of them are short.  Then we have to discuss Ong, what is going to happen with her.  Either way her deposition is 20 minutes long. The longest one would be our surgeon, our medical expert Dr. Wilkerson.  His depo is about two hours long.  And that will -- you know, that will be it.

THE COURT:  You are going to play that in your case?

MR. DIEPPA:  Yeah.

THE COURT:  That's today?

MR. DIEPPA:  Yeah.

THE COURT:  I'm just trying to get a sense.

And can that be shortened?  Do we have to see the whole thing?

MR. DIEPPA:  We designated the entire thing.  You know,

there are exhibits that he reviews because, you know, you have to see the exhibits and what he's discussing and what he's looking at.  He wasn't available for trial so that was the agreement.

THE COURT:  Right.  So you might be able to kind of fast forward over the little things.  It's video; right?

MR. DIEPPA:  Yeah.  I will try.  I don't think there was too much back and forth, it was all me pretty much.  Yeah.

THE COURT:  Yeah.  I mean, in the scheme of things two hours is not too long for a treater.

Okay.  And then -- so you will play some videos, no other live witnesses though on your direct on your case in chief?

MR. DIEPPA:  No.  Not on my case in chief, Your Honor.

THE COURT:  Okay.  And then we would -- you are going to pull your first witness tomorrow morning, is that your plan?

MR. DRAHOS:  Yes.

THE COURT:  And you should go all day for your witness or how is your plan looking for tomorrow?

MR. DRAHOS:  So we will have our corporate representative.  We are going to play a video from our security officer which is I think -- what is it, 30 minutes?
30 minutes.  And then -- and then we have our biomechanics expert.

THE COURT:  Okay.  All right.

So if everybody is okay with it I think we should run today until we finish the plaintiff's case, even if that goes a little late.  I'm completely free to run a little late if we have to.  All right?

MR. DRAHOS:  That works for us.

THE COURT:  All right, everybody.  Let's take a lunch recess.  We are done with Ms. Cole; right?

MR. DIEPPA:  Yes, Your Honor.

THE COURT:  Thank you very much.

THE WITNESS:  Thank you.

MR. DRAHOS:  What time would you like us back?

THE COURT:  1:30.  What is it?  It's 12:25.  I mean, I'm happy to take a shorter break than that.

MR. DRAHOS:  I don't want to speak for everybody, but for this side of the table I think it would work.

MR. DIEPPA:  I would like a little bit longer.

THE COURT:  Let's say 1:15.  How is that?

All right.  We are in recess.

COURTROOM DEPUTY:  All rise.

(A brief recess was taken from 12:29 p.m. to 1:40 p.m.)

COURTROOM SECURITY OFFICER:  All rise.

COURTROOM DEPUTY:  This court is back in session.

THE COURT:  Before we get rolling on this video, Mr. Dieppa, you have educated me on the use of the corporate rep.  Never had to look at that before.  You were absolutely

right.  I don't find contrary authority on the ability to use the deposition of somebody who has been designated as the 30(b)(6) or the corporate representative by the adverse party, can be used as the substantive evidence in their case.  Cannot be used by you, by the party who designated the person, but -- so very interesting.

In any event, so we're ready now with -- you could all be seated.  Sorry.

Who is this?

MR. DIEPPA:  Corporate representative, Your Honor.

THE COURT:  Oh.  I thought that face looked familiar.

So this is the witness -- next witness in plaintiff's case.

And did you all go through -- this is all agreed pieces of the testimony?

MR. DRAHOS:  Yes.

THE COURT:  Okay.  Great.

MR. DIEPPA:  Plaintiff calls Carnival's corporate representative Monica Borcegue by way of video.

THE COURT:  Everybody hates hearing themselves.

Nobody likes hearing themselves so I'm sorry for the discomfort you're about to experience.

Okay.  Go ahead.

(Video deposition of Monica Borcegue was published.)

MR. DIEPPA:  We are just skipping, ahead, Your Honor.

(Video was paused.)

(Video was published.)

MR. JARNAGIN:  Objection.  This is not -- this is not a portion of the transcript that was designated.

MR. DIEPPA:  Sorry, what do you have?

MR. JARNAGIN:  There's no mention of affirmative defense in what you designated.

MR. DIEPPA:  I got to pull up my designations.

Just tell me the next page and line you have.

MR. JARNAGIN:  Next page and line would be page 11, line 21.

MR. DIEPPA:  Page 11, line 21.  Sure.

So I'm skipping ahead.  Should be -- what does --

MR. JARNAGIN:  What has been filed with the designation of the court does not line up with what's being played currently so -- so I ask that you start your video from what you next designated which is page 11, line 21 where it talks about plaintiff did not exercise ordinary care.

MR. DIEPPA:  Sounds good.  No problem.

THE COURT:  Which looks like that is what was up, right, the affirmative defenses?

MR. DIEPPA:  Yeah.  That was the did not exercise reasonable care.

(Video was published.)

(Video was paused.)

(Video was published.)

(Video was paused.)

MR. DIEPPA:  Next is 40, 11.

MR. JARNAGIN:  That's right.

(Video was published.)

(Video was paused.)

MR. DIEPPA:  Picking up at 43, 4.

MR. JARNAGIN:  Yeah.

(Video was published.)

(Video was paused.)

MR. DIEPPA:  71, 9.

MR. JARNAGIN:  Yes.

(Video was published.)

(Video was paused.)

MR. DIEPPA:  So 73 is next.

MR. JARNAGIN:  Yeah.  73, line 6.

MR. DIEPPA:  Gotcha.

Your Honor, can we have a quick recess, not a recess, but just to raise something to the Court?

THE COURT:  Okay.

MR. DIEPPA:  So it appears that the last few excerpts are mismatched which gives me two options, either I can take the time to find the right spot --

THE COURT:  Oh, I see what you're saying.  It's not lining up?

MR. DIEPPA:  -- or I can just read it out for the purposes of the record.  It may take me a couple of minutes to just find the spot in the video.

We're not talking about very much here.  We're talking about three excerpts of -- three or four excerpts of testimony total so not very much time.  But I will need a second or maybe a five-minute recess to find the spot.

THE COURT:  Okay.  So do you prefer to find it in the video or in the transcript?

MR. DIEPPA:  Oh, I know where it is in the transcript.

THE COURT:  Oh, you want to find it in the video?

MR. DIEPPA:  Yeah.  I've got to find it in the video.  So it's up to the Court.  If the Court wants to wait --

THE COURT:  You can take a break and do it.  I mean, I'm not going anywhere.

MR. DIEPPA:  Okay.  Wonderful.

THE COURT:  We'll go off record for a few minutes while you do that.

(A brief recess was taken from 2:07 p.m. to 2:11 p.m.)

MR. DIEPPA:  I apologize for the delay.  We're ready for the excerpt.

THE COURT:  Okay.

MR. DIEPPA:  This is 73, 6.

(Video was published.)

(Video was paused.)

MR. DIEPPA:  Next is your counter-designation 75, 12?

MR. JARNAGIN:  Yes.

(Video was published.)

(Video was paused.)

MR. DIEPPA:  79, 5?

MR. JARNAGIN:  Yes.

(Video was published.)

(Video was paused.)

MR. DIEPPA:  89, 5.

MR. JARNAGIN:  Yes.

(Video was published.)

(Video was paused.)

MR. DIEPPA:  Your Honor, that concludes the testimony of Carnival's corporate representative by deposition.

THE COURT:  Okay.  Thank you.

So do you want to use any cross-designations now or are you going to rely on her testimony later?  It's up to you.

MR. JARNAGIN:  The cross-designations were part of what was played so we reserve to call Ms. Borcegue tomorrow once plaintiff's case concludes.

THE COURT:  All right.  So you can call your next witness.

MR. DIEPPA:  Next witness we will call is Ms. Shruti Bhatia also by way of deposition.

THE COURT:  Okay.

(Video deposition of Shruti Bhatia was published.)

(Video was paused.)

MR. DIEPPA:  Your Honor, before I call my next witness I just wanted to take up, I know the Court said we could stay a little bit later tonight if necessary, so I went ahead and for the three remaining witnesses by video deposition, there's three witnesses remaining to be called, and that's Dr. Gonzalez, Nurse Ong, and Dr. Wilkerson.

The question I have for the Court is, the two depositions of Dr. Gonzalez and Nurse Ong, they're total of about 58 minutes which would bring us I guess to about close to 5:00 today.  Dr. Wilkerson's deposition is one hour and 55 minutes.  So what would the preference be of the Court?  If I play Dr. Wilkerson it's probably going to run probably, you know, past -- well past 5:00, close to 6:00.  Or I can play the two and then in the morning play Dr. Wilkerson.

THE COURT:  And from the defense?  Would we be able to wrap up if we were spending two hours on Wilkerson in the morning?

Remind me again how much time you think you have.

MR. DRAHOS:  So we know for sure we have Dr. Courtney and I think two hours for her.  But we're going to work tonight to try to see if we can trim that down a little bit.  And then we have to play the video of our security officer which is a half hour, and then --

THE COURT: We already have your expert medical in which is good.

MR. DRAHOS: Yes. And I need to confer with my partner here about whether or not we want to call the corporate representative. We were going to wait and see how the case played out. So --

THE COURT: I mean --

MR. DRAHOS: Conservatively, three hours. Conservatively.

THE COURT: So I say you bring in as you plan -- as you were planning to bring it in, and if we have to stop in the middle of something and pick it up again tomorrow morning again, the benefit of not being a jury --

MR. DIEPPA: What I would like to do, Your Honor, is just play the two, and that will take us for about, you know, another hour, and play Dr. Wilkerson first thing in the morning. Because also, it's, you know, watching five straight hours of video is taxing on people.

THE COURT: It's a lot.

MR. DIEPPA: I prefer to do it that way. Maybe we can recess and just pick up.

THE COURT: All right. Let's see where you get with these two.

How is --

Mairelys, how are you?

Let's take a quick break and we will set it up so you can roll to the next one.

MR. DIEPPA:  Thank you, Your Honor.

(A brief recess was taken from 3:52 p.m. to 4:07 p.m.)

COURTROOM DEPUTY:  This court is back in session.

THE COURT:  Okay.

MR. DIEPPA:  Your Honor, the plaintiff calls Alexandra Ong by way of video deposition.

THE COURT:  Okay.  Go ahead.

(Video deposition of Alexandra Ong was published.)

(Video was paused.)

MR. DIEPPA:  Just going to pause to bring the exhibit up Your Honor.

THE COURT:  You have it?

MR. DIEPPA:  Just for the record, this is the case summary that's already been entered into evidence which would be Joint Exhibit 2.

(Video was published.)

(Video was paused.)

MR. DRAHOS:  Your Honor, if this is something we had agreed to with deposition designations, we would've most certainly asserted an objection at this point in time.  She's repeatedly said the diagnosis are deferred to the doctor.  And so the next question that is about to result is her interpretation of that, and again she's been asked that

question three times.

THE COURT:  It's funny you say that.  I'm looking myself to see if Dr. Vanegas is actually on our witness list. He's not.

MR. DIEPPA:  Yes, he is, Judge.  He's the next witness, Dr. Gonzalez.

And, Your Honor --

THE COURT:  But why does she need to be testifying about his diagnosis?  Why can't he testify --

MR. DIEPPA:  Your Honor, it's a little bit exasperating that I spoke to Mr. Drahos when you asked us to confer.  And his statement to me is, "We withdraw our objection to the transcript," which is why I was playing it all the way through. If Mr. Drahos had a specific problem with part of the transcript I most certainly would have addressed it with him, but he told me that he had withdrawn the entire thing and told me to just play it.

THE COURT:  Okay.  So if you withdrew your objection to playing the whole thing, it doesn't mean that I am not aware of objectionable testimony coming in through this video.  I can hear the objections.  There's -- you know, there are -- even on the last one there are a lot of objections happening that are -- my point being, again, I -- you have the benefit in a bench trial of knowing that the fact finder is able to decipher who the person is with the direct knowledge; right?  Am I

articulating that well?  Because right when you stood up that's what was going through my head, like why is this person having to tell us what the doctor should be telling us.

MR. DIEPPA:  And, Your Honor, the answer to that is they were not -- I guess they were not in the same room together.  And there are parts of the note that were authored by her and there's parts of the note that were authored by the doctor.

THE COURT:  Right.  And it's too complicated to parse them out.  But it really -- her value why she wrote what she wrote.

MR. DRAHOS:  And I do just need to point out that it was represented to the Court this morning the reason why Nurse Ong's deposition should be played is because she could rebut -- her testimony was going to contradict Dr. Chalal's testimony particularly as it relates to the level of pain.

MR. DIEPPA:  She just said that she complained of shoulder pain to her and she just said and testified that she gave her ibuprofen which was directly on point.

MR. DRAHOS:  She said the doctor prescribed ibuprofen is what she said.

MR. DIEPPA:  Ibuprofen was prescribed.

MR. DRAHOS:  Which again Dr. Chalal testified to all these things.  But I don't want to --

MR. DIEPPA:  Dr. Chalal didn't testify to that because

he had no personal knowledge of that.

MR. DRAHOS:  He testified that he had reviewed the medical chart and was aware of the fact that she had come in and complained of left shoulder pain and had been given ibuprofen.  He did acknowledge both of those things.

MR. DIEPPA:  Your Honor --

THE COURT:  Who gave her the ibuprofen?  The nurse gave it to her --

MR. DRAHOS:  The doctor prescribed it.

THE COURT:  The doctor prescribed it.

MR. DRAHOS:  Which is what she said in the deposition. Dr. Chalal didn't distinguish those things.  He said I acknowledge that she took ibuprofen.

But the point here is that she was supposedly going to rebut Dr. Chalal's opinion that she complained of severe pain and not been able to lift her shoulder, when in fact this witness specifically says "I asked her to lift her shoulder," and notes full range of motion in the chart.

MR. DIEPPA:  She didn't say full range of motion.  She said that she moved her shoulder.  She didn't say full range of motion.

THE COURT:  I don't know.  A little while ago I think she said full range of motion.

MR. DIEPPA:  No.  I was looking back at it, I -- I did not hear that and I don't recall that being said in her

transcript.

THE COURT: Well, it's -- you know, part of the problem is that this witness is just reading from the notes. I don't know that she is having an independent recollection here.

Regardless, I mean --

MR. DIEPPA: Her exact words were, Judge, on page 10: "I asked her to, you know, lift her shoulder. The basic. You know, the range of motion."

THE COURT: That was it.

MR. DIEPPA: She didn't say "full range of motion." That's incorrect.

THE COURT: It does say it in the chart. I have the chart.

MR. DIEPPA: The chart is different from her testimony, Your Honor. It's literally five more minutes.

THE COURT: Okay. I mean, go ahead.

(Video was published.)

(Video was paused.)

MR. DIEPPA: That concludes the testimony of Nurse Ong.

Plaintiff calls her next witness, Dr. Juan Gonzalez -- Vanegas Gonzalez by way of video deposition.

THE COURT: Okay.

(Video deposition of Dr. Juan Vanegas Gonzalez was published.)

(Video was paused.)

MR. DIEPPA:  That concludes the deposition of Dr. Gonzalez.  And at this time I would ask that we recess until tomorrow morning.

THE COURT:  So we will recess and then pick up tomorrow morning with Dr. Wilkerson's testimony which you expect to take about two hours?

MR. DIEPPA:  Yeah.  Basically it's an hour and 59 minutes exactly.

THE COURT:  Okay.  And then we roll to the defense case.

MR. DRAHOS:  Yes, Your Honor.

THE COURT:  Okay.  We have nothing else in the morning; right?

COURTROOM DEPUTY:  No, Judge.

THE COURT:  All right.  So then I will see everybody back here at 9:30.

MR. DIEPPA:  9:30?

MR. DRAHOS:  There's an issue about Dr. Wilkerson's deposition.

THE COURT:  Oh, there was.

MR. DRAHOS:  Okay.  So there's a portion during the deposition when he's asked about reasonable and customary charges specifically as it relates to the charges that he levied as well as Miami Surgical Center and he just says yes.

So we would move to exclude that answer on the basis of

what was argued as it relates to Dr. Chalal. There wasn't a predicate laid as it relates to what his basis for that. He is simply saying what his charges are and what the Miami Surgical Center charges are, but there is no foundation, no predicate laid as to what did he review in the community, is he able to say that everybody in Palm Beach County or Broward County or Miami-Dade charges these rates. He just simply says this was the charge and then he calls it reasonable and customary with no predicate.

MR. DIEPPA: Your Honor --

THE COURT: Hold on.

So with regard to Dr. Chalal he did put in a lot of background about his -- I let in his testimony regarding reasonable -- his view that it was reasonable and customary based on he laid a predicate.

MR. DRAHOS: Yeah. Dr. Chalal did lay a predicate. The Court said I'm going to let Dr. Chalal testify to his personal billing practices, so we would like that same be assigned to Dr. Wilkerson as well, this is what Dr. Wilkerson charged.

I would argue to the Court that Dr. Chalal laid a greater predicate for his opinions than Dr. Wilkerson does in the deposition which the Court will see when he testifies. I just want to make sure that Dr. Wilkerson's testimony isn't given any greater weight because it's being played without my

ability to cross him on that.

MR. DIEPPA:  Your Honor, I mean, number one, they've known what Dr. Wilkerson's testimony was going to be and all these issues since the day of his deposition and they know what my designations are.  So I'm not sure where that objection is coming from.

Number two is, from what I recall the Court allowed Dr. Chalal to testify regarding what he thought of all the medical bills and allowed all that testimony in.

THE COURT:  Allowed him to talk about what he knows about.

MR. DIEPPA:  What he knows of, yes.

THE COURT:  Right.  He wasn't testifying as an expert regarding usual and customary; right?  I denied as to an expert on what is reasonable and customary, usual and customary.

MR. DIEPPA:  And that's the key difference here. Because Dr. Chalal was not testifying about his own medical bills; Dr. Wilkerson is testifying about his own medical bills. And that's, Judge, a key difference here because Dr. Chalal is testifying what he charges in his own office which is completely different from what Dr. Wilkerson charges and what he knows to be charged in the community.  And that is Dr. Wilkerson's testimony as to what is reasonable and customary in the community.  He does lay a foundation.  I think the Court should hear the testimony and then, you know, we can

decide, but --

THE COURT:  And I'm not looking at your -- what you disclosed.  Did you disclose him as an expert on usual and customary?

MR. DIEPPA:  I did on our initial Rule 26.  He -- Rule 26(C) was filed for Dr. Wilkerson and it included all those topics.  And there was no objection.  It was timely filed.  It was served on counsel.  There was never any objection as to the scope of Dr. Wilkerson's testimony.  And that would have been the time to raise it.  Because they did raise it as to another one of my Rule 26 experts and we had a hearing in front of Judge Strauss to resolve that issue.  So for them to raise it at this juncture, they were well aware in addition to his deposition testimony as to what his expected testimony was going to be under Rule 26(C), and I'm happy to provide that.

MR. DRAHOS:  Relating to the timeliness of the objection, the objection as it relates to Dr. Chalal's ability to testify to reasonable and customary was raised here in this courtroom.  So at the time we didn't have a ruling from the Court as to how the Court was going to interpret Dr. Chalal.  Now we do have the benefit of that ruling and all I'm asking is for the Court to apply the same standard as was applied to Dr. Chalal.  And, again, we would argue that Dr. Chalal laid a greater predicate than what ultimately we're going to hear from Dr. Wilkerson.

THE COURT:  Okay.  So, I mean, I will have to hear what Dr. Wilkerson testifies in order to actually make a ruling on this.

But, again, when -- when you have a medical doctor with years of experience doing these types of things, I have no problem letting them come in, as I did with Dr. Chalal, and testify about what they charge.  He testified he has a lot of familiarity with what others charge, but I was not -- go back and look at my rulings from yesterday, but I think I did not find him or I did not permit him to testify as an expert on usual and customary; right?

MR. DRAHOS:  Yes, you did.

THE COURT:  But I let all his testimony come in about what he sees.  So --

MR. DIEPPA:  Yeah.

THE COURT:  I don't see why it would be any different for Dr. Wilkerson.  So if Dr. Wilkerson opines that that is the usual and customary we can take it up at that point.

