UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
CASE NO. 23-cv-60532

EUREKA COLE,                              Fort Lauderdale, Florida

          Plaintiff,                      May 31, 2024

     vs.                                  9:42 a.m. - 5:29 p.m.

CARNIVAL CORPORATION,                     Volume 3

          Defendant.                      Pages 1 - 181
_____

BENCH TRIAL - DAY 3
BEFORE THE HONORABLE MELISSA DAMIAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:


FOR THE PLAINTIFF:          RAYMOND R. DIEPPA, ESQUIRE
                            FLORIDA LEGAL
                            150 Southeast 2nd Avenue
                            Suite 1001
                            Miami, Florida 33131

FOR THE DEFENDANT:          MICHAEL DRAHOS, ESQUIRE
                            W. COOPER JARNAGIN, ESQUIRE
                            ASHLEY N. GENOESE, ESQUIRE
                            GRAYROBINSON, P.A.
                            515 North Flagler Drive
                            Suite 650
                            West Palm Beach, Florida 33130


STENOGRAPHICALLY REPORTED BY:

               MAIRELYS ALBO, RPR
               OFFICIAL COURT REPORTER
               United States District Court
               Southern District of Florida
               299 East Broward Boulevard
               Fort Lauderdale, Florida 33301

I N D E X

WITNESS                                                    PAGE

DR. JOHN P. WILKERSON (by video deposition)          15

MONICA BORCEGUE (live)

DIRECT EXAMINATION BY MR JARNAGIN                       31
CROSS-EXAMINATION BY MR. DIEPPA                         47

VIKRAM THAPA (by video deposition)                     73

DR. AMY COURTNEY

DIRECT EXAMINATION BY MR. DRAHOS                        74
CROSS-EXAMINATION BY MR. DIEPPA                         99

ANDY LIBERTI

REBUTTAL DIRECT EXAMINATION BY MR. DIEPPA              146
VOIR DIRE EXAMINATION BY MR. DRAHOS                    150
CROSS-EXAMINATION MR. DRAHOS                           173
REDIRECT EXAMINATION BY MR. DIEPPA                     175

PLAINTIFF RESTS                                        17

DEFENSE RESTS                                         141

PLAINTIFF REBUTTAL RESTS                              177

CERTIFICATE OF REPORTER                              181

EXHIBITS

| Exhibit | Marked | Received |
|---|---|---|
| Plaintiff's 8 | | 16 |
| Plaintiff's Exhibit 10 | 116 | |
| Defense 7-10 | | 142 |
| Defense 13, with exception of Photo 9 | | 143 |

(Case called to order of the Court at 9:42 a.m.)

COURTROOM SECURITY OFFICER:  All rise.

COURTROOM DEPUTY:  The United States District Court for the Southern District of Florida is now in session with the Honorable Melissa Damian presiding.

THE COURT:  Good morning, everybody.

Everybody be seated.

COURTROOM DEPUTY:  We're back on the record with Case No. 23-cv-60532-Damian, Cole v. Carnival Corporation.

Counsel, please state your appearances beginning with the plaintiff.

MR. DIEPPA:  Raymond Dieppa here for the plaintiff, Eureka Cole.

MR. DRAHOS:  Good morning, Michael Drahos for the defendant, Carnival.

MR. JARNAGIN:  Cooper Janragin on behalf of defendant Carnival.

MS. GENOESE:  Ashley Genoese on behalf of defendant Carnival for Carnival.

THE COURT:  And your corporate representative.

All right.  So we are going to start off with doctor -- with the doctor; is that right?

MR. DIEPPA:  Actually, Your Honor, before we get into the doctor I did want to address something that I raised in the notice of supplemental authority which I filed last evening.

THE COURT:  Okay.

MR. DIEPPA:  And this is in regards to the -- two issues.  In regards to the medical expenses and the standard in a maritime tort case and in regards to medical expenses and whether or not they can be claimed if they are not directly owed by the plaintiff which were issues that were raised by the Court, and we did do some research last night.  And the third issue is the standard of proof for reasonable and customary medical expenses that the plaintiff has to sustain in, you know, district court and in the state of Florida.

And to that end, Your Honor, I did -- I have copies of the cases that are cited in the notice of filing supplemental authority.  They have already been provided to opposing counsel.

THE COURT:  Okay.  So what is the point that you are trying to make to me?

MR. DIEPPA:  The point I'm trying to make, Your Honor, is that in the Higgs case --

THE COURT:  Very familiar with it.

MR. DIEPPA:  Yes.

THE COURT:  I will tell you my understanding and you tell me if it's anything different from what you are going to try and tell me.

Under Higgs you can offer evidence to a jury or to the fact finder of the amounts billed, the actual amounts billed.

You can offer evidence of the amounts that would have been billed by a collateral source like an insurance carrier or the like.  You can offer evidence of what she actually paid out of pocket.  You can offer -- and, very importantly, you can offer evidence of what the customary and reasonable expenses or costs for these procedures would have been.  You could offer all of that evidence.  It's telling you you can't -- the court doesn't have to exclude all of that evidence.

Then what the jury or the fact finder does is considers all of that.  Perhaps when you have a jury you don't let the jury know that Blue Cross and Blue Shield paid a certain amount, but you let the jury or the fact finder consider all of that and come up with what they think is a reasonable amount of expenses for the medical --

MR. DIEPPA:  I'm addressing the other portion of the Higgs holding.

THE COURT:  Okay.

MR. DIEPPA:  And that starts on page 33.  And I can give a copy to Your Honor.

THE COURT:  I have it.  It's okay.

MR. DIEPPA:  And that states -- it's on page 12 of my copy.  And I'll just quote it.

"Our guiding principle is that plaintiffs are entitled to recover the reasonable value of treatment for injuries they have sustained regardless of whether their medical expenses

have been paid and by whom."

That's the key term.  They're recognizing that general maritime law incorporates the general law of torts when not inconsistent with the law of admiralty.

And it goes on there:  "When plaintiff seeks to recover for expenditures made or liability incurred to third persons for services rendered, normally the amount recovered is the reasonable value of the services rather than the amount paid or charged."

Goes on:  "The value of medical services made necessary by the tort can ordinarily be recovered although they have created no liability or expense to the injured person."

And that's the key term.

Also I gave -- I cited a copy of the Offenberg v. Carnival case.  And that was -- this is a 2021 opinion by Judge Moore.  And the issue came up before Judge Moore, and his ruling was that the court will now preclude evidence of the -- pursuant to Higgs the court will not preclude evidence of the amount of plaintiff's medical expenses based on the arguments presented in the instant motion unless the evidence meets the high standard in the motion."

So in that case the plaintiff was allowed to board the full medical expenses.  I agree with Higgs because Higgs addressed the write-off and the court had to deal with the issue of whether the write off could come into evidence and the

court said, yes, collateral rule still applies. And I agree, if the defendants have evidence of collateral source payments, they can admit it at trial.

THE COURT: It's a little different from some of the Florida law. That where it's a little different.

MR. DIEPPA: Yeah. But the issue Your Honor raised yesterday was if because there's an LOP if the plaintiff can claim the full damages, and I think Higgs answers that question in the affirmative. The case is citing Higgs since 2020, cite that proposition in the affirmative which is the issue I wanted to address with the Court.

THE COURT: No. And I appreciate that.

Part of my concern yesterday -- and I actually already had gone back to make sure I was articulating it correctly.

My concern was I only had evidence of the bills. I only had seen evidence of the amounts that were billed by the providers.

So I am saying that the case law says that the fact finder is supposed to determine the reasonable -- damages should be the reasonable amount that should have been incurred; right? So --

MR. DIEPPA: Higgs addresses that as well.

THE COURT: I know. I know.

But, again, my point was under Higgs the fact finder can and should be considering the totality of the circumstances

for lack of a better expression which is how much was actually billed. I have the amounts actually billed to her. 141-some-odd thousand. But with Higgs and in Judge Moore's case it's telling me I can and should or the jury can and should also consider what is customary in the, you know, community, is that a high amount, is that a low amount; right? Also how much did she -- if she paid anything. Because I had that -- the question was in my head, like did she actually pay anything? Because that's fair game.

MR. DIEPPA: That's correct. But I think Your Honor has to do that -- like it says in Higgs, based on all the relevant evidence and the testimony. But I think Your Honor also has to consider evidence that was discussed in Higgs which is, well, what's the evidence of the collateral source, you know, what's the evidence of the reasonable and customary --

THE COURT: That's what I was saying, I don't have any of it.

MR. DIEPPA: But thus far what you have heard -- you will hear from our physician.

THE COURT: I know.

MR. DIEPPA: But thus far what you've heard, you know, is from Dr. Chalal, I guess, to that extent. But there's not -- you know, normally, you know, you have defense counsel here, you know, bringing in a schedule of charges or a schedule of what's been written off or a ledger from the insurance

company; we don't have that here.  It's not even in the evidence or cited by the defense.  And that's the point I'm trying to make, is that once I come in with my evidence -- and that evidence, unlike in Higgs and unlike in the other case has already been stipulated into evidence in this case.  So the ledgers, the medical bill, the medical bill summary here is already in evidence.

Now, the corollary issue was the standard of proof issue.  And I cited -- actually it's a Middle District of Florida District Court decision that has a very good summary.

THE COURT:  Which one was that?

MR. DIEPPA:  This was the Lawton-Davis v. State Farm case, Your Honor.

THE COURT:  Okay.  And what's the point on that?

MR. DIEPPA:  Yeah.  And there's another case we cited out of the Fourth District which is also on the notice of authority, and that's Walerowicz v. Armand-Hosang.  And because this is a blended maritime case with blended issue of state and maritime law where they don't conflict, I just wanted to let the Court know that as discussed by the Middle District opinion where they summarized the cases, and as the Fourth DCA ruled in 2018, there's not really a requirement in Florida that the evidence of the plaintiff's medical bills be supported by expert testimony.  It just needs to be the plaintiff on the stand saying those are my medical bills.

THE COURT:  Oh, okay.  Yes, I saw this.

MR. DIEPPA:  Yeah.  And -- because that was the issue we had, you know, the little back and forth that I wanted to make clear.  But I want to make sure we are on the same page before I go forward and play the doctor and do what I need to do to rest my case.

And I want to make sure because the Walerowicz case is right on point.  Because the same issue was raised in the Walerowicz case and there was a motion for a directed verdict on the basis that because the treating physician testified and because the plaintiff entered the bills into evidence, you know, based on her personal knowledge, it was insufficient.  And in the Walerowicz case it actually came back and it was affirmed that the directed verdict should have been denied.  And that's also summarized in the notice of filing supplemental authority.

So it's pretty clear what, you know, case law is in Florida on these topics.  And --

THE COURT:  I think we are on the same page.

MR. DIEPPA:  Okay.

THE COURT:  I -- you know, I was -- maybe it's on the defendant's now to present the other evidence concerning damages.

All I have right now in the record is -- and the case isn't over.  Defense hasn't put on their case yet.  All I have

right now is what was actually billed.

MR. DIEPPA:  Yeah.

THE COURT:  And Dr. Chalal talking about, you know, as you would expect, that that was coded im- -- some of the procedures were not coded for the right thing and basically as you would expect their witness to say, they were charging too much for the types of things you would have needed.

MR. DIEPPA:  And lastly, Your Honor, just so -- there's -- because Dr. Wilkerson is coming in as a Rule 26(C) expert, I wanted to provide Your Honor with a copy of the disclosure that was provided for his testimony on October 11, 2023, identifying his topics.  And I also wanted to provide -- unless Your Honor is already familiar the case, Cedant v. United States case from the 11th Circuit, 2023.

THE COURT:  Regarding?

MR. DIEPPA:  This is regarding the scope of testimony for a treating physician disclosed under Rule 26(C), nonretained experts.

So this was a recent decision --

THE COURT:  Saying?

MR. DIEPPA:  Saying that basically a treating physician disclosed under Rule 26(C) can give the same expert opinions, you know, regarding various topics, including causation, as a retained witness can provide.

THE COURT:  I don't recognize the name of the case.

But I did also update myself after we had the issue with Dr. Chalal.  And I -- I think we discussed it a little bit yesterday that I do still feel comfortable that a physician, even when it's a treater with 20, 30 years' experience doing this kind of work, you know, should be able to testify about -- they have an expertise, basically.  But I didn't let Chalal come in as an expert on the amounts that can be charged for certain things.  But I am happy to let these doctors testify about their experience and what they have seen and what they do see.

You were saying Dr. Wilkerson -- and I don't know, I mean, if you want me to see the disclosure, I'll see the disclosure.

MR. DIEPPA:  Yeah.  I have --

THE COURT:  So he was disclosed as an expert on the reasonableness of the medical -- the reasonable, customary --

MR. DIEPPA:  Yes.  Uh-huh.

THE COURT:  -- of the expenses in addition to an expert on the --

MR. DIEPPA:  Yeah.

THE COURT:  -- injury that she had?

And that was not opposed.

Was it opposed?

MR. DIEPPA:  Was not, Your Honor.

THE COURT:  Did you move to strike him?  I don't think

you did.

MR. DRAHOS:  No.  No.  But I want to go back to what I think started this part of the discussion, which is he can disclose anybody he wants, he can tell us whatever his intention is going to be to call whoever; when he comes into trial he still has to lay a predicate.

THE COURT:  Right.  We discussed this yesterday.

MR. DRAHOS:  So our contention here is if the ruling from the Court was that Dr. Chalal can speak to his personal billing practices, and that's evidence in the case, then we would expect Dr. Wilkerson to be treated with the same weight, not more weight than Dr. Chalal because he's been designated as --

MR. DIEPPA:  I'm not disputing the weight that should be given to the witnesses.  The weight, that is up to the fact finder.

MR. DRAHOS:  Then I don't know what we're talking about.

THE COURT:  So what he is saying is you disclosed him so it's not going to be strike his expert testimony because he was not timely disclosed for those things.  That's really the purpose of --

MR. DIEPPA:  Yes.

THE COURT:  -- your expert disclosures.

That's all well and good.  He was timely disclosed as

an expert on these things.  But then when your expert who was properly disclosed comes in the other side always has the opportunity to voir dire them on the issue to make sure that they're qualified to testify as an expert on that particular issue, or where here they're not here live, I'm going to need to be watching to make sure he has laid a foundation or predicate to establish that he is, in fact, qualified to testify as an expert on these issues.  And his point is -- because he's already seen this deposition -- that he hasn't.

So I remember we left off with this yesterday afternoon.  I need to see what he is saying to determine what -- whether he's testifying as an expert on these issues or if he is just a fact witness testifying as to his own experience.

MR. DIEPPA:  Yes, Your Honor.

And the thing is, you know, Dr. Chalal, he is a 26(B)(C) expert, it's a little bit different.  But the point being is that, you know, it's less of an issue because the issue is really are can the bills come in, can the Court consider the bills.  And, you know --

THE COURT:  Aren't the bills in?

MR. DIEPPA:  Yeah.  They are in.  So it's less of an issue.  So -- and I will leave it at that and I will provide the Court with -- I provided this to counsel already and a copy of his disclosure.

And just so the Court is aware, all of his medical records and treatment records and the other related records were all attached to this, but it's voluminous, but that's all in evidence. And I can give the Court the exhibit number.

THE COURT: Okay. Okay.

So you can -- if you want to give it to Johanna, you can. I don't think -- I don't know that I need it, but if you think we are going to be referring to it -- thank you.

Do you need to set it to plaintiff's counsel table?

COURTROOM DEPUTY: It is already.

MR. DIEPPA: It's set to mine?

COURTROOM DEPUTY: Yes.

MR. DIEPPA: Plaintiff calls Dr. John P. Wilkerson by way of video testimony.

THE COURT: Okay.

(Video deposition of John P. Wilkerson was published.)

(Video paused.)

MR. DIEPPA: Your Honor, would it be all right if I take a brief five-minute recess?

THE COURT: We should have taken it when they took it.

MR. DIEPPA: That's what I was thinking too.

THE COURT: Sure.

(A brief recess was taken from 11:00 a.m. to 11:11 a.m.)

COURTROOM SECURITY OFFICER: All rise.

THE COURT: Okay. Everybody be seated.

Ready to start back up?

MR. DIEPPA:  Yeah.

(Video was published.)

(Video was paused.)

THE COURT:  Okay.

MR. DIEPPA:  That concludes the testimony of Dr. Wilkerson.

I guess before plaintiff rests, there is a demonstrative for the Court that's been stipulated in.

It simply is a weighing of the lid that was done in a different method than was done by Carnival's employee.  So it takes about ten seconds long.

THE COURT:  Okay.

MR. DIEPPA:  So I will present that next.

THE COURT:  Oh, they do it on the video?

MR. DIEPPA:  Yeah.  They have seen it.

They've seen it and it was agreed yesterday.

It's marked as Plaintiff's 8.

THE COURT:  Right.  I saw it on the list.

MR. DIEPPA:  So --

THE COURT:  Okay.

(Video was published.)

(Video was paused.)

MR. DIEPPA:  Just by way of background the lid was shipped to me by defense counsel.  I am not sure if it's the

same lid, but it was shipped to me. And then before we shipped it back, you know, we took a weight reading of it using a crane scale, like, you know, you use to weigh fish.

THE COURT: What do you mean you -- I mean, it's obviously not the exact lid that hit her, but is it the same type of lid, do we know that?

MR. DIEPPA: All I know is it's what was sent to me by defense counsel.

THE COURT: Okay. It looks like one of those, like the one on the table.

MR. DIEPPA: Yeah. So it was sent to me, I sent it back. And this is a scale from Amazon.

(Video was published.)

(Video was paused.)

MR. DIEPPA: It's in pounds, not grams. 2.2 pounds.

THE COURT: Just so the record is clear, the video which is in evidence?

MR. DIEPPA: It's been marked into evidence, yeah.

THE COURT: So it showed that the -- a single lid weighed 2.2 pounds.

MR. DIEPPA: Yeah. And you will -- well, I guess you'll see why that's relevant later.

All right. So at this time the plaintiff rests.

THE COURT: Okay.

MR. DIEPPA: Reserving for rebuttal.

THE COURT:  To be clear, I didn't hear Dr. Wilkerson, anybody attempt to qualify him as an expert on the what's reasonable in the community.  I mean, I was making sure to take notes.  First of all, he said he doesn't know anything about billing so he's clearly not a billing expert or how they, CitiMed, comes up with their rates.

MR. DIEPPA:  Yes, Your Honor.

THE COURT:  Right.

MR. DIEPPA:  I can address that.

Dr. Wilkerson said that he's got privileges at multiple hospitals, that he owns the surgery center, that he actually puts the codes in himself and personally does everything and manages the billing personally himself.  So he knows the charges and billing for each procedure.  And that he reviewed each bill and said those bills are reasonable and customary for, you know, what this type of procedure is.

And obviously he is experienced.  He's an orthopedic surgeon.  In fact, his testimony about using the coding was kind of similar to what Dr. Chalal said in a way as to identifying the proper codes for the procedures and how much they should be billed for and saying that he personally does that.  So --

THE COURT:  I think it's no different from Dr. Chalal. Both of them testified based on their experience.  Arguably they have similar, regardless of who was practicing longer

doing what, but they have similar amounts of experience from which they can testify based on their own personal knowledge of what their facility does, what they do, what they charge.  And both of them have seen what others in the community charge.  But neither was offered as, nor do I find that they qualify as an expert beyond how -- beyond how it works; right?  Like, you put a code, you bill.  Like, they clearly both of them have more than 20 years' experience in the process, but I didn't hear either one of them say that they conducted, you know, a study of what's -- Dr. Chalal kind of did.  I agree with the defense here that Dr. Chalal actually laid a bigger foundation or a greater foundation for having considered what's happening in the community with regard to what people -- or what doctors are charging for these things.

But my point being, he is not any more of an expert than Dr. Chalal is.  I don't find that either one of them was brought in and anybody tried to establish them as an expert overall on reasonable and customary charges.

Hold on.  One at a time.

MR. DIEPPA:  I was just going to remark, Your Honor, that we -- I understand what -- how the Court is viewing the two physicians.  What I would say is that, you know, under the cases we've cited interpreting Florida law, we have met the standards, specifically from the most recent case Walerowicz, which says that the combination of the plaintiff's testimony

and the surgeon's testimony, coupled with the introduction of the medical bills provided sufficient testimony to establish the reasonableness and necessity of the medical bills presented to the jury.  And that's at 248 So.3d 140.

THE COURT:  I'm not saying that you didn't reach a threshold of demonstrating reasonable and customary, I'm just saying that neither doctor was offered as having conducted all of the studies for lack of a better word concerning what is reasonable and customary in the community.  I mean --

MR. DIEPPA:  Yeah.

THE COURT:  -- I'm not saying you haven't reached your threshold.  You have presented evidence that that is reasonable and customary, and the person that presented it has a lot of experience; same thing with Dr. Chalal.

Mr. Drahos?

MR. DRAHOS:  Yeah.  Your Honor just kind of commented on what I intended on saying.  I did want to clarify one point which is that we did attempt to present Dr. Chalal as an expert industry wide and he did present evidence of seeing competitors and second opinions and things of that nature.  And, you know, the one thing that differed here was that Dr. Wilkerson specifically admitted on the record that he doesn't know how CitiMed comes to their rates.  So it is questionable whether or not --

THE COURT:  I wrote it down.  "I don't know how they

come up with their rates."

He says:  "I don't know anything about billing."

And then he says:  "I don't know how they come up with their rates."

MR. DIEPPA:  He did say that, Your Honor.  But he also was presented with his own bills and said those bills --

THE COURT:  Those were -- yes.

MR. DIEPPA:  And then he talked about the, you know, coding and everything else.  But --

THE COURT:  So just -- I mean, I appreciate Mr. Drahos' point is he did ask to have Dr. Chalal qualified, as did you, as an expert on usual and customary rates.  I have denied as to both.  Like I said, they're both qualified to give their opinion about what they did or what they would do for this particular type of surgery.  I'm not overlooking either of their opinions regarding whether this was reasonable, these bills were reasonable for these procedures, but neither one even tried to come in and tell me, you know, in all of Miami-Dade County or all of Broward County this is the range and, you know, this is the high end, this is the low end. Neither one really did that so I think it's a nonissue.

MR. DIEPPA:  Yeah.  And, Your Honor -- and I think that's -- your -- exactly as it says in Higgs, it's now to the fact finder based on the relevant evidence, the amount billed, the amount paid, and any expert testimony or other relevant

evidence to be considered by the fact finder.  And of course the fact finder can rely on her own personal experience and other things and other information and we have no issue with that.

THE COURT:  Right.  Okay.

MR. DRAHOS:  Thank you, Your Honor.

THE COURT:  Okay.  So now the plaintiff rests their case in chief?

MR. DIEPPA:  Yes, Your Honor.

Before -- I don't know if this is the right time to do it, but I don't want to waive it.  We would ask -- it's not an instruction because there's no jury, but we would ask for an inference based on certain missing evidence that now has been established as missing which was requested and which is --

THE COURT:  How has it been established as missing if the defense hasn't put on their case yet?

MR. DIEPPA:  Well, yeah.  That's why -- I don't know. I can make the motion at the end of their case, but I don't want to waive it.  And the issue is -- yeah.  And the issue is three things because -- and that's why I'm making the motion now.

There is a -- the ship logs regarding the wind speeds that were -- you know, data which was in possession or ESI which was in possession of Carnival that corporate rep admitted they do not have, which would probably be determinative in this

case; the video which also it was established that there's -- you know, there's cameras but there's no video of this incident; and thirdly the identity of the worker which actually was requested multiple times and was, you know, subject of hearings.  The worker is -- was never identified despite -- well, you heard me asking, going through like every single name to try to find who it was and to this day we never found out who it was.

Issue being regardless of what the Court decides to infer or not infer, is that the absence of those things are things that help one side over the other.  And they were requested.  There was a -- you know, for the record, there was a preservation of evidence letter sent less than a month after this accident on August 10, 2022, which was acknowledged by Carnival in writing.  And the request specifically -- you know, we have a copy here.  It's not disputed.  The request specifically asked for all this type of information to be provided.  We can provide the Court with the exact language.

So that is an issue.  Maybe we need to wait until the close of defense case to consider it.  But it is an issue regarding there's certain missing evidence that occurred in a case where there was an anticipation of litigation, there was an incident report filed, there was a written request for preservation of evidence, there were discovery request subsequent to that, and all of this information was peculiarly

and solely in the possession of Carnival Cruise Line.

So, you know, the Court can hold the motion in advance, but I just want to, you know, be clear for the record that the motion has been made on those grounds, you know, subject to the close of evidence.

MR. DRAHOS:  So, first of all, the motion was raised ore tenus, but it was actually brought to my attention moments before Your Honor walked in to start today's proceedings.

There's so much here that has been represented to the Court, either inaccurately or prematurely that I'm not really sure where to begin with this.  And I don't know if Your Honor wants to hear the substance of these arguments, but let me just kind of address some of the bullet points.

As it relates to the ship logs, those were never specifically requested of Carnival in this case.  There's no discovery request asking us for ship logs.  There's no discovery request asking us for information related to the weather at all.

During the deposition of Ms. Borcegue who testified as our corporate representative she specifically says on the record that there are ship logs.  She wasn't asked for them so she didn't have the information there at the deposition.  We are going to address that point during our case in chief.

As it relates to video, CCTV video, you are going to hear from our chief of security who was quite frankly berated

on the record about whether or not there's existence of CCTV video and he adamantly and repeatedly and consistently testifies that there wasn't any.  So there's no record here of us having it at one point, losing it or in bad faith destroying it.

And then as it relates to the identity of the worker, they were less than accurate or I should say less than specific as it relates to who they contend was in the area.  There's all kinds of wide disparities in terms of who was there, who wasn't there, who said what.  There was somebody there in all white.  Well, no.  There was somebody with a blue shirt.  Was it a male or was it a female?  We did make an effort to try and identify that individual and we can lay that predicate during our case in chief when we call Ms. Borcegue.

So the idea that we in some way destroyed evidence, lost evidence is just completely unfounded.  Not to mention the fact that the request that the plaintiff is relying upon, which he handed to me moments before Your Honor came in, is a presuit notice of intent to initiate litigation.  And we would welcome the opportunity to present this to the Court so that you can see how general this is.

THE COURT:  Well, is it even relevant?  Because what you are saying is you didn't destroy anything.  So --

MR. DRAHOS:  Exactly.  And the last point I want to make in that regard is that the Court is going to hear and is

well aware through pleading practice in this case that their theory has changed throughout the course of the case.  At one point they said that the containers fell on the plaintiff, then they started talking about wind later in the litigation.  So the idea that a presuit notice could have or should have put us on some kind of burden or create some sort of obligation that we should have preserved something that quite frankly he never asked for throughout the entire course of this case is just ridiculous.

MR. DIEPPA:  Your Honor, if I can respond?

If you read the second page, there's a subheading here, and -- we can provide a copy to the court.

Says:  "Preservation of evidence.  Preserve video, preserve electronic information.  Please suspend your document retention policies."

THE COURT:  Okay.  So hold on.

How is that relevant if these things weren't destroyed?  It would be one thing -- so that becomes relevant, these preservation letters become relevant when -- I mean, even without a preservation letter if there's -- if there's an incident and the entity is aware that litigation is likely they are not to destroy anything that might be relevant to whatever the incident is.

MR. DIEPPA:  And I'm not making that accusation.  I haven't said anything about destroyed.  I said it's not here.

THE COURT: Then it's -- but still, the preservation letter becomes relevant when there was a lack of preservation. That's not what Mr. Drahos is saying is -- that's not what happened here. The videos don't exist. I'm going to hear -- he's proffering that I'm going to hear that the videos don't exist.

MR. DIEPPA: You will hear that there was supposedly an attempt to check for the video, but you will also hear that nothing was preserved and everything has been written over.

THE COURT: Okay. Well, I will hear what I hear. Let's just -- okay.

And then it's not like they are -- you're even accusing them of hiding some employee so that you can't, you know --

MR. DIEPPA: Well, that -- I had multiple conversations and requests and we pushed very hard in discovery to get the name of this employee. They were never identified.

THE COURT: That's still not a preservation issue. I'm just saying your preservation letter is not really relevant to any of these things. If you were suggesting that the weather logs are usually, you know, that they had them, but then they destroyed them, which also doesn't sound like what Mr. Drahos is saying, it's not what happened; he is saying you never actually asked for them so that's why you didn't get them.

MR. DIEPPA: Well, Your Honor, the issue with that is we have compulsory disclosure in federal court so if they had

evidence which was in any way related to this it should have been on a supplemental Rule 26 disclosure.

THE COURT:  His point is how do they know it's related to this.  I mean --

MR. DIEPPA:  My second amended complaint says that this was caused by wind and the dispute was wind.  And I understand where Your Honor is going.  And the reason -- and that's why I said, Your Honor, there's no accusation here of destruction or anything like that.  I'm raising it as consideration of the Court that if this evidence is missing and it's relevant to their defenses.  Because if they're going to come in here and say, well, there's no evidence of X, no evidence that this employee knew something, and we tried, and it's their employee, and they failed to identify the employee despite, you know, multiple efforts on my part, and they gave me the name of 12 employees and they failed to identify which one was the one that was described by the plaintiffs --

THE COURT:  Okay.  So then your motion is premature.

MR. DIEPPA:  Okay.

THE COURT:  So we will just -- you have put me on notice of it.  But if you are now turning to they can't, you know, rely -- basically they can't try and take advantage of some inference from you not bringing any of these things in is now what you're saying.

MR. DIEPPA:  That's really more what I was --

THE COURT:  Well, then it's premature.

MR. DRAHOS:  He asked for an adverse inference is what he asked for.

THE COURT:  He did start by asking for an adverse inference.  But I don't see it because, again, you know, if at the end of the case you are going to bring this back up again and evidence has come out that any of these things were, you know, destroyed after they knew you wanted it, that's a whole different story.  But doesn't sound like we're there, at least not --

MR. DIEPPA:  No, Your Honor.

THE COURT:  -- from what I've heard.

MR. DIEPPA:  There's levels to it.  But I understand.  Thank you.

THE COURT:  Okay.  So I am good to keep going for a little while.

Mairelys, how is my court reporter?  Are you good for a while?

Do you want -- tell me what's up for you.  Remind me.

MR. DRAHOS:  So we're going to call Ms. Borcegue, our corporate representative first, then we are going to have a brief video that's about a half hour of the security guy, and then we're going to have Dr. Courtney testify live here in the courtroom.

THE COURT:  So is everybody okay going until about 1:00

or however long we take -- let's see how long her direct is and then we can reassess?

MR. DIEPPA:  You mean for lunch?

THE COURT:  Yeah.

MR. DIEPPA:  That's -- that will work.  Yeah.

And I spoke to the clerk before.  The biomechanics, we're arranging for a Zoom link to be sent to him so he'll go on right after.

THE COURT:  Did you send the Zoom link?

COURTROOM DEPUTY:  Sent it to you by e-mail.

MR. DIEPPA:  Thank you so much.

It's a live one where everyone logs on?

COURTROOM DEPUTY:  Correct.

THE COURT:  Okay.  So let's, if you would like, why don't we start with Ms. Borcegue.

Do you need a break before you go on, are you okay?

MR. DRAHOS:  No.  We were just -- if we can get a copy of that Zoom link because Ms. Genoese will need to have access to.

Thank you.

COURTROOM DEPUTY:  No problem.

MR. JARNAGIN:  The defense calls Monica Borcegue as its witness.

(Monica Borcegue sworn by CRD.)

THE WITNESS:  Yes.

COURTROOM DEPUTY:  Thank you.

Please state and spell your name for the record.

A.   My name is Monica Borcegue, and it's M-o-n-i-c-a B-o-r-c-e-g-u-e.

DIRECT EXAMINATION

BY MR. JARNAGIN:

Q.   Good morning, Ms. Borcegue.

A.   Good morning.

Q.   Ms. Borcegue, who is your employer?

A.   Carnival Cruise Line.

Q.   And tell us a little bit about your employment history with Carnival.

A.   So I have been with the company 19 years -- or it will be 19 years this September.  I can go through my entire history briefly if that helps.

Q.   Succinctly.

A.   I started in 2006 as a crew medical administrative assistant.  I was in that position for about nine months and then I switched over to the legal department.  At that time medical and legal were the same department.  But claims is what I did next.  I was a legal secretary for about three years.  After that I was an adjuster -- claims adjuster for another three years or so.  And then I got promoted to litigation representative.  I did that for I guess five years or so, it's kind of -- I've lost track by now.  And then I'm currently the

guest claims manager for the department.

Q.   And in your current role as guest claims manager what are your day-to-day responsibilities?

A.   So what I mainly do is assist both in-house and outside counsel with discovery in all the litigation cases.  So it would be pulling records, talking to other departments, whether they are shoreside or shipboard departments, asking for information for all the cases, doing prior incident searches.  Basically anything like that.  I would also testify as a corporate rep and at trial like I'm doing today.

Q.   And, Ms. Borcegue, when did you become involved in this particular case?

A.   It would have been around June of last year once discovery request came in, that's when I first would have started working on the case.

Q.   And what vessel did Ms. Cole's incident occur on?

A.   Carnival Conquest.

Q.   Roughly how many crew members work on the Conquest at any given time?

A.   I believe the crew amount would be 1,150.

Q.   And describe to us the venues and the amenities that are available on the Conquest to the passengers.

A.   Sure.  There are a number of lounges, bars, restaurants. There are pools, jacuzzi, there's a spa, massage rooms, kids clubs.  This is no particular order.  Dining venues, I think

I've already mentioned that.

Q.   So it's fair to say there's many operations occurring on this one cruise ship?

A.   Yes.

Q.   And on what deck did Ms. Cole's incident occur?

A.   It was the lido deck, that's Deck 9.

Q.   Okay.  And we hear a lot about the lido deck, but can you describe the lido deck for the Carnival Conquest to us?

A.   Sure.  So the lido deck is one of the most I guess visited decks.  It's quite popular because that's where most of the outdoor activities are.  There's pools, there's hot tubs.  We have various dining venues on there.  The main buffet is there.  That's the indoor restaurant.  They've got buffet lines there, all sorts of breakfast, lunch, and dinner.  We also have venues outside both midship and aft.  Pizzerias, seafood venues, hamburger venues, Mexican food, there's bars both midship and aft.  So there's a lot of activity going on in the lido deck.

THE COURT:  We probably shouldn't have put her on before lunch.  We should probably take an early lunch.

MR. JARNAGIN:  I know.

Ms. Genoese, can you please put up Defense Exhibit 3-6.

BY MR. JARNAGIN:

Q.   All right.  Ms. Borcegue, you've seen this photo before as you've sat during trial; correct?

A.   I have.

Q.   What is depicted in this photo?

A.   So this is the aft portion of the lido deck.  It's the covered dining area which is all the way aft behind the hot tubs.

Q.   And within this photo is the table that Ms. Cole claims to have had her incident near?

A.   Yes.

Q.   What's behind the table?

A.   So that is a permanent wait stand.  It's for the waiters or the servers to use as storage.  I know that at some point it's been referred to as a cart, it's actually a permanent fixture that is on the deck at all times.

THE COURT:  Mr. Dieppa?

MR. DIEPPA:  Your Honor, I would like to raise an objection to this testimony.  I know she's the corporate rep, but there's a lack of personal knowledge in terms of her personally, but there's also a lack of organizational personal knowledge in regards to anyone who may have worked for Carnival who may have had this knowledge.

So it's just a lack of foundation for all of this.  It's not based on the witness's personal knowledge nor is it based on Carnival's personal knowledge.

THE COURT:  Where the cart is?  What -- what did she say that she would not be qualified to say?

MR. DIEPPA:  Everything that is the nature of the

cruise ship, everything that happened on the cruise ship and how it happened, it's not within her personal knowledge. Ms. Borcegue has never worked on a cruise ship.

THE COURT: Isn't she a corporate rep?

MR. DIEPPA: Yeah. But she never worked on a cruise ship.

THE COURT: But isn't she a corporate rep?

MR. DIEPPA: Yeah, she is. And the corporate rep can talk about institutional knowledge. But from what I heard in the plaintiff's case in chief is no employees of Carnival actually, you know, witnessed this incident; they came there after the fact.

MR. JARNAGIN: We're not claiming Ms. Borcegue witnessed it either.

THE COURT: Right.

She's testifying as a corporate -- as a designated corporate representative so I will overrule that and allow her to testify.

MR. DIEPPA: Okay.

BY MR. JARNAGIN:

Q. So, Ms. Borcegue, on top of this bolted down service station what do you see in this photo?

A. So there are a few of the plastic containers that we have been discussing, the white ones with the lids. I see maybe three, four of them.

Q.   And these have had a few different names throughout the trial; is that right?

A.   Yes.  Onboard they refer to them as "Lexans," so that or "plastic container" is fine.

Q.   Have you had the opportunity to personally visit this area onboard the Conquest in preparation for your trial testimony?

A.   Yes, I have.

Q.   So you've personally been able to handle the plastic containers that are available on the Conquest?

A.   I have.

Q.   Are these the same plastic containers that were present -- strike that.

When you visited the Conquest on what date did you visit?

A.   It would've been last Friday I believe.

Q.   Okay.  When you visited the Conquest and observed and handled these plastic containers, were they the same plastic containers that were involved in Ms. Cole's incident back in July of 2022?

A.   It was the same type of container.  We have not changed the type of container used onboard.

         MR. DIEPPA:  Your Honor, lack of foundation.

         THE COURT:  Overruled.

BY MR. JARNAGIN:

Q.   Now, specifically what are these plastic containers used for onboard the ship?

A.   So they use them for storage.  This would be again for the waiters or the serving staff.  It's part of the food operations departments' supplies.  It's where they would keep extra supplies, whether it was, you know, cups or silverware or napkins or plates.  Any extra supplies, that's what they would usually keep inside of these containers.

Q.   And are there any particular policies and procedures written that are specific to these plastic containers that Carnival maintains?

A.   No.

Q.   So you said the food operations department is responsible for the plastic containers?

A.   Correct.

Q.   What does the food operations department do in the event of adverse weather?

A.   So that instruction would actually come from the captain and the officers on the bridge.

The food operations department, just like any other department -- food is actually part of food and beverage. They're part of hotel operations.  We have all sorts of departments onboard -- they would all take a directive from the bridge or from the captain, you know, as to what to do in extreme weather conditions.

So if there were extreme weather conditions then at that point the bridge would make out -- you know, make an

announcement or send out a notification to all of the department heads and at that point in time they would do whatever was needed depending on the weather, of course.

Q.   So the Conquest captain makes the call as to whether certain areas of the ship are going to be shut down and items onboard secured?

A.   Correct.  That would be his decision.

Q.   And that decision would be going out to the different departments that are available on the Conquest?

A.   Yes.  Correct.

Q.   Why does the food operations department follow the captain's command rather than acting on its own?

A.   Every department kind of interacts with each other.  So if -- you know, if every department was doing something on their own it kind of would interrupt others functions.  Because food and beverage kind of operate together, hotel operates with housekeeping as well; everybody needs to work together.  So no department would take any decision about closing off a certain area -- of course we're talking about weather.  In the case of extreme weather it would be a call that is made by the bride with the captain's, you know, orders and everybody would need to work together at that point to do whatever needs to be done.

Q.   Okay.  And for the lido deck alone, how many departments are responsible for that deck?

A.   For the deck there would be food operations, beverage

operations, there would be housekeeping operations, there would be entertainment, there would be deck -- deck and engine also have their functions out there as well.

Q.   And you said it's the ship's captain's call whether certain areas of the ship are closed down.  What factors does the ship's captain consider in whether certain areas of the ship should be closed due to weather?

A.   So there are no written procedures for them on the bridge. This is something that's at the discretion of the captains and the officers that are at the bridge.  They do take into consideration wind force, wind direction, the ship speed and the ships' course.  These are all factors they would look into and make a call.  No situation is the same so it actually just depends on, you know, what the weather is and where they're at.

I believe it's, you know, somewhere around 35 knots or so that they would start considering that situation to be an extreme weather situation, and at that point they would make a call based on all those factors whether or not they would need to close an outer deck.

Q.   Okay.  And you have been here during trial for the past few days; correct?

A.   Yes.

Q.   You heard Ms. Cole and her husband discuss approximate wind speeds between 25 and 30 miles per hour?

A.   I have.

Q. Have you done investigation in this case regarding what type of wind conditions would trigger the captain to close a deck?

A. Yes. It's how I explained, really there's nothing written, there's no magic number. They would always need to take into consideration wind force and direction and the ship's course and speed and all of that.

So it's at the discretion of the captain. But usually it is around 35 knots where they would start considering, you know, harsh weather conditions and then what to do.

Q. You also heard the testimony of the Coles discussing a boat taking on water as they were leaving Nassau?

A. Yes.

Q. And did you have the opportunity to perform an investigation and determine whether Carnival assisted or has any knowledge what they testified to?

A. Something like that, an event like that would usually be recorded in the deck's -- in the deck logs and the bridge navigation logs. They keep all sorts of navigational information, technical information in those logs. It's basically everything that occurs on the bridge that's recorded.

An event like that, if we were involved in any sort of rescue operation or if we had seen anything like that, that would definitely be noted. In this case there was no notation that afternoon of any rescue operation or anything similar to

that.

Q.   And you were previously deposed as a 30(b)(6) witness in this case; correct?

A.   Yes.

Q.   That was in December of 2023?

A.   Yes.  Correct.

Q.   Did you discuss that the deck logs were available at that time with Mr. Dieppa?

A.   Yes.  We did get into a discussion about the winds and the weather and all of that and we don't keep -- I believe I said something to the effect of we don't keep any weather records. But that would be recorded in the deck logs.  Every hour they have updates that are automatically put into those deck logs of, you know, the wind speeds and ocean conditions and things like that.

    So at that point in time I remember saying I don't have them.  As I sit here today they have not been requested at any point.  But they do exist and that's something that the bridge would be able to pull for that day.

Q.   And that's something that you have consulted in response to the Coles' testimony here at trial?

A.   Yes.  For various reasons as we have discussed for both the operation -- you know, rescue operation and also just to check on the weather and the wind conditions and all of that for the date of the incident.

Q.   As far as the hourly observations that were documented by the bridge within this deck log, what was the knot speed at 5:00 p.m. on the day of the incident, and the knot speed at 6:00 p.m. on the day of the incident?

A.   At 5:00 I believe it was 14 knots, and at 6:00 it would have been 23 knots.

Q.   And earlier you discussed that there is generally a 35 knot threshold although other factors are involved whether open decks are shut down?

A.   That is correct.

MR. DIEPPA:  Your Honor, I object.  It's not permitted for a 30(b)(6) witness to disavow their deposition testimony in this fashion and come up with numbers that have never been disclosed up until this moment as to the wind speed on the deck.

In pre- -- Your Honor is familiar with the pretrial motions and the evidence in this case so I'm just -- for the record I move to strike that testimony, you know, based on unfair surprise and based on the fact that the witness came up with it during the trial and I was not advised of it.

THE COURT:  Overruled.  It's definitely in response to issues that were raised in the plaintiff's case in chief.

Go ahead.

BY MR. JARNAGIN:

Q.   So additionally, Ms. Borcegue, we discussed that you were a

part of the discovery process in this case; correct?

A.   Yes.

Q.   Okay.  As part of that process you reach out to the ships; correct?

A.   Correct.

Q.   A request in this case was made for CCTV footage of Ms. Cole's incident?

A.   Yes, it was.  It would have been.

Q.   What did you determine as part of your investigation?

A.   So the area is not covered by any cameras.  That is listed in the investigation.  We always follow up with the vessel and I did follow up with the vessel asking about any cameras on the lido deck.  I was told that there were no cameras.  We double checked that, we confirmed that with the chief security officer onboard the vessel.

Deck 9 has no CCTV cameras.  There's one camera on the outer decks that's located on the forward part of the vessel on Deck 14.  That would be the only open deck camera.  So this particular area in the photograph would not be covered by any type of CCTV camera.

Q.   And if there's no camera present in the area, then there's no camera to record any footage; correct?

A.   That's correct.

Q.   So there's no footage that was even recorded so there's no footage that can be lost?

A.   Correct.  Nothing existed.  There were no cameras.

Q.   Now, as part of Carnival's policies and -- well, strike that.

Carnival has onboard procedures for investigating incidents?

A.   Yes, we do.

Q.   Generally what happens after a passenger is injured and goes to the medical center?

A.   So once a passenger is seen at the medical center it is our procedure to report it to security.  When the doctor -- the doctor's responsibility to call security if they give the guest anything beyond first aid treatment, unless of course a guest would ask for an investigation, but that's rare, few and far between.

So at that point in time once a guest is treated anything over first aid would get called into security.  They would give the guest a Passenger Injury Statement to fill out and then at that point security would start the investigation.  They would take statements, take photographs, visit the area.  It would depend on the investigation.  That's generally how it works.

Q.   And in this case Ms. Cole did fill out a Passenger Injury Statement?

A.   She did.

Q.   As part of the statement it asks whether there were witnesses to the incident?

A.   It's one of the questions, yes.

Q.   Are there any crew members listed on that statement filled out by Ms. Cole?

A.   I don't believe so.  I believe it only said "guest," if I'm not mistaken.

Q.   There was a request made during discovery regarding the identity of the assistant server within the area that Ms. Cole was seated.

Did Carnival undertake an investigation to try and uncover who this assistant server was?

A.   We did.  I personally reached out to the food operations department to get a schedule for that day, to get names of any of the servers that would have been assigned to that area.  We had 12 names.  We looked into it.  We contacted them.  Some of these people were still on vessels, were still under contract but on vacation, and there were some that are no longer with Carnival, but we still had contact information for them and we did the best that we could to try and ask if anybody remembered anything.

Q.   So despite Carnival having no onboard record of any employee witnessing the incident, Carnival did undertake efforts during discovery to try and uncover who this person was that Ms. Cole identified?

A.   Yes, we did.  And just to add unfortunately it's not like a sit down restaurant where, you know, there are assigned waiters

to tables.  This is kind of an open deck, you know, seating area.  These waiters and servers would kind of roam around the area so there's nobody really assigned to this table.

The best we could do is grab the schedule from that day, go through the names and ask everybody if they remember any sort of issue on -- you know, on their contract.

Q.  As part of your position with Carnival you were also performing prior incident searches at the request of plaintiff's counsel in discovery?

A.  Yes.

Q.  Did you do one in this case?

A.  I did.

Q.  Tell me what the search was and what the results were.

A.  So we did a five-year search.  It would be five years before the incident for the class of vessels, and it would have been for any objects that would have hit any passenger.  For that time period there was nothing other than the plaintiff's incident that came up.

Q.  And there's nothing that includes no incidence involving the plastic container that we have at this trial?

A.  Correct.

MR. JARNAGIN:  Thank you, Ms. Borcegue.  That's all the questions I have for you.

THE WITNESS:  Thank you.

CROSS-EXAMINATION

BY MR. DIEPPA:

Q.   Ms. Borcegue, did you bring any documents to help you testify?

A.   Do I have anything personally?  No.

Q.   Okay.  You have nothing with you there?

A.   No.

Q.   Okay.  So you don't have the logs you referenced regarding the wind with you today?

A.   Not as -- not sitting up here, no.  They're accessible, but --

Q.   You don't have them as we sit here today, you didn't bring them with you up on the stand?

A.   Not printed, no.

Q.   They're not in evidence, correct, as far as you know?

A.   I don't know.  I don't know what is or isn't.

Q.   Okay.  Do you know the name of the captain that was piloting with Conquest on July 24, 2022?

A.   Not off the top of my head.  That's information that we do have.  As a company we can look that up, I just don't know the name of the captain.

Q.   So how did you consult with the captain if you don't know his name?

A.   I didn't consult with the captain.  That's not --

Q.   How do you know what the captain did that day or didn't do?

A.    We're talking about the deck logs.  We're not talking about the captain.  I never said I spoke to the captain.

Q.    Ma'am, you testified that it's up to the captain what to do in the face of certain winds; correct?

A.    I testified generally that it's up to any Carnival captain at any point in time on any of our vessels.

Q.    Okay.  If you don't know who the captain of the Carnival Conquest was on July 24, 2022, and what he did that day, how would you know it was reasonable and how would you know how fast the winds were going?

A.    Because we have deck logs that are reported and that I have reviewed which don't say anything about the decks being shut down for high winds.  They don't note anything about any rescue operation which is something we looked for.  They note obviously what the winds were at 5:00 and at 6:00.  As I explained, it's an hourly automatic entry that gets put into the bridge navigation logs that would show wind speeds and the ship's direction and all of that.  That's what I was talking about.  I never said anything about speaking to the captain himself.

Q.    Okay.  So, just to be clear, you've never actually spoken to the captain of the ship that was responsible for the ship on the day in question?

A.    No, I have not.

Q.    Okay.  So you wouldn't know whether or not he thought it

would have been reasonable or not to alert the cruise employees or alert the ship that a portion of the ship needed to be closed?

A.   Well, that was not noted in the deck logs.  That's something that gets noted, that's something I have confirmed with the current staff captain onboard the Conquest to -- kind of explained to me the process, and the process would be if at any point in time, any captain, again, on any ship, this is general information, decides to shut down any open deck area, decides to do anything about any extreme weather, that would all be documented within the deck logs.

Q.   You have no personal -- sorry.  Go ahead.

A.   They have a duty to document all of this, if anything happens navigation-wise or, you know, technically, or anything like that, they document everything on these deck logs.  And on that day there is no indication that the winds reached 35 knots.  There's no indication that the captain closed or asked to close any of the outer decks or anything like that.

Q.   I just want to be clear here, you have never actually worked onboard a cruise ship?

A.   Other than for ship inspections, I'm still working shoreside.  I'm going onboard for work, but I've never been a crew member on the cruise ships, no.

Q.   You've never worked on the bridge of a ship; correct?

A.   No.

Q.   You have no information as to how a captain can make a determination as to whether or not the conditions are safe enough for the passengers, you don't have that expertise, do you, ma'am?

A.   As far as expertise when, you know, onboard a ship and when to close things down?  I personally do not.  It would only be information that I've asked of the officers onboard now to assist me in this case.

Q.   And you haven't identified an expert here in this trial that would even be able to comment or opine as to whether or not it would have been safe given the wind conditions on that specific day to close the decks or not, that's not an expert that you brought with you here today; correct?

A.   I don't believe so.

Q.   Okay.  So we know you didn't speak to the captain for the bridge of the sip, the Carnival Conquest, who was assigned to the Carnival Conquest on July 24, 2022.

Did you speak to any members -- any other ship's officers regarding this incident?

A.   Not any officers that would have been present at the time. Just -- again, just to get general knowledge of how everything works and to obtain the deck logs and all of that, that would be the staff that's currently onboard the ship now, but I'm not sure if they were even the same ones onboard at the time.

Q.   Okay.  And you agree with me when I spoke to you and we

placed you under oath at deposition -- and we will go through your 30(b)(6) notice in a moment -- I asked you specifically what the wind speed and you told me that you didn't know, that Carnival didn't know; correct?

A.   I told you as --

MR. DRAHOS:  Objection.

A.   -- I sit here today I don't have that information in front of me or with me.  I don't recall exactly what I said, but I know that I didn't have it with me that day since they had not been requested.

MR. DIEPPA:  Okay.  Someone could -- oh.  Is there anyone there to turn on the screen?

THE COURT:  So we're now at podium?

MR. DIEPPA:  No.  It's still plaintiff.  I just have a cable.

THE COURT:  Oh, okay.

Before we put this up on the screen, what are you doing?

MR. DIEPPA:  I'm going to show her her --

THE COURT:  -- her own --

MR. DIEPPA:  -- her own testimony.

THE COURT:  Which we already saw.  It's already in evidence.

MR. DIEPPA:  Is it in evidence, Your Honor?

THE COURT:  Well, she -- her -- her --

MR. DIEPPA: If it's already in evidence --

THE COURT: -- deposition was played; right?

Are you going from the deposition that was already played?

MR. DIEPPA: I am, Your Honor.

THE COURT: So it's already in evidence because it was already played.

MR. DIEPPA: That's fine, Your Honor. If that's the Court's ruling I will move on.

THE COURT: Because normally I would say did she testify inconsistently with what she just said. Is that what you're about to suggest?

MR. DIEPPA: I mean, it's not what she said in her depo, that's for sure.

THE COURT: Okay. That's fine.

If you're going to impeach her that's fine. And he's impeaching her with something that's already in evidence so we are fine.

BY MR. DIEPPA:

Q. When you sat at your deposition, your 30(b)(6) deposition, you did not tell me on behalf of Carnival what the wind speed was on the subject day; correct?

A. No. And I specifically remember saying "as I sit here today I don't have them available."

I never said they weren't available. I never said anything

like that.  I don't want to misstate my testimony.  I would have to review it, but I'm pretty sure I even said I can get that if possible.  I know I said that about something, I just can't -- there's a lot of testimony I can't remember.  But --

Q.  Okay.  Page 73, starting at line 5, you recall that being your testimony?

"I'm not aware of any information about weather.  They don't really keep weather reports.  I think they only keep the navigational deck logs which would record certain weather conditions, but they do it on an hourly basis.  I'm not sure if we have the information for the exact time of the incident."

That's what you said?

A.  Right.  That's not inconsistent with what I just said.  We have hour -- it's on the hour information in the deck logs. What I clearly said there is I'm not sure if we have the information for the exact time of the incident.  Meaning if the accident would have happened at 6:22, there's no, you know, entry for 6:22 p.m.  However, there will be one for 6:00 and there will be one for 7:00.  That's how the deck logs operate.

So, again, we don't have any weather reports.  I already said that today.  And the navigational logs are everything I have been discussing.  We have access to those.

Q.  And you're a -- as you said, you're a paralegal that works for Carnival, that's your main job, handling litigation and doing inspections and things of that nature?

A.   I do paralegal work, but I'm not a certified paralegal. That's not my title.

Q.   And you participated in the preparation for this case I assume?

A.   Yes.

Q.   Okay.  So you would have known that there was a pretrial disclosure requiring a listing of evidence and listing of exhibits, things like that?

A.   Not exactly.  I'm not an attorney so I don't do --

Q.   Did you sign any interrogatories in this case?

A.   I do.  I assist with research, but I don't have any involvement in pleadings or anything like that.

Q.   Okay.  And -- and you sat here I guess when we started on Wednesday, and you reviewed the exhibit list there?

A.   I have not seen the exhibit list, actually.

Q.   Do you know if anywhere on the defense exhibit list is an exhibit entitled "wind speed logs for July 24, 2022"?

A.   Again, I'm not a lawyer.  I'm not the lawyer on this case. I'm the corporate representative.  I don't do those preparations and I don't do anything with pleadings or anything like that.

Q.   And you recall when I deposed you and I asked you if you were prepared to testify regarding the topics in the 30(b)(6) notice, you recall that, ma'am?

A.   I do.

Q.   Okay.  And on the 30(b)(6) notice you confirmed that you were the appropriate representative to testify regarding these topics, No. 16 which would have been:  "The identity of any employees or other witnesses who were present"; correct?

A.   Correct.

Q.   Now, did you hear the testimony of Ms. Bhatia?

A.   I did.

Q.   Okay.  Did you hear her discussion about the other workers that were involved in the incident?

A.   I did.

Q.   Okay.  Do you recall me asking if you knew the names of any of the workers that were involved in this incident when I deposed you?

A.   When you asked me or when you asked --

Q.   Well, I also asked you at your deposition, do you recall that?

A.   I don't recall exactly what you asked me during mine.  I don't think we had any information at that point in time.  If you're asking me about the maitre d', I know that you asked her by name and she did kind of remember some and didn't remember everybody, but she couldn't remember whether it was a man or woman that actually came up to her that day.  So --

Q.   And I also asked you to testify regarding Carnival's policies and procedures, Section 19?

A.   Sure.

Q.   And you confirmed that you were the appropriate representative.  And that section included training of employees securing of cargo, warning of dangerous conditions on the vessel, monitoring areas of the vessel for dangerous conditions, and maintenance of the subject vessels common areas.

You were designated to testify on all those topics; correct?

A.   That's correct.

Q.   And when you -- when you talked about the wind speeds and the captain and all those things, this figure you said about a of 35-mile per hour limit on the restriction, you agree that you did not identify that during your corporate rep testimony; correct?

A.   No.  I don't believe we had that information available when I was deposed.  It's not something we had looked into at that point in time.  And like I told you that day as I sat there today I did not have the information from the deck logs.  But those are available to us at any time if we ask the ship for them.

Q.   What about Carnival's written procedure that when winds go over 35 miles per hour the lido deck needs to be shut down, did you bring that with you?

A.   There is no written procedure.  I believe that was a question that was asked and I answered.  There's no written

procedure because the captain has that decision to make basing it on wind speeds, on wind -- it's wind force, wind direction, it's the ship's course and it's the ship's speed.  So basing it on all of that is when the captain makes a determination.  It's not always the same and it's not -- you know, it's not a set number.  It's at their discretion.  They're the ones who know best.

Q.   The captain would be the one who would know best whether or not it's too windy for the guests to be outside; correct?

A.   That is his job.  It's his decision to do that.  There is no written procedure.

Q.   And that's something that Carnival has been aware of well before this incident; correct?

A.   That's it's a captain's job to make sailing decisions or --

Q.   That it's the captain's job to look at the winds and shut down parts of the deck when it's too windy, that's something Carnival has always known; correct?

A.   That's one of his job duties amongst many other things, sure.

Q.   And you would agree that the captain has the discretion regardless of whether or not the winds hit 35 miles per hour or not to close certain parts of the ship in the interest of the safety of the passengers; correct?  The captain does have that power?

A.   He has the power to do, yeah, basically whatever he wants;

however, I'm not sure why he would ever close anything if it's not a safety issue.

Q.   Well, you're not sure because you never spoke to him?

A.   Well, no.  That's not what I'm saying.

Q.   Did you speak to him, the captain of the ship?

A.   No, I didn't.  But what you're asking me is a little different than that.  I don't think that I need to speak to the captain.  If it's a sunny day, sure, the captain can close down the lido deck, but why would he?

Q.   Well, I'm curious because --

A.   On that day there was no reason for him to shut down the lido deck or he would have for the passenger safety.

(Stenographer clarification.)

Q.   And, ma'am, I'm curious because you told me you have absolutely no experience working on a cruise ship, you have absolutely no experience working as a captain or a first officer, you have not talked to the captain of this ship or his officers, so how could you speculate as to what this particular captain would have done on this particular date with this particular set of conditions, ma'am?  How could you do that?

A.   Respectfully, sir, with common sense.  It's everything I've already testified to and explained.  If there's no notation in the deck logs about anything that day, then, you know, we can infer that nothing happened if it's not noted.

Q.   And I'm just saying as respectfully when you say what the

captain would have done, that's not essentially based on anything, it's not based on your professional experience, and it's not based or your personal knowledge of speaking to the ship's officers?

A. It's -- again, it's based on the fact that it's not noted in the deck log. Anything that we're discussing, had anything been shut down, had winds been too, too much, had it been a safety risk, it all would have been documented in those deck logs and none of that was documented meaning there was nothing to document.

Q. Do you know the location of the instrument that measured the wind allegedly on the ship?

A. No, I don't have that information.

Q. Okay. Well, I mean, it's a large ship; right? The Carnival Conquest is a massive ship?

A. Right. And they have the technology to, you know, sail the ship and gather this information. It's --

Q. Do you know if the wind was being collected from the bow of the ship, from the stern of the ship, from the ship's bridge, do you know?

A. I'm not sure exactly how that works.

Q. We played your deposition testimony earlier. You don't have any reason to dispute the veracity of what you said in your deposition, at least the portion that was played in this trial?

A.   I testified the way I did and I don't see anything incorrect or inappropriate about what I testified to.

Q.   Okay.  And you said there was no notation about the Carnival Conquest pausing to rescue a vessel or not rescue a vessel, but once again you did not verify that with the staff of the ship to see if that actually had happened or not?

A.   I verified that through the deck logs.  I asked the ship for the deck logs for that date, and the fact that nothing was documented means nothing occurred.

Q.   What I'm asking specifically is not about the deck logs. I'm asking if you spoke to any people that were on the Carnival Conquest.

A.   No.  I've repeatedly explained that, no, I did not ask anybody.  But, again, it is something that those people would have noted on a deck log.  So since there is nothing of notation in the deck log, there's nothing -- there's nothing there.

Q.   Is it your -- is it still your position that a passenger should know because everyone knows and it's common sense that if you walk on a windy deck something can fly up and hit you? Is that still your position?

A.   Absolutely.  Personal responsibility and self-awareness is a thing.  It doesn't just go out the window because you're on vacation or because you are on a cruise ship.  Especially people that have been out on the deck for two, three hours

before and knew that it was windy. I believe Ms. Cole's husband himself testified he had been out there and it was windy. So it's not -- wind isn't something unique to a cruise ship. You can walk outside this courtroom, and if it's windy you can expect, you know, wind to pick items up and that's just how it works. It's just common sense.

Q. Yeah. And that's something that everyone knows, including Carnival; correct?

A. Correct. It's common sense for everybody.

MR. DIEPPA: Thank you.

THE COURT: Are you done with cross?

MR. DIEPPA: Yeah. I'm done. I'm sorry, I thought I -- I should have said no more questions.

THE COURT: Oh, we were like there was some dramatic pause.

Okay. Do you have redirect?

MR. JARNAGIN: We do not.

THE COURT: I have a question, and I don't know if it requires her to stay up here or not.

Was there a discovery request for deck logs?

MR. DIEPPA: There was no -- other than the inquiry, the 30(b)(6) deposition, I can represent that there was no specific request for deck logs, Your Honor. Because --

THE COURT: And in the 30(b)(6) notice which you just showed a piece of, was -- did you request a corporate rep -- a

representative with information regarding the wind speed?

MR. DIEPPA: It was regarding all -- I would say yes indirectly because it was regarding all the allegations in the plaintiff's complaint which at the time was that it was windy. And that is what was requested, Your Honor. And I can provide the Court a copy of the 30(b)(6) notice.

THE COURT: I would like to see a copy. Anyway it should be marked for identification because you just referred to it.

And then was there a request in the 30(b)(6) notice for someone to testify about Carnival's procedures when it is windy? Is that in the 30(b)(6) notice?

MR. DIEPPA: Other than -- I have it here, Your Honor -- policy and procedures -- there was nothing specific to wind, I don't believe, other than dangerous conditions which we wanted -- we had, you know, Section 19 was regarding the policies and procedures regarding the securing of cargo, warning of dangerous conditions on the vessel.

THE COURT: So -- so you testified -- so I have a couple of questions.

First of all, when you refer to "deck logs," is that the log kept by the captain on the bridge? Or are there logs for each deck of the ship?

THE WITNESS: No. It's kept -- it's an electronic log. So it's --

THE COURT:  Okay.  So it's not like a deck log for Deck 9 --

THE WITNESS:  No.

THE COURT:  And then -- yes?

MR. DIEPPA:  Sorry.  There was one other relevant category and I'm going to have to e-mail this to the court to mark it for ID.  I don't have it printed.  Category 13 was: "All evidence, facts or witnesses supporting any assertion by the defendant that they did not have notice of the dangerous condition alleged in the plaintiff's complaint," and 14:  "Evidence, facts, and witnesses supporting any assertion by the defendant as to the duration of time the dangerous condition alleged in the plaintiff's complaint existed."

None of this was objected to, Your Honor.

THE COURT:  No.  Well, okay --

MR. JARNAGIN:  We did file a notice of objection.

THE COURT:  Well, then your testimony is that the procedure is when -- whether it's written or not -- is that when the wind speed gets to approximately 35 knots then the captain considers closing the outdoor deck areas; is that right?

THE WITNESS:  He can.  It depends on, again, the ship's direction, the course, the wind direction.  All of the factors play into it.  So that's why it's at their discretion and it's not -- it's what I said, it's not a magic number.

THE COURT:  Right.

THE WITNESS:  There's no like written procedure or anything like that.  It's always at the captain's discretion.

THE COURT:  Right.  But based on your looking into it as the corporate representative, 35 knots seems to be a number where the captain starts thinking about this may be dangerous conditions?

THE WITNESS:  Correct.

THE COURT:  So -- all right.  Well, thank you.  You can step down.

THE WITNESS:  Thank you.

THE COURT:  So going back to your point about -- and there's still more witnesses to come, I know, including the security officer, I know.  But I just want to kind of close the loop on your point regarding whether an adverse inference or any inference would be appropriate.

It doesn't sound like you ever requested the deck logs. Just because you mention in the complaint that there were dangerous conditions and you mention that it was windy, I don't find that that should have put the defendant on notice that you wanted the deck logs, or it doesn't sound to me like you asked for any record that the defendant kept regarding the weather. And to ask them to guess that you might want it because in your second amended complaint you mention that it was windy, I don't -- I don't --

MR. DIEPPA: Yeah. And, Your Honor, just to speak to that point, and you're correct, there was no-follow up request. And there was no follow-up request because of the statements made at the 30(b)(6) deposition that they didn't know.

THE COURT: Well, okay. Let's talk about that.

She still doesn't know. She doesn't know what the wind speed was at 6:20 p.m. when this allegedly happened. What she knows now -- and I'm bringing this up because that -- you know, she did -- Carnival did go back and do some research based on your case in chief, but it is -- I agree with the witness that it's consistent. In her deposition she said that sitting there at that point she didn't know and she said they don't keep a minute-by-minute record of the wind speeds, but they keep an hourly -- the logs, they log it hourly. And that's what she came in here today and said, they keep it hourly and at 5:00 it was this speed and at 6:00 it was this speed. But it's not inconsistent with -- and as she sat there day at her deposition which is why I was asking about the 30(b)(6) notice, she did not even have that hourly information because you didn't request her to be prepared with it when she came in and testified. Your 30(b)(6) notice did not ask for somebody to come in prepared to testify to what the wind speeds were at any given time.

So I don't -- I mean, I find her testimony was consistent with her deposition testimony. And you -- you

haven't shown me anything that says she should have had that information on the day she testified.

MR. DIEPPA:  Your Honor, one point on that.  There was a request for document production, Schedule B, under Rule 30(b)(6) at the deposition.  And that requested all policies and procedures, it also requested for the witness to bring any documents, photographs, et cetera, that she would require to provide testimony on the above topics.  It asked her to bring those documents with her to the extent she had them.  Now --

THE COURT:  All policies and procedures?

MR. DIEPPA:  Once again --

THE COURT:  Come on.  I would have objected if I were the other side.  That's a very broad request.

MR. DIEPPA:  As you can see from the transcript there was no objection.

But my last point on this, Your Honor, and I'm not really going to argue with the Court on what the witness said or didn't say, is that -- and this came up yesterday.  30(b)(6) depositions are special.  They have a very special place and position under the Federal Rules of Civil Procedure.  When you take a 30(b)(6) deposition you are entitled to take the testimony of the corporation at face value.

If -- there's another rule that allows if there's a change in the testimony for the witness to file an errata sheet and to alter that testimony before trial.  There's also a

large body of case law -- and I can show it to you, Your Honor -- that most of the time if there's a material change in the corporate rep's testimony it's prohibited to file any testimony that contradicts it or changes it.  And there's a body of case law and I can pull up that case law.  I've had to deal with this issue before.

THE COURT:  Why are you telling me all this?  I just told you that I found that her testimony was consistent.

MR. DIEPPA:  It was not the same, Your Honor.

THE COURT:  I was looking at -- I heard her deposition testimony, I was looking at it on the screen as she was testifying, and she today and during her deposition said -- at her deposition she said I don't know what the wind speeds were, but there is a deck log where it would record -- this is not her exact words.  But she told you that there was a deck log that would record it hourly.  If you didn't go and follow up afterwards and ask for that deck log, you didn't even ask for it on the record, can I have that deck log that shows me the hourly wind speeds, that's not on her.  She came in today and again said there's a deck log that keeps the hourly -- the information hourly and now today she was prepared to tell you what the hourly wind speed was.

Now, I agree that that's bordering on, you know --

MR. DIEPPA:  The other issue, Your Honor, is regarding the captain's procedures which she also testified to --

THE COURT: Hold on. Let me finish my thought because I don't want to make it sound -- I didn't want that to sound like I was about to say anything -- like she said wrong.

I find that that is all consistent. There's not an inconsistency there between her 30(b)(6) deposition testimony and her testimony as the corporate representative here in trial.

What I was going to say is that there is a difference, what a corporate representative does at a deposition and what a corporate representative can do at trial is actually different. She can speak for the corporation both times, but it is true that when she is testifying in trial and she hasn't been given a list of things to be prepared for to speak on behalf of the corporation about she shouldn't be speaking to things that are not policies and procedures, you know, and are not within her own personal knowledge. So there -- it may be debatable whether, you know, she has personal knowledge of what the wind speeds were at 5:00 and 6:00. Nevertheless -- and you did object to that, to her testifying about things that are not in her personal knowledge before she started. Nevertheless I don't see any prejudice from it. It was information you wanted to know anyway. Now we know what the wind speeds were.

And then she testified about policies and procedures which is where you are going next. And, again, not inconsistent with her deposition. You didn't ask her about the

policy of when -- what wind speed does the captain shut down a deck.  That's something she can testify on behalf of the corporation about because it is a policy and procedure.  And she did it today.  She said there's no written policy, but generally the policy is that around 35 knots he starts making decisions from the bridge about whether to shut down decks.

Doesn't sound like there's any policy about when the captain tells everybody to start strapping things down.  Sounds like that just happens on a day-by-day basis, but she did not testify that there's a policy like at a certain wind speed there's an instruction to everybody to strap everything down.

So I don't think there's anything you requested that you didn't get previously.  She now gave you some of the things you wish you would have requested.  I don't see the prejudice.

MR. DIEPPA:  Your Honor, just on the captain's policy, those were discussed on page 79 and 80 of her deposition, part of which were played.  And just -- you know, and I think the Court sees this, that that 35 mile per hour figure there was not in that testimony.

THE COURT:  It wasn't, but it wasn't asked.

MR. DIEPPA:  I mean --

THE COURT:  And, by the way, where is the harm on that now?  Because nobody has said, not your case, not their case, nobody has said that the winds ever reached 35 miles an hour.

MR. DIEPPA:  Oh, yeah.  We didn't.  Nobody has said

that.

THE COURT:  It kind of --

MR. DIEPPA:  And the other question is -- obviously is that a reasonable or safe policy.

THE COURT:  That's not --

MR. JARNAGIN:  All right.  This is closing argument.

THE COURT:  We are not there on this.  We can argue about this all day.

MR. DIEPPA:  No.  I understand, Your Honor.

THE COURT:  I just wanted to make sure to address your point which was well taken that you want -- you know, we don't want a corporate representative not being prepared to testify about things at her deposition that you asked her to be prepared for, I find that that did not happen.

And you didn't -- there's no indication that you followed up and requested specific things like the deck logs or like the information regarding the hourly wind speeds so the fact that you didn't get it before today, I find that there was -- they didn't do anything wrong in that regard.  And anyway at the end of the day now she has given you that information and I don't see the harm.  It wouldn't have changed.

MR. DIEPPA:  Your Honor, I -- you know, I will go through the rest of my discovery.  But I understand Your Honor's ruling.  Thank you.

THE COURT:  And then just to close the other loops with regard to the videos, and maybe the security witness will also testify to this, but I think she closed that loop.  There are no video CCTV cameras on the lido deck so that doesn't exist so there can be no adverse inference based on them not producing those.

And regarding the identification of the employee, she testified that they searched to try and figure it out and they didn't have enough information on which to do that.

So to the extent you were prematurely asking for an adverse inference, based on her testimony today I think she closed -- "her" being the corporate rep, closed the loop on this.  All right?

Now we're at 1:05.  Let's take a lunch break and we will pick up.

You have a video next?

MR. DRAHOS:  Yes, we do.  And then we have our live witness.

THE COURT:  Okay.  Is there something else?  I think I've done all of your -- you didn't need to respond if you didn't want to.  I was paying very close attention to the issues that he raised.

MR. DRAHOS:  Okay.  Thank you, Your Honor.

When do you want us back?

THE COURT:  Whenever you guys want.  I can -- I need to

give the court reporter a minimum of 30, 35 minutes.  She's going to hate me and never work for me again.

Want to come back at 1:45?

MR. DIEPPA:  Works for me.

MR. DRAHOS:  We would like to come back as soon as the court reporter is able to eat and rest.

THE COURT:  All right.  So let's say 1:45, and if we all roll back in here early -- hasn't happened yet on my end, it's always been my fault -- then we can get started when we are all here.  But no later than 1:45.

(A luncheon recess was taken from 1:05 p.m. to 1:54 p.m.)

COURTROOM SECURITY OFFICER:  All rise.

THE COURT:  All right.  Welcome back, everybody.  You can be seated.

MR. DIEPPA:  Good morning, Your Honor -- good afternoon, Your Honor.  Sorry.

Your Honor, before the next witness goes on I just wanted to put a couple more things on the record regarding the last witness, if I may?

Just I wanted to make sure for the record there was an objection to the testimony of Carnival's corporate representative concerning the subject matter that's outside of the realm of lay testimony, specifically ship operations, meteorology and things of that nature.  The corporate representative is not qualified and there was no expert on

those topics so I think that objection needs to be raised.

Concerning the discovery request, which we will provide a copy of them, under Rule 26, there's a continuing duty to supplement all discovery request. There were multiple discovery requests for all documents supporting Carnival's affirmative defenses in this case which we will provide and obviously there would have been -- with that a continued duty to supplement as to that. That is all.

THE COURT: All right. So noted. And the objection regarding her testimony is overruled for the reasons we already discussed.

All right. So let's call -- or it's a video?

MR. DRAHOS: Yes, Your Honor.

Defense would call security officer Vikram Thapa by way of deposition testimony and we intend to play his video.

THE COURT: Yes.

MR. JARNAGIN: And also just for the record we designated portions of Mr. Thapa's deposition and plaintiff's cross designations are included all within it so the entire deposition is playing.

MR. DIEPPA: Thank you.

THE COURT: Okay.

(Video deposition of Vikram Thapa was published.)

(Video was paused.)

MR. DIEPPA: Can we have a few minutes before the next

witness, Your Honor?

THE COURT:  Yes.  The next one is in person?

MR. JARNAGIN:  Yes, Your Honor.

THE COURT:  Okay.  Take five.

(A brief recess was taken from 2:37 p.m. to 2:41 p.m.)

MR. DRAHOS:  Call Dr. Courtney into the courtroom, Your Honor.

THE COURT:  Sure.

(Dr. Amy Courtney sworn by CRD.)

THE WITNESS:  I do.

COURTROOM DEPUTY:  Please have a seat and state and spell your name for the record.

A.   Okay.  Thank you.

Amy, A-m-y; Courtney, C-o-u-r-t-n-e-y.

MR. DRAHOS:  May I proceed, Your Honor?

THE COURT:  Yes.

DIRECT EXAMINATION

BY MR. DRAHOS:

Q.   Good afternoon, Dr. Courtney.  Can you please introduce yourself to the Court.

A.   Yes.  I'm Amy Courtney.  I am a biomechanical engineer.

Q.   And who is your employer, Dr. Courtney?

A.   I am employed by Exponent, which is a scientific and engineering consulting firm.

Q.   And how long have you worked for Exponent?

A.   11 years.

Q.   Can you provide us with the benefit of your educational background starting with college?

A.   Sure.

I completed a bachelor's degree at Michigan State University in engineering mechanics.  I used my electives to take anatomy, human physiology biomechanics course, and did four years of biomechanical laboratory research during that time.  For graduate school I went to Harvard University and was enrolled in a joint program between Harvard, MIT, and Harvard Medical School.  These are all within a few miles of each other in the Cambridge, Boston area.

In that part of my education I completed two years of coursework at Harvard Medical School along with other MD and PhD students.  I also took advanced mathematics and engineering coursework and completed laboratory research at the Beth Israel Hospital which was one of the teaching hospitals of Harvard Medical School.

Q.   So tell us how this program, this joint program with MIT and Harvard works.

A.   Sure.

It's called the medical engineering and medical physics program, and a PhD or MD student can enroll either through Harvard or through MIT, and they form one cohort, one class each year and then they go through their studies together.

Q.   So when you started at Harvard in this program, were you in the same classes as students who ultimately became medical doctors?

A.   Correct.

Q.   Okay.  And what did these medical courses entail?

A.   Human anatomy and physiology, and then pathophysiology, meaning what goes wrong with various body systems.  There were whole courses dedicated to various body systems, and that included studies then of radiology and of pathology at the cellular level and it also included clinical training at a local hospital there in Cambridge.

Q.   Tell us about the clinical training in particular.

A.   It was at the Mount Auburn Hospital, and it was the kind of thing that medical students go through where we actually, we learned to take a history and physical of patients and took care of patients under the oversight of physicians.

Q.   So what is the name of this degree when you're finished?

A.   I have a PhD in medical engineering and medical physics.

Q.   So it's a doctorate?

A.   A doctorate.  Correct.

Q.   Okay.  And who actually signed your doctoral diploma?

A.   The medical engineering and medical physics diploma was signed by the dean of Harvard as well as the director of that joint program.

Q.   So are you a medical doctor?

A.    No.

Q.    Are you making any medical diagnosis in this case?

A.    No.

Q.    So can you explain to us what biomechanics is.

A.    Sure.

The name kind of says it all.  "Bio" refers to life or tissues, living tissues.  "Mechanics" has to do with the application of that branch of physics toward and combining the study of biological tissues using principles of physics.  So the way that a mechanical engineer might apply those skills to materials and structures like a car and the components that go into a vehicle, I apply those similar principles to study of the human body on various levels; the tissue level, the joint level, and the whole body level.

Q.    So can every engineer who has some physics experience call themselves a biomechanical engineer?

A.    Well, I guess you can call yourself what you want.

Q.    What is it about your particular training that allows for you to call yourself a biomechanical engineer?

A.    Biological tissues have unique properties like other materials, and in particular, they're living.  And so the physiology of those tissues and the effects of ageing and disease on those tissues effects the mechanical properties at the material up through the structural level.  And so both the unique properties of the tissues themselves as well as the

effects of the physiology are important to correctly evaluate biomechanical applications.

Q. So explain for us then what the difference is between biomechanical science and clinical medicine.

A. Sure.

Because I have been involved in quite a few studies involving, you know, living people and whole people.

But in this context the biomechanical engineer, if we're talking about an event and an individual who has sustained an injury or says that they did, the biomechanical engineer is interested in the event. You know, what were the forces that were brought to bear or that resulted from an individual interacting with their environment and then what is the potential, is there a biomechanical mechanism for that to result in an acute pathology or injury. Whereas a physician, at least in my experience, a patient usually initiates a visit or maybe emergency services due and the physician evaluates the individual as they present and then tries to figure out what made may be wrong or what their complaints are and treat them from that point.

Q. Okay. So let's talk about your employment experience.

You told us about Exponent, but where else have you worked?

A. I worked for about 25 years in research and teaching prior to joining Exponent, and right after my research at the Beth Israel Hospital I did postdoctoral studies and research at the

Cleveland Clinic at their main campus in Cleveland, Ohio.  They have a research institute there.  I did that for a number of years.  I also have some college teaching experience.  I was a professor of physics at the United States Military Academy at West Point.

Q.   So as it relates to this Beth Israel employment that you told us about, is that affiliated with Harvard Medical School as well?

A.   It is.  It's one of the teaching hospitals right there in Boston.

Q.   And I think you told us that you taught physics at West Point?

A.   Right.

Q.   Have you taught anywhere else?

A.   I have.  Different things.  I've taught calculus at Harvard.  I've taught human anatomy at the college level.

Q.   Okay.  Do you hold any other professional licenses or certifications?

A.   I have a certification -- I'm a certified abbreviated injury scale specialist.  And that's a tool that is used to take diagnostic codes from medical records and categorize the severity level of traumatic injuries.  And it's used in research, and it's used in triage and hospitals, it's used in the military.  I use it for research.

Q.   And are you a member of any professional organizations?

A.   I am.   Probably relevant to this situation, I am a member of the American Society for Bone and Mineral Research and they do a lot of research on the effects of disease and ageing on the musculoskeletal system.

Q.   And have you published any peer reviewed articles related to the subject of biomechanical engineering?

A.   Yeah.   I have more than 75 articles.   And probably at least a third of them are directly related to biomechanical topics.

Q.   Okay.   And are you a peer reviewer for any scientific journals?

A.   I am.   Several.   The Journal of Biomechanics would be one example.

Q.   So let's talk about the scope of information that you reviewed in this case.

What materials were you provided in support of your opinions in the case?

A.   I was provided some information about the ship and about the incident area, some photographs as well as documentation. I was provided with medical records for Ms. Cole from the ship as well as subsequent treatment she received and sought out.   I was provided with some sworn testimony, deposition testimony of various individuals, and then I also gathered additional information on my own.

Q.   That deposition testimony that you reviewed, did it include Mr. and Mrs. Cole?

A.   Yes, sir.

Q.   Did you disregard any factual information during your evaluation in this case?

A.   No.

Q.   So tell us what was the scope of what you were evaluating.

A.   I was evaluating what the motions, what the situation -- let me start over.

The event that has been described to have occurred on the lido deck of the ship when this plastic lid contacted the back of Ms. Cole, I evaluated what that -- the nature of that contact, the direction of loading, the location of the contact and what the resulting loading on her body or the motions that may have resulted from that.  And then what I was asked to evaluate is does that provide a biomechanical mechanism for the pathological findings that were reported by her treating providers.

Q.   Have you done this type of evaluation before?

A.   Yes.

Q.   And is there a certain type of approach or procedure that you take when you are evaluating situations like this one?

A.   Yes.  It's very helpful to take the approach of the scientific method.  Even though we're not discovering new science when applied to a historical event, I can -- I have a question in front of me and the hypothesis in that method is that this event resulted in the diagnosed findings in her

medical records.  And in order to evaluate that I look at documentary evidence, testimony, as well as physical evidence and then evaluate whether that hypothesis is supported or is not supported.

Q.   And did you apply this scientific method during your evaluation in this case?

A.   Yes.

Q.   In formulating your opinions did you render any independent medical diagnoses?

A.   No.

Q.   What source of medical information specifically did you rely upon in formulating your opinions?

A.   I used the medical records to inform me of what the findings were and so that included -- in addition to I considered the statements that were recorded in the medical records about the nature of the event.  So that included I think three different statements that were obtained the same day from various shipboard documents and then the emergency room that she went to the next day and then both the -- then CitiMed and a physical therapy and so forth.  In addition to the operative report, and the MRI report of her treating physicians, eventually I also received Dr. Chalal's report of his medical examination.  That came later.

        MR. DRAHOS:  At this time, Your Honor, the defense wishes to tender Dr. Courtney as an expert in biomechanical

engineering.

THE COURT:  Any objection?

MR. DIEPPA:  Plaintiff's objection is limited to any attempt to make any statements that require medical diagnosis by a medical doctor.  So to that extent is the objection, that she's an engineer and a biomechanic, no objection.

THE COURT:  Okay.  So she can testify as an expert.

MR. DRAHOS:  Thank you, Your Honor.

BY MR. DRAHOS:

Q.  So, Dr. Courtney, what I would like to do now for the benefit of the Court is, can you just give us a general summary of the conclusions that you reached in this case?

A.  So the primary question that I was asked to address was, "Did this incident involve a biomechanical mechanism to result in the diagnosed findings in Ms. Cole's shoulder?"

And so my first opinion is that after my evaluation, no, there was not a biomechanical mechanism present that is consistent with those diagnosed findings.

But then secondarily the question is, "She did have findings, so is there a biomechanical mechanism that is consistent with those findings?"

And I came to the conclusion that, yes, there are.

Q.  Okay.  So let's work our way through how you got to that conclusion.

Can you tell us what your understanding of the subject area

looks like, a description of it, please.

A.   Yes.   This area of the lido deck, Deck 9 on the Carnival ship is a covered area that is semi-enclosed and somewhat open to the -- it's behind a couple -- I'll call them hot tubs, and there's several dining tables with chairs arranged in the area. There are some serve stations also in the area.  It's my understanding that both the serve stations and the tables are permanently secured to the floor and that the chairs, you know, can be moved in and out for people to sit at the tables.

Q.   And where did you gain this information from?

A.   Photographs that were provided to me, as well as shipboard diagrams that I obtained on my own, and photographs that were taken by Mr. Thapa after the event.

MR. DRAHOS:  Ms. Genoese, can you put up Defense Exhibit 3-4, please.

BY MR. DRAHOS:

Q.   Dr. Courtney, do you recognize what's being depicted in the screen and previously identified as Defense Exhibit 3-4?

A.   I do.

Q.   And how do you recognize it?

A.   It was one of the photographs that was provided to me early on.

Q.   And is this the photograph of the incident scene that you reviewed in support of your opinions in the case?

A.   Yes.  And my reading of Ms. Cole's deposition, she

indicated that this chair that's on the right of the photo was actually where she was seated at the time.

Q.   Okay.  And so what is your understanding of what occurred?

A.   Well, this is not the exact scene, but it is taken contemporaneous to this event.  And you can see on that serve station there are some plastic bins and lids, and it's my understanding that Ms. Cole was seated in that chair with her back to the station and that she was beginning to eat, that she had raised a fork with some food preparing to eat.  And at that time a lid from somewhere on that serve station struck her in the upper left back area.

Q.   And where did you get this information from?

A.   A combination of statements that were given the same day in the -- and that are documented in the medical records as well as her sworn deposition testimony.

Q.   Did you evaluate the subject lid?

A.   Yes.

      MR. DRAHOS:  And, Ms. Genoese, can you put up Defense Exhibit 13-2.

BY MR. DRAHOS:

Q.   Dr. Courtney, do you recognize what's been put up on the screen and previously identified as Defense Exhibit 13-2?

A.   Yes.  I belive that's a collage that was presented in my report.

Q.   And what does that collage represent?

A.   An exemplar lid that was sent to me.  It's showing -- this is just photographs of the top and bottom of a lid.

Q.   And do you recognize that exemplar lid here in this courtroom today?

A.   It was like that one on top of the bin, just the lid part.

MR. DRAHOS:  Your Honor, let the record reflect the witness has pointed to the exemplar container and lid which is contained on the plaintiff's table and has been here in the courtroom throughout the trial.

THE COURT:  So reflected.

MR. DRAHOS:  Thank you.

BY MR. DRAHOS:

Q.   So what measurements, if any, did you take of the lid?

A.   Weight and length and width.

Q.   And how much did it weigh?

A.   1.8 pounds.

Q.   And what was the width?

A.   18 inches.

Q.   And what was the length?

A.   Not quite 26 inches.

Q.   Were these recordings consistent with the recordings that had been taken by the Carnival security staff?

A.   The length and width were.  I think the staff may have made a decimal error or -- my weight wasn't consistent with the weight that was initially reported, but I relied on my own.

Q. And how significant was the difference in weight between yours and the security staff?

A. Well, you know, once I realized there was a difference I didn't really consider that weight anymore.

Q. Okay. So let's talk about the scene itself.

How far away was Ms. Cole sitting from the serving station?

A. Less than one lid length. So that 25, 26 inches, and that is apparent from a number of scene photographs, the way that the tables and the chairs were arranged.

Q. So what does that tell you, if anything, with regard to the distance that the lid traveled before impacting Ms. Cole?

A. About 2 feet.

Q. Now, was there any evidence of bruising or swelling noted on her body documented in any record that you reviewed in this case?

A. So I relied on what was in her medical records and the medical records actually had -- they refer to as pertinent negative findings. So not only was there no finding of a bruise, but it was documented that they looked and found no bruise.

Q. And what does this tell you about the significance of the -- or strike that.

What does this tell you about the force of the impact?

A. Well, that it wasn't enough to cause a bruise. And I did some calculations about, you know, what kind of -- what speed

would that lid have had to be travelling in order to cause a bruise and that was referenced in my report and produced with my file.

Q.   So what speed would the lid have to travel in order to cause a bruise?

MR. DIEPPA:  Your Honor, I object.  There's no calculation in the Rule 26 report that was served.

THE COURT:  There's no what?

MR. DIEPPA:  That calculation that she's going to attempt to testify is not contained in the Rule 26.  There's no calculation as to force of impact or speed or any of that that I -- when I deposed her.  And I have the report here.  It's not in her written Rule 26(C) --

THE COURT:  So you're saying she's expressing an opinion that wasn't previously disclosed?

MR. DIEPPA:  That opinion as to the velocity is not an opinion she expressed at deposition, it's not an opinion that's in her report.  And I will show you the report.  It's --

THE COURT:  Well, I mean, it's one thing if it's a new opinion, like a materially new opinion --

MR. DIEPPA:  It's new.

THE COURT:  -- it was not previously disclosed. Because we're not saying that she's not qualified to give that opinion.

MR. DIEPPA:  No, Your Honor.  The issue is -- and I

half-expected this to happen. Because I did ask Dr. Courtney

if she made any calculations, and she said that she had not.

And I can -- you know, I can show you in her depo where she

said that.

She said: "I did some calculations that did not end up

in the report, but I will share with you" -- but I just want to

right now -- you know, there's nothing of an attempt to

duplicate the condition of the accident in anyway, and there's

no calculations in the report. They're just not there. So

these, I never had the chance to review the calculations or

expect that she's going to testify to it.

THE COURT: So it seems that the calculation of the

velocity, the speed at which they were travelling or the force

at which they were traveling is not the opinion that she's

actually here to give, it's what would be the result; right? I

mean, the opinion that she was disclosed for would be the

ultimate like whether what happened here, the flying of the lid

and making contact with Ms. Cole's back would cause, you know,

the level of damage or injury that could occur from that;

wouldn't it go without saying that for that she would have had

to have come up with a velocity?

MR. DIEPPA: No. I asked her: "Am I correct in

understanding that you don't have a measurement of the speed or

force of impact in the report?"

"ANSWER: In the report. That's correct."

That's on page 26 of her deposition.

THE COURT:  Right.  So she didn't put the speed in her report, but how could she have come up with her ultimate opinion about what kind of damage could have occurred if that wasn't part of --

MR. DIEPPA:  Because she didn't do that in her report, Your Honor.

THE COURT:  No.  But it's leading up to her final opinion; am I right?

MR. DRAHOS:  Yes, Your Honor.

MR. DIEPPA:  That's incorrect, Your Honor.  Because in her report she didn't mention anything about calculations, she didn't mention --

THE COURT:  Hold on.  Hold on.

In your view what is the opinion that she can give?

MR. DIEPPA:  She's -- well, it's not the opinion that she can give, it's the opinion that she's trying to give now which is an opinion that she didn't have in her Rule 26 --

THE COURT:  No.  No.  No.  Stop.

What is the opinion in your view that she can give?

MR. DIEPPA:  She can give a biomechanical opinion based on what she said in her Rule 26 disclosure.

THE COURT:  Which is?

MR. DIEPPA:  Which was that -- it's very vague, but somehow the movement could not have supported this type of

injury.  There was nothing in there about if this was --

THE COURT:  Okay.  So I'm overruling you because her opinion -- that's not her opinion that she's here to give. That's just a part of how she reached her opinion that you're aware of that she's here to give.

The fact that she didn't disclose -- we're not here to -- for a final opinion and determination of how fast was that lid going or, you know, with what -- I know there's another word for it.  I don't do physics -- but with what strength was it moving.  That's not the opinion she's here to give.  The opinion she's here to give is under all of the circumstances could the force that that thing hit Ms. Cole with have caused the damage or injury that is at issue.

MR. DIEPPA:  Your Honor, I disagree.

THE COURT:  Okay.  You disagree with me.  But I'm overruling your objection.

MR. DIEPPA:  Yes, Your Honor.  Understood.

And I would just request that the Court review the expert's Rule 26 report.

THE COURT:  Okay.  Go ahead.

MR. DRAHOS:  Thank you.

BY MR. DRAHOS:

Q.  Dr. Courtney, do you remember the question?

A.  If you could repeat it, please.

Q.  Sure.

So you had stated that there was no evidence of bruising, so the question that I asked you was what degree of force would have had to have -- the lid had to have travelled in order to have caused a bruise?

A.   So the fact that there was no bruise was documented in the medical records.  And so the speed of the lid that would result in a bruise gives me an upper bound on the severity of the incident.  Those calculations were produced with my file as part of the bases along with the literature and other bases that were sent with my file prior to my deposition.

And so that velocity or the speed of the lid was somewhere between 5-and-a-half and I think 8, 7.8 miles per hour depending on whether just the corner would have struck her versus a flatter edge.  Because if a corner strikes you then it takes a lower amount of force because it's all concentrated.

Q.   So in this courtroom it's been described by witnesses that the force of impact was like a bomb or a cannon ball was another description.

If that were an accurate comparison would you expect to see bruising or swelling somewhere on her body?

A.   Well, you asked me about my areas of publication and I said about a third were biomechanics.  My other area of expertise is blast and ballistic injury, and this is -- it's a different world.

Q.   Where specifically did Ms. Cole describe the pain from the

impact?

A.   According to Dr. Gonzalez she pointed at her trapezius muscle which is in the upper left and right on either side of the neck and going down the thoracic spine.

Q.   Is there a difference between the left shoulder and the left trapezius?

A.   Yes.   Would this be an appropriate time for me to show you that on the model or not yet?

Q.   Well, I see that you've brought a model.   Would this assist you in explaining these anatomical distinctions in the body?

A.   I think so.

Q.   And is this a true and accurate depiction of the shoulder in your experience?

A.   Mostly.

Q.   Okay.   Where did you get it from?

A.   It doesn't include every ligament and it certainly doesn't have nerves and blood vessels, but for what it does depict, it's accurate.

MR. DRAHOS:   All right.   So at this time, Your Honor, the witness with the Court's permission would like to be able to demonstrate the differences in the anatomy between the trapezius and the left shoulder.   It's been shown to counsel.

THE COURT:   Okay.

A.   So this is a model of the left shoulder joint.   And this larger bone is the scapula also known as the shoulder blade.

And in the front is the clavicle or collarbone.  And then this is part of the upper arm bone or the humerus.

The trapezius is not on this model because it's not part of the shoulder joint.  So if we extrapolate from the shoulder over to the spine, the trapezius attaches along the spine, along the neck and upper back, and it's trapezoid shape, which hence the name, and part of it does reach over to the upper part of the scapula over here.

The shoulder joint itself and the rotator cuff do not involve the trapezius.

BY MR. DRAHOS:

Q.   So from a biomechanical perspective, is there any significance to the fact that Ms. Cole is describing pain in her left shoulder, but the doctors identified the left trapezius as the area of injury on palpation?

A.   Yes.  And she also did describe in various descriptions of it being her left upper back.  So there were a variety of descriptions that were given.  And, yes, because that tells me the point of contact and then allows me to consider then given the anatomy, how is that force going to be -- is that force even going to be propagated to the shoulder joint.

Q.   So, in other words, if the force was directed towards the trapezius, could the energy somehow transfer to the shoulder and result in an injury?

A.   No.

Q.   So in using that same anatomical model can you explain to the Court the tendons that surround the rotator cuff.

A.   Tendons attach muscle to bone.  The rotator cuff, if you think of the cuff of your sleeve, it surrounds.  So there are four muscles and four tendons that form the rotator cuff.  The supraspinatus tendon is right on top here.  That's the one where 3 to 4 millimeter, like 10 percent thickness defect was documented in Ms. Cole's medical records.  The other ones are the infraspinatus, the teres minor, and then on the front the subscapulares.

Q.   Okay.  And so it's your opinion that the subject incident did not provide a biomechanical mechanism for injuries to those regions of the body.  Can you explain how it was that you came to that conclusion?

A.   Yes.  There are biomechanical studies that document how rotator cuff injuries happen acutely, what the types of loading that result in specific varieties of findings in the rotator cuff, and a remote loading to the trapezius is not among them.

Q.   So do you have an opinion within a reasonable degree of biomechanical engineering as to whether the subject incident provided a biomechanical mechanism to cause an acute injury to Ms. Cole's shoulder?

A.   It did not.  Because it was not in the correct direction, location, or magnitude to result in an acute rotator cuff injury.

Q.   Okay.  So let's talk about that.

So you said it was not in the correct location.  What do you mean by that?

A.   That is the summary of what we were just discussing in terms of the contact point being on the trapezius.

Q.   Okay.  And you also made mention of the direction being incorrect.  Can you explain what you mean in that regard?

A.   Yes.  When an acute injury happens that involves the supraspinatus tendon, the arm has to be -- the upper arm bone has to be in a certain position which is abducted, taken away from the body, externally rotated like this, and then loaded.

And so for one way that that happens in real life is a fall rearward where you land on the hand and that provides a force that is upward into that tendon causing it to stretch and potentially be damaged.

Q.   Okay.  So I want to hit the pause button for a minute, take you outside of this model for just a second.

And I want to represent to you that it's been stated at least by an orthopedic surgeon who treated Ms. Cole that she braced herself on a table and that that was the mechanism which caused an acute tear to her shoulder.

Do you agree or disagree with that theory?

A.   I saw one mention in the medical records that she braced herself with her arm after the contact.  I also saw a description in the medical records that that whole serve

station moved and struck her back, so I considered those things.

The bracing of the arm, even if the loading were enough, which it would not have been enough, even if the direction were correct. But a forward bracing of the arm does not involve the correct anatomical position or direction of loading to injure the supraspinatus tendon.

Q. Why not?

A. Well, if the -- if the arm is flexed and forward on the table, then the direction of loading up into the shoulder is posteriorly rearward directed. It loads this other tendon down here, the subscapulares, and it would not result -- it's just the wrong direction for the findings that have been reported.

Q. You also made mention of magnitude of the load. Can you tell us in terms of this lid striking her in the trapezius, would the magnitude of that load be sufficient enough to cause an acute injury?

A. Well, it didn't. There was no bruising, no abrasion, and no laceration diagnosed by her treating medical providers and I'm relying on those findings.

With regard to bracing herself, the way that she testified to it, which is what I'm aware of, was that it was a reaction to being surprised by that contact, not because the force was enough to push her body forward in a significant manner.

Q. Okay. So let me go to the second opinion that you told us

about.  Because Dr. Chalal, the expert for the defense, and there's been other doctors who have testified that there's pathology in her shoulder.

So if this incident, this incident involving the lid was not the cause, is there another biomechanical mechanism that will explain those findings?

A.   Yes.

Q.   Can you explain for us what is the other biomechanical mechanism that would explain the pathology that Dr. Chalal's identified on her MRI?

A.   Well, he wasn't the only one.  I was aware of the MRI findings by her treating physician which reported a 3 to 4 millimeter partial tear in that supraspinatus tendon on the under side.

Some of the other findings reported in the medical records were impingement syndrome and that was biomechanically significant to me as well as os acromiale, which it goes along with the likelihood that she had impingement syndrome.

Impingement syndrome just means that this space in between the acromion and the shoulder is smaller.  And so every time we raise and lower our arm in every day activities the supraspinatus tendon is rubbing back and forth.  Now, it's lubricated, but as we age and things degenerate, that friction can result in partial tears of the supraspinatus and that repetitive motion, the engineering term is a fatigue mechanism

because doing something over and over and over, that rubbing. And then the fact that her particular tendon was rubbing in a space that is smaller than usual is also consistent with that biomechanical mechanism.

Q. Okay. Doctor, have all of the opinions you've given here today been within a reasonable degree of biomechanical engineering science?

A. Yes.

MR. DRAHOS: Thank you. Those are all the questions I have.

THE COURT: All right. Thank you.

MR. DIEPPA: I think I turned this off.

CROSS-EXAMINATION

BY MR. DIEPPA:

Q. Good afternoon, ma'am.

You've made some statements about the -- the distance that you measured between the -- I guess where the cart was and where Ms. Cole was seated.

Did you ever actually go to the ship and measure that distance?

A. No.

Q. Okay. Did you read what the distance was in any of the testimony?

A. No.

Q. And you agree with me that when I took your deposition

before in this case I asked you if you had made any calculations concerning velocity, or the lid, and you told me you had not; correct?

A.   I told you they were not in the report and that I had provided bases for the statements I made about not enough to cause a bruise that was in the file that was produced to you.

Q.   Let me show you your testimony here on page 25 and 26.

MR. DRAHOS:   You have a line?

BY MR. DIEPPA:

Q.   Do you recall when I asked you on page 26:  "Am I correct in understanding that you don't have a measurement of the speed or force of the impact in your report?"

And your answer was:  "In the report.  Correct"?

A.   Yes.

Q.   Okay.  And you don't have an estimate of the wind speed; correct?

A.   I do.

Q.   Is that an --

A.   An estimate.

Q.   Is it an estimate that you came up with yourself?

A.   It's an estimate that I researched myself.

Q.   Okay.  It's not an independent opinion of yours; correct?

A.   Correct.

Q.   And you're not a meteorologist?

A.   No.

Q.   Okay.  My understanding is that that wind speed was obtained from a weather station at the Nassau Airport?

MR. DRAHOS:  Objection, Your Honor.  We didn't talk about wind speed at all so this is outside the scope of my direct.

THE COURT:  Well, she used it in coming up with her -- some of her opinions.

BY MR. DIEPPA:

Q.   Okay.  And you talk -- the wind speed measurement that you obtained, you obtained that from a weather station at the Nassau Airport; correct?

A.   That's where the data came from.

Q.   Do you know how far away the Nassau Airport weather station is from the position where the cruise ship was at the time of this incident?

A.   No.

Q.   Okay.  Do you know how far the cruise terminal is from the Nassau Airport?

A.   No.  But the wind speed was constant, very consistent over the hours preceding this incident.  So it didn't seem like there was a lot of variability going on at the time.

Q.   Okay.  You're not a meteorologist, are you, ma'am?

A.   No.  I did look up, however, the breeze that was outside today in Fort Lauderdale which was 11 miles an hour, gusting to 12.

Q.   I'm sorry, I don't think there was a question pending.

Just going back to what you put into your report or attempted to put into your report in this case, you don't even know the distance from that weather station at the Nassau airport to where the cruise terminal is?

A.   Correct.

Q.   You don't know if that's 5 miles or 10 miles?

A.   I don't know the distance.

Q.   So if you don't know the distance from this weather station in -- I guess it was the Lynden Pindling Airport Weather Station; am I correct?

Do you recall?

A.   You can show me or I can pull it up.  I think there's only one.

Q.   Okay.  Let's see.  I believe we have it here.

This is the copy that was provided to me.  Is that the one you are relying on here?

A.   Yes.

Q.   Okay.  And this says:  "July 24, 2022, Lynden Pindling International Airport Station, the Bahamas"; correct?

A.   Yes.

Q.   You would agree with me as far as you know, at least from the testimony in this case, that the ship was out in the ocean when this incident occurred?

A.   That's fine.  I also looked up Miami's and it was very

consistent so it's an estimate.

Q.   Would you agree with me that the ship was out in the ocean?

A.   I'm not sure where the ship was exactly.

Q.   Okay.  So you're not sure where the ship was.

And do you dispute that even the distance to the cruise terminal, as we can see here -- and this is just Google Maps -- appears to be about 10 miles approximate?  It's on your screen there.  You have any reason to dispute that?

MR. DRAHOS:  Again, I want to object and just --

THE COURT:  I agree.  There's really no foundation for using what this is.  You're --

MR. DIEPPA:  I will rephrase the question, Your Honor.

BY MR. DIEPPA:

Q.   Your calculation of the velocity of the lid, it depends on the wind speed at the time of the incident, doesn't it?

A.   Not even a little bit.

Q.   So how would you make an estimate as to how fast the lid was moving if you don't know what the wind was?

A.   What I estimated was how fast would the lid have had to be moving to result in a bruise.  That's what I calculated.  And I calculated that two different ways; one, just based on the weight of the lid, and one if it was the corner that caused the impact.

For context, I compared the results of those calculations to my understanding of what the wind speed was and it was quite

a bit lower.  So I was not -- that satisfied my investigation toward that end.

Q.   Did your calculation that you just mention now in any way rely on the wind speed?

A.   No.

Q.   Okay.  So what -- where did you get the speed input?

A.   That's the output.

Q.   What speed input did you use?

A.   There's no speed input.  The speed is the answer to the mathematical problem.

Q.   So what -- the velocity you used exactly, what was it?

A.   I didn't use one.  That was the answer to the math problem, not the input to the math problem.

Q.   And what was that number?

A.   I will have to look it up.  I would say 5 -- between 5 and 6 miles per hour if the corner contacted the skin, and between 7 and 8 miles per hour if it was a broader surface that contacted the skin.

Q.   And are you disputing that Ms. Cole was diagnosed with a contusion to her shoulder, back area immediately after this accident?  Are you disputing that?

A.   No.  And my medical training lets me understand what that diagnosis represents.

Q.   And let's talk about your medical training.

You agree with me that you are not qualified to offer

medical opinions in this case, that's what you told me?

A.   I am not offering medical opinions in this case.

Q.   You're not qualified to perform any medical diagnosis; correct?  That's what you told me?

A.   I'm not offering medical diagnoses in this case.  I've referred to her medical records a number of times and I do understand those.

Q.   What I'm asking is you're not qualified to do that; not if you are doing it today.  You're not qualified to do it at all, ma'am?

A.   I'm just sticking with my answer that I'm not doing that today.

Q.   Okay.  And you said you went to Harvard Medical School, but they didn't give you a medical diploma, did they, like an MD?

A.   I was not on the MD track.  I have a PhD.  That's correct.

Q.   Okay.  And you're not qualified to review radiological findings either; correct?

A.   I am not reviewing radiology findings in this case.  I'm relying on the reports that I was given to review.

Q.   I'm just asking if you are qualified to do that, ma'am.

A.   I'm going to stick to my answer.

My training does include radiological training and I have done research and published in the peer reviewed literature regarding medical imaging studies for a variety of musculoskeletal disorders.

Q. What I'm asking is are you -- are you contending that you are qualified to review MRI films?

A. To review them?

Q. Yes.

A. I would say yes. I do not make medical diagnoses.

Q. We can agree that you didn't make any attempt to duplicate the conditions of this accident; correct?

A. Physically, no.

Q. We can agree that you did not review any evidence of or medical record indicating degenerative changes to the shoulder prior to July 24, 2022?

A. I had none of the medical records prior to this incident.

Q. Okay. You would agree with me that you told me that traumatic tears occur mostly in persons with disease or aged tendons, is that what you told me in your deposition?

A. I think you were asking me about a piece of literature that says that it's more likely to occur in people with degeneration and I agree with that.

Q. Yes. I think my exact question to you was: "You would agree that in the Mall Study cited in your report he actually states some authors believe that traumatic tears occur mostly in diseased or aged tendons so you cannot exclude that possibility based on the study either" --

(Stenographer clarification.)

BY MR. DIEPPA:

Q.   I believe my exact question to you was:  "You would agree that in the Mall Study you rely on he actually states some authors believe that traumatic tears occur mostly in diseased or aged tendons so you cannot exclude that possibility based on the study either?"

You agreed to that proposition; correct?

A.   Not based on the study.  That doesn't contain enough information to reach a conclusion in and of itself.

Q.   I was asking about your response to my question.

A.   In my deposition?

Q.   Yes.

A.   It's in there.

Q.   Was that your testimony there on page 64, 17 through 22?

MR. DRAHOS:  Objection, Your Honor, improper impeachment.

THE COURT:  Are you saying that she testified inconsistent with that here today?

MR. DIEPPA:  She said in her depo "I agree."  It's to the same question.

A.   I agree that that study states that.

BY MR. DIEPPA:

Q.   Okay.

THE COURT:  I thought that's what she said today too.

BY MR. DIEPPA:

Q.   So in your report you have a line here talking about repetitive biomechanical loading over time combined with degenerative processes.

Can you tell me where you obtained the evidence indicating that before Ms. Cole had this incident there was -- she was mechanically loading or biomechanically loading her shoulder? Where do you find that evidence?

A.   Because she was living and breathing and moving around and that is the type of activity I'm talking about.  Nothing specific, just daily living.

Q.   So the fact that she was about 50 years old, that's it?

A.   I don't think I just said anything about her age.  You -- and you were asking me about repetitive motion, so the fact that she's 50 doesn't have to do with the motion.  So can you just repeat your question, please?

Q.   Did you find any -- is there any evidence to support what you wrote there in your report that you found evidence of repetitive biomechanical loading in Ms. Cole's shoulder before this incident?  So if you did, what did you review?

A.   Yes.  This paragraph in the report is kind of a topic sentence, and the rest of that biomechanical analysis section sets forth the reasoning for that.  Some of that is the peer reviewed scientific literature about findings in people who have no symptoms based on age.  Some of it is in her medical

records, the findings that her treating physicians reported, and that Dr. Chalal, relying on his opinion, that some of those are degenerative in nature, and some of those are arthritis which is also a chronic condition that can make these types of findings more susceptible.

Q.   Okay.  So, I mean, is there anything you can point to before her medical records on July 24, 2022?

A.   I have no prior medical records prior to this incident.

Q.   Okay.  Do you know how Ms. Cole was living her life or what activities she was engaged in before this as to her left shoulder?

A.   I remember her stating that at the time she was working as a phlebotomist in a hospital.  And I know she had been cruising before.  And I know that she was in three car accidents before. That's all -- I shouldn't say "I know"; I'm aware that was her testimony.

Q.   Okay.  Are you saying that it's -- are you specifically claiming that it's because of her age that she had this degenerative condition?

A.   I'm saying that age is one factor that the biomechanical literature says is consistent with these types of findings due to repetitive motion.

     The nature of the other pathological findings, I'm relying on the medical providers to say those are evidence of things that take time to develop and are not evidence of acute injury.

Q.   They're just simply evidence of things that you don't have available because you don't know anything about Ms. Cole's life before July 24, 2022, do you?

A.   Well, let me reiterate that I'm not diagnosing Ms. Cole.  I am looking at the pathology that's been diagnosed, and considering from a biomechanical perspective what types of loading result in those types of findings.  So I do know enough to come to that conclusion.

Q.   Do you -- I'm saying you don't know anything about her life.  Do you know anything about her life or --

A.   I know what she testified to in her deposition and I have given you certain aspects of that already.

Q.   Specifically what, her job?

A.   Her job, the fact that she had three car accidents prior.  The fact that she said she was feeling pretty good prior.

Q.   Did you see the -- do you know whether she injured her shoulder in any of those car accidents?

A.   She didn't specify the injuries.  She talked about legal filings that she made and that medical treatment that she had received, but I'm not familiar with that.

Q.   Did you ask for those records to review them?

A.   I did ask if they were available.

Q.   Did you review them?

A.   I was not provided with them.

Q.   Okay.  So you never got a chance to see that those

accidents she was involved in, there's nothing in the record concerning her left shoulder; correct?  You did not see that?

A.   I don't know one way or the other.

Q.   And so, just to be clear, this claim about the wind speed, you are not claiming as we sit here today that the wind was blowing at any specific speed at the moment of Ms. Cole's injury, are you?

A.   I'm not.  My research provided general context to the event for me.

Q.   Okay.  You recall that when I asked you if you had any information as to the degenerative condition of Ms. Cole's shoulder prior to the subject incident you told me that you didn't; correct?

A.   That I did or didn't?  What did you --

Q.   Did not have it.

A.   I don't have prior medical records.  The findings do give us some information in that regard, the findings reported by her medical providers.

Q.   Do you recall when I asked you on page 63 of your deposition, starting on page 62:  "And you keep saying the degenerative changes, but you don't have any information as to the degenerative condition of Ms. Cole's shoulder prior to the subject incident?

    "We can agree with that."

        MR. DRAHOS:  Objection.

THE COURT:  How is that -- that's consistent.  So if you're going to impeach her, you impeach her with inconsistent prior statements.  That's a consistent statement.

MR. DIEPPA:  Understood, Your Honor.

BY MR. DIEPPA:

Q.   So the -- as to the variable of the wind speed, you can't give us a specific figure, and then the distance you are claiming between I guess the container and where Ms. Cole was sitting, that's not a distance that you actually measured on the ship; correct?

A.   To your second question, I didn't actually measure it.  I looked at a number of photographs that gave me the proportions of the setting.  With regard to the wind speed, and you say "variable," I didn't actually use a weather reported wind speed in any of my calculations so that's what "variable" means to me.

Q.   Okay.  And the distance you just got, I guess -- I mean, were you certain that's the table where Ms. Cole was seated at?  Did anyone, you know, on Carnival like tell you that's where she was seated at?

A.   My understanding from Mr. Thapa taking her to the area and having her point out what table she was at, where she was seated, and then at her deposition she marked, she put an "X" on that seat to say that that's where she was and that her back was to the serve station.  She was facing -- her husband was

also seated at the table and maybe one other person.

Q.   You would have been able to, if you had requested it possibly, to actually measure the distance; correct?  That's something you could have done?

A.   I could have estimated it.  I am sure they would've let me go to the ship if I felt like I needed to.

Q.   Okay.  And you can agree that as far as any information, medical history indicating in Ms. Cole's history that she had repetitive loading or age-related degeneration as it concerns her left shoulder, you don't have that information; correct?

MR. DRAHOS:  Objection.  It's been asked and answered several times.

THE COURT:  It has.

MR. DIEPPA:  Okay.

THE COURT:  Whether she has prior medical history information?

MR. DIEPPA:  Well, this is specifically indicating repetitive loading or age-related degeneration and asking her if she has a medical history of that.

THE COURT:  Right.  I think she already said no to that a couple of times.

BY MR. DIEPPA:

Q.   When you made your calculations or the calculations you talked about today regarding the lid, did those include one lid or two lids?

A.   One.

Q.   Okay.  Did you review the testimony of the plaintiff's husband regarding how many lids struck her?

A.   I did.

Q.   Do you recall what he said, one or two?

A.   I believe he said he saw three lids come off and that her back was actually between the lid and his direct view.  And so he may have estimated one or two, he may have said that, but he didn't have a direct line of sight.

Q.   So are you claiming that Mr. Cole was not able to see the incident?

A.   I don't know that he saw which lids made direct contact.  And I relied on the total body of information that I had about the incident.  Had there been two lids, it would have required much slower motion based on increase mass to cause a bruise and so my conclusions wouldn't be different.

Q.   And I'm just going to go here to your Rule 26 report.

Dr. Courtney, is this your Rule 26 report that you produced in this case?

A.   It looks like it.  I don't see a number of pages here, but it looks like it.

Q.   Yeah.  I will scroll to the end.

A.   That's not the end.  My literature list is following that.

Q.   Is this your signature on the report?

A.   Yes.

Q.   Okay.  At least this section that I have shown you, 1 through 16, is that the portion that contains your written opinions that you disclosed in this case?

A.   Yes.  The -- the literature that I cited to is missing.

Q.   Okay.  As far as your opinions, can you direct me to the section in your report that contains the calculations that you testified to on direct examination regarding the speed of the lid and how hard it would have had to hit her and where that calculation is in this report?

        MR. DRAHOS:  Objection.  Again, asked and answered.

        THE COURT:  Also, is her report in evidence?

        MR. DRAHOS:  It's not.  So --

        MR. DIEPPA:  No.

        THE COURT:  So why are we going through -- I mean, if you want to mark it.

        MR. DIEPPA:  I can use it for impeachment.

        THE COURT:  You still have to mark it so I have it in the record.

        MR. DIEPPA:  Yeah.  I can mark it for ID, but I can impeach her with it.

        THE COURT:  You can impeach her with it, but just --  I mean, you know -- and, again, we are in a bench trial; if this were a jury I would be really upset right now that you have this published.

        MR. DIEPPA:  Well, yeah.  I would not publish this in

front of a jury, Judge.

THE COURT:  So why don't we mark this for identification as -- you haven't marked anything else that wasn't already listed, so it would be Plaintiff's 10.

MR. DIEPPA:  Okay.

(Plaintiff's Exhibit 10 was marked for identification.)

THE WITNESS:  And that's part of my report, Your Honor.

THE COURT:  Right.  Because what was marked was -- the defense had marked the studies cited by you, but then didn't use them.

MR. DIEPPA:  Yeah.  The studies themselves.

THE COURT:  Right.  So now I have to go to the objection.  Asked and answered.

So the question was:  "Can you direct me to a section in your report that contains the calculations that you testified to on direct examination regarding the speed of the lid and how hard it would have to hit her, where that calculation is in this report?"

So why do you need her to be directing you to where it is in the report?  She already laid out what she used to come up with her calculations, why does it matter where it is in her report unless you're telling me that it was different in her report.

MR. DIEPPA:  It was different, Your Honor.  I'm trying to make the point that I made during my objection which you

overruled, but I can lay the foundation on cross.  Because that calculation, I don't believe is in her report.  So if it is in her report, I'm just asking her to point it out for me.  But I think I should be permitted to do that given what my objection was.

THE COURT:  So can you just tell me what the point is?  So are you saying that she previously testified that it went slower or with less force than what she's saying now?  What's inconsistent?

MR. DIEPPA:  She didn't include that calculation in her report.  She didn't say that.

THE COURT:  Okay.  No.  I've already overruled this.  She already said and -- well, what I originally said was that's all a basis, something that she uses to come up with her opinions.  And then she actually clarified it for you which is that it's in all of the stuff that accompanies her report that she used in coming to her opinions.  I have no reason to deny that.  She has already told you you are not going to find that calculation in her report.  It's in the stuff -- sorry to call it "stuff," but in the things that she provided to you underlying her report.

So I've already overruled that so I am sustaining this objection.

BY MR. DIEPPA:

Q.  Dr. Courtney, do you recall how many times your opinions

have either been stricken or limited by a court in the United States?

MR. DRAHOS:  Objection.  Relevance.

THE COURT:  Overruled.

A.  No.

BY MR. DIEPPA:

Q.  Okay.  Do you recall during the time I deposed you presenting you with at least four instances, four separate cases where your opinions had either been stricken or limited?

MR. DRAHOS:  Objection.  Relevance.  It's also misstating the document.

THE COURT:  I mean, he's entitled to, you know, attack the credibility or the weight of her opinions so overruled.

A.  I remember that there were -- that I told you that I self-limit to biomechanical opinions every time I testify.  I think you brought up two examples of cases where there was an order that I had not seen that said I was not allowed to offer medical opinions.  In both of those cases none of my opinions that I offered had to be changed or stricken because I was not offering medical opinions.  That was a preemptive move to keep me from offering medical opinions.  I guess they didn't trust me.  So I remember having that discussion with you on the record.

BY MR. DIEPPA:

Q.  Okay.  I guess as I'm showing this it will be Plaintiff's

11.

THE COURT:  What is it?

MR. DIEPPA:  This is Carnival's Answers to Expert Interrogatories.

THE COURT:  And why do we need to see it?

MR. DIEPPA:  Because she identified a case where her opinions were limited.

THE COURT:  Inconsistent with what she just said?

MR. DIEPPA:  It was one of the cases which I wish to ask her about since she didn't recall it.  I just want to confirm.  I can just ask her the name of the case, I don't need to publish the --

THE COURT:  You can -- normally you would give it to her and ask if it refreshes her recollection, but, yeah --

MR. DIEPPA:  I can do it on paper --

THE COURT:  You can do it.  I mean, it's me.  If you want to tell her the name of a specific case to help her remember what happened, that's fine.

BY MR. DIEPPA:

Q.   You remember in -- at least in your answers to expert interrogatories or the ones that were filed on your behalf having your opinions limited in the case of Barry v. Chops and Hops, LLC?

A.   That was one of the cases we discussed where I testified both at deposition and at trial and I was allowed to testify at

trial. I did not offer medical opinions. And I did not have to change or withdraw any of the opinions I was offering.

Q. Okay. From my reading of this interrogatory it says your opinions were limited to -- "could not be used to offer opinions as to cause or likelihood of any medical conditions or diagnosis relating to the impact"; correct?

A. If you're reading it. It's not in front of me anymore.

Q. Would you like to see it?

A. Are you going to ask me a question about it, if you read it right?

Q. Yes.

A. Then I need to see it.

THE COURT: So this is the interrogatories that she did not prepare; that the lawyers prepared?

MR. DIEPPA: Expert interrogatory.

THE COURT: Oh, so she --

MR. DIEPPA: It was signed -- it was directed to her and provided to us.

MR. DRAHOS: Do you have a copy of this so we can see it?

THE COURT: Why don't you show it to her so she -- maybe that will help her remember or you can put it up.

MR. DIEPPA: It's up, Your Honor.

A. I see that that's the summary of that order.

MR. DRAHOS: I still haven't seen it. You have

produced --

MR. DIEPPA:  It's on the screen.

MR. DRAHOS:  I mean I would like to be able to see the whole answer.

MR. DIEPPA:  The whole answer is there if you want to see it.

MR. DRAHOS:  I would object to improper impeachment.  I think this is consistent with what she already said.

THE COURT:  I agree that it's consistent.

MR. DIEPPA:  I was just trying to confirm why she was excluded in that case specifically, Your Honor.

A.  I was not excluded.  I testified at trial.

MR. DIEPPA:  Excuse me.  Why she was limited.

THE COURT:  I mean, are you saying that she's offering an opinion here that she was precluded from offering in that other case?

MR. DIEPPA:  Causation opinions, medical causation opinions, which I'm entitled to lay a foundation here.  I'm entitled to impeach her on her qualifications.

MR. DRAHOS:  I'm going to object again --

THE COURT:  You are entitled to impeach her on her qualifications.  I mean, I see what you're saying.  I think we limited and she acknowledged that she's limited in this case also to not giving medical opinions.  I mean, I see what you are saying.  At some point she was limited maybe a little

further by another court, but -- okay.  I see what you're saying.  It's fine.  Overruled -- I mean I'm overruling the defendant's objection to that.

But you can move on.

BY MR. DIEPPA:

Q.   And you recall that you were also limited in another case, in this case your opinion was limited in the federal court for the Western District of Louisiana in Okey v. United States, Case No. 20-cv-00119?  You recall that, us discussing that?

A.   I can recall discussing it.  That was a preemptive motion. I prepared a Rule 26 report obviously in that setting for federal court and I was allowed to testify to all of those opinions.  I did not have to withdraw or change any of them because they were not medical to begin with.

Q.   Okay.  You don't disagree that in that case the court, the federal court said that you could not offer opinions about the cause of a specific injury such as whether the injury was caused by degenerative changes or a traumatic event, that was the ruling of the court as to your testimony in that case?

A.   In that individual, which I was not doing.  I was not making individual diagnoses or opinions about need for treatment or anything that is in the purview of the medical providers.

Q.   Okay.  What I'm asking specifically is you would agree that the court's order in that case is an order excluding your

opinion on those topics, ma'am?

A.   I didn't have an opinion on those topics.  It was a preclusive order.  All the opinions in my report I was allowed to offer.

Q.   Okay.  I'm going to show you a copy of the order here.

This is, again, the court's order in Okey v. United States.

Can you see the line where it says:  "Accordingly any opinions on medical causation are hereby excluded"?

A.   Yes.  And I would point out the word "any," of which there were none, and none of my opinions were excluded.

Q.   Well, that was the above opinions, wasn't it?  Specific injury such as whether --

THR COURT:  Okay.  You guys are arguing back and forth. I see what you are saying.  She was limited in that case and she is saying it didn't matter because she wasn't offering such opinion so it didn't have any effect.

But I get your point, she has been limited before from giving a little further than what we limited here.  I get it.

MR. DIEPPA:  And more importantly she's giving opinions on degenerative changes in this case, Your Honor.

THE COURT:  I heard her opinions.  I'm not so sure that's exactly what her opinion was, but I get your point.

BY MR. DIEPPA:

Q.   And you were asked about MRI films in this case.  In this case did you actually review the films?

A.   No.

Q.   So you didn't review Ms. Cole's MRI film, you just looked at the report?

A.   Correct.

Q.   You agree that in Arruda v. Michelin North America in the Circuit Court for the Ninth Judicial Circuit of Osceola County, Florida, that court ruled that you were not qualified to review a DTI brain imaging scans; correct?

A.   They did.  And I was not doing that in that case.

Q.   And you were further determined not competent to testify regarding the efficacy of DTI scans, neuroradiology diagnosis of traumatic brain injury; correct?

A.   And I did not do that either.  I did question the scientific method of an expert that they put up.

Q.   I mean, I don't expect you would try to do that if the court already had ruled you were not entitled to do that; correct?

A.   Sure.

Q.   And you would agree that in that same case, the Arruda v. Michelin North America, you were further limited to not being permitted to render any opinions as to whether the plaintiff had sustained an acute injury and/or a concussion as a result of the subject incident; correct?

A.   And I did not.  That has to do with specific diagnoses of an individual which I did not do and I do not do.

MR. DIEPPA:  Your Honor, the orders I just cited, I would like to -- I guess I will mark them for ID as P-11.  I think we're at P-11.

MR. DRAHOS:  I don't know why they have to be marked for identification.

THE COURT:  I know.  So I think we can just note for the record that you have identified three cases.

MR. DIEPPA:  Well, four including the one she identified in her interrogatory answers.

THE COURT:  Okay.  So four cases in which her testimony has been limited for various reasons having to do with whether she's competent to make medical diagnoses.  It's all in the record.  I mean, you went through them.  So -- I mean, I think it's a valid point.  It's fine.

MR. DIEPPA:  On that note, Your Honor, I did want to make a motion for judicial notice.  Since they're court decisions of courts in the United States, the Court is permitted to take judicial notice of the opinions.

THE COURT:  I am.

MR. DIEPPA:  Okay.

THE COURT:  So yes.  If there are opinions from other courts, the court can take judicial notice of them.  I don't know how that's going to effect -- I think you've already made your point and it's well taken.

BY MR. DIEPPA:

Q.   Now, in terms of any of the articles that you cited here, and I think we talked about some of them during your deposition, the Mall Study, and I think there was another study, the Zeneti Study.  Do I have those right?

A.   Those were two that you brought up.

Q.   Those were two that I guess were actually in the body of your report, in your opinions, directly cited to?

A.   That's likely.

Q.   You would agree that the Mall report does not deal with, you know, people tearing their shoulders as a result of accidents, car accidents, or things falling on them; that study has nothing to do with that?

A.   Can you bring it up for me?  Or I can.

Q.   Sure.

      The Mall Study, you'd like me to bring that up?

A.   Or at least just the first page.  Yes, please.

Q.   And, just for the record, the Mall Study is entitled "Evidence-based examination of the epidemiology and outcomes of traumatic rotator cuff tears."

      Do I have that correct?

A.   Yes.

Q.   Do I also have it correct that this is actually not a study itself, it's like a collection of studies?

A.   It is -- we would call it a meta review.  It's a review of several peer reviewed published studies.

Q.   Is there anything in here that says that a lid falling at a certain force cannot cause an injury such as the one that was suffered by Ms. Cole?

A.   No.

Q.   And the same would hold true for the other article; correct?  The Zeneti article.

A.   It doesn't go through all the things that do not cause injury.  What it does go through is what does result; what type of loading, in what anatomical orientation does result in acute rotator cuff injury.  It doesn't go through all the ways it doesn't.

Q.   Well, the other study you relied on, Zeneti, I mean, this one as we discussed earlier at your deposition, it deals with tuberosity fractures; correct?  Ms. Cole did not have a fracture.

A.   She did not.  It includes -- it includes with certain types of acute traumatic shoulder injuries that the top of that bone can be pulled off by the tendon.  That's part of what that particular study contemplates.

Q.   It also talks about that people with a mean age of 50 years, they can have traumatic injuries to their shoulder; correct?

A.   Anyone can have a traumatic injury to their shoulder.

Q.   I mean, that's what the study found, correct, that -- in the study group here that was being discussed in this cohort

they found that for the people who did suffer those injuries, it was a mean age of 50 years old?

A.   The patients that were included in this study, all the patients were acute.  That was the point of the study, and they had a mean age of 50 years, yes.

Q.   Okay.  And can you tell me how old approximately Ms. Cole was at the time of her injury?

A.   I believe she was 51.

Q.   So -- and just to try to get my head around this and wrap this up, you did not for example make any effort to recreate Ms. Cole's incident, meaning that you did not get someone of a similar size and weight and place them in a similar position; correct?

A.   No.

Q.   You did supposedly have a lid that was provided to you by defense counsel, but you did not do anything other than weigh and measure the lid; correct?

A.   Do you mean do anything physical with it?

Q.   Yeah.  I mean, other than weigh and measure the lid you didn't conduct any sort of experiment or investigation with the lid; correct?

A.   I did not.  But you're welcome to Frisbee it into my shoulder.

Q.   I would never do that.

THE COURT:  I would not offer that.

BY MR. DIEPPA:

Q.   I wouldn't want to cause you a severe injury to your shoulder.

A.   I'm not worried.

Q.   But you -- so you didn't -- I mean, Exponent, it's a big company, they do defense work for a lot of big corporations. You didn't use any equipment, for example, you know, a wind tunnel, anything to try to propel this and measure how fast it moves, you didn't conduct any study of that nature?

MR. DRAHOS:  Objection.  Asked and answered.

THE COURT:  Overruled.

A.   I did not do any physical testing.

BY MR. DIEPPA:

Q.   As we discussed before, you did not inspect the premises?

A.   Correct.  Not in person.

Q.   Did you measure the table?

A.   I did not go to the premises in person.

Q.   I understand.  But you still measured the distance between supposedly the cart and the table, so I was just asking if you also were able to measure the table somehow?

A.   I did not.

Q.   Did you measure the height of Ms. Cole's chair?

A.   No.  Except that the top -- excuse me.  I'm sorry.  Let me clarify.

The back edge of the chair was about even with the surface of the serve cart that the trays were sitting on.  I did note that.

Q.  Okay.  I mean, did you measure the exact height of the chair Ms. Cole was sitting on?

A.  No.

Q.  Did you inspect the chair Ms. Cole was sitting on?

A.  No.

Q.  Did you inspect the cart?

A.  No.  Other than reviewing the photographs that were provided to me.

Q.  Did you get a measurement of the cart?

A.  No.

Q.  Do you know if the cart was moved in between the time you looked at the photograph that was provided to you by defense counsel and the time of Ms. Cole's incident?

A.  I am confident that it was not because it's bolted to the floor.

Q.  Okay.  You are just confident that was not -- that it was not, but you're not sure?

A.  That's fair.

Q.  And would you mind --

        MR. DIEPPA:  And, Your Honor, may I approach the witness?  I am not throwing anything at her, I promise.

        If I could use this, do I have permission to use this,

Counsel?

MR. DRAHOS:  Yeah.  I don't know what you plan on doing with it.

BY MR. DIEPPA:

Q.  I just wanted to be sure here.  And we're looking at the model you brought here today.

Are you saying that there's no possible way that the shoulder can move where it would cause an injury, or there's no possible way it could move forward and cause an injury?

A.  There's -- if I'm understanding your question, you're asking if my opinion is that there's no possible way the arm could move to cause an injury; no, that is not my opinion.

Q.  Okay.  And do you have an opinion as to according to your testimony -- I'm sorry.

THE COURT:  First you threatens to throw something at you, and now he's going to break your toys.

BY MR. DIEPPA:

Q.  I'm sorry.

And going back to your testimony on direct, do you have an opinion as to the direction of movement of Ms. Cole's arm?

A.  At what point?

Q.  At point of impact.

A.  At the point of the impact her arm didn't move.  There was no direct contact to her arm or shoulder from the lid in that moment.

Q.   Are you aware of her testimony in this case that she moved her arm?

A.   Yes.   After the contact that she was surprised and there's one entry, not in her deposition testimony, but among the several descriptions in the medical records there's one description that she then braced herself with her left arm.

Q.   So if that -- if her testimony and the description she provided to Dr. Wilkerson, her surgeon, is accurate, let's assume that, what direction would her arm have been moving?

A.   Forward like this with respect to her body.

Q.   So forward?

A.   Her arm would have been moving forward, the resistance force would have been rearward.

Q.   Okay.   So am I moving this in the correct direction to describe that direction?

A.   That is flexion of the arm like this.   My understanding is that it was more a front to back movement because it was on the table according to that one description.

Q.   Okay.   I just want to confirm --

A.   Okay.   Stop moving it.

Bring it toward me.

THE COURT:   Right.   And then I think it should be made clear for the record because I think this is an important point.

So you're moving -- Mr. Dieppa is moving the piece that

is the arm, the top of the arm, you are kind of swinging it up and down, and I think that she needs to now illustrate that her point -- I don't know how you describe that.

THE WITNESS:  I will describe it, ma'am.  Thank you.

This bone is the humerus.  It's the upper arm bone. Sitting at a table if your arms are on the table it's flexed forward a little bit just at rest.

So my understanding of that particular hypothetical of after the contact over here to the trapezius, which was surprising, the arm would be moved forward or put down on the table, the angle of the arm isn't really changing so much as the whole body moving forward a little bit to push back on the table for support.

BY MR. DIEPPA:

Q.  I see.  I see.

If I could have it back?

Thank you.

So if you have that direction of movement which you describe, if you continue to move the arm in this direction, contrary to the ligaments, is it possible for any injury to occur, for these ligaments to tear?

A.  Not just by moving it, no.  The medical records document that Ms. Cole had what's called full range of motion of her shoulder on multiple physical examinations.  So all of the movement was possible without injury.

Q.   Not exactly my question.

My question is, if you move this arm forward in the direction that you described violently or you hyperextend it, can you cause an injury to the tendons, labrum?

A.   Okay.  That's not hyperextension.  Hyperextension is when -- for example, this happens more with little kid, an acute rotator cuff injury when you're swinging them by the arms, the arms can get hyperextended and that is a biomechanical mechanism of acute rotator cuff injury.  That has nothing to do with our incident here.

Q.   But my question was can it happen if this arm moves forward in the wrong direction?

A.   No.  Not just by movement.  There has to be enough force.

Q.   Can it happen if enough force is applied?

A.   If enough force is applied any biological tissues can be injured.  If there was enough force applied rearward.  The way that you're holding that now, it is not the supraspinatus tendon that would be injured.  The force is directed rearward toward the subscapulares or the infraspinatus.  Excuse me.  The infraspinatus.

Q.   The infraspinatus tendon?

A.   Yes.

THE COURT:  Is that one of the injuries here?

MR. DIEPPA:  Supraspinatus tendon and labrum tear.

MR. DRAHOS:  It's not, Your Honor.

THE COURT:  So what she just said could happen from that force is not one of the injuries here?

THE WITNESS:  Correct, ma'am -- Your Honor.

The subscapulares, infraspinatus, and teres tendons were all reported by her treating physicians to be intact.

BY MR. DIEPPA:

Q.   But your testimony is that there's no possible way for those tendons to be injured with a forward movement; that's your testimony?

A.   What tendons?

Q.   The tendons Ms. Cole injured.

A.   There was one finding in her subscapulares tendon, and I am saying that that direction of loading is not consistent with that isolated finding, yes.

Q.   Okay.

A.   I'm not talking about her.  Just biomechanically that loading is not consistent.

Q.   So you would disagree with the opinions of her -- of Dr. Wilkerson, her surgeon, regarding medically how that would tear that way?

A.   I don't know that he evaluated the loading.  His opinions are medical and I have no opinions about his preferred course of treatment.

Q.   Let me give this back to you.

You don't deny what her findings were on the MRI; correct?

A.   I accept the findings in the medical records for what they are and deferring to Dr. Chalal with regard to interpretation -- further interpretation of those findings.

Q.   Okay.  So you would not have an opinion as to when the tears that were presented on MRI would have manifested; correct?

A.   What do you mean by "manifested"?

Q.   Well, you said the MRI showed the tears to her shoulder as of July 27, 2022; correct?

A.   There were findings in the shoulder on that date, yes.

Q.   So you have no information as to -- since you are claiming it wouldn't have been from this hit, you have no information as to how they would have otherwise manifested?

A.   I think that goes to my second biomechanical opinion that those findings in conjunction with the interpretation of Dr. Chalal of arthritis, that those are consistent in location and nature to repetitive motion over a long period of time. Those are biomechanical findings reported in the literature.

Q.   Okay.  But my question is different.  My question is do you have an estimate as to when -- you are saying she didn't tear her shoulder on July 24, 2022.  What I'm trying to find out is do you know -- do you have a date when she did tear that shoulder and she did suffer that?

A.   If I can correct, I'm not making diagnoses so I'm not sure why you're phrasing it that way.

What I'm saying is the loading in the subject incident, whether the remote loading to the trapezius muscle, or hypothetical direct loading due to bracing is not consistent with the pathological findings that are reported by the treating physicians, and that those pathological findings are consistent with known mechanisms of partial supraspinatus tears in the condition of impingement which her treating medical providers diagnosed.

Q.   Okay.  But you're not qualified to diagnose pathology; correct?

A.   I didn't.  But because of my medical training I understand what she was diagnosed with.

MR. DIEPPA:  All right, Ms. Courtney.  No further questions.

THE COURT:  Thank you.

Can you -- I know -- I think the court reporter I think had it from before, but my notes, it's all over the place.

Wait.

The super- -- what's the one that --

MR. DIEPPA:  I can get you --

MR. DRAHOS:  The supraspinatus?

THE COURT:  Yes.  Okay.  I'm going to mark --

THE WITNESS:  Would you like me to spell it?

THE COURT:  Yes.

THE WITNESS:  Supraspinatus, it's all one word,

s-u-p-r-a-s-p-i-n-a-t-u-s.

THE COURT:  Okay.

MR. DIEPPA:  It was anterior and inferior labral tear. And it was the undersurface of the supraspinatus tendon labrum torn at 3:00 and 6:00 position so 3:00 and 6:00.

THE COURT:  Okay.  So redir- --

THE WITNESS:  3:00 to 6:00, not 3:00 and.

So the labrum we haven't talked about.  It's the plate where the arm bone attaches and they refer to it like a clock face and this tear started around the 3:00 position in the front and goes down to about the 6:00 position according to her medical providers.

THE COURT:  Okay.  Thank you.

So redirect?

MR. DRAHOS:  I don't have any redirect, Your Honor.

THE COURT:  Okay.  Let me just make sure.

So looking at your model where is the clock, it's from the front?

THE WITNESS:  So the part they're talking about is the labrum.  The labrum is -- if you think of the shoulder as a ball and socket joint, it's the socket part.  So it's the blue right here.  And the labrum is a rim and it's made out of cartilage around that joint.

And the location diagnosed by her medical providers, the clock faces as you are looking straight on.  So if we move

to the front, it's from about 3:00 down to 6:00.

THE COURT:  Okay.  And so the tear is from 3:00 to 6:00?

THE WITNESS:  In the labrum.

The tendon you just asked me to spell, the supraspinatus, is this one on top.  And the location -- this isn't exact, but they said undersurface 3 to 4 millimeters and about 10 percent of the thickness of that tendon.

THE COURT:  Is where there is a tear in her case --

THE WITNESS:  Yes, Your Honor.

THE COURT:  -- based on what the doctors have said?

THE WITNESS:  Yes.

THE COURT:  And you're saying that the load, if it was going to hit or cause the acute trauma or damage anywhere, it would be in the -- if I'm looking at the front, it would be in the front?

THE WITNESS:  For the labrum you would need a load in that direction.  For the supraspinatus tendon, that was -- in the biomechanical literature that requires the arm to be abducted, moved away from the body, externally rotated like this, and then a force applied to the base of the hand which usually happens by falling down.

THE COURT:  Interesting.  Okay.  Thank you.

I mean, I was just curious.  And I think that Dr. Wilkerson's, the picture that he had, it was -- I don't

think it was a photo, it was a picture of a model, is consistent with that.

MR. DRAHOS:  So the --

THE COURT:  Meaning, like it's okay that this isn't in evidence or being -- we don't have a picture of that because the picture that Wilkerson was using, this actually now that I have seen it in 3D, gives me a better understanding of where Mr. Dieppa had indicated everything on that picture.

MR. DRAHOS:  Yeah.  I think a point of clarity needs to be made in that regard.

So that picture was shown to Dr. Wilkerson as an example of the anatomy.  It was not a representation of the injuries that they're claiming occurred in the case.

THE COURT:  I understand that.  But it was a good -- I'm just saying by seeing it in 3D, seeing the physical model here I can refer to Dr. Wilkerson's pictures, not for the answers, not for where everything is, but I can now understand his pictures better.  That's what I'm saying.

MR. DIEPPA:  Yes, Your Honor.  And point of clarity as well, Dr. Wilkerson is the only witness who both reviewed the MRI and also arthroscopically looked inside her shoulder.

THE COURT:  This is true.

MR. DRAHOS:  Actually --

THE COURT:  Can we -- don't worry.  We're not going to open up that can of worms.

MR. DRAHOS:  Dr. Chalal looked at the photos.

THE COURT:  He's the only guy that got to go inside there with a camera.  That's fine.

Okay.  So can we let -- are you Dr. Courtney?  I guess you are a PhD, you are.  Okay.

Can we let Dr. Courtney go?

MR. DRAHOS:  Yes, Your Honor.

THE COURT:  Thank you very much.  Appreciate it.

Where did you come in from?

THE WITNESS:  Tampa.

THE COURT:  Oh.  All right.  That's not too bad.

Did you take the -- can't take the train really.

THE WITNESS:  I drove.  It takes just as long to do all the flight stuff.

THE COURT:  It's going to take a while if you go now.  I would hang out for a while before you get on the road.

THE WITNESS:  Thank you, ma'am.

THE COURT:  Have a safe drive back.  Thank you.

Okay.  So we have the Zoom is the next witness?

MR. DRAHOS:  Well, that's their rebuttal witness.  But before we close our case I have a housekeeping matter I just want to address with the Court, and that is we want to formally move into evidence, to the extent it has not already been done, Defendant's Exhibits 1 through 10, 13 with the exception of Photo 9 which we agreed to take out, and the exemplar container

lid.

MR. DIEPPA: Wait.

THE COURT: Okay. Hold on.

So 1 through 10.

MR. DIEPPA: Defense 1 through 6 are already in.

THE COURT: 1 through 6 were stipulated previously.

The CitiMed letter of protection --

MR. DIEPPA: That was agreed.

THE COURT: So that's that was 7.

The social media posts, I think they were used on cross-examination, but were they in?

MR. DRAHOS: We marked them for identification.

MR. DIEPPA: We objected, Your Honor. I don't think a foundation has really been laid for them, but they were already shown to the plaintiff.

THE COURT: I think that the plaintiff confirmed that they were hers. She didn't deny that they were hers. I mean, they have been seen.

MR. DIEPPA: The objection was rel- -- they didn't show her doing anything contrary like to her limitations. She's holding a phone and it's -- you know, it's what it is. Your Honor can consider it. I just don't think it's particularly relevant.

MR. DRAHOS: Disagree.

THE COURT: Okay. So to the extent the objection is

relevance, I'm overruling.  And 7, 8, 9 were talked about -- I mean 8, 9, 10 were discussed extensively with Ms. Cole so they are admitted.

And then you said 13, Dr. Chalal used some medical illustrations and demonstratives.  That's 13?

MR. DRAHOS:  Yes.  With the exception of Photo 9.  So there was I think a number of photos.  Yes, you're right. Dr. Chalal did use an illustration.  We're moving that into evidence.

THE COURT:  Is there any objection to that?

MR. DIEPPA:  I mean, the illustrations were marked as demonstrative.  But if you're not using 9, it's okay.  You can --

THR COURT:  What's 9?  Did I not see it?

MR. DRAHOS:  9?  Yeah.  We decided not to use it.

THE COURT:  So then other than 9, there's no objection to 13 coming -- the rest of 13 coming in?

MR. DIEPPA:  Yeah.  That's just illustrations, Judge. That's okay.

And then 15, which is I think the next one, we maintain our objection.

MR. DRAHOS:  We're going to withdraw 15.

THE COURT:  Okay.  And 14, though, the studies were actually used by you, Mr. Dieppa, to --

MR. DIEPPA:  I used two.

THE COURT:  You used -- I know at least two of the studies.  I don't think they need to be in evidence, but --

MR. DIEPPA:  It was just impeachment, Judge.

THE COURT:  Okay.  The exemplar container lid you guys stipulated to as 16, and -- but I have a note here it's not the actual container lid.

So that's for the defense exhibits, is that it or was there anything else?

MR. DRAHOS:  It is.

And if Your Honor would like to see the lid, we would be happy to publish it to Your Honor to have an opportunity to examine it during our case in chief.

MR. DIEPPA:  Is there another lid besides that one?

MR. DRAHOS:  No.  No.  Just that one.

THE COURT:  So the plaintiff has already raised it's not the exact lid.

MR. DIEPPA:  If it's a demonstrative lid, I don't see the issue with it because we all know it's not the same one.  And it's been described differently.  So if it's not, you know, being offered for the purposes of being the same authentic lid that was involved in this incident, then, you know, it's okay.  It's an exemplar.

THE COURT:  I mean, it's here.  I don't need to touch it.  I mean, I can rely on my own independent knowledge of these things.

MR. DIEPPA:  Okay.  So I think our biomechanic -- rebuttal biomechanic is logged into the Zoom conference.

THE COURT:  Yeah, I see that.

MR. DIEPPA:  I don't know if you want to take a few moments?

THE COURT:  I do.  I want to take just a quick break.  I just need to go inside and look at one thing, it will just take me a couple of minutes and then I'll come out.

And maybe while that's happening -- can you control letting -- making sure the witness is in and ready to go on the Zoom unless you need to take a break?

Johanna?  Come on in.

All right.  So let's take a little break.  Johanna will get this set up for the Zoom and then we can roll as soon as we all come back in, just a couple of minutes.

COURTROOM SECURITY OFFICER:  All rise, please.

(A brief recess was taken from 4:27 p.m. to 4:37 p.m.)

COURTROOM SECURITY OFFICER:  All rise.

MR. DIEPPA:  Your Honor, is it okay if I sit for this one if it's all on Zoom?

THE COURT:  Yeah.  That's fine.

MR. JARNAGIN:  When we perform cross-examination are we able to use the monitor, or do we need to log-in through a laptop?

COURTROOM DEPUTY:  So the Zoom you can see it on your

monitor.

Are you able to see it?

MR. JARNAGIN:  Yes.

And he'll be able to just talk into the microphone?

COURTROOM DEPUTY:  Yes.

MR. DIEPPA:  All right.  Plaintiff as part of his rebuttal case calls Mr. Andy Liberti.

THE COURT:  Okay.  Mr. Liberti, are you there?

MR. LIBERTI:  Yeah, I'm here.

All right.  We're going to ask you to raise your right hand to be sworn.  Okay?

(Mr. Andy Liberti sworn by CRD.)

THE WITNESS:  I do.

COURTROOM DEPUTY:  Please state and spell your name for the record.

A.  Andy Liberti, A-n-d-y L-i-b-e-r-t-i.

THE COURT:  Okay.  Mr. Dieppa?

DIRECT EXAMINATION

BY MR. DIEPPA:

Q.  Good afternoon, Mr. Liberti.  I know you are on Zoom. Where are you joining us from?

A.  I'm in my home.

Q.  What state?

A.  North Carolina.

Q.  All right.  Tell us a little bit about yourself in terms of

your training, education, and work experience.

A.   Okay.  I have a bachelor's degree in aeronautical and astronautical engineering from Purdue University.

Most of my career has been spent doing mechanical engineering, and I had six years in orthopedic design, the biomedical field.

So I have seen lots of different industries throughout my career, lots of different projects, different problems that needed to be solved.

Q.   Your engineering degree, where did you receive that?

A.   Purdue University.

Q.   Okay.  And that was you said aeronautical and astronautical engineer?

A.   Yeah.  Aeronautical and astronautical engineering.

Q.   Okay.  And then you said you worked for a company.  Can you just explain that in a little bit further detail, the company you worked for and what you did in terms of biomechanical design?

A.   Sure.  I worked for Zimmer Incorporated.

(Stenographer clarification.)

THE COURT:  Zimmer?

THE WITNESS:  Yes, ma'am.

A.   Based out of Warsaw, Indiana.

What I did for them, I was the orthopedic designer in the group.  We were doing a special project that was looking at

fixing a femoral fracture from a different point of view that nobody in the world had done before.  So my part of the work was to design instrumentation, design the implant, and then the rest of the team will take it and basically try to perform it on a cadaver to see how the product would work and then we would just keep doing reiterations of that.  So I guess I was in that kind of environment for six years.

Q.   All right.  And in terms of that work that you did for Zimmer, did that require having at least an engineering knowledge of how the human body works?

A.   Yes.

Q.   And how long have you been an engineer?

A.   26 years.

Q.   You hold any engineering licenses?

A.   No, sir.

Q.   And tell us the rest of your work experience after that, after you worked in the biomechanical field at Zimmer.

A.   I've worked -- after that I worked in aerospace -- the aerospace industry again working on designing aircraft seats for -- and interiors for -- how do you call it?  Like first class seating for airplanes.

   I also worked on airplane design as far as the internal structures.  I've also worked in the tobacco industry.  I am currently in the nutraceutical industry.  I have done cellphone design.  I have done lawn and garden design.  I do freelance

work on the side so I design for hundreds of different --
hundreds and thousands maybe even different clients.  Anything
from dog toys to sculptures that are selling around the
Mediterranean Sea right now on the ships.  So I've seen a lot
and I've done quite a bit.

Q.   Thank you for that.

And talking about your expert experience, my understanding
is that that's not really your main line of work.  I mean, this
is your first time testifying as an engineer in court.  Do I
have that right?

A.   Yes, sir.  That's correct.

Q.   Okay.  Do you have like a main job?

A.   Yeah.  My main job is I'm a project manager/mechanical
engineer at a nutraceutical industry.

Q.   And that's your work and you're doing that at this moment?

A.   That's correct.  Yeah.  I have been there for almost six
years.

MR. DIEPPA:  Your Honor, based on the training,
experience of Mr. Liberti, I would like to proffer him as an
expert in biomechanics.

MR. DRAHOS:  We object, Your Honor.  There's no
predicate laid for that at all.

THE COURT:  So it is -- I mean, I have been listening
to his background, I wasn't quite sure.  So he's an engineer.

MR. DIEPPA:  Engineer.  He worked six years designing

medical implants.  He has extensive experience in the engineering field.  He has, you know, a degree in aeronautics. I mean, he is sufficiently qualified to meet the standard to be -- to testify as to biomechanics.  I mean --

THE COURT:  Do you want to voir dire him yourself, Mr. Drahos?

MR. DRAHOS:  Absolutely, Your Honor.

THE COURT:  Okay.

MR. DRAHOS:  May I?

THE COURT:  Yes.

MR. DRAHOS:  Thank you.

VOIR DIRE EXAMINATION

BY MR. DRAHOS:

Q.  Mr. Liberti, can you hear me?  This is Michael Drahos, counsel for Carnival.

So let's first start with your medical knowledge.

You would agree you're not a medical doctor; correct, sir?

A.  That's correct.

Q.  You have no formal medical education of any sort?

A.  Correct.

Q.  You have never completed any medical training at all?

A.  Not medical training.  I have done training when I was in the orthopedic field to understand the -- the anatomy, to understand the mechanics of how the body works.

Q.  So you would agree you hold no medical certifications of

any sort?

A.   That's correct.

Q.   And as a matter of fact, you've never even taken an anatomy class, have you, sir?

A.   No, I have not.

Q.   Okay.  So as it relates to your background as an engineer, you would agree that you do not hold a doctorate in engineering science?

A.   Not a doctorate, no.

Q.   You don't have a master's in engineering science?

A.   No, I do not.

Q.   You don't have a bachelor's in engineering science?

A.   Not in engineering science, no.

Q.   You, sir, are not even a licensed engineer?

A.   Correct.

Q.   Your bachelor's degree is in aeronautical engineering?

A.   Aeronautical and astronautical engineering.

Q.   Are you a member of any professional organizations or societies of biomechanics?

A.   No.

Q.   Have you ever published or lectured on the subject of biomechanics?

A.   No, sir.

Q.   Has any court in America qualified you as an expert in biomechanics?

A.   No, sir.

Q.   Do you hold yourself out in the community as an expert in biomechanics?

A.   No, sir.

Q.   Does your employer Herbalife know that you are testifying here today as an expert purportedly in the field of biomechanics?

A.   No, sir.

Q.   You made mention of this position that you held where you had experience in orthopedic design.

     You would agree that that was almost 20 years ago, sir?

A.   Yes, that's correct.

Q.   And the components that you had a roll in designing, that was something that specifically required the input of a doctor; would you agree?

A.   Yeah.  I would agree with that.

Q.   And based upon the input of the doctor you followed the doctor's instructions and guidance?

A.    I followed his guidance, I would say.  Not his instruction, per se.

     MR. DRAHOS:  Your Honor, under Daubert v. Merrell Dow we do not believe that this expert holds the sufficient qualifications, whether it be experience, education, or training in the field of biomechanical medicine.  He's not a licensed engineer, he's never had any biomechanical training of

any sort.  He's never had any biomechanical education.  The only experience that he can even possibly relay to the field of biomechanics was a job he had almost 20 years ago which, by the way, had nothing to do with a shoulder.

THE COURT:  And what is "orthopedics," Mr. Liberti?  When you say you did orthopedics, what does that mean?

THE WITNESS:  The orthopedics in this sense is the way that the body moves.  So the work that we did was on joints.  So we worked on a hip joint, you work on a knee joint or an elbow joint, or in this case a shoulder joint.  So it's the way that the body moves, it's the way that the body works together.  So if there's a break, how do we fix that break so the body works once again the way it once did.

THE COURT:  And so what do you do that we're in that field now?

THE WITNESS:  I don't do -- I don't do any biomechanical work now.

THE COURT:  So the biomechanical work was when you were doing the orthopedics?

THE WITNESS:  I'd say yes and no.  And if I can explain?

Forces are forces.  Equations are equations.  But the force that is being talked about in this case is an impact force.  That impact force is what caused -- in my opinion, is what caused the injury.

So the -- that impact force can happen -- somebody is walking down the street and they get hit by a car, how hard did they get hit?  Say somebody fell off a ladder, when they hit the ground, how hard did they hit?  What did they break?

Same kind of thing, if I'm walking down my factory where I work, if I turn the corner and a forklift hits me in the shin, those are all biomechanical forces.  They're equations.  They are engineering equations.  You don't have to have a biomechanical background to figure out equations.

THE COURT:  Okay.  So if Mr. -- is it Liberti or Liberti?

THE WITNESS:  Liberti.

THE COURT:  So if Mr. Liberti is simply going to give his opinion on what the force --

MR. DIEPPA:  That's all he's doing.

THE COURT:  -- could have been, but not what its effect on the body could have been -- he can't do that.  But if he wants to give us his calculation based on the experience that he does have of what the force would have or could have been given the measurements that he has available to him, that's okay.  But that's it.  He can't talk about -- he's not an expert on how that impacts the body, the bio part.

MR. DIEPPA:  No, Your Honor.  And his -- number one, his report already survived a motion to strike in front of the magistrate.  His opinions have been disclosed and I can proffer

his CV further.

And his report is very clear and straightforward.  It's what Mr. Liberti said.  And what Mr. Liberti said in his report is not a medical opinion any more than Dr. Courtney who is not qualified either to give medical opinions.

THE COURT:  Right.

MR. DIEPPA:  But his opinion is simply that for this injury, the force would have been sufficient to cause it.

THE COURT:  That's what I'm saying.  I'm not going to -- I don't see that anything in his background qualifies to tell us what about this injury.  If you want to have him testify to what the force, speed, velocity -- I think it's really force is what he is talking about -- could have been under the circumstances, that makes sense in his background.

But he is not qualified to tell us what injury that force could cause on the human body based on the experience that he has laid out.  And I don't know what the magistrate judge was considering as far as qualifications.  I mean --

MR. DRAHOS:  I would like to speak to that, Your Honor.

THE COURT:  Okay.

MR. DRAHOS:  We filed a motion to strike this expert for being disclosed late.  He was listed to us as a rebuttal expert to rebut Dr. Chalal.  So we challenged his qualification as a rebuttal witness, and the court at that particular time said he can testify as a rebuttal, but defense can reserve

their right to challenge his qualifications later at trial which is exactly what we did.

THE COURT:  Right.

MR. DIEPPA:  Your Honor, I mean, his -- his admissible experience is being an engineer which is the same as Dr. Courtney's experience because --

THE COURT:  No.

MR. DIEPPA:  And the reason I say that, Your Honor, is because Dr. Courtney is not a medical doctor and did not purport to be a medical doctor.

THE COURT:  She did not purport to be a medical doctor and she did not give medical opinions or medical diagnoses. And certainly Mr. Liberti is not saying he is going to do that. But the difference is that her background, her area of expertise, like half of it was in anatomy and medical training, and medical fields.  Mr. Liberti, his background based on what the record is here today is on the engineering and the mechanical side.  And like I said, I'm okay with him -- and he has even insisted the force is the force, you know.

So if -- he is definitely more of an expert than me, and I can see it being helpful to me to understand force, I am okay with that.  But he is not qualified -- I am finding that he is not qualified -- no offense, Mr. Liberti -- to talk about medical causation or any effect on the body.  Because one of the things that I'm concerned about is that he said or you said

how that force could cause the injury at issue.  That's not happening.

So he can testify about the force itself and then you can rely on other evidence in the record about that other people have testified about about what kind of force is needed to cause what kind of injury, but that's not his area.

MR. DIEPPA:  Okay.  I mean, I would just like to lay a foundation that he did review the medical records.

THE COURT:  So did I, but I'm not an expert on the medical --

MR. DIEPPA:  I understand.

THE COURT:  So, Mr. Liberti, if you want to ask him about -- and have him testify as an expert, I am granting in part or over -- I should say I'm overruling in part the objection to him being qualified as an expert, but I'm limiting the area that he can testify as an expert.

MR. DIEPPA:  Yeah, Your Honor.  And, just for the record, and I know Your Honor's ruling, but I don't think this was raised timely under the rules, and I -- and he was disclosed timely and properly.  So, you know --

THE COURT:  I will revisit it.  I will take a look at what the magistrate judge wrote.  And if I find that what the magistrate judge said, did not say -- if the magistrate judge did not say that this is something to be revisited when he testified, I will consider it at that point.

MR. DIEPPA:  And the other argument is as far as 702 is concerned, the standard for 702 is does he have specialized knowledge beyond what a layperson has.

THE COURT:  I just said that he does.

MR. DIEPPA:  And does he have experience in the field.

THE COURT:  Yes, he does.  I agree.  His -- his background qualifies him to help me as the fact finder understand force, but not to talk about the body, the anatomy, injuries and things like that.

MR. DIEPPA:  Okay.  Well, I will -- we will proceed, Your Honor.

THE COURT:  Okay.  Thank you.

BY MR. DIEPPA:

Q.   Mr. Liberti, in this case you prepared a report.  My understanding is it was a rebuttal report to rebut the opinions of Dr. Chalal.

Do you recall that?

A.   Yes, sir.

Q.   Okay.  And in that report you made some calculations about the force after reviewing some materials in this case?

A.   Yes.  Correct.

Q.   Okay.  And my understanding is you reviewed some -- you reviewed some photographs, you reviewed some measurements of the lid, and you reviewed some weight measurements there?

A.   Yeah.  That's correct.

Q.   Did you also review the testimony of the people involved as to how this incident occurred and do you have an understanding of how this incident occurred?

A.   Yes, sir.

Q.   Okay.  So first off in your report did you also identify certain articles which support the opinion that you proffered in your expert report?

A.   Yeah.  That's correct.

Q.   Okay.  And those articles, do they also -- even though you did not directly rely on the articles specifically, do they inform and support your opinions in this case?

A.   Yes, they do.

Q.   And those articles are attached to your report as well?

A.   Yes, correct.  They are in the back.

Q.   Okay.  And first off, tell us your understanding of how the incident with Ms. Cole the plaintiff occurred.  If you could describe that for us.

A.   She was sitting on the lido deck, and I guess it was very windy that day.  And right behind where she was sitting was kind of like -- almost like a little table, and on that were some trays and some lids -- to those trays, I mean.  And the wind picked that up and hit her.  And from what I understand, it hit her and that basically sent her kind of moving forward, if you will, and then she braced herself against the table to stop that impact.  So that's kind of -- you know, basically it

was kind of like a shock.  And so she braced herself against the table to help stop that momentum and that is where I believe the event occurred.

Q.   Okay.  And we have heard from various witnesses including Ms. Cole's surgeon, Dr. Wilkerson, who described the same or similar movement that you described.

And Dr. Wilkerson has opined in this case that that movement would have caused sufficient force to result in injury to Ms. Cole's shoulder.

That being said, my question to you is -- is outside of the medical diagnosis and outside of medical opinions, have you made a calculation as to the approximate amount of force that would have been exerted as a result of this incident?

A.   Yeah.  Yes, I did.

Q.   Okay.  Can you tell us what you did and the result that you came up with?

A.   You want me to step through the equations then?

Q.   Yeah.  Just tell us what you did and tell us, you know, the -- the sum of the calculation.

A.   Okay.  So basically I just want to start out by saying that the definition of impact force for Your Honor, the impact force is defined as a force that delivers a shock or high impact in a relatively short period of time.  So that's kind of like getting the definition of what impact force is.

So an object experiences an impact force if the object

experiences a force as a result of an impact.  And it's a weird way of saying it, but that's what that means.  So in practice it means that an impact force causes a very large acceleration and has a very small duration.  So this is where the equation starts to happen.

So the equation for impact force is the force equal the mass times the velocity over time.  So obviously there's a bunch of variables in there.  So, again, as an engineer what I did was I just went through and said, okay, what are the variables that I had, what can I fill in.

So we're looking for impact force.  We know the mass.  I know the mass of Ms. Cole.  And basically what I was figuring on that was, if she was sitting down, I'm going to use half of her mass.  So it's just not her full mass because her whole body didn't move.  You could figure half of her body moved forward in that event.

The velocity, to figure velocity, the equation for velocity is distance over time.  So in this case -- again, there were some estimations.  The estimate was that her body travelled .61 meters which is about 2 feet.  So that's, you know, moving forward and again that lunging forward, something hits you in the back, you're going to move forward.  So again I calculated that at 2 feet.

And then the time -- so again, velocity equals distance over time, so time is that happens in basically what people

call a split second; right?

So the average reaction time for a human being is a quarter of a second.  Again, these are things that I found just doing research online.  So when you start to put all this together, what that gives you is that there was a force of 98.7 pounds of impact on her body when she stopped herself.  So again, the math is talking now so the math is saying that with that velocity, with that mass, with that -- let me go back to my equation -- with that time, you end up with force of 98.7 pounds.

So, again, this is where I started to piece things together.  So basically when her arms are out forward, if you kind of think about someone who is lunged forward, right, it's almost kind of like -- silly way of saying it, but like Superman.  You know, your body is kind of out.  That's also the same thing, if you change your body posture that's the same thing as --

MR. DRAHOS:  Objection.  He's getting into body mechanics here, Your Honor.

THE COURT:  Well, not necessarily because I think where he is going is still part of the calculations of the distance, but let's see.

Keep going.

THE WITNESS:  I can keep going?  Okay.

A.  So again -- and, again, it's just all the equations.  I'm

not trying to make anything up. You're either going this way or this way. So it's just the angle that I'm talking about here. So essentially what that is equivalent to as if I was taking an object and I'm pushing it up and it weighs 99 pounds. That's the same kind of thing. And I'm doing that quickly. And you think about it, I'm doing that within a quarter of a second. So all of a sudden I'm lifting 99 pounds quickly. And I know for me personally I can't lift 99 pounds quickly like that. There's just no way. You know, that's a heavy force in my opinion.

So, again, when you do something like that, and from the research that I showed -- or I'm sorry, from the research that I found that is the same thing -- and that can cause a tear in these areas, that's --

MR. DRAHOS: Objection.

THE COURT: Right. That's okay. I understand.

BY MR. DIEPPA:

Q. We'll hold on "tear," Mr. Liberti. And just -- I'm going to give you an opportunity to rephrase that.

I want you to assume in this case that Dr. Wilkerson has opined that that movement resulted in a tear injury supraspinatus tendon.

MR. DRAHOS: Objection. I think --

THE COURT: Let's see what it's being -- what the hypothetical is being used for.

MR. DRAHOS:  All right.

BY MR. DIEPPA:

Q.   Okay.  So from the records, from the medical evidence that's already in evidence in this case you kind of already know that.

What I want to know from you is that according to your calculations, what's the sum total of the force in mass on the shoulder?

A.   99 pounds.

Q.   Okay.  And how fast -- if you know, how quickly would that have been exerted on the shoulder?

A.   In my opinion it happened in a quarter of a second.  That reaction time.

Q.   So you would go from a weight and sum total force of basically zero to 99 pounds in a quarter of a second?

A.   That's correct.

THE COURT:  Maybe I missed something.  Keeping track of all of the elements that you were considering in reaching that impact or that force.

Do you take into consideration the weight of the object?  So did you take into consideration the weight of the lid?  Is that --

THE WITNESS:  No, ma'am.  No, ma'am.  Because in my opinion the object hitting her did not cause the tear, like it didn't --

THE COURT:  That's okay.

THE WITNESS:  Yeah.  It's the movement that happened. That's what I'm trying to get at.

MR. DIEPPA:  Yeah.

THE COURT:  So to go over again what contributes to that force, it was time and speed?

THE WITNESS:  Yes, ma'am.  And mass.

THE COURT:  And the mass.

And the mass was half of Ms. Cole's -- of Ms. Cole's body weight basically?

THE WITNESS:  Correct.  Yes.

THE COURT:  The time is how long it would have taken her to move the 2 feet, her body?

THE WITNESS:  Yes, ma'am.

THE COURT:  And where did you get the speed?

THE WITNESS:  So speed is defined as distance over time.  So if you take that distance that you just talked about, divided by that time that you just talked about, that gives you the velocity, ma'am.

THE COURT:  Okay.  So you're not actually concerned with the object that was hitting her, you are more concerned with the force coming from her moving really quickly regardless of what hit her?

THE WITNESS:  Can I -- can I restate that just a little?

THE COURT:  Sure.

THE WITNESS:  It's not really the force of her moving, it was the force of her stopping, if that makes sense.

THE COURT:  Okay.

THE WITNESS:  The force of her just taking -- the moving, that's okay.  I mean, if the hands had never come out in any kind of situation, once you stop, it's the stopping is the force.  The stop is the force.  There's no velocity to begin with, now all of a sudden there's a huge acceleration and then there's a stop, and it's that stop that is the impact force.

THE COURT:  Okay.

BY MR. DIEPPA:

Q.  Yes.

THE WITNESS:  Does that make sense?

THE COURT:  Yeah.  It's a little different from any other way anybody has looked at this so it's interesting.

THE WITNESS:  Yes, ma'am.

MR. DIEPPA:  May I continue?

THE COURT:  Yes.  Sorry.

BY MR. DIEPPA:

Q.  And going -- just following up a little bit on what the Court asked you, you did take measurements or at least weight measurements of the lids that were involved in this case?

A.  I did see those, yes.

Q.   Yeah.   But from what you are saying is -- and, you know, and relating it to what the surgeon said in this case, that is the lid can cause the reaction, but the force comes from the stopping?

MR. DRAHOS:  Objection.  Leading.

THE COURT:  Well, he's --

MR. DIEPPA:  I'm clarifying.

MR. DRAHOS:  Well, I also think it's outside the ruling of the Court.  He's now talking about how the body is reacting to the force, which is --

THE COURT:  Well, I think Mr. Dieppa is really doing what I just did.

MR. DIEPPA:  I'm just going to your point, Your Honor. And Dr. Wilkerson mentioned this as well, that it's not so much the weight of the lid, it's her reaction to the lid which is the same thing Dr. Wilkerson said who is a medical doctor so I'm trying to relate.

THE COURT:  All right.

BY MR. DIEPPA:

Q.   I'm sorry, Mr. Liberti.  What I was saying is that it's not so much as other witnesses have said that these lids struck Ms. Cole then immediately injured her; it was the movement subsequent to getting hit with the lid?

THE COURT:  I mean, he doesn't -- that's not really in his area.

MR. DIEPPA: Can he answer or --

THE COURT: I mean, I think he answered it for me, which is that it's not a matter of the lids hitting her, it's just -- it's a matter of how fast the force that would have come from her moving so fast against the table for lack of a better description.

MR. DIEPPA: Is -- am I --

THE COURT: The way you asked it is -- it's just talking about that it immediately injured her as opposed to --

MR. DIEPPA: I said "impact," but I know what you're getting at.

THE COURT: Okay. Go ahead.

BY MR. DIEPPA:

Q. I will just repeat the question for you, Mr. Liberti.

Mr. Liberti, from what I gather from what you are saying is that the forces in this case, in Ms. Cole's case, they don't directly arise from being struck by the lid, they arise from the reaction to getting struck by the lid and the subsequent stopping?

THE STENOGRAPHER: I'm sorry, what was the answer?

THE COURT: He said yes; right?

THE WITNESS: I said: "Yes, sir."

BY MR. DIEPPA:

Q. And you did in your report make a measurement of Ms. Cole's weight at the time of the incident?

A.   Yes, sir.

THE COURT:  Ms. Cole probably doesn't want you to talk about that.

MR. DIEPPA:  I think it was already talked about at this point.  It was already brought up.

BY MR. DIEPPA:

Q.   But in any event you did reach a conclusion as to Ms. Cole's weight, at least you got that data before you reached your opinions?

A.   Yes.  Correct.  That's how I got my opinions, yes.

Q.   Okay.  And -- well, it's in your report, correct, Mr. Liberti, the number?

A.   Yeah.  It's in my report.

Q.   Without going into anatomy and the human body or anything like that, the force you described, can you equate it to anything in the physical realm that you're familiar with or anything, you know, in terms that a layperson can understand would react to that force?  Like, I don't know, a piece of wood, a car window or something like that, is that something you're able to do?

MR. DRAHOS:  Objection.

BY MR. DIEPPA:

Q.   I will put it this way, going from zero to 90-something pounds in a quarter second, if you were to apply that force to a window or a piece of wood or anything like that, you know,

more or less what would happen?

MR. DRAHOS: Objection.

THE COURT: I don't see that being -- I mean, I think that is actually part of his field. He's not saying how it would effect the body, he's saying how it would effect --

MR. DRAHOS: What would be the relevance of that, Your Honor, if it breaks a window? What difference does that make? We are talking about how her body reacted.

THE COURT: No. I think it's helpful for me to appreciate how -- what that means, what 98 pounds of force means.

So you can answer.

A. Well, 98 pounds of force on a piece of wood is going to probably smash that piece of wood. 98 pounds on a window is going to shatter that window.

You know, again, the way that I think about it is like a weightlifter laying on a bench and they are going to, you know, do a bench press and it's essentially the same kind of -- it's weight. I mean, it's weight and motion.

So I understand I'm not a biomechanical person, I'm just saying that if I'm sitting at a bench and I'm going to push 99 pounds, it's the same kind of idea, I'm going to push 99 pounds all of a sudden.

BY MR. DIEPPA:

Q. And so is that the extent of what you did in this case,

Mr. Liberti?

A.   Yes.  I mean, I did go out and look at what 98 pounds would do.  Because my question when I came up with the numbers was, okay, now I've got numbers, what do the numbers mean?  And for me, again, not having a huge background in the biomechanical, I will agree with that, what does 99 pounds mean to me.  So what I did was I did do some research to see if I was to do something like that what would happen, what could happen to me and I found --

MR. DRAHOS:  Objection.

THE COURT:  Okay.

(Stenographer clarification.)

THE COURT:  Say that again.

THE WITNESS:  Me?

THE COURT:  Yes.

THE WITNESS:  I was just saying that I found references and I have references in my document that show what I was trying to get across there.

THE COURT:  All right.  Thank you.

MR. DIEPPA:  Yeah.  And, Your Honor, just for the record, we would like to proffer for ID Mr. Liberti's CV and his report.  Just to proffer.  Because there's been a ruling on limiting his testimony, we would like to proffer it for the record.

THE COURT:  That's fine.  They could put it on the

record because if there's an appeal and they want to appeal my finding that he's not qualified on those grounds, that's fine.

So we will mark Mr. Liberti's CV and report?

MR. DIEPPA:  CV, report, and -- yeah.  CV and report.

Just to proffer it for Your Honor as to his qualifications and as to his proffered opinions, we have to do that for the record.

THE COURT:  My guess is it's in the record as part of the motion to strike before the magistrate judge or was that only about timing?

MR. DIEPPA:  That was mostly about timing, Judge. Actually, it was mostly about scope.

MR. DRAHOS:  Yeah.

THE COURT:  If it's not already in the record then you can add it to the record.

I don't need to consider it for my -- making my findings, but I think it's -- that's fine for you to have it in there in case you want to appeal my ruling on that.

MR. DIEPPA:  I kind of have to, Judge.

THE COURT:  So do you have anything else for Mr. Liberti?

BY MR. DIEPPA:

Q.  Wrapping up, Mr. Liberti, have we gone over all the opinions you intend to offer in this case?

THE COURT:  Well, obviously not because I told him he

couldn't offer some of them.

BY MR. DIEPPA:

Q.   Well, that you have been allowed to offer.   But have we gone over the extent of the opinions regarding the calculations of force?

A.   Yeah.   That's what I had, yeah.

Q.   Okay.   In your report did you also review the records of Dr. Wilkerson?

A.   Yes.

Q.   And have all your -- has all your testimony today been based on generally accepted engineering principles?

A.   Yes.   Definitely.

Q.   And is all your testimony here offered within a reasonable degree of engineering certainty?

        MR. DRAHOS:  Objection.

A.   Yes.

        THE COURT:  Overruled.  Okay.

        MR. DIEPPA:  Thank you for your time, Mr. Liberti.  You may have some questions from defense counsel.

        THE COURT:  Cross?

        MR. DRAHOS:  Yes.  Thank you, Your Honor.  And I think I can be brief.

                    CROSS-EXAMINATION

BY MR. DRAHOS:

Q.   Mr. Liberti, you would agree you never spoke to Ms. Cole;

correct?

A.   Correct.

Q.   And you don't know whether or not her chair moved or the table moved at the time of this impact?

A.   I'm sorry, can you repeat yourself?

Q.   Yes, sir.

You don't know whether or not Ms. Cole's chair or table moved at the time of this impact?

A.   Right.  Yes.  Correct.  I don't know that.

Q.   So your opinions based upon the force of this impact are entirely dependent upon your conclusion that her arms braced the table in front of her; correct?

A.   Yes, sir.

Q.   All right.  And you would agree that you relied upon Ms. Cole's deposition testimony regarding her body movements in order to form your opinion in this regard?

A.   Did I rely on her opinion?

Q.   Her deposition testimony, yes, sir.

A.   Yes.

Q.   And you would agree that if Ms. Cole's arms never braced the table in front of her your calculations are flawed?

MR. DIEPPA:  Objection.  Misstates deposition testimony.

THE COURT:  Overruled.

MR. DIEPPA:  You can answer.

A.   Can you repeat it?

BY MR. DRAHOS:

Q.   Sure.

You would agree if Ms. Cole never braced the table in front of her with her arms as you're suggesting, your calculations are flawed?

A.   I wouldn't say that they're flawed.  I would say that it would be something different.  I wouldn't say that they're flawed.

MR. DRAHOS:  Thank you, sir.  That's all I have.

THE COURT:  Redirect?

REDIRECT EXAMINATION

BY MR. DIEPPA:

Q.   Mr. Liberti, in terms of your calculations, does it make a difference if Ms. Cole stretched her arms all the way out, half way out, or three quarters of the way out when she braced herself on the table?

A.   No.  That doesn't matter.

MR. DIEPPA:  Thank you.

THE COURT:  Okay.  Thank you, Mr. Liberti.

You can log off of the Zoom.  We appreciate your time.

THE WITNESS:  All right.  Thank you.

MR. DIEPPA:  Your Honor, for the proffers do you want me to print them out later, do you want me to e-mail them to your clerk?

THE COURT:  So no.  You can -- you can file it as a notice for purposes -- you know, per the court -- per your request to include his CV and report in the record.  That's fine.  Just do it as a notice.  File it.

MR. DIEPPA:  Understood.

Same thing, because I don't think the evidence is in the record -- I mean, it's not in the docket.  I don't know if it is, like all of this, we didn't file all of this, did we?

THE COURT:  His studies?

MR. DIEPPA:  No.  Just everything that we brought today and the exhibit book.

MR. JARNAGIN:  Yeah.  The joint exhibits haven't been filed.

THE COURT:  So there's a -- once we close there is -- you will get instructions on how to -- how do they get those instructions?  It's in the local rule; right?  What happens?

You have to file all of the exhibits.

MR. DIEPPA:  Oh, yeah.  I remember that.

THE COURT:  Johanna, do you know how that happens?

I always do this in criminal cases.  How do they file all their exhibits, conventionally file them with the clerk's office?

COURTROOM DEPUTY:  With the records office in the clerk's office.

THE COURT:  Okay.  So with Mr. Liberti being done, does

that conclude your rebuttal case?

MR. DIEPPA:  Concludes my rebuttal case, Your Honor.

THE COURT:  Okay.  So everybody rests?

MR. DRAHOS:  Yes.

THE COURT:  All right.  And it's okay, I will leave open the possibility that everybody needs to sort through and agree on the exhibits that we will get conventionally filed. Nobody is precluded from that in case you guys find any mistakes or anything is left out; another benefit of us not sending a jury back right now with a whole bunch of documents and something missing.

Okay.  Well, I had anticipated asking you to kind of seal everything up if you wanted to do it with argument, but given that it's 5:20 and I'm not going to give you a break to prepare for that, what I'm going to ask you to do is I have the proposed findings of fact and conclusions of law that were submitted by the parties, obviously you do that before -- I always find it kind of silly to submit them too early before you know how everything is going to come in in the case in the trial, but what I would like you to do now is take those and update them based on what has happened here in trial.

So you can, you know, update the facts.  You won't have the transcript in time obviously and that is fine.  I will be inputting things from the transcript and as soon as it is available if the parties want it before I rule that is

certainly your prerogative.

But I think -- I'm trying to think of how long -- so if you each update your findings of fact and conclusions of law based on the trial, do you want the transcript in order to do that?

MR. DIEPPA:  I don't need it, Your Honor.

MR. DRAHOS:  I think we would like to have the transcript.

THE COURT:  I know.  Yeah.

Because to the extent -- it usually does benefit the defense more to be able to say, for example, there was an absence of evidence on this, or -- and in order to do that, right, they are going to refer to -- or there's conflicting evidence on something, and it is easier to refer to the transcript for that.

So if you want you can -- when we go off the record, work -- work with the court reporter to find out the estimates on timing and costs and things like that.  And then for now I will say ten days, two weeks, what do you think assuming you can get the transcript, depending on how much you want to pay and how expedited you want it, but assuming you can get the transcript in less than a week --

MR. DIEPPA:  Was 21 days possible or -- if it's going to be transcripts and otherwise --

THE COURT:  And then you'll have to go through them.

MR. JARNAGIN:  I mean, 21 days is fine for us.

THE COURT:  So we will give you 21 days, and conveniently it's the 31st so I can even do that math.  So by June 21st, which --

COURTROOM DEPUTY:  That's a Friday, Judge.

THE COURT:  So by June 21st the parties can submit their proposed -- their updated proposed findings of fact and conclusions of law based on the trial and then I will issue my findings of fact and conclusions of law after that.  Okay?

There were no -- again, it's always unusual because it's a bench trial as far as motions for directed verdict or -- you know, either at the close of the plaintiff's case or at the close of the entire case.  But I have been considering nevertheless whether there was sufficient evidence at the close of the plaintiff's case that this case could have gone to a jury or to the fact finder and I was satisfied that there was sufficient evidence, you know, that this could have gone to a jury or gone to the fact finder.  But otherwise I don't think there's any basis for any directed verdicts.

So I am saving you all from having to make those motions now on the record.  I'm not precluding you from making any motions.  I don't think they're necessary because like I said I have been paying attention and watching for exactly that.  So hopefully you don't need to file anything other than getting your exhibits in conventionally and the 21 days to

submit your proposed findings.

Okay?

MR. DIEPPA:  Your Honor, it's been a pleasure.

THE COURT:  All right.  Well, thank you all very much. I do appreciate that everybody has been so well prepared and so professional and it has been a pleasure.  So everybody have a good weekend and now I guess it's time for happy hour.

MR. DRAHOS:  Thank you, Your Honor.

COURTROOM DEPUTY:  All rise.  Court is adjourned.

(Court is adjourned at 5:29 p.m.)

C E R T I F I C A T E


I hereby certify that the foregoing is an

accurate transcription of the proceedings in the

above-entitled matter.


DATE:  July 6, 2024           /s/Mairelys Albo
                              MAIRELYS ALBO, RPR
                              Official Court Reporter
                              United States District Court
                              Southern District of Florida
                              299 East Broward Boulevard
                              Fort Lauderdale, Florida 33301

1

**/**

**/s/Mairelys** [1] - 181:8

**1**

**1** [6] - 1:8, 115:1, 141:24, 142:4, 142:5, 142:6
**1,150** [1] - 32:20
**1.8** [1] - 86:16
**10** [11] - 2:20, 23:14, 95:7, 102:7, 103:7, 116:4, 116:6, 139:8, 141:24, 142:4, 143:2
**1001** [1] - 1:15
**11** [4] - 11:11, 75:1, 101:24, 119:1
**116** [1] - 2:20
**11:00** [1] - 15:23
**11:11** [1] - 15:23
**11th** [1] - 11:14
**12** [4] - 5:21, 28:15, 45:14, 101:25
**13** [7] - 2:21, 63:7, 141:24, 143:4, 143:5, 143:17
**13-2** [2] - 85:19, 85:22
**14** [4] - 42:5, 43:18, 63:11, 143:23
**140** [1] - 20:4
**141** [1] - 2:14
**141-some-odd** [1] - 8:3
**142** [1] - 2:21
**143** [1] - 2:21
**146** [1] - 2:11
**15** [3] - 2:3, 143:20, 143:22
**150** [2] - 1:14, 2:11
**16** [4] - 2:20, 55:3, 115:2, 144:5
**17** [2] - 2:13, 107:14
**173** [1] - 2:12
**175** [1] - 2:12
**177** [1] - 2:15
**18** [1] - 86:18
**181** [2] - 1:8, 2:16
**19** [4] - 31:13, 31:14, 55:24, 62:16
**1:00** [1] - 29:25
**1:05** [2] - 71:14, 72:11
**1:45** [3] - 72:3, 72:7, 72:10
**1:54** [1] - 72:11

**2**

**2** [4] - 87:12, 161:20, 161:23, 165:13

**2.2** [2] - 17:15, 17:20
**20** [4] - 12:4, 19:8, 152:11, 153:3
**20-cv-00119** [1] - 122:9
**2006** [1] - 31:17
**2018** [1] - 9:22
**2020** [1] - 7:9
**2021** [1] - 6:15
**2022** [12] - 23:14, 36:18, 47:18, 48:8, 50:17, 54:17, 102:19, 106:11, 109:7, 110:3, 136:9, 136:21
**2023** [3] - 11:12, 11:14, 41:5
**2024** [2] - 1:5, 181:8
**21** [4] - 178:23, 179:1, 179:2, 179:25
**21st** [2] - 179:4, 179:6
**22** [1] - 107:14
**23** [1] - 42:6
**23-cv-60532** [1] - 1:2
**23-cv-60532-Damian** [1] - 3:9
**24** [9] - 47:18, 48:8, 50:17, 54:17, 102:19, 106:11, 109:7, 110:3, 136:21
**248** [1] - 20:4
**25** [4] - 39:24, 78:23, 87:7, 100:7
**26** [16] - 28:2, 73:3, 86:20, 87:7, 88:7, 88:10, 90:1, 90:18, 90:22, 91:19, 100:7, 100:10, 114:17, 114:18, 122:11, 148:13
**26(B)(C** [1] - 14:17
**26(C** [4] - 11:9, 11:17, 11:22, 88:13
**27** [1] - 136:9
**299** [2] - 1:25, 181:11
**2:37** [1] - 74:5
**2:41** [1] - 74:5
**2nd** [1] - 1:14

**3**

**3** [5] - 1:7, 1:9, 95:7, 98:12, 139:7
**3-4** [2] - 84:15, 84:18
**3-6** [1] - 33:21
**30** [3] - 12:4, 39:24, 72:1
**30(b)(6** [18] - 41:2, 42:12, 51:2, 52:20, 54:23, 55:1, 61:22,

61:24, 62:6, 62:10, 62:12, 65:4, 65:18, 65:21, 66:5, 66:18, 66:21, 68:5
**31** [2] - 1:5, 2:5
**31st** [1] - 179:3
**33** [1] - 5:18
**33130** [1] - 1:19
**33131** [1] - 1:15
**33301** [2] - 1:25, 181:11
**35** [12] - 39:15, 40:9, 42:7, 49:16, 56:22, 57:21, 63:19, 64:5, 69:5, 69:18, 69:24, 72:1
**35-mile** [1] - 56:12
**3:00** [7] - 138:5, 138:7, 138:10, 139:1, 139:2
**3D** [2] - 140:7, 140:15

**4**

**4** [3] - 95:7, 98:12, 139:7
**47** [1] - 2:5
**4:27** [1] - 145:17
**4:37** [1] - 145:17

**5**

**5** [4] - 53:5, 102:7, 104:15
**5-and-a-half** [1] - 92:12
**50** [5] - 108:12, 108:15, 127:21, 128:2, 128:5
**51** [1] - 128:8
**515** [1] - 1:18
**5:00** [5] - 42:3, 42:5, 48:15, 65:15, 68:18
**5:20** [1] - 177:14
**5:29** [2] - 1:6, 180:10

**6**

**6** [4] - 104:16, 142:5, 142:6, 181:8
**61** [1] - 161:20
**62** [1] - 111:20
**63** [1] - 111:19
**64** [1] - 107:14
**650** [1] - 1:19
**6:00** [12] - 42:4, 42:5, 48:15, 53:18, 65:16, 68:18, 138:5, 138:7, 138:11, 139:1, 139:3
**6:20** [1] - 65:7
**6:22** [2] - 53:17, 53:18

**7**

**7** [3] - 104:17, 142:9, 143:1
**7-10** [1] - 2:21
**7.8** [1] - 92:12
**702** [2] - 158:1, 158:2
**73** [2] - 2:6, 53:5
**74** [1] - 2:8
**75** [1] - 80:7
**79** [1] - 69:16
**7:00** [1] - 53:19

**8**

**8** [6] - 2:20, 16:18, 92:12, 104:17, 143:1, 143:2
**80** [1] - 69:16

**9**

**9** [13] - 2:21, 33:6, 43:16, 63:2, 84:2, 141:25, 143:1, 143:2, 143:6, 143:12, 143:14, 143:15, 143:16
**90-something** [1] - 169:23
**98** [4] - 170:10, 170:13, 170:14, 171:2
**98.7** [2] - 162:5, 162:10
**99** [9] - 2:9, 163:4, 163:7, 163:8, 164:9, 164:15, 170:22, 170:23, 171:6
**9:42** [2] - 1:6, 3:1

**A**

**a.m** [4] - 1:6, 3:1, 15:23
**abbreviated** [1] - 79:19
**abducted** [2] - 96:10, 139:20
**able** [15] - 12:5, 36:8, 41:19, 50:10, 72:6, 93:20, 113:2, 114:10, 121:3, 129:21, 145:23, 146:2, 146:4, 169:20, 178:11
**above-entitled** [1] - 181:6
**abrasion** [1] - 97:18
**absence** [2] - 23:10,

178:12
**absolutely** [4] - 58:15, 58:16, 60:22, 150:7
**Academy** [1] - 79:4
**acceleration** [2] - 161:3, 166:9
**accept** [1] - 136:1
**accepted** [1] - 173:11
**access** [2] - 30:18, 53:22
**accessible** [1] - 47:10
**accident** [5] - 23:14, 53:17, 89:8, 104:21, 106:7
**accidents** [6] - 109:14, 110:14, 110:17, 111:1, 126:11
**accompanies** [1] - 117:16
**according** [5] - 93:2, 131:13, 132:18, 138:11, 164:6
**Accordingly** [1] - 123:7
**accurate** [6] - 25:7, 92:19, 93:12, 93:18, 132:8, 181:5
**accusation** [2] - 26:24, 28:8
**accusing** [1] - 27:12
**acknowledged** [2] - 23:14, 121:23
**acromiale** [1] - 98:17
**acromion** [1] - 98:20
**acting** [1] - 38:12
**activities** [3] - 33:11, 98:21, 109:10
**activity** [2] - 33:17, 108:10
**actual** [2] - 4:25, 144:6
**acute** [14] - 78:15, 95:21, 95:24, 96:8, 96:21, 97:17, 109:25, 124:22, 127:9, 127:17, 128:4, 134:7, 134:9, 139:14
**acutely** [1] - 95:16
**adamantly** [1] - 25:2
**add** [2] - 45:24, 172:15
**addition** [3] - 12:18, 82:14, 82:20
**additional** [1] - 80:22
**additionally** [1] - 42:25
**address** [8] - 3:24, 7:11, 18:9, 24:13, 24:23, 70:10, 83:13, 141:22

**addressed** [1] - 6:24
**addresses** [1] - 7:22
**addressing** [1] - 5:15
**adjourned** [2] - 180:9, 180:10
**adjuster** [2] - 31:22
**administrative** [1] - 31:17
**admiralty** [1] - 6:4
**admissible** [1] - 156:4
**admit** [1] - 7:3
**admitted** [3] - 20:22, 22:24, 143:3
**advance** [1] - 24:2
**advanced** [1] - 75:15
**advantage** [1] - 28:22
**adverse** [6] - 29:2, 29:4, 37:15, 64:15, 71:5, 71:11
**advised** [1] - 42:20
**aeronautical** [5] - 147:2, 147:12, 147:14, 151:16, 151:17
**aeronautics** [1] - 150:2
**aerospace** [2] - 148:18, 148:19
**affiliated** [1] - 79:7
**affirmed** [1] - 10:14
**aft** [4] - 33:15, 33:17, 34:2, 34:3
**afternoon** [6] - 14:11, 40:25, 72:16, 74:19, 99:15, 146:20
**afterwards** [1] - 67:17
**age** [10] - 98:23, 108:13, 108:25, 109:18, 109:20, 113:9, 113:18, 127:20, 128:2, 128:5
**age-related** [2] - 113:9, 113:18
**aged** [3] - 106:14, 106:22, 107:5
**ageing** [2] - 77:22, 80:3
**ago** [2] - 152:11, 153:3
**agree** [42] - 6:23, 7:1, 19:10, 50:25, 56:12, 57:20, 65:10, 67:23, 96:22, 99:25, 102:22, 103:2, 103:10, 104:25, 106:6, 106:9, 106:13, 106:18, 106:20, 107:2, 107:19, 107:21, 111:24, 113:7, 121:9, 122:24,

124:5, 124:19, 126:9, 150:17, 150:25, 151:7, 152:11, 152:15, 152:16, 158:6, 171:6, 173:25, 174:14, 174:20, 175:4, 177:7
**agreed** [4] - 16:17, 107:7, 141:25, 142:8
**ahead** [4] - 42:23, 49:12, 91:20, 168:12
**aid** [2] - 44:12, 44:16
**aircraft** [1] - 148:19
**airplane** [1] - 148:22
**airplanes** [1] - 148:21
**Airport** [6] - 101:2, 101:11, 101:13, 101:18, 102:10, 102:20
**airport** [1] - 102:5
**ALBO** [2] - 1:23, 181:9
**Albo** [1] - 181:8
**alert** [2] - 49:1, 49:2
**allegations** [1] - 62:3
**alleged** [2] - 63:10, 63:13
**allegedly** [2] - 59:12, 65:7
**allow** [1] - 35:17
**allowed** [6] - 6:22, 118:17, 119:25, 122:12, 123:3, 173:3
**allows** [3] - 66:23, 77:18, 94:19
**almost** [5] - 149:16, 152:11, 153:3, 159:20, 162:14
**alone** [1] - 38:23
**alter** [1] - 66:25
**Amazon** [1] - 17:12
**amended** [2] - 28:5, 64:24
**amenities** [1] - 32:21
**America** [3] - 124:5, 124:20, 151:24
**American** [1] - 80:2
**amount** [13] - 5:12, 5:13, 6:7, 6:8, 6:19, 7:20, 8:6, 21:24, 21:25, 32:20, 92:15, 160:12
**amounts** [7] - 4:25, 5:1, 7:16, 8:2, 12:7, 19:1
**Amy** [3] - 74:9, 74:14, 74:21
**AMY** [2] - 2:7, 74:14
**analysis** [1] - 108:22
**anatomical** [4] -

93:10, 95:1, 97:6, 127:9
**anatomy** [11] - 75:7, 76:6, 79:16, 93:21, 94:20, 140:12, 150:23, 151:3, 156:15, 158:8, 169:14
**Andy** [3] - 146:7, 146:12, 146:16
**ANDY** [2] - 2:10, 146:16
**angle** [2] - 133:11, 163:2
**announcement** [1] - 38:1
**ANSWER** [1] - 89:25
**answer** [11] - 100:13, 104:9, 104:12, 105:11, 105:21, 121:4, 121:5, 168:1, 168:20, 170:12, 174:25
**answered** [6] - 56:25, 113:11, 115:10, 116:13, 129:11, 168:2
**Answers** [1] - 119:3
**answers** [4] - 7:8, 119:20, 125:9, 140:17
**anterior** [1] - 138:3
**anticipated** [1] - 177:12
**anticipation** [1] - 23:22
**anyway** [4] - 62:7, 68:22, 70:20, 89:8
**apparent** [1] - 87:8
**appeal** [3] - 172:1, 172:18
**appearances** [1] - 3:10
**APPEARANCES** [1] - 1:11
**application** [1] - 77:8
**applications** [1] - 78:2
**applied** [5] - 81:23, 134:14, 134:15, 134:16, 139:21
**applies** [1] - 7:1
**apply** [4] - 77:10, 77:12, 82:5, 169:24
**appreciate** [6] - 7:12, 21:10, 141:8, 170:10, 175:21, 180:5
**approach** [3] - 81:19, 81:21, 130:23
**appropriate** [4] - 55:2,

56:1, 64:16, 93:7
**approximate** [3] - 39:23, 103:7, 160:12
**area** [29] - 25:8, 34:3, 36:5, 38:19, 43:10, 43:19, 43:21, 44:19, 45:7, 45:13, 46:2, 46:3, 49:9, 75:12, 80:18, 83:25, 84:2, 84:3, 84:5, 84:6, 85:11, 92:22, 94:15, 104:20, 112:21, 156:14, 157:6, 157:16, 167:25
**areas** [8] - 38:5, 39:5, 39:6, 56:4, 56:6, 63:20, 92:21, 163:14
**arguably** [1] - 18:24
**argue** [2] - 66:17, 70:7
**arguing** [1] - 123:13
**argument** [3] - 70:6, 158:1, 177:13
**arguments** [2] - 6:19, 24:12
**arise** [2] - 168:17
**arm** [27] - 94:2, 96:9, 96:24, 97:3, 97:5, 97:9, 98:21, 131:11, 131:20, 131:23, 131:24, 132:2, 132:6, 132:9, 132:12, 132:16, 133:1, 133:5, 133:10, 133:11, 133:19, 134:2, 134:11, 138:9, 139:19
**Armand** [1] - 9:17
**Armand-Hosang** [1] - 9:17
**arms** [8] - 133:6, 134:8, 162:12, 174:11, 174:20, 175:5, 175:15
**arranged** [2] - 84:5, 87:9
**arranging** [1] - 30:7
**Arruda** [2] - 124:5, 124:19
**arthritis** [2] - 109:3, 136:16
**arthroscopically** [1] - 140:21
**article** [2] - 127:5, 127:6
**articles** [7] - 80:5, 80:7, 126:1, 159:6, 159:9, 159:10, 159:13
**articulating** [1] - 7:14

**ASHLEY** [1] - 1:17
**Ashley** [1] - 3:18
**aspects** [1] - 110:12
**assertion** [2] - 63:8, 63:11
**assigned** [4] - 45:13, 45:25, 46:3, 50:16
**assist** [4] - 32:4, 50:8, 54:11, 93:9
**assistant** [3] - 31:18, 45:7, 45:10
**assisted** [1] - 40:15
**assume** [3] - 54:4, 132:9, 163:20
**assuming** [2] - 178:19, 178:21
**astronautical** [4] - 147:3, 147:12, 147:14, 151:17
**attach** [1] - 95:3
**attached** [2] - 15:3, 159:13
**attaches** [2] - 94:5, 138:9
**attack** [1] - 118:12
**attempt** [7] - 18:2, 20:18, 27:8, 83:4, 88:10, 89:7, 106:6
**attempted** [1] - 102:3
**attention** [3] - 24:7, 71:21, 179:23
**attorney** [1] - 54:9
**Auburn** [1] - 76:13
**August** [1] - 23:14
**authentic** [1] - 144:20
**authority** [4] - 3:25, 4:13, 9:17, 10:16
**authors** [2] - 106:21, 107:4
**automatic** [1] - 48:16
**automatically** [1] - 41:13
**available** [12] - 32:22, 36:9, 38:9, 41:7, 52:24, 52:25, 56:15, 56:19, 110:2, 110:22, 154:20, 177:25
**Avenue** [1] - 1:14
**average** [1] - 162:2
**aware** [10] - 15:1, 26:1, 26:21, 53:7, 57:12, 91:5, 97:22, 98:11, 109:15, 132:1
**awareness** [1] - 60:22

## B

**B-o-r-c-e-g-u-e** [1] - 31:4

**bachelor's** [4] - 75:5, 147:2, 151:12, 151:16
**background** [11] - 16:24, 75:3, 149:24, 151:6, 154:9, 155:10, 155:14, 156:14, 156:16, 158:7, 171:5
**bad** [2] - 25:4, 141:11
**Bahamas** [1] - 102:20
**ball** [2] - 92:17, 138:21
**ballistic** [1] - 92:23
**Barry** [1] - 119:22
**bars** [2] - 32:23, 33:16
**base** [1] - 139:21
**based** [40] - 6:19, 8:11, 10:12, 18:24, 19:2, 21:24, 22:13, 34:21, 34:22, 39:18, 42:18, 42:19, 59:1, 59:2, 59:3, 59:5, 64:4, 65:9, 71:5, 71:11, 90:21, 103:21, 106:23, 107:5, 107:8, 108:25, 114:15, 126:18, 139:11, 147:23, 149:18, 152:17, 154:18, 155:16, 156:16, 173:11, 174:10, 177:21, 178:4, 179:8
**bases** [3] - 92:9, 100:5
**basing** [2] - 57:1, 57:3
**basis** [5] - 10:10, 53:10, 69:9, 117:14, 179:19
**Beach** [1] - 1:19
**bear** [1] - 78:12
**became** [1] - 76:2
**become** [2] - 26:19, 32:11
**becomes** [2] - 26:18, 27:2
**BEFORE** [1] - 1:10
**begin** [3] - 24:11, 122:14, 166:9
**beginning** [2] - 3:10, 85:8
**behalf** [6] - 3:16, 3:18, 52:21, 68:13, 69:2, 119:21
**behind** [4] - 34:3, 34:8, 84:4, 159:19
**belive** [1] - 85:23
**BENCH** [1] - 1:9
**bench** [5] - 115:22, 170:17, 170:18, 170:21, 179:11

**benefit** [4] - 75:2, 83:11, 177:9, 178:10
**berated** [1] - 24:25
**best** [4] - 45:18, 46:4, 57:7, 57:8
**Beth** [3] - 75:16, 78:24, 79:6
**better** [5] - 8:1, 20:8, 140:7, 140:18, 168:6
**between** [17] - 39:24, 44:14, 68:5, 75:10, 78:3, 87:1, 92:12, 93:5, 93:21, 98:19, 99:17, 104:15, 104:16, 112:8, 114:7, 129:19, 130:14
**beverage** [3] - 37:19, 38:16, 38:25
**beyond** [4] - 19:6, 44:12, 158:3
**Bhatia** [1] - 55:6
**big** [2] - 129:6, 129:7
**bigger** [1] - 19:11
**bill** [4] - 9:6, 18:15, 19:7
**billed** [9] - 4:25, 5:2, 7:16, 8:2, 11:1, 18:21, 21:24
**billing** [6] - 13:10, 18:5, 18:13, 18:14, 21:2
**bills** [13] - 7:15, 9:23, 9:25, 10:11, 14:19, 14:20, 14:21, 18:15, 20:2, 20:3, 21:6, 21:17
**bin** [1] - 86:5
**bins** [1] - 85:6
**bio** [2] - 77:6, 154:22
**biological** [3] - 77:9, 77:20, 134:15
**biomechanic** [3] - 83:6, 145:1, 145:2
**biomechanical** [47] - 74:21, 75:8, 77:16, 77:19, 78:2, 78:4, 78:8, 78:10, 78:14, 80:6, 80:8, 81:14, 82:25, 83:14, 83:17, 83:20, 90:21, 94:12, 95:12, 95:15, 95:20, 95:21, 98:5, 98:8, 99:4, 99:6, 108:3, 108:19, 108:22, 109:20, 110:6, 118:15, 134:9, 136:14, 136:18, 139:19, 147:17, 148:17, 152:24,

152:25, 153:1, 153:17, 153:18, 154:7, 154:9, 170:20, 171:5
**biomechanically** [3] - 98:16, 108:7, 135:16
**Biomechanics** [1] - 80:11
**biomechanics** [12] - 30:6, 75:7, 77:4, 92:22, 149:20, 150:4, 151:19, 151:22, 151:25, 152:3, 152:7, 153:3
**biomedical** [1] - 147:6
**bit** [11] - 12:2, 14:17, 31:11, 103:16, 104:1, 133:7, 133:12, 146:25, 147:16, 149:5, 166:22
**blade** [1] - 93:25
**blast** [1] - 92:23
**blended** [2] - 9:18
**blood** [1] - 93:17
**blowing** [1] - 111:6
**blue** [2] - 25:11, 138:21
**Blue** [2] - 5:11
**board** [1] - 6:22
**boat** [1] - 40:11
**body** [43] - 67:1, 67:5, 76:7, 76:8, 77:13, 77:14, 81:12, 87:14, 92:20, 93:10, 95:13, 96:11, 97:24, 114:13, 126:6, 132:10, 133:12, 139:20, 148:10, 150:24, 153:8, 153:11, 153:12, 154:17, 154:22, 155:16, 156:24, 158:8, 161:15, 161:19, 162:6, 162:15, 162:16, 162:18, 165:10, 165:13, 167:9, 169:14, 170:5, 170:8, 174:15
**bolted** [2] - 35:21, 130:17
**bomb** [1] - 92:17
**Bone** [1] - 80:2
**bone** [8] - 93:25, 94:2, 95:3, 96:9, 127:17, 133:5, 138:9
**book** [1] - 176:11
**BORCEGUE** [1] - 2:4
**Borcegue** [17] - 24:19,

25:14, 29:20, 30:15, 30:22, 30:24, 31:3, 31:7, 31:9, 32:11, 33:23, 35:3, 35:13, 35:21, 42:25, 46:22, 47:3
**bordering** [1] - 67:23
**Boston** [2] - 75:12, 79:10
**bottom** [1] - 86:2
**Boulevard** [2] - 1:25, 181:11
**bound** [1] - 92:7
**bow** [1] - 59:18
**braced** [9] - 96:20, 96:23, 132:6, 159:24, 160:1, 174:11, 174:20, 175:4, 175:16
**bracing** [4] - 97:3, 97:5, 97:21, 137:3
**brain** [2] - 124:8, 124:12
**branch** [1] - 77:8
**break** [10] - 30:16, 71:14, 131:16, 145:6, 145:11, 145:13, 153:12, 154:4, 177:14
**breakfast** [1] - 33:14
**breaks** [1] - 170:7
**breathing** [1] - 108:9
**breeze** [1] - 101:23
**bride** [1] - 38:20
**bridge** [15] - 37:17, 37:22, 37:25, 39:8, 39:10, 40:18, 40:21, 41:18, 42:2, 48:17, 49:24, 50:16, 59:19, 62:22, 69:6
**brief** [6] - 15:19, 15:23, 29:22, 74:5, 145:17, 173:22
**briefly** [1] - 31:15
**bring** [9] - 29:6, 47:3, 47:12, 56:23, 66:6, 66:8, 126:13, 126:15, 132:21
**bringing** [3] - 8:24, 28:23, 65:8
**broad** [1] - 66:13
**broader** [1] - 104:17
**brought** [10] - 19:17, 24:7, 50:13, 78:12, 93:9, 118:16, 126:5, 131:6, 169:5, 176:10
**Broward** [3] - 1:25, 21:19, 181:11
**bruise** [11] - 87:19, 87:20, 87:24, 88:2,

88:5, 92:4, 92:5, 92:7, 100:6, 103:20, 114:15
**bruising** [4] - 87:13, 92:1, 92:20, 97:18
**buffet** [2] - 33:12, 33:13
**bullet** [1] - 24:13
**bunch** [2] - 161:8, 177:10
**burden** [1] - 26:6
**button** [1] - 96:16
**BY** [62] - 1:22, 2:5, 2:5, 2:8, 2:9, 2:11, 2:11, 2:12, 31:6, 33:22, 35:20, 36:23, 42:24, 47:2, 52:19, 74:18, 83:9, 84:16, 85:20, 86:12, 91:22, 94:11, 99:14, 100:9, 101:8, 103:13, 107:1, 107:22, 108:1, 112:5, 113:22, 117:24, 118:6, 118:24, 119:19, 122:5, 123:23, 125:25, 129:2, 129:14, 131:4, 131:17, 133:14, 135:6, 146:19, 150:13, 158:13, 163:17, 164:2, 166:13, 166:21, 167:19, 168:13, 168:23, 169:6, 169:22, 170:24, 172:22, 173:2, 173:24, 175:2, 175:13

**C**

**C-o-u-r-t-n-e-y** [1] - 74:14
**cable** [1] - 51:15
**cadaver** [1] - 148:5
**calculated** [3] - 103:20, 103:21, 161:22
**calculation** [14] - 88:7, 88:9, 88:11, 89:12, 103:14, 104:3, 115:9, 116:18, 117:2, 117:10, 117:19, 154:18, 160:12, 160:19
**calculations** [22] - 87:25, 89:2, 89:5, 89:9, 89:10, 90:12, 92:8, 100:2, 103:24,

4

112:15, 113:23, 115:6, 116:15, 116:21, 158:19, 162:21, 164:7, 173:4, 174:21, 175:5, 175:14
**calculus** [1] - 79:15
**Cambridge** [2] - 75:12, 76:11
**camera** [6] - 43:16, 43:18, 43:20, 43:21, 43:22, 141:3
**cameras** [7] - 23:2, 43:10, 43:12, 43:13, 43:16, 44:1, 71:4
**campus** [1] - 79:1
**cannon** [1] - 92:17
**cannot** [3] - 106:22, 107:5, 127:2
**captain** [41] - 37:16, 37:22, 38:4, 39:6, 40:2, 40:8, 47:17, 47:21, 47:22, 47:24, 47:25, 48:2, 48:3, 48:5, 48:7, 48:19, 48:22, 49:6, 49:8, 49:17, 50:1, 50:15, 56:11, 57:1, 57:4, 57:8, 57:20, 57:23, 58:5, 58:8, 58:16, 58:17, 58:19, 59:1, 62:22, 63:20, 64:6, 69:1, 69:8
**captain's** [8] - 38:12, 38:21, 39:4, 57:14, 57:15, 64:3, 67:25, 69:15
**captains** [1] - 39:9
**car** [7] - 77:11, 109:14, 110:14, 110:17, 126:11, 154:2, 169:19
**care** [1] - 76:16
**career** [2] - 147:4, 147:8
**cargo** [2] - 56:3, 62:17
**Carnival** [42] - 3:9, 3:15, 3:17, 3:19, 6:15, 22:24, 23:15, 24:1, 24:15, 31:10, 31:12, 32:17, 33:8, 34:18, 35:10, 37:9, 40:15, 44:4, 45:9, 45:17, 45:20, 45:21, 46:7, 48:5, 48:7, 50:16, 50:17, 51:4, 52:21, 53:24, 57:12, 57:17, 59:15, 60:4, 60:11, 61:8, 65:9, 84:2, 86:22, 112:19,

150:15
**CARNIVAL** [1] - 1:7
**Carnival's** [9] - 16:11, 34:22, 44:2, 55:23, 56:21, 62:11, 72:21, 73:5, 119:3
**Carolina** [1] - 146:24
**carrier** [1] - 5:2
**cart** [8] - 34:11, 34:23, 99:17, 129:20, 130:2, 130:9, 130:12, 130:14
**cartilage** [1] - 138:23
**CASE** [1] - 1:2
**Case** [3] - 3:1, 3:8, 122:9
**case** [126] - 4:4, 4:18, 6:15, 6:22, 7:9, 7:18, 8:4, 9:4, 9:5, 9:13, 9:15, 9:18, 10:6, 10:7, 10:9, 10:13, 10:17, 10:24, 10:25, 11:13, 11:14, 11:25, 13:10, 19:24, 22:8, 22:16, 22:18, 23:1, 23:20, 23:22, 24:15, 24:23, 25:13, 26:1, 26:2, 26:8, 29:6, 32:12, 32:15, 35:10, 38:19, 40:1, 40:24, 41:3, 42:17, 42:22, 43:1, 43:6, 44:21, 46:11, 50:8, 54:3, 54:10, 54:18, 65:10, 67:1, 67:5, 69:23, 73:6, 77:2, 80:14, 80:16, 81:3, 82:6, 83:12, 84:24, 87:15, 100:1, 102:3, 102:23, 105:1, 105:2, 105:5, 105:18, 114:19, 115:3, 119:6, 119:11, 119:17, 119:22, 121:11, 121:16, 121:23, 122:6, 122:7, 122:15, 122:19, 122:25, 123:14, 123:20, 123:24, 123:25, 124:9, 124:19, 132:1, 139:9, 140:13, 141:21, 144:12, 146:7, 153:10, 153:23, 158:14, 158:20, 159:11, 160:7, 161:18, 163:20, 164:4, 166:24, 167:2,

168:16, 170:25, 172:18, 172:24, 177:1, 177:2, 177:8, 177:19, 179:12, 179:13, 179:15
**cases** [13] - 4:12, 9:21, 19:23, 32:5, 32:8, 118:9, 118:16, 118:18, 119:9, 119:24, 125:7, 125:10, 176:20
**categorize** [1] - 79:21
**category** [2] - 63:6, 63:7
**causation** [5] - 11:23, 121:17, 123:8, 156:24
**caused** [9] - 28:6, 91:13, 92:4, 96:21, 103:22, 122:18, 153:24, 153:25, 160:8
**causes** [1] - 161:3
**causing** [1] - 96:14
**CCTV** [6] - 24:24, 25:1, 43:6, 43:16, 43:20, 71:4
**Cedant** [1] - 11:13
**cellphone** [1] - 148:24
**cellular** [1] - 76:10
**center** [3] - 18:11, 44:8, 44:9
**certain** [19] - 5:11, 12:8, 22:13, 23:21, 38:5, 38:18, 39:4, 39:6, 48:4, 53:9, 57:22, 69:10, 81:19, 96:10, 110:12, 112:18, 127:2, 127:16, 159:6
**certainly** [3] - 93:16, 156:13, 178:1
**certainty** [1] - 173:14
**CERTIFICATE** [1] - 2:16
**certification** [1] - 79:19
**certifications** [2] - 79:18, 150:25
**certified** [2] - 54:1, 79:19
**certify** [1] - 181:4
**cetera** [1] - 66:7
**chair** [8] - 85:1, 85:7, 129:23, 130:1, 130:5, 130:7, 174:3, 174:7
**chairs** [3] - 84:5, 84:8, 87:9
**Chalal** [24] - 8:22,

11:3, 12:2, 12:6, 13:9, 13:12, 14:16, 18:19, 18:23, 19:10, 19:11, 19:16, 20:14, 20:18, 21:11, 98:1, 109:2, 136:2, 136:16, 141:1, 143:4, 143:8, 155:23, 158:16
**Chalal's** [2] - 82:22, 98:9
**challenge** [1] - 156:1
**challenged** [1] - 155:23
**chance** [2] - 89:10, 110:25
**change** [5] - 66:24, 67:2, 120:2, 122:13, 162:16
**changed** [4] - 26:2, 36:19, 70:22, 118:19
**changes** [5] - 67:4, 106:10, 111:21, 122:18, 123:20
**changing** [1] - 133:11
**charge** [2] - 19:3, 19:4
**charged** [2] - 6:9, 12:7
**charges** [3] - 8:24, 18:14, 19:18
**charging** [2] - 11:6, 19:14
**check** [2] - 27:8, 41:23
**checked** [1] - 43:14
**chief** [9] - 22:8, 24:23, 24:25, 25:14, 35:10, 42:22, 43:14, 65:10, 144:12
**chops** [1] - 119:22
**chronic** [1] - 109:4
**Circuit** [3] - 11:14, 124:6
**circumstances** [3] - 7:25, 91:12, 155:14
**cite** [1] - 7:9
**cited** [12] - 4:12, 6:14, 9:2, 9:9, 9:15, 19:23, 106:20, 115:4, 116:9, 125:1, 126:1, 126:7
**CitiMed** [4] - 18:6, 20:23, 82:20, 142:7
**citing** [1] - 7:9
**Civil** [1] - 66:20
**claim** [2] - 7:8, 111:4
**claimed** [1] - 4:5
**claiming** [7] - 35:13, 109:18, 111:5, 112:8, 114:10, 136:11, 140:13
**claims** [5] - 31:20,

31:22, 32:1, 32:2, 34:5
**clarification** [4] - 58:13, 106:24, 147:20, 171:12
**clarified** [1] - 117:15
**clarify** [2] - 20:17, 129:25
**clarifying** [1] - 167:7
**clarity** [2] - 140:9, 140:19
**class** [4] - 46:15, 75:24, 148:21, 151:4
**classes** [1] - 76:2
**clavicle** [1] - 94:1
**clear** [10] - 10:4, 10:17, 17:16, 18:1, 24:3, 48:21, 49:19, 111:4, 132:23, 155:2
**clearly** [3] - 18:5, 19:7, 53:15
**clerk** [2] - 30:6, 175:25
**clerk's** [2] - 176:21, 176:24
**Cleveland** [2] - 79:1
**clients** [1] - 149:2
**Clinic** [1] - 79:1
**clinical** [3] - 76:10, 76:12, 78:4
**clock** [3] - 138:9, 138:17, 138:25
**close** [18] - 23:20, 24:5, 39:19, 40:2, 49:18, 50:6, 50:12, 57:22, 58:1, 58:8, 64:14, 71:1, 71:21, 141:21, 176:14, 179:12, 179:13, 179:14
**closed** [7] - 39:5, 39:7, 49:3, 49:17, 71:3, 71:12
**closing** [3] - 38:18, 63:20, 70:6
**clubs** [1] - 32:25
**code** [1] - 19:7
**coded** [2] - 11:4, 11:5
**codes** [3] - 18:12, 18:20, 79:21
**coding** [2] - 18:18, 21:9
**cohort** [2] - 75:24, 127:25
**Cole** [41] - 3:9, 3:13, 34:5, 39:23, 44:21, 45:3, 45:7, 45:23, 80:19, 80:25, 81:10, 85:7, 87:6, 87:11, 91:12, 92:25, 94:13, 96:19, 99:18,

104:19, 108:6, 109:9, 110:4, 112:8, 112:18, 114:10, 127:3, 127:14, 128:6, 130:5, 130:7, 133:23, 135:11, 143:2, 159:16, 161:12, 167:22, 169:2, 173:25, 175:4, 175:15

**COLE** [1] - 1:4

**Cole's** [31] - 32:16, 33:5, 36:17, 43:7, 61:1, 83:15, 84:25, 89:18, 95:8, 95:22, 108:19, 110:2, 111:6, 111:11, 111:22, 113:8, 124:2, 128:11, 129:23, 130:16, 131:20, 160:5, 160:9, 165:9, 168:16, 168:24, 169:8, 174:7, 174:15, 174:20

**Coles** [1] - 40:11

**Coles'** [1] - 41:21

**collage** [2] - 85:23, 85:25

**collarbone** [1] - 94:1

**collateral** [4] - 5:2, 7:1, 7:2, 8:14

**collected** [1] - 59:18

**collection** [1] - 126:23

**college** [3] - 75:3, 79:3, 79:16

**combination** [2] - 19:25, 85:13

**combined** [1] - 108:3

**combining** [1] - 77:8

**comfortable** [1] - 12:3

**coming** [6] - 11:9, 101:6, 117:17, 143:17, 165:22

**command** [1] - 38:12

**comment** [1] - 50:10

**commented** [1] - 20:16

**common** [5] - 56:5, 58:21, 60:19, 61:6, 61:9

**community** [6] - 8:6, 18:3, 19:4, 19:13, 20:9, 152:2

**company** [6] - 9:1, 31:13, 47:20, 129:7, 147:15, 147:16

**compared** [1] - 103:24

**comparison** [1] - 92:19

**competent** [2] - 124:10, 125:12

**competitors** [1] - 20:19

**complaint** [6] - 28:5, 62:4, 63:10, 63:13, 64:18, 64:24

**complaints** [1] - 78:19

**completed** [4] - 75:5, 75:13, 75:16, 150:21

**completely** [1] - 25:16

**components** [2] - 77:11, 152:13

**compulsory** [1] - 27:25

**concentrated** [1] - 92:15

**concern** [2] - 7:13, 7:15

**concerned** [4] - 156:25, 158:2, 165:20, 165:21

**concerning** [6] - 10:22, 20:8, 72:22, 73:2, 100:2, 111:2

**concerns** [1] - 113:9

**conclude** [1] - 177:1

**concludes** [2] - 16:6, 177:2

**conclusion** [7] - 83:22, 83:24, 95:14, 107:9, 110:8, 169:7, 174:11

**conclusions** [6] - 83:12, 114:16, 177:16, 178:3, 179:8, 179:9

**concussion** [1] - 124:22

**condition** [8] - 63:10, 63:13, 89:8, 109:4, 109:19, 111:11, 111:22, 137:7

**conditions** [18] - 37:23, 37:24, 40:2, 40:10, 41:14, 41:24, 50:2, 50:11, 53:10, 56:3, 56:5, 58:20, 62:15, 62:18, 64:7, 64:19, 106:7, 120:5

**conduct** [2] - 128:20, 129:10

**conducted** [2] - 19:9, 20:7

**conference** [1] - 145:2

**confident** [2] - 130:17, 130:19

**confirm** [3] - 119:11, 121:10, 132:19

**confirmed** [5] - 43:14,

49:5, 55:1, 56:1, 142:16

**conflict** [1] - 9:19

**conflicting** [1] - 178:13

**conjunction** [1] - 136:15

**Conquest** [18] - 32:17, 32:18, 32:22, 33:8, 36:6, 36:9, 36:13, 36:15, 38:4, 38:9, 47:18, 48:8, 49:6, 50:16, 50:17, 59:15, 60:4, 60:12

**consider** [11] - 5:12, 8:5, 8:13, 14:20, 23:20, 39:6, 87:4, 94:19, 142:22, 157:25, 172:16

**consideration** [5] - 28:9, 39:11, 40:6, 164:20, 164:21

**considered** [4] - 19:12, 22:1, 82:15, 97:1

**considering** [7] - 7:25, 39:16, 40:9, 110:6, 155:18, 164:18, 179:13

**considers** [2] - 5:9, 63:20

**consistent** [22] - 65:11, 65:25, 67:8, 68:4, 83:18, 83:21, 86:21, 86:24, 99:3, 101:19, 103:1, 109:21, 112:1, 112:3, 121:8, 121:9, 135:13, 135:17, 136:16, 137:3, 137:6, 140:2

**consistently** [1] - 25:2

**constant** [1] - 101:19

**consult** [2] - 47:22, 47:24

**consulted** [1] - 41:20

**consulting** [1] - 74:24

**contact** [12] - 45:17, 81:11, 89:18, 94:19, 96:5, 96:24, 97:23, 114:12, 131:24, 132:3, 133:9

**contacted** [4] - 45:14, 81:9, 104:16, 104:18

**contain** [1] - 107:8

**contained** [2] - 86:8, 88:10

**container** [9] - 36:4, 36:19, 36:20, 46:20, 86:7, 112:8, 141:25,

144:4, 144:6

**containers** [10] - 26:3, 35:23, 36:9, 36:11, 36:16, 36:17, 36:24, 37:6, 37:8, 37:12

**contains** [3] - 115:2, 115:6, 116:15

**contemplates** [1] - 127:19

**contemporaneous** [1] - 85:5

**contend** [1] - 25:8

**contending** [1] - 106:1

**contention** [1] - 13:8

**context** [3] - 78:8, 103:24, 111:8

**continue** [2] - 133:19, 166:19

**continued** [1] - 73:7

**continuing** [1] - 73:3

**contract** [2] - 45:15, 46:6

**contradicts** [1] - 67:4

**contrary** [2] - 133:20, 142:20

**contributes** [1] - 165:5

**control** [1] - 145:10

**contusion** [1] - 104:20

**conveniently** [1] - 179:3

**conventionally** [3] - 176:21, 177:7, 179:25

**conversations** [1] - 27:14

**Cooper** [1] - 3:16

**COOPER** [1] - 1:17

**copies** [1] - 4:11

**copy** [14] - 5:19, 5:22, 6:14, 11:10, 14:24, 23:16, 26:12, 30:17, 62:6, 62:7, 73:3, 102:16, 120:19, 123:5

**corner** [5] - 92:13, 92:14, 103:22, 104:16, 154:6

**corollary** [1] - 9:8

**corporate** [23] - 3:20, 22:24, 24:20, 29:21, 32:10, 34:15, 35:4, 35:7, 35:8, 35:16, 35:17, 54:19, 56:13, 61:25, 64:5, 67:3, 68:6, 68:9, 68:10, 70:12, 71:12, 72:21, 72:24

**CORPORATION** [1] - 1:7

**Corporation** [1] - 3:9

**corporation** [4] - 66:22, 68:11, 68:14, 69:3

**corporations** [1] - 129:7

**correct** [107] - 8:10, 30:13, 33:24, 37:13, 38:7, 38:10, 39:21, 41:3, 41:6, 42:10, 43:1, 43:4, 43:5, 43:22, 43:23, 44:1, 46:21, 47:15, 48:4, 49:24, 50:13, 51:4, 52:22, 55:4, 55:5, 56:8, 56:9, 56:14, 57:9, 57:13, 57:17, 57:23, 61:8, 61:9, 64:8, 65:2, 76:4, 76:20, 89:22, 89:25, 95:23, 96:2, 97:5, 97:6, 100:3, 100:10, 100:13, 100:16, 100:22, 100:23, 101:11, 102:6, 102:11, 102:20, 105:4, 105:15, 105:17, 106:7, 107:7, 111:2, 111:13, 112:10, 113:3, 113:10, 120:6, 124:4, 124:8, 124:12, 124:17, 124:23, 126:20, 126:22, 127:6, 127:14, 127:22, 127:24, 128:13, 128:17, 128:21, 129:16, 132:14, 135:3, 135:25, 136:6, 136:9, 136:24, 137:10, 149:11, 149:16, 150:17, 150:18, 150:20, 151:2, 151:15, 152:12, 158:21, 158:25, 159:8, 159:14, 164:16, 165:11, 169:10, 169:11, 174:1, 174:2, 174:9, 174:12

**correctly** [2] - 7:14, 78:1

**costs** [2] - 5:5, 178:18

**Counsel** [1] - 131:1

**counsel** [14] - 3:10, 4:14, 8:23, 14:24, 15:9, 16:25, 17:8, 32:5, 46:9, 93:22,

128:16, 130:16, 150:15, 173:19
**County** [3] - 21:19, 124:6
**couple** [6] - 62:20, 72:18, 84:4, 113:21, 145:8, 145:15
**coupled** [1] - 20:1
**course** [12] - 22:1, 26:2, 26:8, 38:3, 38:19, 39:12, 40:6, 44:12, 57:3, 63:23, 75:7, 135:22
**courses** [2] - 76:5, 76:8
**coursework** [2] - 75:14, 75:16
**Court** [36] - 1:24, 3:1, 3:3, 4:7, 7:11, 9:10, 9:20, 13:9, 14:19, 14:24, 15:1, 15:4, 16:9, 19:21, 23:9, 23:18, 24:2, 24:10, 25:20, 25:25, 28:10, 62:6, 66:17, 69:18, 74:20, 83:11, 91:18, 95:2, 124:6, 125:17, 141:22, 166:23, 167:9, 180:10, 181:9, 181:10
**COURT** [303] - 1:1, 1:23, 3:6, 3:20, 4:1, 4:15, 4:19, 4:21, 5:17, 5:20, 7:4, 7:12, 7:23, 8:16, 8:20, 9:11, 9:14, 10:1, 10:19, 10:21, 11:3, 11:15, 11:20, 11:25, 12:15, 12:18, 12:21, 12:25, 13:7, 13:19, 13:24, 14:21, 15:5, 15:15, 15:20, 15:22, 15:25, 16:5, 16:13, 16:15, 16:19, 16:21, 17:4, 17:9, 17:16, 17:19, 17:24, 18:1, 18:8, 18:23, 20:5, 20:11, 20:25, 21:7, 21:10, 22:5, 22:7, 22:15, 25:22, 26:16, 27:1, 27:10, 27:17, 28:3, 28:18, 28:20, 29:1, 29:4, 29:12, 29:15, 29:25, 30:4, 30:9, 30:14, 33:18, 34:13, 34:23, 35:4, 35:7, 35:15, 36:22, 42:21, 51:13, 51:16, 51:20, 51:22, 51:25, 52:2, 52:6, 52:10,

52:15, 61:11, 61:14, 61:18, 61:24, 62:7, 62:19, 63:1, 63:4, 63:15, 63:17, 64:1, 64:4, 64:9, 64:12, 65:5, 66:10, 66:12, 67:7, 67:10, 68:1, 69:20, 69:22, 70:2, 70:5, 70:7, 70:10, 71:1, 71:19, 71:25, 72:7, 72:13, 73:9, 73:16, 73:22, 74:2, 74:4, 74:8, 74:16, 83:2, 83:7, 86:10, 88:8, 88:14, 88:19, 88:22, 89:12, 90:2, 90:8, 90:14, 90:19, 90:23, 91:2, 91:15, 91:20, 93:23, 99:11, 101:6, 103:10, 107:17, 107:24, 112:1, 113:13, 113:15, 113:20, 115:11, 115:14, 115:17, 115:21, 116:2, 116:8, 116:12, 117:6, 117:12, 118:4, 118:12, 119:2, 119:5, 119:8, 119:13, 119:16, 120:13, 120:16, 120:21, 121:9, 121:14, 121:21, 123:13, 123:21, 125:6, 125:10, 125:19, 125:21, 128:25, 129:12, 131:15, 132:22, 134:23, 135:1, 137:15, 137:22, 137:24, 138:2, 138:6, 138:13, 138:16, 139:2, 139:9, 139:11, 139:13, 139:23, 140:4, 140:14, 140:22, 140:24, 141:2, 141:8, 141:11, 141:15, 141:18, 142:3, 142:6, 142:9, 142:16, 142:25, 143:10, 143:14, 143:16, 143:23, 144:1, 144:4, 144:15, 144:23, 145:3, 145:6, 145:21, 146:8, 146:17, 147:21, 149:23, 150:5,

150:8, 150:10, 153:5, 153:14, 153:18, 154:10, 154:13, 154:16, 155:6, 155:9, 155:20, 156:3, 156:7, 156:11, 157:9, 157:12, 157:21, 158:4, 158:6, 158:12, 162:20, 163:16, 163:24, 164:17, 165:1, 165:5, 165:8, 165:12, 165:15, 165:20, 166:1, 166:4, 166:12, 166:16, 166:20, 167:6, 167:11, 167:18, 167:24, 168:2, 168:8, 168:12, 168:21, 169:2, 170:3, 170:9, 171:11, 171:13, 171:15, 171:19, 171:25, 172:8, 172:14, 172:20, 172:25, 173:17, 173:20, 174:24, 175:11, 175:20, 176:1, 176:9, 176:14, 176:19, 176:25, 177:3, 177:5, 178:9, 178:25, 179:2, 179:6, 180:4
**court** [30] - 4:10, 5:7, 6:17, 6:18, 6:24, 7:1, 26:12, 27:25, 29:17, 63:6, 72:1, 72:6, 118:1, 122:1, 122:7, 122:12, 122:15, 122:16, 122:19, 124:7, 124:16, 125:16, 125:22, 137:16, 149:9, 151:24, 155:24, 176:2, 178:17, 180:9
**Court's** [2] - 52:9, 93:20
**court's** [2] - 122:25, 123:6
**Courtney** [20] - 29:23, 74:6, 74:9, 74:14, 74:19, 74:21, 74:22, 82:25, 83:10, 84:17, 85:21, 89:1, 91:23, 114:18, 117:25, 137:13, 141:4, 141:6, 155:4, 156:9
**COURTNEY** [1] - 2:7

**Courtney's** [1] - 156:6
**courtroom** [6] - 29:24, 61:4, 74:6, 86:4, 86:9, 92:16
**COURTROOM** [20] - 3:2, 3:3, 3:8, 15:10, 15:12, 15:24, 30:10, 30:13, 30:21, 31:1, 72:12, 74:11, 145:16, 145:18, 145:25, 146:5, 146:14, 176:23, 179:5, 180:9
**courts** [2] - 125:17, 125:22
**covered** [4] - 34:3, 43:10, 43:19, 84:3
**crane** [1] - 17:2
**CRD** [3] - 30:24, 74:9, 146:12
**create** [1] - 26:6
**created** [1] - 6:12
**credibility** [1] - 118:13
**crew** [5] - 31:17, 32:18, 32:20, 45:2, 49:23
**criminal** [1] - 176:20
**cross** [6] - 61:11, 73:19, 117:1, 142:11, 145:22, 173:20
**CROSS** [6] - 2:5, 2:9, 2:12, 47:1, 99:13, 173:23
**Cross** [1] - 5:11
**cross-examination** [2] - 142:11, 145:22
**CROSS-EXAMINATION** [6] - 2:5, 2:9, 2:12, 47:1, 99:13, 173:23
**cruise** [15] - 33:3, 35:1, 35:3, 35:5, 49:1, 49:20, 49:23, 58:15, 60:24, 61:3, 101:14, 101:17, 102:5, 103:5
**Cruise** [2] - 24:1, 31:10
**cruising** [1] - 109:13
**cuff** [12] - 94:9, 95:2, 95:3, 95:4, 95:5, 95:16, 95:18, 95:24, 126:19, 127:10, 134:7, 134:9
**cups** [1] - 37:4
**curious** [3] - 58:10, 58:14, 139:24
**current** [2] - 32:2, 49:6
**customary** [11] - 4:8,

5:5, 8:5, 8:15, 12:16, 18:15, 19:18, 20:6, 20:9, 20:13, 21:12
**CV** [6] - 155:1, 171:21, 172:3, 172:4, 176:3

## D

**d'** [1] - 55:19
**Dade** [1] - 21:19
**daily** [1] - 108:11
**damage** [4] - 89:19, 90:4, 91:13, 139:14
**damaged** [1] - 96:15
**damages** [3] - 7:8, 7:19, 10:23
**DAMIAN** [1] - 1:10
**Damian** [1] - 3:5
**dangerous** [8] - 56:3, 56:4, 62:15, 62:18, 63:10, 63:12, 64:6, 64:19
**data** [3] - 22:23, 101:12, 169:8
**DATE** [1] - 181:8
**date** [6] - 36:13, 41:25, 58:19, 60:8, 136:10, 136:22
**Daubert** [1] - 152:21
**Davis** [1] - 9:12
**DAY** [1] - 1:9
**day-by-day** [1] - 69:9
**day-to-day** [1] - 32:3
**days** [6] - 39:21, 178:19, 178:23, 179:1, 179:2, 179:25
**DCA** [1] - 9:21
**deal** [3] - 6:24, 67:6, 126:9
**deals** [1] - 127:13
**dean** [1] - 76:23
**debatable** [1] - 68:16
**December** [1] - 41:5
**decided** [1] - 143:15
**decides** [3] - 23:9, 49:9, 49:10
**decimal** [1] - 86:24
**decision** [7] - 9:10, 11:19, 38:7, 38:8, 38:18, 57:1, 57:10
**decisions** [3] - 57:14, 69:6, 125:17
**deck** [69] - 33:5, 33:6, 33:7, 33:8, 33:9, 33:17, 34:2, 34:12, 38:23, 38:24, 38:25, 39:2, 39:19, 40:3, 40:18, 41:7, 41:12, 41:13, 42:2, 42:15, 43:13, 43:16, 43:18,

46:1, 48:1, 48:11, 49:4, 49:9, 49:11, 49:15, 50:22, 53:9, 53:14, 53:19, 56:18, 56:22, 57:16, 58:9, 58:12, 58:23, 59:6, 59:8, 60:7, 60:8, 60:10, 60:15, 60:16, 60:20, 60:25, 61:20, 61:23, 62:21, 62:23, 63:1, 63:20, 64:17, 64:21, 67:14, 67:15, 67:17, 67:18, 67:20, 69:2, 70:16, 71:4, 81:9, 84:2, 159:18

**Deck** [4] - 33:6, 43:18, 63:2, 84:2

**deck's** [1] - 40:18

**decks** [7] - 33:10, 42:9, 43:17, 48:12, 49:18, 50:12, 69:6

**dedicated** [1] - 76:8

**defect** [1] - 95:7

**Defendant** [1] - 1:8

**defendant** [7] - 3:15, 3:16, 3:18, 63:9, 63:12, 64:20, 64:22

**DEFENDANT** [1] - 1:16

**Defendant's** [1] - 141:24

**defendant's** [2] - 10:22, 122:3

**defendants** [1] - 7:2

**defense** [22] - 8:23, 9:2, 10:25, 16:25, 17:8, 19:11, 22:16, 23:20, 30:22, 54:16, 73:14, 82:24, 98:1, 116:9, 128:16, 129:7, 130:15, 142:5, 144:7, 155:25, 173:19, 178:11

**DEFENSE** [1] - 2:14

**Defense** [7] - 2:21, 2:21, 33:21, 84:14, 84:18, 85:18, 85:22

**defenses** [2] - 28:11, 73:6

**deferring** [1] - 136:2

**defined** [2] - 160:22, 165:16

**definitely** [4] - 40:24, 42:21, 156:20, 173:12

**definition** [2] - 160:21, 160:24

**degenerate** [1] - 98:23

**degeneration** [3] -

106:17, 113:9, 113:18

**degenerative** [9] - 106:10, 108:4, 109:3, 109:19, 111:11, 111:21, 111:22, 122:18, 123:20

**degree** [10] - 75:5, 76:17, 92:2, 95:19, 99:6, 147:2, 147:10, 150:2, 151:16, 173:14

**delivers** [1] - 160:22

**demonstrate** [1] - 93:21

**demonstrating** [1] - 20:6

**demonstrative** [3] - 16:9, 143:12, 144:17

**demonstratives** [1] - 143:5

**denied** [2] - 10:14, 21:12

**deny** [3] - 117:17, 135:25, 142:17

**department** [13] - 31:19, 31:20, 32:1, 37:11, 37:14, 37:18, 37:19, 38:2, 38:11, 38:13, 38:14, 38:18, 45:12

**departments** [5] - 32:6, 32:7, 37:21, 38:9, 38:23

**departments'** [1] - 37:3

**dependent** [1] - 174:11

**depict** [1] - 93:17

**depicted** [2] - 34:1, 84:17

**depiction** [1] - 93:12

**depo** [3] - 52:14, 89:3, 107:19

**deposed** [6] - 41:2, 54:22, 55:13, 56:16, 88:12, 118:7

**deposition** [54] - 2:3, 2:6, 14:9, 15:16, 24:19, 24:22, 42:12, 51:1, 52:2, 52:3, 52:20, 55:15, 59:22, 59:24, 61:22, 65:4, 65:11, 65:17, 65:25, 66:5, 66:21, 67:10, 67:12, 67:13, 68:5, 68:9, 68:25, 69:16, 70:13, 73:15, 73:18, 73:20, 73:23, 80:21,

80:24, 84:25, 85:15, 88:17, 90:1, 92:10, 99:25, 106:15, 107:11, 110:11, 111:20, 112:23, 119:25, 126:3, 127:13, 132:4, 174:15, 174:18, 174:22

**depositions** [1] - 66:19

**DEPUTY** [15] - 3:3, 3:8, 15:10, 15:12, 30:10, 30:13, 30:21, 31:1, 74:11, 145:25, 146:5, 146:14, 176:23, 179:5, 180:9

**describe** [9] - 32:21, 33:8, 92:25, 94:16, 132:15, 133:3, 133:4, 133:19, 159:17

**described** [8] - 28:17, 81:8, 92:16, 134:3, 144:19, 160:5, 160:6, 169:15

**describing** [1] - 94:13

**description** [7] - 84:1, 92:18, 96:25, 132:6, 132:7, 132:18, 168:6

**descriptions** [3] - 94:16, 94:18, 132:5

**design** [9] - 147:5, 147:18, 148:3, 148:22, 148:25, 149:1, 152:10

**designated** [4] - 13:12, 35:16, 56:7, 73:18

**designations** [1] - 73:19

**designer** [1] - 147:24

**designing** [3] - 148:19, 149:25, 152:13

**despite** [3] - 23:5, 28:14, 45:20

**destroy** [2] - 25:23, 26:22

**destroyed** [5] - 25:15, 26:17, 26:25, 27:21, 29:8

**destroying** [1] - 25:4

**destruction** [1] - 28:8

**detail** [1] - 147:16

**determination** [3] - 50:2, 57:4, 91:7

**determinative** [1] - 22:25

**determine** [4] - 7:19,

14:11, 40:15, 43:9

**determined** [1] - 124:10

**develop** [1] - 109:25

**diagnose** [1] - 137:9

**diagnosed** [9] - 81:25, 83:15, 83:18, 97:19, 104:19, 110:5, 137:8, 137:12, 138:24

**diagnoses** [8] - 82:9, 105:5, 106:5, 122:21, 124:24, 125:12, 136:24, 156:12

**diagnosing** [1] - 110:4

**diagnosis** [7] - 77:2, 83:4, 104:23, 105:3, 120:6, 124:11, 160:11

**diagnostic** [1] - 79:21

**diagrams** [1] - 84:12

**DIEPPA** [252] - 1:13, 2:5, 2:9, 2:11, 2:12, 3:12, 3:23, 4:2, 4:17, 4:20, 5:15, 5:18, 5:21, 7:6, 7:22, 8:10, 8:18, 8:21, 9:12, 9:15, 10:2, 10:20, 11:2, 11:8, 11:16, 11:21, 12:14, 12:17, 12:20, 12:24, 13:14, 13:23, 14:15, 14:22, 15:11, 15:13, 15:18, 15:21, 16:2, 16:6, 16:14, 16:16, 16:20, 16:24, 17:7, 17:11, 17:15, 17:18, 17:21, 17:25, 18:7, 18:9, 19:20, 20:10, 21:5, 21:8, 21:22, 22:9, 22:17, 26:10, 26:24, 27:7, 27:14, 27:24, 28:5, 28:19, 28:25, 29:11, 29:13, 30:3, 30:5, 30:11, 34:14, 34:25, 35:5, 35:8, 35:19, 36:21, 42:11, 47:2, 51:11, 51:14, 51:19, 51:21, 51:24, 52:1, 52:5, 52:8, 52:13, 52:19, 61:10, 61:12, 61:21, 62:2, 62:13, 63:5, 65:1, 66:3, 66:11, 66:14, 67:9, 67:24, 69:15, 69:21, 69:25, 70:3, 70:9, 70:23, 72:4, 72:15, 73:21, 73:25, 83:3, 88:6, 88:9,

88:16, 88:21, 88:25, 89:22, 90:6, 90:11, 90:16, 90:21, 90:24, 91:14, 91:17, 99:12, 99:14, 100:9, 101:8, 103:12, 103:13, 107:1, 107:19, 107:22, 108:1, 112:4, 112:5, 113:14, 113:17, 113:22, 115:13, 115:16, 115:19, 115:25, 116:5, 116:11, 116:24, 117:10, 117:24, 118:6, 118:24, 119:3, 119:6, 119:9, 119:15, 119:19, 120:15, 120:17, 120:23, 121:2, 121:5, 121:10, 121:13, 121:17, 122:5, 123:19, 123:23, 125:1, 125:8, 125:15, 125:20, 125:25, 129:2, 129:14, 130:23, 131:4, 131:17, 133:14, 134:24, 135:6, 137:13, 137:20, 138:3, 140:19, 142:2, 142:5, 142:8, 142:13, 142:19, 143:11, 143:18, 143:25, 144:3, 144:13, 144:17, 145:1, 145:4, 145:19, 146:6, 146:19, 149:18, 149:25, 154:15, 154:23, 155:7, 156:4, 156:8, 157:7, 157:11, 157:17, 158:1, 158:5, 158:10, 158:13, 163:17, 164:2, 165:4, 166:13, 166:19, 166:21, 167:7, 167:13, 167:19, 168:1, 168:7, 168:10, 168:13, 168:23, 169:4, 169:6, 169:22, 170:24, 171:20, 172:4, 172:11, 172:19, 172:22, 173:2, 173:18, 174:22, 174:25, 175:13, 175:19, 175:23,

176:5, 176:10, 176:18, 177:2, 178:6, 178:23, 180:3
**dieppa** [1] - 34:13
**Dieppa** [7] - 3:12, 41:8, 132:25, 140:8, 143:24, 146:17, 167:11
**differed** [1] - 20:21
**difference** [8] - 68:8, 78:3, 87:1, 87:3, 93:5, 156:14, 170:7, 175:15
**differences** [1] - 93:21
**different** [27] - 4:22, 7:4, 7:5, 14:17, 16:11, 18:23, 29:9, 36:1, 38:8, 58:7, 68:10, 79:15, 82:17, 92:23, 103:21, 114:16, 116:22, 116:24, 136:19, 147:7, 147:8, 148:1, 149:1, 149:2, 166:16, 175:8
**differently** [1] - 144:19
**dining** [4] - 32:25, 33:12, 34:3, 84:5
**dinner** [1] - 33:14
**diploma** [3] - 76:21, 76:22, 105:14
**DIRE** [2] - 2:11, 150:12
**dire** [2] - 14:3, 150:5
**direct** [12] - 30:1, 101:5, 114:7, 114:9, 114:12, 115:5, 115:7, 116:14, 116:16, 131:19, 131:24, 137:3
**DIRECT** [6] - 2:5, 2:8, 2:11, 31:5, 74:17, 146:18
**directed** [8] - 10:9, 10:14, 94:22, 97:11, 120:17, 134:18, 179:11, 179:19
**directing** [1] - 116:19
**direction** [23] - 39:11, 40:6, 48:18, 57:2, 63:23, 81:11, 95:23, 96:6, 97:4, 97:6, 97:10, 97:13, 131:20, 132:9, 132:14, 132:15, 133:18, 133:19, 134:3, 134:12, 135:13, 139:18
**directive** [1] - 37:21
**directly** [5] - 4:5, 80:8,

126:7, 159:10, 168:17
**director** [1] - 76:23
**disagree** [6] - 91:14, 91:15, 96:22, 122:15, 135:18, 142:24
**disavow** [1] - 42:12
**disclose** [2] - 13:4, 91:6
**disclosed** [15] - 11:17, 11:22, 12:15, 13:19, 13:21, 13:25, 14:2, 42:14, 88:15, 88:22, 89:16, 115:3, 154:25, 155:22, 157:20
**disclosure** [8] - 11:11, 12:12, 12:13, 14:25, 27:25, 28:2, 54:7, 90:22
**disclosures** [1] - 13:24
**discovering** [1] - 81:22
**discovery** [15] - 23:24, 24:16, 24:17, 27:15, 32:5, 32:13, 43:1, 45:6, 45:22, 46:9, 61:20, 70:24, 73:2, 73:4, 73:5
**discretion** [6] - 39:9, 40:8, 57:6, 57:20, 63:24, 64:3
**discuss** [2] - 39:23, 41:7
**discussed** [14] - 8:13, 9:20, 12:2, 13:7, 41:22, 42:7, 42:25, 69:16, 73:11, 119:24, 127:13, 127:25, 129:15, 143:2
**discussing** [7] - 35:24, 40:11, 53:22, 59:6, 96:4, 122:9, 122:10
**discussion** [4] - 13:3, 41:9, 55:8, 118:22
**disease** [3] - 77:23, 80:3, 106:14
**diseased** [2] - 106:22, 107:4
**disorders** [1] - 105:25
**disparities** [1] - 25:9
**dispute** [4] - 28:6, 59:23, 103:5, 103:8
**disputed** [1] - 23:16
**disputing** [3] - 13:14, 104:19, 104:21

**disregard** [1] - 81:2
**distance** [18] - 87:11, 99:16, 99:20, 99:22, 102:4, 102:8, 102:9, 103:5, 112:7, 112:9, 112:17, 113:3, 129:19, 161:18, 161:24, 162:21, 165:16, 165:17
**distinctions** [1] - 93:10
**district** [1] - 4:10
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [11] - 1:24, 1:24, 3:3, 3:4, 9:9, 9:10, 9:16, 9:20, 122:8, 181:10, 181:10
**divided** [1] - 165:18
**DIVISION** [1] - 1:2
**docket** [1] - 176:7
**doctor** [16] - 3:21, 3:22, 3:24, 10:5, 20:7, 44:10, 76:25, 83:5, 99:5, 150:17, 152:14, 152:17, 156:9, 156:10, 156:11, 167:16
**doctor's** [2] - 44:11, 152:18
**doctoral** [1] - 76:21
**doctorate** [4] - 76:19, 76:20, 151:7, 151:9
**doctors** [6] - 12:8, 19:13, 76:3, 94:14, 98:2, 139:11
**document** [9] - 26:14, 49:13, 49:15, 59:10, 66:4, 95:15, 118:11, 133:22, 171:17
**documentary** [1] - 82:2
**documentation** [1] - 80:18
**documented** [10] - 42:1, 49:11, 59:8, 59:9, 60:9, 85:14, 87:14, 87:19, 92:5, 95:8
**documents** [6] - 47:3, 66:7, 66:9, 73:5, 82:18, 177:10
**dog** [1] - 149:3
**done** [19] - 16:10, 16:11, 38:22, 40:1, 58:19, 59:1, 61:11, 61:12, 71:20, 81:17, 105:23, 113:4, 141:23, 148:2,

148:24, 148:25, 149:5, 150:22, 176:25
**double** [1] - 43:13
**Dow** [1] - 152:21
**down** [29] - 20:25, 35:21, 38:5, 39:5, 42:9, 45:25, 48:13, 49:9, 50:6, 56:22, 57:16, 58:8, 58:11, 59:7, 64:10, 69:1, 69:6, 69:8, 69:11, 93:4, 97:11, 133:2, 133:10, 138:11, 139:1, 139:22, 154:2, 154:5, 161:13
**DR** [2] - 2:3, 2:7
**Dr** [64] - 8:22, 11:3, 11:9, 12:2, 12:11, 13:9, 13:11, 13:12, 14:16, 15:13, 16:7, 18:1, 18:10, 18:19, 18:23, 19:10, 19:11, 19:16, 20:14, 20:18, 20:21, 21:11, 29:23, 74:6, 74:9, 74:19, 74:22, 82:22, 82:25, 83:10, 84:17, 85:21, 89:1, 91:23, 93:2, 98:1, 98:9, 109:2, 114:18, 117:25, 132:8, 135:19, 136:2, 136:16, 139:25, 140:11, 140:16, 140:20, 141:1, 141:4, 141:6, 143:4, 143:8, 155:4, 155:23, 156:6, 156:9, 158:16, 160:5, 160:7, 163:20, 167:14, 167:16, 173:8
**DRAHOS** [100] - 1:16, 2:8, 2:11, 2:12, 3:14, 13:2, 13:8, 13:17, 20:16, 22:6, 24:6, 25:24, 29:2, 29:20, 30:17, 51:6, 71:17, 71:23, 72:5, 73:13, 74:6, 74:15, 74:18, 82:24, 83:8, 83:9, 84:14, 84:16, 85:18, 85:20, 86:6, 86:11, 86:12, 90:10, 91:21, 91:22, 93:19, 94:11, 99:9, 100:8, 101:3, 103:9, 107:15, 111:25, 113:11, 115:10, 115:12, 118:3, 118:10,

120:19, 120:25, 121:3, 121:7, 121:20, 125:4, 129:11, 131:2, 134:25, 137:21, 138:15, 140:3, 140:9, 140:23, 141:1, 141:7, 141:20, 142:12, 142:24, 143:6, 143:15, 143:22, 144:9, 144:14, 149:21, 150:7, 150:9, 150:11, 150:13, 152:21, 155:19, 155:21, 162:18, 163:15, 163:23, 164:1, 167:5, 167:8, 169:21, 170:2, 170:6, 171:10, 172:13, 173:15, 173:21, 173:24, 175:2, 175:10, 177:4, 178:7, 180:8
**Drahos** [6] - 3:14, 20:15, 27:3, 27:21, 150:6, 150:14
**Drahos'** [1] - 21:10
**dramatic** [1] - 61:14
**Drive** [1] - 1:18
**drive** [1] - 141:18
**drove** [1] - 141:13
**DTI** [2] - 124:8, 124:11
**due** [4] - 39:7, 78:17, 109:21, 137:3
**duplicate** [2] - 89:8, 106:6
**duration** [2] - 63:12, 161:4
**during** [18] - 24:19, 24:23, 25:13, 33:24, 39:20, 42:20, 45:6, 45:22, 55:17, 56:13, 67:12, 75:8, 81:2, 82:5, 116:25, 118:7, 126:2, 144:12
**duties** [1] - 57:18
**duty** [3] - 49:13, 73:3, 73:7

## E

**e-mail** [3] - 30:10, 63:6, 175:24
**early** [4] - 33:19, 72:8, 84:21, 177:18
**easier** [1] - 178:14
**East** [2] - 1:25, 181:11
**eat** [3] - 72:6, 85:8,

85:9

**edge** [2] - 92:14, 130:1

**education** [5] - 75:13, 147:1, 150:19, 152:23, 153:1

**educational** [1] - 75:2

**effect** [7] - 41:11, 123:16, 125:23, 154:16, 156:24, 170:5

**effects** [4] - 77:22, 77:23, 78:1, 80:3

**efficacy** [1] - 124:11

**effort** [2] - 25:12, 128:10

**efforts** [2] - 28:15, 45:22

**either** [16] - 19:9, 19:16, 21:15, 24:10, 35:14, 75:23, 93:3, 105:17, 106:23, 107:6, 118:1, 118:9, 124:13, 155:5, 163:1, 179:12

**elbow** [1] - 153:10

**electives** [1] - 75:6

**electronic** [2] - 26:14, 62:24

**elements** [1] - 164:18

**emergency** [2] - 78:17, 82:18

**employed** [1] - 74:23

**employee** [8] - 16:11, 27:13, 27:16, 28:13, 28:14, 45:21, 71:7

**employees** [5] - 28:16, 35:10, 49:1, 55:4, 56:3

**employer** [3] - 31:9, 74:22, 152:5

**employment** [3] - 31:11, 78:21, 79:6

**enclosed** [1] - 84:3

**end** [12] - 4:11, 21:20, 22:18, 29:6, 70:20, 72:8, 89:5, 104:2, 114:22, 114:23, 162:9

**energy** [1] - 94:23

**engaged** [1] - 109:10

**engine** [1] - 39:2

**engineer** [19] - 74:21, 77:10, 77:15, 77:16, 77:19, 78:8, 78:10, 83:6, 147:13, 148:12, 149:9, 149:14, 149:24, 149:25, 151:6, 151:14, 152:25, 156:5, 161:8

**engineering** [28] - 74:24, 75:6, 75:15, 75:22, 76:18, 76:22, 80:6, 83:1, 95:20, 98:25, 99:7, 147:3, 147:5, 147:10, 147:14, 148:9, 148:14, 150:2, 151:7, 151:10, 151:12, 151:13, 151:16, 151:17, 154:8, 156:17, 173:11, 173:14

**enroll** [1] - 75:23

**enrolled** [1] - 75:10

**entail** [1] - 76:5

**entered** [1] - 10:11

**entertainment** [1] - 39:2

**entire** [4] - 26:8, 31:14, 73:19, 179:13

**entirely** [1] - 174:11

**entitled** [10] - 5:23, 54:17, 66:21, 118:12, 121:18, 121:19, 121:21, 124:16, 126:17, 181:6

**entity** [1] - 26:21

**entry** [3] - 48:16, 53:18, 132:4

**environment** [2] - 78:13, 148:7

**epidemiology** [1] - 126:18

**equal** [1] - 161:6

**equals** [1] - 161:24

**equate** [1] - 169:15

**equation** [4] - 161:4, 161:6, 161:17, 162:9

**equations** [7] - 153:22, 154:8, 154:9, 160:17, 162:25

**equipment** [1] - 129:8

**equivalent** [1] - 163:3

**errata** [1] - 66:24

**error** [1] - 86:24

**ESI** [1] - 22:23

**especially** [1] - 60:24

**ESQUIRE** [4] - 1:13, 1:16, 1:17, 1:17

**essentially** [3] - 59:1, 163:3, 170:18

**establish** [3] - 14:7, 19:17, 20:2

**established** [3] - 22:14, 22:15, 23:1

**estimate** [8] - 100:15, 100:19, 100:20,

100:21, 103:1, 103:17, 136:20, 161:19

**estimated** [3] - 103:19, 113:5, 114:8

**estimates** [1] - 178:17

**estimations** [1] - 161:19

**et** [1] - 66:7

**Eureka** [1] - 3:13

**EUREKA** [1] - 1:4

**evaluate** [5] - 78:1, 81:14, 82:1, 82:3, 85:16

**evaluated** [2] - 81:10, 135:21

**evaluates** [1] - 78:17

**evaluating** [3] - 81:5, 81:6, 81:20

**evaluation** [4] - 81:3, 81:17, 82:6, 83:16

**evening** [1] - 3:25

**event** [16] - 37:14, 40:17, 40:22, 78:9, 78:11, 81:8, 81:23, 81:25, 82:16, 84:13, 85:5, 111:8, 122:18, 160:3, 161:16, 169:7

**eventually** [1] - 82:22

**Evidence** [1] - 126:18

**evidence** [81] - 4:24, 5:1, 5:3, 5:5, 5:7, 5:8, 6:17, 6:18, 6:20, 6:25, 7:2, 7:15, 7:16, 8:12, 8:13, 8:14, 8:15, 9:2, 9:3, 9:4, 9:5, 9:7, 9:23, 10:11, 10:22, 13:10, 15:4, 17:17, 17:18, 20:12, 20:19, 21:24, 22:1, 22:13, 23:13, 23:21, 23:24, 24:5, 25:15, 25:16, 26:13, 28:1, 28:10, 28:12, 29:7, 42:17, 47:15, 51:23, 51:24, 52:1, 52:6, 52:17, 54:7, 63:8, 63:11, 82:2, 87:13, 92:1, 106:9, 108:5, 108:8, 108:17, 108:18, 109:24, 109:25, 110:1, 115:11, 140:5, 141:23, 143:9, 144:2, 157:4, 164:3, 164:4, 176:6, 178:12, 178:14, 179:14, 179:17

**Evidence-based** [1] - 126:18

**exact** [11] - 17:5, 23:18, 53:11, 53:16, 67:15, 85:4, 106:19, 107:2, 130:4, 139:7, 144:16

**exactly** [12] - 21:23, 25:24, 51:8, 54:9, 55:17, 59:21, 103:3, 104:11, 123:22, 134:1, 156:2, 179:23

**examination** [6] - 82:23, 115:7, 116:16, 126:18, 142:11, 145:22

**EXAMINATION** [16] - 2:5, 2:5, 2:8, 2:9, 2:11, 2:11, 2:12, 2:12, 31:5, 47:1, 74:17, 99:13, 146:18, 150:12, 173:23, 175:12

**examinations** [1] - 133:24

**examine** [1] - 144:12

**example** [6] - 80:12, 128:10, 129:8, 134:6, 140:12, 178:11

**examples** [1] - 118:16

**except** [1] - 129:24

**exception** [3] - 2:21, 141:24, 143:6

**exclude** [3] - 5:8, 106:22, 107:5

**excluded** [4] - 121:11, 121:12, 123:8, 123:10

**excluding** [1] - 122:25

**excuse** [3] - 121:13, 129:24, 134:19

**exemplar** [6] - 86:1, 86:3, 86:7, 141:25, 144:4, 144:22

**exerted** [2] - 160:13, 164:11

**exhibit** [6] - 15:4, 54:14, 54:15, 54:16, 54:17, 176:11

**Exhibit** [8] - 2:19, 2:20, 33:21, 84:15, 84:18, 85:19, 85:22, 116:6

**Exhibits** [1] - 141:24

**EXHIBITS** [1] - 2:17

**exhibits** [7] - 54:8, 144:7, 176:12, 176:17, 176:21, 177:7, 179:25

**exist** [4] - 27:4, 27:6, 41:18, 71:4

**existed** [2] - 44:1, 63:13

**existence** [1] - 25:1

**expect** [7] - 11:4, 11:6, 13:11, 61:5, 89:11, 92:19, 124:15

**expected** [1] - 89:1

**expedited** [1] - 178:21

**expenditures** [1] - 6:6

**expense** [1] - 6:12

**expenses** [9] - 4:3, 4:4, 4:9, 5:5, 5:14, 5:25, 6:19, 6:23, 12:18

**experience** [29] - 12:4, 12:9, 14:14, 18:24, 19:1, 19:8, 20:14, 22:2, 58:15, 58:16, 59:2, 77:15, 78:16, 78:21, 79:3, 93:13, 147:1, 148:16, 149:7, 149:19, 150:1, 152:10, 152:23, 153:2, 154:18, 155:16, 156:5, 156:6, 158:5

**experienced** [1] - 18:17

**experiences** [2] - 160:25, 161:1

**experiment** [1] - 128:20

**Expert** [1] - 119:3

**expert** [46] - 9:24, 11:10, 11:22, 12:7, 12:15, 12:18, 13:20, 13:24, 14:1, 14:4, 14:8, 14:12, 14:17, 18:2, 18:5, 19:6, 19:15, 19:17, 20:18, 21:12, 21:25, 50:9, 50:12, 72:25, 82:25, 83:7, 98:1, 119:20, 120:15, 124:14, 149:7, 149:20, 151:24, 152:2, 152:6, 152:22, 154:22, 155:21, 155:23, 156:20, 157:9, 157:13, 157:15, 157:16, 159:7

**expert's** [1] - 91:19

**expertise** [5] - 12:6, 50:3, 50:5, 92:22, 156:15

**experts** [1] - 11:18

**explain** [10] - 77:4, 78:3, 95:1, 95:13, 96:7, 98:6, 98:8,

98:9, 147:16, 153:21
**explained** [5] - 40:4, 48:16, 49:7, 58:22, 60:13
**explaining** [1] - 93:10
**Exponent** [5] - 74:23, 74:25, 78:22, 78:24, 129:6
**expressed** [1] - 88:17
**expressing** [1] - 88:14
**expression** [1] - 8:1
**extensive** [1] - 150:1
**extensively** [1] - 143:2
**extent** [9] - 8:22, 66:9, 71:10, 83:5, 141:23, 142:25, 170:25, 173:4, 178:10
**externally** [2] - 96:11, 139:20
**extra** [2] - 37:3, 37:5
**extrapolate** [1] - 94:4
**extreme** [5] - 37:23, 37:24, 38:20, 39:17, 49:10

## F

**face** [3] - 48:4, 66:22, 138:10
**faces** [1] - 138:25
**facility** [1] - 19:3
**facing** [1] - 112:25
**fact** [34] - 4:25, 5:9, 5:12, 7:18, 7:24, 13:15, 14:7, 14:13, 18:18, 21:24, 22:1, 22:2, 25:17, 35:12, 42:19, 59:5, 60:8, 70:18, 91:6, 92:5, 94:13, 99:2, 108:12, 108:14, 110:14, 110:15, 151:3, 158:7, 177:16, 178:3, 179:7, 179:9, 179:16, 179:18
**factor** [1] - 109:20
**factors** [5] - 39:5, 39:12, 39:18, 42:8, 63:23
**factory** [1] - 154:5
**facts** [3] - 63:8, 63:11, 177:22
**factual** [1] - 81:2
**failed** [2] - 28:14, 28:16
**fair** [3] - 8:9, 33:2, 130:21
**faith** [1] - 25:4
**fall** [1] - 96:12
**falling** [3] - 126:11,

127:1, 139:22
**familiar** [5] - 4:19, 11:13, 42:16, 110:20, 169:16
**far** [16] - 8:18, 8:21, 42:1, 44:13, 47:15, 50:5, 87:6, 101:13, 101:17, 102:22, 113:7, 115:5, 148:22, 155:18, 158:1, 179:11
**Farm** [1] - 9:12
**fashion** [1] - 42:13
**fast** [8] - 48:10, 91:7, 103:17, 103:19, 129:9, 164:10, 168:4, 168:5
**fatigue** [1] - 98:25
**fault** [1] - 72:9
**Federal** [1] - 66:20
**federal** [4] - 27:25, 122:7, 122:12, 122:16
**feet** [4] - 87:12, 161:20, 161:23, 165:13
**fell** [2] - 26:3, 154:3
**felt** [1] - 113:6
**female** [1] - 25:12
**femoral** [1] - 148:1
**few** [8] - 35:23, 36:1, 39:20, 44:13, 73:25, 75:11, 78:6, 145:4
**field** [10] - 147:6, 148:17, 150:2, 150:23, 152:6, 152:24, 153:2, 153:15, 158:5, 170:4
**fields** [1] - 156:16
**figure** [8] - 56:11, 69:18, 71:8, 78:18, 112:7, 154:9, 161:15, 161:17
**figuring** [1] - 161:12
**file** [14] - 63:16, 66:24, 67:3, 88:3, 92:8, 92:10, 100:6, 176:1, 176:4, 176:8, 176:17, 176:20, 176:21, 179:24
**filed** [6] - 3:25, 23:23, 119:21, 155:21, 176:13, 177:7
**filing** [2] - 4:12, 10:15
**filings** [1] - 110:19
**fill** [3] - 44:17, 44:21, 161:10
**filled** [1] - 45:2
**film** [1] - 124:2
**films** [3] - 106:2,

123:24, 123:25
**final** [2] - 90:8, 91:7
**finder** [12] - 4:25, 5:9, 5:12, 7:19, 7:24, 13:16, 21:24, 22:1, 22:2, 158:7, 179:16, 179:18
**findings** [38] - 81:15, 81:25, 82:14, 83:15, 83:18, 83:20, 83:21, 87:18, 95:17, 97:13, 97:20, 98:6, 98:12, 98:15, 105:17, 105:18, 108:24, 109:1, 109:5, 109:21, 109:23, 110:7, 111:16, 111:17, 135:25, 136:1, 136:3, 136:10, 136:15, 136:18, 137:4, 137:5, 172:17, 177:16, 178:3, 179:7, 179:9, 180:1
**fine** [17] - 36:4, 52:8, 52:15, 52:16, 52:18, 102:25, 119:18, 122:2, 125:14, 141:3, 145:21, 171:25, 172:2, 172:17, 176:4, 177:23, 179:1
**finish** [1] - 68:1
**finished** [1] - 76:17
**firm** [1] - 74:24
**first** [16] - 18:4, 24:6, 29:21, 32:14, 44:12, 44:16, 58:16, 62:21, 83:16, 126:16, 131:15, 148:20, 149:9, 150:16, 159:5, 159:15
**fish** [1] - 17:3
**five** [5] - 15:19, 31:24, 46:14, 74:4
**five-minute** [1] - 15:19
**five-year** [1] - 46:14
**fix** [1] - 153:12
**fixing** [1] - 148:1
**fixture** [1] - 34:11
**Flagler** [1] - 1:18
**flatter** [1] - 92:14
**flawed** [4] - 174:21, 175:6, 175:7, 175:9
**flexed** [2] - 97:9, 133:6
**flexion** [1] - 132:16
**flight** [1] - 141:14
**floor** [2] - 84:8, 130:18
**FLORIDA** [2] - 1:1, 1:14

**Florida** [15] - 1:4, 1:15, 1:19, 1:24, 1:25, 3:4, 4:10, 7:5, 9:10, 9:22, 10:18, 19:23, 124:7, 181:10, 181:11
**fly** [1] - 60:20
**flying** [1] - 89:17
**follow** [6] - 38:11, 43:11, 43:12, 65:2, 65:3, 67:16
**follow-up** [1] - 65:3
**followed** [3] - 70:16, 152:17, 152:19
**following** [2] - 114:23, 166:22
**food** [12] - 33:16, 37:2, 37:11, 37:14, 37:18, 37:19, 38:11, 38:16, 38:25, 45:11, 85:9
**footage** [4] - 43:6, 43:22, 43:24, 43:25
**FOR** [2] - 1:13, 1:16
**force** [81] - 39:11, 40:6, 57:2, 87:23, 88:11, 89:13, 89:24, 91:12, 92:2, 92:15, 92:17, 94:20, 94:22, 96:13, 97:23, 100:12, 117:8, 127:2, 132:13, 134:13, 134:14, 134:15, 134:16, 134:18, 135:2, 139:21, 153:23, 153:24, 154:1, 154:14, 154:19, 155:8, 155:12, 155:13, 155:16, 156:19, 156:21, 157:1, 157:3, 157:5, 158:8, 158:20, 160:8, 160:12, 160:21, 160:22, 160:24, 160:25, 161:1, 161:3, 161:6, 161:11, 162:5, 162:9, 163:9, 164:7, 164:14, 164:19, 165:6, 165:22, 166:2, 166:3, 166:5, 166:8, 166:11, 167:3, 167:10, 168:4, 169:15, 169:18, 169:24, 170:10, 170:13, 173:5, 174:10
**forces** [5] - 78:11, 153:22, 154:7, 168:16

**foregoing** [1] - 181:4
**fork** [1] - 85:9
**forklift** [1] - 154:6
**form** [3] - 75:24, 95:5, 174:16
**formal** [1] - 150:19
**formally** [1] - 141:22
**formulating** [2] - 82:8, 82:12
**FORT** [1] - 1:2
**Fort** [4] - 1:4, 1:25, 101:24, 181:11
**forth** [5] - 10:3, 82:20, 98:22, 108:23, 123:13
**forward** [22] - 10:5, 43:17, 97:5, 97:9, 97:24, 131:9, 132:10, 132:11, 132:12, 133:7, 133:10, 133:12, 134:2, 134:11, 135:8, 159:23, 161:16, 161:21, 161:22, 162:12, 162:13
**foundation** [10] - 14:6, 19:11, 19:12, 34:20, 36:21, 103:10, 117:1, 121:18, 142:14, 157:8
**four** [8] - 35:25, 75:8, 95:5, 118:8, 125:8, 125:10
**Fourth** [2] - 9:16, 9:21
**fracture** [2] - 127:15, 148:1
**fractures** [1] - 127:14
**frankly** [2] - 24:25, 26:7
**freelance** [1] - 148:25
**friction** [1] - 98:23
**Friday** [2] - 36:14, 179:5
**Frisbee** [1] - 128:22
**front** [16] - 51:7, 81:24, 94:1, 95:9, 116:1, 120:7, 132:17, 138:11, 138:18, 139:1, 139:15, 139:16, 154:24, 174:12, 174:21, 175:4
**full** [4] - 6:23, 7:8, 133:23, 161:14
**functions** [2] - 38:15, 39:3

## G

**gain** [1] - 84:10
**game** [1] - 8:9
**garden** [1] - 148:25
**gather** [2] - 59:17, 168:15
**gathered** [1] - 80:22
**general** [7] - 6:2, 6:3, 25:21, 49:9, 50:21, 83:11, 111:8
**generally** [6] - 42:7, 44:7, 44:20, 48:5, 69:5, 173:11
**GENOESE** [2] - 1:17, 3:18
**Genoese** [5] - 3:18, 30:18, 33:21, 84:14, 85:18
**given** [15] - 13:15, 32:19, 50:11, 65:23, 68:12, 70:20, 85:13, 94:18, 94:19, 99:5, 105:19, 110:12, 117:4, 154:20, 177:14
**Gonzalez** [1] - 93:2
**Google** [1] - 103:6
**grab** [1] - 46:4
**graduate** [1] - 75:9
**grams** [1] - 17:15
**granting** [1] - 157:13
**GRAYROBINSON** [1] - 1:18
**greater** [1] - 19:12
**ground** [1] - 154:4
**grounds** [2] - 24:4, 172:2
**group** [2] - 127:25, 147:25
**guess** [21] - 8:22, 16:8, 17:21, 31:24, 33:9, 54:13, 64:23, 77:17, 99:17, 102:10, 112:8, 112:17, 118:21, 118:25, 125:2, 126:6, 141:4, 148:6, 159:18, 172:8, 180:7
**guest** [7] - 32:1, 32:2, 44:11, 44:12, 44:15, 44:17, 45:4
**guests** [1] - 57:9
**guidance** [2] - 152:18, 152:19
**guiding** [1] - 5:23
**gusting** [1] - 101:24
**guy** [2] - 29:22, 141:2
**guys** [4] - 71:25, 123:13, 144:4, 177:8

## H

**half** [7] - 29:22, 89:1, 156:15, 161:13, 161:15, 165:9, 175:15
**half-expected** [1] - 89:1
**hamburger** [1] - 33:16
**hand** [3] - 96:13, 139:21, 146:11
**handed** [1] - 25:18
**handle** [1] - 36:8
**handled** [1] - 36:16
**handling** [1] - 53:24
**hands** [1] - 166:6
**hang** [1] - 141:16
**happy** [3] - 12:8, 144:11, 180:7
**hard** [5] - 27:15, 115:8, 116:17, 154:2, 154:4
**harm** [2] - 69:22, 70:21
**harsh** [1] - 40:10
**Harvard** [12] - 75:9, 75:10, 75:14, 75:17, 75:20, 75:24, 76:1, 76:23, 79:7, 79:16, 105:13
**hate** [1] - 72:2
**head** [3] - 8:8, 47:19, 128:9
**heads** [1] - 38:2
**hear** [16] - 8:19, 18:1, 19:9, 24:12, 24:25, 25:25, 27:4, 27:5, 27:7, 27:8, 27:10, 33:7, 55:6, 55:8, 150:14
**heard** [10] - 8:18, 8:21, 23:6, 29:12, 35:9, 39:23, 40:11, 67:10, 123:21, 160:4
**hearings** [1] - 23:5
**heavy** [1] - 163:9
**height** [2] - 129:23, 130:4
**held** [1] - 152:9
**help** [6] - 23:11, 47:3, 119:17, 120:22, 158:7, 160:2
**helpful** [3] - 81:21, 156:21, 170:9
**helps** [1] - 31:15
**hence** [1] - 94:7
**Herbalife** [1] - 152:5
**hereby** [2] - 123:8, 181:4
**herself** [8] - 96:20,

96:24, 97:21, 132:6, 159:24, 160:1, 162:6, 175:17
**hiding** [1] - 27:13
**Higgs** [15] - 4:18, 4:24, 5:16, 6:18, 6:23, 7:8, 7:9, 7:22, 7:24, 8:3, 8:11, 8:13, 9:4, 21:23
**high** [5] - 6:21, 8:6, 21:20, 48:13, 160:22
**himself** [4] - 18:12, 18:13, 48:20, 61:2
**hip** [1] - 153:9
**historical** [1] - 81:23
**history** [7] - 31:11, 31:14, 76:15, 113:8, 113:15, 113:19
**hit** [18] - 17:5, 46:16, 57:21, 60:20, 91:12, 96:16, 115:8, 116:17, 136:12, 139:14, 154:2, 154:3, 154:4, 159:22, 159:23, 165:23, 167:23
**hits** [2] - 154:6, 161:21
**hitting** [3] - 164:24, 165:21, 168:3
**hold** [14] - 19:19, 24:2, 26:16, 68:1, 79:17, 90:14, 127:5, 142:3, 148:14, 150:25, 151:7, 152:2, 163:18
**holding** [3] - 5:16, 134:17, 142:21
**holds** [1] - 152:22
**home** [1] - 146:22
**Honor** [114] - 3:23, 4:11, 4:17, 5:19, 7:6, 8:10, 8:12, 9:13, 11:8, 11:10, 11:13, 12:24, 14:15, 15:18, 18:7, 19:20, 20:16, 21:5, 21:22, 22:6, 22:9, 24:8, 24:11, 25:18, 26:10, 27:24, 28:7, 28:8, 29:11, 34:14, 36:21, 42:11, 42:16, 51:24, 52:5, 52:8, 61:23, 62:5, 62:14, 63:14, 65:1, 66:3, 66:16, 67:2, 67:9, 67:24, 69:15, 70:9, 70:23, 71:23, 72:15, 72:16, 72:17, 73:13, 74:1, 74:3, 74:7, 74:15, 82:24, 83:8, 86:6, 88:6, 88:25, 90:7, 90:10,

90:11, 91:14, 91:17, 93:19, 101:3, 103:12, 107:15, 112:4, 116:7, 116:24, 120:23, 121:11, 123:20, 125:1, 125:15, 130:23, 134:25, 135:3, 138:15, 139:10, 140:19, 141:7, 142:13, 142:22, 144:10, 144:11, 145:19, 149:18, 149:21, 150:7, 152:21, 154:23, 155:19, 156:4, 156:8, 157:17, 158:11, 160:21, 162:19, 167:13, 170:7, 171:20, 172:5, 173:21, 175:23, 177:2, 178:6, 180:3, 180:8
**Honor's** [2] - 70:25, 157:18
**HONORABLE** [1] - 1:10
**Honorable** [1] - 3:5
**hopefully** [1] - 179:24
**Hops** [1] - 119:23
**Hosang** [1] - 9:17
**Hospital** [3] - 75:17, 76:13, 78:25
**hospital** [2] - 76:11, 109:13
**hospitals** [4] - 18:11, 75:17, 79:9, 79:23
**hot** [3] - 33:11, 34:3, 84:4
**hotel** [2] - 37:20, 38:16
**hour** [15] - 29:22, 39:24, 41:12, 53:14, 56:12, 56:22, 57:21, 69:18, 69:24, 92:12, 101:24, 104:16, 104:17, 180:7
**hourly** [13] - 42:1, 48:16, 53:10, 65:14, 65:15, 65:19, 67:16, 67:19, 67:20, 67:21, 67:22, 70:17
**hours** [2] - 60:25, 101:20
**house** [1] - 32:4
**housekeeping** [3] - 38:17, 39:1, 141:21
**huge** [2] - 166:9, 171:5

**human** [8] - 75:7, 76:6, 77:13, 79:16, 148:10, 155:16, 162:2, 169:14
**humerus** [2] - 94:2, 133:5
**hundreds** [2] - 149:1, 149:2
**husband** [4] - 39:23, 61:2, 112:25, 114:3
**hyperextend** [1] - 134:3
**hyperextended** [1] - 134:8
**hyperextension** [2] - 134:5
**hypothesis** [2] - 81:24, 82:3
**hypothetical** [3] - 133:8, 137:3, 163:25

## I

**ID** [4] - 63:7, 115:19, 125:2, 171:21
**idea** [3] - 25:15, 26:5, 170:22
**identification** [6] - 62:8, 71:7, 116:3, 116:6, 125:5, 142:12
**identified** [11] - 23:5, 27:16, 45:23, 50:9, 84:18, 85:22, 94:14, 98:10, 119:6, 125:7, 125:9
**identify** [5] - 25:12, 28:14, 28:16, 56:13, 159:5
**identifying** [2] - 11:12, 18:20
**identity** [4] - 23:3, 25:6, 45:7, 55:3
**illustrate** [1] - 133:2
**illustration** [1] - 143:8
**illustrations** [3] - 143:5, 143:11, 143:18
**imaging** [2] - 105:24, 124:8
**immediately** [3] - 104:20, 167:22, 168:9
**impact** [30] - 87:23, 88:11, 89:24, 92:17, 93:1, 100:12, 103:23, 120:6, 131:22, 131:23, 153:23, 153:24, 154:1, 159:25, 160:21, 160:22,

160:24, 160:25, 161:1, 161:3, 161:6, 161:11, 162:6, 164:19, 166:10, 168:10, 174:4, 174:8, 174:10

**impacting** [1] - 87:11
**impacts** [1] - 154:22
**impeach** [7] - 52:16, 112:2, 115:20, 115:21, 121:19, 121:21
**impeaching** [1] - 52:17
**impeachment** [4] - 107:16, 115:16, 121:7, 144:3
**impingement** [4] - 98:16, 98:18, 98:19, 137:7
**implant** [1] - 148:3
**implants** [1] - 150:1
**important** [2] - 78:1, 132:23
**importantly** [2] - 5:4, 123:19
**improper** [2] - 107:15, 121:7
**in-house** [1] - 32:4
**inaccurately** [1] - 24:10
**inappropriate** [1] - 60:2
**inches** [3] - 86:18, 86:20, 87:7
**incidence** [1] - 46:19
**incident** [56] - 23:3, 23:23, 26:21, 26:23, 32:8, 32:16, 33:5, 34:6, 35:11, 36:17, 41:25, 42:3, 42:4, 43:7, 44:25, 45:21, 46:8, 46:15, 46:18, 50:19, 53:11, 53:16, 55:9, 55:12, 57:13, 80:18, 83:14, 84:23, 92:8, 95:11, 95:20, 98:4, 101:15, 101:20, 102:24, 103:15, 106:12, 108:6, 108:20, 109:8, 111:12, 111:23, 114:11, 114:14, 124:23, 128:11, 130:16, 134:10, 137:1, 144:21, 159:2, 159:3, 159:16, 160:13, 168:25
**incidents** [1] - 44:5

**include** [6] - 80:24, 93:16, 105:22, 113:24, 117:10, 176:3
**included** [7] - 56:2, 73:19, 76:9, 76:10, 82:14, 82:16, 128:3
**includes** [3] - 46:19, 127:16
**including** [5] - 11:23, 61:7, 64:13, 125:8, 160:4
**inconsistency** [1] - 68:5
**inconsistent** [8] - 6:4, 53:13, 65:17, 68:25, 107:18, 112:2, 117:9, 119:8
**inconsistently** [1] - 52:11
**Incorporated** [1] - 147:19
**incorporates** [1] - 6:3
**incorrect** [3] - 60:2, 90:11, 96:7
**increase** [1] - 114:15
**incurred** [2] - 6:6, 7:20
**independent** [3] - 82:8, 100:22, 144:24
**Indiana** [1] - 147:23
**indicated** [2] - 85:1, 140:8
**indicating** [4] - 106:10, 108:5, 113:8, 113:17
**indication** [3] - 49:16, 49:17, 70:15
**indirectly** [1] - 62:3
**individual** [7] - 25:13, 78:9, 78:12, 78:18, 122:20, 122:21, 124:25
**individuals** [1] - 80:22
**indoor** [1] - 33:13
**industries** [1] - 147:7
**industry** [5] - 20:19, 148:19, 148:23, 148:24, 149:14
**infer** [3] - 23:10, 58:24
**inference** [8] - 22:13, 28:23, 29:2, 29:5, 64:15, 64:16, 71:5, 71:11
**inferior** [1] - 138:3
**inform** [2] - 82:13, 159:11
**information** [49] - 22:3, 23:17, 23:25, 24:17, 24:22, 26:14, 32:8, 40:20, 45:17,

47:19, 49:9, 50:1, 50:7, 51:7, 53:7, 53:11, 53:14, 53:16, 55:18, 56:15, 56:18, 59:13, 59:17, 62:1, 65:19, 66:2, 67:21, 68:21, 70:17, 70:21, 71:9, 80:13, 80:17, 80:23, 81:2, 82:11, 84:10, 85:12, 107:9, 111:11, 111:17, 111:21, 113:7, 113:10, 113:16, 114:13, 136:11, 136:12
**infraspinatus** [5] - 95:9, 134:19, 134:20, 134:21, 135:4
**initiate** [1] - 25:19
**initiates** [1] - 78:16
**injure** [1] - 97:6
**injured** [9] - 6:12, 44:7, 110:16, 134:16, 134:18, 135:8, 135:11, 167:22, 168:9
**injuries** [12] - 5:24, 79:22, 95:12, 95:16, 110:18, 127:17, 127:21, 128:1, 134:23, 135:2, 140:13, 158:9
**injury** [43] - 12:21, 78:10, 78:15, 79:20, 89:19, 91:1, 91:13, 92:23, 94:15, 94:24, 95:21, 95:25, 96:8, 97:17, 109:25, 111:7, 122:17, 123:12, 124:12, 124:22, 127:2, 127:8, 127:10, 127:23, 128:7, 129:3, 131:8, 131:9, 131:12, 133:20, 133:25, 134:4, 134:7, 134:9, 153:25, 155:8, 155:11, 155:15, 157:1, 157:6, 160:8, 163:21
**Injury** [2] - 44:17, 44:21
**input** [6] - 104:6, 104:8, 104:9, 104:13, 152:14, 152:17
**inputting** [1] - 177:24
**inquiry** [1] - 61:21

**inside** [4] - 37:6, 140:21, 141:2, 145:7
**insisted** [1] - 156:19
**inspect** [3] - 129:15, 130:7, 130:9
**inspections** [2] - 49:21, 53:25
**instances** [1] - 118:8
**instant** [1] - 6:20
**institute** [1] - 79:2
**institutional** [1] - 35:9
**instruction** [4] - 22:12, 37:16, 69:11, 152:19
**instructions** [3] - 152:18, 176:15, 176:16
**instrument** [1] - 59:11
**instrumentation** [1] - 148:3
**insufficient** [1] - 10:12
**insurance** [2] - 5:2, 8:25
**intact** [1] - 135:5
**intend** [2] - 73:15, 172:24
**intended** [1] - 20:17
**intent** [1] - 25:19
**intention** [1] - 13:5
**interacting** [1] - 78:13
**interacts** [1] - 38:13
**interest** [1] - 57:22
**interested** [1] - 78:11
**interesting** [2] - 139:23, 166:17
**interiors** [1] - 148:20
**internal** [1] - 148:22
**International** [1] - 102:20
**interpretation** [3] - 136:3, 136:15
**interpreting** [1] - 19:23
**Interrogatories** [1] - 119:4
**interrogatories** [3] - 54:10, 119:21, 120:13
**interrogatory** [3] - 120:3, 120:15, 125:9
**interrupt** [1] - 38:15
**introduce** [1] - 74:19
**introduction** [1] - 20:1
**investigating** [1] - 44:4
**investigation** [10] - 40:1, 40:15, 43:9, 43:11, 44:13, 44:18, 44:20, 45:9, 104:1, 128:20

**involve** [3] - 83:14, 94:10, 97:5
**involved** [11] - 32:11, 36:17, 40:22, 42:8, 55:9, 55:12, 78:6, 111:1, 144:21, 159:1, 166:24
**involvement** [1] - 54:12
**involves** [1] - 96:8
**involving** [3] - 46:19, 78:7, 98:4
**isolated** [1] - 135:14
**Israel** [3] - 75:16, 78:25, 79:6
**issue** [33] - 4:8, 6:16, 6:25, 7:6, 7:10, 9:8, 9:9, 9:18, 10:2, 10:8, 12:1, 14:3, 14:5, 14:18, 14:19, 14:23, 22:3, 22:19, 23:9, 23:19, 23:20, 27:17, 27:24, 46:6, 58:2, 67:6, 67:24, 88:25, 91:13, 144:18, 157:1, 179:8
**issues** [6] - 4:3, 4:6, 14:8, 14:12, 42:22, 71:22
**items** [2] - 38:5, 61:5
**itself** [5] - 87:5, 94:9, 107:9, 126:23, 157:3

---

## J

**jacuzzi** [1] - 32:24
**Janragin** [1] - 3:16
**JARNAGIN** [21] - 1:17, 2:5, 3:16, 30:22, 31:6, 33:20, 33:22, 35:13, 35:20, 36:23, 42:24, 46:22, 61:17, 63:16, 70:6, 73:17, 74:3, 145:22, 146:3, 176:12, 179:1
**job** [10] - 53:24, 57:10, 57:14, 57:15, 57:18, 110:13, 110:14, 149:12, 149:13, 153:3
**Johanna** [4] - 15:6, 145:12, 145:13, 176:19
**JOHN** [1] - 2:3
**John** [2] - 15:13, 15:16
**joining** [2] - 78:24, 146:21
**joint** [15] - 75:10, 75:19, 76:24, 77:13,

93:24, 94:4, 94:9, 94:21, 138:21, 138:23, 153:9, 153:10, 176:12
**joints** [1] - 153:8
**Journal** [1] - 80:11
**journals** [1] - 80:10
**Judge** [9] - 6:15, 6:16, 8:3, 116:1, 143:18, 144:3, 172:11, 172:19, 179:5
**judge** [5] - 155:18, 157:22, 157:23, 172:9
**JUDGE** [1] - 1:10
**judicial** [3] - 125:16, 125:18, 125:22
**Judicial** [1] - 124:6
**July** [12] - 36:18, 47:18, 48:8, 50:17, 54:17, 102:19, 106:11, 109:7, 110:3, 136:9, 136:21, 181:8
**June** [3] - 32:13, 179:4, 179:6
**jury** [13] - 4:24, 5:9, 5:10, 5:11, 5:12, 8:4, 20:4, 22:12, 115:23, 116:1, 177:10, 179:16, 179:18

## K

**keep** [16] - 29:15, 37:3, 37:6, 40:19, 41:10, 41:11, 53:8, 65:12, 65:13, 65:15, 111:20, 118:20, 148:6, 162:23, 162:24
**keeping** [1] - 164:17
**keeps** [1] - 67:20
**kept** [3] - 62:22, 62:24, 64:22
**key** [2] - 6:2, 6:13
**kid** [1] - 134:6
**kids** [1] - 32:24
**kind** [42] - 12:5, 18:19, 19:10, 20:16, 24:13, 26:6, 31:25, 38:13, 38:15, 38:16, 46:1, 46:2, 49:6, 55:20, 64:14, 70:2, 76:13, 77:6, 87:25, 90:4, 108:21, 133:1, 148:7, 154:5, 157:5, 157:6, 159:20, 159:23, 159:25, 160:1, 160:23,

162:13, 162:14, 162:15, 163:5, 164:4, 166:7, 170:18, 170:22, 172:19, 177:12, 177:18
**kinds** [1] - 25:9
**knee** [1] - 153:9
**knot** [3] - 42:2, 42:3, 42:7
**knots** [8] - 39:15, 40:9, 42:5, 42:6, 49:17, 63:19, 64:5, 69:5
**knowledge** [19] - 10:12, 19:2, 34:16, 34:18, 34:19, 34:21, 34:22, 35:2, 35:9, 40:16, 50:21, 59:3, 68:16, 68:17, 68:20, 144:24, 148:10, 150:16, 158:3
**known** [4] - 54:6, 57:17, 93:25, 137:6
**knows** [4] - 18:13, 60:19, 61:7, 65:8

## L

**L-i-b-e-r-t-i** [1] - 146:16
**laboratory** [2] - 75:8, 75:16
**labral** [1] - 138:3
**labrum** [9] - 134:4, 134:24, 138:4, 138:8, 138:20, 138:22, 139:4, 139:17
**laceration** [1] - 97:19
**lack** [8] - 8:1, 20:8, 27:2, 34:16, 34:17, 34:20, 36:21, 168:5
**ladder** [1] - 154:3
**laid** [6] - 14:6, 19:11, 116:20, 142:14, 149:22, 155:17
**land** [1] - 96:13
**language** [1] - 23:18
**laptop** [1] - 145:24
**large** [3] - 59:14, 67:1, 161:3
**larger** [1] - 93:25
**last** [7] - 3:25, 4:7, 25:24, 32:13, 36:14, 66:16, 72:19
**lastly** [1] - 11:8
**late** [1] - 155:22
**LAUDERDALE** [1] - 1:2

**Lauderdale** [4] - 1:4, 1:25, 101:24, 181:11
**law** [15] - 6:3, 6:4, 7:5, 7:18, 9:19, 10:17, 19:23, 67:1, 67:5, 177:16, 178:3, 179:8, 179:9
**lawn** [1] - 148:25
**Lawton** [1] - 9:12
**Lawton-Davis** [1] - 9:12
**lawyer** [2] - 54:18
**lawyers** [1] - 120:14
**lay** [6] - 13:6, 25:13, 72:23, 117:1, 121:18, 157:7
**laying** [1] - 170:17
**layperson** [2] - 158:3, 169:17
**leading** [2] - 90:8, 167:5
**learned** [1] - 76:15
**least** [14] - 29:9, 59:24, 78:16, 80:7, 96:19, 102:22, 115:1, 118:8, 119:20, 126:16, 144:1, 148:9, 166:23, 169:8
**leave** [2] - 14:23, 177:5
**leaving** [1] - 40:12
**lectured** [1] - 151:21
**ledger** [1] - 8:25
**ledgers** [1] - 9:6
**left** [15] - 14:10, 85:11, 93:3, 93:5, 93:6, 93:22, 93:24, 94:14, 94:17, 109:10, 111:2, 113:10, 132:6, 177:9
**LEGAL** [1] - 1:14
**legal** [4] - 31:19, 31:20, 31:21, 110:18
**length** [4] - 86:14, 86:19, 86:23, 87:7
**less** [9] - 14:18, 14:22, 23:13, 25:7, 87:7, 117:8, 170:1, 178:22
**letter** [5] - 23:13, 26:20, 27:2, 27:18, 142:7
**letters** [1] - 26:19
**letting** [1] - 145:10
**level** [8] - 76:10, 77:13, 77:14, 77:24, 79:16, 79:22, 89:19
**levels** [2] - 29:13, 77:13
**Lexans** [1] - 36:3

**liability** [2] - 6:6, 6:12
**LIBERTI** [2] - 2:10, 146:9
**Liberti** [32] - 146:7, 146:8, 146:12, 146:16, 146:20, 149:19, 150:14, 153:5, 154:10, 154:11, 154:12, 154:13, 155:3, 156:13, 156:16, 156:23, 157:12, 158:14, 163:18, 167:20, 168:14, 168:15, 169:12, 171:1, 172:21, 172:23, 173:18, 173:25, 175:14, 175:20, 176:25
**Liberti's** [2] - 171:21, 172:3
**licensed** [2] - 151:14, 152:25
**licenses** [2] - 79:17, 148:14
**lid** [58] - 16:10, 16:24, 17:1, 17:5, 17:6, 17:19, 81:9, 85:10, 85:16, 86:1, 86:2, 86:3, 86:5, 86:7, 86:13, 87:7, 87:11, 88:1, 88:4, 89:17, 91:8, 92:3, 92:6, 92:11, 97:15, 98:4, 100:2, 103:14, 103:17, 103:19, 103:22, 113:24, 114:7, 115:8, 116:17, 127:1, 128:15, 128:17, 128:19, 128:21, 131:24, 142:1, 144:4, 144:6, 144:10, 144:13, 144:16, 144:17, 144:20, 158:24, 164:22, 167:3, 167:15, 167:23, 168:17, 168:18
**lido** [15] - 33:6, 33:7, 33:8, 33:9, 33:17, 34:2, 38:23, 43:13, 56:22, 58:9, 58:12, 71:4, 81:9, 84:2, 159:18
**lids** [11] - 35:24, 85:6, 113:25, 114:3, 114:6, 114:12, 114:14, 159:21, 166:24, 167:21,

168:3
**life** [6] - 77:6, 96:12, 109:9, 110:2, 110:10
**lift** [1] - 163:8
**lifting** [1] - 163:7
**ligament** [1] - 93:16
**ligaments** [2] - 133:20, 133:21
**likelihood** [2] - 98:18, 120:5
**likely** [3] - 26:21, 106:17, 126:8
**limit** [2] - 56:12, 118:15
**limitations** [1] - 142:20
**limited** [17] - 83:3, 118:1, 118:9, 119:7, 119:22, 120:4, 121:13, 121:23, 121:25, 122:6, 122:7, 123:14, 123:17, 123:18, 124:20, 125:11
**limiting** [2] - 157:15, 171:23
**Line** [2] - 24:1, 31:10
**line** [6] - 53:5, 100:8, 108:2, 114:9, 123:7, 149:8
**lines** [1] - 33:13
**link** [3] - 30:7, 30:9, 30:18
**list** [6] - 16:19, 54:14, 54:15, 54:16, 68:13, 114:23
**listed** [4] - 43:10, 45:2, 116:4, 155:22
**listening** [1] - 149:23
**listing** [2] - 54:7
**literature** [9] - 92:9, 105:23, 106:16, 108:24, 109:21, 114:23, 115:4, 136:18, 139:19
**litigation** [7] - 23:22, 25:19, 26:4, 26:21, 31:23, 32:5, 53:24
**live** [5] - 2:4, 14:5, 29:23, 30:12, 71:17
**living** [6] - 77:7, 77:21, 78:7, 108:9, 108:11, 109:9
**LLC** [1] - 119:23
**load** [4] - 97:14, 97:16, 139:13, 139:17
**loaded** [1] - 96:11
**loading** [21] - 81:11, 81:12, 95:16, 95:18, 97:3, 97:6, 97:10,

14

108:3, 108:7, 108:19, 110:7, 113:9, 113:18, 127:9, 135:13, 135:17, 135:21, 137:1, 137:2, 137:3
**loads** [1] - 97:11
**local** [2] - 76:11, 176:16
**located** [1] - 43:17
**location** [7] - 59:11, 81:11, 95:24, 96:2, 136:16, 138:24, 139:6
**log** [15] - 42:2, 59:6, 60:15, 60:16, 62:22, 62:24, 63:1, 65:14, 67:14, 67:15, 67:17, 67:18, 67:20, 145:23, 175:21
**log-in** [1] - 145:23
**logged** [1] - 145:2
**logs** [39] - 22:22, 24:14, 24:16, 24:21, 27:20, 30:12, 40:18, 40:19, 40:20, 41:7, 41:12, 41:13, 47:8, 48:1, 48:11, 48:17, 49:4, 49:11, 49:15, 50:22, 53:9, 53:14, 53:19, 53:21, 54:17, 56:18, 58:23, 59:9, 60:7, 60:8, 60:10, 61:20, 61:23, 62:21, 62:22, 64:17, 64:21, 65:14, 70:16
**look** [9] - 39:12, 47:20, 57:15, 82:1, 101:23, 104:15, 145:7, 157:21, 171:2
**looked** [11] - 45:14, 48:14, 56:16, 87:19, 102:25, 112:12, 124:2, 130:15, 140:21, 141:1, 166:17
**looking** [10] - 64:4, 67:10, 67:11, 110:5, 131:5, 138:17, 138:25, 139:15, 147:25, 161:11
**looks** [4] - 17:9, 84:1, 114:20, 114:21
**loop** [3] - 64:15, 71:3, 71:12
**loops** [1] - 71:1
**LOP** [1] - 7:7
**losing** [1] - 25:4
**lost** [3] - 25:16, 31:25, 43:25

**Louisiana** [1] - 122:8
**lounges** [1] - 32:23
**low** [2] - 8:6, 21:20
**lower** [3] - 92:15, 98:21, 104:1
**lubricated** [1] - 98:23
**lunch** [5] - 30:3, 33:14, 33:19, 71:14
**luncheon** [1] - 72:11
**lunged** [1] - 162:13
**lunging** [1] - 161:21
**Lynden** [2] - 102:10, 102:19

## M

**ma'am** [20] - 48:3, 50:4, 54:24, 58:14, 58:20, 99:15, 101:22, 105:10, 105:20, 123:1, 133:4, 135:3, 141:17, 147:22, 164:23, 165:7, 165:14, 165:19, 166:18
**magic** [2] - 40:5, 63:25
**magistrate** [6] - 154:25, 155:17, 157:22, 157:23, 172:9
**magnitude** [3] - 95:24, 97:14, 97:16
**mail** [3] - 30:10, 63:6, 175:24
**main** [6] - 33:12, 53:24, 79:1, 149:8, 149:12, 149:13
**maintain** [1] - 143:20
**maintains** [1] - 37:9
**maintenance** [1] - 56:5
**Mairelys** [1] - 29:17
**MAIRELYS** [2] - 1:23, 181:9
**maitre** [1] - 55:19
**male** [1] - 25:11
**Mall** [6] - 106:20, 107:3, 126:3, 126:9, 126:15, 126:17
**man** [1] - 55:21
**manager** [2] - 32:1, 32:2
**manager/ mechanical** [1] - 149:13
**manages** [1] - 18:13
**manifested** [3] - 136:5, 136:7, 136:13
**manner** [1] - 97:24

**Maps** [1] - 103:6
**maritime** [4] - 4:4, 6:3, 9:18, 9:19
**mark** [8] - 63:7, 115:15, 115:17, 115:19, 116:2, 125:2, 137:22, 172:3
**Marked** [1] - 2:19
**marked** [11] - 16:18, 17:18, 62:8, 112:23, 116:3, 116:6, 116:8, 116:9, 125:4, 142:12, 143:11
**mass** [11] - 114:15, 161:7, 161:11, 161:12, 161:14, 162:8, 164:7, 165:7, 165:8, 165:9
**massage** [1] - 32:24
**massive** [1] - 59:15
**master's** [1] - 151:10
**material** [2] - 67:2, 77:24
**materially** [1] - 88:20
**materials** [4] - 77:11, 77:21, 80:15, 158:20
**math** [5] - 104:12, 104:13, 162:7, 179:3
**mathematical** [1] - 104:10
**mathematics** [1] - 75:15
**matter** [9] - 72:22, 116:21, 123:15, 141:21, 151:3, 168:3, 168:4, 175:18, 181:6
**MD** [4] - 75:14, 75:23, 105:14, 105:15
**mean** [66] - 12:12, 17:4, 18:3, 20:9, 21:10, 26:19, 28:4, 30:3, 52:13, 59:14, 65:24, 69:21, 88:19, 89:16, 96:3, 96:7, 109:6, 112:17, 115:14, 115:22, 118:12, 119:16, 121:3, 121:14, 121:22, 121:24, 122:2, 124:15, 125:13, 127:12, 127:20, 127:24, 128:2, 128:5, 128:18, 128:19, 129:6, 130:4, 136:7, 139:24, 142:17, 143:2, 143:11, 144:23, 144:24, 149:8, 149:23,

150:3, 150:4, 153:6, 155:18, 156:4, 157:7, 159:21, 166:6, 167:24, 168:2, 170:3, 170:19, 171:2, 171:4, 171:6, 176:7, 179:1
**meaning** [5] - 53:16, 59:9, 76:7, 128:11, 140:4
**means** [7] - 60:9, 98:19, 112:15, 161:2, 161:3, 170:10, 170:11
**measure** [10] - 99:19, 112:11, 113:3, 128:17, 128:19, 129:9, 129:17, 129:21, 129:23, 130:4
**measured** [4] - 59:11, 99:17, 112:9, 129:19
**measurement** [5] - 89:23, 100:11, 101:9, 130:12, 168:24
**measurements** [6] - 86:13, 154:20, 158:23, 158:24, 166:23, 166:24
**mechanical** [4] - 77:10, 77:23, 147:4, 156:18
**mechanically** [1] - 108:7
**mechanics** [4] - 75:6, 77:7, 150:24, 162:19
**mechanism** [13] - 78:14, 81:14, 83:14, 83:17, 83:20, 95:12, 95:21, 96:20, 98:5, 98:9, 98:25, 99:4, 134:9
**mechanisms** [1] - 137:6
**media** [1] - 142:10
**medical** [115] - 4:3, 4:4, 4:9, 5:14, 5:25, 6:10, 6:19, 6:23, 9:6, 9:23, 9:25, 12:16, 15:1, 20:2, 20:3, 31:17, 31:20, 44:8, 44:9, 75:22, 76:2, 76:5, 76:14, 76:18, 76:22, 76:25, 77:2, 79:21, 80:19, 82:1, 82:9, 82:11, 82:13, 82:15, 82:23, 83:4, 83:5, 85:14, 87:16,

87:17, 92:6, 95:8, 96:23, 96:25, 97:19, 98:15, 104:22, 104:24, 105:1, 105:2, 105:3, 105:5, 105:6, 105:14, 105:24, 106:5, 106:10, 106:12, 108:25, 109:7, 109:8, 109:24, 110:19, 111:16, 111:18, 113:8, 113:15, 113:19, 118:18, 118:20, 118:21, 120:1, 120:5, 121:17, 121:24, 122:14, 122:22, 123:8, 125:12, 132:5, 133:22, 135:22, 136:1, 137:7, 137:11, 138:12, 138:24, 143:4, 150:1, 150:16, 150:17, 150:19, 150:21, 150:22, 150:25, 155:4, 155:5, 156:9, 156:10, 156:11, 156:12, 156:15, 156:16, 156:24, 157:8, 157:10, 160:11, 164:3, 167:16
**Medical** [5] - 75:11, 75:14, 75:18, 79:7, 105:13
**medically** [1] - 135:19
**medicine** [2] - 78:4, 152:24
**Mediterranean** [1] - 149:4
**meet** [1] - 150:3
**meets** [1] - 6:20
**MELISSA** [1] - 1:10
**Melissa** [1] - 3:5
**member** [4] - 49:23, 79:25, 80:1, 151:18
**members** [3] - 32:18, 45:2, 50:18
**mention** [11] - 25:16, 64:18, 64:19, 64:24, 90:12, 90:13, 96:6, 96:23, 97:14, 104:3, 152:9
**mentioned** [2] - 33:1, 167:14
**Merrell** [1] - 152:21
**met** [1] - 19:23
**meta** [1] - 126:24

**meteorologist** [2] - 100:24, 101:22
**meteorology** [1] - 72:24
**meters** [1] - 161:20
**method** [5] - 16:11, 81:22, 81:24, 82:5, 124:14
**Mexican** [1] - 33:16
**Miami** [2] - 1:15, 21:19
**Miami's** [1] - 102:25
**Miami-Dade** [1] - 21:19
**Michael** [2] - 3:14, 150:14
**MICHAEL** [1] - 1:16
**Michelin** [2] - 124:5, 124:20
**Michigan** [1] - 75:5
**microphone** [1] - 146:4
**Middle** [2] - 9:9, 9:20
**midship** [2] - 33:15, 33:16
**might** [3] - 26:22, 64:23, 77:10
**mile** [1] - 69:18
**miles** [12] - 39:24, 56:22, 57:21, 69:24, 75:11, 92:12, 101:24, 102:7, 103:7, 104:16, 104:17
**Military** [1] - 79:4
**military** [1] - 79:24
**millimeter** [2] - 95:7, 98:13
**millimeters** [1] - 139:7
**mind** [1] - 130:22
**mine** [2] - 15:11, 55:17
**Mineral** [1] - 80:2
**minimum** [1] - 72:1
**minor** [1] - 95:9
**minute** [4] - 15:19, 65:13, 96:16
**minute-by-minute** [1] - 65:13
**minutes** [4] - 72:1, 73:25, 145:8, 145:15
**missed** [1] - 164:17
**missing** [7] - 22:13, 22:14, 22:15, 23:21, 28:10, 115:4, 177:11
**misstate** [1] - 53:1
**misstates** [1] - 174:22
**misstating** [1] - 118:11
**mistaken** [1] - 45:5
**mistakes** [1] - 177:9
**MIT** [3] - 75:10, 75:19,

75:24
**model** [10] - 93:8, 93:9, 93:24, 94:3, 95:1, 96:17, 131:6, 138:17, 140:1, 140:15
**moment** [5] - 42:14, 51:2, 111:6, 131:25, 149:15
**moments** [3] - 24:7, 25:18, 145:5
**momentum** [1] - 160:2
**MONICA** [2] - 2:4, 31:3
**Monica** [3] - 30:22, 30:24, 31:3
**monitor** [2] - 145:23, 146:1
**monitoring** [1] - 56:4
**month** [1] - 23:13
**months** [1] - 31:18
**Moore** [2] - 6:16
**Moore's** [1] - 8:3
**morning** [5] - 3:6, 3:14, 31:7, 31:8, 72:15
**most** [5] - 19:24, 33:9, 33:10, 67:2, 147:4
**mostly** [6] - 93:14, 106:14, 106:21, 107:4, 172:11, 172:12
**motion** [22] - 6:20, 6:21, 10:9, 22:18, 22:20, 24:2, 24:4, 24:6, 28:18, 98:25, 108:14, 108:15, 109:22, 114:15, 122:10, 125:16, 133:23, 136:17, 154:24, 155:21, 170:19, 172:9
**motions** [6] - 42:17, 81:6, 81:12, 179:11, 179:21, 179:22
**Mount** [1] - 76:13
**move** [16] - 12:25, 42:18, 52:9, 118:20, 122:4, 131:8, 131:9, 131:12, 131:23, 133:19, 134:2, 138:25, 141:23, 161:15, 161:22, 165:13
**moved** [10] - 84:9, 97:1, 130:14, 132:1, 133:10, 139:20, 161:15, 174:3, 174:4, 174:8
**movement** [12] - 90:25, 131:20,

132:17, 133:18, 133:25, 134:13, 135:8, 160:6, 160:8, 163:21, 165:2, 167:22
**movements** [1] - 174:15
**moves** [4] - 129:10, 134:11, 153:8, 153:11
**moving** [19] - 91:10, 103:18, 103:20, 108:9, 132:9, 132:12, 132:14, 132:20, 132:25, 133:12, 133:22, 143:8, 159:23, 161:20, 165:22, 166:2, 166:6, 168:5
**MR** [371] - 2:5, 2:5, 2:8, 2:9, 2:11, 2:11, 2:12, 2:12, 3:12, 3:14, 3:16, 3:23, 4:2, 4:17, 4:20, 5:15, 5:18, 5:21, 7:6, 7:22, 8:10, 8:18, 8:21, 9:12, 9:15, 10:2, 10:20, 11:2, 11:8, 11:16, 11:21, 12:14, 12:17, 12:20, 12:24, 13:2, 13:8, 13:14, 13:17, 13:23, 14:15, 14:22, 15:11, 15:13, 15:18, 15:21, 16:2, 16:6, 16:14, 16:16, 16:20, 16:24, 17:7, 17:11, 17:15, 17:18, 17:21, 17:25, 18:7, 18:9, 19:20, 20:10, 20:16, 21:5, 21:8, 21:22, 22:6, 22:9, 22:17, 24:6, 25:24, 26:10, 26:24, 27:7, 27:14, 27:24, 28:5, 28:19, 28:25, 29:2, 29:11, 29:13, 29:20, 30:3, 30:5, 30:11, 30:17, 30:22, 31:6, 33:20, 33:22, 34:14, 34:25, 35:5, 35:8, 35:13, 35:19, 35:20, 36:21, 36:23, 42:11, 42:24, 46:22, 47:2, 51:6, 51:11, 51:14, 51:19, 51:21, 51:24, 52:1, 52:5, 52:8, 52:13, 52:19, 61:10, 61:12, 61:17, 61:21, 62:2, 62:13, 63:5, 63:16, 65:1, 66:3, 66:11, 66:14, 67:9,

67:24, 69:15, 69:21, 69:25, 70:3, 70:6, 70:9, 70:23, 71:17, 71:23, 72:4, 72:5, 72:15, 73:13, 73:17, 73:21, 73:25, 74:3, 74:6, 74:15, 74:18, 82:24, 83:3, 83:8, 83:9, 84:14, 84:16, 85:18, 85:20, 86:6, 86:11, 86:12, 88:6, 88:9, 88:16, 88:21, 88:25, 89:22, 90:6, 90:10, 90:11, 90:16, 90:21, 90:24, 91:14, 91:17, 91:21, 91:22, 93:19, 94:11, 99:9, 99:12, 99:14, 100:8, 100:9, 101:3, 101:8, 103:9, 103:12, 103:13, 107:1, 107:15, 107:19, 107:22, 108:1, 111:25, 112:4, 112:5, 113:11, 113:14, 113:17, 113:22, 115:10, 115:12, 115:13, 115:16, 115:19, 115:25, 116:5, 116:11, 116:24, 117:10, 117:24, 118:3, 118:6, 118:10, 118:24, 119:3, 119:6, 119:9, 119:15, 119:19, 120:15, 120:17, 120:19, 120:23, 120:25, 121:2, 121:3, 121:5, 121:7, 121:10, 121:13, 121:17, 121:20, 122:5, 123:19, 123:23, 125:1, 125:4, 125:8, 125:15, 125:20, 125:25, 129:2, 129:11, 129:14, 130:23, 131:2, 131:4, 131:17, 133:14, 134:24, 134:25, 135:6, 137:13, 137:20, 137:21, 138:3, 138:15, 140:3, 140:9, 140:19, 140:23, 141:1, 141:7, 141:20, 142:2, 142:5, 142:8, 142:12, 142:13, 142:19, 142:24,

143:6, 143:11, 143:15, 143:18, 143:22, 143:25, 144:3, 144:9, 144:13, 144:14, 144:17, 145:1, 145:4, 145:19, 145:22, 146:3, 146:6, 146:9, 146:19, 149:18, 149:21, 149:25, 150:7, 150:9, 150:11, 150:13, 152:21, 154:15, 154:23, 155:7, 155:19, 155:21, 156:4, 156:8, 157:7, 157:11, 157:17, 158:1, 158:5, 158:10, 158:13, 162:18, 163:15, 163:17, 163:23, 164:1, 164:2, 165:4, 166:13, 166:19, 166:21, 167:5, 167:7, 167:8, 167:13, 167:19, 168:1, 168:7, 168:10, 168:13, 168:23, 169:4, 169:6, 169:21, 169:22, 170:2, 170:6, 170:24, 171:10, 171:20, 172:4, 172:11, 172:13, 172:19, 172:22, 173:2, 173:15, 173:18, 173:21, 173:24, 174:22, 174:25, 175:2, 175:10, 175:13, 175:19, 175:23, 176:5, 176:10, 176:12, 176:18, 177:2, 177:4, 178:6, 178:7, 178:23, 179:1, 180:3, 180:8
**MRI** [10] - 82:21, 98:10, 98:11, 106:2, 123:24, 124:2, 135:25, 136:5, 136:8, 140:21
**MS** [1] - 3:18
**multiple** [6] - 18:10, 23:4, 27:14, 28:15, 73:4, 133:24
**muscle** [3] - 93:3, 95:3, 137:2
**muscles** [1] - 95:5

**musculoskeletal** [2] - 80:4, 105:25

## N

**name** [17] - 11:25, 23:6, 27:16, 28:15, 31:2, 31:3, 47:17, 47:21, 47:23, 55:20, 74:12, 76:17, 77:6, 94:7, 119:11, 119:17, 146:14
**names** [5] - 36:1, 45:12, 45:14, 46:5, 55:11
**napkins** [1] - 37:5
**Nassau** [6] - 40:12, 101:2, 101:11, 101:13, 101:18, 102:4
**nature** [10] - 20:20, 34:25, 53:25, 72:24, 81:10, 82:16, 109:3, 109:23, 129:10, 136:17
**navigation** [3] - 40:19, 48:17, 49:14
**navigation-wise** [1] - 49:14
**navigational** [3] - 40:19, 53:9, 53:21
**near** [1] - 34:6
**necessarily** [1] - 162:20
**necessary** [2] - 6:10, 179:22
**necessity** [1] - 20:3
**neck** [2] - 93:4, 94:6
**need** [28] - 10:5, 14:5, 14:11, 15:7, 15:9, 23:19, 30:16, 30:18, 38:21, 39:18, 40:5, 58:7, 71:20, 71:25, 116:19, 119:5, 119:11, 120:12, 122:21, 139:17, 144:2, 144:23, 145:7, 145:11, 145:23, 172:16, 178:6, 179:24
**needed** [6] - 11:7, 38:3, 49:2, 113:6, 147:9, 157:5
**needs** [8] - 9:24, 38:17, 38:22, 56:22, 73:1, 133:2, 140:9, 177:6
**negative** [1] - 87:18
**nerves** [1] - 93:17
**neuroradiology** [1] -

124:11
**never** [30] - 23:5, 23:7, 24:14, 26:7, 27:16, 27:22, 35:3, 35:5, 42:13, 48:2, 48:19, 48:21, 49:19, 49:22, 49:24, 52:25, 58:3, 72:2, 89:10, 110:25, 128:24, 150:21, 151:3, 152:25, 153:1, 166:6, 173:25, 174:20, 175:4
**nevertheless** [3] - 68:18, 68:20, 179:14
**new** [4] - 81:22, 88:19, 88:20, 88:21
**next** [10] - 16:14, 31:21, 68:24, 71:16, 72:17, 73:25, 74:2, 82:19, 141:19, 143:20
**night** [1] - 4:7
**nine** [1] - 31:18
**Ninth** [1] - 124:6
**NO** [1] - 1:2
**no-follow** [1] - 65:2
**nobody** [6] - 46:3, 69:23, 69:24, 69:25, 148:2, 177:8
**none** [6] - 59:9, 63:14, 106:12, 118:18, 123:10
**nonissue** [1] - 21:21
**nonretained** [1] - 11:18
**normally** [4] - 6:7, 8:23, 52:10, 119:13
**North** [4] - 1:18, 124:5, 124:20, 146:24
**notation** [4] - 40:24, 58:22, 60:3, 60:16
**note** [6] - 48:13, 48:14, 125:6, 125:15, 130:2, 144:5
**noted** [8] - 40:24, 49:4, 49:5, 58:24, 59:5, 60:15, 73:9, 87:13
**notes** [2] - 18:4, 137:17
**nothing** [21] - 27:9, 40:4, 44:1, 46:17, 46:19, 47:6, 58:24, 59:9, 60:8, 60:9, 60:15, 60:16, 62:14, 89:7, 91:1, 108:10, 111:1, 126:12, 134:10, 153:4

**notice** [24] - 3:25, 4:12, 9:16, 10:15, 25:19, 26:5, 28:21, 51:2, 54:24, 55:1, 61:24, 62:6, 62:10, 62:12, 63:9, 63:16, 64:20, 65:18, 65:21, 125:16, 125:18, 125:22, 176:2, 176:4
**notification** [1] - 38:1
**number** [15] - 15:4, 32:23, 40:5, 57:6, 63:25, 64:5, 79:2, 87:8, 104:14, 105:6, 112:12, 114:20, 143:7, 154:23, 169:12
**numbers** [4] - 42:13, 171:3, 171:4
**nutraceutical** [2] - 148:24, 149:14

## O

**oath** [1] - 51:1
**object** [13] - 42:11, 68:19, 88:6, 103:9, 121:7, 121:20, 149:21, 160:25, 163:4, 164:21, 164:24, 165:21
**objected** [3] - 63:14, 66:12, 142:13
**objection** [40] - 34:15, 51:6, 63:16, 66:15, 72:21, 73:1, 73:9, 83:2, 83:3, 83:5, 83:6, 91:16, 101:3, 107:15, 111:25, 113:11, 115:10, 116:13, 116:25, 117:4, 117:23, 118:3, 118:10, 122:3, 129:11, 142:19, 142:25, 143:10, 143:16, 143:21, 157:15, 162:18, 163:15, 163:23, 167:5, 169:21, 170:2, 171:10, 173:15, 174:22
**objects** [1] - 46:16
**obligation** [1] - 26:6
**observations** [1] - 42:1
**observed** [1] - 36:15
**obtain** [1] - 50:22
**obtained** [6] - 82:17, 84:12, 101:2,

101:10, 108:5
**obviously** [10] - 17:5, 18:17, 48:15, 70:3, 73:7, 122:11, 161:7, 172:25, 177:17, 177:23
**occur** [8] - 32:16, 33:5, 89:19, 106:14, 106:17, 106:21, 107:4, 133:21
**occurred** [11] - 23:21, 60:9, 81:8, 85:3, 90:4, 102:24, 140:13, 159:2, 159:3, 159:16, 160:3
**occurring** [1] - 33:2
**occurs** [1] - 40:21
**ocean** [3] - 41:14, 102:23, 103:2
**October** [1] - 11:11
**OF** [2] - 1:1, 2:16
**Offenberg** [1] - 6:14
**offense** [1] - 156:23
**offer** [16] - 4:24, 5:1, 5:3, 5:4, 5:6, 104:25, 118:17, 120:1, 120:4, 122:16, 123:4, 128:25, 172:24, 173:1, 173:3
**offered** [5] - 19:5, 20:7, 118:19, 144:20, 173:13
**offering** [8] - 105:2, 105:5, 118:20, 118:21, 120:2, 121:14, 121:15, 123:15
**office** [3] - 176:22, 176:23, 176:24
**officer** [4] - 43:14, 58:17, 64:14, 73:14
**OFFICER** [5] - 3:2, 15:24, 72:12, 145:16, 145:18
**officers** [7] - 37:17, 39:10, 50:7, 50:18, 50:20, 58:18, 59:4
**Official** [1] - 181:9
**OFFICIAL** [1] - 1:23
**Ohio** [1] - 79:1
**Okey** [2] - 122:8, 123:6
**old** [3] - 108:12, 128:2, 128:6
**onboard** [16] - 36:3, 36:6, 36:20, 36:25, 37:21, 38:6, 43:15, 44:4, 45:20, 49:6, 49:20, 49:22, 50:5, 50:7, 50:23, 50:24

**once** [11] - 9:3, 32:13, 44:9, 44:15, 60:5, 66:11, 87:3, 153:13, 166:7, 176:14
**one** [77] - 9:11, 17:9, 17:10, 19:9, 19:16, 19:19, 20:17, 20:21, 21:17, 21:21, 23:11, 25:4, 26:2, 26:18, 28:16, 30:12, 33:3, 33:9, 43:16, 45:1, 46:11, 53:18, 53:19, 57:8, 57:18, 63:5, 66:3, 74:2, 75:17, 75:24, 79:9, 80:11, 81:20, 84:21, 86:5, 87:7, 88:19, 95:6, 96:12, 96:23, 98:11, 102:14, 102:16, 103:21, 103:22, 104:12, 109:20, 111:3, 113:1, 113:24, 114:1, 114:5, 114:8, 119:9, 119:24, 125:8, 127:2, 127:13, 132:4, 132:5, 132:18, 134:23, 135:2, 135:12, 137:19, 137:25, 139:6, 143:20, 144:13, 144:14, 144:18, 145:7, 145:20, 154:23, 156:24
**ones** [5] - 35:24, 50:24, 57:6, 95:8, 119:21
**online** [1] - 162:4
**open** [7] - 42:8, 43:18, 46:1, 49:9, 84:3, 140:25, 177:6
**operate** [2] - 38:16, 53:19
**operates** [1] - 38:16
**operation** [5] - 40:23, 40:25, 41:23, 48:14
**operations** [12] - 33:2, 37:2, 37:11, 37:14, 37:18, 37:20, 38:11, 38:25, 39:1, 45:11, 72:23
**operative** [1] - 82:21
**opine** [1] - 50:10
**opined** [2] - 160:7, 163:21
**opinion** [54] - 6:15, 9:20, 21:14, 83:16, 88:15, 88:16, 88:17, 88:20, 88:24, 89:14,

89:16, 90:4, 90:9, 90:15, 90:16, 90:17, 90:18, 90:20, 90:21, 91:3, 91:4, 91:7, 91:10, 91:11, 95:11, 95:19, 97:25, 100:22, 109:2, 121:15, 122:7, 123:1, 123:2, 123:16, 123:22, 131:11, 131:12, 131:13, 131:20, 136:4, 136:14, 153:24, 154:14, 155:4, 155:7, 159:6, 163:10, 164:12, 164:24, 174:16, 174:17

**opinions** [60] - 11:22, 20:20, 21:16, 80:16, 82:8, 82:12, 84:24, 99:5, 101:7, 105:1, 105:2, 115:3, 115:5, 117:15, 117:17, 117:25, 118:9, 118:13, 118:15, 118:18, 118:20, 118:21, 119:7, 119:22, 120:1, 120:2, 120:4, 120:5, 121:17, 121:18, 121:24, 122:13, 122:16, 122:21, 123:3, 123:8, 123:10, 123:11, 123:19, 123:21, 124:21, 125:18, 125:21, 126:7, 135:18, 135:21, 135:22, 154:25, 155:5, 156:12, 158:15, 159:11, 160:11, 169:9, 169:10, 172:6, 172:24, 173:4, 174:10

**opportunity** [6] - 14:3, 25:20, 36:5, 40:14, 144:11, 163:19

**opposed** [3] - 12:22, 12:23, 168:9

**opposing** [1] - 4:13

**order** [16] - 3:1, 32:25, 82:1, 88:1, 88:4, 92:3, 118:17, 120:24, 122:25, 123:3, 123:5, 123:6, 174:16, 178:4, 178:12

**orders** [2] - 38:21,

125:1

**ordinarily** [1] - 6:11

**ore** [1] - 24:7

**organizational** [1] - 34:17

**organizations** [2] - 79:25, 151:18

**orientation** [1] - 127:9

**originally** [1] - 117:13

**orthopedic** [6] - 18:17, 96:19, 147:5, 147:24, 150:23, 152:10

**orthopedics** [4] - 153:5, 153:6, 153:7, 153:19

**os** [1] - 98:17

**Osceola** [1] - 124:6

**otherwise** [3] - 136:13, 178:24, 179:18

**outcomes** [1] - 126:18

**outdoor** [2] - 33:11, 63:20

**outer** [3] - 39:19, 43:17, 49:18

**output** [1] - 104:7

**outside** [11] - 32:4, 33:15, 57:9, 61:4, 72:22, 96:17, 101:4, 101:23, 160:10, 160:11, 167:8

**overall** [1] - 19:18

**overlooking** [1] - 21:15

**overrule** [1] - 35:17

**overruled** [12] - 36:22, 42:21, 73:10, 117:1, 117:12, 117:22, 118:4, 118:13, 122:2, 129:12, 173:17, 174:24

**overruling** [5] - 91:2, 91:16, 122:2, 143:1, 157:14

**oversight** [1] - 76:16

**owed** [1] - 4:6

**own** [13] - 14:13, 19:2, 21:6, 22:2, 38:12, 38:15, 51:20, 51:21, 68:16, 80:23, 84:12, 86:25, 144:24

**owns** [1] - 18:11

## P

**P-11** [2] - 125:2, 125:3

**P.A** [1] - 1:18

**p.m** [12] - 1:6, 42:3, 42:4, 53:18, 65:7,

72:11, 74:5, 145:17, 180:10

**page** [14] - 5:18, 5:21, 10:4, 10:19, 26:11, 53:5, 69:16, 90:1, 100:7, 100:10, 107:14, 111:19, 111:20, 126:16

**PAGE** [1] - 2:2

**Pages** [1] - 1:8

**pages** [1] - 114:20

**paid** [6] - 5:3, 5:11, 6:1, 6:8, 8:7, 21:25

**pain** [2] - 92:25, 94:13

**Palm** [1] - 1:19

**palpation** [1] - 94:15

**paper** [1] - 119:15

**paragraph** [1] - 108:21

**paralegal** [3] - 53:23, 54:1

**part** [35] - 7:13, 13:3, 28:15, 37:2, 37:19, 37:20, 43:1, 43:3, 43:9, 43:17, 44:2, 44:24, 46:7, 69:16, 75:13, 86:5, 90:5, 91:4, 92:9, 94:2, 94:3, 94:7, 94:8, 116:7, 127:18, 138:19, 138:21, 146:6, 148:2, 154:22, 157:14, 162:21, 170:4, 172:8

**partial** [3] - 98:13, 98:24, 137:6

**participated** [1] - 54:3

**particular** [16] - 14:4, 21:15, 32:12, 32:25, 37:7, 43:19, 58:18, 58:19, 58:20, 76:12, 77:18, 77:21, 99:2, 127:19, 133:8, 155:24

**particularly** [1] - 142:22

**parties** [3] - 177:17, 177:25, 179:6

**parts** [2] - 57:16, 57:22

**Passenger** [2] - 44:17, 44:21

**passenger** [5] - 44:7, 44:9, 46:16, 58:12, 60:18

**passengers** [3] - 32:22, 50:3, 57:23

**past** [1] - 39:20

**pathological** [4] - 81:15, 109:23, 137:4, 137:5

**pathology** [6] - 76:9, 78:15, 98:3, 98:9, 110:5, 137:9

**pathophysiology** [1] - 76:6

**patient** [1] - 78:16

**patients** [4] - 76:15, 76:16, 128:3, 128:4

**pause** [2] - 61:15, 96:16

**paused** [5] - 15:17, 16:4, 16:23, 17:14, 73:24

**pausing** [1] - 60:4

**pay** [2] - 8:8, 178:20

**paying** [2] - 71:21, 179:23

**payments** [1] - 7:2

**peculiarly** [1] - 23:25

**peer** [5] - 80:5, 80:9, 105:23, 108:23, 126:25

**pending** [1] - 102:1

**people** [16] - 19:13, 45:15, 60:11, 60:14, 60:25, 78:7, 84:9, 106:17, 108:24, 126:10, 127:20, 128:1, 157:5, 159:1, 161:25

**per** [11] - 39:24, 56:12, 56:22, 57:21, 69:18, 92:12, 104:16, 104:17, 152:20, 176:2

**percent** [2] - 95:7, 139:8

**perform** [4] - 40:14, 105:3, 145:22, 148:4

**performing** [1] - 46:8

**perhaps** [1] - 5:10

**period** [3] - 46:17, 136:17, 160:23

**permanent** [2] - 34:9, 34:11

**permanently** [1] - 84:8

**permission** [2] - 93:20, 130:25

**permitted** [4] - 42:11, 117:4, 124:21, 125:18

**person** [8] - 6:12, 20:13, 45:22, 74:2, 113:1, 129:16, 129:18, 170:20

**personal** [15] - 10:12, 13:9, 19:2, 22:2, 34:16, 34:17, 34:21, 34:22, 35:2, 49:12, 59:3, 60:22, 68:16,

68:17, 68:20

**personally** [10] - 18:12, 18:13, 18:21, 34:17, 36:5, 36:8, 45:11, 47:5, 50:6, 163:8

**persons** [2] - 6:6, 106:14

**perspective** [2] - 94:12, 110:6

**pertinent** [1] - 87:17

**PhD** [5] - 75:15, 75:23, 76:18, 105:15, 141:5

**phlebotomist** [1] - 109:13

**phone** [1] - 142:21

**photo** [6] - 33:23, 34:1, 34:5, 35:22, 85:1, 140:1

**Photo** [3] - 2:21, 141:25, 143:6

**photograph** [3] - 43:19, 84:23, 130:15

**photographs** [11] - 44:19, 66:7, 80:18, 84:11, 84:12, 84:21, 86:2, 87:8, 112:12, 130:10, 158:23

**photos** [2] - 141:1, 143:7

**phrasing** [1] - 136:25

**physical** [8] - 76:15, 82:2, 82:20, 128:18, 129:13, 133:24, 140:15, 169:16

**physically** [1] - 106:8

**physician** [8] - 8:19, 10:10, 11:17, 11:21, 12:3, 78:15, 78:17, 98:12

**physicians** [6] - 19:22, 76:16, 82:22, 109:1, 135:5, 137:5

**physics** [9] - 75:22, 76:18, 76:22, 77:8, 77:9, 77:15, 79:4, 79:11, 91:9

**physiology** [4] - 75:7, 76:6, 77:22, 78:1

**pick** [2] - 61:5, 71:15

**picked** [1] - 159:22

**picture** [6] - 139:25, 140:1, 140:5, 140:6, 140:8, 140:11

**pictures** [2] - 140:16, 140:18

**piece** [8] - 61:25, 106:16, 132:25, 162:11, 169:18, 169:25, 170:13,

170:14
**piloting** [1] - 47:18
**Pindling** [2] - 102:10, 102:19
**pizzerias** [1] - 33:15
**place** [3] - 66:19, 128:12, 137:17
**placed** [1] - 51:1
**plaintiff** [22] - 3:11, 3:12, 4:6, 4:9, 6:5, 6:22, 7:7, 9:24, 10:11, 15:13, 16:8, 17:23, 22:7, 25:17, 26:3, 51:14, 124:21, 142:15, 142:16, 144:15, 146:6, 159:16
**Plaintiff** [1] - 1:5
**PLAINTIFF** [3] - 1:13, 2:13, 2:15
**Plaintiff's** [4] - 2:20, 16:18, 116:4, 118:25
**plaintiff's** [19] - 2:20, 6:19, 9:23, 15:9, 19:25, 35:10, 42:22, 46:9, 46:17, 62:4, 63:10, 63:13, 73:18, 83:3, 86:8, 114:2, 116:6, 179:12, 179:15
**plaintiffs** [2] - 5:23, 28:17
**plan** [1] - 131:2
**plastic** [12] - 35:23, 36:4, 36:8, 36:11, 36:16, 36:24, 37:8, 37:12, 46:20, 81:9, 85:6
**plate** [1] - 138:8
**plates** [1] - 37:5
**play** [3] - 10:5, 63:24, 73:15
**played** [6] - 52:2, 52:4, 52:7, 59:22, 59:24, 69:17
**playing** [1] - 73:20
**pleading** [1] - 26:1
**pleadings** [2] - 54:12, 54:20
**pleasure** [2] - 180:3, 180:6
**pocket** [1] - 5:4
**podium** [1] - 51:13
**point** [62] - 4:15, 4:17, 7:24, 9:2, 9:14, 10:8, 14:8, 14:17, 19:15, 20:17, 21:11, 24:23, 25:4, 25:24, 26:3, 28:3, 34:10, 37:25, 38:2, 38:22, 39:17,

41:16, 41:18, 44:15, 44:18, 48:6, 49:8, 55:18, 56:17, 64:12, 64:15, 65:2, 65:12, 66:3, 66:16, 70:11, 78:20, 94:19, 96:5, 109:6, 112:22, 116:25, 117:3, 117:6, 121:25, 123:9, 123:17, 123:22, 125:14, 125:24, 128:4, 131:21, 131:22, 131:23, 132:24, 133:3, 140:9, 140:19, 148:1, 157:25, 167:13, 169:5
**Point** [2] - 79:5, 79:12
**pointed** [2] - 86:7, 93:2
**points** [1] - 24:13
**policies** [9] - 26:15, 37:7, 44:2, 55:24, 62:17, 66:5, 66:10, 68:15, 68:23
**policy** [9] - 62:14, 69:1, 69:3, 69:4, 69:5, 69:7, 69:10, 69:15, 70:4
**pools** [2] - 32:24, 33:11
**popular** [1] - 33:10
**portion** [5] - 5:15, 34:2, 49:2, 59:24, 115:2
**portions** [1] - 73:18
**position** [13] - 31:18, 46:7, 60:18, 60:21, 66:20, 96:10, 97:6, 101:14, 128:12, 138:5, 138:10, 138:11, 152:9
**possession** [3] - 22:23, 22:24, 24:1
**possibility** [3] - 106:23, 107:5, 177:6
**possible** [8] - 53:3, 131:7, 131:9, 131:11, 133:20, 133:25, 135:7, 178:23
**possibly** [2] - 113:3, 153:2
**postdoctoral** [1] - 78:25
**posteriorly** [1] - 97:11
**posts** [1] - 142:10
**posture** [1] - 162:16
**potential** [1] - 78:14

**potentially** [1] - 96:15
**pounds** [19] - 17:15, 17:20, 86:16, 162:5, 162:10, 163:4, 163:7, 163:8, 164:9, 164:15, 169:24, 170:10, 170:13, 170:14, 170:22, 170:23, 171:2, 171:6
**power** [2] - 57:24, 57:25
**practice** [2] - 26:1, 161:2
**practices** [1] - 13:10
**practicing** [1] - 18:25
**pre** [1] - 42:16
**preceding** [1] - 101:20
**preclude** [2] - 6:17, 6:18
**precluded** [2] - 121:15, 177:8
**precluding** [1] - 179:21
**preclusive** [1] - 123:3
**predicate** [4] - 13:6, 14:7, 25:13, 149:22
**preemptive** [2] - 118:20, 122:10
**preferred** [1] - 135:22
**prejudice** [2] - 68:21, 69:14
**premature** [2] - 28:18, 29:1
**prematurely** [2] - 24:10, 71:10
**premises** [2] - 129:15, 129:18
**preparation** [2] - 36:6, 54:3
**preparations** [1] - 54:20
**prepare** [2] - 120:14, 177:15
**prepared** [11] - 54:23, 65:20, 65:22, 67:21, 68:13, 70:12, 70:14, 120:14, 122:11, 158:14, 180:5
**preparing** [1] - 85:9
**prerogative** [1] - 178:1
**present** [11] - 10:22, 16:14, 20:18, 20:19, 25:20, 36:11, 43:21, 50:20, 55:4, 78:18, 83:17
**presented** [7] - 6:20, 20:3, 20:12, 20:13, 21:6, 85:23, 136:5
**presenting** [1] - 118:8
**preservation** [9] -

23:13, 23:24, 26:13, 26:19, 26:20, 27:1, 27:2, 27:17, 27:18
**preserve** [2] - 26:13, 26:14
**preserved** [2] - 26:7, 27:9
**presiding** [1] - 3:5
**press** [1] - 170:18
**presuit** [2] - 25:18, 26:5
**pretrial** [2] - 42:16, 54:6
**pretty** [3] - 10:17, 53:2, 110:15
**previously** [8] - 41:2, 69:13, 84:18, 85:22, 88:15, 88:22, 117:7, 142:6
**primary** [1] - 83:13
**principle** [1] - 5:23
**principles** [3] - 77:9, 77:12, 173:11
**print** [1] - 175:24
**printed** [2] - 47:14, 63:7
**privileges** [1] - 18:10
**problem** [4] - 30:21, 104:10, 104:12, 104:13
**problems** [1] - 147:8
**Procedure** [1] - 66:20
**procedure** [11] - 18:14, 18:16, 44:10, 56:21, 56:24, 57:1, 57:11, 63:18, 64:2, 69:3, 81:19
**procedures** [16] - 5:6, 11:5, 18:20, 21:17, 37:7, 39:8, 44:4, 55:24, 62:11, 62:14, 62:17, 66:6, 66:10, 67:25, 68:15, 68:23
**proceed** [2] - 74:15, 158:10
**proceedings** [2] - 24:8, 181:5
**process** [5] - 19:8, 43:1, 43:3, 49:7
**processes** [1] - 108:4
**produced** [5] - 88:2, 92:8, 100:6, 114:18, 121:1
**producing** [1] - 71:5
**product** [1] - 148:5
**production** [1] - 66:4
**professional** [5] - 59:2, 79:17, 79:25, 151:18, 180:6
**professor** [1] - 79:4

**proffer** [6] - 149:19, 154:25, 171:21, 171:22, 171:23, 172:5
**proffered** [2] - 159:6, 172:6
**proffering** [1] - 27:5
**proffers** [1] - 175:23
**program** [6] - 75:10, 75:19, 75:23, 76:1, 76:24
**prohibited** [1] - 67:3
**project** [2] - 147:25, 149:13
**projects** [1] - 147:8
**promise** [1] - 130:24
**promoted** [1] - 31:23
**proof** [2] - 4:8, 9:8
**propagated** [1] - 94:21
**propel** [1] - 129:9
**proper** [1] - 18:20
**properly** [2] - 14:2, 157:20
**properties** [3] - 77:20, 77:23, 77:25
**proportions** [1] - 112:12
**proposed** [4] - 177:16, 179:7, 180:1
**proposition** [2] - 7:10, 107:7
**protection** [1] - 142:7
**provide** [13] - 11:10, 11:12, 11:24, 14:23, 23:18, 26:12, 62:5, 66:8, 73:2, 73:6, 75:2, 81:14, 95:12
**provided** [22] - 4:13, 11:11, 14:24, 20:2, 23:18, 80:15, 80:17, 80:19, 80:21, 84:11, 84:21, 95:21, 100:5, 102:16, 110:24, 111:8, 117:20, 120:18, 128:15, 130:11, 130:15, 132:8
**providers** [9] - 7:17, 81:16, 97:19, 109:24, 111:18, 122:23, 137:8, 138:12, 138:24
**provides** [1] - 96:13
**publication** [1] - 92:21
**publish** [3] - 115:25, 119:12, 144:11
**published** [10] - 15:16, 16:3, 16:22, 17:13, 73:23, 80:5,

105:23, 115:24, 126:25, 151:21
**pull** [3] - 41:19, 67:5, 102:13
**pulled** [1] - 127:18
**pulling** [1] - 32:6
**Purdue** [2] - 147:3, 147:11
**purport** [2] - 156:10, 156:11
**purportedly** [1] - 152:6
**purpose** [1] - 13:22
**purposes** [2] - 144:20, 176:2
**pursuant** [1] - 6:18
**purview** [1] - 122:22
**push** [4] - 97:24, 133:12, 170:21, 170:22
**pushed** [1] - 27:15
**pushing** [1] - 163:4
**put** [25] - 10:25, 19:7, 22:16, 26:5, 28:20, 33:18, 33:21, 41:13, 48:16, 51:17, 64:20, 72:18, 84:14, 85:18, 85:21, 90:2, 102:2, 102:3, 112:23, 120:22, 124:14, 133:10, 162:4, 169:23, 171:25
**puts** [1] - 18:12

**Q**

**qualification** [1] - 155:23
**qualifications** [6] - 121:19, 121:22, 152:23, 155:18, 156:1, 172:6
**qualified** [24] - 14:4, 14:7, 21:11, 21:13, 34:24, 72:25, 88:23, 104:25, 105:3, 105:8, 105:9, 105:16, 105:20, 106:2, 124:7, 137:9, 150:3, 151:24, 155:5, 155:15, 156:22, 156:23, 157:15, 172:2
**qualifies** [2] - 155:10, 158:7
**qualify** [2] - 18:2, 19:5
**quarter** [5] - 162:2, 163:6, 164:12, 164:15, 169:24
**quarters** [1] - 175:16

**questionable** [1] - 20:23
**questions** [7] - 45:1, 46:23, 61:13, 62:20, 99:9, 137:14, 173:19
**quick** [1] - 145:6
**quickly** [5] - 163:5, 163:7, 163:8, 164:10, 165:22
**quite** [8] - 24:25, 26:7, 33:10, 78:6, 86:20, 103:25, 149:5, 149:24
**quote** [1] - 5:22

**R**

**radiological** [2] - 105:16, 105:22
**radiology** [2] - 76:9, 105:18
**raise** [3] - 34:14, 98:21, 146:10
**raised** [11] - 3:24, 4:6, 7:6, 10:8, 24:6, 42:22, 71:22, 73:1, 85:9, 144:15, 157:19
**raising** [1] - 28:9
**range** [2] - 21:19, 133:23
**rare** [1] - 44:13
**rates** [5] - 18:6, 20:23, 21:1, 21:4, 21:12
**rather** [2] - 6:8, 38:12
**Raymond** [1] - 3:12
**RAYMOND** [1] - 1:13
**reach** [5] - 20:5, 43:3, 94:7, 107:9, 169:7
**reached** [7] - 20:11, 45:11, 49:16, 69:24, 83:12, 91:4, 169:9
**reaching** [1] - 164:18
**react** [1] - 169:18
**reacted** [1] - 170:8
**reacting** [1] - 167:9
**reaction** [6] - 97:22, 162:2, 164:13, 167:3, 167:15, 168:18
**read** [3] - 26:11, 99:22, 120:9
**reading** [4] - 17:2, 84:25, 120:3, 120:7
**ready** [2] - 16:1, 145:10
**real** [1] - 96:12
**realized** [1] - 87:3
**really** [23] - 9:22, 13:21, 14:19, 21:21, 24:10, 27:18, 28:25,

40:4, 46:3, 53:8, 66:17, 87:4, 103:10, 115:23, 133:11, 141:12, 142:14, 149:8, 155:13, 165:22, 166:2, 167:11, 167:24
**realm** [2] - 72:23, 169:16
**rearward** [5] - 96:13, 97:11, 132:13, 134:16, 134:18
**reason** [6] - 28:7, 58:11, 59:23, 103:8, 117:17, 156:8
**reasonable** [23] - 4:8, 5:5, 5:13, 5:24, 6:8, 7:19, 7:20, 8:15, 12:16, 18:3, 18:15, 19:18, 20:6, 20:9, 20:12, 21:16, 21:17, 48:9, 49:1, 70:4, 95:19, 99:6, 173:13
**reasonableness** [2] - 12:16, 20:3
**reasoning** [1] - 108:23
**reasons** [3] - 41:22, 73:10, 125:11
**reassess** [1] - 30:2
**rebut** [2] - 155:23, 158:15
**rebuttal** [10] - 17:25, 141:20, 145:2, 146:7, 155:22, 155:24, 155:25, 158:15, 177:1, 177:2
**REBUTTAL** [2] - 2:11, 2:15
**receive** [1] - 147:10
**Received** [1] - 2:19
**received** [3] - 80:20, 82:22, 110:20
**recent** [2] - 11:19, 19:24
**recess** [5] - 15:19, 15:23, 72:11, 74:5, 145:17
**recognize** [5] - 11:25, 84:17, 84:20, 85:21, 86:3
**recognizing** [1] - 6:2
**recollection** [1] - 119:14
**record** [48] - 3:8, 10:24, 17:16, 20:22, 23:12, 24:3, 24:21, 25:1, 25:3, 31:2, 42:18, 43:22, 45:20, 53:9, 64:22, 65:13, 67:14, 67:16, 67:18,

72:18, 72:20, 73:17, 74:12, 86:6, 87:14, 106:10, 111:1, 115:18, 118:23, 125:7, 125:13, 126:17, 132:23, 146:15, 156:17, 157:4, 157:18, 171:21, 171:24, 172:1, 172:7, 172:8, 172:14, 172:15, 176:3, 176:7, 178:16, 179:21
**recorded** [5] - 40:18, 40:21, 41:12, 43:24, 82:15
**recordings** [2] - 86:21
**records** [32] - 15:2, 32:6, 41:11, 79:21, 80:19, 82:1, 82:13, 82:16, 85:14, 87:16, 87:17, 92:6, 95:8, 96:23, 96:25, 98:15, 105:6, 106:12, 109:1, 109:7, 109:8, 110:21, 111:16, 132:5, 133:22, 136:1, 157:8, 164:3, 173:7, 176:23
**recover** [2] - 5:24, 6:5
**recovered** [2] - 6:7, 6:11
**recreate** [1] - 128:10
**redir** [1] - 138:6
**REDIRECT** [2] - 2:12, 175:12
**redirect** [4] - 61:16, 138:14, 138:15, 175:11
**refer** [7] - 36:3, 62:21, 87:17, 138:9, 140:16, 178:13, 178:14
**referenced** [2] - 47:8, 88:2
**references** [2] - 171:16, 171:17
**referred** [3] - 34:11, 62:8, 105:6
**referring** [1] - 15:8
**refers** [1] - 77:6
**reflect** [1] - 86:6
**reflected** [1] - 86:10
**refreshes** [1] - 119:14
**regard** [12] - 19:13, 25:25, 70:19, 71:2, 87:10, 96:7, 97:21, 111:17, 112:13, 136:2, 140:10, 174:16

**regarding** [34] - 11:15, 11:16, 11:23, 21:16, 22:22, 23:21, 40:1, 45:6, 47:8, 50:19, 54:23, 55:2, 55:23, 62:1, 62:2, 62:3, 62:16, 62:17, 64:15, 64:22, 67:24, 70:17, 71:7, 72:18, 73:10, 105:24, 113:24, 114:3, 115:7, 116:16, 124:11, 135:19, 173:4, 174:15
**regardless** [5] - 5:25, 18:25, 23:9, 57:21, 165:22
**regards** [4] - 4:2, 4:3, 4:4, 34:18
**regions** [1] - 95:13
**reiterate** [1] - 110:4
**reiterations** [1] - 148:6
**rel** [1] - 142:19
**relate** [1] - 167:17
**related** [8] - 15:2, 24:17, 28:1, 28:3, 80:5, 80:8, 113:9, 113:18
**relates** [6] - 24:14, 24:24, 25:6, 25:8, 79:6, 151:6
**relating** [2] - 120:6, 167:2
**relatively** [1] - 160:23
**relay** [1] - 153:2
**relevance** [4] - 118:3, 118:10, 143:1, 170:6
**relevant** [15] - 8:12, 17:22, 21:24, 21:25, 25:22, 26:17, 26:18, 26:19, 26:22, 27:2, 27:18, 28:10, 63:5, 80:1, 142:23
**relied** [5] - 86:25, 87:16, 114:13, 127:12, 174:14
**rely** [9] - 22:2, 28:22, 82:12, 104:4, 107:3, 144:24, 157:4, 159:10, 174:17
**relying** [6] - 25:17, 97:20, 102:17, 105:19, 109:2, 109:23
**remark** [1] - 19:20
**remember** [16] - 14:10, 41:16, 46:5, 52:23, 53:4, 55:20, 55:21, 91:23, 109:12, 118:14,

118:22, 119:18, 119:20, 120:22, 176:18

**remembered** [1] - 45:18

**Remind** [1] - 29:19

**remote** [2] - 95:18, 137:2

**render** [2] - 82:8, 124:21

**rendered** [1] - 6:7

**rep** [9] - 22:24, 32:10, 34:15, 35:4, 35:7, 35:8, 56:13, 61:25, 71:12

**rep's** [1] - 67:3

**repeat** [5] - 91:24, 108:16, 168:14, 174:5, 175:1

**repeatedly** [2] - 25:2, 60:13

**repetitive** [8] - 98:25, 108:3, 108:14, 108:19, 109:22, 113:9, 113:18, 136:17

**rephrase** [2] - 103:12, 163:19

**report** [69] - 23:23, 44:10, 82:21, 82:22, 85:24, 88:2, 88:7, 88:12, 88:18, 89:6, 89:9, 89:24, 89:25, 90:3, 90:6, 90:12, 91:19, 100:4, 100:12, 100:13, 102:2, 102:3, 106:20, 108:2, 108:18, 108:21, 114:17, 114:18, 114:24, 115:6, 115:9, 115:11, 116:7, 116:15, 116:18, 116:20, 116:22, 116:23, 117:2, 117:3, 117:11, 117:16, 117:19, 117:21, 122:11, 123:3, 124:3, 126:7, 126:9, 154:24, 155:2, 155:3, 158:14, 158:15, 158:19, 159:5, 159:7, 159:13, 168:24, 169:11, 169:13, 171:22, 172:3, 172:4, 173:7, 176:3

**REPORTED** [1] - 1:22

**reported** [12] - 48:11,

81:15, 86:25, 97:13, 98:12, 98:15, 109:1, 111:17, 112:14, 135:5, 136:18, 137:4

**Reporter** [1] - 181:9

**reporter** [5] - 29:17, 72:1, 72:6, 137:16, 178:17

**REPORTER** [2] - 1:23, 2:16

**reports** [3] - 53:8, 53:20, 105:19

**represent** [3] - 61:22, 85:25, 96:18

**representation** [1] - 140:12

**representative** [16] - 3:20, 24:20, 29:21, 31:24, 35:17, 54:19, 55:2, 56:2, 62:1, 64:5, 68:6, 68:9, 68:10, 70:12, 72:22, 72:25

**represented** [1] - 24:9

**represents** [1] - 104:23

**request** [24] - 23:15, 23:16, 23:23, 23:24, 24:16, 24:17, 25:17, 32:14, 43:6, 45:6, 46:8, 61:20, 61:23, 61:25, 62:10, 65:2, 65:3, 65:20, 66:4, 66:13, 73:2, 73:4, 91:18, 176:3

**requested** [14] - 22:14, 23:4, 23:12, 24:15, 41:17, 51:10, 62:5, 64:17, 66:5, 66:6, 69:12, 69:14, 70:16, 113:2

**requests** [2] - 27:15, 73:5

**require** [3] - 66:7, 83:4, 148:9

**required** [2] - 114:14, 152:14

**requirement** [1] - 9:22

**requires** [2] - 61:19, 139:19

**requiring** [1] - 54:7

**rescue** [6] - 40:23, 40:25, 41:23, 48:13, 60:4

**Research** [1] - 80:2

**research** [18] - 4:7, 54:11, 65:9, 75:8, 75:16, 78:23, 78:24, 78:25, 79:2, 79:23, 79:24, 80:3, 105:23,

111:8, 162:4, 163:12, 171:7

**researched** [1] - 100:21

**reserve** [1] - 155:25

**reserving** [1] - 17:25

**resistance** [1] - 132:12

**respect** [1] - 132:10

**respectfully** [2] - 58:21, 58:25

**respond** [2] - 26:10, 71:20

**response** [3] - 41:20, 42:21, 107:10

**responsibilities** [1] - 32:3

**responsibility** [2] - 44:11, 60:22

**responsible** [3] - 37:11, 38:24, 48:22

**rest** [8] - 10:6, 70:24, 72:6, 108:22, 133:7, 143:17, 148:4, 148:16

**restate** [1] - 165:24

**restaurant** [2] - 33:13, 45:25

**restaurants** [1] - 32:23

**restriction** [1] - 56:12

**RESTS** [3] - 2:13, 2:14, 2:15

**rests** [4] - 16:8, 17:23, 22:7, 177:3

**result** [19] - 78:15, 83:14, 89:15, 92:6, 94:24, 95:17, 95:24, 97:12, 98:24, 103:20, 110:7, 124:22, 126:10, 127:8, 127:9, 160:8, 160:13, 160:15, 161:1

**resulted** [4] - 78:12, 81:13, 81:25, 163:21

**resulting** [1] - 81:12

**results** [2] - 46:13, 103:24

**retained** [1] - 11:24

**retention** [1] - 26:15

**review** [20] - 53:2, 89:10, 91:18, 105:16, 105:19, 106:2, 106:3, 106:9, 108:20, 110:21, 110:23, 114:2, 123:25, 124:2, 124:7, 126:24, 157:8, 159:1, 173:7

**reviewed** [16] - 18:14,

48:12, 54:14, 80:5, 80:14, 80:24, 84:24, 87:14, 105:23, 108:24, 126:25, 140:20, 158:22, 158:23, 158:24

**reviewer** [1] - 80:9

**reviewing** [3] - 105:18, 130:10, 158:20

**revisit** [1] - 157:21

**revisited** [1] - 157:24

**ridiculous** [1] - 26:9

**rim** [1] - 138:22

**rise** [6] - 3:2, 15:24, 72:12, 145:16, 145:18, 180:9

**risk** [1] - 59:8

**road** [1] - 141:16

**roam** [1] - 46:2

**role** [1] - 32:2

**roll** [3] - 72:8, 145:14, 152:13

**room** [1] - 82:19

**rooms** [1] - 32:24

**rotated** [2] - 96:11, 139:20

**rotator** [11] - 94:9, 95:2, 95:3, 95:5, 95:16, 95:17, 95:24, 126:19, 127:10, 134:7, 134:9

**roughly** [1] - 32:18

**RPR** [2] - 1:23, 181:9

**rubbing** [3] - 98:22, 99:1, 99:2

**Rule** [15] - 11:9, 11:17, 11:22, 28:2, 66:4, 73:3, 88:7, 88:10, 88:13, 90:18, 90:22, 91:19, 114:17, 114:18, 122:11

**rule** [4] - 7:1, 66:23, 176:16, 177:25

**ruled** [3] - 9:21, 124:7, 124:16

**rules** [1] - 157:19

**Rules** [1] - 66:20

**ruling** [9] - 6:17, 13:8, 52:9, 70:25, 122:19, 157:18, 167:8, 171:22, 172:18

**S**

**s-u-p-r-a-s-p-i-n-a-t-u-s** [1] - 138:1

**safe** [4] - 50:2, 50:11, 70:4, 141:18

**safety** [4] - 57:23,

58:2, 58:12, 59:8

**sail** [1] - 59:16

**sailing** [1] - 57:14

**sat** [5] - 33:24, 52:20, 54:13, 56:17, 65:17

**satisfied** [2] - 104:1, 179:16

**saving** [1] - 179:20

**saw** [7] - 10:1, 16:19, 51:22, 96:23, 96:24, 114:6, 114:12

**scale** [3] - 17:3, 17:12, 79:20

**scans** [2] - 124:8, 124:11

**scapula** [2] - 93:25, 94:8

**scene** [4] - 84:23, 85:4, 87:5, 87:8

**Schedule** [1] - 66:4

**schedule** [4] - 8:24, 45:12, 46:4

**school** [1] - 75:9

**School** [5] - 75:11, 75:14, 75:18, 79:7, 105:13

**science** [7] - 78:4, 81:23, 99:7, 151:8, 151:10, 151:12, 151:13

**scientific** [6] - 74:23, 80:9, 81:22, 82:5, 108:24, 124:14

**scope** [5] - 11:16, 80:13, 81:5, 101:4, 172:12

**screen** [7] - 51:12, 51:17, 67:11, 84:18, 85:22, 103:7, 121:2

**scroll** [1] - 114:22

**sculptures** [1] - 149:3

**se** [1] - 152:20

**Sea** [1] - 149:4

**seafood** [1] - 33:15

**seal** [1] - 177:13

**search** [2] - 46:13, 46:14

**searched** [1] - 71:8

**searches** [2] - 32:8, 46:8

**seat** [2] - 74:11, 112:24

**seated** [11] - 3:7, 15:25, 45:8, 72:14, 85:2, 85:7, 99:18, 112:18, 112:20, 112:23, 113:1

**seating** [2] - 46:1, 148:21

**seats** [1] - 148:19

**second** [14] - 20:20, 26:11, 28:5, 64:24, 96:17, 97:25, 112:11, 136:14, 162:1, 162:3, 163:7, 164:12, 164:15, 169:24
**secondarily** [1] - 83:19
**seconds** [1] - 16:12
**secretary** [1] - 31:21
**Section** [2] - 55:24, 62:16
**section** [5] - 56:2, 108:22, 115:1, 115:6, 116:14
**secured** [2] - 38:6, 84:8
**securing** [2] - 56:3, 62:17
**SECURITY** [5] - 3:2, 15:24, 72:12, 145:16, 145:18
**security** [12] - 24:25, 29:22, 43:14, 44:10, 44:11, 44:16, 44:18, 64:14, 71:2, 73:14, 86:22, 87:2
**see** [55] - 12:10, 12:12, 14:11, 17:22, 25:21, 29:5, 30:1, 35:22, 35:24, 60:1, 60:6, 62:7, 66:14, 68:21, 69:14, 70:21, 85:5, 92:19, 93:9, 102:15, 103:6, 110:16, 110:25, 111:2, 114:10, 114:20, 119:5, 120:8, 120:12, 120:19, 120:24, 121:3, 121:6, 121:22, 121:24, 122:1, 123:7, 123:14, 133:15, 143:14, 144:10, 144:17, 145:3, 145:25, 146:2, 148:5, 155:10, 156:21, 162:22, 163:24, 166:25, 170:3, 171:7
**seeing** [3] - 20:19, 140:15
**seeks** [1] - 6:5
**seem** [1] - 101:20
**sees** [1] - 69:18
**self** [2] - 60:22, 118:15
**self-awareness** [1] - 60:22
**self-limit** [1] - 118:15

**selling** [1] - 149:3
**semi** [1] - 84:3
**semi-enclosed** [1] - 84:3
**send** [2] - 30:9, 38:1
**sending** [1] - 177:10
**sense** [8] - 58:21, 60:19, 61:6, 61:9, 153:7, 155:14, 166:3, 166:15
**sent** [9] - 17:7, 17:11, 23:13, 30:7, 30:10, 86:1, 92:10, 159:23
**sentence** [1] - 108:22
**separate** [1] - 118:8
**September** [1] - 31:14
**serve** [7] - 84:6, 84:7, 85:5, 85:10, 96:25, 112:25, 130:2
**served** [1] - 88:7
**server** [2] - 45:7, 45:10
**servers** [3] - 34:10, 45:13, 46:2
**service** [1] - 35:21
**services** [4] - 6:7, 6:8, 6:10, 78:17
**serving** [2] - 37:2, 87:6
**session** [1] - 3:4
**set** [5] - 15:9, 15:11, 57:5, 58:20, 145:14
**sets** [1] - 108:23
**setting** [2] - 112:13, 122:11
**several** [5] - 80:11, 84:5, 113:12, 126:25, 132:5
**severe** [1] - 129:3
**severity** [2] - 79:22, 92:7
**shape** [1] - 94:6
**share** [1] - 89:6
**shatter** [1] - 170:15
**sheet** [1] - 66:24
**Shield** [1] - 5:11
**shin** [1] - 154:7
**ship** [53] - 22:22, 24:14, 24:16, 24:21, 33:3, 35:1, 35:3, 35:6, 36:25, 38:5, 39:5, 39:6, 39:11, 48:22, 49:2, 49:8, 49:20, 49:21, 49:24, 50:5, 50:23, 56:19, 57:22, 58:5, 58:15, 58:17, 59:12, 59:14, 59:15, 59:17, 59:19, 60:6, 60:7, 60:24, 61:4, 62:23, 72:23,

80:17, 80:19, 81:9, 84:3, 99:19, 101:14, 102:23, 103:2, 103:3, 103:4, 112:10, 113:6
**ship's** [10] - 39:4, 39:6, 40:6, 48:18, 50:18, 57:3, 59:4, 59:19, 63:22
**shipboard** [3] - 32:7, 82:18, 84:11
**shipped** [3] - 16:25, 17:1
**ships** [3] - 43:3, 49:23, 149:4
**ships'** [1] - 39:12
**shirt** [1] - 25:11
**shock** [2] - 160:1, 160:22
**shoreside** [2] - 32:7, 49:22
**short** [1] - 160:23
**shoulder** [46] - 83:15, 93:5, 93:12, 93:22, 93:24, 93:25, 94:4, 94:9, 94:14, 94:21, 94:23, 95:22, 96:21, 97:10, 98:3, 98:20, 104:20, 106:10, 108:7, 108:19, 109:11, 110:17, 111:2, 111:12, 111:22, 113:10, 127:17, 127:21, 127:23, 128:23, 129:4, 131:8, 131:24, 133:24, 136:8, 136:10, 136:21, 136:23, 138:20, 140:21, 153:4, 153:10, 160:9, 164:8, 164:11
**shoulders** [1] - 126:10
**show** [12] - 48:17, 51:19, 67:1, 88:18, 89:3, 93:7, 100:7, 102:13, 120:21, 123:5, 142:19, 171:17
**showed** [4] - 17:19, 61:25, 136:8, 163:12
**showing** [2] - 86:1, 118:25
**shown** [5] - 66:1, 93:22, 115:1, 140:11, 142:15
**shows** [1] - 67:18
**shut** [10] - 38:5, 42:9, 48:12, 49:9, 56:22, 57:15, 58:11, 59:7,

69:1, 69:6
**side** [7] - 14:2, 23:11, 66:13, 93:3, 98:14, 149:1, 156:18
**sight** [1] - 114:9
**sign** [1] - 54:10
**signature** [1] - 114:24
**signed** [3] - 76:21, 76:23, 120:17
**significance** [2] - 87:21, 94:13
**significant** [3] - 87:1, 97:24, 98:17
**silly** [2] - 162:14, 177:18
**silverware** [1] - 37:4
**similar** [8] - 18:19, 18:25, 19:1, 40:25, 77:12, 128:12, 160:6
**simply** [4] - 16:10, 110:1, 154:13, 155:7
**single** [2] - 17:19, 23:6
**sip** [1] - 50:16
**sit** [8] - 41:17, 45:25, 47:12, 51:7, 52:23, 84:9, 111:5, 145:19
**sitting** [12] - 47:10, 65:11, 87:6, 112:9, 130:2, 130:5, 130:7, 133:6, 159:18, 159:19, 161:13, 170:21
**situation** [6] - 39:13, 39:16, 39:17, 80:1, 81:6, 166:7
**situations** [1] - 81:20
**six** [4] - 147:5, 148:7, 149:16, 149:25
**size** [1] - 128:12
**skills** [1] - 77:10
**skin** [2] - 104:16, 104:18
**sleeve** [1] - 95:4
**slower** [2] - 114:15, 117:8
**small** [1] - 161:4
**smaller** [2] - 98:20, 99:3
**smash** [1] - 170:14
**So.3d** [1] - 20:4
**social** [1] - 142:10
**societies** [1] - 151:19
**Society** [1] - 80:2
**socket** [2] - 138:21
**solely** [1] - 24:1
**solved** [1] - 147:9
**someone** [4] - 51:11, 62:11, 128:11, 162:13
**somewhat** [1] - 84:3

**somewhere** [4] - 39:15, 85:10, 92:11, 92:20
**soon** [3] - 72:5, 145:14, 177:24
**sorry** [14] - 49:12, 61:12, 63:5, 72:16, 102:1, 117:19, 129:24, 131:14, 131:18, 163:12, 166:20, 167:20, 168:20, 174:5
**sort** [8] - 26:6, 40:22, 46:5, 128:20, 150:19, 151:1, 153:1, 177:6
**sorts** [3] - 33:14, 37:20, 40:19
**sought** [1] - 80:20
**sound** [7] - 27:21, 29:9, 64:17, 64:21, 68:2, 69:7
**sounds** [1] - 69:8
**source** [4] - 5:2, 7:2, 8:14, 82:11
**Southeast** [1] - 1:14
**Southern** [3] - 1:24, 3:4, 181:10
**SOUTHERN** [1] - 1:1
**spa** [1] - 32:24
**space** [2] - 98:19, 99:3
**speaking** [3] - 48:19, 59:3, 68:14
**special** [3] - 66:19, 147:25
**specialist** [1] - 79:20
**specialized** [1] - 158:2
**specific** [14] - 25:7, 37:8, 50:12, 61:23, 62:14, 70:16, 95:17, 108:11, 111:6, 112:7, 119:17, 122:17, 123:11, 124:24
**specifically** [20] - 19:24, 20:22, 23:15, 23:17, 24:15, 24:20, 36:24, 51:2, 52:23, 60:10, 72:23, 82:11, 92:25, 109:17, 110:13, 113:17, 121:11, 122:24, 152:14, 159:10
**specify** [1] - 110:18
**speculate** [1] - 58:18
**speed** [49] - 39:11, 40:7, 42:2, 42:3, 42:14, 51:3, 52:21, 54:17, 57:3, 62:1, 63:19, 65:7, 65:16,

67:22, 69:1, 69:10, 87:25, 88:4, 88:11, 89:13, 89:23, 90:2, 92:6, 92:11, 100:11, 100:15, 101:1, 101:4, 101:9, 101:19, 103:15, 103:25, 104:4, 104:6, 104:8, 104:9, 111:4, 111:6, 112:6, 112:13, 112:14, 115:7, 116:16, 155:12, 165:6, 165:15, 165:16

**speeds** [13] - 22:22, 39:24, 41:14, 48:17, 56:10, 57:2, 65:13, 65:22, 67:13, 67:19, 68:18, 68:22, 70:17

**spell** [5] - 31:2, 74:12, 137:23, 139:5, 146:14

**spent** [1] - 147:4

**spine** [3] - 93:4, 94:5

**split** [1] - 162:1

**spoken** [1] - 48:21

**staff** [7] - 37:2, 49:6, 50:23, 60:5, 86:22, 86:23, 87:2

**stand** [3] - 9:25, 34:9, 47:13

**standard** [6] - 4:3, 4:8, 6:21, 9:8, 150:3, 158:2

**standards** [1] - 19:24

**start** [13] - 3:21, 16:1, 24:8, 29:4, 30:15, 39:16, 40:9, 44:18, 69:8, 81:7, 150:16, 160:20, 162:4

**started** [10] - 13:3, 26:4, 31:17, 32:14, 54:13, 68:20, 72:9, 76:1, 138:10, 162:11

**starting** [3] - 53:5, 75:3, 111:20

**starts** [4] - 5:18, 64:6, 69:5, 161:5

**state** [7] - 3:10, 4:10, 9:18, 31:2, 74:11, 146:14, 146:23

**State** [2] - 9:12, 75:5

**Statement** [2] - 44:17, 44:22

**statement** [3] - 44:24, 45:2, 112:3

**statements** [9] - 44:19, 65:3, 82:15, 82:17, 83:4, 85:13, 99:16, 100:5, 112:3

**States** [9] - 1:24, 3:3, 11:14, 79:4, 118:2, 122:8, 123:6, 125:17, 181:10

**states** [4] - 5:21, 106:21, 107:3, 107:21

**STATES** [2] - 1:1, 1:10

**stating** [1] - 109:12

**station** [12] - 35:22, 85:6, 85:8, 85:10, 87:6, 97:1, 101:2, 101:10, 101:13, 102:4, 102:9, 112:25

**Station** [2] - 102:11, 102:20

**stations** [2] - 84:6, 84:7

**stay** [1] - 61:19

**STENOGRAPHER** [1] - 168:20

**Stenographer** [4] - 58:13, 106:24, 147:20, 171:12

**STENOGRAPHICALLY** [1] - 1:22

**step** [2] - 64:10, 160:17

**stern** [1] - 59:19

**stick** [1] - 105:21

**sticking** [1] - 105:11

**still** [18] - 7:1, 12:3, 13:6, 27:1, 27:17, 45:15, 45:17, 49:21, 51:14, 60:18, 60:21, 64:13, 65:6, 115:17, 120:25, 129:19, 162:21

**stipulated** [4] - 9:5, 16:9, 142:6, 144:5

**Stop** [1] - 90:19

**stop** [7] - 132:20, 159:25, 160:2, 166:7, 166:8, 166:10

**stopped** [1] - 162:6

**stopping** [4] - 166:3, 166:7, 167:4, 168:19

**storage** [2] - 34:10, 37:1

**story** [1] - 29:9

**straight** [1] - 138:25

**straightforward** [1] - 155:2

**strap** [1] - 69:11

**strapping** [1] - 69:8

**street** [1] - 154:2

**strength** [1] - 91:10

**stretch** [1] - 96:14

**stretched** [1] - 175:15

**stricken** [3] - 118:1,

118:9, 118:19

**strike** [9] - 12:25, 13:20, 36:12, 42:18, 44:2, 87:22, 154:24, 155:21, 172:9

**strikes** [1] - 92:14

**striking** [1] - 97:15

**struck** [7] - 85:10, 92:13, 97:1, 114:3, 167:21, 168:17, 168:18

**structural** [1] - 77:24

**structures** [2] - 77:11, 148:23

**student** [1] - 75:23

**students** [3] - 75:15, 76:2, 76:14

**studies** [14] - 20:8, 75:25, 76:9, 78:6, 78:25, 95:15, 105:24, 116:9, 116:11, 126:23, 126:25, 143:23, 144:2, 176:9

**Study** [6] - 106:20, 107:3, 126:3, 126:4, 126:15, 126:17

**study** [17] - 19:10, 77:9, 77:12, 106:23, 107:6, 107:8, 107:21, 126:4, 126:11, 126:22, 127:12, 127:19, 127:24, 127:25, 128:3, 128:4, 129:10

**stuff** [4] - 117:16, 117:19, 117:20, 141:14

**subheading** [1] - 26:11

**subject** [15] - 23:4, 24:4, 52:22, 56:5, 72:22, 80:6, 83:25, 85:16, 95:11, 95:20, 111:12, 111:23, 124:23, 137:1, 151:21

**submit** [3] - 177:18, 179:6, 180:1

**submitted** [1] - 177:17

**subscapulares** [5] - 95:10, 97:12, 134:19, 135:4, 135:12

**subsequent** [4] - 23:25, 80:20, 167:23, 168:18

**substance** [1] - 24:12

**succinctly** [1] - 31:16

**sudden** [3] - 163:7,

166:9, 170:23

**suffer** [2] - 128:1, 136:23

**suffered** [1] - 127:3

**sufficient** [7] - 20:2, 97:16, 152:22, 155:8, 160:8, 179:14, 179:17

**sufficiently** [1] - 150:3

**suggest** [1] - 52:12

**suggesting** [2] - 27:19, 175:5

**Suite** [2] - 1:15, 1:19

**sum** [3] - 160:19, 164:7, 164:14

**summarized** [2] - 9:21, 10:15

**summary** [5] - 9:6, 9:10, 83:11, 96:4, 120:24

**sunny** [1] - 58:8

**super** [1] - 137:19

**Superman** [1] - 162:15

**supplement** [2] - 73:4, 73:8

**supplemental** [4] - 3:25, 4:12, 10:15, 28:2

**supplies** [3] - 37:3, 37:4, 37:5

**support** [6] - 80:15, 84:24, 108:17, 133:13, 159:6, 159:11

**supported** [4] - 9:23, 82:3, 82:4, 90:25

**supporting** [3] - 63:8, 63:11, 73:5

**supposed** [1] - 7:19

**supposedly** [3] - 27:7, 128:15, 129:20

**Supraspinatus** [1] - 137:25

**supraspinatus** [14] - 95:6, 96:9, 97:7, 98:13, 98:22, 98:24, 134:17, 134:24, 137:6, 137:21, 138:4, 139:6, 139:18, 163:22

**surface** [2] - 104:17, 130:1

**surgeon** [6] - 18:18, 96:19, 132:8, 135:19, 160:5, 167:2

**surgeon's** [1] - 20:1

**surgery** [2] - 18:11, 21:15

**surprise** [1] - 42:19

**surprised** [2] - 97:23,

132:3

**surprising** [1] - 133:10

**surround** [1] - 95:2

**surrounds** [1] - 95:4

**survived** [1] - 154:24

**susceptible** [1] - 109:5

**suspend** [1] - 26:14

**sustain** [1] - 4:9

**sustained** [3] - 5:25, 78:9, 124:22

**sustaining** [1] - 117:22

**swelling** [2] - 87:13, 92:20

**swinging** [2] - 133:1, 134:7

**switched** [1] - 31:19

**sworn** [6] - 30:24, 74:9, 80:21, 85:15, 146:11, 146:12

**symptoms** [1] - 108:25

**syndrome** [3] - 98:16, 98:18, 98:19

**system** [1] - 80:4

**systems** [2] - 76:7, 76:8

## T

**table** [29] - 15:9, 17:10, 34:5, 34:8, 46:3, 86:8, 96:20, 97:10, 112:18, 112:22, 113:1, 129:17, 129:20, 129:21, 132:18, 133:6, 133:11, 133:13, 159:20, 159:24, 160:2, 168:5, 174:4, 174:7, 174:12, 174:21, 175:4, 175:17

**tables** [5] - 46:1, 84:5, 84:7, 84:9, 87:9

**talks** [1] - 127:20

**Tampa** [1] - 141:10

**taught** [4] - 79:11, 79:14, 79:15, 79:16

**teaching** [4] - 75:17, 78:23, 79:3, 79:9

**team** [1] - 148:4

**tear** [15] - 96:21, 98:13, 133:21, 134:24, 135:20, 136:20, 136:22, 138:3, 138:10, 139:2, 139:9,

163:13, 163:18, 163:21, 164:24

**tearing** [1] - 126:10

**tears** [8] - 98:24, 106:14, 106:21, 107:4, 126:19, 136:5, 136:8, 137:6

**technical** [1] - 40:20

**technically** [1] - 49:14

**technology** [1] - 59:16

**ten** [2] - 16:12, 178:19

**tender** [1] - 82:25

**tendon** [18] - 95:6, 96:9, 96:14, 97:7, 97:11, 98:13, 98:22, 99:2, 127:18, 134:18, 134:21, 134:24, 135:12, 138:4, 139:5, 139:8, 139:18, 163:22

**tendons** [11] - 95:2, 95:3, 95:5, 106:15, 106:22, 107:5, 134:4, 135:4, 135:8, 135:10, 135:11

**tenus** [1] - 24:7

**teres** [2] - 95:9, 135:4

**term** [3] - 6:2, 6:13, 98:25

**terminal** [3] - 101:17, 102:5, 103:6

**terms** [10] - 25:9, 34:16, 96:5, 97:15, 126:1, 146:25, 147:17, 148:8, 169:17, 175:14

**testified** [27] - 10:10, 18:24, 24:19, 40:16, 48:3, 48:5, 58:22, 60:1, 60:2, 61:2, 62:19, 65:21, 66:2, 67:25, 68:23, 71:8, 97:21, 98:2, 107:17, 110:11, 115:7, 116:16, 117:7, 119:24, 121:12, 157:5, 157:25

**testifies** [1] - 25:3

**testify** [33] - 12:5, 12:8, 14:4, 14:8, 19:2, 29:23, 32:9, 35:18, 47:4, 52:11, 54:23, 55:2, 55:23, 56:7, 62:11, 65:22, 69:2, 69:10, 70:12, 71:3, 83:7, 88:10, 89:11, 118:15, 119:25, 122:12, 124:10, 150:4, 155:12, 155:25,

157:3, 157:13, 157:16

**testifying** [8] - 14:12, 14:13, 35:16, 67:12, 68:12, 68:19, 149:9, 152:5

**testimony** [71] - 8:12, 9:24, 11:11, 11:16, 13:20, 15:14, 16:6, 18:18, 19:25, 20:1, 20:2, 21:25, 34:15, 36:6, 40:11, 41:21, 42:12, 42:18, 51:21, 53:1, 53:4, 53:6, 55:6, 56:13, 59:22, 63:17, 65:24, 65:25, 66:8, 66:22, 66:24, 66:25, 67:3, 67:4, 67:8, 67:11, 68:5, 68:6, 69:19, 71:11, 72:21, 72:23, 73:10, 73:15, 80:21, 80:24, 82:2, 85:15, 99:23, 100:7, 102:23, 107:14, 109:16, 114:2, 122:19, 125:10, 131:14, 131:19, 132:1, 132:4, 132:7, 135:7, 135:9, 159:1, 171:23, 173:10, 173:13, 174:15, 174:18, 174:23

**testing** [1] - 129:13

**THAPA** [1] - 2:6

**Thapa** [4] - 73:14, 73:23, 84:13, 112:21

**Thapa's** [1] - 73:18

**THE** [348] - 1:10, 1:13, 1:16, 3:6, 3:20, 4:1, 4:15, 4:19, 4:21, 5:17, 5:20, 7:4, 7:12, 7:23, 8:16, 8:20, 9:11, 9:14, 10:1, 10:19, 10:21, 11:3, 11:15, 11:20, 11:25, 12:15, 12:18, 12:21, 12:25, 13:7, 13:19, 13:24, 14:21, 15:5, 15:15, 15:20, 15:22, 15:25, 16:5, 16:13, 16:15, 16:19, 16:21, 17:4, 17:9, 17:16, 17:19, 17:24, 18:1, 18:8, 18:23, 20:5, 20:11, 20:25, 21:7, 21:10, 22:5, 22:7, 22:15, 25:22, 26:16, 27:1, 27:10, 27:17, 28:3, 28:18, 28:20,

29:1, 29:4, 29:12, 29:15, 29:25, 30:4, 30:9, 30:14, 30:25, 33:18, 34:13, 34:23, 35:4, 35:7, 35:15, 36:22, 42:21, 46:24, 51:13, 51:16, 51:20, 51:22, 51:25, 52:2, 52:6, 52:10, 52:15, 61:11, 61:14, 61:18, 61:24, 62:7, 62:19, 62:24, 63:1, 63:3, 63:4, 63:15, 63:17, 63:22, 64:1, 64:2, 64:4, 64:8, 64:9, 64:11, 64:12, 65:5, 66:10, 66:12, 67:7, 67:10, 68:1, 69:20, 69:22, 70:2, 70:5, 70:7, 70:10, 71:1, 71:19, 71:25, 72:7, 72:13, 73:9, 73:16, 73:22, 74:2, 74:4, 74:8, 74:10, 74:16, 83:2, 83:7, 86:10, 88:8, 88:14, 88:19, 88:22, 89:12, 90:2, 90:8, 90:14, 90:19, 90:23, 91:2, 91:15, 91:20, 93:23, 99:11, 101:6, 103:10, 107:17, 107:24, 112:1, 113:13, 113:15, 113:20, 115:11, 115:14, 115:17, 115:21, 116:2, 116:7, 116:8, 116:12, 117:6, 117:12, 118:4, 118:12, 119:2, 119:5, 119:8, 119:13, 119:16, 120:13, 120:16, 120:21, 121:9, 121:14, 121:21, 123:21, 125:6, 125:10, 125:19, 125:21, 128:25, 129:12, 131:15, 132:22, 133:4, 134:23, 135:1, 135:3, 137:15, 137:22, 137:23, 137:24, 137:25, 138:2, 138:6, 138:7, 138:13, 138:16, 138:19, 139:2, 139:4, 139:9, 139:10, 139:11, 139:12, 139:13, 139:17, 139:23,

140:4, 140:14, 140:22, 140:24, 141:2, 141:8, 141:10, 141:11, 141:13, 141:15, 141:17, 141:18, 142:3, 142:6, 142:9, 142:16, 142:25, 143:10, 143:16, 143:23, 144:1, 144:4, 144:15, 144:23, 145:3, 145:6, 145:21, 146:8, 146:13, 146:17, 147:21, 147:22, 149:23, 150:5, 150:8, 150:10, 153:5, 153:7, 153:14, 153:16, 153:18, 153:20, 154:10, 154:12, 154:13, 154:16, 155:6, 155:9, 155:20, 156:3, 156:7, 156:11, 157:9, 157:12, 157:21, 158:4, 158:6, 158:12, 162:20, 162:24, 163:16, 163:24, 164:17, 164:23, 165:1, 165:2, 165:5, 165:7, 165:8, 165:11, 165:12, 165:14, 165:15, 165:16, 165:20, 165:24, 166:1, 166:2, 166:4, 166:5, 166:12, 166:15, 166:16, 166:18, 166:20, 167:6, 167:11, 167:18, 167:24, 168:2, 168:8, 168:12, 168:20, 168:21, 168:22, 169:2, 170:3, 170:9, 171:11, 171:13, 171:14, 171:15, 171:16, 171:19, 171:25, 172:8, 172:14, 172:20, 172:25, 173:17, 173:20, 174:24, 175:11, 175:20, 175:22, 176:1, 176:9, 176:14, 176:19, 176:25, 177:3, 177:5, 178:9, 178:25, 179:2, 179:6, 180:4

**themselves** [3] - 77:16, 77:25, 116:11

**theory** [2] - 26:2, 96:22

**therapy** [1] - 82:20

**they've** [2] - 16:17, 33:13

**thickness** [2] - 95:7, 139:8

**thinking** [2] - 15:21, 64:6

**third** [4] - 4:7, 6:6, 80:8, 92:22

**thirdly** [1] - 23:3

**thoracic** [1] - 93:4

**thousand** [1] - 8:3

**thousands** [1] - 149:2

**THR** [2] - 123:13, 143:14

**threatens** [1] - 131:15

**three** [11] - 22:20, 31:21, 31:23, 35:25, 60:25, 82:17, 109:14, 110:14, 114:6, 125:7, 175:16

**threshold** [3] - 20:6, 20:12, 42:8

**throughout** [5] - 26:2, 26:8, 36:1, 86:9, 147:7

**throw** [1] - 131:15

**throwing** [1] - 130:24

**timely** [4] - 13:21, 13:25, 157:19, 157:20

**timing** [3] - 172:10, 172:11, 178:18

**tissue** [1] - 77:13

**tissues** [8] - 77:7, 77:9, 77:20, 77:22, 77:23, 77:25, 134:15

**title** [1] - 54:2

**tobacco** [1] - 148:23

**today** [30] - 32:10, 41:17, 47:9, 47:12, 50:13, 51:7, 52:24, 53:21, 56:18, 65:15, 67:12, 67:19, 67:21, 69:4, 70:18, 71:11, 86:4, 99:6, 101:24, 105:9, 105:12, 107:18, 107:24, 111:5, 113:24, 131:6, 152:6, 156:17, 173:10, 176:10

**today's** [1] - 24:8

**together** [7] - 38:16, 38:17, 38:22, 75:25, 153:11, 162:4,

162:12

**took** [5] - 15:20, 17:2, 75:15, 76:15, 99:25

**tool** [1] - 79:20

**top** [9] - 35:21, 47:19, 86:2, 86:5, 95:6, 127:17, 129:24, 133:1, 139:6

**topic** [1] - 108:21

**topics** [11] - 10:18, 11:12, 11:23, 54:23, 55:3, 56:7, 66:8, 73:1, 80:8, 123:1, 123:2

**torn** [1] - 138:5

**tort** [2] - 4:4, 6:11

**torts** [1] - 6:3

**total** [3] - 114:13, 164:7, 164:14

**totality** [1] - 7:25

**touch** [1] - 144:23

**toward** [4] - 77:8, 104:2, 132:21, 134:19

**towards** [1] - 94:22

**toys** [2] - 131:16, 149:3

**track** [3] - 31:25, 105:15, 164:17

**train** [1] - 141:12

**training** [17] - 56:2, 76:10, 76:12, 77:18, 104:22, 104:24, 105:22, 137:11, 147:1, 149:18, 150:21, 150:22, 152:24, 152:25, 156:15

**transcript** [8] - 66:14, 177:23, 177:24, 178:4, 178:8, 178:15, 178:20, 178:22

**transcription** [1] - 181:5

**transcripts** [1] - 178:24

**transfer** [1] - 94:23

**trapezius** [13] - 93:2, 93:6, 93:22, 94:3, 94:5, 94:10, 94:15, 94:23, 95:18, 96:5, 97:15, 133:9, 137:2

**trapezoid** [1] - 94:6

**trauma** [1] - 139:14

**traumatic** [10] - 79:22, 106:14, 106:21, 107:4, 122:18, 124:12, 126:19, 127:17, 127:21,

127:23

**travel** [1] - 88:4

**traveled** [1] - 87:11

**traveling** [1] - 89:14

**travelled** [2] - 92:3, 161:19

**travelling** [2] - 88:1, 89:13

**trays** [3] - 130:2, 159:21

**treat** [1] - 78:19

**treated** [3] - 13:11, 44:15, 96:19

**treater** [1] - 12:4

**treating** [11] - 10:10, 11:17, 11:21, 81:15, 82:21, 97:19, 98:12, 109:1, 135:5, 137:5, 137:7

**treatment** [7] - 5:24, 15:2, 44:12, 80:20, 110:19, 122:22, 135:23

**triage** [1] - 79:23

**TRIAL** [1] - 1:9

**trial** [27] - 7:3, 13:6, 32:10, 33:24, 36:2, 36:6, 39:20, 41:21, 42:20, 46:20, 50:9, 59:25, 66:25, 68:7, 68:10, 68:12, 86:9, 115:22, 119:25, 120:1, 121:12, 156:1, 177:20, 177:21, 178:4, 179:8, 179:11

**tried** [3] - 19:17, 21:18, 28:13

**tries** [1] - 78:18

**trigger** [1] - 40:2

**true** [4] - 68:11, 93:12, 127:5, 140:22

**trust** [1] - 118:21

**try** [12] - 4:23, 23:7, 25:12, 28:22, 45:9, 45:18, 45:22, 71:8, 124:15, 128:9, 129:9, 148:4

**trying** [12] - 4:16, 4:17, 9:3, 90:17, 116:24, 121:10, 136:21, 163:1, 165:3, 167:17, 171:18, 178:2

**tuberosity** [1] - 127:14

**tubs** [3] - 33:11, 34:4, 84:4

**tunnel** [1] - 129:9

**turn** [2] - 51:12, 154:6

**turned** [1] - 99:12

**turning** [1] - 28:21

**two** [15] - 4:2, 19:22, 60:25, 75:13, 103:21, 113:25, 114:5, 114:8, 114:14, 118:16, 126:5, 126:6, 143:25, 144:1, 178:19

**type** [13] - 17:6, 18:16, 21:15, 23:17, 36:19, 36:20, 40:2, 43:20, 81:17, 81:19, 90:25, 108:10, 127:8

**types** [7] - 11:7, 95:16, 109:4, 109:21, 110:6, 110:7, 127:16

## U

**ultimate** [2] - 89:17, 90:3

**ultimately** [1] - 76:2

**uncover** [2] - 45:9, 45:22

**under** [16] - 4:24, 7:24, 11:17, 11:22, 19:22, 45:15, 51:1, 66:4, 66:20, 73:3, 76:16, 91:11, 98:14, 152:21, 155:14, 157:19

**underlying** [1] - 117:21

**understood** [3] - 91:17, 112:4, 176:5

**undersurface** [2] - 138:4, 139:7

**undertake** [2] - 45:9, 45:21

**unfair** [1] - 42:19

**unfortunately** [1] - 45:24

**unfounded** [1] - 25:16

**unique** [3] - 61:3, 77:20, 77:25

**UNITED** [2] - 1:1, 1:10

**United** [9] - 1:24, 3:3, 11:14, 79:4, 118:1, 122:8, 123:6, 125:17, 181:10

**University** [4] - 75:6, 75:9, 147:3, 147:11

**unless** [5] - 6:20, 11:13, 44:12, 116:22, 145:11

**unlike** [2] - 9:4

**unusual** [1] - 179:10

**up** [72] - 5:13, 6:16, 13:15, 16:1, 18:6,

21:1, 21:3, 29:6, 29:19, 33:21, 42:13, 42:14, 42:19, 43:11, 43:12, 46:18, 47:10, 47:13, 47:20, 48:3, 48:5, 51:17, 55:22, 60:20, 61:5, 61:19, 65:2, 65:3, 65:8, 66:18, 67:5, 67:16, 70:16, 71:15, 77:24, 84:14, 85:18, 85:21, 89:5, 89:21, 90:3, 90:8, 97:10, 100:20, 101:6, 101:23, 102:13, 102:25, 104:15, 116:21, 117:14, 118:16, 120:22, 120:23, 124:14, 126:5, 126:13, 126:15, 128:10, 133:1, 140:25, 145:14, 159:22, 160:16, 162:9, 163:1, 163:4, 166:22, 169:5, 171:3, 172:23, 177:13

**update** [4] - 12:1, 177:21, 177:22, 178:3

**updated** [1] - 179:7

**updates** [1] - 41:13

**upper** [9] - 85:11, 92:7, 93:3, 94:2, 94:6, 94:7, 94:17, 96:9, 133:5

**upset** [1] - 115:23

**upward** [1] - 96:14

**uses** [1] - 117:14

**usual** [2] - 21:12, 99:3

## V

**vacation** [2] - 45:16, 60:24

**vague** [1] - 90:24

**valid** [1] - 125:14

**value** [4] - 5:24, 6:8, 6:10, 66:22

**variability** [1] - 101:21

**variable** [3] - 112:6, 112:14, 112:15

**variables** [2] - 161:8, 161:10

**varieties** [1] - 95:17

**variety** [2] - 94:17, 105:24

**various** [11] - 11:23, 33:12, 41:22, 76:7, 76:8, 77:13, 80:22,

82:18, 94:16, 125:11, 160:4

**vehicle** [1] - 77:12

**velocity** [16] - 88:16, 89:13, 89:21, 92:11, 100:2, 103:14, 104:11, 155:12, 161:7, 161:17, 161:24, 162:8, 165:19, 166:8

**venues** [6] - 32:21, 32:25, 33:12, 33:14, 33:15, 33:16

**veracity** [1] - 59:23

**verdict** [3] - 10:9, 10:14, 179:11

**verdicts** [1] - 179:19

**verified** [1] - 60:7

**verify** [1] - 60:5

**versus** [1] - 92:14

**vessel** [10] - 32:16, 43:11, 43:12, 43:15, 43:17, 56:4, 60:4, 60:5, 62:18

**vessels** [5] - 45:15, 46:15, 48:6, 56:5, 93:17

**video** [17] - 2:3, 2:6, 15:14, 16:15, 17:16, 23:1, 23:2, 24:24, 25:2, 26:13, 27:8, 29:22, 71:4, 71:16, 73:12, 73:15

**Video** [10] - 15:16, 15:17, 16:3, 16:4, 16:22, 16:23, 17:13, 17:14, 73:23, 73:24

**videos** [3] - 27:4, 27:5, 71:2

**view** [4] - 90:15, 90:20, 114:7, 148:1

**viewing** [1] - 19:21

**Vikram** [2] - 73:14, 73:23

**VIKRAM** [1] - 2:6

**violently** [1] - 134:3

**visit** [4] - 36:5, 36:13, 44:19, 78:16

**visited** [3] - 33:9, 36:13, 36:15

**VOIR** [2] - 2:11, 150:12

**voir** [2] - 14:3, 150:5

**Volume** [1] - 1:7

**voluminous** [1] - 15:3

**vs** [1] - 1:6

## W

**wait** [4] - 23:19, 34:9,

137:18, 142:2
**waiters** [4] - 34:9, 37:2, 45:25, 46:2
**waive** [2] - 22:11, 22:19
**Walerowicz** [5] - 9:17, 10:7, 10:9, 10:13, 19:24
**walk** [2] - 60:20, 61:4
**walked** [1] - 24:8
**walking** [2] - 154:2, 154:5
**wants** [4] - 13:4, 24:12, 57:25, 154:18
**warning** [2] - 56:3, 62:18
**Warsaw** [1] - 147:23
**watching** [2] - 14:6, 179:23
**water** [1] - 40:12
**ways** [2] - 103:21, 127:10
**weather** [27] - 24:18, 27:19, 37:15, 37:23, 37:24, 38:3, 38:19, 38:20, 39:7, 39:14, 39:17, 40:10, 41:10, 41:11, 41:24, 49:10, 53:7, 53:8, 53:9, 53:20, 64:22, 101:2, 101:10, 101:13, 102:4, 102:9, 112:14
**Weather** [1] - 102:10
**Wednesday** [1] - 54:14
**week** [1] - 178:22
**weekend** [1] - 180:7
**weeks** [1] - 178:19
**weigh** [4] - 17:3, 86:15, 128:16, 128:19
**weighed** [1] - 17:20
**weighing** [1] - 16:10
**weighs** [1] - 163:4
**weight** [24] - 13:11, 13:12, 13:14, 13:15, 17:2, 86:14, 86:24, 86:25, 87:1, 87:4, 103:22, 118:13, 128:12, 158:24, 164:14, 164:20, 164:21, 165:10, 166:23, 167:15, 168:25, 169:8, 170:19
**weightlifter** [1] - 170:17
**weird** [1] - 161:1
**welcome** [3] - 25:19, 72:13, 128:22

**West** [3] - 1:19, 79:5, 79:11
**Western** [1] - 122:8
**whereas** [1] - 78:15
**white** [2] - 25:10, 35:24
**whole** [10] - 29:8, 76:8, 77:14, 78:7, 96:25, 121:4, 121:5, 133:12, 161:14, 177:10
**wide** [2] - 20:19, 25:9
**width** [3] - 86:14, 86:17, 86:23
**Wilkerson** [20] - 11:9, 12:11, 13:11, 15:13, 15:16, 16:7, 18:1, 18:10, 20:21, 132:8, 135:19, 140:6, 140:11, 140:20, 160:5, 160:7, 163:20, 167:14, 167:16, 173:8
**WILKERSON** [1] - 2:3
**Wilkerson's** [2] - 139:25, 140:16
**wind** [58] - 22:22, 26:4, 28:6, 39:11, 39:23, 40:2, 40:6, 41:14, 41:24, 42:14, 47:9, 48:17, 50:11, 51:3, 52:21, 54:17, 56:10, 57:2, 59:12, 59:18, 61:3, 61:5, 62:1, 62:15, 63:19, 63:23, 65:6, 65:13, 65:22, 67:13, 67:19, 67:22, 68:17, 68:22, 69:1, 69:10, 70:17, 100:15, 101:1, 101:4, 101:9, 101:19, 103:15, 103:18, 103:25, 104:4, 111:4, 111:5, 112:6, 112:13, 112:14, 129:8, 159:22
**window** [6] - 60:23, 169:19, 169:25, 170:7, 170:14, 170:15
**winds** [11] - 41:9, 48:4, 48:10, 48:13, 48:15, 49:16, 56:21, 57:15, 57:21, 59:7, 69:24
**windy** [11] - 57:9, 57:16, 60:20, 61:1, 61:3, 61:4, 62:4, 62:12, 64:19, 64:24,

159:19
**wise** [1] - 49:14
**wish** [2] - 69:14, 119:9
**wishes** [1] - 82:25
**withdraw** [3] - 120:2, 122:13, 143:22
**WITNESS** [46] - 2:2, 30:25, 46:24, 62:24, 63:3, 63:22, 64:2, 64:8, 64:11, 74:10, 116:7, 133:4, 135:3, 137:23, 137:25, 138:7, 138:19, 139:4, 139:10, 139:12, 139:17, 141:10, 141:13, 141:17, 146:13, 147:22, 153:7, 153:16, 153:20, 154:12, 162:24, 164:23, 165:2, 165:7, 165:11, 165:14, 165:16, 165:24, 166:2, 166:5, 166:15, 166:18, 168:22, 171:14, 171:16, 175:22
**witness** [24] - 11:6, 11:24, 14:13, 30:23, 41:2, 42:12, 42:19, 65:10, 66:6, 66:17, 66:24, 71:2, 71:18, 72:17, 72:19, 74:1, 86:7, 93:20, 130:24, 140:20, 141:19, 141:20, 145:10, 155:24
**witness's** [1] - 34:21
**witnessed** [2] - 35:11, 35:14
**witnesses** [9] - 13:15, 44:25, 55:4, 63:8, 63:11, 64:13, 92:16, 160:4, 167:21
**witnessing** [1] - 45:21
**woman** [1] - 55:22
**wood** [4] - 169:19, 169:25, 170:13, 170:14
**word** [4] - 20:8, 91:9, 123:9, 137:25
**words** [2] - 67:15, 94:22
**worker** [3] - 23:3, 23:5, 25:6
**workers** [2] - 55:8, 55:12
**works** [12] - 19:6, 44:20, 50:22, 53:23,

59:21, 61:6, 72:4, 75:20, 148:10, 150:24, 153:11, 153:13
**world** [2] - 92:24, 148:2
**worms** [1] - 140:25
**worried** [1] - 129:5
**worry** [1] - 140:24
**would've** [2] - 36:14, 113:5
**wrap** [1] - 128:9
**wrapping** [1] - 172:23
**write** [2] - 6:24, 6:25
**write-off** [1] - 6:24
**writing** [1] - 23:15
**written** [15] - 8:25, 23:23, 27:9, 37:8, 39:8, 40:4, 56:21, 56:24, 56:25, 57:11, 63:18, 64:2, 69:4, 88:13, 115:2
**wrote** [3] - 20:25, 108:18, 157:22

## Y

**year** [3] - 32:13, 46:14, 75:25
**years** [22] - 31:13, 31:14, 31:21, 31:23, 31:24, 46:14, 75:1, 75:8, 75:13, 78:23, 79:3, 108:12, 127:21, 128:2, 128:5, 147:5, 148:7, 148:13, 149:17, 149:25, 152:11, 153:3
**years'** [2] - 12:4, 19:8
**yesterday** [7] - 7:7, 7:13, 12:3, 13:7, 14:10, 16:17, 66:18
**yourself** [8] - 74:20, 77:17, 77:19, 100:20, 146:25, 150:5, 152:2, 174:5

## Z

**Zeneti** [3] - 126:4, 127:6, 127:12
**zero** [2] - 164:15, 169:23
**Zimmer** [4] - 147:19, 147:21, 148:9, 148:17
**Zoom** [11] - 30:7, 30:9, 30:18, 141:19, 145:2, 145:11,

145:14, 145:20, 145:25, 146:20, 175:21