MR. DIEPPA:  Yeah.  And he is going to do that based on his personal knowledge because it's his own procedures, it's the surgical center, it's the place he has been working with. And he's been a surgeon for, not as long as Dr. Chalal, but quite long.  And, you know, important fact of the matter is, Judge, is Dr. Chalal gave figures and --

THE COURT:  So Wilkerson should be able to give figures

based on his experience also.  But I think the request is he shouldn't be given a higher status as an expert on what is usual and customary than what Dr. Chalal had.

MR. DIEPPA:  That's for the fact finder.

THE COURT:  Right.  And, again, I'm telling you that when I'm presented with a doctor who has been practicing for 20-some-odd years doing this kind of procedure and he -- his office charges a certain amount, you know, I find that material.  And it doesn't necessarily mean they are an expert on what is usual and customary in the community unless they can tell me that they went out and did a study of, you know, what they are all charging.

Chalal was just talking about -- I don't know.  Almost like a fact witness.  He was a fact witness on what his office charges and that he knows that they may have looked at this website which is where he based it on there on the range of customary; right?  Didn't mean he was an expert on it.

Same thing will most likely go for Wilkerson. Wilkerson comes in here and tells me -- which I believe I have already seen something about him, that he has been doing this kind of work for X number of years, and is familiar with what his office charges and what others charge, that's fine.  That's not necessarily jumping to the end where he is an expert on what is usual and customary unless he lays that predicate, that foundation.  So we will have to see what he says.

MR. DRAHOS:  Thank you.

MR. DIEPPA:  Understood, Your Honor.

THE COURT:  All right.  So I will see everybody at 9:30.  Have a good evening.

COURTROOM DEPUTY:  All rise.  Court is adjourned.

(Proceedings concluded at 5:19 p.m.)

C E R T I F I C A T E


        I hereby certify that the foregoing is an

accurate transcription of the proceedings in the

above-entitled matter.



DATE:  July 5, 2024             /s/Mairelys Albo
                                MAIRELYS ALBO, RPR
                                Official Court Reporter
                                United States District Court
                                Southern District of Florida
                                299 East Broward Boulevard
                                Fort Lauderdale, Florida 33301

## $

**$141,264.11** [1] - 38:19
**$280,000** [1] - 84:12

## '

**'22** [2] - 72:22

## /

**/s/Mairelys** [1] - 122:8

## 1

**1** [5] - 1:8, 23:3, 59:13, 63:1, 63:2
**10** [5] - 55:23, 55:24, 63:1, 63:2, 114:6
**10/26/2019** [1] - 48:20
**100-some-odd** [1] - 10:9
**1001** [1] - 1:15
**103** [1] - 2:6
**105** [2] - 79:24, 80:8
**107** [1] - 81:6
**108** [2] - 2:7, 81:15
**10:48** [1] - 45:10
**11** [6] - 81:6, 81:16, 104:10, 104:12, 104:17, 105:3
**110** [1] - 2:8
**115** [1] - 2:9
**11:00** [1] - 45:10
**12** [4] - 14:20, 37:12, 66:11, 107:1
**122** [2] - 1:8, 2:10
**12:25** [1] - 102:12
**12:29** [1] - 102:20
**12th** [3] - 66:21, 67:3, 67:8
**13** [3] - 55:21, 57:18, 80:7
**13th** [1] - 39:1
**14** [3] - 2:4, 39:7, 78:8
**140-something-thousand** [1] - 87:22
**15** [4] - 24:16, 37:12, 55:21, 57:18
**150** [1] - 1:14
**15th** [2] - 38:24, 67:9
**16** [2] - 21:14, 81:7
**17** [1] - 38:9
**19** [2] - 66:13, 74:13
**19th** [2] - 38:25, 66:15
**1:15** [1] - 102:17
**1:30** [1] - 102:12
**1:40** [1] - 102:20

## 2

**2** [8] - 1:7, 1:9, 7:11, 7:12, 28:7, 49:7, 81:15, 110:17
**2,800** [1] - 39:8
**2-3** [1] - 58:16
**20** [5] - 5:10, 24:17, 31:13, 95:2, 100:14
**20-some-odd** [1] - 120:7
**200** [3] - 31:7, 35:4, 61:15
**2002** [1] - 14:14
**2012** [1] - 46:6
**2018** [10] - 46:17, 47:9, 47:22, 48:6, 48:22, 49:1, 49:4, 49:13, 49:16, 49:19
**2019** [13] - 47:4, 48:5, 48:6, 48:7, 48:9, 48:11, 48:12, 48:23, 49:4, 49:12, 49:19, 50:1, 50:12
**2022** [24] - 14:15, 14:24, 15:4, 15:8, 15:11, 17:1, 18:2, 34:23, 36:3, 46:3, 50:18, 64:25, 65:8, 66:11, 66:21, 67:3, 67:11, 68:10, 68:11, 69:22, 70:16, 71:10, 74:16, 94:14
**2023** [5] - 45:21, 55:15, 77:17, 78:8, 78:9
**2024** [3] - 1:5, 43:2, 122:8
**21** [4] - 72:16, 104:11, 104:12, 104:17
**21st** [2] - 69:22, 70:16
**22** [2] - 74:10, 80:7
**22nd** [7] - 15:8, 16:17, 50:18, 66:15, 72:22, 78:16, 78:23
**23-cv-60532** [1] - 1:2
**23-cv-60532-Damian** [1] - 3:8
**23rd** [2] - 16:25, 51:4
**24** [3] - 14:24, 34:23, 74:16
**24th** [5] - 15:11, 18:2, 18:4, 52:1, 94:14
**25** [4] - 19:23, 33:5, 53:13, 72:22
**25th** [2] - 78:17, 78:23
**26** [5] - 48:23, 49:4, 49:12, 118:5, 118:11
**26(C** [2] - 118:6, 118:15

## 2 (cont.)

**27** [1] - 65:8
**27th** [2] - 36:3, 64:25
**28** [4] - 39:8, 47:4, 48:7, 50:12
**299** [2] - 1:25, 122:11
**2:07** [1] - 106:19
**2:11** [1] - 106:19
**2nd** [2] - 1:14, 77:16

## 3

**3** [3] - 20:5, 20:6, 26:3
**3-2** [1] - 54:15
**3-51** [1] - 65:14
**30** [11] - 1:5, 19:23, 22:24, 31:13, 33:5, 53:13, 54:10, 61:3, 95:2, 101:22, 101:23
**30(b)(6** [3] - 96:22, 98:4, 103:3
**30th** [1] - 43:2
**33130** [1] - 1:19
**33131** [1] - 1:15
**33301** [2] - 1:25, 122:11
**35** [2] - 22:24, 54:10
**36th** [1] - 70:13
**3:00** [4] - 19:5, 22:22, 52:14, 53:1
**3:00ish** [1] - 18:12
**3:45** [1] - 23:1
**3:52** [1] - 110:4

## 4

**4** [1] - 105:7
**40** [1] - 105:3
**40th** [2] - 15:9, 16:4
**43** [1] - 105:7
**441** [1] - 49:21
**45** [1] - 2:4
**47** [2] - 55:21, 55:23
**4:07** [1] - 110:4

## 5

**5** [14] - 20:22, 24:24, 25:19, 26:8, 30:9, 61:6, 71:18, 78:7, 78:12, 78:14, 81:14, 107:5, 107:9, 122:8
**5,600** [1] - 39:10
**5-7** [1] - 72:15
**5-9** [1] - 72:3
**51** [1] - 14:25
**51-year-old** [1] - 65:20
**515** [1] - 1:18
**53** [1] - 14:12
**55** [2] - 57:17, 108:13
**58** [1] - 108:11

## 5 (cont.)

**59** [1] - 115:8
**5:00** [2] - 108:12, 108:15
**5:19** [2] - 1:6, 121:6

## 6

**6** [9] - 26:8, 40:4, 50:2, 50:11, 68:10, 68:11, 81:14, 105:16, 106:23
**6-5** [1] - 47:1
**600** [3] - 31:8, 31:9, 35:6
**650** [1] - 1:19
**6:00** [2] - 23:2, 108:15
**6:00-something** [1] - 23:1
**6:20** [2] - 23:11, 53:4

## 7

**7** [6] - 38:11, 90:24, 91:3, 93:13, 94:8, 94:11
**7-3** [2] - 62:20, 65:3
**7-4** [1] - 63:5
**7-9** [1] - 64:12
**7/24/2022** [1] - 65:21
**71** [1] - 105:11
**73** [3] - 105:15, 105:16, 106:23
**75** [1] - 107:1
**76** [1] - 2:5
**79** [1] - 107:5
**79-3** [1] - 5:7
**7th** [1] - 70:14

## 8

**801** [1] - 6:14
**85** [1] - 98:2
**89** [1] - 107:9
**8:00** [2] - 18:6, 34:22
**8:00ish** [1] - 18:6
**8:15** [1] - 34:22
**8:30** [3] - 18:23, 34:21

## 9

**9** [2] - 78:7, 105:11
**9-10** [1] - 69:9
**9-21** [1] - 69:18
**9-24** [1] - 70:9
**9-26** [1] - 70:20
**9-7** [1] - 67:24
**9-9** [1] - 68:22
**96** [2] - 76:11, 79:21
**97** [2] - 76:11, 79:21
**9:00** [1] - 18:6

## 9 (cont.)

**9:30** [3] - 115:16, 115:17, 121:4
**9:46** [2] - 1:6, 3:1

## A

**a.m** [4] - 1:6, 3:1, 45:10
**ability** [4] - 12:20, 103:1, 117:1, 118:17
**able** [20] - 28:6, 41:5, 43:22, 44:9, 47:2, 58:18, 63:11, 67:25, 71:4, 72:17, 97:19, 99:1, 99:19, 99:21, 101:5, 108:17, 111:24, 113:16, 116:5, 119:25
**above-entitled** [1] - 122:6
**absolutely** [1] - 102:25
**access** [4] - 67:14, 67:16, 67:21, 71:12
**accident** [20] - 34:2, 37:19, 37:20, 39:21, 43:3, 44:1, 44:17, 46:6, 46:15, 46:17, 46:24, 48:6, 48:22, 49:5, 49:12, 49:15, 49:18, 49:20, 50:13, 59:20
**accidents** [2] - 15:15, 15:17
**according** [4] - 10:21, 28:6, 36:2, 96:1
**account** [4] - 67:12, 67:15, 67:22, 74:13
**accounts** [10] - 73:8, 73:10, 73:14, 73:22, 74:22, 75:4, 78:11, 78:22, 79:15, 79:16
**accurate** [4] - 80:23, 81:2, 97:21, 122:5
**accurately** [1] - 38:19
**acknowledge** [2] - 113:5, 113:13
**acknowledged** [3] - 7:20, 88:22, 88:23
**acknowledging** [1] - 88:24
**acting** [1] - 6:13
**actual** [1] - 10:1
**acute** [1] - 8:20
**addition** [3] - 62:21, 94:5, 118:13
**additional** [3] - 35:18, 41:13, 63:15
**addressed** [1] - 111:15

**adjourned** [1] - 121:5
**admissible** [1] - 6:15
**admission** [2] - 6:16, 42:10
**adverse** [1] - 103:3
**Advise** [1] - 55:20
**affirmed** [1] - 72:11
**afraid** [1] - 36:23
**afternoon** [1] - 100:10
**afterwards** [2] - 4:16, 35:25
**ago** [2] - 83:21, 113:22
**agree** [4] - 10:9, 11:6, 53:15, 53:17
**agreed** [6] - 70:8, 95:25, 96:13, 97:12, 103:14, 110:21
**agreement** [5] - 91:13, 95:16, 96:11, 98:18, 101:4
**ahead** [7] - 90:13, 103:23, 103:25, 104:13, 108:5, 110:9, 114:16
**ALBO** [2] - 1:23, 122:9
**Albo** [1] - 122:8
**alert** [1] - 12:11
**alertness** [1] - 63:18
**Alexandra** [2] - 110:7, 110:10
**ALEXANDRA** [1] - 2:8
**allow** [1] - 53:18
**allowed** [8] - 17:10, 52:22, 86:25, 88:4, 88:10, 117:7, 117:9, 117:10
**almost** [1] - 120:13
**amount** [20] - 10:22, 38:18, 38:19, 84:10, 84:12, 84:20, 85:4, 85:12, 85:19, 88:11, 92:3, 92:7, 92:12, 93:14, 93:18, 93:21, 93:24, 94:8, 120:8
**amounts** [1] - 85:9
**Anesthesia** [1] - 94:18
**announcement** [1] - 22:12
**annual** [1] - 40:5
**answer** [14] - 56:3, 71:24, 72:18, 72:25, 73:19, 73:23, 74:6, 74:10, 74:18, 76:24, 77:1, 78:21, 112:4, 115:25
**ANSWER** [2] - 56:6, 57:23
**answered** [9] - 77:15, 77:20, 77:24, 78:1, 78:3, 78:9, 78:25,

79:2, 79:7
**answering** [1] - 72:11
**Answers** [1] - 71:19
**answers** [5] - 71:20, 72:1, 72:12, 75:22, 75:24
**anticipated** [1] - 9:24
**anyway** [1] - 90:10
**apologize** [2] - 86:15, 106:20
**APPEARANCES** [1] - 1:11
**appearances** [1] - 3:9
**appeared** [1] - 77:16
**applicable** [2] - 89:13, 91:12
**applications** [1] - 72:21
**applied** [1] - 118:22
**apply** [1] - 118:22
**appointment** [6] - 48:5, 48:14, 48:18, 64:21, 66:7, 66:20
**approach** [4] - 29:14, 55:17, 90:23, 90:25
**appropriate** [1] - 85:21
**approximate** [1] - 84:12
**April** [4] - 73:18, 73:24, 79:6
**Arawak** [2] - 18:8, 52:10
**Arcola** [1] - 70:14
**area** [22] - 4:15, 7:25, 16:21, 16:23, 17:16, 18:8, 20:7, 20:12, 20:19, 20:20, 20:23, 22:20, 24:20, 25:14, 29:9, 33:6, 34:16, 60:6, 60:15, 61:3, 80:13, 80:17
**argue** [10] - 85:12, 85:20, 87:21, 89:21, 90:12, 92:10, 92:11, 95:17, 116:21, 118:23
**argued** [1] - 116:1
**arguing** [1] - 90:10
**argument** [3] - 9:12, 89:16, 89:22
**arm** [8] - 38:8, 68:5, 68:18, 69:8, 70:4, 70:23, 70:25, 93:3
**arms** [3] - 69:5, 69:7, 69:15
**arthritis** [1] - 44:15
**articulating** [1] - 112:1
**ASHLEY** [1] - 1:17
**aside** [1] - 12:21

**assert** [1] - 98:16
**asserted** [1] - 110:22
**assessment** [1] - 4:15
**assigned** [2] - 13:4, 116:19
**Associate** [2] - 14:14, 37:23
**Associates** [2] - 64:20, 94:17
**assuming** [1] - 97:18
**assurance** [1] - 91:14
**ate** [4] - 17:21, 18:5, 50:24
**attempted** [1] - 44:2
**attempts** [1] - 21:17
**attending** [1] - 48:4
**attitude** [1] - 96:20
**attorney's** [1] - 65:6
**August** [12] - 45:21, 55:14, 66:11, 66:21, 67:3, 67:8, 67:11, 68:10, 68:11, 69:22, 70:16, 77:16
**author** [1] - 6:23
**authored** [2] - 112:6, 112:7
**authorities** [3] - 97:10, 98:2, 98:3
**authority** [11] - 96:2, 97:8, 97:10, 97:22, 98:24, 99:4, 99:6, 99:7, 100:3, 100:4, 103:1
**auto** [2] - 46:6, 46:17
**availability** [1] - 98:6
**available** [3] - 12:12, 97:5, 101:3
**Avenue** [4] - 1:14, 64:14, 64:18, 70:14
**awaiting** [1] - 91:14
**award** [1] - 88:17
**aware** [3] - 111:19, 113:3, 118:13

## B

**background** [1] - 116:13
**bad** [1] - 41:15
**bag** [2] - 34:3
**bags** [1] - 44:7
**Bahama** [1] - 18:9
**Bahamas** [7] - 13:1, 16:13, 18:18, 19:22, 52:4, 52:12, 54:1
**balance** [1] - 19:20
**ball** [1] - 27:22
**ballpark** [1] - 24:16
**bandaged** [1] - 41:3
**baptized** [3] - 73:18,

73:24, 79:17
**bar** [2] - 53:24, 54:6
**based** [9] - 5:12, 36:25, 53:19, 77:10, 99:6, 116:15, 119:19, 120:1, 120:16
**basic** [1] - 114:7
**basis** [6] - 4:5, 6:12, 81:17, 92:14, 115:25, 116:2
**bathroom** [1] - 45:5
**Beach** [2] - 1:19, 116:6
**bed** [2] - 41:5, 43:9
**BEFORE** [1] - 1:10
**begin** [1] - 66:7
**beginning** [2] - 3:9, 74:19
**begins** [1] - 73:6
**behalf** [3] - 3:12, 3:15, 3:16
**behind** [3] - 27:19, 55:9, 56:1
**bench** [1] - 111:24
**BENCH** [1] - 1:9
**benefit** [3] - 109:13, 111:23, 118:21
**benefits** [1] - 40:15
**best** [1] - 44:2
**better** [3] - 28:4, 33:1, 34:25
**between** [13] - 7:25, 18:6, 24:11, 29:19, 51:12, 67:8, 72:21, 78:11, 78:13, 78:22, 81:14, 98:18
**beyond** [4] - 41:14, 84:16, 85:6, 98:21
**BHATIA** [1] - 2:7
**Bhatia** [2] - 107:24, 108:1
**big** [1] - 86:14
**bill** [7] - 38:12, 88:5, 88:9, 93:12, 93:13, 93:17, 94:9
**billing** [1] - 116:18
**bills** [18] - 38:15, 38:19, 84:7, 86:21, 87:9, 87:10, 87:15, 88:1, 88:6, 89:9, 91:10, 91:23, 93:14, 93:18, 93:21, 117:9, 117:18
**binding** [1] - 99:7
**biomechanical** [1] - 95:13
**biomechanics** [2] - 9:23, 101:23
**biopsies** [1] - 37:24

**birthday** [3] - 15:8, 16:4, 43:17
**bit** [8] - 14:9, 18:14, 37:19, 84:5, 102:16, 108:5, 108:23, 111:10
**blood** [3] - 14:15, 37:25, 38:3
**blow** [8] - 33:17, 47:8, 48:13, 59:17, 63:9, 64:13, 65:15, 72:16
**blowing** [8] - 20:8, 21:5, 22:7, 22:13, 23:16, 26:11, 26:12, 34:18
**blue** [1] - 25:21
**blurry** [2] - 30:13, 30:14
**board** [2] - 88:11, 90:1
**boarded** [1] - 50:18
**boat** [2] - 16:22, 22:10
**body** [7] - 56:25, 57:2, 57:11, 57:21, 58:2, 89:17, 92:20
**boom** [5] - 26:19, 27:13, 27:15, 55:6, 57:4
**Boom** [2] - 27:7, 55:3
**Borcegue** [4] - 3:17, 103:19, 103:24, 107:19
**BORCEGUE** [1] - 2:6
**born** [2] - 14:10, 14:11
**bottle** [7] - 9:17, 25:23, 25:24, 30:15, 31:5, 32:2, 32:5
**bottom** [1] - 33:9
**bought** [1] - 16:7
**Boulevard** [2] - 1:25, 122:11
**bowl** [5] - 38:6, 38:7, 44:9, 44:11, 44:12
**bowled** [1] - 44:10
**bowler** [1] - 38:6
**bowling** [3] - 15:3, 44:9, 44:13
**brace** [3] - 92:22, 92:23, 92:25
**braced** [4] - 26:21, 27:8, 27:22, 36:21
**brain** [1] - 90:18
**break** [10] - 44:24, 45:2, 45:3, 45:5, 86:9, 94:23, 100:2, 102:13, 106:14, 110:1
**breakfast** [5] - 18:5, 51:8, 52:7, 52:9
**breaks** [1] - 12:5
**brief** [5] - 45:5, 45:10,

102:20, 106:19, 110:4

**bring** [6] - 13:10, 17:10, 108:11, 109:10, 109:11, 110:12

**bringing** [2] - 25:10, 90:20

**brought** [8] - 5:17, 15:7, 17:10, 25:13, 25:14, 48:25, 49:10, 60:21

**Broward** [4] - 1:25, 64:16, 116:6, 122:11

**brushed** [1] - 58:4

**buffet** [1] - 25:14

**bumped** [1] - 46:20

**buy** [6] - 15:6, 15:22, 15:24, 15:25, 33:16

**buying** [1] - 18:10

**BY** [35] - 1:22, 2:4, 2:4, 2:5, 14:6, 20:17, 26:1, 29:17, 39:20, 40:17, 42:17, 43:1, 45:18, 47:20, 48:15, 50:10, 52:24, 55:22, 58:17, 59:14, 61:7, 62:11, 71:3, 74:9, 76:5, 77:14, 77:22, 78:24, 79:23, 80:11, 84:4, 84:22, 90:22, 91:2, 92:19

## C

**C-Collar** [6] - 63:14, 63:20, 63:22, 63:25, 64:1

**C-o-l-e** [1] - 13:24

**cannon** [1] - 27:21

**cannot** [1] - 103:4

**canon** [1] - 27:22

**capacity** [3] - 39:13, 39:17, 39:25

**car** [3] - 46:15, 46:20, 46:21

**Cardiovascular** [1] - 94:16

**cards** [4] - 17:8, 17:9, 32:21, 51:20

**care** [8] - 10:9, 38:4, 47:5, 47:25, 48:8, 49:4, 104:18, 104:23

**Caribbean** [1] - 13:1

**CARNIVAL** [1] - 1:7

**Carnival** [27] - 3:8, 3:15, 3:17, 6:13, 6:16, 15:19, 15:20, 21:8, 21:16, 21:21, 23:13, 23:18, 24:20,

28:11, 33:1, 33:15, 34:8, 58:8, 65:21, 71:21, 71:23, 73:23, 82:5, 83:23, 95:1, 95:24, 100:8

**Carnival's** [3] - 5:20, 103:18, 107:14

**carrying** [4] - 21:11, 21:12, 21:13, 44:6

**cart** [4] - 25:20, 26:4, 26:9, 33:8

**Case** [2] - 3:1, 3:8

**CASE** [1] - 1:2

**case** [35] - 4:11, 5:20, 11:8, 11:18, 15:13, 33:15, 36:2, 47:16, 62:1, 79:4, 85:2, 88:2, 88:3, 93:22, 93:25, 94:6, 95:19, 95:23, 96:5, 97:24, 98:8, 99:3, 99:25, 100:18, 101:12, 101:14, 102:2, 103:4, 103:13, 107:20, 109:5, 110:15, 115:10

**cases** [2] - 12:15, 98:24

**cast** [1] - 9:1

**causation** [1] - 9:13

**caused** [1] - 22:3

**Cay** [2] - 18:8, 52:10

**celebrated** [1] - 16:4

**Center** [5] - 64:15, 64:18, 94:17, 115:24, 116:4

**center** [12] - 58:9, 58:25, 59:4, 60:5, 60:16, 60:18, 60:24, 61:4, 61:18, 62:12, 64:22, 119:21

**certain** [2] - 86:6, 120:8

**certainly** [2] - 110:22, 111:15

**CERTIFICATE** [1] - 2:10

**certify** [1] - 122:4

**cervical** [3] - 37:13, 63:6, 63:9

**cetera** [2] - 85:16

**chair** [3] - 54:22, 56:1, 56:5

**Chalal** [41] - 4:11, 4:23, 5:13, 6:23, 7:1, 7:3, 7:8, 7:18, 7:20, 8:7, 8:14, 8:25, 9:15, 10:13, 10:15, 10:18, 10:22, 11:24, 37:7, 37:10, 37:16, 88:15,

112:23, 112:25, 113:12, 116:1, 116:12, 116:16, 116:17, 116:21, 117:8, 117:17, 117:19, 118:20, 118:23, 119:6, 119:22, 119:24, 120:3, 120:13

**Chalal's** [7] - 4:17, 5:12, 5:19, 6:19, 112:15, 113:15, 118:17

**challenged** [1] - 83:20

**chance** [1] - 11:1

**change** [3] - 73:17, 88:2, 88:3

**changed** [2] - 37:22, 74:2

**charge** [5] - 32:20, 116:8, 119:7, 119:8, 120:22

**charged** [5] - 32:13, 32:20, 32:22, 116:20, 117:22

**charges** [10] - 115:23, 116:3, 116:4, 116:7, 117:20, 117:21, 120:8, 120:15, 120:22

**charging** [1] - 120:12

**chart** [6] - 4:10, 113:3, 113:18, 114:12, 114:13, 114:14

**chicken** [3] - 25:17, 53:25, 54:5

**chief** [4] - 99:3, 99:25, 101:13, 101:14

**child** [2] - 19:22, 40:21

**Christ** [1] - 73:19

**circled** [1] - 20:12

**Circuit** [2] - 99:6

**CitiMed** [6] - 64:23, 65:1, 65:24, 66:4, 66:8, 94:18

**claim** [5] - 39:12, 39:16, 60:6, 85:2, 86:25

**claimed** [2] - 47:16, 71:9

**claiming** [2] - 15:12, 39:24

**clarification** [1] - 89:11

**clarified** [1] - 83:9

**clarify** [3] - 20:14, 20:18, 25:12

**clarity** [2] - 95:10, 96:7

**class** [1] - 68:8

**clean** [1] - 34:6

**clear** [4] - 34:3, 77:12, 83:13, 87:10

**clearly** [1] - 50:6

**Clerk** [1] - 13:25

**clinic** [2] - 59:9, 59:11

**close** [6] - 79:5, 81:10, 81:23, 90:6, 108:11, 108:15

**closed** [3] - 21:24, 73:18, 79:17

**closing** [3] - 85:11, 86:4, 92:10

**co** [1] - 91:12

**co-payments** [1] - 91:12

**Cole** [71] - 3:8, 3:12, 3:21, 5:16, 5:24, 6:24, 7:15, 7:20, 7:21, 8:2, 8:9, 9:14, 11:7, 13:17, 13:18, 13:23, 14:7, 14:23, 19:12, 19:13, 35:9, 37:20, 38:12, 39:21, 41:1, 42:18, 44:21, 45:19, 47:2, 50:11, 50:16, 53:1, 54:16, 56:20, 58:18, 59:15, 59:19, 60:24, 61:8, 61:23, 63:6, 65:4, 65:17, 65:20, 67:25, 68:23, 69:10, 69:19, 70:10, 70:21, 71:7, 71:12, 71:20, 72:4, 72:17, 74:11, 75:6, 76:6, 77:15, 77:23, 78:20, 78:25, 82:12, 82:14, 82:15, 84:23, 85:23, 90:23, 94:20, 102:7

**COLE** [2] - 1:4, 2:3

**Cole's** [6] - 9:2, 30:23, 71:2, 82:19, 83:13, 87:20

**Collar** [6] - 63:14, 63:20, 63:22, 63:25, 64:1

**collar** [3] - 37:13, 63:7, 63:10

**collateral** [5] - 88:12, 88:14, 88:17, 88:18, 89:2

**Colombia** [1] - 13:12

**coming** [9] - 84:14, 84:20, 85:13, 95:7, 95:10, 98:7, 99:16, 111:20, 117:6

**comment** [2] - 6:6, 8:14

**commented** [1] - 6:23

**community** [4] -

116:5, 117:22, 117:24, 120:10

**compact** [1] - 57:3

**company** [1] - 12:24

**complain** [1] - 8:1

**complained** [7] - 4:13, 5:18, 7:22, 8:3, 112:17, 113:4, 113:15

**complaining** [4] - 5:24, 7:21, 8:12, 10:18

**complaint** [1] - 9:20

**complaints** [1] - 7:3

**complete** [2] - 76:21, 99:18

**completed** [1] - 40:24

**completely** [3] - 6:15, 102:3, 117:21

**completing** [1] - 72:1

**completion** [1] - 74:5

**complicated** [1] - 112:9

**compulsory** [1] - 37:6

**concerned** [3] - 85:4, 86:10, 89:25

**concerning** [1] - 77:24

**concluded** [1] - 121:6

**concludes** [4] - 107:13, 107:20, 114:19, 115:1

**condition** [1] - 49:7

**conditions** [2] - 21:9, 60:12

**confer** [2] - 109:3, 111:11

**confronted** [1] - 81:25

**Conquest** [2] - 15:20, 50:18

**conservatively** [2] - 109:8, 109:9

**consider** [2] - 88:12, 99:19

**consideration** [1] - 88:19

**consistent** [1] - 66:2

**construed** [1] - 95:15

**contain** [1] - 93:17

**container** [4] - 24:13, 25:23, 62:22

**containers** [16] - 20:15, 21:11, 21:12, 21:13, 21:18, 25:1, 25:20, 28:1, 29:4, 29:10, 33:8, 55:10, 56:12, 66:3, 80:1, 83:8

**contains** [2] - 55:10, 63:24

**contemplating** [1] -

62:6

**content** [5] - 67:21, 72:21, 73:10, 74:14, 74:25

**contested** [1] - 7:18

**contesting** [1] - 7:18

**context** [2] - 76:20, 82:8

**contingent** [2] - 87:15, 91:16

**continue** [3] - 31:24, 32:5, 32:8

**contract** [1] - 13:7

**contradict** [2] - 5:19, 112:15

**contrary** [6] - 4:22, 9:6, 10:12, 10:15, 10:17, 103:1

**controls** [1] - 67:19

**cook** [1] - 15:2

**COOPER** [1] - 1:17

**Cooper** [6] - 3:16, 45:20, 79:10, 79:11, 80:3, 80:5

**copy** [3] - 5:17, 6:3, 11:13

**corner** [2] - 46:20, 68:10

**corporate** [17] - 3:18, 95:1, 95:24, 96:4, 96:5, 96:6, 98:14, 99:20, 99:22, 100:8, 101:20, 102:24, 103:3, 103:10, 103:18, 107:14, 109:4

**CORPORATION** [1] - 1:7

**Corporation** [1] - 3:8

**correct** [87] - 16:15, 17:2, 20:1, 20:9, 20:16, 23:6, 23:9, 24:6, 24:18, 26:6, 28:8, 29:20, 29:21, 30:16, 36:4, 36:11, 38:21, 41:4, 41:9, 44:8, 45:22, 45:23, 46:9, 46:11, 46:18, 46:22, 46:25, 47:6, 47:10, 50:17, 50:20, 50:21, 50:23, 50:25, 51:6, 51:9, 51:11, 51:14, 51:16, 51:19, 52:3, 52:5, 52:8, 52:11, 52:12, 52:13, 52:15, 52:18, 53:2, 53:5, 53:8, 53:12, 53:14, 53:16, 53:20, 53:23, 56:3, 56:13, 56:14, 56:23, 56:24,

58:10, 58:13, 59:12, 60:7, 62:16, 62:19, 63:1, 64:24, 65:2, 65:4, 65:7, 68:12, 71:11, 71:14, 71:17, 72:13, 75:5, 82:17, 85:1, 85:3, 92:18, 93:16, 93:20, 94:15, 94:19, 98:20

**cost** [1] - 40:4

**Counsel** [1] - 55:20

**counsel** [4] - 3:9, 96:13, 98:8, 118:8

**counter** [5] - 96:13, 96:15, 98:9, 98:10, 107:1

**counter-designated** [3] - 96:13, 98:9, 98:10

**counter-designation** [1] - 107:1

**counter-designations** [1] - 96:15

**County** [2] - 116:6

**couple** [3] - 83:20, 100:8, 106:2

**course** [6] - 6:13, 17:8, 43:23, 76:22, 83:11, 85:18

**Court** [31] - 1:24, 3:1, 3:3, 6:2, 10:13, 83:11, 84:7, 85:5, 85:18, 90:3, 95:20, 97:8, 98:9, 105:19, 106:13, 108:4, 108:9, 108:13, 112:13, 116:17, 116:21, 116:23, 117:7, 117:25, 118:20, 118:22, 122:9, 122:10

**court** [9] - 3:7, 45:12, 79:20, 82:11, 88:12, 102:22, 104:15, 110:5, 121:5

**COURT** [179] - 1:1, 1:23, 3:6, 3:13, 3:19, 4:3, 4:8, 5:1, 5:4, 6:5, 6:8, 6:19, 7:5, 7:7, 7:10, 7:12, 7:19, 8:6, 8:17, 9:5, 9:19, 9:25, 10:4, 10:8, 10:20, 11:3, 11:15, 12:4, 12:10, 12:14, 12:18, 13:6, 13:9, 13:13, 14:4, 20:11, 20:15, 25:24, 29:16, 39:15, 40:6, 40:9, 40:11, 40:15, 42:6,

42:11, 42:16, 42:23, 44:23, 45:1, 45:6, 45:13, 45:15, 47:13, 47:17, 50:7, 52:21, 55:19, 62:9, 74:7, 75:9, 75:15, 75:19, 75:23, 76:12, 76:16, 76:18, 77:4, 77:10, 77:19, 78:5, 78:9, 78:14, 78:18, 78:20, 81:22, 82:11, 82:18, 82:21, 83:4, 83:16, 83:18, 84:2, 84:14, 84:17, 84:19, 85:8, 85:20, 86:8, 86:22, 87:3, 87:7, 87:12, 87:18, 88:24, 89:15, 89:19, 90:5, 90:16, 91:1, 92:6, 92:11, 92:18, 94:21, 95:12, 95:22, 96:4, 96:25, 97:12, 97:22, 98:23, 99:3, 99:8, 99:13, 99:16, 100:6, 100:18, 100:20, 100:22, 101:5, 101:9, 101:15, 101:18, 101:25, 102:6, 102:9, 102:12, 102:17, 102:23, 103:11, 103:17, 103:20, 104:20, 105:20, 105:24, 106:8, 106:11, 106:14, 106:17, 106:22, 107:15, 107:21, 107:25, 108:17, 109:1, 109:7, 109:10, 109:19, 109:22, 110:6, 110:9, 110:14, 111:2, 111:8, 111:18, 112:9, 113:7, 113:10, 113:22, 114:2, 114:9, 114:12, 114:16, 114:22, 115:4, 115:9, 115:12, 115:15, 115:20, 116:11, 117:10, 117:13, 118:2, 119:1, 119:13, 119:16, 119:25, 120:5, 121:3

**Court's** [3] - 3:23, 20:18, 96:2

**Courtney** [2] - 9:22, 108:21

**courtroom** [2] - 45:25, 118:19

**COURTROOM** [14] - 3:2, 3:3, 3:7, 13:20, 14:1, 44:25, 45:11, 45:12, 102:19, 102:21, 102:22, 110:5, 115:14, 121:5

**courts** [1] - 98:5

**covered** [1] - 81:18

**CRD** [1] - 13:18

**Creak** [4] - 26:22, 26:25, 55:7, 57:7

**credibility** [2] - 82:20, 83:20

**crew** [7] - 56:11, 59:24, 60:2, 80:12, 80:17, 80:19, 80:20

**cross** [13] - 11:1, 45:15, 52:21, 81:23, 84:16, 85:7, 86:13, 90:18, 90:20, 99:22, 107:16, 107:18, 117:1

**CROSS** [2] - 2:4, 45:17

**cross-designations** [2] - 107:16, 107:18

**CROSS-EXAMINATION** [2] - 2:4, 45:17

**cross-examine** [1] - 11:1

**Cruise** [3] - 15:19, 21:21, 33:1

**cruise** [35] - 12:14, 12:24, 12:25, 13:1, 13:2, 15:4, 15:6, 15:7, 15:10, 16:3, 16:9, 16:11, 16:14, 16:16, 17:3, 19:1, 33:12, 33:16, 46:3, 50:16, 62:13, 65:9, 65:21, 66:14, 67:12, 68:14, 68:17, 71:9, 71:13, 71:15, 73:11, 75:1, 78:16, 78:18, 95:3

**cumulative** [1] - 81:18

**current** [1] - 62:25

**customary** [15] - 115:22, 116:8, 116:14, 117:14, 117:15, 117:24, 118:4, 118:18, 119:11, 119:18, 120:3, 120:10, 120:17, 120:24

**D**

**Dade** [1] - 116:7

**damages** [22] - 84:5, 84:18, 85:9, 85:12, 85:21, 86:11, 86:19, 87:25, 88:5, 88:17, 88:19, 89:5, 89:22, 90:9, 90:11, 90:19, 92:12, 93:24, 94:5

**DAMIAN** [1] - 1:10

**Damian** [1] - 3:5

**dance** [1] - 15:2

**DATE** [1] - 122:8

**date** [12] - 48:23, 66:23, 67:1, 68:9, 69:11, 69:21, 70:15, 74:1, 78:11, 78:13, 78:14

**dated** [3] - 47:4, 48:7, 50:11

**dates** [3] - 68:15, 72:22, 78:16

**DAY** [1] - 1:9

**days** [2] - 64:21, 66:13

**deactivate** [1] - 73:21

**deceased** [1] - 14:13

**decide** [6] - 11:16, 12:6, 12:10, 84:7, 118:1

**decided** [1] - 64:3

**decipher** [1] - 111:24

**decision** [1] - 73:21

**deck** [37] - 17:7, 18:13, 19:16, 19:18, 19:24, 20:2, 20:7, 20:25, 21:8, 21:20, 21:22, 21:24, 22:20, 23:1, 23:14, 24:4, 26:13, 50:20, 50:24, 51:2, 51:7, 51:10, 51:12, 51:18, 51:24, 52:7, 52:17, 52:25, 53:3, 53:6, 53:10, 54:11, 60:16, 60:17, 60:23, 61:19, 82:15

**deductibles** [2] - 89:13, 91:12

**deems** [1] - 85:19

**Defendant** [1] - 1:8

**DEFENDANT** [1] - 1:16

**Defendant's** [12] - 47:1, 50:2, 54:15, 67:24, 68:22, 69:9, 69:18, 70:9, 70:20, 71:18, 72:3, 72:15

**defendant's** [2] - 3:25, 96:19

**defendants** [3] - 5:3, 10:25, 11:1

**Defense** [7] - 20:5, 20:6, 21:13, 26:3,

50:11, 65:3, 90:24
**defense** [12] - 78:7, 81:22, 86:12, 88:15, 91:3, 96:12, 99:9, 100:9, 104:7, 108:17, 115:9
**defenses** [1] - 104:21
**deferred** [1] - 110:23
**definite** [1] - 11:20
**definitely** [1] - 11:24
**deflects** [1] - 63:19
**degenerating** [1] - 44:18
**delay** [1] - 106:20
**deleted** [2] - 74:15, 74:25
**demeanor** [1] - 96:20
**Demonstrative** [1] - 21:13
**denied** [4] - 79:3, 79:5, 95:19, 117:14
**deny** [6] - 12:20, 49:11, 50:12, 50:14, 63:25, 64:2
**department** [1] - 63:14
**depict** [1] - 54:18
**depicted** [4] - 54:22, 61:10, 61:12, 70:21
**depo** [7] - 10:24, 75:19, 76:1, 76:12, 76:18, 96:9, 100:16
**deposed** [1] - 5:8
**deposition** [81] - 2:6, 2:7, 2:8, 2:9, 5:11, 6:14, 7:1, 10:1, 10:6, 10:8, 10:10, 10:16, 13:10, 55:14, 55:18, 57:8, 57:15, 74:5, 74:23, 75:13, 75:16, 75:17, 75:22, 76:8, 76:21, 77:1, 77:2, 77:16, 78:4, 79:8, 79:12, 79:20, 79:21, 79:25, 80:14, 80:24, 81:3, 81:6, 81:8, 81:16, 82:1, 82:4, 82:7, 82:8, 82:24, 83:1, 83:8, 83:11, 83:14, 83:15, 92:21, 95:23, 96:7, 97:1, 97:3, 97:13, 97:16, 97:23, 98:5, 98:11, 100:14, 103:2, 103:24, 107:14, 107:24, 108:1, 108:6, 108:12, 110:8, 110:10, 110:21, 112:14, 113:11, 114:21, 114:23, 115:1,

115:19, 115:22, 116:23, 117:4, 118:14
**depositions** [2] - 97:4, 108:10
**DEPUTY** [11] - 3:3, 3:7, 13:20, 14:1, 44:25, 45:12, 102:19, 102:22, 110:5, 115:14, 121:5
**describe** [2] - 27:16, 74:14
**described** [3] - 56:23, 57:9, 60:12
**designated** [16] - 95:25, 96:11, 96:13, 97:16, 98:9, 98:10, 98:21, 99:10, 99:13, 100:25, 103:2, 103:5, 104:4, 104:7, 104:17
**designation** [2] - 104:14, 107:1
**designations** [7] - 96:15, 97:17, 104:8, 107:16, 107:18, 110:21, 117:5
**destination** [2] - 16:11, 17:3
**detail** [1] - 74:14
**details** [1] - 12:25
**determine** [1] - 97:20
**determined** [2] - 4:15, 63:15
**diabetes** [1] - 49:7
**diabetic** [1] - 48:10
**diagnosis** [5] - 42:10, 42:12, 42:15, 110:23, 111:9
**Diagnostics** [1] - 94:17
**DIEPPA** [185] - 1:13, 2:4, 2:5, 3:11, 3:21, 4:4, 4:25, 5:2, 5:6, 6:6, 6:11, 6:22, 7:6, 7:9, 7:11, 7:13, 8:5, 8:13, 8:24, 9:8, 9:20, 10:3, 10:7, 10:25, 11:13, 12:3, 13:11, 13:17, 13:25, 14:2, 14:6, 20:13, 20:17, 26:1, 29:14, 29:17, 39:13, 39:18, 39:20, 40:17, 42:8, 42:13, 42:17, 42:25, 43:1, 44:21, 47:11, 47:15, 47:18, 50:1, 50:4, 52:19, 52:22, 55:20, 62:7, 74:4, 74:8, 75:11, 75:17, 75:21,

76:2, 76:5, 76:14, 76:17, 76:22, 77:9, 77:14, 77:22, 78:8, 78:13, 78:19, 78:24, 79:19, 79:23, 80:11, 81:20, 81:25, 82:17, 82:19, 83:3, 83:5, 83:17, 84:1, 84:3, 84:4, 84:18, 84:21, 84:22, 85:14, 86:5, 86:20, 86:24, 87:6, 87:9, 87:14, 87:23, 89:6, 89:12, 89:17, 89:24, 90:15, 90:21, 90:22, 90:25, 91:2, 92:10, 92:16, 92:19, 94:20, 94:24, 95:13, 95:18, 95:25, 96:11, 97:6, 97:21, 98:1, 98:20, 99:2, 99:5, 100:11, 100:19, 100:21, 100:25, 101:7, 101:14, 102:8, 102:16, 103:10, 103:18, 103:25, 104:5, 104:8, 104:12, 104:19, 104:22, 105:3, 105:7, 105:11, 105:15, 105:17, 105:21, 106:1, 106:10, 106:12, 106:16, 106:20, 106:23, 107:1, 107:5, 107:9, 107:13, 107:23, 108:3, 109:14, 109:20, 110:3, 110:7, 110:12, 110:15, 111:5, 111:10, 112:4, 112:17, 112:22, 112:25, 113:6, 113:19, 113:24, 114:6, 114:10, 114:14, 114:19, 115:1, 115:7, 115:17, 116:10, 117:2, 117:12, 117:16, 118:5, 119:15, 119:19, 120:4, 121:2
**Dieppa** [9] - 3:11, 13:16, 44:23, 75:10, 80:9, 81:19, 98:13, 98:18, 102:24
**difference** [3] - 29:19, 117:16, 117:19
**different** [12] - 8:17, 10:5, 13:4, 37:24, 42:24, 52:23, 58:6,

75:20, 99:23, 114:14, 117:21, 119:16
**difficulty** [1] - 44:6
**dining** [1] - 80:13
**DIRECT** [2] - 2:4, 14:5
**direct** [9] - 8:25, 81:18, 85:15, 86:2, 86:7, 92:24, 95:23, 101:12, 111:25
**direction** [2] - 24:25, 96:2
**directly** [5] - 5:18, 5:19, 89:8, 91:9, 112:19
**disability** [1] - 40:14
**disagree** [1] - 58:22
**disagreement** [1] - 11:20
**disappointed** [1] - 33:23
**disclose** [1] - 118:3
**disclosed** [1] - 118:3
**discomfort** [3] - 43:6, 43:8, 103:22
**discovery** [1] - 61:25
**discretion** [1] - 33:13
**discuss** [3] - 42:1, 79:14, 100:13
**discussed** [4] - 4:1, 22:20, 69:13, 75:21
**discussing** [2] - 79:25, 101:2
**discussion** [1] - 99:12
**disembarked** [4] - 18:19, 18:23, 18:25, 62:15
**disputing** [1] - 8:2
**disrespect** [1] - 86:17
**distance** [5] - 24:11, 26:4, 26:5, 26:8, 28:2
**distinguish** [1] - 113:12
**distractions** [1] - 63:19
**distress** [1] - 22:9
**District** [8] - 1:24, 1:24, 3:3, 3:4, 98:25, 122:10, 122:10
**DISTRICT** [3] - 1:1, 1:1, 1:10
**DIVISION** [1] - 1:2
**docked** [1] - 17:4
**Docket** [3] - 5:7, 97:11, 98:1
**doctor** [23] - 4:14, 13:12, 31:2, 31:14, 31:22, 44:14, 48:10, 48:24, 48:25, 49:2,

58:11, 58:20, 67:6, 87:2, 87:19, 110:23, 112:3, 112:8, 112:20, 113:9, 113:10, 119:4, 120:6
**doctor's** [1] - 58:22
**doctors** [1] - 36:15
**document** [2] - 47:8, 50:7
**documentation** [1] - 8:11
**documented** [1] - 7:14
**dollar** [3] - 84:11, 85:23, 86:3
**dominos** [2] - 51:21, 51:22
**done** [7] - 33:1, 34:14, 59:8, 66:18, 67:1, 100:12, 102:7
**door** [3] - 11:17, 11:23, 86:12
**dosage** [1] - 35:3
**doubt** [1] - 9:1
**down** [16] - 9:22, 17:21, 18:14, 21:18, 25:6, 25:19, 26:11, 55:8, 56:7, 56:13, 56:16, 60:18, 73:25, 90:12, 90:18, 108:23
**downplaying** [1] - 10:22
**Dr** [101] - 4:11, 4:17, 4:23, 5:12, 5:13, 5:19, 6:19, 6:23, 7:1, 7:3, 7:8, 7:18, 7:20, 8:7, 8:14, 8:25, 9:15, 9:22, 10:13, 10:15, 10:18, 10:22, 11:24, 36:16, 36:18, 36:25, 37:7, 37:10, 37:16, 41:18, 41:19, 41:21, 42:1, 42:4, 42:18, 66:10, 66:16, 66:20, 66:23, 67:2, 67:3, 67:5, 67:8, 68:14, 70:18, 71:10, 88:15, 95:3, 95:15, 95:20, 100:16, 108:8, 108:10, 108:12, 108:14, 108:16, 108:21, 109:16, 111:3, 111:6, 112:15, 112:23, 112:25, 113:12, 113:15, 114:20, 114:23, 115:2, 115:5, 115:18, 116:1, 116:12, 116:16, 116:17, 116:19, 116:21,

116:22, 116:24, 117:3, 117:8, 117:17, 117:18, 117:19, 117:21, 117:23, 118:6, 118:9, 118:17, 118:20, 118:23, 118:25, 119:2, 119:6, 119:17, 119:22, 119:24, 120:3
**DR** [1] - 2:9
**DRAHOS** [44] - 1:16, 3:14, 4:6, 4:9, 7:17, 10:11, 12:9, 12:13, 12:16, 13:4, 13:7, 45:4, 45:9, 90:3, 95:9, 95:14, 96:6, 97:15, 98:13, 99:11, 100:4, 101:17, 101:20, 102:5, 102:11, 102:14, 103:16, 108:21, 109:3, 109:8, 110:20, 112:12, 112:20, 112:23, 113:2, 113:9, 113:11, 115:11, 115:18, 115:21, 116:16, 118:16, 119:12, 121:1
**Drahos** [4] - 3:14, 4:4, 111:11, 111:14
**draw** [1] - 37:25
**drawing** [1] - 14:15
**drawn** [1] - 38:3
**dressed** [1] - 30:1
**Drive** [1] - 1:18
**drive** [1] - 38:8
**driving** [2] - 38:9
**dropped** [2] - 26:21, 27:23
**dry** [1] - 17:18
**due** [7] - 4:16, 20:18, 21:25, 36:21, 38:22, 49:7, 86:24
**during** [11] - 4:12, 23:16, 33:11, 40:18, 60:9, 73:11, 78:4, 93:9, 100:1, 100:2, 115:21
**dust** [1] - 17:20

## E

**early** [1] - 18:24
**earning** [3] - 39:13, 39:17, 39:24
**East** [2] - 1:25, 122:11
**Easter** [1] - 73:24

**easy** [1] - 37:25
**eat** [8] - 16:24, 17:9, 19:17, 19:25, 21:3, 25:8, 54:2, 60:20
**eating** [4] - 26:18, 26:20, 52:9, 57:4
**educated** [1] - 102:24
**effect** [2] - 42:20, 88:18
**effects** [1] - 83:19
**efficient** [2] - 11:10, 13:9
**either** [5] - 11:5, 35:22, 100:14, 105:22
**elbow** [1] - 29:3
**Eleventh** [1] - 99:6
**eliminates** [1] - 89:18
**embarked** [1] - 19:14
**emergency** [3] - 16:21, 32:9, 63:13
**employee** [4] - 5:3, 6:12, 60:19, 83:23
**employees** [13] - 21:8, 21:17, 23:13, 23:18, 24:20, 25:1, 26:15, 28:11, 81:24, 82:5, 82:15, 83:25, 95:3
**employment** [1] - 6:13
**empty** [1] - 34:3
**encounter** [2] - 7:15, 32:18
**encountered** [1] - 30:21
**end** [5] - 12:18, 62:9, 79:6, 83:8, 120:23
**enemy** [1] - 27:18
**enjoy** [2] - 15:1, 44:2
**enjoyment** [4] - 84:8, 84:24, 85:16, 86:3
**entered** [3] - 16:20, 59:8, 110:16
**entire** [6] - 5:10, 51:5, 63:24, 78:18, 100:25, 111:16
**entirety** [4] - 23:13, 84:13, 88:20, 93:17
**entitled** [4] - 82:7, 91:25, 96:21, 122:6
**entitlement** [1] - 89:18
**Entry** [3] - 5:7, 97:11, 98:2
**ER** [2] - 63:25, 88:9
**erased** [2] - 74:15, 74:25
**escorted** [1] - 58:9
**ESQUIRE** [4] - 1:13, 1:16, 1:17, 1:17
**estimate** [4] - 19:21, 22:21, 53:18, 84:12

**estimated** [2] - 23:7, 23:8
**estimating** [1] - 53:9
**estimation** [1] - 53:13
**et** [2] - 85:16
**Eureka** [6] - 3:12, 13:17, 13:18, 13:23, 38:12, 65:20
**EUREKA** [3] - 1:4, 2:3, 13:24
**evaluation** [2] - 48:20, 50:12
**evening** [1] - 121:4
**event** [2] - 65:21, 103:7
**events** [1] - 22:2
**eventually** [2] - 91:17, 99:23
**evidence** [25] - 4:11, 6:17, 6:18, 38:12, 50:7, 85:15, 86:10, 86:19, 86:21, 87:4, 87:5, 87:20, 88:6, 88:7, 88:14, 88:20, 89:20, 90:9, 94:12, 96:18, 97:24, 99:3, 99:18, 103:4, 110:16
**evidentiary** [2] - 6:11, 97:20
**exact** [3] - 64:9, 83:6, 114:6
**exactly** [5] - 8:8, 37:12, 38:24, 83:21, 115:8
**EXAMINATION** [6] - 2:4, 2:4, 2:5, 14:5, 45:17, 76:4
**examination** [3] - 8:25, 37:7, 58:11
**examine** [1] - 11:1
**examined** [1] - 31:21
**example** [1] - 12:25
**exams** [1] - 63:15
**exasperating** [1] - 111:10
**except** [2] - 8:10, 46:24
**excepts** [1] - 7:2
**excerpt** [1] - 106:21
**excerpts** [5] - 96:1, 97:4, 105:21, 106:5
**exclude** [1] - 115:25
**excruciating** [1] - 35:2
**excuse** [2] - 48:16, 61:11
**exercise** [2] - 104:18, 104:22
**exhaust** [2] - 39:2, 40:10
**exhibit** [5] - 49:25,

71:20, 72:5, 78:6, 110:12
**Exhibit** [29] - 7:9, 7:11, 20:22, 23:3, 24:24, 25:19, 30:9, 38:11, 47:1, 50:2, 50:11, 54:15, 58:16, 59:13, 61:6, 62:20, 63:5, 65:3, 67:24, 68:22, 71:18, 72:3, 72:15, 90:24, 91:3, 93:13, 94:8, 94:11, 110:17
**exhibits** [2] - 101:1, 101:2
**exist** [1] - 67:7
**exists** [1] - 98:5
**expect** [4] - 25:3, 33:17, 33:19, 115:5
**expected** [1] - 118:14
**expenses** [8] - 87:21, 88:11, 88:20, 88:22, 90:2, 92:8, 94:2, 94:6
**experience** [3] - 103:22, 119:5, 120:1
**experienced** [1] - 32:24
**experiencing** [1] - 21:9
**expert** [13] - 95:13, 95:19, 100:15, 101:24, 109:1, 117:13, 117:14, 118:3, 119:10, 120:2, 120:9, 120:17, 120:23
**expertise** [1] - 53:18
**experts** [1] - 118:11
**explain** [11] - 4:4, 34:2, 55:2, 55:4, 55:5, 75:25, 76:1, 77:25, 78:3, 78:21, 78:25
**explained** [3] - 36:20, 73:17, 74:22
**explaining** [2] - 74:5, 77:2
**explanation** [1] - 79:8
**extent** [1] - 98:22
**extra** [1] - 11:13
**extreme** [2] - 28:24, 28:25

## F

**face** [1] - 103:11
**Facebook** [14] - 67:12, 67:14, 67:22, 71:8, 71:12, 71:16, 72:23,

73:16, 73:25, 77:3, 77:24, 78:22, 79:14, 93:2
**facilities** [2] - 94:12, 94:13
**facility** [1] - 64:7
**facing** [1] - 25:22
**fact** [17] - 7:21, 7:22, 8:9, 9:1, 39:22, 43:2, 49:7, 77:1, 82:4, 99:21, 111:24, 113:3, 113:16, 119:23, 120:4, 120:14
**fail** [1] - 83:6
**fall** [1] - 6:15
**fallen** [1] - 62:22
**familiar** [5] - 17:8, 48:9, 89:1, 103:11, 120:21
**familiarity** [1] - 119:8
**family** [1] - 23:17
**Family** [2] - 64:14, 64:18
**far** [3] - 20:4, 23:10, 85:4
**fast** [1] - 101:6
**feet** [3] - 24:17, 26:8, 81:14
**fell** [2] - 17:15, 17:20
**felt** [6] - 26:19, 27:13, 36:13, 55:1, 56:25, 58:8
**female** [1] - 65:20
**few** [3] - 19:11, 105:21, 106:17
**Fifth** [1] - 99:6
**figure** [5] - 6:10, 84:11, 85:17, 85:23, 86:4
**figures** [2] - 119:24, 119:25
**file** [3] - 49:10, 96:1, 97:8
**filed** [5] - 79:20, 88:2, 104:14, 118:6, 118:7
**filing** [2] - 62:6, 97:7
**Filipino** [2] - 30:3, 30:5
**fill** [5] - 6:20, 6:22, 7:7, 59:6, 76:23
**filled** [2] - 23:4, 59:10
**filling** [3] - 32:18, 59:15, 59:19
**final** [4] - 4:18, 10:14, 72:4, 73:1
**finder** [2] - 111:24, 120:4
**findings** [1] - 36:21
**fine** [5] - 39:14, 42:9,

42:24, 65:19, 120:22
**fingers** [1] - 25:17
**finish** [2] - 60:20, 102:2
**first** [25] - 6:20, 6:24, 7:15, 9:16, 16:12, 16:16, 26:12, 29:25, 30:20, 32:17, 33:5, 36:20, 50:20, 50:24, 59:8, 65:19, 66:10, 66:17, 66:20, 67:2, 73:15, 73:20, 76:16, 101:16, 109:16
**Fisk** [1] - 99:6
**five** [8] - 19:6, 38:1, 45:6, 51:12, 52:12, 106:7, 109:17, 114:15
**five-minute** [2] - 45:6, 106:7
**Flagler** [1] - 1:18
**flares** [1] - 43:11
**floor** [3] - 17:18, 29:4, 54:9
**FLORIDA** [2] - 1:1, 1:14
**Florida** [17] - 1:4, 1:15, 1:19, 1:24, 1:25, 3:4, 14:11, 14:16, 46:18, 49:17, 62:18, 87:24, 88:10, 98:25, 99:1, 122:10, 122:11
**flow** [1] - 6:9
**fly** [1] - 33:11
**flying** [1] - 23:22
**focal** [2] - 63:18
**focus** [1] - 73:19
**follow** [2] - 35:20, 89:25
**following** [8] - 16:25, 50:13, 51:4, 52:1, 62:15, 66:7, 66:13, 67:11
**food** [17] - 17:16, 18:8, 21:1, 21:3, 21:6, 22:25, 25:9, 25:12, 25:13, 25:15, 25:16, 27:23, 54:10, 60:20, 61:17
**FOR** [2] - 1:13, 1:16
**force** [3] - 27:16, 57:13
**foregoing** [3] - 73:7, 74:21, 122:4
**form** [5] - 52:19, 59:6, 59:10, 59:20, 60:2
**FORT** [1] - 1:2
**Fort** [5] - 1:4, 1:25, 14:16, 64:15, 122:11

**forth** [2] - 97:17, 101:8
**forward** [3] - 19:19, 22:18, 101:6
**foundation** [7] - 84:19, 84:21, 92:5, 92:6, 116:4, 117:24, 120:25
**four** [2] - 14:13, 106:5
**Foursquare** [1] - 72:24
**free** [1] - 102:3
**freshen** [1] - 100:5
**Friday** [2] - 17:16, 17:17
**friend** [1] - 43:17
**friends** [5] - 21:4, 23:17, 53:22, 54:3, 67:16
**front** [7] - 20:15, 32:17, 57:15, 69:16, 76:8, 87:5, 118:11
**frontwards** [1] - 57:5
**full** [8] - 58:14, 58:20, 88:11, 113:18, 113:19, 113:20, 113:23, 114:10
**fully** [6] - 42:10, 89:8, 89:14, 91:9
**funny** [1] - 111:2
**future** [1] - 84:13

## G

**games** [1] - 51:17
**generally** [1] - 90:1
**GENOESE** [1] - 1:17
**Genoese** [5] - 3:19, 47:8, 48:13, 49:25, 71:1
**gentleman** [1] - 83:24
**girlfriend** [1] - 16:6
**girlfriend's** [1] - 15:8
**girlfriends** [1] - 24:14
**given** [7] - 6:1, 9:1, 31:3, 31:5, 113:4, 116:25, 120:2
**glossed** [1] - 8:25
**GONZALEZ** [1] - 2:9
**Gonzalez** [7] - 108:8, 108:10, 111:6, 114:20, 114:21, 114:23, 115:2
**gotcha** [1] - 105:17
**GRAYROBINSON** [1] - 1:18
**great** [4] - 12:14, 76:7, 86:22, 103:17
**greater** [3] - 116:22, 116:25, 118:24
**gripped** [1] - 17:17

**groceries** [1] - 44:6
**grocery** [1] - 44:6
**ground** [1] - 97:20
**grounds** [1] - 6:18
**group** [5] - 19:11, 20:2, 53:22, 54:12, 54:13
**growing** [1] - 19:22
**guess** [23] - 3:25, 4:4, 16:8, 16:16, 19:24, 22:6, 22:9, 22:15, 24:5, 28:4, 30:20, 34:1, 34:5, 36:15, 41:13, 41:17, 77:10, 83:19, 89:15, 89:21, 99:16, 108:11, 112:5
**guest** [2] - 59:23, 82:23
**guests** [1] - 80:20
**guy** [1] - 30:3
**guys** [2] - 12:5, 34:5

## H

**half** [1] - 108:25
**hand** [13] - 26:20, 27:23, 29:3, 47:9, 47:19, 47:24, 48:2, 54:14, 57:4, 57:5, 68:20, 69:25, 70:4
**handed** [1] - 44:11
**handle** [1] - 45:15
**hands** [3] - 38:10, 44:12, 44:13
**happy** [2] - 102:13, 118:15
**hard** [4] - 29:7, 42:6, 55:2, 57:14
**hates** [1] - 103:20
**HCA** [10] - 35:12, 35:23, 62:17, 62:21, 63:1, 63:6, 64:3, 64:6, 64:14, 94:16
**head** [3] - 68:15, 86:14, 112:2
**heading** [1] - 49:21
**Health** [2] - 64:14, 64:18
**Healthcare** [1] - 35:12
**hear** [8] - 57:6, 87:1, 89:22, 111:21, 113:25, 117:25, 118:24, 119:1
**heard** [7] - 12:18, 22:12, 23:25, 37:19, 44:16, 86:1, 89:1
**hearing** [3] - 103:20, 103:21, 118:11
**hearsay** [5] - 6:14, 6:15, 42:5, 42:10,

99:18
**heavier** [1] - 93:6
**help** [2] - 43:24, 47:8
**helps** [1] - 6:9
**hereby** [1] - 122:4
**herself** [2] - 6:21, 8:9
**high** [6] - 14:17, 21:25, 22:3, 33:5, 33:11, 68:8
**High** [1] - 14:18
**higher** [2] - 93:3, 120:2
**highlighted** [1] - 91:7
**himself** [2] - 24:15, 54:12
**history** [3] - 47:7, 50:9, 65:15
**hit** [39] - 27:5, 27:6, 27:11, 27:12, 27:14, 27:20, 28:13, 28:22, 29:7, 29:10, 33:18, 34:17, 49:13, 49:20, 54:23, 54:24, 54:25, 55:1, 55:2, 55:4, 55:5, 56:20, 56:23, 56:25, 57:3, 57:9, 57:12, 57:14, 57:22, 58:3, 58:5, 58:8, 60:6, 62:22, 65:22, 65:25, 66:2
**hitting** [1] - 23:22
**hobbies** [1] - 15:1
**hold** [5] - 9:25, 19:20, 76:12, 95:22, 116:11
**holding** [3] - 29:3, 68:5, 93:6
**hole** [2] - 90:12, 90:18
**Hollywood** [2] - 46:17, 49:16
**home** [2] - 35:10, 43:12
**honest** [1] - 36:23
**honestly** [1] - 57:25
**Honor** [73] - 3:11, 3:14, 4:7, 4:25, 5:17, 5:21, 6:6, 6:11, 6:25, 7:6, 8:13, 8:24, 10:12, 11:13, 12:3, 12:9, 12:17, 29:14, 39:11, 42:14, 47:11, 50:4, 62:7, 74:4, 75:11, 76:3, 76:23, 77:9, 79:19, 81:21, 82:10, 82:17, 85:14, 86:20, 86:24, 87:23, 89:6, 89:17, 89:24, 89:25, 90:15, 90:25, 94:25, 95:18, 96:10, 96:11, 97:6, 97:10, 98:1, 98:13, 99:5,

100:12, 101:14, 102:8, 103:10, 103:25, 105:18, 107:13, 108:3, 109:14, 110:3, 110:7, 110:13, 110:20, 111:7, 111:10, 112:4, 113:6, 114:15, 115:11, 116:10, 117:2, 121:2
**HONORABLE** [1] - 1:10
**Honorable** [1] - 3:5
**hook** [2] - 87:1, 87:7
**horse** [2] - 43:21, 43:22
**horses** [2] - 43:18
**Hospital** [11] - 14:12, 14:14, 35:12, 38:2, 62:18, 62:21, 63:1, 63:6, 64:3, 64:6, 64:14
**hospital** [1] - 64:1
**hour** [10] - 9:11, 19:23, 33:6, 53:13, 53:19, 60:9, 108:12, 108:25, 109:16, 115:7
**hours** [13] - 19:6, 30:24, 31:1, 51:12, 52:12, 53:7, 100:16, 101:10, 108:18, 108:22, 109:8, 109:18, 115:6
**house** [1] - 12:24
**human** [1] - 86:18
**hurt** [1] - 5:14
**husband** [28] - 14:20, 15:24, 15:25, 16:8, 19:9, 19:12, 23:24, 24:3, 25:8, 25:22, 27:11, 28:6, 28:9, 28:18, 29:12, 35:9, 41:1, 41:7, 44:5, 52:9, 53:1, 54:4, 54:12, 55:8, 56:8, 56:17, 60:24, 61:23
**husband's** [2] - 14:22, 24:9
**hysterical** [2] - 28:13, 30:3

## I

**ibuprofen** [21] - 5:15, 6:1, 8:23, 9:10, 9:17, 10:19, 31:3, 31:5, 31:20, 31:22, 32:5, 32:8, 35:3, 43:12,

61:15, 112:19, 112:20, 112:22, 113:5, 113:7, 113:13
**ibuprofens** [2] - 31:21, 31:24
**ice** [4] - 34:6, 34:7, 60:22, 61:15
**idea** [2] - 12:13, 92:3
**identified** [3] - 74:13, 97:11, 98:2
**identify** [1] - 72:20
**II** [2] - 14:14, 37:23
**illness** [1] - 65:16
**image** [1] - 64:3
**images** [3] - 72:21, 73:10, 74:14
**imaging** [1] - 63:20
**immediately** [2] - 8:3, 92:25
**impact** [1] - 57:4
**impairment** [1] - 42:1
**impeach** [2] - 4:17, 6:25
**impeaching** [1] - 76:24
**impeachment** [4] - 47:12, 47:13, 50:5, 81:21
**important** [2] - 11:23, 119:23
**impression** [2] - 76:2, 76:25
**improper** [1] - 47:12
**improvement** [1] - 37:3
**in-house** [1] - 12:24
**inaccurate** [2] - 66:4, 66:5
**inadmissible** [3] - 88:13, 88:18, 99:18
**inches** [1] - 28:7
**incident** [32] - 21:21, 23:11, 28:9, 28:10, 32:6, 32:25, 34:11, 38:2, 38:20, 43:13, 44:14, 48:11, 52:2, 53:4, 53:7, 53:21, 54:19, 59:2, 59:18, 59:25, 60:3, 60:21, 66:13, 68:13, 68:17, 71:9, 78:11, 80:18, 81:4, 81:11, 82:5, 93:19
**include** [3] - 84:12, 88:7, 94:16
**included** [2] - 83:13, 118:6
**including** [9] - 17:25, 51:15, 72:22, 74:16, 88:8, 89:13, 91:11,

96:19, 100:8
**inconsistent** [2] - 83:14, 97:2
**inconvenience** [1] - 84:24
**Incorporated** [1] - 94:18
**incorrect** [3] - 48:1, 63:3, 114:11
**increase** [1] - 35:3
**increasing** [1] - 35:1
**incurred** [5] - 38:20, 87:9, 88:1, 88:22, 93:18
**independent** [1] - 114:4
**independently** [1] - 76:19
**indicated** [1] - 62:24
**individual** [1] - 68:18
**infirmary** [21] - 5:16, 6:22, 7:5, 7:16, 9:11, 23:2, 29:22, 30:7, 30:17, 30:24, 31:19, 31:25, 32:3, 32:12, 32:14, 33:22, 34:12, 34:13, 34:14, 35:23, 82:22
**initial** [5] - 4:19, 5:6, 6:22, 7:5, 118:5
**injure** [2] - 15:17, 49:22
**injured** [3] - 15:12, 17:22, 46:10
**Injury** [2] - 59:6, 59:10
**injury** [18] - 7:16, 8:20, 9:3, 11:25, 15:11, 22:20, 23:4, 23:7, 23:14, 32:24, 36:19, 36:21, 41:14, 47:15, 48:20, 50:6, 63:19, 94:13
**inside** [4] - 19:16, 20:19, 21:3, 54:8
**Instagram** [1] - 72:23
**instead** [2] - 11:8, 64:22
**instruction** [3] - 87:23, 87:24, 90:4
**insurance** [2] - 89:3, 91:13
**intend** [2] - 96:3, 98:20
**intended** [1] - 4:17
**intends** [1] - 3:24
**intense** [1] - 36:14
**intent** [1] - 96:8
**interact** [1] - 59:3
**interest** [1] - 6:16
**interesting** [2] - 13:9,

103:6
**Internet** [1] - 16:1
**interpret** [2] - 99:11, 118:20
**interpretation** [2] - 4:12, 110:25
**interpreted** [1] - 8:7
**interrogatories** [5] - 71:23, 72:11, 77:15, 78:3, 79:11
**Interrogatories** [1] - 71:19
**Interrogatory** [3] - 72:16, 74:10, 74:13
**interrogatory** [12] - 75:22, 75:24, 76:24, 77:1, 77:6, 77:12, 77:20, 77:24, 78:5, 78:10, 78:21, 79:1
**intoxicated** [1] - 63:17
**introduce** [1] - 88:16
**introduced** [2] - 5:24, 88:20
**involved** [3] - 13:14, 49:11, 65:20
**island** [6] - 18:7, 18:9, 18:17, 19:4, 19:6, 54:1
**issue** [20] - 3:21, 5:24, 6:1, 8:5, 9:21, 11:20, 11:23, 76:23, 82:11, 82:12, 82:13, 82:19, 84:6, 90:19, 98:12, 99:14, 99:20, 115:18, 118:12
**issued** [2] - 13:12, 71:23
**issues** [6] - 12:21, 38:5, 51:1, 51:23, 96:22, 117:4
**issuing** [1] - 13:14
**items** [1] - 51:23
**itself** [1] - 50:16

**J**

**jacket** [1] - 16:22
**Jackson** [4] - 14:11, 14:13, 38:2, 40:15
**jacuzzi** [1] - 51:15
**Jamaica** [1] - 43:17
**Jarnagin** [9] - 3:16, 45:16, 76:24, 77:16, 79:24, 80:2, 81:3, 81:25, 98:18
**JARNAGIN** [47] - 1:17, 2:4, 3:16, 39:11, 42:5, 45:18, 47:20, 48:13, 48:15, 49:24, 50:2, 50:10, 52:24,

55:17, 55:21, 55:22, 58:16, 58:17, 59:13, 59:14, 61:6, 61:7, 62:10, 62:11, 71:1, 71:3, 74:9, 75:6, 78:16, 80:8, 81:17, 84:15, 85:6, 92:4, 99:15, 104:3, 104:6, 104:10, 104:14, 105:4, 105:8, 105:12, 105:16, 107:2, 107:6, 107:10, 107:18
**join** [1] - 24:9
**joining** [1] - 16:9
**Joint** [14] - 7:9, 7:11, 20:22, 23:3, 24:24, 25:19, 30:9, 58:16, 59:13, 61:6, 62:20, 63:5, 64:12, 110:17
**jokes** [1] - 17:9
**JUAN** [1] - 2:9
**Juan** [2] - 114:20, 114:23
**Judge** [10] - 10:3, 95:18, 97:21, 98:6, 111:5, 114:6, 115:14, 117:19, 118:12, 119:24
**judge** [1] - 52:22
**JUDGE** [1] - 1:10
**judgment** [1] - 91:16
**july** [1] - 122:8
**July** [24] - 14:24, 15:4, 15:8, 15:11, 16:17, 16:25, 18:2, 18:4, 34:23, 36:3, 50:18, 51:4, 52:1, 64:25, 65:8, 72:22, 74:16, 78:13, 78:16, 78:17, 78:23, 94:14
**jumping** [1] - 120:23
**juncture** [1] - 118:13
**June** [3] - 78:8, 78:9, 78:11
**jury** [6] - 85:25, 86:1, 87:23, 87:24, 109:13

**K**

**keep** [2] - 23:21, 33:1
**key** [2] - 117:16, 117:19
**kick** [3] - 31:11, 31:12, 31:14
**kids** [1] - 14:12
**kind** [6] - 11:25, 20:19, 26:2, 101:5, 120:7, 120:21
**knee** [3] - 17:20,

17:21, 18:1
**knocked** [1] - 27:19
**knowing** [1] - 111:24
**knowledge** [5] - 5:5, 9:16, 111:25, 113:1, 119:20
**known** [1] - 117:3
**knows** [5] - 12:22, 117:10, 117:12, 117:22, 120:15

**L**

**lack** [1] - 92:4
**lady** [7] - 30:2, 30:4, 30:5, 30:8, 60:18, 67:6
**laid** [5] - 116:2, 116:5, 116:15, 116:21, 118:23
**language** [1] - 87:16
**last** [12] - 28:1, 41:14, 41:17, 55:12, 67:17, 73:6, 73:18, 73:24, 74:19, 105:21, 111:22
**lastly** [1] - 6:11
**late** [2] - 102:3
**Latoya** [2] - 15:9, 16:6
**LAUDERDALE** [1] - 1:2
**Lauderdale** [5] - 1:4, 1:25, 14:16, 64:15, 122:11
**law** [6] - 88:2, 88:3, 88:10, 89:17, 98:8
**lawsuit** [3] - 62:6, 71:21, 71:24
**lawyers** [1] - 12:24
**lay** [4] - 84:19, 84:21, 116:16, 117:24
**layperson** [2] - 7:24
**lays** [1] - 120:24
**lead** [3] - 4:1, 5:8, 6:12
**least** [5] - 24:3, 28:1, 28:6, 31:19, 37:3
**leave** [4] - 22:8, 22:10, 40:9, 40:10
**leaving** [1] - 60:23
**left** [26] - 4:14, 15:11, 27:4, 27:23, 27:24, 29:1, 29:24, 31:25, 36:14, 38:8, 44:11, 44:17, 57:5, 58:14, 60:5, 62:17, 65:23, 65:25, 66:16, 66:24, 68:18, 70:4, 70:17, 70:23, 113:4
**left-handed** [1] - 44:11
**leg** [2] - 46:10, 46:12

**legal** [5] - 72:25, 74:18, 96:23, 96:25, 97:7
**LEGAL** [1] - 1:14
**length** [1] - 93:4
**less** [6] - 18:19, 18:22, 24:11, 26:4, 26:8, 26:12
**letter** [15] - 13:11, 64:25, 86:13, 86:23, 87:3, 87:10, 87:12, 87:13, 87:14, 88:8, 88:25, 89:7, 89:18, 91:3, 91:20
**letting** [2] - 99:17, 119:6
**level** [9] - 8:15, 8:16, 8:18, 11:7, 11:22, 28:24, 62:25, 63:17, 112:16
**levied** [1] - 115:24
**Liberti** [2] - 95:15, 95:20
**lido** [32] - 17:7, 18:13, 19:16, 19:18, 20:7, 20:25, 21:20, 21:22, 21:24, 22:20, 23:14, 24:4, 26:13, 50:20, 50:24, 51:2, 51:7, 51:10, 51:12, 51:18, 51:24, 52:7, 52:16, 52:25, 53:3, 53:6, 53:10, 54:11, 60:16, 60:17, 60:23, 61:19
**life** [10] - 15:1, 16:22, 37:21, 44:2, 63:22, 73:17, 84:8, 85:16, 86:3
**lift** [4] - 69:8, 113:16, 113:17, 114:7
**lifted** [2] - 69:5, 69:7
**likely** [2] - 95:6, 120:18
**limitations** [1] - 44:3
**limited** [4] - 37:17, 72:23, 74:16, 91:11
**line** [20] - 22:22, 22:24, 54:2, 54:9, 54:10, 55:20, 55:23, 55:24, 60:19, 63:16, 81:6, 95:3, 104:9, 104:10, 104:11, 104:12, 104:15, 104:17, 105:16
**Line** [3] - 15:19, 21:22, 33:1
**lines** [4] - 22:23, 55:21, 57:17, 81:15
**lining** [1] - 105:25
**list** [8] - 4:18, 4:19,

4:24, 5:4, 5:7, 10:14, 74:24, 111:3
**listed** [8] - 4:18, 4:24, 5:2, 5:6, 5:23, 7:14, 48:23, 94:12
**literally** [1] - 114:15
**litigiousness** [1] - 62:8
**live** [6] - 44:2, 95:7, 95:10, 96:10, 98:15, 101:12
**living** [1] - 40:5
**location** [4] - 29:19, 60:25, 61:18, 69:13
**longest** [1] - 100:15
**look** [20] - 10:23, 12:4, 12:23, 24:19, 29:4, 30:13, 47:7, 61:14, 68:20, 88:25, 98:1, 98:24, 99:4, 99:8, 99:19, 100:2, 100:3, 100:6, 102:25, 119:9
**looked** [4] - 24:14, 38:15, 103:11, 120:15
**looking** [15] - 9:7, 20:6, 23:3, 25:19, 26:2, 38:11, 80:6, 80:16, 81:6, 81:15, 101:3, 101:19, 111:2, 113:24, 118:2
**looks** [8] - 24:16, 26:7, 66:1, 68:5, 69:1, 69:15, 104:20
**loss** [7] - 39:13, 39:16, 39:24, 84:8, 84:24, 85:15, 86:2
**lost** [3] - 39:12, 39:16, 80:4
**loud** [1] - 22:8
**love** [4] - 15:2, 15:3
**lower** [2] - 7:25, 49:22
**Lucien** [6] - 14:23, 19:12, 19:13, 35:9, 41:1, 53:1
**luggage** [1] - 35:10
**lunch** [6] - 51:10, 65:22, 86:9, 94:22, 94:23, 102:6

## M

**ma'am** [9] - 20:18, 40:8, 44:25, 45:14, 47:21, 47:23, 55:25, 65:12, 91:5
**Madam** [1] - 13:25
**maintain** [5] - 67:12, 73:7, 73:13, 74:21, 75:3

**Mairelys** [2] - 45:1, 109:25
**MAIRELYS** [2] - 1:23, 122:9
**mama** [1] - 18:9
**March** [1] - 43:17
**mark** [3] - 20:13, 25:21, 86:14
**married** [3] - 14:19, 14:20, 14:21
**material** [2] - 4:13, 120:9
**math** [1] - 34:21
**matter** [6] - 49:6, 55:15, 75:25, 99:21, 119:23, 122:6
**matters** [1] - 89:3
**MD** [1] - 64:20
**mean** [41] - 8:8, 8:12, 11:9, 20:12, 21:12, 24:8, 24:16, 26:7, 31:17, 42:9, 42:11, 44:17, 44:18, 48:6, 50:5, 67:18, 76:18, 77:19, 81:22, 82:21, 85:8, 85:20, 86:16, 87:15, 88:4, 88:15, 89:4, 89:24, 98:23, 100:1, 101:9, 102:12, 106:14, 109:7, 111:19, 114:5, 114:16, 117:2, 119:1, 120:9, 120:17
**meaning** [2] - 78:5, 94:3
**measure** [1] - 85:21
**media** [11] - 72:20, 73:8, 73:10, 73:14, 73:21, 74:22, 75:4, 78:10, 78:22, 79:5, 79:6
**medical** [52] - 4:10, 30:20, 37:6, 38:12, 38:19, 42:10, 42:15, 46:3, 46:24, 50:9, 58:9, 58:25, 59:4, 59:11, 60:5, 60:16, 60:17, 60:24, 61:4, 61:18, 62:12, 64:6, 64:22, 67:7, 84:7, 86:20, 86:21, 87:21, 88:1, 88:5, 88:6, 88:11, 88:20, 88:21, 89:9, 90:1, 91:10, 93:12, 93:13, 93:17, 93:18, 93:21, 94:2, 94:6, 94:9, 100:15, 109:1, 113:3, 117:9, 117:17, 117:18,

119:4
**medication** [2] - 9:1, 35:18
**medications** [1] - 41:10
**Medicine** [1] - 94:17
**Mediterranean** [1] - 13:2
**meet** [1] - 45:21
**meeting** [1] - 68:14
**MELISSA** [1] - 1:10
**Melissa** [1] - 3:5
**member** [2] - 59:24, 60:2
**members** [6] - 51:17, 56:11, 80:13, 80:17, 80:19, 80:20
**Memorial** [3] - 14:11, 14:13, 38:2
**memory** [2] - 48:11, 81:10
**men** [1] - 43:25
**mention** [1] - 104:6
**mentioned** [1] - 44:5
**met** [2] - 54:21, 68:15
**meteorologist** [1] - 53:15
**Miami** [8] - 1:15, 14:11, 14:18, 46:7, 94:17, 115:24, 116:3, 116:7
**Miami-Dade** [1] - 116:7
**Michael** [1] - 3:14
**MICHAEL** [1] - 1:16
**microbiology** [1] - 37:24
**middle** [2] - 63:16, 109:12
**Middle** [1] - 98:25
**might** [4] - 13:9, 77:11, 84:19, 101:5
**miles** [5] - 10:9, 19:23, 33:5, 53:13, 53:19
**milligrams** [2] - 31:7, 35:6
**mind** [1] - 80:20
**mine** [1] - 16:6
**minimizing** [1] - 93:10
**minute** [2] - 45:6, 106:7
**minutes** [17] - 5:10, 22:24, 31:13, 37:12, 54:10, 54:23, 61:3, 95:2, 100:14, 101:22, 101:23, 106:2, 106:17, 108:11, 108:13, 114:15, 115:8
**misleading** [1] - 76:22

**mismatched** [1] - 105:22
**misremembering** [1] - 82:25
**miss** [1] - 66:1
**mistaken** [1] - 70:14
**mitigate** [1] - 23:18
**mixed** [1] - 49:23
**moment** [5] - 24:7, 24:8, 86:18, 98:12
**money** [6] - 39:5, 39:24, 86:15, 87:4, 88:7, 91:25
**MONICA** [1] - 2:6
**Monica** [3] - 3:17, 103:19, 103:24
**month** [5] - 39:5, 39:6, 39:8, 67:11
**months** [8] - 38:9, 38:23, 38:24, 39:3, 39:4, 39:9, 41:6, 49:7
**morning** [25] - 3:6, 3:11, 3:13, 3:14, 3:16, 3:19, 13:23, 14:7, 14:8, 16:16, 18:4, 18:23, 18:24, 43:9, 45:19, 45:20, 101:16, 108:16, 108:19, 109:12, 109:17, 112:13, 115:3, 115:5, 115:12
**most** [6] - 54:10, 95:6, 100:12, 110:21, 111:15, 120:18
**motion** [10] - 37:17, 58:14, 58:21, 95:19, 113:18, 113:19, 113:21, 113:23, 114:8, 114:10
**motor** [5] - 49:4, 49:11, 49:15, 49:20, 50:13
**move** [5] - 22:18, 56:25, 57:2, 84:2, 115:25
**moved** [7] - 65:9, 65:11, 65:22, 65:24, 66:2, 66:6, 113:20
**moving** [3] - 29:2, 93:3
**MR** [273] - 2:4, 2:4, 2:5, 3:11, 3:14, 3:16, 3:21, 4:4, 4:6, 4:9, 4:25, 5:2, 5:6, 6:6, 6:11, 6:22, 7:6, 7:9, 7:11, 7:13, 7:17, 8:5, 8:13, 8:24, 9:8, 9:20, 10:3, 10:7, 10:11, 10:25, 11:13, 12:3,

12:9, 12:13, 12:16, 13:4, 13:7, 13:11, 13:17, 13:25, 14:2, 14:6, 20:13, 20:17, 26:1, 29:14, 29:17, 39:11, 39:13, 39:18, 39:20, 40:17, 42:5, 42:8, 42:13, 42:17, 42:25, 43:1, 44:21, 45:4, 45:9, 45:18, 47:11, 47:15, 47:18, 47:20, 48:13, 48:15, 49:24, 50:1, 50:2, 50:4, 50:10, 52:19, 52:22, 52:24, 55:17, 55:20, 55:21, 55:22, 58:16, 58:17, 59:13, 59:14, 61:6, 61:7, 62:7, 62:10, 62:11, 71:1, 71:3, 74:4, 74:8, 74:9, 75:6, 75:11, 75:17, 75:21, 76:2, 76:5, 76:14, 76:17, 76:22, 77:9, 77:14, 77:22, 78:8, 78:13, 78:16, 78:19, 78:24, 79:19, 79:23, 80:8, 80:11, 81:17, 81:20, 81:25, 82:17, 82:19, 83:3, 83:5, 83:17, 84:1, 84:3, 84:4, 84:15, 84:18, 84:21, 84:22, 85:6, 85:14, 86:5, 86:20, 86:24, 87:6, 87:9, 87:14, 87:23, 89:6, 89:12, 89:17, 89:24, 90:3, 90:15, 90:21, 90:22, 90:25, 91:2, 92:4, 92:10, 92:16, 92:19, 94:20, 94:24, 95:9, 95:13, 95:14, 95:18, 95:25, 96:6, 96:11, 97:6, 97:15, 97:21, 98:1, 98:13, 98:20, 99:2, 99:5, 99:11, 99:15, 100:4, 100:11, 100:19, 100:21, 100:25, 101:7, 101:14, 101:17, 101:20, 102:5, 102:8, 102:11, 102:14, 102:16, 103:10, 103:16, 103:18, 103:25, 104:3, 104:5, 104:6, 104:8, 104:10, 104:12, 104:14, 104:19, 104:22, 105:3, 105:4, 105:7, 105:8,

105:11, 105:12, 105:15, 105:16, 105:17, 105:21, 106:1, 106:10, 106:12, 106:16, 106:20, 106:23, 107:1, 107:2, 107:5, 107:6, 107:9, 107:10, 107:13, 107:18, 107:23, 108:3, 108:21, 109:3, 109:8, 109:14, 109:20, 110:3, 110:7, 110:12, 110:15, 110:20, 111:5, 111:10, 112:4, 112:12, 112:17, 112:20, 112:22, 112:23, 112:25, 113:2, 113:6, 113:9, 113:11, 113:19, 113:24, 114:6, 114:10, 114:14, 114:19, 115:1, 115:7, 115:11, 115:17, 115:18, 115:21, 116:10, 116:16, 117:2, 117:12, 117:16, 118:5, 118:16, 119:12, 119:15, 119:19, 120:4, 121:1, 121:2
**MRI** [5] - 35:22, 35:25, 36:20, 66:18, 67:1
**MVA** [1] - 48:20

**N**

**name** [5] - 13:21, 13:23, 14:22, 15:9, 65:6
**narrative** [1] - 63:24
**Nassau** [4] - 16:13, 18:18, 52:4, 52:6
**necessarily** [2] - 120:9, 120:23
**necessary** [1] - 108:5
**neck** [7] - 7:25, 48:21, 49:22, 50:13, 70:3, 70:6, 70:7
**need** [13] - 44:24, 45:2, 45:3, 76:18, 87:13, 95:10, 99:18, 100:4, 100:6, 106:6, 109:3, 111:8, 112:12
**needed** [3] - 36:22, 41:21, 66:19
**needs** [2] - 89:5, 90:7

**negative** [1] - 63:16
**negligence** [1] - 32:23
**neurologic** [1] - 63:19
**never** [16] - 25:5, 36:24, 44:16, 44:20, 47:24, 62:12, 63:2, 63:22, 63:23, 66:1, 66:5, 69:8, 79:2, 79:5, 102:25, 118:8
**new** [4] - 48:25, 49:9, 64:16, 98:23
**next** [24] - 3:20, 24:5, 28:10, 32:8, 41:7, 49:24, 50:3, 63:5, 94:25, 96:3, 103:12, 104:9, 104:10, 104:17, 105:3, 105:15, 107:1, 107:21, 107:23, 108:3, 110:2, 110:24, 111:5, 114:20
**night** [4] - 32:6, 34:23, 43:10
**nine** [3] - 18:13, 19:16, 54:9
**NO** [1] - 1:2
**nobody** [1] - 103:21
**noise** [2] - 29:9, 29:10
**none** [3] - 5:21, 7:17, 7:18
**nonissue** [1] - 99:17
**normal** [2] - 41:5, 63:17
**north** [1] - 49:21
**North** [1] - 1:18
**Northern** [1] - 98:25
**Northwestern** [1] - 14:18
**notates** [1] - 49:2
**note** [4] - 90:23, 97:9, 112:6, 112:7
**notes** [3] - 58:20, 113:18, 114:3
**nothing** [1] - 115:12
**notice** [4] - 25:1, 96:2, 96:23, 97:7
**noticed** [2] - 54:12, 96:22
**notified** [1] - 4:16
**noting** [1] - 99:8
**November** [1] - 39:1
**number** [11] - 84:20, 85:13, 88:10, 88:12, 92:9, 92:14, 92:15, 92:16, 117:2, 117:7, 120:21
**numerous** [1] - 5:13
**nurse** [12] - 4:1, 4:9, 5:9, 6:12, 6:20, 8:4,

10:21, 11:9, 30:18, 30:20, 32:17, 113:7
**Nurse** [21] - 4:9, 4:17, 4:22, 5:2, 5:3, 5:15, 5:22, 5:23, 6:2, 6:12, 7:1, 7:2, 7:7, 9:5, 9:16, 13:1, 13:7, 108:8, 108:10, 112:13, 114:19
**nurses** [1] - 38:4

**O**

**oath** [2] - 45:13, 55:15
**object** [4] - 81:17, 85:6, 90:3, 98:10
**objection** [29] - 3:25, 4:5, 7:2, 39:11, 42:5, 47:11, 47:15, 50:4, 52:19, 62:7, 72:25, 74:18, 84:15, 90:17, 92:4, 95:14, 96:16, 96:17, 98:16, 99:9, 104:3, 110:22, 111:12, 111:18, 117:5, 118:7, 118:8, 118:17
**Objection** [1] - 73:4
**objectionable** [1] - 111:20
**objections** [2] - 111:21, 111:22
**objects** [1] - 33:11
**observe** [4] - 56:4, 56:6, 56:7, 56:16
**observed** [2] - 55:9, 56:11
**obtained** [1] - 22:7
**occurred** [4] - 22:21, 49:16, 80:18, 81:4
**October** [9] - 47:4, 48:5, 48:6, 48:7, 48:23, 49:4, 49:12, 50:1, 50:12
**odd** [3] - 85:23, 99:1, 99:24
**OF** [2] - 1:1, 2:10
**offer** [3] - 10:1, 10:8, 12:7
**offered** [1] - 42:15
**office** [4] - 117:20, 120:8, 120:14, 120:22
**officer** [6] - 34:1, 58:24, 59:3, 59:7, 101:22, 108:24
**OFFICER** [3] - 3:2, 45:11, 102:21
**Official** [1] - 122:9
**OFFICIAL** [1] - 1:23

**offset** [1] - 88:17
**old** [3] - 14:12, 14:24, 20:13
**onboard** [3] - 65:9, 66:13, 71:13
**once** [8] - 21:2, 52:16, 52:25, 61:18, 73:17, 79:1, 94:11, 107:19
**one** [34] - 4:19, 12:5, 13:2, 14:13, 15:8, 18:9, 21:13, 24:9, 28:13, 30:3, 31:7, 34:5, 49:16, 49:18, 54:23, 55:5, 64:3, 67:14, 67:19, 67:21, 77:3, 84:5, 88:10, 92:15, 94:25, 95:7, 95:22, 100:15, 108:12, 110:2, 111:22, 117:2, 118:11
**one's** [1] - 92:12
**ones** [2] - 5:23, 86:11
**ONG** [2] - 2:8, 12:11
**Ong** [24] - 4:9, 4:17, 4:22, 5:2, 5:3, 5:15, 5:16, 5:22, 5:23, 6:2, 6:12, 7:7, 9:5, 9:16, 12:11, 13:1, 13:8, 100:13, 108:8, 108:10, 110:8, 110:10, 114:19
**Ong's** [3] - 7:1, 7:2, 112:14
**open** [5] - 11:17, 11:23, 33:9, 67:18, 86:12
**opines** [1] - 119:17
**opinion** [3] - 8:15, 33:21, 113:15
**opinions** [1] - 116:22
**opportunity** [2] - 45:21, 85:17
**opposing** [1] - 98:8
**opposition** [1] - 97:9
**options** [1] - 105:22
**order** [4] - 3:1, 6:7, 54:4, 119:2
**ordinarily** [1] - 33:19
**ordinary** [1] - 104:18
**orthopedic** [1] - 66:10
**outcome** [1] - 87:11
**outside** [3] - 21:3, 54:11, 90:17
**overruled** [2] - 47:17, 50:9
**owe** [1] - 91:22
**owed** [4] - 87:10, 87:14, 88:23, 88:25
**owes** [1] - 87:16

**owing** [1] - 86:24
**own** [5] - 38:10, 117:17, 117:18, 117:20, 119:20

---

**P**

---

**P.A** [1] - 1:18
**p.m** [11] - 1:6, 23:11, 52:14, 53:1, 102:20, 106:19, 110:4, 121:6
**Page** [1] - 80:8
**page** [24] - 49:24, 50:3, 55:20, 55:21, 55:23, 57:17, 63:5, 65:4, 72:3, 72:4, 74:2, 76:11, 76:14, 77:25, 79:24, 80:6, 81:6, 81:15, 104:9, 104:10, 104:12, 104:17, 114:6
**PAGE** [1] - 2:2
**Pages** [1] - 1:8
**pages** [2] - 77:2, 79:21
**paid** [3] - 39:22, 40:9, 40:12
**pain** [79] - 4:14, 4:15, 5:12, 5:15, 5:18, 5:24, 7:21, 7:22, 7:25, 8:1, 8:3, 8:11, 8:12, 8:15, 8:16, 8:18, 8:21, 8:22, 9:1, 9:2, 9:3, 9:7, 9:9, 9:14, 9:21, 10:18, 10:21, 10:22, 11:7, 11:22, 12:1, 12:2, 26:21, 27:23, 28:22, 28:23, 28:24, 29:18, 29:19, 29:22, 31:16, 34:25, 35:5, 35:15, 35:18, 37:17, 41:10, 41:13, 41:16, 43:5, 43:8, 43:11, 48:21, 50:13, 57:6, 62:25, 64:11, 84:8, 84:9, 84:13, 84:23, 85:15, 85:21, 85:23, 86:3, 90:11, 91:25, 92:7, 92:9, 92:12, 92:14, 112:16, 112:18, 113:4, 113:15
**painkillers** [1] - 30:18
**Palm** [2] - 1:19, 116:6
**palpation** [1] - 4:16
**pan** [1] - 8:4
**paper** [5] - 7:7, 74:2, 80:19, 80:21
**papers** [1] - 32:18
**park** [1] - 70:13
**Park** [1] - 70:14

**parking** [1] - 35:10
**parse** [1] - 112:9
**part** [18] - 4:13, 6:22, 11:18, 12:8, 20:5, 26:3, 71:24, 72:11, 72:25, 74:18, 82:3, 85:2, 95:9, 98:15, 99:24, 107:18, 111:14, 114:2
**particular** [2] - 60:15, 74:24
**particularly** [1] - 112:16
**partner** [1] - 109:3
**parts** [6] - 10:10, 75:17, 75:18, 75:19, 112:6, 112:7
**party** [5] - 51:17, 98:4, 98:19, 103:3, 103:5
**passed** [1] - 42:19
**Passenger** [2] - 59:6, 59:10
**passenger** [1] - 33:16
**password** [1] - 67:20
**past** [5] - 15:15, 47:7, 84:13, 108:15
**Pathology** [2] - 14:14, 37:23
**patient** [6] - 38:5, 63:13, 63:17, 65:20, 65:21, 87:15
**pause** [1] - 110:12
**paused** [15] - 104:1, 104:25, 105:2, 105:6, 105:10, 105:14, 106:25, 107:4, 107:8, 107:12, 108:2, 110:11, 110:19, 114:18, 114:25
**pay** [2] - 40:3, 86:22
**paying** [1] - 93:15
**payment** [2] - 91:15
**payments** [2] - 88:17, 91:12
**penalty** [1] - 72:12
**people** [9] - 16:8, 17:10, 20:2, 22:10, 22:23, 43:24, 82:3, 83:2, 109:18
**per** [3] - 53:13, 53:19, 91:12
**percent** [1] - 40:4
**performed** [3] - 4:14, 58:11, 63:15
**period** [1] - 78:18
**perjury** [1] - 72:12
**permit** [1] - 119:10
**permitted** [1] - 98:5
**person** [13] - 5:4, 6:24,

7:15, 9:17, 18:24, 33:12, 34:10, 97:2, 97:4, 97:23, 103:5, 111:25, 112:2
**personal** [5] - 9:15, 40:10, 113:1, 116:18, 119:20
**personally** [2] - 86:25, 93:15
**pertaining** [2] - 74:15, 80:21
**Philippines** [2] - 13:8, 83:24
**phlebotomist** [2] - 14:15, 38:1
**phlebotomy** [1] - 40:2
**phone** [1] - 93:6
**phonetic** [2] - 57:5, 68:21
**photo** [21] - 54:16, 61:8, 61:21, 68:2, 68:4, 68:7, 68:9, 68:11, 68:23, 68:25, 69:2, 69:6, 69:10, 69:19, 69:23, 70:1, 70:10, 70:12, 70:13, 70:15, 70:17
**photograph** [15] - 20:5, 20:6, 26:3, 26:5, 30:9, 32:2, 34:7, 54:22, 61:12, 61:14, 68:19, 69:3, 70:21, 70:24, 70:25
**photographs** [9] - 20:7, 24:24, 61:25, 62:3, 62:5, 62:8, 71:7, 71:15, 74:16
**photos** [4] - 93:2, 93:4, 93:7, 93:9
**physical** [6] - 36:10, 36:12, 46:14, 46:24, 58:11, 66:7
**physically** [1] - 40:2
**physician** [8] - 47:5, 47:25, 48:8, 48:10, 49:4, 49:6, 49:8, 64:8
**physicians** [1] - 38:4
**pick** [5] - 28:6, 40:25, 109:12, 109:21, 115:4
**picking** [1] - 105:7
**picture** [1] - 9:18
**pictures** [1] - 79:18
**pieces** [1] - 103:14
**pill** [1] - 30:15
**pills** [1] - 34:4
**Pintrest** [1] - 72:24
**place** [6] - 53:7, 63:7, 63:14, 63:25, 119:21

**placed** [2] - 68:18, 92:17
**places** [2] - 33:7
**plaintiff** [19] - 3:10, 3:12, 3:23, 12:7, 12:20, 13:17, 73:7, 74:21, 86:17, 86:18, 90:6, 90:7, 95:4, 97:12, 103:18, 104:18, 110:7, 114:20
**Plaintiff** [1] - 1:5
**PLAINTIFF** [1] - 1:13
**plaintiff's** [5] - 30:9, 99:25, 102:2, 103:12, 107:20
**Plaintiff's** [6] - 38:11, 65:14, 71:18, 93:13, 94:8, 94:11
**plan** [3] - 101:16, 101:19, 109:10
**planning** [4] - 16:8, 97:15, 97:18, 109:11
**Plantation** [4] - 35:11, 35:12, 35:23, 62:18
**plate** [2] - 61:16, 61:17
**plates** [1] - 54:14
**play** [19] - 17:9, 96:9, 96:12, 96:14, 96:15, 98:11, 98:15, 100:7, 100:18, 101:11, 101:21, 108:14, 108:15, 108:16, 108:24, 109:15, 109:16, 111:17
**played** [8] - 17:7, 95:6, 98:6, 104:15, 107:19, 109:6, 112:14, 116:25
**playing** [6] - 51:17, 96:1, 96:25, 97:23, 111:13, 111:19
**plenty** [1] - 33:7
**pocket** [5] - 86:11, 87:4, 87:20, 87:25, 92:8
**point** [39] - 4:21, 8:1, 8:21, 8:23, 8:24, 10:16, 11:24, 13:8, 17:15, 17:20, 18:9, 18:11, 21:2, 24:4, 25:3, 26:18, 28:21, 29:1, 35:15, 40:13, 41:18, 54:2, 54:5, 77:3, 82:6, 82:23, 83:9, 84:2, 84:5, 87:2, 90:14, 95:6, 99:24, 110:22, 111:23, 112:12, 112:19, 113:14,

119:18
**points** [3] - 12:19, 75:20, 83:15
**policy** [1] - 91:13
**ponytail** [1] - 30:5
**port** [3] - 18:16, 50:22, 52:4
**portion** [13] - 59:17, 59:19, 63:9, 64:13, 65:15, 82:24, 83:1, 83:5, 83:6, 96:12, 100:1, 104:4, 115:21
**portions** [5] - 11:6, 12:7, 82:7, 98:11, 99:10
**posed** [1] - 71:21
**position** [2] - 68:21, 97:19
**positioned** [1] - 70:4
**possible** [1] - 93:10
**post** [6] - 63:16, 67:21, 71:15, 72:21, 73:12, 88:13
**posted** [1] - 73:10
**posts** [2] - 71:8, 74:17
**postsurgical** [1] - 41:13
**practices** [1] - 116:18
**practicing** [1] - 120:6
**pre** [1] - 99:6
**pre-Eleventh** [1] - 99:6
**predicate** [9] - 42:14, 116:2, 116:4, 116:9, 116:15, 116:16, 116:22, 118:24, 120:24
**prefer** [2] - 106:8, 109:20
**preference** [1] - 108:13
**prejudice** [1] - 5:21
**prejudicial** [1] - 92:5
**prepare** [1] - 4:10
**prepared** [1] - 97:1
**prerogative** [1] - 11:12
**prescribe** [1] - 35:18
**prescribed** [4] - 112:20, 112:22, 113:9, 113:10
**presence** [1] - 81:3
**present** [6] - 42:10, 42:15, 60:24, 63:6, 65:15, 96:18
**presentation** [1] - 98:17
**presented** [5] - 9:4, 62:17, 63:13, 79:18, 120:6
**presiding** [1] - 3:5

**presumably** [1] - 100:8
**pretty** [10] - 14:16, 26:22, 34:6, 36:13, 38:3, 57:13, 57:25, 64:16, 80:21, 101:8
**previous** [3] - 47:14, 61:2, 69:2
**previously** [4] - 46:6, 46:23, 54:21, 56:15
**primary** [4] - 47:4, 47:25, 48:8, 49:3
**problem** [6] - 8:14, 99:25, 104:19, 111:14, 114:2, 119:6
**problematic** [1] - 83:2
**procedural** [1] - 12:21
**procedure** [1] - 120:7
**procedures** [1] - 119:20
**proceed** [2] - 13:15, 14:3
**Proceedings** [1] - 121:6
**proceedings** [1] - 122:5
**produce** [1] - 61:25
**produced** [2] - 5:22, 11:1
**profession** [1] - 37:23
**Professional** [1] - 94:18
**propel** [1] - 28:7
**proper** [1] - 85:19
**protect** [1] - 23:18
**protection** [16] - 65:1, 86:13, 86:23, 87:3, 87:10, 87:13, 87:14, 87:17, 88:8, 89:1, 89:7, 89:18, 91:3, 91:14, 91:20
**provide** [3] - 6:2, 97:10, 118:15
**provided** [7] - 32:2, 34:8, 81:7, 96:12, 97:7, 98:7, 98:8
**provider** [5] - 89:9, 89:10, 91:10, 91:11, 91:14
**provider's** [1] - 91:14
**providers** [1] - 88:6
**providing** [1] - 90:3
**public** [1] - 67:19
**publish** [1] - 71:18
**published** [16] - 103:24, 104:2, 104:24, 105:1, 105:5, 105:9, 105:13, 106:24, 107:3, 107:7,

107:11, 108:1, 110:10, 110:18, 114:17, 114:24
**pull** [13] - 43:20, 54:15, 58:16, 59:13, 63:23, 65:3, 67:24, 70:20, 78:6, 78:12, 101:16, 104:8
**purchased** [1] - 16:1
**pure** [1] - 9:14
**purposes** [2] - 4:20, 106:2
**put** [22] - 11:19, 28:4, 35:9, 61:6, 62:20, 76:12, 84:11, 85:8, 85:17, 86:3, 86:10, 86:12, 86:19, 87:21, 88:4, 88:5, 89:5, 92:9, 97:3, 97:4, 97:12, 116:12
**puts** [1] - 92:15
**putting** [5] - 12:21, 85:23, 87:18, 95:23, 96:4

## Q

**quantified** [1] - 84:11
**Quest** [1] - 94:17
**QUESTION** [2] - 56:4, 57:21
**questioned** [1] - 73:15
**questions** [11] - 52:20, 59:5, 73:23, 75:7, 77:13, 77:21, 77:24, 78:10, 80:8, 81:19, 96:20
**quick** [2] - 105:18, 110:1
**quite** [3] - 64:9, 74:1, 119:23
**quote** [1] - 89:6

## R

**rabbit** [2] - 90:12, 90:18
**raise** [9] - 4:6, 10:11, 40:3, 40:5, 95:14, 105:19, 118:10, 118:12
**raised** [2] - 3:22, 118:18
**range** [10] - 37:17, 58:14, 58:21, 113:18, 113:19, 113:20, 113:23, 114:8, 114:10, 120:16
**rates** [1] - 116:7

**rating** [1] - 42:1
**RAYMOND** [1] - 1:13
**Raymond** [1] - 3:11
**re** [1] - 19:14
**re-embarked** [1] - 19:14
**react** [1] - 28:18
**read** [27] - 11:3, 11:10, 23:10, 48:16, 48:17, 63:11, 65:17, 72:17, 72:18, 72:19, 73:1, 74:5, 74:11, 74:20, 75:14, 75:17, 75:18, 75:19, 81:8, 82:8, 82:24, 83:5, 83:11, 87:13, 91:7, 91:19, 106:1
**reading** [2] - 79:4, 114:3
**ready** [3] - 49:21, 103:7, 106:20
**really** [23] - 5:14, 8:23, 11:3, 22:17, 27:6, 30:3, 31:16, 41:22, 55:2, 55:4, 55:5, 56:18, 58:4, 67:16, 79:4, 79:6, 82:12, 83:19, 89:3, 90:19, 99:14, 112:10
**reason** [18] - 5:9, 10:11, 16:2, 39:1, 48:4, 48:14, 48:17, 62:3, 77:23, 77:25, 78:1, 78:3, 83:9, 85:12, 85:22, 85:24, 92:13, 112:13
**reasonable** [9] - 92:12, 104:23, 115:22, 116:8, 116:14, 117:15, 117:23, 118:18
**reasonableness** [1] - 88:21
**rebut** [3] - 11:19, 112:14, 113:15
**rebuttal** [13] - 6:4, 10:4, 11:5, 11:8, 12:2, 12:8, 12:20, 90:8, 95:5, 95:7, 95:10
**recalled** [1] - 90:7
**received** [2] - 33:21, 61:17
**receives** [1] - 9:20
**receiving** [2] - 36:5, 36:9
**recess** [13] - 45:7, 45:10, 102:7, 102:18, 102:20, 105:18, 106:7,

106:19, 109:21, 110:4, 115:2, 115:4
**recognize** [7] - 54:16, 61:8, 68:2, 68:23, 69:19, 70:10, 71:20
**recollection** [6] - 6:19, 7:19, 28:5, 77:7, 80:12, 114:4
**recommend** [3] - 35:20, 66:16, 66:25
**recommended** [1] - 66:23
**record** [16] - 3:7, 13:22, 47:4, 47:25, 48:7, 50:11, 58:18, 58:20, 63:3, 63:24, 66:4, 79:19, 84:15, 106:2, 106:17, 110:15
**records** [6] - 4:12, 9:4, 36:2, 36:8, 46:3, 67:7
**recover** [4] - 91:17, 93:22, 93:24, 94:6
**recovers** [1] - 87:8
**recovery** [1] - 40:18
**red** [2] - 20:12
**redirect** [6] - 74:7, 75:10, 81:20, 82:9, 90:14, 90:20
**REDIRECT** [2] - 2:5, 76:4
**refer** [1] - 64:14
**referral** [2] - 64:6, 64:13
**referred** [1] - 64:22
**referring** [1] - 7:8
**reflect** [2] - 38:19, 93:14
**reflected** [1] - 94:8
**reflection** [1] - 71:4
**refresh** [4] - 48:11, 77:7, 80:12, 81:10
**regard** [1] - 116:12
**regarding** [9] - 3:23, 5:12, 7:3, 32:13, 80:24, 81:10, 116:13, 117:8, 117:14
**regardless** [4] - 87:11, 91:23, 98:6, 114:5
**regards** [2] - 75:12, 80:1
**regular** [1] - 48:9
**rehabilitation** [1] - 81:20
**related** [1] - 50:6
**relates** [5] - 112:16, 115:23, 116:1, 116:2, 118:17

**relating** [2] - 22:2, 118:16
**relation** [2] - 25:20, 28:2
**release** [1] - 41:23
**relevance** [4] - 39:16, 47:11, 47:15, 50:5
**relevant** [7] - 6:7, 6:9, 9:12, 9:16, 39:15, 82:9, 88:3
**relieve** [1] - 22:11
**rely** [1] - 107:17
**remain** [1] - 60:15
**remainder** [1] - 62:12
**remained** [2] - 53:3, 61:3
**remaining** [2] - 108:6, 108:7
**remember** [25] - 9:11, 11:18, 19:19, 22:7, 23:1, 26:20, 27:8, 38:25, 45:13, 46:12, 46:14, 54:24, 54:25, 56:9, 56:19, 61:5, 64:9, 65:13, 67:1, 74:1, 77:5, 83:21, 83:22, 88:24, 98:7
**remembered** [1] - 21:6
**remembers** [2] - 76:19, 82:13
**remind** [1] - 108:20
**removed** [2] - 54:13, 63:20
**rendered** [2] - 89:12, 91:11
**renewing** [1] - 50:4
**rep** [10] - 95:1, 95:24, 96:4, 96:5, 96:6, 98:14, 99:20, 99:22, 100:8, 102:25
**repeatedly** [2] - 11:24, 110:23
**rephrase** [3] - 27:10, 80:5, 94:4
**report** [5] - 6:23, 28:10, 62:21, 65:8, 82:21
**reported** [2] - 29:22, 62:25
**REPORTED** [1] - 1:22
**Reporter** [1] - 122:9
**REPORTER** [2] - 1:23, 2:10
**represent** [1] - 10:13
**representative** [7] - 3:18, 101:21, 103:3, 103:10, 103:19, 107:14, 109:5
**represented** [1] - 112:13

**request** [3] - 92:3, 92:7, 120:1
**requested** [3] - 82:8, 96:15, 98:10
**require** [1] - 87:24
**required** [2] - 63:21, 88:1
**reserve** [1] - 107:19
**reside** [1] - 14:16
**resolve** [1] - 118:12
**respect** [1] - 75:24
**respond** [2] - 4:25, 36:12
**responded** [2] - 73:13, 77:12
**response** [3] - 58:6, 72:16, 75:3
**responses** [1] - 78:6
**responsible** [4] - 89:9, 89:14, 91:10, 93:15
**rest** [5] - 70:2, 94:5, 94:25, 95:6, 100:11
**resting** [2] - 69:25, 70:2
**result** [11] - 17:23, 32:25, 38:20, 41:10, 46:15, 57:11, 57:21, 58:2, 93:18, 94:13, 110:24
**returned** [5] - 60:5, 60:8, 60:16, 61:18, 62:12
**returning** [1] - 61:3
**reunion** [1] - 68:8
**review** [3] - 12:16, 81:16, 116:5
**reviewed** [1] - 113:2
**reviewing** [2] - 81:7, 83:10
**reviews** [1] - 101:1
**rid** [1] - 74:3
**ride** [3] - 18:7, 43:18
**rip** [2] - 26:25, 27:3
**rise** [5] - 3:2, 45:11, 102:19, 102:21, 121:5
**road** [1] - 9:22
**rocking** [2] - 22:15, 22:17
**roll** [3] - 100:2, 110:2, 115:9
**rolling** [3] - 60:10, 60:13, 102:23
**room** [5] - 32:10, 34:5, 34:11, 60:22, 112:5
**rose** [1] - 43:9
**roughly** [1] - 66:13
**route** [2] - 22:3, 22:9
**RPR** [2] - 1:23, 122:9
**rule** [3] - 89:2, 89:24,

98:4
**Rule** [5] - 6:14, 118:5, 118:11, 118:15
**ruled** [1] - 95:18
**ruling** [3] - 118:19, 118:21, 119:2
**rulings** [1] - 119:9
**run** [3] - 102:1, 102:3, 108:14

**S**

**sailing** [2] - 50:22, 51:4
**sake** [1] - 74:4
**salad** [5] - 25:17, 53:25, 54:5, 61:16, 61:17
**sat** [16] - 17:7, 17:21, 18:8, 20:4, 20:7, 20:11, 20:15, 20:19, 25:7, 25:22, 26:19, 54:11, 54:13, 54:24, 55:8
**Saturday** [1] - 17:19
**save** [1] - 73:5
**saw** [8] - 28:1, 33:13, 33:25, 36:20, 37:10, 41:18, 67:5
**scene** [2] - 34:2, 59:1
**scheme** [1] - 101:9
**schlopped** [1] - 57:5
**school** [2] - 14:17, 68:8
**scientific** [1] - 53:17
**scope** [5] - 6:13, 84:16, 85:7, 90:18, 118:9
**scotch** [1] - 68:21
**screen** [1] - 23:5
**sea** [4] - 16:12, 16:13, 17:5, 51:4
**seat** [3] - 13:21, 33:25, 54:3
**seated** [5] - 25:20, 26:9, 28:16, 54:18, 103:8
**secluded** [1] - 33:6
**second** [5] - 16:12, 27:5, 51:24, 95:22, 106:6
**secondary** [1] - 82:19
**section** [2] - 48:13, 82:1
**secure** [1] - 21:17
**secured** [1] - 33:8
**SECURITY** [3] - 3:2, 45:11, 102:21
**security** [5] - 58:24, 59:3, 59:7, 101:21,

108:24
**see** [58] - 4:21, 7:24, 9:17, 11:5, 20:23, 21:8, 21:16, 23:5, 23:8, 23:17, 23:21, 24:20, 26:5, 29:5, 29:6, 30:11, 31:2, 34:7, 36:8, 37:6, 38:13, 38:18, 39:16, 45:24, 47:2, 55:9, 56:1, 56:20, 58:18, 61:14, 61:15, 61:16, 66:10, 67:3, 67:18, 67:25, 68:20, 71:4, 71:6, 74:1, 80:24, 91:5, 92:6, 98:23, 98:24, 100:23, 101:2, 105:24, 108:23, 109:5, 109:22, 111:3, 115:15, 116:23, 119:16, 120:25, 121:3
**seeing** [5] - 31:15, 49:3, 67:2, 83:7
**seek** [4] - 46:23, 64:8, 64:10
**seeking** [2] - 93:22, 93:24
**sees** [1] - 119:14
**Senior** [1] - 14:18
**sense** [1] - 100:22
**sentence** [4] - 65:19, 73:1, 73:6, 74:19
**sentences** [1] - 91:8
**separate** [2] - 49:15, 86:18
**September** [3] - 38:24, 67:9, 71:10
**series** [1] - 20:6
**served** [2] - 53:24, 118:8
**service** [1] - 91:11
**Services** [1] - 94:18
**services** [1] - 89:12
**serving** [1] - 21:6
**session** [4] - 3:4, 45:12, 102:22, 110:5
**set** [3] - 31:13, 45:7, 110:1
**settlement** [1] - 91:16
**Seventh** [2] - 64:14, 64:18
**several** [3] - 21:10, 83:25, 98:3
**severe** [1] - 113:15
**severity** [2] - 9:2, 62:25
**shelf** [1] - 66:3
**ship** [49] - 4:10, 10:3,

12:24, 13:3, 15:10, 16:20, 17:3, 17:11, 18:6, 18:11, 18:12, 18:20, 18:23, 18:25, 19:5, 19:7, 19:14, 19:15, 22:3, 22:6, 22:15, 22:24, 27:18, 32:9, 33:12, 33:16, 34:1, 35:7, 35:8, 35:9, 46:3, 50:22, 51:4, 52:4, 52:14, 52:16, 52:25, 54:1, 54:7, 54:8, 60:10, 62:17, 65:10, 65:22, 66:14, 68:14, 68:17, 71:9, 71:13
**ship's** [13] - 5:16, 7:15, 29:22, 30:7, 30:17, 31:22, 31:25, 32:3, 32:12, 33:22, 35:22, 58:11, 59:4
**ships** [1] - 12:25
**shirt** [1] - 18:10
**shocked** [1] - 83:24
**short** [3] - 30:5, 40:13, 100:13
**shortened** [1] - 100:23
**shorter** [1] - 102:13
**shortly** [1] - 53:21
**should've** [1] - 35:5
**shoulder** [68] - 4:14, 5:14, 5:18, 7:4, 7:21, 7:22, 7:25, 8:1, 8:3, 8:4, 8:8, 8:10, 8:11, 8:12, 9:3, 9:9, 9:13, 9:20, 10:18, 11:21, 15:12, 15:17, 17:25, 27:4, 28:7, 29:1, 29:20, 29:24, 34:25, 35:16, 36:6, 36:14, 36:22, 37:17, 40:19, 40:20, 42:21, 43:3, 43:5, 43:6, 43:8, 43:9, 44:15, 44:18, 58:12, 58:14, 64:4, 65:23, 65:25, 66:16, 66:24, 66:25, 68:19, 69:7, 69:25, 70:2, 70:5, 70:17, 93:3, 93:4, 93:10, 112:18, 113:4, 113:16, 113:17, 113:20, 114:7
**shoulders** [2] - 69:5, 70:24
**shoved** [1] - 57:4
**show** [6] - 7:2, 16:21, 20:4, 34:16, 67:8, 79:11
**showed** [1] - 93:12

**showing** [1] - 63:24
**shown** [1] - 93:2
**SHRUTI** [1] - 2:7
**Shruti** [2] - 107:23, 108:1
**shut** [1] - 73:25
**side** [4] - 20:4, 25:17, 27:24, 102:15
**sightsee** [1] - 18:7
**sightseeing** [1] - 18:10
**sign** [1] - 49:21
**signature** [4] - 65:4, 72:3, 72:4, 72:9
**signed** [4] - 64:25, 78:6, 91:4, 91:20
**significance** [3] - 27:7, 55:6, 58:1
**signing** [1] - 79:4
**signs** [1] - 33:10
**silence** [1] - 95:15
**silly** [1] - 86:6
**similar** [2] - 21:13, 21:15
**simply** [3] - 75:3, 116:3, 116:7
**single** [1] - 55:1
**sit** [7] - 24:5, 24:21, 25:6, 25:19, 26:11, 33:25, 43:6
**sites** [1] - 72:20
**sitting** [18] - 23:17, 24:4, 24:13, 24:15, 25:21, 25:22, 26:18, 28:10, 34:17, 43:2, 46:20, 53:21, 54:12, 54:22, 56:5, 56:7, 56:12, 56:16
**six** [1] - 38:23
**skipping** [2] - 103:25, 104:13
**sleep** [4] - 34:23, 41:5, 41:7, 41:8
**slept** [1] - 41:6
**slipped** [4] - 17:17, 17:19, 18:1, 62:22
**slot** [1] - 33:9
**slow** [1] - 18:14
**small** [1] - 22:6
**Snapchat** [1] - 72:24
**snippets** [1] - 96:9
**social** [11] - 72:20, 73:8, 73:10, 73:14, 73:21, 74:22, 75:4, 78:10, 78:22, 79:5, 79:6
**sofa** [2] - 41:6, 41:8
**solid** [1] - 97:20
**solution** [1] - 12:17
**someone** [9] - 9:2,

9:13, 22:9, 22:11, 28:13, 28:14, 30:4, 46:20, 49:20
**somewhat** [1] - 66:15
**somewhere** [3] - 10:3, 28:2, 64:9
**sorry** [11] - 18:15, 20:13, 47:19, 56:19, 61:15, 63:18, 85:10, 90:13, 103:8, 103:21, 104:5
**sort** [3] - 27:2, 57:7, 88:9
**sound** [4] - 17:22, 26:24, 26:25, 55:7
**sounds** [2] - 16:14, 104:19
**source** [1] - 88:17
**sources** [4] - 88:12, 88:15, 88:18, 89:2
**Southeast** [1] - 1:14
**Southern** [3] - 1:24, 3:4, 122:10
**SOUTHERN** [1] - 1:1
**souvenirs** [1] - 18:11
**spades** [1] - 17:8
**spasms** [1] - 41:16
**speaker** [1] - 22:8
**speaking** [1] - 59:7
**speaks** [2] - 59:17, 63:9
**special** [2] - 16:2, 98:4
**specific** [5] - 29:18, 77:23, 78:1, 99:9, 111:14
**specifically** [5] - 9:9, 20:22, 92:21, 113:17, 115:23
**specificity** [1] - 27:17
**speculation** [1] - 9:15
**speculative** [1] - 92:4
**speed** [3] - 22:13, 26:12, 53:9
**speeds** [1] - 53:18
**spell** [1] - 13:21
**spend** [1] - 19:3
**spending** [1] - 108:18
**spent** [3] - 51:12, 52:12, 77:1
**spine** [1] - 63:15
**spot** [3] - 105:23, 106:3, 106:7
**stacked** [2] - 25:1, 33:9
**stacking** [1] - 56:12
**stand** [2] - 24:19, 43:19
**standard** [2] - 87:24, 118:22
**start** [6] - 18:2, 36:5,

37:22, 46:2, 73:5, 104:16
**started** [7] - 7:7, 7:23, 14:14, 14:15, 29:9, 36:9, 38:1
**starting** [2] - 14:9, 55:23
**state** [5] - 3:9, 13:21, 42:13, 42:14, 82:4
**statement** [10] - 7:23, 23:4, 32:13, 42:8, 42:9, 42:15, 59:15, 80:23, 82:6, 111:12
**Statement** [2] - 59:6, 59:10
**statements** [7] - 5:13, 6:17, 7:13, 33:15, 52:20, 75:12, 83:13
**states** [1] - 99:5
**STATES** [2] - 1:1, 1:10
**States** [3] - 1:24, 3:3, 122:10
**station** [13] - 55:9, 56:2, 56:4, 56:6, 56:7, 56:10, 56:12, 56:16, 65:9, 65:11, 65:24, 66:2, 66:6
**status** [1] - 120:2
**stay** [3] - 9:11, 13:3, 108:4
**Stenographer** [1] - 89:11
**STENOGRAPHICALLY** [1] - 1:22
**step** [1] - 43:20
**still** [29] - 21:6, 22:13, 26:11, 26:15, 28:16, 31:16, 33:13, 34:18, 37:16, 38:1, 40:2, 42:24, 43:5, 44:9, 45:13, 50:1, 57:15, 60:8, 60:9, 60:10, 60:13, 60:24, 76:8, 86:24, 87:16, 91:22, 99:7, 100:2
**stipulate** [1] - 98:14
**stipulated** [1] - 38:12
**stood** [1] - 112:1
**stop** [4] - 22:3, 22:6, 49:21, 109:11
**straight** [3] - 36:9, 54:8, 109:17
**Strauss** [2] - 95:18, 118:12
**Street** [1] - 70:13
**strength** [1] - 38:7
**stretch** [1] - 85:10
**stretched** [2] - 69:15, 70:23
**strike** [4] - 57:11,

57:21, 58:2, 95:20
**striking** [2] - 51:1, 51:23
**struck** [1] - 92:20
**study** [1] - 120:11
**stuff** [1] - 37:25
**subject** [5] - 73:6, 73:7, 74:19, 74:21, 74:25
**submitted** [2] - 89:9, 91:10
**subsequent** [1] - 44:1
**substantive** [2] - 97:24, 103:4
**substantively** [1] - 6:16
**suffered** [1] - 32:24
**suffering** [13] - 84:9, 84:10, 84:13, 85:15, 85:22, 85:24, 86:3, 90:11, 92:1, 92:7, 92:9, 92:12, 92:14
**sufficient** [1] - 96:23
**suggest** [1] - 62:7
**Suite** [2] - 1:15, 1:19
**summary** [8] - 38:12, 86:21, 88:5, 93:12, 93:13, 93:17, 94:9, 110:16
**summer** [1] - 15:4
**Sunday** [1] - 18:4
**sunglasses** [2] - 71:2, 71:5
**supplemental** [5] - 96:2, 97:8, 97:9, 100:3, 100:4
**support** [3] - 96:23, 96:25, 97:7
**suppose** [1] - 90:8
**supposed** [1] - 33:9
**supposedly** [1] - 113:14
**surgeon** [3] - 66:10, 100:15, 119:22
**surgery** [27] - 36:9, 36:22, 37:1, 37:3, 38:22, 38:24, 40:19, 40:21, 40:24, 41:11, 41:18, 42:19, 44:1, 47:9, 47:19, 47:24, 48:2, 66:16, 66:19, 66:24, 66:25, 67:4, 67:9, 70:17, 70:19, 71:10
**surgical** [2] - 47:7, 119:21
**Surgical** [3] - 94:17, 115:24, 116:3
**surprise** [1] - 96:24
**sustained** [2] - 48:20,

62:9
**sworn** [1] - 13:18
**symptoms** [1] - 37:4

## T

**T-shirt** [1] - 18:10
**table** [20] - 24:9, 24:10, 24:19, 24:23, 24:25, 25:4, 25:7, 25:10, 25:13, 25:15, 27:8, 53:22, 54:11, 54:18, 55:8, 55:10, 57:13, 58:4, 60:21, 102:15
**tables** [2] - 21:11, 24:12
**talks** [2] - 11:6, 104:17
**taxing** [1] - 109:18
**tea** [2] - 17:19, 17:21
**tear** [2] - 8:20, 57:7
**technically** [1] - 6:3
**ten** [1] - 14:21
**tenderness** [1] - 63:16
**term** [1] - 40:14
**terminal** [1] - 19:1
**terms** [8] - 5:21, 18:16, 26:3, 28:24, 29:18, 44:17, 80:17, 88:21
**testified** [13] - 4:11, 4:23, 5:15, 5:16, 27:11, 56:11, 82:14, 83:22, 97:25, 112:18, 112:23, 113:2, 119:7
**testifies** [3] - 6:2, 116:23, 119:2
**testify** [13] - 5:8, 8:10, 63:23, 92:8, 95:16, 97:1, 111:9, 112:25, 116:17, 117:8, 118:18, 119:7, 119:10
**testifying** [7] - 83:22, 97:14, 111:8, 117:13, 117:17, 117:18, 117:20
**testimony** [50] - 4:13, 4:17, 5:10, 5:12, 5:19, 6:14, 6:20, 7:1, 7:3, 8:25, 9:24, 11:2, 23:25, 30:23, 57:24, 74:5, 75:13, 75:16, 79:20, 79:21, 80:6, 81:7, 81:13, 81:15, 83:10, 83:13, 87:1, 88:21, 96:19, 97:13, 103:15, 106:5, 107:13, 107:17,

111:20, 112:15, 114:14, 114:19, 115:5, 116:13, 116:24, 117:3, 117:9, 117:23, 117:25, 118:9, 118:14, 119:13
**THE** [191] - 1:10, 1:13, 1:16, 3:6, 3:13, 3:19, 4:3, 4:8, 5:1, 5:4, 6:5, 6:8, 6:19, 7:5, 7:7, 7:10, 7:12, 7:19, 8:6, 8:17, 9:5, 9:19, 9:25, 10:4, 10:8, 10:20, 11:3, 11:15, 12:4, 12:10, 12:14, 12:18, 13:6, 13:9, 13:13, 13:19, 13:23, 14:4, 20:11, 20:15, 25:24, 25:25, 29:16, 39:15, 40:6, 40:8, 40:9, 40:10, 40:11, 40:13, 40:15, 40:16, 42:6, 42:11, 42:16, 42:23, 44:22, 44:23, 45:1, 45:6, 45:13, 45:14, 45:15, 47:13, 47:17, 50:7, 52:21, 55:19, 62:9, 74:7, 75:8, 75:9, 75:15, 75:19, 75:23, 76:12, 76:16, 76:18, 77:4, 77:10, 77:19, 78:5, 78:9, 78:14, 78:18, 78:20, 81:22, 82:11, 82:18, 82:21, 83:4, 83:16, 83:18, 84:2, 84:14, 84:17, 84:19, 85:8, 85:20, 86:8, 86:22, 87:3, 87:7, 87:12, 87:18, 88:24, 89:15, 89:19, 90:5, 90:16, 91:1, 92:6, 92:11, 92:18, 94:21, 95:12, 95:22, 96:4, 96:25, 97:12, 97:22, 98:23, 99:3, 99:8, 99:13, 99:16, 100:6, 100:18, 100:20, 100:22, 101:5, 101:9, 101:15, 101:18, 101:25, 102:6, 102:9, 102:10, 102:12, 102:17, 102:23, 103:11, 103:17, 103:20, 104:20, 105:20, 105:24, 106:8, 106:11, 106:14, 106:17, 106:22, 107:15,

107:21, 107:25, 108:17, 109:1, 109:7, 109:10, 109:19, 109:22, 110:6, 110:9, 110:14, 111:2, 111:8, 111:18, 112:9, 113:7, 113:10, 113:22, 114:2, 114:9, 114:12, 114:16, 114:22, 115:4, 115:9, 115:12, 115:15, 115:20, 116:11, 117:10, 117:13, 118:2, 119:1, 119:13, 119:16, 119:25, 120:5, 121:3

**themselves** [2] - 103:20, 103:21

**theory** [1] - 5:20

**therapy** [5] - 36:10, 36:12, 46:14, 46:24, 66:7

**therefore** [1] - 63:20

**they've** [2] - 5:22, 117:2

**thinking** [2] - 11:17, 58:3

**third** [1] - 16:13

**three** [17] - 14:12, 16:14, 31:7, 31:20, 31:22, 35:5, 49:7, 51:12, 53:6, 55:4, 77:2, 106:5, 108:6, 108:7, 109:8, 111:1

**three-day** [1] - 16:14

**throbbing** [1] - 28:23

**throw** [1] - 47:1

**ticket** [7] - 15:6, 15:7, 15:22, 15:24, 15:25, 16:7, 33:16

**tickets** [1] - 16:1

**tie** [1] - 21:18

**Tik** [1] - 72:23

**timeliness** [1] - 118:16

**timely** [1] - 118:7

**today** [17] - 12:5, 12:6, 12:10, 38:15, 43:2, 43:6, 58:6, 60:10, 79:9, 83:22, 91:22, 91:23, 99:23, 100:12, 100:20, 102:2, 108:12

**together** [1] - 112:6

**Tok** [1] - 72:23

**tomorrow** [9] - 95:4, 95:5, 95:8, 101:16,

101:19, 107:19, 109:12, 115:3, 115:4

**tonight** [2] - 108:5, 108:22

**took** [8] - 30:7, 31:7, 31:12, 60:18, 61:21, 68:11, 90:12, 113:13

**top** [1] - 33:10

**topics** [1] - 118:7

**torn** [1] - 9:13

**total** [9] - 14:13, 16:14, 38:18, 38:23, 38:24, 39:3, 39:9, 106:6, 108:10

**totally** [2] - 11:12, 33:23

**towards** [4] - 24:19, 24:23, 25:4, 96:20

**transcript** [25] - 5:17, 5:22, 6:3, 10:24, 11:4, 11:6, 11:10, 11:11, 12:1, 12:4, 12:7, 12:16, 55:18, 57:15, 76:8, 79:22, 83:12, 98:15, 104:4, 106:9, 106:10, 111:13, 111:15, 114:1

**transcription** [1] - 122:5

**transcripts** [1] - 97:17

**transplant** [1] - 38:5

**trapezius** [5] - 4:15, 9:21, 9:23, 11:21, 29:20

**traumatic** [1] - 65:21

**travel** [1] - 15:2

**travelling** [1] - 51:17

**treat** [2] - 4:10, 36:19

**treated** [1] - 94:13

**treater** [1] - 101:10

**treatment** [5] - 5:25, 33:21, 36:5, 44:2, 46:24

**trial** [12] - 4:18, 4:20, 4:24, 58:6, 85:25, 88:13, 88:18, 88:19, 97:19, 101:3, 111:24

**TRIAL** [1] - 1:9

**tried** [1] - 92:22

**trim** [1] - 108:23

**trip** [1] - 16:9

**trouble** [1] - 29:1

**troubleshooting** [1] - 38:3

**true** [1] - 72:12

**truthful** [1] - 76:25

**try** [6] - 13:10, 30:10, 43:18, 92:23, 101:7, 108:23

**trying** [11] - 10:1, 10:13, 11:9, 19:20, 27:8, 27:9, 85:10, 89:25, 94:5, 99:11, 100:22

**tumbled** [1] - 17:15

**Tumblr** [1] - 72:24

**turn** [4] - 11:18, 49:24, 50:3, 57:17

**tweets** [1] - 74:17

**twice** [2] - 27:11, 27:12

**Twitter** [1] - 72:23

**two** [37] - 9:11, 24:12, 27:9, 27:14, 30:24, 31:1, 38:10, 38:24, 39:3, 39:4, 39:8, 39:9, 41:6, 43:25, 44:12, 44:13, 54:23, 55:4, 61:22, 64:10, 64:21, 65:19, 77:2, 88:12, 91:7, 100:16, 101:9, 105:22, 108:9, 108:16, 108:18, 108:22, 109:15, 109:23, 115:6, 117:7

**two-hour** [1] - 9:11

**type** [6] - 8:20, 25:16, 27:19, 33:10, 56:1, 66:1

**types** [1] - 119:5

## U

**ultimately** [6] - 4:14, 25:6, 85:18, 92:16, 97:18, 118:24

**unbearable** [1] - 40:22

**under** [10] - 6:14, 45:13, 48:17, 55:15, 65:15, 72:11, 87:16, 88:8, 88:10, 118:15

**undergo** [2] - 36:25, 47:9

**understood** [2] - 84:3, 121:2

**underwent** [1] - 46:14

**United** [3] - 1:24, 3:3, 122:10

**UNITED** [2] - 1:1, 1:10

**unless** [9] - 76:19, 85:12, 85:22, 85:24, 87:20, 92:13, 120:10, 120:24

**up** [92] - 3:21, 3:22, 13:16, 14:15, 17:16, 17:18, 17:20, 18:4, 19:22, 20:13, 24:5, 24:8, 24:19, 26:21,

27:8, 27:22, 29:3, 29:25, 33:12, 35:5, 35:20, 38:2, 40:25, 41:3, 43:11, 43:20, 45:7, 47:1, 47:8, 48:13, 49:1, 49:10, 49:23, 51:7, 52:6, 53:3, 54:15, 57:4, 57:13, 58:4, 58:16, 59:13, 59:17, 61:6, 62:20, 63:9, 63:25, 64:13, 65:3, 65:15, 67:24, 68:10, 68:21, 69:8, 70:4, 70:20, 72:16, 76:12, 77:12, 78:7, 78:12, 84:20, 85:13, 85:18, 87:21, 89:4, 90:10, 90:16, 90:19, 90:20, 97:19, 98:7, 100:5, 104:8, 104:15, 104:20, 105:7, 105:25, 106:13, 107:17, 108:4, 108:18, 109:12, 109:21, 110:1, 110:13, 112:1, 115:4, 119:18

**upstairs** [2] - 18:12, 19:16

**upwards** [1] - 26:21

**user** [1] - 7:14

**username** [1] - 67:20

**usual** [8] - 117:14, 117:15, 118:3, 119:11, 119:18, 120:3, 120:10, 120:24

## V

**vacation** [1] - 43:14

**value** [1] - 112:10

**VANEGAS** [1] - 2:9

**Vanegas** [3] - 111:3, 114:21, 114:23

**vehicle** [5] - 49:4, 49:12, 49:15, 49:20, 50:13

**verdict** [2] - 86:7, 91:16

**versus** [1] - 11:21

**vessel** [1] - 62:15

**vessels** [1] - 13:5

**vicinity** [1] - 26:15

**Video** [31] - 103:24, 104:1, 104:2, 104:24, 104:25, 105:1, 105:2, 105:5, 105:6, 105:9, 105:10, 105:13,

105:14, 106:24, 106:25, 107:3, 107:4, 107:7, 107:8, 107:11, 107:12, 108:1, 108:2, 110:10, 110:11, 110:18, 110:19, 114:17, 114:18, 114:23, 114:25

**video** [30] - 2:6, 2:7, 2:8, 2:9, 3:24, 5:10, 10:2, 10:5, 10:24, 10:25, 95:1, 95:3, 95:7, 95:11, 96:9, 101:6, 101:21, 102:23, 103:19, 104:16, 106:3, 106:9, 106:11, 106:12, 108:6, 108:24, 109:18, 110:8, 111:20, 114:21

**videos** [6] - 74:17, 94:24, 95:4, 95:5, 100:7, 101:11

**videotape** [1] - 63:23

**view** [1] - 116:14

**visit** [4] - 32:14, 37:14, 66:17, 67:2

**visits** [1] - 67:8

**Volume** [1] - 1:7

**vs** [1] - 1:6

## W

**wage** [1] - 39:12

**wages** [1] - 39:16

**wait** [9] - 11:4, 22:11, 22:22, 31:2, 34:1, 34:12, 54:9, 106:13, 109:5

**waited** [1] - 22:24

**waiter** [1] - 80:25

**waiving** [1] - 95:16

**walk** [3] - 24:7, 29:3, 60:19

**walked** [3] - 8:3, 34:1, 82:22

**walking** [4] - 19:19, 24:23, 24:25, 25:4

**wall** [1] - 17:17

**wants** [2] - 96:9, 106:13

**warning** [1] - 33:10

**watch** [1] - 17:8

**watching** [1] - 109:17

**water** [4] - 22:7, 25:24, 43:20, 62:23

**wear** [1] - 16:22

**wearing** [2] - 37:13,

83:23

**weather** [4] - 19:18, 22:2, 34:18, 41:15

**website** [1] - 120:16

**weeks** [2] - 39:8, 73:25

**weight** [1] - 116:25

**welcome** [2] - 44:22, 75:8

**West** [1] - 1:19

**Westside** [2] - 62:21, 94:16

**whatsoever** [1] - 56:25

**white** [5] - 30:6, 30:8, 60:18, 83:4, 83:23

**whole** [6] - 17:5, 41:1, 41:6, 77:6, 100:23, 111:19

**wifey** [1] - 28:20

**Wilkerson** [40] - 36:16, 36:18, 36:25, 41:18, 41:19, 41:21, 42:1, 42:4, 42:18, 66:10, 66:16, 66:20, 66:23, 67:2, 67:3, 67:5, 67:8, 68:14, 70:18, 71:10, 95:3, 100:16, 108:8, 108:14, 108:16, 108:18, 109:16, 116:19, 116:22, 117:18, 117:21, 118:6, 118:25, 119:2, 119:17, 119:25, 120:18, 120:19

**Wilkerson's** [7] - 108:12, 115:5, 115:18, 116:24, 117:3, 117:23, 118:9

**wind** [8] - 21:5, 22:15, 23:16, 23:19, 27:19, 28:5, 53:9, 53:18

**winds** [9] - 19:21, 20:8, 21:25, 22:3, 22:12, 26:11, 33:5, 33:11, 33:17

**windy** [6] - 19:19, 21:9, 21:22, 60:8, 60:9, 60:12

**wine** [1] - 17:10

**wiping** [1] - 21:11

**wish** [1] - 5:9

**withdraw** [1] - 111:12

**withdrawn** [1] - 111:16

**withdrew** [1] - 111:18

**WITNESS** [12] - 2:2, 13:19, 13:23, 25:25,

40:8, 40:10, 40:13, 40:16, 44:22, 45:14, 75:8, 102:10

**witness** [44] - 3:23, 4:1, 4:18, 4:24, 5:4, 5:6, 5:22, 6:4, 6:17, 10:5, 10:14, 11:5, 12:21, 13:16, 29:15, 55:17, 88:16, 90:25, 95:5, 95:7, 95:10, 96:22, 97:1, 97:13, 97:23, 98:3, 98:4, 98:6, 98:9, 101:16, 101:18, 103:12, 107:22, 107:23, 108:3, 111:3, 111:5, 113:17, 114:3, 114:20, 120:14

**witnessed** [4] - 59:20, 59:25, 60:3, 82:5

**witnesses** [5] - 6:7, 59:18, 101:12, 108:6, 108:7

**woman** [3] - 58:8, 83:4, 83:23

**women** [1] - 40:20

**wonderful** [1] - 106:16

**words** [2] - 64:9, 114:6

**worker** [5] - 28:12, 29:25, 30:2, 30:20, 81:11

**workers** [2] - 21:10, 21:17

**works** [3] - 4:9, 86:16, 102:5

**workstation** [1] - 65:22

**world** [3] - 12:13, 73:18, 79:17

**worn** [2] - 63:22, 63:25

**worried** [1] - 83:20

**worst** [2] - 40:21

**would've** [3] - 9:3, 42:23, 110:21

**wrap** [1] - 108:18

**wrist** [1] - 68:21

**write** [4] - 59:22, 59:24, 60:2, 80:20

**wrote** [3] - 82:23, 112:10, 112:11

**Y**

**year** [4] - 38:9, 40:5, 73:18, 73:24

**years** [11] - 14:12, 14:20, 27:9, 38:1, 49:23, 61:22, 64:10,

83:21, 119:5, 120:7, 120:21

**yesterday** [6] - 4:2, 4:11, 6:6, 23:24, 27:11, 119:9

**young** [3] - 30:8, 60:18, 67:6

**yourself** [10] - 14:9, 16:7, 16:24, 43:22, 45:7, 51:8, 53:24, 61:23, 92:22, 92:25

**YouTube** [1] - 72:24

**Z**

**zoom** [2] - 30:10, 71:1